K2BYBRI1                        TRIAL

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                v.                          19 CR 521 (PKC)

5    PETER BRIGHT,

6                Defendant.
                                             Trial
7    ------------------------------x

8                                            New York, N.Y.
                                             February 11, 2020
9                                            10:15 a.m.

10   Before:

11
                         HON. P. KEVIN CASTEL,
12
                                             District Judge
13                                           —and a Jury—

14                       APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     BY:  ALEXANDER LI
17        TIMOTHY TURNER HOWARD
          Assistant United States Attorneys
18
     DAVID E. PATTON
19        Federal Defenders of New York, Inc.
          Attorney for Defendant
20   BY:  AMY GALLICCHIO
          ZAWADI S. BAHARANYI
21        Assistant Federal Defenders

22   Also Present:
     Elizabeth Jensen, FBI
23   Ariella Fetman, Government Paralegal
     Alondra Rayes, Defense Paralegal
24   Jason Fisher, Technical Support

25

K2BYBRI1                          TRIAL

1           (In open court; jury not present)

2           (Case called)

3           THE DEPUTY CLERK:  For the government?

4           MR. LI:  Good morning, your Honor.  Alexander Li for

5    the government.  With me is Assistant U.S. Attorney Timothy

6    Howard; Ariella Fetman, a paralegal in our office; and FBI

7    Special Agent Elizabeth Jensen.

8           THE COURT:  Good morning to you all.

9           For the defendant.

10          MS. GALLICCHIO:  Good morning, your Honor.  The

11   Federal Defenders by Amy Gallicchio on behalf of Mr. Bright.

12   Also present is Zawadi Baharanyi; Mr. Bright; and Alondra

13   Rayes, who is a paralegal with us.

14          THE COURT:  Good morning to you all.

15          Now, I understand that following the final

16   pretrial conference, there was a meet-and-confer between

17   counsel, and the parties have agreed on the excerpts from the

18   chatrooms and text messages that are coming in on the

19   government's case and that there is one open issue regarding a

20   photograph.

21          Is that correct?

22          MR. LI:  Your Honor, I believe there are two open

23   issues, one regarding a photograph, and one regarding one clip

24   from the post-arrest statement, your Honor.

25          THE COURT:  Okay.  So let's talk about the one clip

1    from the post-arrest statement.  This is the reference to the

2    17-year-old?

3            MR. LI:  Yes, your Honor.

4            THE COURT:  Tell me what the excerpt is that relates

5    to the 17-year-old that you want to get in and the defendant

6    objects to.

7            MR. LI:  Your Honor, the excerpt that we want to get

8    in -- it's a very, very short clip.  In essence, the question

9    to the defendant is whether he had ever intended to meet with

10   the 17-year-old girl who had in a separate clip informed the

11   defendant that she was turning tricks in Manhattan.

12           The defendant stated that he did have texts saying

13   that he would be happy to meet up with the 17-year-old girl in

14   the clip at issue.  And he further stated that it was possible

15   that the meeting would have been sexual.

16           THE COURT:  All right.  Ms. Gallicchio.

17           MS. GALLICCHIO:  Yes, your Honor.  Those are the very

18   things that the Court indicated it would preclude, in light of

19   the age of consent in New York.  So that clip addresses that.

20           That clip does not address at all his intention to

21   have sexual intercourse with a prostitute.  It doesn't talk

22   about a prostitute.  He says that it's possible that it would

23   have turned sexual.

24           So the government is getting in the conversation about

25   the fact that the young girl was turning tricks in Manhattan.

1    And the Court is allowing that for other purposes.  But I think

2    this clip is exactly what the Court had indicated it would

3    exclude.

4              THE COURT:  It is exactly what I said I would exclude

5    because it puts me in the very difficult position of explaining

6    to the jury that the age of consent in New York is 17.  But for

7    some purposes, it can be unlawful federal law.  Particularly we

8    talked about a photograph of a sub-18-year-old was exchanged.

9              I've allowed the interaction regarding the 17-year-old

10   to come in with regard to the limited issue of an intent to

11   refer to law enforcement, and that's it.

12             So this excerpt is out.

13             MS. GALLICCHIO:  Your Honor, just so the record is

14   clear, we did reach agreement, the parties, over the weekend.

15   I do want to make clear that our objection still stands with

16   respect to its admissibility.

17             THE COURT:  I understand, yes.  The positions you took

18   at final pretrial conference are the positions you adhere to.

19   Correct?

20             MS. GALLICCHIO:  Yes.  Thank you.

21             THE COURT:  Now, with regard to the photograph, this

22   is what I understand the bid and the ask to be:  The government

23   seeks to offer the actual photograph which was transmitted --

24   first of all, let me get this clear.

25             Who was it transmitted by and to?

1           MR. LI:  Your Honor, the defendant transmitted the

2    photograph to the undercover agent in the course of the

3    communications at issue.

4           THE COURT:  Okay.  So it relates directly to the crime

5    charged.

6           MR. LI:  That's correct, your Honor.

7           THE COURT:  As I understand it, what the government

8    has proposed -- and the defendant objects altogether on the

9    ground that any probative value of the actual photograph is

10   substantially outweighed by the danger of unfair prejudice.

11          MS. GALLICCHIO:  That's right.  Yes, your Honor.  The

12   fact that it's sent is what's relevant.

13          THE COURT:  That sounds to me to be reasonable,

14   because I believe the government can get the photograph into

15   evidence, and I don't believe the probative value is

16   substantially outweighed by the danger of unfair prejudice.

17          What I understand the government has offered to do is

18   to have that photograph in the evidentiary record.  It would be

19   offered and received into evidence.

20          But that which you published to the jury, you've

21   proposed a couple of alternatives:  One, either a thumbnail of

22   the actual picture or a slightly blurred image.

23          Is that correct?

24          MR. LI:  Your Honor, we're actually proposing to just

25   put in the chat messages which include a very small, just a few

K2BYBRI1                    TRIAL

1    millimeters by a few millimeters, thumbnail of the photograph.

2    The actual sort of enlarged photograph, which is the

3    attachment, will go to the jury, but it will not be published,

4    and it will not be part of the public --

5              THE COURT:  You're just not going to publish it at

6    all.

7              MR. LI:  That's correct, your Honor.

8              THE COURT:  The only thing that would be published is

9    the jury would see chat and the thumbnail.

10              Is that correct?

11              MR. LI:  That's correct, your Honor.

12              THE COURT:  Let me hear why that doesn't do the trick.

13              MS. GALLICCHIO:  What I understand is that the

14    government is going to send to the jury the actual not just the

15    thumbnail, the actual enlarged photograph.  So I think it sort

16    of goes to our original argument with regard to the relevance.

17              If the Court is ruling that it's admissible, then I

18    think that photograph -- we would ask for some redaction of it.

19    But the government has proposed over the weekend so that an

20    actual photograph of his genitals are not sitting in the back

21    with the jury.

22              THE COURT:  Do you have the photograph here?

23              MR. LI:  Yes, your Honor.

24              THE COURT:  If you'll hand it up for me.

25              Or is it in my binder here?

K2BYBRI1                          TRIAL

1                MR. LI:  Yes, your Honor.

2                THE COURT:  What exhibit?

3                MR. LI:  It's 3J as in Juliette, your Honor.  The

4      thumbnail we're referring to is in 3A as in alpha on page 79.

5                THE COURT:  The photo 3J, which has been marked for

6      identification, is of an erect or semi-erect penis.  Because it

7      relates specifically to the intent of this defendant in this

8      case as to the charged offense and not to 404(b) evidence or

9      the like and it's a single photograph, I don't find that the

10     nature of the photograph is such that its probative value is

11     substantially outweighed by the danger of unfair prejudice,

12     jury confusion, or waste of time.

13                So I'm going to allow the photo into evidence, but

14     it's not going to be published.  It will be with the exhibits

15     available to the jurors at the end of the case.

16                Anything else before our jurors come up?

17                MR. LI:  Nothing from the government, your Honor.

18                (Defense counsel conferred)

19                MS. GALLICCHIO:  No.  Nothing, your Honor.

20                THE COURT:  All right.  Thank you all very much.

21                (Continued on next page)

22

23

24

25

K2BYBRI1                          TRIAL

1                    (In open court; jury present)

2                    (A jury of twelve and two alternates was impaneled and

3        sworn)

4                    THE COURT:  Please be seated.

5                    Ladies and gentlemen, those of you who have patiently

6        sat in this courtroom all day, I am so appreciative of what

7        you've done.  You have served.  You are necessary to the proper

8        functioning of this process.  You may now return to the jury

9        room, with the appreciation of the Court for participating in

10       this important process.

11                   And now, ladies and gentlemen of the jury, what we're

12       going to do is we're going to take a recess, a ten-minute

13       recess, let you go into the jury room.  And Flo is going to get

14       you organized.  You're going to get nice little passes that

15       will help you get through the line in the morning.

16                   And then you're going to come back to the courtroom,

17       and we're going to begin with opening statements, first

18       proceeded by some preliminary instructions that I have to give

19       you.

20                   So as I said before, do not discuss the case among

21       yourselves or with anyone.  And when I say, "Do not discuss the

22       case," I mean, for example, if there's a witness who's

23       testifying and you go into the jury room on a recess, it's not,

24       oh, boy, what did you think of that?  Or commenting on it or

25       commenting on the performance of the lawyers.

1          Keep that to yourself until the deliberation stage of

2    the case, and when the case is all over -- it's a short

3    trial -- you'll be able to talk about it with anybody you

4    choose.  All right, ladies and gentlemen.  See you in

5    ten minutes.  And you can leave your coats in the jury room.

6          (In open court; jury not present)

7          THE COURT:  We're in recess.

8          (Recess)

9          THE COURT:  Please be seated.

10         Ladies and gentlemen, I have some preliminary

11   instructions for you.

12         The indictment in this case contains one count or

13   charge against Peter Bright.  As I told you this morning, an

14   indictment is an accusation.  It's proof of nothing.  It's

15   merely the means by which a criminal case is commenced.

16         And the defendant has denied the charge made by the

17   government and has pleaded not guilty to the indictment.  The

18   indictment charges Mr. Bright with one count of attempting to

19   entice a minor to engage in illegal sexual activity.

20         At the end of the trial, I'll provide you with

21   detailed instructions on the relevant law.  In fact, I'll give

22   it to you orally, and then I'm going to give you the typed text

23   of my instructions.  You'll also have a verdict sheet that you

24   can go through, which will help you in your deliberations.

25         The defendant denies the charge and has entered a plea

1    of not guilty.  The law presumes a defendant innocent of the

2    charge until such time, if ever, as the government proves each

3    element of the charge by proof beyond a reasonable doubt.

4            As I also told you, my job is to instruct you on the

5    law that governs or controls the case, and your duty is to

6    follow those instructions.

7            The burden of proof never shifts to the defendant in a

8    criminal case, and the law never imposes on the defendant the

9    obligation of doing anything in a criminal trial.

10           The presumption of innocence remains with the

11   defendant throughout the trial and unless and until, after

12   hearing and considering all the evidence and my final

13   instructions on the law, you as jurors are unanimously

14   convinced of defendant's guilt beyond a reasonable doubt.

15   Until it is time to deliberate at the conclusion of the case,

16   it's important that you keep an open mind.

17           You must pay close attention to all the evidence

18   presented.  Evidence consists of only the testimony of

19   witnesses, documents, and other things admitted as evidence and

20   stipulations agreed to by the parties.

21           Certain things are not evidence and must not be

22   considered by you.  I'll list them for you now:  Statements and

23   arguments by lawyers are not evidence.  Nor are my own

24   statements to you.

25           In a few moments, the lawyers will stand at that

K2BYBRI1                         TRIAL

1    podium, and they will give you a preview of what they believe

2    the evidence in this case will show.  Their preview or opening

3    statement is not itself evidence.  Nor is the closing statement

4    by the attorneys evidence.

5         In fact, questions asked by lawyers are not evidence.

6    Somebody might ask the question, isn't it a fact, sir, that you

7    were at Yankee Stadium on July 3, 2016?

8         That question means nothing about Yankee Stadium and

9    July 3, 2016.  It's the answer to the question, together with

10   the question, that makes it evidence.

11        Something else that is not evidence are objections to

12   questions.  Lawyers have an obligation to their client to make

13   an objection when they believe evidence being offered is

14   improper under the rules of evidence.

15        You should not be influenced by the objection or the

16   Court's ruling on it.  If the objection is sustained, ignore

17   the question and any answer that may have been given.  If the

18   objection is overruled, treat the answer like any other answer.

19        If you're instructed that some item of evidence is

20   admitted for a limited purpose, you must follow that

21   instruction and consider it only for that limited purpose.

22        Something else that is not evidence is any evidence or

23   testimony that is stricken after it's given.  If a witness

24   testifies to something and then later I say, ladies and

25   gentlemen, I'm striking that testimony, please disregard it,

K2BYBRI1                          TRIAL

1    then it's no longer evidence, and you may not consider it.

2              Something else that's not evidence is anything you may

3    have seen or heard outside the courtroom, and that must be

4    decided.  You're to decide the case solely on the evidence or

5    lack of evidence here in the courtroom.

6              In deciding the facts of the case, you have to decide

7    the credibility of the witnesses, how truthful and believable

8    they are.

9              Now, how do you decide what to believe and whatnot to

10   believe.  You're going to listen to the witnesses, watch them,

11   observe them, and then decide, as you would decide questions in

12   your ordinary life, did they know what they were talking about.

13   Were they candid, honest, open, and truthful.  Did they have a

14   reason to falsify, exaggerate, or distort their testimony.

15             Sometimes it's not what a witness says but how he or

16   she says it that may give you a clue as to whether or not to

17   accept that witness' version of an event or incident as

18   credible or believable.

19             In short, the way a witness testifies may play an

20   important part in your reaching a judgment as to whether you

21   can accept the witness' testimony as reliable.

22             You will use your common sense and good judgment to

23   evaluate their testimony based on all of the circumstances.  I

24   cannot emphasize too strongly that you must keep an open mind

25   until the trial is over.

1            A case can be presented only step-by-step, witness by

2    witness.  And it would be unfair to one side or the other if

3    you made up your mind before you heard all the evidence.

4            We know from experience that frequently we will hear a

5    person give his version of events which sounds most impressive

6    and even compelling.  And yet, when we hear another person's

7    version of the same events or even the same person questioned

8    about what he saw, what seemed so very compelling and

9    impressive may be completely weakened or destroyed.

10           In order to ensure that you decide this case only on

11   the evidence and that you are not influenced in any way by

12   anything that might occur outside the courtroom in your

13   presence, I must give you a specific set of instructions.

14           Do not discuss the case among yourselves or with

15   anyone else.  You heard what I said about having a little

16   mystery in your life.  This is all between us.  And when the

17   trial is over, then you can tell your loved ones, your friends

18   what went on in the courtroom.

19           You'll have a duty to discuss the case when you're in

20   deliberations.  As I mentioned to you, not discussing the case

21   means even when you go in the jury room, not commenting, not

22   rolling your eyes, not expressing anything about what you heard

23   in the courtroom.  Talk about the Mets or the Yankees or

24   Netflix or the weather.

25           Next, you're not to read anything in the newspapers or

K2BYBRI1                        TRIAL

1   elsewhere about the case.  You're not to listen or view any

2   reporting about the case, although I don't expect there will be

3   any.

4           But you're also not to conduct any research about the

5   case.  You're not to Google or otherwise search any names,

6   events, terminology, laws, legal concepts, websites that may be

7   referred to in the trial, or any matter touching in any way

8   upon the trial.

9           I want you to think, and I want you to imagine again

10   that it was a family member of yours that was involved in this

11   trial as either the prosecutor, the defense counsel, the

12   defendant, the victim, whoever it might be.

13           You would not want jurors who were doing their own

14   research because you look at something, and there may be a

15   simple explanation as to why it is, not what it seems to be.

16   And you're depriving one side or the other of the opportunity

17   to respond in court.  So don't do it.  It's a violation of your

18   oath as jurors.

19           Do not send or receive any electronic communications

20   about the case.  This includes texting, emailing, blogging,

21   Twittering, Instagramming, Facebooking, or using any other

22   electronic communications to discuss or even mention the case.

23           You may not even post that you're a juror in this

24   case.  You may not communicate with fellow jurors about the

25   case, with witnesses or parties, with no one.  You'll have a

K2BYBRI1                         TRIAL

1    chance when the case is over.

2             Now, if it becomes necessary to send the Court a note

3    about something you saw or heard, do not share the content of

4    the note.  If you come in in the morning and you see a juror

5    writing a note out to the judge, they're not being rude by not

6    sharing the content of the note with you.

7             They're following my instructions because once in a

8    while, it may be something that might require a juror to be

9    excused.  And we would not want -- I would not want -- all of

10   you to be affected by whatever that might be.

11            You're not allowed to let anybody speak to you about

12   the case.  If you're approached by anyone to speak about it,

13   politely tell them the judge has directed you not to do so.  If

14   any person seeks to contact you about the case, you're required

15   to report the incident to me promptly.  I'm sure that won't

16   happen.

17            If anyone you know comes into the courtroom -- and

18   that could happen because this is a public courtroom -- it's

19   important that you do not hear from them anything that may have

20   happened while the jury was not present.  If you see a friend

21   or relative come into court, please send me a note through the

22   clerk at your first opportunity.

23            Something else.  The attorneys, the defendant, and the

24   witnesses are instructed that they may not talk to the jury

25   outside the courtroom.  They may not even offer a friendly

1   greeting.

2              So if you happen to see any of them outside of the

3   courtroom, for example, in an elevator or coming in or out of

4   the building, they will not and should not speak to you.

5              Please do not take offense at this.  They're going to

6   act like they're a perfect stranger, and you should do the same

7   thing.  And in doing so, you'll be following my instructions.

8              I will allow the lawyers in the case to leave the

9   courtroom without announcement or interruption at any time, so

10  long as one lawyer for a party remains.  Please take no offense

11  if this occurs.  It's in compliance with my rules and may

12  actually facilitate the trial.

13             So a few words about procedure.  The lawyers will have

14  the opportunity but are not required to make opening statements

15  to you.  Again, as I said, the defendant has no burden in this

16  case and is not required to deliver an opening statement.

17             Statements, as I said, are not evidence.  And they're

18  just a preview.  After all the evidence has been received, the

19  lawyers will have an opportunity to sum up.

20             I should tell you that what happens is the government

21  will call its witnesses, they will present their direct

22  testimony, there will be an opportunity for cross-examination,

23  the defendant need not cross-examine, and then there may be

24  redirect testimony.  That's how the case proceeds through the

25  government's case.

K2BYBRI1                          TRIAL

1          Now, ladies and gentlemen, with all of that in mind, I

2     will now give each said the opportunity to make an opening

3     statement.

4          Mr. Li, you're going to give the opening statement on

5     behalf of the government?

6          MR. LI:  Yes, your Honor.

7          THE COURT:  All right.  Whenever you're ready.

8          MR. LI:  We're here today because Peter Bright, that

9     man, tried to have sex with a seven-year-old girl and

10    nine-year-old boy.  In April 2019, the defendant reached out

11    online to a person he believed to be the mother of two young

12    children.

13         He told the mother he wanted to teach her children

14    about sex.  Over hundreds of chat messages, the defendant

15    described, in graphic detail, exactly what he meant, including

16    inserting a finger in the girl, inserting a small toy in the

17    girl, and having the children play with his penis.  He asked

18    for pictures of the kids.  And he sent the mother pictures of

19    himself, his STD tests, and his penis.

20         Soon enough, the defendant made plans to meet the

21    children in person.  And so on one Wednesday afternoon, last

22    May, the defendant met the mother right here in Manhattan.

23         As they began walking to the children's home, sirens

24    blared, and the defendant was stopped and arrested.  As it

25    turned out, the mother was really an undercover FBI agent, and

1    the defendant got caught in a sting operation.  When the FBI

2    searched the defendant, they found four condoms, two in his

3    pockets and two in his wallet.

4            That's why we're here today, because the defendant

5    showed up at a meeting to have sex with two young children.

6            Ladies and gentlemen, this opening statement is the

7    government's opportunity to give you a preview of what we

8    expect to prove at trial.  I'd like to spend this time on three

9    things:

10           First, I want to explain the crime that the defendant,

11   Peter Bright, is charged with committing.  Second, I want to

12   tell you what I expect the evidence will prove.  Third, I'll

13   walk you through how the government will prove it.

14           Let me start with the crime.  The defendant is charged

15   with attempted enticement of a minor.  That is exactly what it

16   sounds like.  The defendant is charged with trying to persuade

17   a seven-year-old girl and nine-year-old boy to engage in sexual

18   activity.

19           That is a federal crime, regardless of whether the

20   defendant succeed, regardless of whether the children were

21   real, and regardless of whether he was trying to reach the

22   children through a third party, like an adult or an undercover

23   agent.

24           I'd now like to spend a few minutes on what I expect

25   the evidence will show.  Before I do that, let me just say in

K2BYBRI1                           TRIAL

1    advance that you may find some of the evidence in this trial

2    disturbing.

3          We're going to present that evidence to you because it

4    shows what the defendant said and what he did, and it's that

5    evidence that proves the defendant is actually guilty.

6          So here is what the evidence will show:  The evidence

7    will show that in April 2019, the defendant contacted an

8    undercover FBI agent on an online fetish network called KinkD.

9          The undercover agent was posing as the mother of a

10   seven-year-old girl and nine-year-old boy, and her profile said

11   she was looking to teach her kids about the birds and the bees.

12   I'll refer to the undercover agent as "the mother."

13         The defendant and the mother exchanged hundreds of

14   messages, initially over KinkD and then over another

15   application calls WhatsApp.  In those messages, the defendant

16   told the mother he wanted to teach her kids how to please

17   others and themselves.

18         He said he could train the seven-year-old girl by

19   putting a finger inside her or a tiny toy or the tip of his

20   penis.  He developed a lesson plan to teach the children about

21   the foreskin of his penis.  He sent the mother pictures of

22   himself, his STD tests, his penis, and he asked for pictures of

23   the kids.

24         In May 2019, the defendant spoke with the mother by

25   phone.  On the call, the defendant confirmed his first lesson

K2BYBRI1                          TRIAL

would be to teach the kids about his foreskin, and he suggested
they schedule weekly lessons.

          The defendant and the mother made plans for the first
lesson.  The mother told the defendant that she would meet him
outside.  When they met, the defendant showed the mother his
STD test results on his phone.

          The defendant confirmed that he was ready to meet the
kids, and he started walking with the mother to the house.
That's when the FBI arrested the defendant and found four
condoms on him.

          But there's a twist to this story.  Two days before
the meeting, the defendant told the mother that he was -- and I
quote -- "struck by the fear yesterday that I've been met by a
cop or something."

          (Continued on next page)

1          MR. LI:  And so with that fear on his mind, the

2     defendant created a cover story.  He created a way to protect

3     himself in case he got caught.  What he did was to make a

4     secret audio recording of the meeting with the mother.  Right

5     after the defendant was arrested the defendant gave the FBI his

6     cover story.  He told the FBI that he was a journalist for a

7     technology website and that he had recorded the meeting.  He

8     told the FBI that he was gathering evidence on the mother's

9     child exploitation and was planning to turnover that evidence

10    to law enforcement.  But the defendant's cover story was full

11    of holes.  The FBI asked the defendant what steps he had taken

12    to report the mother to law enforcement.  The defendant

13    admitted that he hadn't turned over the mother's phone number

14    or user name.  He hadn't turned over the hundreds of messages.

15    He didn't even tell anyone that he was meeting the mother.

16    When the FBI asked why he didn't simply report the chats, he

17    said he hadn't thought of it.  The defendant's cover story that

18    he was a journalist concerned about child exploitation had even

19    more holes.

20         When the FBI asked if he had any other communications

21    with minors, he told them that he was chatting with at

22    14-year-old girl.  He said the girl had sent him a picture

23    wearing panties and a T-shirt and she might also send him a him

24    a nude picture.  At the end of the day the evidence will show

25    that the defendant's cover story makes no sense and is just not

1    consistent with the way he acted.

2            So that's what the evidence will show, that the

3    defendant met up with someone he found online in order to have

4    sex with her children and then he created an elaborate cover

5    story to protect himself in case he got caught.

6            To prove it the government will call four witnesses.

7            First, the government will call the FBI undercover

8    agent who posed as the mother of the children.  She will walk

9    you through the chats, the phone call and the meeting with the

10   defendant.  You will see the chats and you will hear portions

11   of the call and the meeting.

12           Second, the government will call another FBI agent who

13   will testify that he led the team that arrested the defendant

14   and found the four condoms on him.  That agent will also tell

15   you that he interviewed the defendant after he was arrested.

16   You will see portions of that interview which was video

17   recorded including the portions where the defendant spun his

18   cover story.

19           Third, the government will call an investigative

20   analyst from the U.S. Attorney's Office.  The analyst will

21   testify that he reviewed the defendant's social media for

22   publishing posts about sexual activity with children.  The

23   analyst will show you what he found including a Twitter post in

24   which the defendant declared that age based rape laws, the same

25   laws he told the FBI he was trying to help enforce are, quote,

1     stupid.

2            Finally, the government will call the editor and chief

3     of a website where the defendant worked as a journalist.  The

4     editor and chief will testify that the defendant was not an

5     investigative journalist.  His job was about technology, such

6     as Microsoft and consumer technology.  The defendant had never

7     written about child exploitation and would not have been

8     allowed to write about that topic without seeking approval

9     which he never did.

10           Ladies and gentlemen, at the end of this case both

11    sides will have the opportunity to talk to you again.  Between

12    now and then you will see and hear all of the evidence.  During

13    that time I'd ask you to do three things.

14           First, pay careful attention to the evidence.

15           Second, follow the judge's instructions on the law.

16           Third, use your common sense, the same common sense

17    you use everyday and let that common sense guide your

18    interpretation of the evidence.

19           If you do those three things, you will have done your

20    duty as jurors, the defendant will get a fair trial and will

21    you come to the only verdict consistent with the evidence, that

22    the defendant, Peter Bright, is guilty as charged.

23           THE COURT:  Thank you, Mr. Li.

24           Ms. Gallicchio.

25           MS. GALLICCHIO:  Ms. Baharanyi will give the opening.

1          THE COURT:  Excellent.  Ms. Baharanyi, when every

2     you're ready.

3          MS. BAHARANYI:  Thank you.

4          Mr. Bright has no desire have sex with children.  He

5     has never had sex with children.  This case is about an

6     undercover agent and an undercover officer looking for a

7     predator who cast her net so wildly that she caught a man who

8     was innocent.  That is Mr. Bright.

9          Now, who is Mr. Bright?  Mr. Bright is a journalist.

10    He is a self-proclaimed tech nerd.  He is a husband in an open

11    and loving marriage.  And Mr. Bright is a proud member of the

12    kink community.  Now when I say "kink" that's a category for

13    nontraditional, nonconventional sexual practice between

14    consenting adults.  It can involve role play.  It can involve

15    fantasy, sometimes bondage or submission.  Mr. Bright is a big

16    fan of kink.  He likes kink.  He likes kinky sex.  You will

17    hear that today.  But he likes kinky sex with other kinky

18    consulting adults.  That's what he went looking for when he

19    went on the kink app.

20          This app you will hear is an app for people, a dating

21    app for people who are looking for fantasy for role play, for

22    bondage, dominant submission, kinky sex.  Mr. Bright went on

23    this app and he filled out their public profile.  The app asked

24    you to write a summary about yourself, say who you are, talk

25    about your kinky interests.  Mr. Bright did that.  And the app

1    asks to you select the kinky roles that you want to play.  The

2    summary, these kinky roles, they're all public on the app so

3    other people looking at your profile can see exactly what

4    you're into.  Mr. Bright selected the role of dominant.  He

5    selected the role of daddy.  He selected the role of age player

6    p.

7         Now, I'm sure many of you never heard the word

8    "age-play" or "age-player" before walking through those doors.

9    So we'll call an expert.  His name is Dr. James Cantor.  He is

10   a clinical psychologist.  He is sex a researcher and he'll

11   explain to you that age-play is role-playing.  It's acting

12   between consenting adults when one adult pretends to be a

13   different age.  Sometimes there's an adult pretending to be a

14   preteen and sometimes he is an adult pretending to be a

15   toddler.  Sometimes an adult pretending to be a baby.  These

16   adults who are pretending, who are acting, they're called

17   "littles".  And the people, the adults who role-play and act

18   with them are called "mommy" or "daddy".

19        Now, I will tell you now, all of this is sexual.  You

20   will hear a lot about Mr. Bright's sexual activities.  You will

21   hear a lot about age-play.  You may be confused by it.  You may

22   be disturbed by it.  Frankly, you may not approve of adults

23   dressing up like children and having sex with other adults.

24   And that's OK.  But whatever you think about age-play, however

25   you feel about age-play it's between consulting adults.  And

1   it's legal.

2          And when Mr. Bright messaged Princessmom, messaged the

3   undercover agent, he was messaging someone that he thought was

4   also into age-play.  Obviously, the issue is this person is

5   actually an undercover agent.  She chose the name "Princessmom"

6   on KinkD.  She created a KinkD profile.  She elected the kinky

7   role of "mommy".  She said on the app that she had been kinky

8   for two years, and that she was looking for someone who teach

9   her kids about the birds and the bees.  Princessmom, the

10  uncover, used the language of age-play.  She used the labels of

11  age-play on an app for people who are looking to age-play.  She

12  didn't go to a teen chat room.  She didn't go on social media,

13  Facebook or Instagram, the sort of places where you might

14  expect a child molester to be lurking.  Princessmom, or this

15  undercover, went on KinkD.  She went fishing for a predator on

16  an app for adults who are looking for role-play for adults who

17  are looking for fantasy, who are adults who are looking for

18  other adults.

19         Now you'll hear that Mr. Bright and Princessmom

20  messaged for days.  They used the language of age-play in their

21  messages.  And for Mr. Bright that was completely consistent

22  with other age-play conversations and other age-play in

23  relationships he'd had.

24         But after a few days Princessmom started dropping red

25  flags Princessmom.  First, there was a phone call.  Mr. Bright

K2BAABRI2                    Opening Statement – Baharanyi

1    and Princessmom had a phone conversation and you'll hear

2    Mr. Bright tell you that this conversation felt a little off

3    for an age-player and then Princessmom sent photos.  One of

4    her, a blond attractive woman in her mid 30s and two of what

5    seemed like kids.  Mr. Bright did not know what to think.

6    Before these red flags trickled in, it had never crossed his

7    mind that Princessmom was talking about real children.

8              So now Mr. Bright hoped, prayed even, Princessmom was

9    really just committed to this fantasy but he feared that

10   Princessmom was a real mother who was looking for someone to

11   molest her real children.  So decided he was going to figure

12   out what Princessmom was really up to.  He had to keep her

13   talking.  He had to keep the conversation going.  He had to

14   meet her and he had to record everything.  This way if

15   Princessmom showed up, if she is a real predator, then he would

16   have the best evidence to turn her in.  That was Mr. Bright's

17   plan.

18             So he agreed to meet Princessmom.  He went to a park

19   for the meeting.  He waited in the park and he recorded

20   everything.  You'll get to listen to this recording.  You'll

21   hear Mr. Bright wondering out loud if it's possible, if it's

22   really possible that this woman is going against every maternal

23   instinct to hurt her children.  You'll hear the amazement in

24   his voice that someone could do something so terrible, so

25   brazenly and then you'll hear Princessmom show up.

1      Now, Mr. Bright thought everything was going according

2  to plan until FBI surrounded him, placed his hands behind his

3  back and placed him under arrest.  But Mr. Bright is not a

4  predator.  The FBI got it wrong.  And you will know that they

5  got it wrong because FBI agents will get on the stand.  They'll

6  tell you that people, people who adults -- excuse me -- who

7  like to have sex with children have child pornography.  It's

8  the first thing they look for.  And the FBI has every resource

9  imaginable to uncover it.  But Mr. Bright didn't have any child

10  pornography in his possession and that's because he had has no

11  desire to have sex with children.

12      How else will you know that Mr. Bright didn't show up

13  to have sex with a seven or nine-year-old?  Because Mr. Bright

14  didn't hide anything.  You will hear that Mr. Bright used his

15  real photos, his real name, his real phone number when

16  communicating with the undercover agent.  He told her what he

17  did for work.  He told her where in Brooklyn he lived.  He

18  wasn't hiding anything.  Then when the FBI showed up and

19  arrested him, Mr. Bright gave them permission to search his

20  phones.  Gave them permission to search his computer.  Gave

21  them permission to search his entire Google account.  Now what

22  that means is his web history, his search history, every

23  e-mail, every chat, Mr. Bright turned it all over because he

24  had nothing to hide, and that's because he was doing nothing

25  wrong.

K2BAABRI2                       Jensen – Direct

1       Mr. Bright is still not hiding.  He will take that

2  stand.  He will swear an oath to tell the truth and then he

3  will share everything.  He'll talk to you about his sex life.

4  He'll talk to you about his case.  He'll tell you his plan and

5  he'll walk you through it. and then Mr. Bright will tell you

6  that when he showed up to meet Princessmom he had no desire to

7  have sex with children.

8       Mr. Bright is here today accused of something he would

9  never do and that's because the undercover, this undercover

10  officer made a mistake.  Mr. Bright has no desire to have sex

11  with children.  He has never had sex with children.  He's never

12  enticed anyone into sex.  He's innocent.  And after you've

13  heard all of the evidence in this case, after you've heard from

14  Mr. Bright himself, we will ask you to return the only just

15  verdict, not guilty.

16       THE COURT:  Thank you very much, Ms. Baharanyi.

17       The government may call its fist witness.

18       MR. LI:  Thank you, your Honor.

19       At this time, the government calls Special Agent

20  Elizabeth Jensen.

21   ELIZABETH JENSEN,

22      called as a witness by the Government,

23      having been duly sworn, testified as follows:

24  DIRECT EXAMINATION

25  BY MR. LI:

K2BAABRI2                    Jensen - Direct

1    Q.  Good morning.

2             Are you currently employed?

3    A.  I am.

4    Q.  Where do you work?

5    A.  I work at Federal Bureau of Investigation.

6    Q.  You'll understand me if I refer to that agency as the

7    "FBI"?

8    A.  I will.

9    Q.  What is your title?

10   A.  It's "special agent".

11   Q.  How long have you been a special agent with the FBI?

12   A.  Five years.

13   Q.  Are you assigned to a particular unit within the FBI?

14   A.  I am.

15   Q.  What is that unit?

16   A.  So I work crimes against children.  So we do anything

17   regarding the sexual exploitation of minors which includes

18   risky possession distribution of child pornography, sexually

19   enticement, human trafficking, international parental

20   kidnapping.

21   Q.  How long have you been investigating crimes against

22   children?

23   A.  Three years.

24   Q.  Have you ever received training in the investigation of

25   crimes against children?

```
 1   A.  I have.

 2   Q.  What sorts of training have you received?

 3   A.  We have webinars, training sessions, different academies

 4   online, in-person trainings, conferences.

 5   Q.  Is that just a portion of the training you received or is

 6   that all of it?

 7   A.  That's correct.

 8   Q.  Is it just --

 9   A.  A portion.

10   Q.  Are you familiar with the term "online undercover"?

11   A.  I am.

12   Q.  What is an online undercover?

13   A.  It is an agent acting in an undercover capacity, typically,

14   online.

15   Q.  In your capacity as special agent with the FBI, have you

16   ever operated an online undercover?

17   A.  I have.

18   Q.  Have you been trained to operate an online undercover --

19   A.  I have.

20   Q.  What sorts of training have you received -- excuse me --

21   specifically in undercover operations?

22   A.  Specifically, we went out of state, a two-week course where

23   we go over different facets of investigation, legal matters,

24   techniques issues that could arise.  We have an online platform

25   dedicated to undercover online.  We had have different
```

1    webinars.  I am surrounded by other agents also doing the same

2    work and so that gives us an opportunity to put our ideas

3    things through.

4    Q.  When you operate an online undercover account, what sort of

5    person do you pretend to be?

6    A.  Typically, I'm a mom.

7    Q.  Do you have any children?

8    A.  Typically.

9    Q.  In your online undercover capacity?

10   A.  Yes, in my undercover capacity I have a child or children.

11   Q.  Did there come a time when you operated an online

12   undercover account on an application called KinkD?

13   A.  There has.

14   Q.  What is KinkD?

15   A.  KinkD is an online social media platform geared towards

16   users with unconventional sexual desires, tastes, interests,

17   behaviors.

18   Q.  Can you describe some of those unconventional tastes and

19   behaviors?

20   A.  Sure.  The catch phrase of 'BDSM' you might have people

21   interested in golden showers, a terminology called "fisting",

22   seven -- a switch.  I can go -- different fetishes, whether

23   it's a leg fetish, a foot fetish.

24   Q.  Are those all fetishes that people talk about on KinkD?

25   A.  They talk about it and they advertise for it.

1   Q.   How long have you operated an account on KinkD?

2   A.   Almost a year.

3            MR. LI:  Ms. Fetman, could we please pull up

4   Government Exhibit One for identification only.

5            (Pause)

6   Q.   Special Agent Jensen, do you recognize this document?

7   A.   I do.

8   Q.   What is it?

9   A.   This is a screen shot of my KinkD profile.

10  Q.   Is that your undercover profile?

11  A.   That's correct.

12  Q.   Who took this screen shot?

13  A.   I did.

14  Q.   When did you take it?

15  A.   May, 2019.

16  Q.   Is this a fair and accurate reproduction of the screen shot

17  that you took?

18  A.   Yes.

19            MR. LI:  The government offers Government Exhibit One.

20            THE COURT:  Any objection?

21            MS. GALLICCHIO:  No objection.

22            THE COURT:  Received.  You may publish.

23            (Government's Exhibit One received in evidence)

24            MR. LI:  Would you please publish for jury?

25            (Pause)

1    Q.  Special Agent Jensen, when did you create a profile on

2    KinkD?

3    A.  April of 2019.

4            THE COURT:  Ladies and gentlemen, can you see the

5    exhibit?  It will show up on the back screen if it's also

6    getting towards your --

7            MR. LI:  Your Honor, it is showing on the back screen.

8            THE COURT:  But not in the jury box.

9            THE JUROR:  It say "signal out of range".

10           THE COURT:  OK.  Thank you.

11           (Pause)

12   Q.  Special Agent Jensen, did there come a time when you began

13   communicating on KinkD with someone using profile name

14   "Randomanon"?

15   A.  That's correct.

16   Q.  When did those communications begin?

17   A.  The Randomanon account contacted my account in April 2019.

18           MR. LI:  Going to jump ahead a little bit since we

19   can't pull up the next couple of exhibits.

20           Your Honor, I'm afraid I think we are going to have to

21   wait for technology.  My next set of topics all relate to the

22   exhibits.  It's very difficult to jump ahead straight to the

23   end.

24           THE COURT:  Well, you may have to do it the old

25   fashioned way.  You may publish your exhibits by distributing

1     among the jurors.

2                MR. LI:  Yes, your Honor.

3                May I have just a moment?

4                THE COURT:  Yes.

5                (Pause)

6                THE COURT:  Ladies and gentlemen, you may stand up and

7     stretch.

8                (Pause)

9                MR. LI:  Your Honor, my approach the witness?

10               THE COURT:  Yes, you may.

11               (Pause)

12               MR. LI:  May I continue?

13               THE COURT:  You may.

14    BY MR. LI:

15    Q.   Special Agent Jensen, was this an improved FBI uncover

16    account?

17    A.   Yes.

18    Q.   Was this profile information visible to other KinkD users?

19    A.   That's correct.

20    Q.   Turning your attention to Government Exhibit One.  Please

21    read the text written in the section "myself summary"?

22    A.   Looking for a teacher to teach my kids about the birds and

23    the bees.

24    Q.   What did you mean when you wrote that?

25               MS. GALLICCHIO:  Objection.

1          THE COURT:  What were you endeavoring to convey by

2    that language?

3          THE WITNESS:  I was looking for someone that's

4    interested in teaching my kids about sex.

5    Q.  Are the kids described in the sentence real people?

6    A.  No.

7    Q.  You testified a moment ago that at some point you began

8    communicating with an individual using the profile name

9    "Randomanon".  How did those communications begin?

10   A.  The Randomanon account communicated with my account asking

11   about further information about my profile.

12         MR. LI:  Ms. Fetman, could we please pull up

13   Government Exhibit 2A through 2D for identification only.  You

14   can also use hard copies if that's easier for you.

15         (Pause)

16   Q.  Special Agent Jensen, do you recognize these exhibits?

17   A.  I do.

18   Q.  What are they?

19   A.  These are screen shots of --

20         THE JUROR:  Are we supposed to be able to see this

21   right now?

22         THE COURT:  This is in evidence or no?

23         MR. LI:  No, your Honor.  This is just for

24   identification.

25         THE COURT:  So this is not yet in evidence.  So you

1   should not be able to see it.

2   A.  So these are screen shots of the KinkD communication to

3   myself and the Randomanon account.

4   Q.  Who took these screen shots?

5   A.  I did.

6   Q.  Are these fair and accurate reproductions of screen shots

7   you took?

8   A.  They are.

9        MR. LI:  The government offers Government Exhibit 2A

10  through 2D.

11       MS. GALLICCHIO:  No objection.

12       THE COURT:  Received.

13       (Government's Exhibit 2A - 2D received in evidence)

14       MR. LI:  Please publish Government Exhibit 2A for the

15  jury.

16       (Pause)

17  Q.  Special Agent Jensen, let me direct your attention to the

18  top part of the screen.  Do you see a small photograph and text

19  "Randomanon"?

20  A.  Yes.

21  Q.  Is that the account with which you were communicating?

22  A.  That's correct.

23  Q.  Let me direct your attention now to the first white text

24  bubble on the left.  Who wrote that message?

25  A.  That message came from the Randomanon account.

1    Q.  In that message does he identify himself?

2    A.  He does.

3    Q.  What is the name that uses?

4    A.  He uses "Peter".

5    Q.  Throughout this KinkD exchange, were all the messages on

6    the white bubbles on the left sent by the Randomanon account?

7    A.  That's correct.

8    Q.  Now, do you see the messages in the blue bubbles on the

9    right?

10   A.  Yes.

11   Q.  Who sent those messages?

12   A.  I did.

13   Q.  Was that using your undercover account?

14   A.  That's correct.

15   Q.  How out this KinkD exchange were all of the messages on

16   blue bubble on the right sent by you?

17   A.  Yes.

18   Q.  How does this conversation between you and Peter begin?

19   A.  The first bubble asks can you elaborate a little further on

20   your profile.

21   Q.  Was this the first message between you and Peter on KinkD?

22   A.  That's correct.

23   Q.  When did Peter send you that first message?

24   A.  April 18th at 11:29 a.m. year 2019.

25   Q.  When did you respond his message?

1   A.  May 1, 2019 at 7:40 a.m.

2   Q.  Would you please read your messages to Peter shown on the

3   screen shot?

4   A.  Hi Peter.  Sorry.  I was swamped with finals but free to

5   discuss now.  My princess is seven and Prince Charming is nine.

6   Q.  What did you mean when you wrote my "princess is seven"?

7   A.  I was referring to my purported seven-year-old daughter and

8   my purported nine --

9            MS. GALLICCHIO:  Objection.

10            THE COURT:  Basis?

11            MS. GALLICCHIO:  They speak for themselves.  What she

12   meant is not relevant.

13            THE COURT:  The question is not what you meant.  The

14   question is what did you intend to communicate back?  What were

15   the meaning of the words that you expected the receiver to

16   understand.  That's the question.

17   A.  The ages of my children.

18   Q.  What were you trying to convey when you said "my Prince

19   Charming is nine"?

20   A.  The age of my son.

21   Q.  And what is that age?

22   A.  Nine.

23            MR. LI:  Ms. Fetman, please turn to Government Exhibit

24   2B which is in evidence.

25            (Pause)

K2BAABRI2                          Jensen – Direct

1   Q.   Special Agent Jensen, would you please read Peter's first

2   two messages on the top left here?

3   A.   No worries.  I hope everything went OK.  OK.  And they need

4   educating.

5   Q.   What did you understand Peter to mean when he asked "and

6   they need educating"?

7           MS. GALLICCHIO:  Objection.

8           THE COURT:  Overruled.

9   A.   I am sure that to mean asking about educating children

10  about the birds and the bees.

11  Q.   Are the kids real?

12  A.   No.

13  Q.   Did there come a time when you and Peter moved your

14  conversation off KinkD and onto another platform?

15  A.   We did.

16  Q.   What platform did you use?

17  A.   We ended up moving over to What's App.

18  Q.   What is What's App?

19  A.   It is an online application where users can send messages,

20  pictures, video back and forth.  It's encrypted.

21  Q.   Are messages on What's App transmitted over the internet?

22  A.   That's correct.

23  Q.   How does a user access What's App?

24  A.   Go into the App Store.  You download What's App.  And then

25  you can find other users based on the telephone users.

K2BAABRI2                          Jensen - Direct

1   Q.   And what kind of device does one typically access What's

2   App using?

3   A.   Typically, a cellphone.

4        MR. LI:   Ms. Fetman, please turn to Government Exhibit

5   2D which is in evidence.

6   Q.   Special Agent Jensen, could you please read Peter's final

7   message on the bottom left here?

8   A.   OK.   My What's App number is (832)907-8710.

9   Q.   Did you communicate with Peter using that telephone number

10  on What's App?

11  A.   That's correct.

12  Q.   Special Agent Jensen, let me direct your attention now to

13  what's been marked in your binder as Government Exhibit 3A

14  through 3O.

15       Do you recognize these exhibits?

16  A.   I do.

17  Q.   What are they?

18  A.   This is an extraction of the communications between myself

19  and the (832)907-0710 telephone number.

20  Q.   When you say "communications" what kind of communications

21  are referring to?

22  A.   Text messages.

23  Q.   Are they using the What's App application?

24  A.   That's correct.

25  Q.   Are there any redactions in the chats?

1   A.  There are.

2           THE COURT:  Ladies and gentlemen, a redaction is the

3   covering or removal of material which is not relevant to this

4   case.  And it's appropriate that the parties under the court

5   supervision to make redactions.

6           All right.  Go ahead.

7   Q.  In addition to the actual text messages communicated

8   between you and Peter, does Government Exhibit 3A and 3O also

9   include attachments?

10  A.  They do.

11  Q.  Are some of these attachments also redacted?

12  A.  They are.

13  Q.  Other than redactions, are the extracted What's App chats

14  and attachments in Government Exhibit 3A through 3O a fair and

15  accurate representation of chats and photos that you exchanged

16  with Peter?

17  A.  That's correct.

18  Q.  How do you know that?

19  A.  I reviewed them.  I wrote them, my initials are on here.

20          MR. LI:  The government offers Government Exhibit 3A

21  through 3O.

22          MS. GALLICCHIO:  Your Honor, we have no objection with

23  exception to 3J which we've previously objected to.

24          THE COURT:  All right.  Subject to that objection

25  which is overruled, the exhibits are all received.

1          (Government's Exhibit 3J received in evidence)

2          MR. LI:  Ms. Fetman, please publish Government Exhibit

3     3A for the jury.

4          (Pause)

5     Q.  Special Agent Jensen, what is this?

6     A.  This is the beginning of the What's App communications

7     between myself and the 832 telephone number.

8     Q.  You referred earlier to an "extraction".  What is an

9     extraction?

10    A.  So what we have the undercover cellphone.  We take a

11    systems file extraction from the cellphone and this an

12    extraction from that report.

13    Q.  Does the extraction contain the chats that you exchanged

14    with Peter?

15    A.  Yes.

16    Q.  Let me direct your attention to the participant section at

17    top of the page.  Do you see a small photograph and then the

18    text 1-832-907-0710?

19    A.  I do.

20    Q.  Is the number (832)907-0710 the same phone number that

21    Randomanon provided you on KinkD?

22    A.  That's correct.

23    Q.  Do you see a small photograph under the participant's box

24    next to the number we just described?

25    A.  I do.

1    Q.   Is that the profile picture corresponding to the 0710

2    account?

3    A.   That's correct.

4    Q.   Who sets the profile picture for a What's App account?

5    A.   The user of the account.

6           MR. LI:  Ms. Fetman, please publish Government Exhibit

7    3B which is in evidence side-by-side with 3A.

8           (Pause)

9    Q.   Special Agent Jensen, what is Government Exhibit 3B?

10   A.   It's a bigger photo of the smaller photo in the What's App

11   chats.

12          MR. LI:  We can pull down 3B.  Thank you much.

13          With the permission of the Court I'll now read

14   Government Exhibit 101 which is a stipulation between the

15   parties.

16          THE COURT:  All right.  Ladies and gentlemen, a

17   stipulation --

18          This is a stipulation of fact, Mr. Li?

19          MR. LI:  Yes, your Honor.

20          THE COURT:  All right.  A stipulation of fact is an

21   agreement by the parties that a certain fact is true and you

22   must accept that that fact has been established.  However, the

23   weight, if any, to give to that fact is entirely up to you,

24   ladies and gentlemen, as jurors.

25          You may proceed.

1          MR. LI:  It is hereby stipulated and agreed by an

2    between the United States of America, by Jeffrey S. Berman,

3    United States Attorney for the Southern District of New York,

4    Alexander Li and Timothy Howard, Assistant United States

5    Attorneys, of counsel, and Peter Bright, by and through his

6    counsel, Amy Gallicchio Esquire and Zawadi Baharanyi, Esquire,

7    as follows:

8          One, records from the cellular telephone provider

9    T-Mobile U.S. Incorporated indicates that between at least May

10   1, 2019 and May 21, 2019, the customer name associated with the

11   telephone number (832)907-0710, was Peter Bright.

12         It is further stipulated and agreed that this

13   stipulation, Government Exhibit 101, is admissible as a

14   Government Exhibit at trial.

15         The government offers Government Exhibit 101.

16         MS. GALLICCHIO:  No objection.

17         THE COURT:  Received.

18         (Government's Exhibit 101 received in evidence)

19         MR. LI:  We can take that down now.  Thank you.

20   Q.  Special Agent Jensen, in the course of your investigation,

21   did you come to meet Peter Bright in person?

22   A.  I did.

23   Q.  Was the person you met also the same person pictured in

24   Government Exhibit 3B?

25   A.  That's correct.

K2BAABRI2                          Jensen - Direct

1   Q.  Do you see that same person here in the courtroom today?

2              THE COURT:  You can stand up if you'd like.

3   A.  I do.

4   Q.  Could you please identify that person by location and an

5   article of clothing?

6   A.  He is sitting in the second table with the white shirt and

7   a gray jacket.

8              MS. GALLICCHIO:  Identified the defendant, your Honor.

9              THE COURT:  Identification noted.

10  Q.  Turning your attention now to Government Exhibit 3A,

11  Special Agent Jensen, do you see the second blue bubble on the

12  left which is dated May 14, 2019 at 8:12 p.m.?

13  A.  I do.

14  Q.  What does that message say?

15  A.  Hi there.  I am from KinkD.

16  Q.  Above the text of that message, do you see the small title

17  1-832-907-0710 and it goes on; do you see that?

18  A.  I do.

19  Q.  Turning now to the right-hand side of the page, do you see

20  a text bubble in green?

21  A.  I do.

22  Q.  What does that message say?

23  A.  Hey, there.

24  Q.  Who sent that message?

25  A.  I did.

K2BAABRI2                     Jensen - Direct

```
 1   Q.  Throughout the What's App exchange, were all of the text
 2   messages in green bubble sent by you?
 3   A.  That's correct.
 4   Q.  Let me turn your attention to the redacted black box above
 5   the text "hey, there".  What has been redacted?
 6   A.  My undercover cellphone and my user name.
 7             THE COURT:  An undercover cellphone telephone number?
 8             THE WITNESS:  That's correct.
 9             THE COURT:  Thank you.
10             MR. LI:  Ms. Fetman, if we could -- thank you.
11   Q.  Turning your attention to the top part of the page under
12   the section "participants", do you see two redacted black
13   boxes?
14   A.  I do.
15   Q.  What's been redacted there?
16   A.  My undercover cellphone telephone number and the name of
17   the account, undercover account.
18             MR. LI:  Let's turn back to Government Exhibit 3A.
19   Could we blow up the second blue message again.
20             (Pause)
21   Q.  Special Agent Jensen, throughout this What's App exchange
22   were all of blue bubbles on the left contained at line
23   1-832-907-0710 sent by Peter?
24   A.  Yes.
25             MR. LI:  Ms. Fetman, let's turn to page two please.
```

K2BAABRI2                      Jensen - Direct

1          So going forward, Special Agent Jensen, I'll read the

2    text in the blue boxes and if you could please read the text in

3    the green boxes and we'll start with the last blue bubble on

4    the left which is dated May 15, 2019 at 10:40 a.m. I'll begin.

5    "Q.  So I'd love to hear more about what you're doing?

6    "A.  We used to have a very hands-on patient teacher who taught

7    them how to please and be pleased but he left and now we're

8    back to square one.

9          MR. LI:  Could we actually go back, Ms. Fetman.

10         (Pause)

11         MR. LI:  Let's proceed.

12   "Q.  Page ten -- on page three?

13   "A.  You have any teaching experience?

14   "Q.  A little, yes.  Teaching girls about the changes their

15   bodies go through, that kind of thing.  Helping them learn how

16   to use their bodies or those of other people.

17   "A.  Him, we may be looking for different things.

18   "Q.  I think teaching them how to please and be pleased is very

19   much the same kind of thing.  That's what I mean by "using

20   their bodies".

21         MS. GALLICCHIO:  Your Honor, I have an objection.

22         THE COURT:  Basis?

23         MS. GALLICCHIO:  With respect to this process.  It's

24   not a question and answer.

25         THE COURT:  No.  The exhibit is in evidence, correct?

1           MR. LI:  Yes, your Honor.

2           THE COURT:  All right.  A party is free to read from

3    an exhibit in evidence and of course, you are entitled to

4    cross-examine.

5           Go ahead.

6           MR. LI:  Let's continue reading please.

7    "A.  Oh, then, yes, we may be on the same page.  I really want

8    my little princess to learn how to be a good girl and

9    understand how to feel good.

10   "Q.  To teach her how best to pleasure boys and how to get

11   herself off.  That kind of thing sounds very much like what

12   I've done before and am looking to do.

13          MR. LI:  Let's stop there.

14          Ms. Fetman, let's turn to page eight please.

15   Q.  Special Agent Jensen, if you could please read the green

16   boxes starting with the second to last one on the right which

17   is dated May 28, 2019 at 11"31 a.m. and I'll continue reading

18   the blue box on the left if you could please begin.

19   "A.  When did you last teach a little girl?  I don't want just

20   anyone teaching them.

21   "Q.  I have a girl I have been teach teaching off and on for a

22   couple of months now.  But she's in the Bronx which makes the

23   logistics much harder.

24   "A.  As old as my princess?

25   "Q.  A bit older.  11.

K2BAABRI2                      Jensen - Direct

1    "A.  Oh, OK.  A little bit.  What are you good at teaching?  We

2    have started the basics with Kayla.

3              MR. LI:  Let's stop there.

4    Q.  Special Agent Jensen, who is Kayla?

5    A.  Kayla is my purported seven-year-old daughter.

6    Q.  Is she a real person?

7    A.  No.

8    Q.  And you mentioned a second ago that she was purported to be

9    seven-years-old.  Did you tell Peter her age?

10   A.  That's correct.

11   Q.  What was the name of your purported son?

12   A.  "Braden".

13   Q.  What was his purported age?

14   A.  Nine.

15   Q.  Did you tell Peter his purported age?

16   A.  I did.

17             MR. LI:  Let's continue reading where we left off and

18   now we're on page ten.

19             I am going to pick up with Peter's message on May 15,

20   2019 at 11"37 a.m.

21   "Q.  I think masturbation and anal sex are probably my favor

22   subjects.  Helping girls find their special places to touch.

23   It's very rewarding.

24             Special Agent Jensen, what did you understand Peter to

25   mean when he said "helping girls find their special places to

1    touch.  It's very rewarding"?

2              MS. GALLICCHIO:  Objection.

3              THE COURT:  That was something you wrote or that was

4    something that was written to you?

5              THE WITNESS:  Correct, the latter.

6              THE COURT:  The latter.  All right.

7              What did you understand the words to mean when you

8    received that?

9              THE WITNESS:  I understood them to refer to a vagina,

10   anus, breasts.

11             THE COURT:  All right.  Next question.

12             MR. LI:  Ms. Fetman, please turn to page 11, please.

13   Q.  Let's continue reading, Special Agent Jensen, if you could

14   please begin with the second to last green box on the left

15   which is dated May 15, 2019 at 11:48 a.m.?

16   "A.  You teach boys too about anal?  You definitely need a

17   lesson in preparation LOL.

18   "Q.  So learning about lube, getting the anus more relaxed and

19   open.  This is so important?

20   "A.  How did the 11-year-old like anal?  Were you a good

21   teacher?

22   "Q.  I think boys need to be taught about it because I've heard

23   so many horror stories from girls about educated boys.  We're

24   still going slow on that front, getting them comfortable with

25   touching that part, explore it with her fingers.

1    "A.  Yeah.  They rip the inside and just force it in.

2    "Q.  Yeah and it puts girls off it for life.  Such a waste.

3           MR. LI:  Let's stop there.

4           Ms. Fetman, let's turn to page 14 please.

5    Q.  Special Agent Jensen, if you could begin with the last

6    green box on the right which is dated May 15, 2019 at

7    11:55 a.m.

8    "A.  How do you teach?

9    "Q.  In the past it's been one-on-one in a bedroom setting.  I

10   do find the idea of teaching two together is very exciting.

11   "A.  Would that be too much for you?

12   "Q.  I don't think so.

13   "A.  Our last teacher was experienced.

14          MR. LI:  Let's stop there.

15          Ms. Fetman, let's turn to page 18 please.

16   Q.  Special Agent Jensen, do you see the first blue bubble to

17   the left which is dated May 15, 2019 at 12:14 p.m.?

18   A.  I do.

19   Q.  What is the content of that message?

20   A.  It is a screen shot of an STD test.

21          MR. LI:  Ms. Fetman, let's pull up Government Exhibit

22   3O please, which is in evidence and let's put it side-by-side.

23          (Pause)

24   Q.  Special Agent Jensen, what is Government Exhibit 3O?

25   A.  It's a screen shot of the STD test that Peter sent.

1    Q.  It has personal information on listed which has been

2    redacted?

3    A.  That's correct.

4    Q.  Other than the redactions, is Government Exhibit 3O the

5    same image that Peter sent you in the What's App chat?

6    A.  Yes.

7              MR. LI:  Ms. Fetman, let's take down Government

8    Exhibit 3O please and replace it with Government Exhibit 3

9    which was also in evidence.

10   Q.  Special Agent Jensen, what is Government Exhibit 3I?

11   A.  It's a second screen shot that Peter sent regarding the HIV

12   testing.

13   Q.  Has the personal information on the image been redacted?

14   A.  It has.

15   Q.  Other than the redactions, is Government Exhibit 3I another

16   image that Peter sent you in the What's App chat?

17   A.  That's correct.

18   Q.  Did Peter ask you -- excuse me -- did you ask Peter to send

19   these STD tests?

20   A.  I did.

21   Q.  Why did you ask Peter to send you STD tests?

22   A.  Two reasons.  One, as undercover mom I wanted a safe and

23   clean person.  And then two, it's another overt act that

24   someone has to take to show interest in having sex with the

25   kids.

1          MR. LI:  Ms. Fetman, let's take down Government

2    Exhibit 3I please.  Going back to Government Exhibit 3A the

3    chats let's turn to page 32.

4    Q.  Special Agent Jensen, do you see the first blue bubble to

5    the left which is dated May 16, 2019 at 12:14 p.m.?

6    A.  I do.

7    Q.  What is this?

8    A.  This is a photo Peter sent of himself.

9          MR. LI:  Ms. Fetman, let's pull up Government Exhibit

10   3H please which is in evidence and put it side-by-side.

11          (Pause)

12   Q.  Special Agent Jensen, is this the same picture that Peter

13   sent you in the What's App chat?

14   A.  That's correct.

15          MR. LI:  We can take down Government Exhibit 3H.

16   Q.  Special Agent Jensen, could you please read the last green

17   bubble on the right which is dated May 16, 2019 at 12:23 p.m.?

18   A.  You are not old.  How old are you?

19   Q.  What does Peter respond?

20   A.  Thirty-eight.

21          MR. LI:  Ms. Fetman, let's continue to page 46 please.

22   Q.  Special Agent Jensen, let's continue reading beginning with

23   the second green chat bubble to the right which is dated

24   May 16, 2019 at 3:48 p.m.?

25   "A.  Have you thought about what kind of lesson you would like

K2BAABRI2                    Jensen - Direct

1  to start with?  Anything excite you?

2  "Q.  Really depends on their experience but I am thinking maybe

3  something involving foreskin is the way to start.

4          MR. LI:  Let's stop there.

5  Q.  Special Agent Jensen, whose foreskin did you understand

6  Peter to be referring to?

7  A.  His own.

8          MR. LI:  Continue reading.

9  "Q.  I'm not on Peter's message at May 16, 2019 at 3:51 p.m.

10  Because it's still kind of on your shoulder here.

11  "A.  Yeah.  I think it's rare.  Yeah, I think it is kind of

12  rare here.  Does the other girl you teach like it?

13  "Q.  Yes.  In fact, every American I have been with except one

14  enjoyed it.  But the one we were back at her place we got naked

15  and she said no because I wasn't circumcised.  Much eye rolling

16  there.

17  "A.  Wow.  Really?  Why did see say no?

18  "Q.  She thought it looked wrong.  Had never seen one before.

19  "A.  What a bitch, LOL.

20  "Q.  Yeah.  It was pretty ridiculous?

21  "A.  Kayla and Braden will be delighted to be taught about it.

22  They're inquisitive and good students.  LOL.

23  "Q.  Cool.  Let them handle it.  See how it pulls back et

24  cetera.

25          MR. LI:  Let's stop there.

1              Ms. Fetman, let's take down Government's Exhibit 3A

2     for now.

3     Q.   Special Agent Jensen, did there come a time when you and

4     Peter arranged a telephone call?

5     A.   That's correct.

6     Q.   When was that call?

7     A.   That was on Friday, May 17, 2019.

8     Q.   Was the telephone call recorded?

9     A.   It was.

10    Q.   Who reported it?

11    A.   I did.

12              MR. LI:  Your Honor, may I approach the witness?

13              THE COURT:  You may.

14              (Pause)

15    Q.   Special Agent Jensen, I just handed you a disk that's been

16    marked for identification as Government Exhibit Five.  Do you

17    recognize this disk?

18    A.   I do.

19    Q.   What is it?

20    A.   It's a disk of the excerpts from cellphone undercover call.

21    Q.   Is that the recorded call you just described with Peter?

22    A.   That's correct.

23    Q.   How do you know those are its contents?

24    A.   I listened to and my initials are on the disk.

25    Q.   Based on your review, are the clips on the disk true and

K2BAABRI2                          Jensen - Direct

1    accurate excerpts from your recorded telephone call with Peter?
2    A.   They are.
3          MR. LI:   The government offers Government Exhibit Five
4    and the exhibits that are on it which are marked Government
5    Exhibit 5A through 5D.
6          MS. GALLICCHIO:   No objection.
7          THE COURT:   All right.   Received.
8          (Government's Exhibits 5A - 5D received in evidence)
9          THE COURT:   Ladies and gentlemen, unaccustomed as I am
10   to ending early -- it's two minutes to five -- I'm going to
11   give us all a holiday by breaking at this juncture.   I feel
12   like I've known you forever and I am sure you feel like you've
13   been in this courtroom forever but you have really been patient
14   people.   It's been a long day.   It's new circumstances for
15   everybody.
16         Please have a restful evening.   Put the case out of
17   your mind.   Remember, do not discuss the case among yourselves
18   or with anyone.   No looking things up online or Googling, not
19   even the lawyers or the judge or anyone.   You'll have plenty of
20   time to do a after the trial is over.
21         Please be here so that we can get a ten o'clock sharp
22   start.   We can't start without all of you.   So that means
23   getting here early, not getting at the front door at ten
24   o'clock.   Getting at the front door at ten to, quarter to and
25   being ready for action at ten o'clock.   And I will do my best

K2BAABRI2                          Jensen – Direct

1   on my end to move this case to an appropriate and fair

2   conclusion in a timely fashion.

3              See you tomorrow morning.

4              (Jury not present)

5              THE COURT:  All right.  Please be seated.

6              What I'm going to do is, I know you all have work to

7   do but I am going to ask that by Wednesday night –- well,

8   actually, let me make it Thursday morning open of court, you

9   will have filed online any comments that you have on the jury

10  instructions which have been marked as Court Exhibit Two and

11  were distributed earlier today.  All right?

12             See you tomorrow morning.  Thank you very much.

13             (Adjourned to February 12, 2020 at ten a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          INDEX OF EXAMINATION

 2   Examination of:                              Page

 3   ELIZABETH JENSEN

 4   Direct By Mr. Li . . . . . . . . . . . . . . .30

 5                         GOVERNMENT EXHIBITS

 6   Exhibit No.                                Received

 7    One   . . . . . . . . . . . . . . . . . . .34

 8    2A - 2D   . . . . . . . . . . . . . . . . .38

 9    3J    . . . . . . . . . . . . . . . . . . .44

10    101   . . . . . . . . . . . . . . . . . . .46

11    5A - 5D   . . . . . . . . . . . . . . . . .58

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```