K2CYBRIT                    TRIAL (CORRECTED 2-14-20)

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          19 CR 521 (PKC)

5   PETER BRIGHT,

6              Defendant.
                                          Trial
7   ------------------------------x

8                                         New York, N.Y.
                                          February 12, 2020
9                                         10:20 a.m.

10  Before:

11
                     HON. P. KEVIN CASTEL,
12
                                          District Judge
13                                        -and a Jury-

14                        APPEARANCES

15  GEOFFREY S. BERMAN
         United States Attorney for the
16       Southern District of New York
    BY:  ALEXANDER LI
17       TIMOTHY TURNER HOWARD
         Assistant United States Attorneys
18
    DAVID E. PATTON
19       Federal Defenders of New York, Inc.
         Attorney for Defendant
20  BY:  AMY GALLICCHIO
         ZAWADI S. BAHARANYI
21       Assistant Federal Defenders

22  Also Present:
    Elizabeth Jensen, FBI
23  Ariella Fetman, Government Paralegal
    Alondra Rayes, Defense Paralegal
24  Jason Fisher, Technical Support

25

K2CYBRI1                    Jensen - Direct

1              (Trial resumed)

2              (In open court; jury not present)

3              THE COURT:  Please remain standing for our jury.  Good

4    morning.

5              Yes.  If you'll come up and take the stand.  Thank

6    you.

7              (In open court; jury present)

8              THE COURT:  All right.  Ladies and gentlemen, please

9    be seated.

10             You may be seated as well.  Good morning.  I hope you

11   had a good evening.  We're well rested, and we're back in

12   action.

13             Without further ado, the Court reminds

14   Special Agent Jensen that she is still under oath.

15             Mr. Lee, you may continue.

16    ELIZABETH JENSEN, resumed.

17        called as a witness by the Government,

18        having previously been duly sworn, testified as follows:

19   DIRECT EXAMINATION (Cont'd)

20   BY MR. LI:

21   Q.  Good morning, Special Agent Jensen.

22   A.  Good morning.

23   Q.  Do you remember testifying yesterday about your recorded

24   telephone conversation with Peter?

25   A.  I do.

1          MR. LI:  Ms. Fetman, could we please pull up for

2     identification only Government Exhibit 5T.

3     Q.  Special Agent Jensen, do you recognize this exhibit?

4     A.  I do.

5     Q.  What is it?

6     A.  It's a transcript.

7     Q.  What is the transcript of?

8     A.  Of excerpts from the recorded telephone conversation.

9     Q.  Is it a fair and accurate transcript of the clips in

10    Government Exhibit 5?

11    A.  That's correct.

12          MR. LI:  The government offers Government Exhibit 5T

13    as an aid for the jury.

14          MS. GALLICCHIO:  No objection.

15          THE COURT:  All right.  Ladies and gentlemen,

16    Government Exhibit 5T is admitted.

17          (Government's Exhibit 5T received in evidence)

18          THE COURT:  I will explain the use of this.  You may

19    find the transcript of a recording to be helpful to you in

20    listening to that recording.

21          If, however, you hear something different than what

22    appears on the transcript, it's what you hear that controls

23    over the transcript.  The transcript is just there to help you

24    in listening.

25          So if there is something in the transcript that you

K2CYBRI1                        Jensen - Direct

1    don't hear on the tape or you hear something else on the tape,

2    that's what controls.  But it's an aid.  That's all.

3            Please go ahead.

4            MR. LI:  Ms. Fetman, please publish Government Exhibit

5    5T for the jury, and please play Government Exhibit 5A which is

6    in evidence.

7            (Audio played)

8            THE COURT:  You don't have something up on your

9    screen?  Okay.  Let's see whether can get that fixed.  I was

10   hoping we had that completely fixed overnight.  There may be a

11   button that needs to be pushed on somebody's unit.  No.

12   There's no button to be pushed on anybody's unit.

13           MR. LI:  It is showing on the back screen.  I'm not

14   sure if that makes a difference.

15           THE COURT:  Before we had technology, a lawyer would

16   have had copies of the transcript and would have come to court

17   with the copies.  And then we would not have had a slowdown.

18   Sometimes paper works better.

19           (Pause)

20           THE COURT:  There is something else you can do.  I

21   don't know whether this will also suffer from the same

22   infirmity, but there's an Elmo inside of that podium, sir.

23   There's a drawer.  If we can put the transcript up on that,

24   maybe that will come up on the screen.

25           Can you see that?  No.  Nothing.  Now let's try it one

K2CYBRI1                    Jensen - Direct

1    more time with the transcript that you had.  Maybe it was

2    whatever has fixed itself.

3              If you can switch it back to the electronic transcript

4    there.

5              JUROR:  We had it for a split second.

6              THE COURT:  Just wait.  Let's see.

7              JUROR:  It's changing though.  Something is happening.

8    Then you just did something, and we can see something

9    happening, and it's just dark.

10             THE COURT:  Thank you very much.

11             Go ahead, Mr. Li.

12             MR. LI:  All right.  Ms. Fetman, if we could restart

13   Government Exhibit 5A, please.

14             (Audio played)

15             MR. LI:  Ms. Fetman, please play Government Exhibit

16   5B.

17             (Audio played)

18             MR. LI:  Ms. Fetman, please play Government Exhibit

19   5C.

20             (Audio played)

21             MR. LI:  Ms. Fetman, please play Government Exhibit

22   5D.

23             (Audio played)

24   BY MR. LI:

25   Q.  Special Agent Jensen, are you the woman on that call?

K2CYBRI1                    Jensen - Direct

1    A.   That's correct.

2    Q.   What is the video that's being shown on these clips that we

3    just saw?

4    A.   At the time of the call, all I had was my bureau-issued

5    cellphone.  So I just took an audio recording while on my

6    covert cell phone.

7    Q.   Special Agent Jensen --

8              THE COURT:  You took a video recording which picked up

9    the audio?

10             THE WITNESS:  That's correct.

11             THE COURT:  Thank you.

12             MR. LI:  Ms. Fetman, we can pull down Government

13   Exhibit 5D.  Thank you.

14   Q.   Special Agent Jensen, after your phone call with Peter on

15   May 17, 2019, did you continue to communicate with each other?

16   A.   I did.

17   Q.   Did you communicate on WhatsApp?

18   A.   That's correct.

19             MR. LI:  Ms. Fetman, please pull up Government Exhibit

20   3A again, which is in evidence.

21             Please turn to page 57.

22   Q.   Special Agent Jensen, can you read the first green chat

23   message on the right which is dated May 17, 2019, at 4:13 p.m.

24   I'll read the blue chat message on the left.

25   A.   "Great chatting with you."

K2CYBRI1                    Jensen - Direct

1    Q.   "And you."

2             What chat were you referring to in this exchange?

3    A.   I was referring to the telephone call we just had.

4    Q.   Is that the same telephone call that we just played for the

5    jury?

6    A.   That's correct.

7             MR. LI:   Ms. Fetman, let's turn to page 61, please.

8    Q.   I'll pick up with the last blue chat message on the left

9    which is dated May 17, 2019, at 5:23 p.m.

10            Special Agent, Jensen, if you could continue reading

11   just with the green bubbles on the right starting with the

12   left:  "Do you want the lessons to be hetero normative?"

13   A.   "Sorry for my ignorance.  What do you mean by that?  As

14   opposed to what?"

15   Q.   "Does Kayla eat flowers and Braydon suck snakes?"

16   A.   "Yes.  Kayla licks mommy and Braydon sucks snakes."

17   Q.   Special Agent Jensen, what did you understand "flowers" to

18   mean in this conversation?

19   A.   I was referring to a vagina.

20   Q.   What did you understand "snakes" to mean in this

21   conversation?

22            THE COURT:   The witness can testify as to what she

23   understood from the words.  What she understood from the words

24   doesn't necessarily mean what the person who uttered them or

25   wrote them meant, but a witness is allowed to testify as to

1   what they understood the words to mean.  And you'll take that

2   for what it's worth.

3            Go ahead.

4   BY MR. LI:

5   Q.  Special Agent Jensen, what did you understand "snakes" to

6   mean in this conversation?

7   A.  Referring to a penis.

8            MR. LI:  Ms. Fetman, let's turn to page 68, please.

9   Q.  Let's continue reading, beginning with the last green chat

10  message on the right which is dated May 17, 2019, at 6:42 p.m.

11  If you could, please, begin.

12  A.  "I'm wondering how you teach her how to pleasure herself

13  and you."

14  Q.  "Some girls at a very early age discover that it feels good

15  to rub certain bits.  But otherwise, help her to discover that

16  herself, touching or vibrating her clit, putting a finger

17  inside or maybe a very tiny toy, how to hold my snake, showing

18  her where the most sensitive parts of it are, the parts that

19  feel best to lick or rub, how to take it in her hand and the

20  kinds of motion that feel good."

21  A.  "Yes.  Helping her discover all the best parts are super

22  important and can be tricky to master."

23  Q.  "Yes.  Gentle touching and teasing.  Is Kayla virgin?"

24  A.  "She has had the tip inside but not the whole cock."

25  Q.  "Okay."

K2CYBRI1                    Jensen - Direct

1    A.  "Does that excite you lol?"

2    Q.  "Yes, but I think the tip might be all I can manage."

3           Let's stop there.

4           Ms. Fetman, let's turn to page 74, please.

5    Q.  Special Agent Jensen, do you see the second green bubble to

6    the right which is dated May 19, 2019, at 5:25 p.m.?

7    A.  I do.

8    Q.  What is the content of that message?

9    A.  That is a photo of me, and it says:  "Lol.  Me at work."

10   Q.  And that text you just described -- what is that text?

11   A.  I'm sorry?

12   Q.  The text you just described, "Lol.  Me at work" -- where do

13   you see that?

14   A.  Underneath the photo.

15          MR. LI:  Ms. Fetman, could we please pull up

16   Government Exhibit 3M, please.

17   Q.  Special Agent Jensen, what is Government Exhibit 3M?

18   A.  That's a photo that I sent.

19   Q.  Is this the same picture that you sent Peter on the

20   WhatsApp chat?

21   A.  That's correct.

22   Q.  Why did you send Peter a picture of yourself?

23   A.  He asked:  "I'd still love to get a picture of you all."

24   Q.  Did Peter also request any pictures of the purported

25   children?

K2CYBRI1                          Jensen - Direct

1    A.   That's correct.

2    Q.   Did you send Peter any pictures of the purported children?

3    A.   I did.

4              MR. LI:  Ms. Fetman, let's take down Government

5    Exhibit 3M.  Let's turn to page 75, please, on Government

6    Exhibit 3A.

7    Q.   Special Agent Jensen, do you see the two small photographs

8    on this page to the right?

9    A.   I do.

10   Q.   Are these the pictures that you sent to Peter of the

11   purported children?

12   A.   That's correct.

13   Q.   Are these the first pictures that you sent Peter of the

14   purported children?

15   A.   Also correct.

16   Q.   Were the children wearing clothes?

17   A.   Yes.

18   Q.   Can you see the faces of the children?

19   A.   I cannot.

20   Q.   Where did you obtain the pictures of the children?

21   A.   So we have stock photos approved by the bureau.  Once we

22   get supervisor permission, we're allowed to use them.

23             MR. LI:  Ms. Fetman, please turn to page 76, please.

24   If were could focus in on that first green chat bubble on the

25   right.

1    Q.  Special Agent Jensen, what is this?

2    A.  That's another photo that I sent.

3    Q.  What's the time stamp on this?

4    A.  On May 19, 2019, at 5:30:10 p.m.

5    Q.  What is the caption on this?

6    A.  It says:  "Here's one before play time."

7    Q.  What's the content of this message?

8    A.  A photo of my face between her upper thigh.

9    Q.  When you say "her thigh," who are you referring to?

10   A.  My purported seven-year-old daughter.

11   Q.  After you sent this photograph, how long did it take for

12   Peter to respond?

13   A.  Twenty-seven seconds.

14   Q.  What was his response?

15   A.  "Oh."

16   Q.  Can you continue.

17   A.  "Play time sounds fabulous."

18   Q.  Let's continue reading the chat messages following his

19   response.

20           If you could please start with the green chat messages

21   on the right, and I'll read the blue chat messages on the left.

22   A.  "Oh, yes."  Always a fabulous time."

23   Q.  "Kissing her flower.  I'm sure it's beautiful.  How big a

24   boy is Braydon?"

25   A.  "Whatcha mean?  How big is what?"

K2CYBRI1                        Jensen – Direct

1   Q.  "His manhood!"

2   A.  "Ohhh.  Lol."

3   Q.  What is your response following that message you just read?

4   A.  I sent a photo with my fingers indicating his purported

5   size with text stating:  "Like the size of half a crayon."

6   Q.  The response at May 19, 2019, at 5:52 p.m. is:  "Oh, cute."

7   A.  "How big are you?"

8   Q.  "I have a picture if you'd like."

9   A.  "I was just wondering how big it would be for them lol."

10  Q.  How did Peter respond to that last message you just read?

11  A.  He sent a photo of his penis.

12  Q.  After this exchange, did Peter continue to request pictures

13  of the children?

14  A.  He did.

15          MS. GALLICCHIO:  Objection to that characterization.

16          THE COURT:  Rephrase your question.  Sustained.  The

17  objection is sustained.

18          Rephrase your question.

19  BY MR. LI:

20  Q.  After this picture, did Peter request any pictures of the

21  children?

22          MS. GALLICCHIO:  Objection.

23          THE COURT:  That I'll allow.

24          Go ahead.

25          THE WITNESS:  Yes.

1           MR. LI:  Ms. Fetman, let's turn to page 90, please.

2           THE COURT:  The jury understands in context, because

3    you've heard the testimony, that there is no dispute that there

4    were no actual children.  So the reference to "children" --

5           Am I correct, Special Agent Jensen, are to the

6    children who you were describing in the chat?  Is that correct?

7           THE WITNESS:  That's correct.

8           THE COURT:  Go ahead.

9    BY MR. LI:

10   Q.  Special Agent Jensen, could you please read the last blue

11   chat on the left which is dated May 20, 2019, at 11:42 a.m.

12   A.  "I must admit, I'd love to have more pictures of the three

13   of you.  The one with you kissing Kayla's thigh is thrilling.

14   I only wish I could see what happens next!"

15   Q.  Following this message, did you send Peter any additional

16   pictures of the purported children?

17   A.  I did.

18          MR. LI:  Ms. Fetman, let's turn to page 84, please.

19   Q.  Let's begin reading with the second blue chat message to

20   the left which is dated May 20, 2019, at 8:50 a.m.  I'll

21   continue to read the blue chats.  If you could, please, read

22   the green chats.

23          "So my concern is am I being set up here?"

24   A.  "What do you mean set up"?

25   Q.  "I was struck by the fear yesterday that I'd been met by a

K2CYBRI1                         Jensen - Direct

1   cop or something."

2   A.   "Funny.  I was thinking the same thing about you, like

3   maybe you told on me or something."

4   Q.   "Haha.  I think it's just a little momentary insecurity

5   because I'm also very excited."

6             Let's stop there.

7             Mr. Special Agent Jensen, did there come a time when

8   you met the defendant in person?

9   A.   I did.

10   Q.   Did you record the meeting with the defendant?

11   A.   I attempted to.

12   Q.   When you say you "attempted to," what do you mean by that?

13   A.   I grabbed a bureau-issued device.  I turned it on and

14   started recording.  Unbeknownst to me, the batteries died.

15   Then when I got back, there was no -- there was 6 seconds of

16   content.

17   Q.   Were you able to record the complete meeting with the

18   defendant?

19   A.   No, I did not.

20   Q.   Did anyone else record the meeting with the defendant?

21   A.   Yes.

22   Q.   Who did that?

23   A.   The defendant.

24   Q.   When did the meeting occur?

25   A.   On May 22, 2019.

K2CYBRI1                    Jensen – Direct

1  Q.  What day of the week is May 22, 2019?

2  A.  A Wednesday.

3  Q.  When did you realize the meeting was going to happen?

4  A.  Ten of 2:00 when the defendant sent a text and then after

5  2:00 when he said he was a few minutes away.

6  Q.  Prior to receiving that text message, were you planning to

7  meet the defendant that day?

8  A.  We had set up Wednesday as a time to meet.  I hadn't heard

9  from him all day.

10        MR. LI:  Ms. Fetman, let's turn to Government Exhibit

11  3A, please, at page 129.

12  Q.  Special Agent Jensen, do you see the top blue text bubble

13  on the left where it reads:  "I'm a few minutes away"?

14        Do you see that?

15  A.  I do.

16  Q.  Was that the message from the defendant that you were

17  referring to just now?

18  A.  That's correct.

19  Q.  When did Peter send this message?

20  A.  It was on May 22, 2019, at 2:02:25 seconds.

21  Q.  Where were you when you saw this message?

22  A.  I was still in my squad area at my desk.

23  Q.  What did you do when you saw the message?

24  A.  So I looked around, told my squad mates, he's there.  We've

25  got to go.  I asked who was available to go.  We grabbed

K2CYBRI1                          Jensen - Direct

1    things.  We did a brief --

2              THE COURT:  I asked two of the what to go?

3              THE WITNESS:  I asked others to go.

4              THE COURT:  You asked others.

5          What do you mean by "others?"  What others?

6              THE WITNESS:  Other agents and task force officers.

7              THE COURT:  Thank you.  Go ahead.

8              THE WITNESS:  So I asked who was available.  We

9    huddled, briefed, and then departed to the location, some by

10   foot; some by car.  And then we drove over or walked over.

11   BY MR. LI:

12   Q.  How many agents were with you?

13   A.  Between agents and task force officers, there were

14   approximately eight, including myself.

15   Q.  What was the plan?

16   A.  So the plan was that I would be undercover to go meet.

17   Jumped in the car, drove up to the location.  I jumped out on

18   Hudson, walked up to the park.  He had already been there

19   waiting.  Once we got there, we would talk.  Then to effect the

20   arrest, we would walk to a location where we both would get

21   arrested.

22   Q.  Where did the meeting occur?

23   A.  The actual meeting occurred in Duane Park, right on Hudson

24   and Duane.

25   Q.  Is that in Manhattan?

K2CYBRI1                        Jensen - Direct

1    A.  That's correct.

2            MR. LI:  Ms. Fetman, we can take down 3A.  Let's put

3    up government 7 for identification only.

4    Q.  Special Agent Jensen, do you recognize this?

5    A.  I do.

6    Q.  What is it?

7    A.  It's a photo of the location where I met with the

8    defendant.

9    Q.  Who took this photograph?

10   A.  I did.

11   Q.  When did you take it?

12   A.  I took it in January 2020.

13   Q.  Is this a fair and accurate reproduction of the photograph

14   you took?

15   A.  That's correct.

16           MR. LI:  The government offers Government Exhibit 7.

17           MS. GALLICCHIO:  No objection.

18           THE COURT:  Received.

19           (Government's Exhibit 7 received in evidence)

20           MR. LI:  Ms. Fetman, please publish Government Exhibit

21   7 for the jury.

22   Q.  Special Agent Jensen, could you please describe where in

23   the photograph you met the defendant.

24   A.  I would say by the fence like the corner area to like the

25   left of the streetlight, in that general vicinity.

K2CYBRI1                    Jensen - Direct

1    Q.  What happened when you got to the park?

2    A.  So once I got to the park, he was already there.  We

3    discussed how the meeting went.  We talked about the STD panel,

4    what he would like to do.  He had texted about practicalities

5    and logistics.  And then I asked him, can you handle two kids?

6              He said yes.

7              And then I asked him, do you want to walk over.

8              He said yes.

9    Q.  What happened next?

10   A.  We walked up Duane, and then we were crossing the street.

11   I saw a flock of kids, and then we turned and were both

12   arrested on the corner of Duane and Hudson.

13             MR. LI:  Ms. Fetman, let's take down Government

14   Exhibit 7 and put up Government Exhibit 8 for identification

15   only.

16   Q.  Special Agent Jensen, do you recognize this?

17   A.  I do.

18   Q.  What is it?

19   A.  It's a photo that I took of the location where we were both

20   arrested.

21   Q.  When did you take this photograph?

22   A.  I took it the same day as the other photograph, in

23   January 2020.

24   Q.  Is this a fair and accurate reproduction of the photograph

25   you took?

1    A.   That's correct.

2              MR. LI:   The government offers Government Exhibit 8.

3              MS. GALLICCHIO:   No objection.

4              THE COURT:   Received.

5              (Government's Exhibit 8 received in evidence)

6              MR. LI:   Ms. Fetman, please publish Government Exhibit

7    8 for the jury.

8    Q.   Special Agent Jensen, please describe where in the

9    photograph the defendant was arrested.

10   A.   We were both arrested to like the right of the mailbox kind

11   of in front of the pole, the window area.   When we were walking

12   up, there were kids on the sidewalk.   So we tried to go to the

13   left out of the way.

14   Q.   Did the arresting officers put you in handcuffs in front of

15   Peter?

16   A.   They did.

17             MR. LI:   Ms. Fetman, we can take down Government

18   Exhibit 8.

19             Ms. Fetman, can we put up Government Exhibit 1,

20   please.

21   Q.   Special Agent Jensen, do you recognize this?

22   A.   I do.

23   Q.   Can you just remind the jury what this is.

24   A.   This is my KinkD profile.

25   Q.   Do you see the line where it says:   "My role, mommy"?

K2CYBRI1                    Jensen - Direct

1   A.  I do.

2   Q.  Did you input the text "Mommy"?

3   A.  When you set up your profile, there are different roles you

4   can pick.  So the box said, "Mommy."  So that's what I

5   selected.

6   Q.  Could you have selected a different role?

7           MS. GALLICCHIO:  Objection.

8           THE COURT:  I think the witness just testified that

9   there is a menu of options.  I don't understand the question.

10  BY MR. LI:

11  Q.  Special Agent Jensen, what are some of the other options

12  you could have selected?

13  A.  Daddy.  Age player.  That's all I recall.

14  Q.  Do you recall whether there were any others?

15  A.  It said, "Unsure."

16  Q.  Do you recall whether there were any other options beyond

17  that?

18  A.  Oh, yeah.  There were 29 you could pick from.

19          THE COURT:  How many?

20          THE WITNESS:  Twenty-nine.

21          THE COURT:  Thank you.

22          MR. LI:  Just a few final questions.

23          Ms. Fetman, please publish Government Exhibit 3A which

24  is in evidence.

25  Q.  Special Agent Jensen, how many messages did you and the

K2CYBRI1                        Jensen - Direct

1    defendant exchange on WhatsApp?

2    A.  769.

3    Q.  How many pages are in Government Exhibit 3A, the WhatsApp

4    chats?

5    A.  132.

6    Q.  Do you remember your testimony earlier today about those

7    chats?

8    A.  I do.

9    Q.  Do you remember your testimony yesterday about those chats?

10   A.  I do recall.

11   Q.  In the earlier testimony that you gave, did you discuss all

12   132 pages of chats?

13   A.  No.

14   Q.  Have you reviewed all of the chats in preparing for your

15   testimony today?

16   A.  I have.

17   Q.  I'd like you now to consider all of the chats in their

18   totality.

19          In those 132 pages of messages, did the defendant ever

20   ask to have sex with you?

21   A.  No.

22   Q.  In those 132 pages of messages, did the defendant ever ask

23   you to pretend to be a child?

24   A.  No.

25   Q.  In those 132 pages of messages, did the defendant ever

K2CYBRI1                          Jensen - Direct

1   discuss role play of any kind?

2   A.  No.

3   Q.  Did the defendant ask about sexual activity with the

4   children?

5   A.  Yes.

6           MS. GALLICCHIO:  Objection.  Characterization.

7           MR. LI:  I'll rephrase.

8           THE COURT:  Go ahead.

9   BY MR. LI:

10  Q.  Did the defendant ever discuss any sex acts in the same

11  conversation as your purported children?

12  A.  Yes.

13  Q.  Did the defendant ever ask for any pictures of the

14  purported children?

15  A.  Yes.

16          MS. GALLICCHIO:  Objection.

17          THE COURT:  Basis.

18          MS. GALLICCHIO:  It's misstating the chats.

19          THE COURT:  Overruled.  You'll have cross-examination.

20  BY MR. LI:

21  Q.  Did you send the defendant pictures of the purported

22  children?

23  A.  I did.

24  Q.  After you sent the defendant pictures of the purported

25  children, did the defendant continue to discuss sexual

K2CYBRI1                    Jensen – Cross

1   activity?

2   A.  That's correct.

3   Q.  Did the defendant ever ask whether the children were really

4   adults?

5   A.  No.

6           MR. LI:  No further questions at this time.

7           THE COURT:  All right.

8           You may cross-examine.

9   CROSS-EXAMINATION

10  BY MS. GALLICCHIO:

11  Q.  Good morning, agent Jensen.

12  A.  Good morning.

13  Q.  Agent Jensen, you know what a kink is; right?

14  A.  A kink or KinkD?

15  Q.  A kink, not the website.

16  A.  That's correct.

17  Q.  You know it refers to atypical sexual practices.

18  A.  That's correct.

19  Q.  And you know that a kink can involve fetishes or fantasies;

20  is that correct?

21  A.  That's correct.

22  Q.  And it's actually the opposite of what's referred to as

23  "vanilla sexual practices."  Right?

24  A.  That's correct.

25  Q.  You're familiar with that term, "vanilla sexual practices."

1   Is that right?

2   A.   That's correct.

3   Q.   That's a term that refers to conventional sexual practices;

4   right?

5   A.   Also correct.

6   Q.   And you know that there are a lot of manifestations of

7   kinky sex; right?

8   A.   What do you mean by that?

9   Q.   Well, bondage can qualify as kinky sex.

10  A.   That's correct.

11  Q.   Dominance and submission.  Right?

12  A.   Also correct.

13  Q.   Sadism and masochism; right?

14  A.   That's right.

15  Q.   And there's a term called BDSM; right?

16  A.   That's correct.

17  Q.   And that stands for those things; right?

18  A.   Yes.

19  Q.   A lot of kinky sexual activities involve role playing;

20  right?

21  A.   That's correct.

22  Q.   And role playing is when two adults act out a scene; right?

23  A.   That's correct.

24  Q.   It is like taking on a role and being an actor.

25  A.   That's correct.

K2CYBRI1                         Jensen - Cross

1   Q.  And you are familiar with a kink called age playing?

2   A.  Also correct.

3   Q.  It is a form of dominance and submission; right?

4   A.  I think you have to set the roles to age play.

5   Q.  I'm sorry.  Say that again.

6   A.  I think that age players set the roles that they're going

7   to encompass.

8   Q.  Right.  And one age player commonly plays the dominant

9   role, and one age player commonly plays the submissive role.

10  Right?

11  A.  That could be correct.

12  Q.  It's a form of kink where age players play out a sexual

13  fantasy.  Right?

14  A.  That's correct.

15  Q.  It's like acting again.  Right?

16  A.  Correct.

17  Q.  It's consensual; right?

18  A.  Yes.

19  Q.  And between adults; right?

20  A.  Also correct.

21  Q.  And you know that there is language that's associated with

22  age play.

23  A.  Correct.

24  Q.  For example, there's a term that's often referred to as

25  "daddy dom little girl."  Right?

K2CYBRI1                        Jensen - Cross

1    A.  Yes.

2    Q.  You've seen that before?

3    A.  That's correct.

4    Q.  So "daddy dom," meaning daddy is the dominant player.

5    Right?

6    A.  Correct.

7    Q.  And then the second part of that is "little girl" is the

8    submissive player.

9    A.  Also correct.

10   Q.  And that's often referred to as DDLG, rather than writing

11   the whole thing out.

12   A.  Yes.

13   Q.  And in addition, age players often take on a title like

14   "daddy."

15   A.  Yes.

16   Q.  Like "mommy."

17   A.  Yes.

18   Q.  Like "prince."

19   A.  Sure.

20   Q.  And "princess."

21   A.  Correct.

22   Q.  Like "angel."

23   A.  Correct.

24   Q.  And they talk about their sexual activity as "play time."

25   A.  Correct.

K2CYBRI1                        Jensen - Cross

1   Q.  And age players frequently refer to -- actually, strike

2   that.

3          They often refer to the submissive role, the person

4   playing the younger, the child, as "a little."

5   A.  Correct.

6   Q.  And age players don't refer to their "little" or their

7   submissive partner as a daughter or a son; right?

8   A.  Right.  They say "a little."  Yes.

9   Q.  And often they use cute terms like "angel" or "prince" or

10  "princess."  Right?

11  A.  I imagine, yes.

12          THE COURT:  Don't imagine.  If you know, you should so

13  testify.  If you don't know, you should say, I don't know.  But

14  don't imagine.  If you mean something other than "imagine,"

15  then you can answer.

16          THE WITNESS:  I've never witnessed an age player or

17  role player refer to their "little" as a "prince" or a

18  "princess."

19  BY MS. GALLICCHIO:

20  Q.  We'll get to that in a minute.

21          There's often activity or scenes that are acted out by

22  age players; right?

23  A.  Correct.

24  Q.  For example, they might act out bath time.  Right?

25  A.  Correct.

K2CYBRI1                         Jensen - Cross

1   Q.  Or they might act out bedtime, putting the "little" to bed.
2   Right?
3   A.  Correct.
4   Q.  They might engage in discipline like spanking.
5   A.  Correct.
6   Q.  They might engage in a fantasy where they're teaching their
7   "little" about sex; right?
8   A.  Correct.
9   Q.  They might engage in a fantasy where a daddy teaches the
10  "little" about her body; right?
11  A.  Correct.
12  Q.  Kind of like teaching the birds and the bees; right?
13  A.  Correct.
14  Q.  Now, in your job, you are searching for child molesters;
15  right?
16  A.  We're out there.  Yes.
17  Q.  You're not looking for age players.
18  A.  Correct.
19  Q.  And you search for online predators as part of your job;
20  right?
21  A.  Well, we're on a sort of platform that enables us to locate
22  certain offenders.
23  Q.  And part of that is online; right?
24  A.  Definitely.
25  Q.  Because some predators are online; right?

1    A.   Correct.

2    Q.   And the FBI has a division dedicated to this cause of

3    seeking out predators, child predators.  Right?

4    A.   Yes.  Correct.

5    Q.   And you are part of that division; right?

6    A.   Also correct.

7    Q.   And you refer to it or it is called the Crimes Against

8    Children Division?

9    A.   Correct.

10   Q.   There is also something called the Child Exploitation Unit.

11             Is that the same thing?

12   A.   Yes.  It's the same thing.

13   Q.   And you have had extensive training to prepare for your job

14   as an undercover officer -- agent.  Excuse me -- in the Crimes

15   Against Children Unit.  Right?

16   A.   Correct.

17   Q.   And there are many agents, other than yourself of course,

18   dedicated to this job.

19   A.   Yes.

20   Q.   Other than agents, I would assume you have technology

21   experts; right?

22   A.   Yeah.

23   Q.   Because a lot of your searching is online; right?

24   A.   That's correct.

25   Q.   And you also work in cooperation with other law enforcement

K2CYBRI1                          Jensen - Cross

1    agencies.

2    A.   Yes.  We are a task force.

3    Q.   Both locally and internationally; right?

4    A.   Are you asking if I work internationally with other people?

5    Q.   Do you sometimes collaborate with other international

6    organizations to find a sexual predator?

7    A.   Yes.  That's correct.

8    Q.   Now, when you're looking online, you're looking where

9    children would be.  Right?

10   A.   No.  Not necessarily.  We have multiple platforms that

11   we're on that are geared toward adult only, and the sexual

12   exploitation of children are there too.

13   Q.   But some of the things you do is you look to see where a

14   child molester might be lurking.  Right?

15   A.   Can you reframe your question.

16   Q.   Would it be fair to say that you would often look in places

17   where you would expect a child molester to be lurking?

18   A.   We go online platforms that have supported offenders in the

19   past or the like of offender.

20   Q.   So, for example, have you looked on Facebook?

21   A.   Correct.

22   Q.   Have you looked on Instagram?

23   A.   Correct.  Snapchat.  Yes.  And offenders are there.

24   Q.   Right.  And those are commonly places where young people

25   and teens are.  Right?

K2CYBRI1                         Jensen - Cross

1   A.  Sure.

2   Q.  You also look on something called the dark web.

3   A.  I don't.  Others in other divisions are dedicated to that

4   platform only.

5   Q.  And that is part of the internet that is encrypted in some

6   way; right?

7   A.  I imagine so.  I'm not involved with the dark internet or

8   dark web.

9   Q.  But you heard of it; right?

10  A.  Correct.

11  Q.  There are other agents in your unit that, as you said, are

12  specifically assigned to that project.  Right?

13  A.  Not in the area in New York.

14  Q.  So in the Child Exploitation Unit --

15  A.  Overall I would imagine, yes.

16  Q.  Do you know for sure?

17  A.  That there are people dedicated to it?

18  Q.  Yes.

19  A.  Yes.

20  Q.  And this is often a place where child molesters share child

21  pornography.  Right?

22  A.  I imagine so, but I don't have firsthand knowledge.

23          THE COURT:  Here is the thing:  You can testify to

24  what you know based on your knowledge and experience.  You

25  can't speculate, and you can't imagine or guess at an answer.

K2CYBRI1                         Jensen – Cross

1    So if you don't know, say, I don't know.  But don't imagine the

2    answer or don't guess at the answer.  Don't speculate at what

3    the answer is.  Okay?

4              THE WITNESS:  Yep.

5              THE COURT:  Next question.

6    BY MS. GALLICCHIO:

7    Q.  So in this case, you went looking, or you started a profile

8    on an adult kinky dating site.  Right?

9    A.  That's correct.

10   Q.  That's called KinkD; right?

11   A.  Right.

12   Q.  Before you joined KinkD, I assume you did some research on

13   the app.

14   A.  Correct.

15             THE COURT:  Is that a question?

16             MS. GALLICCHIO:  Yes.  That's a question.

17   Q.  Is that correct?

18   A.  I knew of the website.

19   Q.  So you actually looked at the website; right?

20   A.  I know it's marketed towards BDSM.  I know it's a kinky

21   website.  But if you're asking me if I did a thesis on KinkD,

22   no.

23             THE COURT:  The question was:  Before you went on the

24   website, did you look at the website.  I think that was the

25   question.

K2CYBRI1                         Jensen - Cross

1                   MS. GALLICCHIO:  Yes.

2                   THE WITNESS:  Yes.  I knew the website, but I didn't

3      do any research on the tenants of website.

4      BY MS. GALLICCHIO:

5      Q.  So you didn't do any research on the targeted audience of

6      the website or of the app?

7      A.  I didn't look at -- I knew the website was geared towards

8      BDSM and kinky fetishes and different sexual desires.

9      Q.  It's dedicated to kinky sexual desires; right?

10     A.  Correct.

11     Q.  It's dedicated to adult kinky sexual desires; right?

12     A.  Correct.

13     Q.  Did you do any research on the KinkD community before you

14     signed up on this website?

15     A.  No.

16     Q.  Did you consult any experts to help you understand the

17     KinkD community?

18     A.  I cooperated with other agents.

19     Q.  Did you consult any psychologist or sexologist to

20     understand the KinkD community?

21     A.  I did not.

22     Q.  But you did look at the website to see what it was about;

23     right?

24     A.  When you go to the app, yes.

25     Q.  Aside from the app, there's an actual website.  Right?

K2CYBRI1                        Jensen - Cross

1    A.  I did not look at the actual website.

2    Q.  Ever?

3    A.  No.

4    Q.  Well, on the app, there is --

5            Actually, can we show to the witness only for

6    identification Defense Exhibit C.

7            Take a look at Defense Exhibit C, Agent Jensen.

8            Do you recognize what that is?

9    A.  I do.

10            MS. GALLICCHIO:  Can we go to the second page, please.

11    Q.  I want you to take a look at both pages.

12            Do you recognize them?

13    A.  I do.

14    Q.  Can you identify what it is.

15    A.  Yes.  When you download the app on whatever cellar device

16    you're using, that comes up before you download it.

17    Q.  Is this a fair and accurate representation of what the app

18    looks like before you download it?

19    A.  That's correct.

20            MS. GALLICCHIO:  I would move to introduce Defense

21    Exhibit C.

22            MR. LI:  Objection, your Honor.

23            THE COURT:  Basis.

24            MR. LI:  Hearsay.

25            THE COURT:  Are you offering it for the truth of its

1   content?

2          MS. GALLICCHIO:  No, your Honor.

3          THE COURT:  I'm going to receive it, not for the truth

4   of its content, but the fact that it is said.

5          (Defendant's Exhibit C received in evidence)

6          So, ladies and gentlemen, what's the difference.

7   Well, if something is admitted for the truth of its content,

8   it's being admitted to prove that what is said in the words is

9   true.

10          Here, I'm only accepting it for the proposition that

11   this is what was said by KinkD about KinkD.  It doesn't mean

12   what KinkD said about KinkD is true or not true.  It's just

13   what they said about themselves.  Okay?

14          Go ahead.

15          MS. GALLICCHIO:  Thank you.

16          If we can go back to the first page and publish it for

17   the jury.

18   Q.  Do you see it, Agent Jensen?

19   A.  I do.

20   Q.  So this is the opening page of the app; right?

21   A.  Correct.

22   Q.  By the way, this app is something that's available on the

23   Apple store app page; right?

24   A.  That's correct.

25   Q.  Is the not on the dark web; right?

K2CYBRI1                          Jensen - Cross

1    A.  Correct.

2    Q.  So KinkD advertises itself as a kink, BDSM, dating life;

3    right?

4    A.  Correct.

5    Q.  It says on the top of the page:  "Fet, kinky life, and

6    fetish dating."  Right?

7    A.  I don't see that.  Yes, I do.  I'm sorry.

8            MS. GALLICCHIO:  Can we go to page 2.

9    Q.  KinkD also has a page in which it describes its content;

10   right?

11   A.  Correct.

12   Q.  Just looking at the top of the description, it describes

13   itself as:  "The best bondage, kink, fetish, and BDSM dating

14   community.  A premiere kinky chat and social network for kinky

15   singles, couples, and swingers."  Correct?

16   A.  Correct.

17            (Continued on next page)

18

19

20

21

22

23

24

25

K2CAABRI2                        Jensen - Cross

1   BY MS. GALLICHIO:

2   Q.  Further down in the middle paragraph it states:

3           You are looking for -- are you looking for kinky sites

4   or kinksters or personal apps for kinks and fetish alternative

5   lifestyles?  Now, you have come to the right place.

6           do you see that?

7   A.  I do.

8   Q.  And you read that before you signed up for this dating

9   site, right?

10  A.  Correct.

11  Q.  It also says in that same paragraph as a mobile community

12  KinkD only caters to open-minded people who want to meet, chat

13  and hook up with other open-minded, right?

14  A.  Correct.

15  Q.  And you read that before you signed up for the app, right.

16  A.  I did.

17  Q.  So you actually obtained this app on the App Store, right?

18  A.  Correct.

19  Q.  And you downloaded it to your phone?

20  A.  My undercover phone, yes.

21  Q.  So, KinkD, the app, makes it very clear who they're

22  targeted audience is, right?

23  A.  It does.

24  Q.  And that audience is adults interested in kinky sex?

25  A.  That's correct.

1   Q.  And when you sign-up you must confirm that you are 18 years

2   or older?

3   A.  Correct.

4           MS. GALLICCHIO:  Can we put up Government Exhibit G1,

5   please, in evidence.

6           (Pause)

7   Q.  So when you signed up, Agent Jensen, you had to create a

8   profile?

9   A.  That's correct.

10  Q.  And you did this yourself, right?

11  A.  I did.

12  Q.  And part of the creating a profile is picking a user name?

13  A.  Correct.

14  Q.  And the user name that you chose was "Princessmom"?

15  A.  Correct.

16  Q.  You also, actually, you know that that is an age-play term,

17  right?

18  A.  Princess, you can use it for a term of endearment.

19  Q.  But you had already said earlier that "princess" and

20  "prince" are age-play terms, right?

21  A.  Yes.

22  Q.  Now you created a self-summary and in your self-summary you

23  said that you are looking for a teacher to teach my kids about

24  the birds and the bees, right?

25  A.  Correct.

K2CAABRI2                        Jensen - Cross

1    Q.  That's a playful way of referring to sex education,

2    correct?

3    A.  Correct.

4    Q.  Now, in that summary you didn't say looking for a man to

5    teach my son and my daughter about sex, right?

6    A.  Correct.

7    Q.  Or my children about sex, right?

8    A.  That would be flagged by the people and taken down.

9    Q.  So you have to be pretty ambiguous then, right?

10   A.  Correct.

11   Q.  And that is your intention here?

12   A.  That's correct.

13   Q.  Now, you also chose a role of "mommy", right?

14   A.  Correct.

15   Q.  Now, you already testified on direct examination that when

16   you sign-up you are given an option of several roles, correct?

17   A.  Correct.

18   Q.  You said there are how many?

19   A.  Twenty-nine.

20          MS. GALLICCHIO:  If we could show to the witness only

21   Defense Exhibit D for identification.

22   Q.  You could take a look at Defense Exhibit D for

23   identification, Agent Jensen; do you recognize what that is?

24   A.  I do.

25   Q.  What is it?

K2CAABRI2                    Jensen - Cross

1    A.  That's the shot where you can pick which role you want to

2    put there.

3    Q.  All right.  So let's take a look at that.  As you

4    indicated, you chose "mommy", right?

5    A.  Correct.

6    Q.  So in this selection of 29 there also exists the option for

7    a man to choose "daddy", right?

8    A.  Correct.

9    Q.  There's an option for "baby boy" right under "daddy",

10   right?

11   A.  Correct.

12   Q.  There's an option for "dominant" and "submissive"?

13   A.  Correct.

14   Q.  There's an option for "baby girl"?

15              MR. LI:  Objection.

16              THE COURT:  Basis?

17              MR. LI:  This is not before the jury.

18              THE COURT:  Has this been offered?

19              MS. GALLICCHIO:  No, it hasn't.

20   Q.  So is this a fair and accurate representation of the role

21   selection.

22   A.  Yes.

23              MS. GALLICCHIO:  I would move to move it into

24   evidence.

25              MR. LI:  No objection.

K2CAABRI2                    Jensen - Cross

1              THE COURT:  All right.  It's received.

2              (Defendant's Exhibit D received in evidence)

3              MS. GALLICCHIO:  Thank you.  Excuse me.

4              May I have it published to the jury?

5              THE COURT:  Yes.

6    Q.  So let's start again.  So this page shows the possible

7    roles that someone can sign-up when they sign onto KinkD?

8    A.  That's right.

9    Q.  In here we see, obviously, I think in the middle of the

10   second column is the option "mommy"?

11   A.  That's correct.

12   Q.  So you clicked on "mommy" and that shows up in your profile

13   page?

14   A.  That's correct.

15   Q.  There's also other options here.  The first one is

16   "dominant", right?

17   A.  Correct.

18   Q.  There's also "submissive", right?

19   A.  Correct.

20   Q.  There is "daddy" as opposed to "mommy", right?

21   A.  Yes.

22   Q.  There's also the option to pick your role as a baby boy or

23   a baby girl, right?

24   A.  That's correct.

25   Q.  It doesn't mean you are a baby boy or a baby girl.  That's

K2CAABRI2                          Jensen - Cross

1    role you are going to play, right?

2    A.  Correct.

3    Q.  The same thing with "mommy" and "daddy" you don't

4    necessarily have to be a mommy or daddy to pick that role,

5    right?

6    A.  That's correct.

7    Q.  It's a role you are going to play on KinkD?

8    A.  That's correct.

9    Q.  There's also an option for "a little"?

10   A.  Correct.

11   Q.  We talked about that earlier that's often what submissive

12   role players refer to themselves as, right?

13   A.  That's correct.

14   Q.  It doesn't mean they're a little person?

15   A.  Correct.

16   Q.  And there's also on option for "age-player" which spells it

17   out, right?

18   A.  Correct.

19           MS. GALLICCHIO:  We could take that down.  Thank you.

20           (Pause)

21   Q.  All of these roles that we saw in Defense Exhibit D are

22   examples of age-play words, right?

23   A.  Correct.

24   Q.  The way age-players recognize each other?

25   A.  Correct.

K2CAABRI2                          Jensen - Cross

1    Q.  They're common in the KinkD community?

2    A.  Correct.

3    Q.  You've also indicated on your profile that you have been

4    kinky for two years, right?

5    A.  Correct.

6            MS. GALLICCHIO:  Could I have Defense Exhibit F,

7    please, just for identification only shown to the witness.

8            (Pause)

9    Q.  Now, before I get to that, when you sign-up for KinkD you

10   also can include a profile picture, right?

11   A.  I believe you have to.

12   Q.  OK.  And so you did that?

13   A.  Yeah.

14   Q.  And take a look at Defense Exhibit F.

15   A.  Yes.

16   Q.  Do you recognize that?

17   A.  I do.

18   Q.  What is it?

19   A.  It's a side profile of my face.

20   Q.  Does that have anything to do with KinkD?

21   A.  Yes.

22   Q.  In what way?

23   A.  That was my profile photo.

24   Q.  Does that fairly and accurately represent your profile

25   photo on KinkD?

K2CAABRI2                         Jensen - Cross

1    A.  It does.

2              MS. GALLICCHIO:  I would move that into evidence, your

3    Honor.

4              MR. LI:  No objection.

5              THE COURT:  Received.

6              (Defendant's Exhibit F received in evidence)

7              MS. GALLICCHIO:  Publish it to the jury please.

8              (Pause)

9    Q.  Now, in this photograph this is a photograph of only you,

10   right?

11   A.  Correct.

12   Q.  You don't include any kids in this picture, right?

13   A.  No.

14   Q.  And this is your real picture?

15   A.  That's correct.

16             MS. GALLICCHIO:  OK.  Take that down.  Thank you.

17   Q.  And so this is where you met Mr. Bright?

18   A.  Correct.

19   Q.  You saw his profile?

20   A.  Correct.

21   Q.  And after you saw his profile he reached out to you, right?

22   A.  Rephrase that.

23   Q.  After you looked at his profile, at some point he reached

24   out to you?

25   A.  No.  He reached out to me.

1    Q.  That's what I said.

2              THE COURT:  No.  No.  Ask your question again.

3              MS. GALLICCHIO:  I'm sorry.

4    Q.  You looked at his profile?

5              THE COURT:  At what point in time?

6    Q.  You looked at his profile after he reached out to you?

7    A.  That's correct.

8    Q.  He reached out to you and not you to him; is that right?

9    A.  Correct.

10             MS. GALLICCHIO:  Sorry, if I was confusing.

11             If we could show to the witness for identification

12   only Defense Exhibit A.

13             (Pause)

14             MS. GALLICCHIO:  And could we scroll through it,

15   please.

16             (Pause)

17             MS. GALLICCHIO:  Put the three pages on the same

18   screen, please, Mr. Fisher.

19             (Pause)

20   Q.  Can you see that, Agent Jensen?

21   A.  I can.

22   Q.  Do you recognize what is Defense Exhibit A?

23   A.  I do.

24   Q.  What is it?

25   A.  Those are three screen shots of Peter's profile on KinkD.

K2CAABRI2                    Jensen - Cross

1   Q.  Do those fairly and accurately represent his KinkD profile?

2   A.  They do.

3           MS. GALLICCHIO:  I would move them into evidence, your

4   Honor.

5           MR. LI:  No objection.

6           THE COURT:  Received.

7           (Defendant's Exhibit A received in evidence)

8           MS. GALLICCHIO:  I would ask that Defense Exhibit A --

9   and we could start with the first page -- be published to the

10  jury.

11          (Pause).

12  Q.  All right.  So taking a look at Defense Exhibit A, I'm

13  assuming, agent -- correct me if I'm wrong -- when you

14  communicated with Mr. Bright, you examined his profile very

15  carefully, right?

16  A.  Yes, I read it.

17  Q.  You read his self-summary, right?

18  A.  Correct.

19  Q.  And in his profile he has a picture himself, right?

20  A.  Correct.

21  Q.  Let's take a look at his self-summary.  This is similar to

22  where in your self-summary you are looking for someone to teach

23  your kids about the birds and the bees, correct?

24  A.  That's correct.

25  Q.  His self-summary is a little more detailed?

1   A.   Also correct.

2   Q.   In his self-summary he indicates that I am looking for

3   friends or more outside the bedroom, kinky filth inside the

4   bedroom, right?

5   A.   Right.

6   Q.   He also says, I'm not entirely opposed to hookups but my

7   strong preference is for substantive meaningful connection.  I

8   want to know what makes you tick.  Mutual caring and

9   understanding makes everything better.

10            That's what's written on his profile page, right?

11   A.   That's correct.

12   Q.   You read that?

13   A.   Correct.

14   Q.   He also says straightish, I guess, but not straight.

15   Ethically nonmonogamous.  You read that before you communicated

16   with him, right?

17   A.   Correct.

18   Q.   There also a "S" asterisk is ridiculous and a sense of

19   humor about it is essential.

20            You read that?

21   A.   Correct.

22   Q.   You were aware of that before you communicated -- you were

23   aware of his self-summary before you communicated with him on

24   KinkD, right?

25   A.   At some point while communicating with him I looked at his

K2CAABRI2                          Jensen - Cross

1   profile.

2   Q.  At what point, at the beginning or in the middle of your

3   communication?

4   A.  At the beginning.

5   Q.  Could we look at page two please.  He also goes on to

6   describe himself as a big nerd in general and expressing that

7   science and technology are his keen interests, right?

8   A.  Correct.

9   Q.  He describes his political views.  He says I'm liberal with

10  some leftist tendencies.  You probably should be too.

11  A.  Correct.

12  Q.  And in his bio he indicates his roles, the roles that he

13  selected, right?

14  A.  Correct.

15  Q.  These are the parts that he likes to play?

16  A.  Correct.

17  Q.  And the roles that he selected that we can see on this

18  exhibit, on Defense Exhibit A are "dominant", "master",

19  "fetishist", "kinkster", "age-player", "daddy", "hedonist",

20  "vanilla" and then there's "TO" that seems to be cutoff, right?

21  A.  Correct.

22  Q.  You saw all of those roles when you communicated with him

23  on KinkD, right?

24  A.  Correct.

25  Q.  So you knew that he was an age-player, right?

K2CAABRI2                      Jensen - Cross

1   A.   Among those things, yes.

2   Q.   You knew that he liked to play the daddy role in age-play?

3   A.   I know he selected it.

4   Q.   But these are roles, right?

5   A.   Correct.

6           MS. GALLICCHIO:  Can we look at page three.

7   Q.   So just to the bottom of the page it indicates also what he

8   is looking for and there's in the gender section he says,

9   "woman TS/TV/TG".  Do you know what stands for?

10  A.   Yes.

11  Q.   Can you tell us?

12  A.   Transexual, transvestites and transgender.

13          MS. GALLICCHIO:  We could take that down.

14  Q.   So it was pretty clear to you that Peter Bright was an

15  age-player?

16  A.   Among those other roles, yes.

17  Q.   You knew that then, right?

18  A.   Correct.

19  Q.   And you know that now, right?

20  A.   Also correct.

21  Q.   You have his phone?

22  A.   Correct.

23  Q.   So when Mr. Bright was arrested his phone, his telephone,

24  cellphone was taken by the police, right?

25  A.   Correct.

K2CAABRI2                    Jensen - Cross

1  Q.  And you know that Mr. Bright consented to the search of his

2  phone?

3  A.  That's correct.

4  Q.  He signed a form giving consent to the FBI to search his

5  phone?

6  A.  That's correct.

7  Q.  He gave his password to search his phone, right?

8  A.  Correct.

9  Q.  And the phone is in the FBI's possession?

10  A.  Correct.

11  Q.  You have access to it whenever you want?

12  A.  Correct.

13  Q.  And you personally examined his phone very carefully?

14  A.  Correct.

15  Q.  It took you weeks, if not months, to go through all the

16  content on his phone, right?

17  A.  Correct.

18  Q.  And the FBI also did a forensic analysis of his phone,

19  right?

20  A.  Correct.

21  Q.  You went through every chat, right?

22  A.  Correct.

23  Q.  You went through every video and every photo, right?

24  A.  Correct.

25  Q.  And you discovered when looking at his phone that

K2CAABRI2                           Jensen – Cross

1    Mr. Bright is not only on the dating site called KinkD but he

2    is on a lot of dating sites, right?

3    A.  Correct.

4    Q.  For example, he's on Scruff, right?

5    A.  Correct.

6    Q.  You know what Scruff is, right?

7    A.  Yes.

8    Q.  Scruff is a dating app for gay, bisexual and trans men,

9    right?

10   A.  Correct.

11   Q.  He's on Grinder, right?

12   A.  Correct.

13   Q.  That's another dating app, right?

14   A.  Correct.

15   Q.  He's on Tinder, right?

16   A.  Correct.

17   Q.  Another dating app, right?

18   A.  Correct.

19   Q.  I could go on but there's many, right?

20   A.  Correct.

21   Q.  And in your examination of these dating apps, you looked at

22   his profile, right?

23   A.  Since the phones, maybe not all of them.  I don't recall.

24   Q.  But from what you've looked at is it fair to say that he is

25   very explicit about his sexual interests on dating sites?

K2CAABRI2                         Jensen - Cross

1   A.  Correct.

2   Q.  And there are a lots of chats and communications with a lot

3   of people on these dating sites, right?

4   A.  The ones I could access when we get the phone to put in

5   airplane mode.  So we don't have access to all conversations.

6   They don't pull up.

7   Q.  But you have had access to lot of them, right?

8   A.  That's correct.

9   Q.  And you saw from what you saw there were lots of

10  communications with men and women, right?

11  A.  Correct.

12  Q.  And transgender men and women, right?

13  A.  Correct.

14          THE COURT:  Please make your question clear whether

15  you are saying that there are such conversations on the website

16  or on the defendant's phone or conversations purportedly in

17  which the defendant engaged.

18          MS. GALLICCHIO:  Thank you.  I will, your Honor.

19  Q.  So just to go back, there are lots of conversations that

20  you saw on his phone with men and women that were sexual in

21  nature?

22  A.  Correct.

23  Q.  And with transgender men and women that were sexual in

24  nature on his phone, right?

25  A.  Correct.

1    Q.  Based on your analysis and investigation, all of these

2    communications that you saw on his phone and his chats with

3    other people on his phone in these dating sites were with

4    adults, right?

5    A.  From what I gathered, yes.

6    Q.  There was, in these communications that you saw on his

7    phone, there was a lot of kink, right?

8    A.  That's correct.

9    Q.  And in these communications that you examine on his phone

10   there was a lot of age-play?

11   A.  I wouldn't say a lot.

12   Q.  But you'd found several examples of age-play on his phone,

13   right.

14   A.  As I recall, I think two or three.

15   Q.  That you saw, right?

16   A.  That's correct.

17   Q.  And in the communications that you saw there were other

18   adults that were engaging in age-play with Mr. Bright, right?

19   A.  That's correct.

20   Q.  In these chats that you saw on his phone you saw reference

21   to the term "daddy", "dom", "little girl" and DDLG, right?

22   A.  I did.

23   Q.  And in these chats that you saw on his phone you saw

24   reference to the term "princess" being used for the literal

25   partner, right?

K2CAABRI2                          Jensen – Cross

1    A.  Yes.

2    Q.  And you saw in these chats on his phone extensively the use

3    of the term "daddy" to refer to the dominant partner?

4    A.  Correct.

5    Q.  And in fact, Mr. Bright commonly referred to himself as

6    "daddy", right?

7    A.  Correct.

8    Q.  And most of these communications that you saw are very

9    graphic and explicit sexually, right?

10   A.  Correct.

11   Q.  In particular, you looked at a communication that Peter had

12   with someone by the name of "Steve"?

13   A.  Correct.

14   Q.  You had access to his entire communication with Stevie,

15   right?

16   A.  From what was there, yes.

17   Q.  Not only whether from look at his phone but the FBI took a

18   forensic image of his phone, right?

19   A.  Correct.

20   Q.  And so they were able to download his communications on an

21   app called "Scruff"?

22   A.  Incorrect.

23   Q.  Incorrect.  You haven't seen that?

24   A.  I did not.

25   Q.  Did you examine the FBI forensic image of his phone?

1    A.  I did.

2    Q.  You examined the SMS communications that he had with

3    Stevie, right?

4    A.  I don't recall.

5    Q.  Well, you examined his communications with Stevie, right?

6    A.  I don't recall.

7    Q.  I thought you just said a moment ago that you did see his

8    communications with Stevie?

9    A.  I remember looking at text messages but I don't recall the

10   "Stevie".

11   Q.  OK.  Do you have the 3500 binder up there?

12            THE COURT:  All right.  Ladies and gentlemen, we're

13   going to take our midmorning break.  Please do not discuss the

14   case among yourselves or with anyone.  We'll back in action in

15   ten minutes.

16            Thank you.

17            (Jury not present)

18            THE COURT:  All right.  We're in recess.

19            Thank you.

20            (Recess)

21            THE COURT:  Please remain standing for the jury.

22            (Jury present)

23            THE COURT:  All right.  Please be seated.

24            Ms. Gallicchio, whenever you're ready.

25            MS. GALLICCHIO:  Thank you, your Honor.

K2CAABRI2                    Jensen - Cross

1   Q.  So, Agent Jensen, before the break we were talking about

2   Mr. Bright's text communications with someone named Stevie,

3   right?

4   A.  Correct.

5   Q.  Now, do you recall observing on his phone conversations

6   with someone named "Stevie"?

7   A.  I recall conversations I took photos of.  I think it was on

8   Google Hangouts or an app.

9   Q.  I am asking you about a conversation with Stevie.  Do you

10  recall seeing conversations with Stevie that related to

11  age-play?

12  A.  Correct.

13  Q.  And you examined those conversations those chats on his

14  phone -- I'm sorry.  Those texts on his phone with Stevie,

15  right?

16  A.  I'm not sure we're talking about the same one.

17          MS. GALLICCHIO:  If I could show the witness -- your

18  Honor, may I approach?

19          THE COURT:  You may.

20          (Pause)

21          MS. GALLICCHIO:  Does the Court wish a copy, your

22  Honor?

23          THE COURT:  Please.

24          (Pause)

25  Q.  Agent Jensen, I'm showing you what's been marked as Defense

1   Exhibit B for identification only.

2               THE COURT:  Say that again, the letter.

3               MS. GALLICCHIO:  "P".

4               THE COURT:  Thank you.

5   Q.  Let me know when you have had a chance to read it.

6               THE COURT:  Do you want to direct the witness to a

7   particular page or line?

8               MS. GALLICCHIO:  I am just going to ask if she

9   recognizes it first in general.

10              THE COURT:  All right.

11              (Pause)

12              MS. GALLICCHIO:  Let me know when you have had a

13  chance?

14              THE COURT:  You take as much time as you'd like.  I

15  asked if you wanted to direct the witness to a particular

16  portion.  You said no.  The witness can take as much time as

17  she likes to review the entire document.

18              (Pause)

19              THE COURT:  All right.  Are you finished?

20              THE WITNESS:  Yes.

21              THE COURT:  Thank you.

22  Q.  Thank you, Agent Jensen.

23              So reviewing Defense Exhibit P, does that help to

24  refresh your recollection about the text conversations that you

25  reviewed between Mr. Bright and Stevie?

1    A.  Yes.  Thank you.

2    Q.  And this was, the text conversations between Mr. Bright and

3    Stevie were on his phone that you examined, right?

4    A.  That's correct.

5              MR. LI:  Objection, your Honor.

6              I think we should probably retrieve the document from

7    the witness.

8              THE COURT:  That's right.

9              Turn it face down in front of you.  The document is

10   not in evidence and you can pull that microphone closer.  You

11   don't need to lean into the microphone to speak.  That's fine.

12             Please proceed.

13   Q.  The text conversation that Mr. Bright had with Stevie that

14   appeared on his phone was a conversation that took place

15   between April the 15th, 2019 and May the 6th of 2019?

16   A.  Correct.

17   Q.  That's about the same time that he was communicating with

18   you, right?

19   A.  Correct.

20   Q.  And the conversations that Mr. Bright had with Stevie in

21   this text communication was very sexual and graphic, right?

22   A.  Correct.

23   Q.  Mr. Bright discusses with Stevie his sexual fantasies --

24             THE COURT:  Well, now you are asking -- just so I

25   understand this, you're asking this witness if you recall this

K2CAABRI2                         Jensen - Cross

1    without looking at the document now you've reviewed it.  Does

2    it refresh your recollection?  You told us before -- maybe I

3    misheard you but you'd not remembered texts with Stevie,

4    correct?

5                THE WITNESS:  Correct.

6                THE COURT:  All right.  And now you've looked at the

7    document and when you're asked whether something refreshes your

8    recollection, there could be two possible answers.  So, let's

9    say somebody said the Yankees won the World Series in the year

10   2000 on October 19, 2000.  Do you recall that?  You might say

11   no.  Somebody shows you a copy of The Post or the Daily News

12   dated October 20, indicating that they won the World Series the

13   night before.  Well, there are two possibilities there.  One

14   you see it's the New York Post or the Daily News.  It doesn't

15   look fake.  It looks real, OK?  But it doesn't refresh your

16   recollection.  In that event your answer is no it doesn't

17   refresh my recollection.  Then again you might say, wait a

18   minute.  Now I remember October 19 is my nephew's birthday and

19   he just turned 21 I was at the party.  I remember this now and

20   now you have a new and refreshed recollection.  Then you should

21   testify yes I remember was October 19, 2000.  So that's what

22   refreshes one's recollection means.

23               So, you're not being asked what do you remember from

24   what you read two minutes ago.  That's not the question.  The

25   question is, having reviewed the document, do you have a new

K2CAABRI2                          Jensen - Cross

1    and refreshed recollection on the subject that you're being

2    asked about.

3              So if I could impose on you, Ms. Gallicchio, put a

4    fresh question to the witness.

5              MS. GALLICCHIO:  Yes.  Thank you.

6    Q.  So, having looked at this document and is your recollection

7    refreshed with respect to the conversations you viewed on

8    Mr. Bright's phone between him and Stevie?

9    A.  Correct.

10   Q.  OK.  And do you recall having reviewed his phone and these

11   conversations that Mr. Bright in his text conversation with

12   Stevie discussed his sexual fantasies?

13   A.  Yes, I remember elements of the text message or

14   conversation.

15   Q.  And do you recall in these text messages with Stevie that

16   he, Mr. Bright, referred to himself as "daddy"?

17   A.  I remember, yes.

18              (Continued on next page)

19

20

21

22

23

24

25

K2CYBRI3                          Jensen - Cross

1    BY MS. GALLICCHIO:

2    Q.  And do you recall in these text messages that Mr. Bright

3    describes to Stevie some of his kinks?

4    A.  Yes.

5    Q.  Including some of his kinks would be something called

6    "water sports."

7            Do you recall that in the text conversation?

8    A.  I don't recall a specific spot, but yes.

9    Q.  Just in general I'm asking.

10   A.  Yes.  Yes.

11   Q.  And "water sports" is sometimes referred to as "pissplay;"

12   right?

13   A.  Correct.

14   Q.  And that's something actually that Mr. Bright, you've

15   already testified to, had discussed with you.

16   A.  Correct.

17   Q.  And in these text conversations with Stevie, Mr. Bright

18   discusses his fantasy about having a "little," a submissive

19   role, play the part of an 11- or 12-year-old in his fantasy;

20   right?

21   A.  I don't recall a spot in a text.

22   Q.  But you recall that in general, that was something he was

23   texting about?

24   A.  Correct.

25   Q.  In relation to that fantasy with a person playing the role

K2CYBRI3                         Jensen - Cross

1   of an 11- and 12-year-old, the fantasy involves teaching this

2   "little" about her body and how it's developing.  Right?

3   A.  Yes.

4   Q.  And that's sort of the thing that he chatted with you

5   about.

6   A.  Correct.

7   Q.  In his text conversations with Stevie, he also --

8   Mr. Bright also suggests to Stevie that he sent him some photos

9   and some videos; right?

10  A.  Yes.

11  Q.  And in his texting conversations with Stevie, he discusses

12  with him playing, play dates.  Right?

13  A.  Yes.

14  Q.  In Mr. Bright's text conversations with Stevie, he often

15  refers to him as his "little boy."  Right?

16  A.  Yes.

17  Q.  And in Mr. Bright's text conversations with Stevie, he

18  discusses with him about his interest in, first, keeping things

19  vanilla at first and focusing on getting to know one another.

20  Right?

21  A.  Yes.

22  Q.  And that's similar to the sort of text conversations you

23  had with Mr. Bright; right?

24  A.  That's correct.

25          MS. GALLICCHIO:  Can we put up Government Exhibit 3A,

1  please, page 26, the first blue box.

2  Q.  This is Government Exhibit 3A.  This is a portion of your

3  WhatsApp conversation with Mr. Bright.  Right?

4  A.  Correct.

5  Q.  So on May 15, he texts to you:  "Gently.  I could come

6  over, make our introductions, get them to tell me about

7  themselves and show me what they've learned already, something

8  along those lines?"

9          Right?

10 A.  That's correct.

11 Q.  He texted that to you; right?

12 A.  That's correct.

13 Q.  And that's similar to the types of conversations he had

14 with Stevie; right?

15 A.  That's correct.

16 Q.  And you know Stevie is an adult.

17 A.  That's correct.

18 Q.  Now, other than Stevie, you saw on his phone, Mr. Bright's

19 phone, other text conversations with other age players; right?

20 A.  Correct.

21 Q.  And you saw the use repeatedly of "daddy dom little girl"

22 or DDLG, the letters.  Right?

23 A.  That's correct.

24 Q.  And you saw repeatedly --

25          THE COURT:  When you say "you saw," you saw when you

K2CYBRI3                        Jensen - Cross

1    looked at it to refresh your recollection?

2            MS. GALLICCHIO:  No, your Honor.  Now I'm talking

3    about other text conversations on his phone.

4            THE COURT:  Go ahead.

5    BY MS. GALLICCHIO:

6    Q.  I'm not talking about Stevie.  I'm talking about other text

7    conversations he had on his phone.  Right?

8    A.  I understood you.

9    Q.  In other text conversations on his phone, you came across

10   other instances in which Mr. Bright discussed a similar

11   scenario, that being someone playing the role of an 11- or a

12   12-year-old.  Right?

13   A.  That's correct.

14   Q.  And in that role, he plays the daddy figure; right?

15   A.  Correct.

16   Q.  And as the daddy figure, he is teaching his "little," to

17   use the terminology, how to touch herself.  Right?

18   A.  Correct.

19   Q.  And those are the same sort of text conversations he had

20   with you.

21   A.  Correct.

22   Q.  And in many of the text conversations that you found on his

23   phone, not just with Stevie but others, he refers to his

24   age-play partner as his "princess."  Right?

25   A.  Correct.

K2CYBRI3                          Jensen - Cross

1   Q.  And in other text conversations with other age players, he

2   talks about sex as "play time."  Right?

3   A.  Correct.

4   Q.  Now, you started communicating with Mr. Bright on the KinkD

5   app.

6   A.  Correct.

7   Q.  And that first conversation was on April 18.

8   A.  Correct.

9   Q.  And the first conversation was Mr. Bright reaching out to

10  you; right?

11  A.  I think it was a little after.

12  Q.  Right.

13  A.  Yes.

14  Q.  You responded on May 1.

15  A.  Correct.

16  Q.  So April 18 was the first time that he texted you; right?

17  A.  Correct.

18  Q.  And then you didn't respond until May 1.

19  A.  Correct.

20  Q.  Between April 18 and May 1, did Mr. Bright pursue you in

21  any way?

22  A.  No.

23  Q.  And I believe we saw your --

24          Government Exhibit 2A, please.

25          If you take a look at Government Exhibit 2A,

K2CYBRI3                          Jensen - Cross

1   Mr. Bright says to you:  "Hi.  I'm Peter.  Can you elaborate a

2   little further on your profile."  Right?

3   A.  Correct.

4   Q.  He was asking you to explain your self-summary; right?

5   A.  Right.

6   Q.  Which you agreed with me earlier that it was ambiguous.

7   A.  Correct.

8   Q.  And to elaborate, you say that:  "My princess is seven, and

9   my prince charming is nine."  Right?

10  A.  Correct.

11  Q.  You don't say that my "daughter" is seven or my "son" is

12  nine.

13  A.  Correct.

14  Q.  You don't say that my "children" are seven and nine.

15  A.  Correct.

16  Q.  You used age-play terminology; right?

17  A.  Correct.

18  Q.  And then Mr. Bright responded, Government Exhibit 2C, using

19  your language.  Right?

20  A.  Correct.

21  Q.  He said:  "Anyway, I'd love to hear more about the prince

22  and princess."  Right?

23  A.  Correct.

24  Q.  He didn't say, "Your children."  Right?

25  A.  Correct.

K2CYBRI3                          Jensen - Cross

1    Q.  Or "your son and daughter."

2    A.  Correct.

3    Q.  He continued using your language, which is age-play

4    language.

5    A.  Correct.

6    Q.  Now, I believe you were the one who suggested that the

7    communication continue on WhatsApp.

8            Is that right?

9    A.  He had said he wanted to use a different platform, and I

10   said WhatsApp.

11           MS. GALLICCHIO:  If we can go to Government

12   Exhibit 2B.

13   Q.  So he said on Government Exhibit 2B:  "This might be better

14   over text.  Messaging here is not very reliable."  Correct?

15   A.  Correct.

16   Q.  And then he gives you his phone number; right?

17   A.  Correct.

18   Q.  That's his actual phone number; right?

19   A.  The 501?

20   Q.  Yes.

21   A.  Yes.  That's his Google Hangout.

22   Q.  And how you communicated with him?

23   A.  No.  I sent him a text there.

24   Q.  But he sent you his Google Hangout number.  Right?

25   A.  Correct.

K2CYBRI3                         Jensen - Cross

1   Q.  And that's when you then suggested WhatsApp; right?

2   A.  Correct.

3   Q.  And then he indicated that, no.  Just texting, SMS.  Right?

4   A.  Correct.

5   Q.  And then at some point he indicates to you he has a

6   WhatsApp number; right?

7   A.  Yes.  I texted that number.

8   Q.  And then you communicated on WhatsApp?

9   A.  Yes.  Then he texted the WhatsApp.

10  Q.  Now, WhatsApp was suggested by you.

11  A.  Correct.

12  Q.  Now, WhatsApp is an encrypted app; right?

13  A.  Correct.

14  Q.  And the texts themselves only live on the phones; right?

15  A.  Correct.

16  Q.  You can't subpoena WhatsApp text messages; right?

17  A.  Correct.

18  Q.  If they're deleted by someone, they're gone off of that

19  person's phone; right?

20  A.  Correct.

21  Q.  They can't be retrieved?

22  A.  No.

23  Q.  Now, your initial conversation --

24          If we can go to Government Exhibit 3, please, page 2,

25  the third blue box.  Thank you.

1          So this is a WhatsApp text from Mr. Bright to you.  He

2     says:  "So I'd love to hear more about what you're looking

3     for."  Right?

4     A.  Correct.

5          MS. GALLICCHIO:  Page 4, please, second green box.

6     Q.  And your response to him was:  "I really want my little

7     princess to learn how to be a good girl."  Right?

8     A.  Correct.

9     Q.  You continue to use the word "princess."  Right?

10    A.  Correct.

11    Q.  You don't say "daughter" or "child."  Right?

12    A.  Correct.

13    Q.  And then, again, on page 6, second green box, you ask

14    Mr. Bright:  "Do you have any experience with little prince

15    charmings?"

16    A.  Correct.

17    Q.  And, again, you continue to use age play terms; right?

18    A.  Correct.

19    Q.  You don't specify that "little prince charming" is your

20    actual son.

21    A.  Right.

22    Q.  So you never referred to the "little prince charming" and

23    the "princess" as your children.  Right?

24    A.  I called them their names later.

25    Q.  Right.  You gave them names, Braydon and Kayla.  Correct?

K2CYBRI3                         Jensen - Cross

1   A.  Correct.

2   Q.  But you never call them your children.

3   A.  I don't recall.  I may not have.

4   Q.  Ever.  Do you ever, in your text conversations, your phone

5   conversations, your in-person conversations, ever refer to

6   Braydon and Kayla or your children?

7   A.  No.  I don't recall saying their names.

8   Q.  Do you ever refer to Braydon and Kayla, in your text

9   conversations, as your "son" and your "daughter"?

10  A.  No.

11  Q.  Do you ever refer to Braydon and Kayla in your phone call

12  as your "son" and your "daughter"?

13  A.  No.

14  Q.  Do you ever refer to them in the in-person conversation,

15  the meet-up, as your "son" and your "daughter"?

16  A.  No.

17  Q.  In fact, Mr. Bright never does either.

18  A.  Correct.

19         MS. GALLICCHIO:  Now, if we could go to page 3, 3,

20  please, the second green box.

21  Q.  This is a text conversation on May 15, 2019.  It's your

22  text; right?

23  A.  Correct.

24  Q.  This is right in the beginning of your communication with

25  Mr. Bright.

1    A.  That's correct.

2    Q.  And you express here -- you write "Hmmmm, we may be looking

3    for different things."  Correct?

4    A.  Yes.

5    Q.  You're expressing some doubt here; right?

6    A.  Correct.

7    Q.  And you don't clarify at that point what you're really

8    looking for.

9    A.  Correct.

10   Q.  You don't say, I'm really looking for someone to molest my

11   kids.

12   A.  No.  I don't say that.

13   Q.  You don't say these are your children; right?

14   A.  No.

15   Q.  You don't say these are your son and daughter.

16   A.  No.

17   Q.  You continue to use age-play language; right?

18   A.  Yes.

19          MS. GALLICCHIO:  If we can go back to page 4, the

20   second green box.

21   Q.  So when explaining what you want, you say:  "I really want

22   my little princess to learn how to be a good girl."  Right?

23   A.  Correct.

24   Q.  Now, there was a second time in which you expressed some

25   doubt to Mr. Bright after the phone call with him.  Right?

K2CYBRI3                    Jensen - Cross

1    A.  Correct.

2               MS. GALLICCHIO:  Let's go to page 58, the third green

3    box.

4    Q.  You text Mr. Bright:  "It sounds like you're thinking of

5    something different."

6               And then if we can go to the next page, page 59, the

7    second green box:  "Maybe I'm misunderstanding you, which is

8    totally possible over text, lol."  And the third green box:

9    "Meaning is often misconstrued."

10              Those are your texts; right?

11   A.  That's correct.

12   Q.  And you're expressing the fact that sometimes meaning can

13   get lost over texts.

14   A.  That's correct.

15   Q.  And at this point, you don't clear up the misunderstanding;

16   right?

17   A.  That's correct.

18   Q.  You don't say, by the way, I'm talking about real kids.

19   A.  No.  I don't say that.

20   Q.  You never say that; right?

21   A.  I was referring to the phone call that we had.

22   Q.  But you never said "real kids."  You never used the

23   expression, these are "real kids."

24   A.  No.

25   Q.  You don't say here, to clear up this misunderstanding that,

1    I'm talking about my children.  Right?

2    A.  Correct.

3    Q.  You continued to use age-play language.

4    A.  Correct.

5    Q.  So Mr. Bright also asked you for photos on several

6    occasions; right?

7    A.  That's correct.

8    Q.  Sending photos would be the perfect way to set the record

9    straight about what you're talking about.  Right?

10   A.  Yes.

11   Q.  You eventually do send photographs of children; right?

12   A.  Yes.

13   Q.  Now, Mr. Bright never asks you for photos of your children.

14   Right?  Using those words.

15   A.  He asked for photos of the three of us are of "you all."

16   Q.  I'm asking you:  Does he ever say, send me a picture of

17   your kids?

18   A.  No.

19   Q.  Does he ever say, send me a picture of your children?

20   A.  No.

21   Q.  Does he ever say, send me a picture of your son and your

22   daughter?

23   A.  No.

24   Q.  Let's look at what he says on Government Exhibit 3, the

25   second blue box.

K2CYBRI3                          Jensen - Cross

1          So this second blue box, Mr. Bright texts to you on

2     May 15 at 12:37:  "Got any family photos?"

3     A.  Right.

4     Q.  That's early on in your conversations; right?

5     A.  That's correct.

6     Q.  And then he doesn't say -- he doesn't mention "son,"

7     "daughter," "children."  Right?

8     A.  Correct.

9          MS. GALLICCHIO:  And then if we can go to page 28, the

10    second blue box.

11    Q.  He says:  "I would still love to see my students."

12         Do you recall that?

13    A.  Correct.

14    Q.  This is the next day, on May 16.

15    A.  Correct.

16    Q.  And you respond, the first green box:  "When would you love

17    to see them?"

18         And his answer is:  "Well, a picture or two would be

19    nice.  But otherwise, when is a good time to come over?"

20         So at this point, he was referring to a picture;

21    right?

22    A.  Correct.

23    Q.  And then also of the possibility of getting together;

24    right?

25    A.  Correct.

K2CYBRI3                    Jensen - Cross

1   Q.  Again, there's nothing in this communication that refers to

2   "children."  Right?

3   A.  Correct.

4   Q.  Or "son" or "daughter."  Right?

5   A.  Correct.

6   Q.  And you don't take this opportunity to clear up any

7   ambiguity.

8   A.  On May 16?

9   Q.  Yes.

10  A.  No.

11  Q.  You decided on May 15, when he asked for a family photo,

12  and May 16, when he asked to see "my students," not to send a

13  picture.

14  A.  Correct.

15  Q.  It's May 19 when you finally do send pictures; right?

16  A.  That's correct.

17  Q.  And that's after the phone call.

18  A.  Also correct.

19  Q.  Now, you asked him to send pictures; right?

20  A.  Correct.

21          MS. GALLICCHIO:  Could we look at page 30.

22  Q.  This is shortly after he asked you for a photograph; right?

23  A.  That's correct.

24  Q.  On page 30, second green box, you say:  "You got a photo?"

25  Right?

K2CYBRI3                          Jensen - Cross

1    A.  Correct.

2    Q.  And then he sends you a photograph, second blue box.

3    Right?  That's a photograph that's on his KinkD profile page.

4    Right?

5    A.  That's correct.

6    Q.  And then the two of you, after that photograph is sent,

7    engage in a little bit of banter about the fact that he's

8    double-fisting Starbucks; right?

9    A.  Correct.

10   Q.  And it's a bit of sexual banter between the two of you;

11   right?

12   A.  I didn't mean it in a sexual way.

13   Q.  Right.  Let's take a look at page 31.  I'm sorry.  Let's

14   start with the second blue box.

15           Mr. Bright says to you:  "Double-fisting Starbucks

16   amuses me."  Right?

17   A.  Correct.

18           MS. GALLICCHIO:  The last green box.

19   Q.  Your response was:  "I was about to use the same words

20   'double-fisting'"?

21   A.  That's correct.

22   Q.  You know the term "double-fisting" has a sexual

23   connotation?

24   A.  Correct, but it also pertains to having two drinks.

25   Q.  Right.

1  A.  Correct.

2  Q.  And then the next picture he sends you, if we can go to

3  page 32, which we've seen earlier, the photograph.  It's a

4  picture of Mr. Bright with no shirt on.

5  A.  Correct.

6  Q.  The two of you then engage in some banter about his beard

7  being two different colors; right?

8  A.  Correct.

9  Q.  And about his age; right?

10  A.  Correct.

11  Q.  This is banter between you and him as adults; right?

12  A.  Correct.

13  Q.  There is no conversation there about "prince" or

14  "princess."

15  A.  Correct.

16  Q.  In fact, you have lots of --

17          We can take that down.

18          You have lots of adult conversation with Mr. Bright;

19  right?

20  A.  Correct.

21  Q.  You both discuss your jobs; right?

22  A.  Correct.

23  Q.  Obviously you had a fake job; right?

24  A.  Correct.

25  Q.  In your job, you play a trainer; right?

K2CYBRI3                          Jensen - Cross

1   A.  That's correct.

2   Q.  Mr. Bright tells you that he's a journalist; right?

3   A.  Correct.

4   Q.  And you know that he is.

5   A.  Correct.

6   Q.  He tells you that he writes about technology; right?

7   A.  Correct.

8   Q.  And you know that he does.

9   A.  That's correct.

10  Q.  He tells you that he works from home; right?

11  A.  Correct.

12  Q.  And you know that to be true.

13  A.  Correct.

14  Q.  He also tells you that he's married and his wife is

15  vanilla.

16  A.  I think he said "girlfriend."

17          THE COURT:  I didn't hear the answer.

18          THE WITNESS:  I think he said "girlfriend."

19  BY MS. GALLICCHIO:

20  Q.  He told you he was in a relationship; correct?

21  A.  Correct.

22  Q.  And that she was vanilla.

23  A.  Correct.

24  Q.  You and he often discussed weekend plans; right?

25  A.  Correct.

1   Q.  You discussed movies; right?

2   A.  Correct.

3   Q.  And during these conversations, you never had any

4   conversation with him about children; right?

5   A.  I recall -- that's incorrect.

6   Q.  When?

7   A.  Weekend plans, taking Braydon and Kayla to the park.

8   Braydon had soccer practice.

9   Q.  That was in a telephone call; right?

10  A.  Correct.

11  Q.  In that telephone call, you didn't refer to Braydon and

12  Kayla as your "son" or your "daughter."

13  A.  That's correct.

14  Q.  And you know that some age players live out the fantasy

15  24/7; right?

16  A.  Yes.  24/7.

17  Q.  Some age players will take their "submissive" or their

18  "little," for example, to Chuck E. Cheese.  Right?

19  A.  Correct.

20  Q.  And they'll ask them or require them -- I guess ask them --

21  to act like a teenager or a child in public.  Right?

22  A.  Correct.

23  Q.  Now, you testified on direct examination that there were

24  many conversations or many text exchanges with Mr. Bright about

25  the scenario that he would teach to your "prince charming" and

1    "princess."  Right?

2    A.  Yes.  There was conversation about it.

3    Q.  As we've already said, these were conversations that were

4    similar to the types of text messages you saw on his phone that

5    he had with other consenting adults; right?

6    A.  That's correct.

7    Q.  The conversations that you had, the texts that you had with

8    Mr. Bright, used a lot of the same language; right?

9    A.  Correct.

10   Q.  And the same scenario as you've already pointed out, that

11   being teaching about body parts and how to please themselves

12   and others.  Right?

13   A.  Correct.  I don't recall saying "foreskin" though.

14   Q.  I just want to clear it up.  He never said -- and I'm in

15   quotes -- "I want to teach your children about sex."

16   A.  Correct.

17   Q.  And as you've already testified, he never used the word

18   "children."

19   A.  That's correct.

20   Q.  Nor did you.

21   A.  Correct.

22   Q.  Now, getting to the foreskin, Mr. Bright offered the fact

23   that he was not circumcised to make sure it was not an issue.

24   Right?

25   A.  Yeah.  He brought it up.  Yes.

1          MS. GALLICCHIO:  Let's look at page 35, the second

2    blue box.

3    Q.  Now, this text from Mr. Bright where he says:  "Oh, um, I

4    don't know if it matters, but I'm not circumcised."

5          This was on May 16, 2019, at 12:26.  Right?

6    A.  That's correct.

7    Q.  This was before you guys had a phone call; right?

8    A.  Correct.

9    Q.  This is before you sent the photographs of the children;

10   right?

11   A.  Correct.

12         MS. GALLICCHIO:  If we can go to page 46, the second

13   green box.

14   Q.  You asked Mr. Bright whether he thought about what kind of

15   lesson he would like to start with.  Right?

16   A.  That's correct.

17   Q.  This was still on May 16, that same day.

18   A.  Correct.

19   Q.  And then it's then that he responds:  "Really depends on

20   their experience, but I'm thinking maybe something involving

21   foreskin is the way to start."  Right?

22   A.  Correct.

23   Q.  And, again, this is before the phone call; right?

24   A.  That's correct.

25   Q.  And this is before the photographs?

K2CYBRI3                              Jensen - Cross

1   A.  That's correct.

2   Q.  And during this conversation, he goes on to explain to you

3   how it is unusual in the United States to be uncircumcised;

4   correct?

5   A.  Right.

6   Q.  And he tells you about the fact that he had been seeing

7   another girl, another adult.  And he tells you about her

8   reaction to his uncircumcised penis.  Right?

9   A.  That's correct.

10          MS. GALLICCHIO:  Page 47, please.

11  Q.  You say to him:  "Yeah.  It's kind of rare here.  Does the

12  other girl like it?"

13          So you're referring here to a conversation that

14  Mr. Bright had with you to the effect that he's teaching

15  someone else; right?

16  A.  Correct.

17  Q.  Referring to an 11-year-old in the Bronx; right?

18  A.  That's correct.

19  Q.  Well, you know there's no 11-year-old in the Bronx.  Right?

20  A.  Yes.  We know there is no 11-year-old in the Bronx.

21  Q.  You know it's another age-player; that he was acting out

22  the scenario that he likes of an 11- and 12-year-old.  Right?

23  A.  That's what he stated.  Yes.

24  Q.  And you found nothing to contradict that; right?

25  A.  Correct.

K2CYBRI3                         Jensen - Cross

1   Q.  I assume the FBI did a thorough investigation to find out

2   whether there was an 11-year-old in the Bronx that Mr. Bright

3   was molesting; right?

4   A.  That's correct.

5   Q.  And you didn't find anything.

6   A.  That's also correct.

7   Q.  And Mr. Bright says to you -- you ask him:  "Does the other

8   girl you teach like it?"

9              He says, "Yes.  In fact, every American I've been

10  with, except one, enjoyed it.  But the one, we were back at her

11  place.  We got naked, and she said no because I wasn't

12  circumcised," a bunch of eye rolling here.  And then you go on

13  to discuss.

14             Right?

15  A.  Correct.

16  Q.  Clearly he's talking about an adult experience.

17  A.  Correct.

18  Q.  Would you agree with me, Agent Jensen, that it's not

19  relevant to a 79-year-old whether a man has a circumcised

20  penis?

21             MR. LI:  Objection.

22             THE COURT:  Sustained.

23  BY MS. GALLICCHIO:

24  Q.  Would you agree with me that whether a penis is circumcised

25  makes no difference to a 79-year-old?

K2CYBRI3                        Jensen - Cross

1           MR. LI:  Objection.

2           THE COURT:  Sustained.

3    BY MS. GALLICCHIO:

4    Q.  And then Mr. Bright suggests to you on page 49, the bottom

5    of the page, the last blue box, he says to you:  "Maybe you'll

6    need a lesson too!"  Right?

7    A.  Correct.

8    Q.  That was suggesting sexual activity with you.  Right?

9    A.  I think he was suggesting it.  Yes.

10   Q.  Now, your response to this, on page 50, bottom of the page,

11   in the bottom green box, you say:  "I'm excited to watch my

12   little angels learn."  Right?

13   A.  That's correct.

14   Q.  And you used age-play language; right?

15   A.  Correct.

16   Q.  You don't call them your "children" or your "son" or your

17   "daughter"?

18   A.  Correct.

19   Q.  Now, the phone call that you had with Mr. Bright was on --

20           We can take that down.

21           -- was on May 17, 2019; right?

22   A.  That's correct.

23   Q.  And you talk about Braydon and Kayla.  Right?

24   A.  That's correct.

25   Q.  You never refer to Braydon and Kayla as your "son" and your

K2CYBRI3                          Jensen - Cross

1    "daughter"?

2    A.  I don't explicitly recall if I ever say "my son Braydon and

3    my daughter Kayla."

4    Q.  You don't recall.

5           You never refer to Braydon and Kayla as your

6    "children."  Right?

7    A.  I don't think I said "children."  My kids.

8    Q.  And Mr. Bright doesn't call them your "children" or your

9    "son" or your "daughter."  Right?

10   A.  No.

11   Q.  Now, after the phone call, the two of you continued to chat

12   obviously.  Right?

13   A.  Correct.

14           MS. GALLICCHIO:  Page 57, again, Government Exhibit 3,

15   page 57, the second blue box.

16   Q.  Mr. Bright says to you:  "Oh, yeah.  The reason I was

17   curious about your involvement is that I was thinking that for

18   explaining things like the clitoris, the proximity of the

19   vagina and anus, etc., it would probably be easier to show them

20   on you."

21           So in this conversation, Mr. Bright is suggesting that

22   he'd like to involve you; right?

23   A.  He was asking in reference to the phone call about my

24   involvement.  And I said that the lessons are for them, and I

25   explained my involvement.

1   Q.  But he's suggesting that you should get involved.

2   A.  I think he was clarifying why he asked that.

3   Q.  Well, he said:  "It would probably be easier to show them

4   on you."  Right?

5   A.  Correct.

6          MS. GALLICCHIO:  If we can go to page 63, the first

7   green box.

8   Q.  You ask Mr. Bright:  "Do you have any limits or something

9   you don't like?"

10          And then you ask him, the second green box:  "Well, do

11   you have stuff you like?"

12          So you're asking him about his kinks; right?

13   A.  Just in general, yes.

14   Q.  And you're asking about what he likes and what he doesn't

15   like.

16   A.  Correct.

17   Q.  And you're referring to "limits."  Right?

18   A.  Correct.

19   Q.  The concept of "limits" is something that is an important

20   concept in the kink community; right?

21   A.  Correct.

22   Q.  And he describes to you his kinks; right?

23   A.  Correct.

24   Q.  And this conversation is before the photographs are sent;

25   right?

K2CYBRI3                          Jensen - Cross

1   A.  That's correct.

2   Q.  And he describes his kinks to you in graphic detail; right?

3   A.  Correct.

4   Q.  He describes, as we've already said, pissplay; right?

5   A.  Correct.

6   Q.  He says forced orgasms and squirting; right?

7   A.  Correct.

8   Q.  And he says that he likes making a girl climax 15, 20, 25

9   times in a row.  Right?

10  A.  Correct.

11  Q.  These are clearly adult activities; correct?

12  A.  Correct.

13  Q.  You certainly didn't think he was talking about things he

14  would do with a seven- or nine-year-old.

15  A.  I think we were clearly past that.

16  Q.  Multiple orgasms are relevant in adult sex; right?

17  A.  The compilation of work.  We see a lot of stuff.

18  Q.  Yes or no?  Are multiple orgasms relevant to an adult as

19  opposed to --

20  A.  Relevant to an adult.

21  Q.  And Mr. Bright makes it clear to you that he's talking

22  about dominance and submission; right?

23          Well, let me refer you to page 65.

24  A.  Yes.  I recall.

25          MS. GALLICCHIO:  The third blue box.

1   Q.  He said:  "I enjoyed it.  She gulped it down and asked for

2   more.  It was part of a broader Dom/sub thing."  Right?

3   A.  Yes.

4   Q.  He was talking about his play; right?

5   A.  Something that he was talking about.  Yes.

6           THE COURT:  I didn't hear your answer.

7           THE WITNESS:  I said that's something he was talking

8   about.  He was referring to broader dom/sub.

9           THE COURT:  Thank you.

10  BY MS. GALLICCHIO:

11  Q.  You didn't take the opportunity to clarify that you're

12  talking about real children, not adults.  Right?

13  A.  No.

14  Q.  In fact, on the top of page 66, please, the first box, you

15  ask:  "Was that with a little princess?"

16          Right?

17  A.  Correct.

18  Q.  Again, you continued to use the age-play language.  Right?

19  A.  Correct.  That was after the phone call.

20  Q.  That was after the phone call; right?

21  A.  Correct.

22  Q.  This was before the photos though; correct?

23  A.  Correct.

24  Q.  And then he discussed with you the fact that these types of

25  activities are the types of activities that he likes that are

K2CYBRI3                          Jensen - Cross

1    relevant, as we said, to the dom/sub category; right.

2    A.   And he says "mommy" versus "princess."

3    Q.   So he's making a distinction in these conversations between

4    age players and adults; right?

5    A.   He just used the word "mommy" versus "princess."

6              MS. GALLICCHIO:  Let's take a look at page 68.

7    Q.   On the second page, the second blue box, he says:  "I think

8    it's more of a mommy thing than a princess thing."

9    A.   Correct.

10   Q.   And "mommy" is the role that you chose on KinkD; right?

11   A.   Correct.

12   Q.   So a "mommy thing" here refers to a dom; right?  A

13   dominant, an adult.

14             MR. LI:  Objection.

15             THE COURT:  Basis?

16             MR. LI:  Calls for speculation as to what the

17   defendant meant.

18             THE COURT:  Well, what did you understand the

19   defendant to mean?

20             THE WITNESS:  I took it as a mommy adult versus a

21   princess child.

22             THE COURT:  Thank you.

23   BY MS. GALLICCHIO:

24   Q.   But he didn't say it's more of a mommy thing than a child

25   thing.  Right?  He said "a princess thing."

K2CYBRI3                          Jensen - Cross

1   A.  Correct.  We never utilized "child."

2   Q.  Right.  You continued to use "princess" when you referred

3   to Kayla; right?

4   A.  Yes.  As a term of endearment.  Yes.

5   Q.  Also an age-playing term.  Right?

6   A.  Yes.

7   Q.  Now, you said that you were surprised that Mr. Bright was

8   showing up at the meeting at Duane Park on the 22nd of May.

9        Is that right?  Or did I misunderstand?

10  A.  I don't think I was surprised.  I just didn't hear from

11  him.

12  Q.  But you had planned to meet; right?

13  A.  We did.  Yes.

14  Q.  And you knew that on May 22, that day, he had a meeting in

15  Manhattan that morning.  Right?

16  A.  Yes.  That's what he said.

17  Q.  And that it would be a perfect time after the meeting, that

18  he could come and meet with you.  Right?

19  A.  Yes.  That's correct.

20  Q.  Now, you indicated that you were planning to record this

21  meeting; right?

22  A.  That's correct.

23  Q.  And as part of your investigation, as part of your work, is

24  that something you do regularly?  Record interactions with

25  individuals.

K2CYBRI3                     Jensen - Cross

1    A.   In these instances, yes.

2    Q.   So that's standard operating procedure; right?

3    A.   That's correct.

4    Q.   So when you show up at this meeting, you're going to make a

5    recording; right?

6    A.   Yes.

7    Q.   Because it's important to obviously capture everything

8    that's said.  Right?

9    A.   That's correct.

10   Q.   A recording is important evidence.

11   A.   That's correct.

12   Q.   And you didn't have the battery life on your phone.

13   A.   It was a different device.

14   Q.   A different device.  So the battery died, and you couldn't

15   record.  Right?

16   A.   Yes.

17            THE COURT:  What did you say?

18            THE WITNESS:  I said, well, yes.

19            THE COURT:  Okay.  I didn't hear you.

20   BY MS. GALLICCHIO:

21   Q.   Now, you testified that prior to this meeting, you had

22   asked for STD tests; right?

23   A.   That's correct.

24   Q.   And that was early on in your conversations with

25   Mr. Bright.  Right?

K2CYBRI3                          Jensen - Cross

1    A.  Correct.

2              MS. GALLICCHIO:  If we can take a look at Government

3    Exhibit 3I.

4    Q.  So Government Exhibit 3I is a screenshot of one of

5    Mr. Bright's STD tests; right?

6    A.  That's correct.

7    Q.  This is his HIV test; right?

8    A.  Correct.

9    Q.  And you were the one who asked him for the test; right?

10   A.  Correct.

11   Q.  This was before the phone call; right?

12   A.  That's correct.

13   Q.  This was before the photos of the kids.

14   A.  That's correct.

15   Q.  And he sent you the screenshot.

16   A.  That's correct.

17   Q.  And we see a redaction.  I think you testified to this on

18   direct.

19              But there are black boxes which are redactions; right?

20   A.  That's correct.

21   Q.  Those redactions weren't there when Mr. Bright sent that to

22   you; right?

23   A.  That's correct.

24              MS. GALLICCHIO:  We can take that down.

25   Q.  You testified on direct examination about the importance of

K2CYBRI3                         Jensen - Cross

1  asking for this, because, to use your words, it's an "overt act

2  that someone has to take to show interest in having sex with

3  kids."  Right?

4  A.  Yes.

5  Q.  But it is also, sharing STD tests, something responsible

6  adults do before having sex with strangers.  Right?

7  A.  Correct.

8  Q.  And it's an important part of your investigation, to get

9  evidence of overt acts; right?

10 A.  Correct.

11 Q.  Sometimes you ask a suspect to bring something to a

12 meeting; right?

13 A.  Correct.

14 Q.  You use that something as proof of their intention; right?

15 A.  Correct.

16 Q.  Sometimes, in your experience, you've asked suspects to

17 bring candy for the children; right?

18 A.  I have not.

19 Q.  Do you know that to be a common practice?

20 A.  Yeah.

21 Q.  So if they show up with candy, it's an overt act; right?

22 A.  Correct.

23 Q.  Sometimes you ask them to bring condoms; right?

24 A.  Correct.

25 Q.  In this instance, you didn't ask Mr. Bright to bring

1   condoms; right?

2   A.   We discussed condoms, and I wanted to see a printout to

3   make sure he was clean.

4   Q.   I asked:  Did you ever ask him to bring condoms?

5   A.   No.

6   Q.   But you then asked him in the phone call that we heard if

7   he could bring to the meeting another overt act, being the

8   actual test results.  Right?

9   A.   Correct, because his name wasn't on it.

10  Q.   And you asked him if he could print it out; right?

11  A.   Correct.

12  Q.   You wanted the actual hard copy; right?

13  A.   Correct.

14  Q.   And if he would have shown up with the actual hard copy, it

15  would be strong evidence of his intent in your mind; right?

16  A.   It would go to the totality of the investigation; right.

17  Q.   It would be an overt act; right?

18  A.   Correct.

19  Q.   But when he showed up, he didn't even have a screenshot;

20  right?

21  A.   Correct.

22  Q.   You asked him for it; is that right?

23  A.   Correct.

24  Q.   He said he didn't bring it.

25  A.   Correct.

K2CYBRI3                        Jensen - Cross

1    Q.  He had to log in to the website of the testing facility to

2    show it to you on his phone; right?

3    A.  That's correct.

4    Q.  As you've already said, you and the FBI are in possession

5    of Mr. Bright's phone.

6    A.  Correct.

7    Q.  And part of your job is to investigate the receipt,

8    possession, and distribution of child pornography.  Right?

9    A.  That's correct.

10   Q.  In your experience, you have found that child molesters are

11   likely to possess child pornography; right?

12            MR. LI:  Objection.

13            THE COURT:  Basis?

14            MR. LI:  Relevance.

15            THE COURT:  Yes.  I'll sustain the objection.

16   BY MS. GALLICCHIO:

17   Q.  In your experience, you look for child pornography every

18   time you arrest somebody; right?

19   A.  Yes.  That's correct.

20   Q.  So it's relevant to your investigation.  Right?

21   A.  Yes.

22   Q.  And you look for it because there is some connection

23   between child pornography and child molesters.

24            MR. LI:  Objection.

25            THE COURT:  Sustained.

K2CYBRI3                          Jensen - Cross

1   BY MS. GALLICCHIO:

2   Q.  Well, you look for it as an overt act; right?

3   A.  Yes.

4   Q.  And you looked for it in this case; right?

5   A.  Yes.

6   Q.  You spent weeks, if not months, examining Mr. Bright's

7   phone in your possession.  Right?

8   A.  Correct.

9   Q.  And you saw on his phone lots of photographs; right?

10  A.  That's correct.

11  Q.  Lots of naked photographs; right?

12  A.  Correct.

13  Q.  All of adults; right?

14  A.  That's correct.

15  Q.  Lots of naked photographs of Mr. Bright.

16  A.  That's correct.

17  Q.  Lots of pictures of his penis.

18  A.  Correct.

19  Q.  Lots of sexual photos and videos; right?

20  A.  Yeah.  A few.  Yes.

21  Q.  Of adults.

22  A.  Yes.  That's correct.

23  Q.  But on his phone, you found not one single picture of child

24  pornography; right?

25  A.  I did not.

1          MS. GALLICCHIO:  I have nothing further, your Honor.

2          THE COURT:  All right.  You may redirect.

3   REDIRECT EXAMINATION

4   BY MR. LI:

5   Q.  Special Agent Jensen, you testified on cross-examination

6   just now about reviewing the defendant's phone.

7          Do you recall that?

8   A.  I do.

9   Q.  And you testified to reviewing his phone for child

10  pornography.

11         Do you recall that?

12  A.  That's correct.

13  Q.  Did Mr. Bright bring any other devices to the meeting?

14  A.  Yes.

15  Q.  Did you review all of the devices in his possession for

16  child pornography?

17  A.  No.

18  Q.  Did you review any other device or account for child

19  pornography, other than the phone?

20  A.  Yes.

21  Q.  What did you review for child pornography?

22  A.  His Gmail account.

23  Q.  Did you find any child pornography on his Google account,

24  on his Gmail account?

25  A.  No.

K2CYBRI3                    Jensen - Redirect

1    Q.  Were you able to review all of the devices and accounts

2    belonging to the defendant for child pornography?

3    A.  No.

4    Q.  And the device that you were able to review for child

5    pornography, the one that you did not find any child

6    pornography on -- is that a device that he brought to the

7    meeting with you?

8    A.  That's correct.

9    Q.  Is that also the same device on which he made his recording

10   of the undercover meeting?

11   A.  That's correct.

12   Q.  I'd like to turn now to your discussion on

13   cross-examination about the defendant's profile on KinkD.

14          Do you recall that discussion?

15   A.  Yes.

16          MR. LI:  Ms. Fetman, can we please pull up Defense

17   Exhibit A.  If I could ask you to turn to the second page,

18   please.  Thank you.

19   Q.  Special Agent Jensen, do you recognize this?

20   A.  I do.

21   Q.  What is this?

22   A.  This is part of the defendant's profile on KinkD.

23   Q.  Do you see under the section "my role"?

24   A.  I do.

25   Q.  Do you see where it says, "Age player."

K2CYBRI3                          Jensen - Redirect

1    A.   I do.

2           MR. LI:  Ms. Fetman, could I impose on you to put up

3    Defense Exhibit D.  Thank you.

4    Q.   Special Agent Jensen, do you recognize Defense Exhibit D on

5    the right here?

6    A.   I do.

7    Q.   What is Defense Exhibit D?

8    A.   This is the screenshot of when you pick what role.

9    Q.   Is one of the roles that the defendant selected age player?

10   A.   Correct.

11   Q.   Did you select the role age player for your account?

12   A.   No.

13          MR. LI:  Ms. Fetman, could we please pull up

14   Government Exhibit 1.

15   Q.   What is the role that you selected?

16   A.   "Mommy."

17   Q.   And who reached out to who on KinkD?

18   A.   He reached out to me.

19   Q.   Now, you testified on cross-examination that, in some

20   cases, "mommy" has a certain meaning in age play.

21          Do you recall that?

22   A.   I do.

23   Q.   Does "mommy" have any other meanings?

24   A.   Yes.

25   Q.   What are some of the other meanings that "mommy" has?

1    A.   Having a daughter.

2    Q.   Can it mean being a mother?

3    A.   Of course.

4    Q.   When you put "mommy" as your role but not age play, what

5    did you intend to convey?

6    A.   That I was a mom.

7              MR. LI:   I apologize.   Could we turn to Defense

8    Exhibit A again.   Sorry for all of the switching.   Could you

9    turn to the last page, please.

10   Q.   Special Agent Jensen, we're looking now at Defense Exhibit

11   A.

12              Can you just remind us what of what we're looking at.

13   A.   Yes.   This is a continuation of his KinkD profile.

14   Q.   When you say "his," do you mean the defendant?

15   A.   That's correct.

16   Q.   Do you see where it says:   "Age range, 18 to 99"?

17   A.   That's correct.

18   Q.   Is it possible on the KinkD application to select an age

19   lower than 18?

20   A.   No.

21              MR. LI:   We can take that down.   Thank you.

22   Q.   On cross-examination, you testified about the various

23   websites that the FBI investigates for child exploitation

24   cases.

25              Do you recall that discussion?

1    A.  I do.

2    Q.  What are some of the websites that the FBI investigates?

3    A.  Instagram, Facebook, Snapchat, Twitter, Nasty Kink Pigs,

4    FetLife, Kinker, Telegram, Wickr, Kik.

5    Q.  Are some of those applications advertised for adults?

6    A.  Yes.

7    Q.  Do they include adult dating sites?

8    A.  Yes.

9    Q.  Do some of the websites you investigate include adult porn?

10           MS. GALLICCHIO:  Objection.  Leading.

11           THE COURT:  This is redirect.  Take a look at the

12   rule.

13   BY MR. LI:

14   Q.  Do they include adult porn?

15   A.  Yes.

16   Q.  Do they include adult social networks?

17   A.  Yes.

18   Q.  How does the FBI select those websites for investigation?

19   A.  Based on the history of other offenders on the accounts.

20   Q.  Is KinkD one of the websites that the FBI investigates?

21           MS. GALLICCHIO:  Objection.

22           THE COURT:  Overruled.

23           THE WITNESS:  Yes.

24           THE COURT:  Mr. Li, do you have much more, or is this

25   a convenient time to break?

1          MR. LI:  Your Honor, I have maybe 15 minutes more.

2          THE COURT:  We'll break for lunch.

3          Ladies and gentlemen, keep an open mind.  There is

4     much more to come.  And do not discuss the case among

5     yourselves or with anyone.  Do have a very pleasant lunch.

6     We'll be back in action for 2:00.  Thank you.

7          (In open court; jury not present)

8          THE COURT:  We are in recess.

9          (Luncheon recess)

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                              2:10 p.m.

3              (In open court; jury present)

4              THE COURT:  Please be seated.

5              Good afternoon, ladies and gentlemen.  It's good to

6     see you back and even a few smiles.  I understand there were

7     some refreshments in the jury room, which is a good thing.

8              Without further ado, Mr. Li, you may continue.

9              MR. LI:  Thank you.

10    Q.  Good afternoon, Special Agent Jensen.

11    A.  Good afternoon.

12    Q.  On cross-examination, do you remember testifying about a

13    conversation on the defendant's phone with someone named

14    Stevie?

15    A.  I do.

16    Q.  And you testified that Stevie and the defendant appeared to

17    be in age play; is that correct?

18    A.  That's correct.

19    Q.  In the Stevie conversation, was there an explicit

20    discussion of DDLG?

21    A.  It's stated in there, yes.

22    Q.  What is DDLG again?

23    A.  Daddy, dom, little girl.

24    Q.  In your conversations with the defendant, did he ever use

25    the words "DDLG"?

K2CYBRI3                        Jensen - Redirect

1    A.  No.

2    Q.  In your conversations with the defendant, did he ever

3    explicitly reference age play?

4    A.  No.

5    Q.  In your conversations with the defendant, did he ever

6    explicitly describe your purported children as adults

7    pretending to be children?

8    A.  No.

9    Q.  In the Stevie conversation, was the sexual activity focused

10   on Stevie or with some other person?

11   A.  With Stevie.

12   Q.  In your conversations with the defendant, was the

13   conversation focused on sexual activity with you?

14   A.  No.

15   Q.  In the Stevie conversation, did Stevie ever suggest

16   bringing his own children into the role play?

17   A.  No.

18   Q.  In the Stevie conversation, did the defendant ever receive

19   pictures of what appeared to be actual children?  Without

20   looking at anything.

21   A.  No.

22   Q.  On cross-examination, do you recall discussing the language

23   that is sometimes used in age play or role play?

24   A.  Yes.

25   Q.  I think you testified earlier that the word "princess" is

1    sometimes used in age play.  Is that correct?

2    A.  Correct.

3    Q.  Does "princess" have any other meanings?

4    A.  "Princess" is a term of endearment.  "Princess" or "queen."

5    By "princess," I referred to the child.

6    Q.  In your conversations with the defendant, what did you

7    intend to convey with the word "princess"?

8    A.  I was referring to "princess" as a seven-year-old girl.

9    Q.  Did you have a similar intent with regard to the word

10   "prince"?

11   A.  That's correct.

12   Q.  I think you testified earlier that the phrase "playtime" is

13   sometimes used in age play; is that correct?

14   A.  That's correct.

15           MR. LI:  Ms. Fetman, if we could please pull up

16   Government Exhibit 3A, and let's turn to page 76, please.

17   Q.  Special Agent Jensen, do you see a photograph to the right

18   in a green bubble?

19   A.  I do.

20   Q.  What is this picture?

21   A.  This is a photograph of the seven-year-old purported child

22   with my face close to her thigh.

23   Q.  By the way, is this a real child in this photograph?

24   A.  No.

25   Q.  Do you see a caption underneath the photograph?

K2CYBRI3                    Jensen - Redirect

1    A.  I do.

2    Q.  What is that caption?

3    A.  "Here's one before play time."

4    Q.  Before you had sent this picture, had you also sent the

5    defendant other pictures of your purported children?

6    A.  Yes.

7    Q.  How does the defendant respond to your picture?  The one

8    you just sent, the one we were just discussing.  Excuse me.

9    A.  He wrote:  "Oooh.  Play time sounds fabulous."

10             MR. LI:  Let's turn to page 57, please, Ms. Fetman.

11   Q.  Do you see the two blue chats to the left, the sort of

12   second and third blue chats?

13   A.  Yes.

14   Q.  Now, on cross-examination, you discussed these chats.

15             Do you remember that discussion?

16   A.  I do.

17   Q.  Could you read these two chats, please.

18   A.  "Oh, yeah.  The reason I was curious about your involvement

19   is that I was thinking that for explaining things like the

20   clitoris, the proximity of the vagina and anus, etc., it would

21   probably be easier to show them on you.  There is only so much

22   that I can demo on my phone, you know.  If that's not something

23   you would be comfortable with, that's okay."

24   Q.  What is the time stamp on that second message?

25   A.  May 17, 2019, at 5:03:26 p.m.

1           MR. LI:  Ms. Fetman, can we turn to page 61, please.

2     Let's look at the very bottom chat there, please.

3     Q.  Do you see a message here on May 17, 2019, at the top at

4     5:23 p.m., which would be about 20 minutes after the chat we

5     just looked at?

6     A.  Yes.

7     Q.  What is the message here?

8     A.  "Do you want the lessons to be hetero normative?"

9           MR. LI:  Ms. Fetman, could we turn to the next page,

10    please.

11    Q.  If you could read the chats in the green bubble to the

12    right, I'll read the chats in the blue bubble to the left.

13    A.  "Sorry for my ignorance.  What do you mean by that?  As

14    opposed to what?"

15    Q.  "Does Kayla eat flowers and Braydon suck snakes?"

16    A.  "Yes.  Kayla licks mommy, and Braydon sucks snakes."

17    Q.  "Okay.  Cool.  Well-rounded and free of prejudice."

18          We can stop there.  Just the last couple of questions.

19          Special Agent Jensen, do you remember testifying

20    earlier about the two phones on the defendant's person at the

21    time of his arrest?

22    A.  I do.

23    Q.  You testified that you reviewed one of those phones for

24    child pornography; is that correct?

25    A.  That's correct.

K2CYBRI3                          Jensen - Redirect

1    Q.  Did the FBI have technical problems accessing the other

2    phone?

3              MS. GALLICCHIO:  Objection.

4              THE COURT:  Basis?

5              MS. GALLICCHIO:  Her knowledge.

6              THE COURT:  We're going to find out.

7              If you know.  You can only answer if you know.

8              THE WITNESS:  Yes.  To date, we have not been able to

9    review it.

10             MR. LI:  Can I just take a moment, your Honor.

11             No further questions.

12             THE COURT:  All right.  Thank you,

13   Special Agent Jensen.  You may step down.

14             MS. GALLICCHIO:  Your Honor, I do have some questions

15   on recross, if the Court would permit.

16             THE COURT:  I generally don't allow recross, unless

17   there is some new matter that came out.

18             So thank you.  You may step down.

19             (Witness excused)

20             THE COURT:  You may call your next witness.

21             MR. LI:  The government calls Special Agent Aaron

22   Spivack.

23   AARON SPIVACK,

24        called as a witness by the Government,

25        having been duly sworn, testified as follows:

1          THE DEPUTY CLERK:  State your name and spell it for

2     the record, please.

3          THE WITNESS:  Aaron Spivack, A-a-r-o-n S-p-i-v-a-c-k.

4          THE COURT:  You may inquire.

5     DIRECT EXAMINATION

6     BY MR. LI:

7     Q.   Good afternoon, Special Agent Spivack.

8          Are you currently employed?

9     A.   I'm employed with the Federal Bureau of Investigation.

10    Q.   Will you understand me if I refer to that agency as the

11    FBI?

12    A.   Yes, sir.

13    Q.   What is your title there?

14    A.   I'm a special agent.

15    Q.   How long have you been a special agent with the FBI?

16    A.   Since approximately 2008.  Twelve years.

17    Q.   Are you assigned to a particular unit within the FBI?

18    A.   I am, sir.  The Child Exploitation and Human Trafficking

19    Task Force.

20    Q.   How long have you been assigned to that unit?

21    A.   Approximately ten years, sir.

22    Q.   Have you been trained in the investigation of child

23    exploitation cases?

24    A.   I have.

25    Q.   What sorts of training have you received?

K2CYBRI3B                    Spivack - Direct

1  A.  Numerous classroom-types of training to include undercover

2  investigations, digital forensics, child forensic interviewing.

3  I also am an instructor of undercover operations for child

4  exploitations.

5  Q.  Is that just a portion of your training, or is that all of

6  it?

7  A.  It's just a small portion.

8  Q.  Let me turn your attention to May 22, 2019.

9          Did you participate in an arrest on that day?

10  A.  I did, sir.

11  Q.  Who did you arrest?

12  A.  We arrested Peter Bright.

13  Q.  Do you see the person you arrested here in the courtroom

14  today?

15          THE COURT:  You may stand up.

16          THE WITNESS:  Thank you, sir.

17          I do, sir.

18  BY MR. LI:

19  Q.  Could you please identify that person by location and an

20  article of clothing.

21  A.  Yes, sir.  He's sitting behind a laptop or computer screen,

22  eyeglasses, and I think that's a gray suit.  Again, it's a

23  little bit hard to tell from back here.

24          THE COURT:  All right.  Identifying the defendant.

25  BY MR. LI:

1    Q.   Where did the arrest occur?

2    A.   It occurred in the vicinity of Duane Park just a few blocks

3    from here in Manhattan.

4    Q.   What was your role during the arrest?

5    A.   My role that day, I was the acting on-scene commander that

6    day.

7    Q.   What does that mean?

8    A.   Essentially I was in charge of the operation that day.  I

9    sort of oversaw the execution of the operation from the

10   deployment of our undercover to the surveillance teams to the

11   actual arrest itself and then transportation back to the

12   office.

13   Q.   How many law enforcement officers participated in that

14   arrest?

15   A.   Approximately eight or nine I believe.

16   Q.   Was there a plan leading up to the arrest?

17   A.   There was.  Yes, sir.

18   Q.   What was the plan?

19   A.   The plan -- it was somewhat of a loose plan because timing

20   is also something that's subject to change.  But the plan was

21   that when our undercover received notification that Mr. Bright

22   was going to arrive at our designated meet spot; that our team

23   would then deploy out to the vicinity of the park and stage in

24   various locations that we had sort of prearranged for our

25   surveillance cars and our surveillance agents on foot.

1          We then planned dispatching our undercover agent who

2     was going to meet with Mr. Bright.  After a certain amount of

3     time or a signal -- we had a couple of different scenarios that

4     were mapped out -- our undercover was going to walk to a

5     designated area which was our fictitious apartment just north

6     of the park, at which point either the undercover or myself,

7     sort of depending on the circumstance, would give the execution

8     order to effect the arrest of both the undercover agent and

9     Mr. Bright.

10          MR. LI:  Ms. Fetman, please pull up for identification

11     only Government Exhibit 8B.

12     Q.  Special Agent Spivack, do you recognize this document?

13     A.  I do, sir.

14     Q.  What is it?

15     A.  This is a map of the vicinity of Duane Park.

16     Q.  Is this a fair and accurate representation of the area

17     around Duane Park?

18     A.  It is.  Yes, sir.

19          MR. LI:  The government offers Government Exhibit 8B.

20          MS. BAHARANYI:  No objection.

21          THE COURT:  Received.

22          (Government's Exhibit 8B received in evidence)

23          MR. LI:  Ms. Fetman, please publish Government Exhibit

24     8B.

25     Q.  Special Agent Spivack, could you please describe where on

K2CYBRI3B                    Spivack - Direct

1    this map the meeting occurred.

2    A.  Yes, sir.  Sort of right in the middle of the screen in the

3    green area, the grassy area, the words "Duane Park."  That's

4    generally the vicinity of where the undercover and Mr. Bright

5    met.

6         They may have been -- I don't have a cursor.  I

7    apologize -- just to the top of it where it says Duane Street

8    and a little bit over to the left in the middle of the screen.

9    That may have been where they first met.

10        I can't recall exactly.  But we had vehicles placed

11   and personnel placed sort of in and around the park to observe

12   the meet which was in the park.

13        MS. BAHARANYI:  Objection, your Honor.  There's

14   someone who is moving the cursor who is not the witness I

15   believe.

16        MR. LI:  We'll stop moving the cursor.

17        THE COURT:  Ladies and gentlemen, if somebody is

18   moving the cursor, please ignore it.  If you were moving the

19   cursor, please stop.

20        Does anybody want to own up to that?  Maybe it was an

21   accident.  There we go.  Now I know.  I'll keep on eye out.

22        MR. LI:  We can pull down Government Exhibit 8B.

23   Q.  Special Agent Spivack, did the arrest go according to plan?

24   A.  It did.  Yes, sir.

25   Q.  Was the defendant searched during the arrest?

K2CYBRI3B                          Spivack - Direct

1    A.  He was.

2    Q.  Did you observe that search?

3    A.  I did.

4    Q.  Did he have anything on him?

5    A.  He did.

6    Q.  What did he have?

7    A.  As I recall, he had a wallet in his pocket.  He had a

8    couple of cell phones, some condoms, I believe some other

9    personal items as well.

10   Q.  Now, you mentioned condoms.

11           Where were the condoms located on him?

12   A.  I know that he had condoms in two places.  He had condoms I

13   know in his wallet and condoms in a pocket.

14   Q.  Do you remember how many were in each location?

15   A.  There were four condoms total as I recall, two in each

16   location.

17   Q.  So two in the pockets?

18   A.  Correct.

19   Q.  Special Agent Spivack, I'm showing you now what has been

20   marked for identification as Government Exhibit 10.

21           Your Honor, may I approach the witness?

22           THE COURT:  You may.

23   BY MR. LI:

24   Q.  I've just handed you what's been marked for identification

25   as Government Exhibit 10.

K2CYBRI3B                          Spivack - Direct

1              Do you recognize Government Exhibit 10?

2    A.  I do.

3    Q.  What is it?

4    A.  These are the condoms that were recovered on the person of

5    Mr. Bright.

6    Q.  How do you know that?

7    A.  I remember seeing them, and I believe I'm the one that

8    checked them into evidence.  This is our evidence bag.

9              MR. LI:  The government offers Government Exhibit 10.

10             MS. BAHARANYI:  Your Honor, we don't object to the

11   condoms being admitted, but we would object to the packaging or

12   whatever is written on the packaging be admitted.

13             THE COURT:  Let me see it.

14             I'm not understanding what you're objecting to.

15             MS. BAHARANYI:  On the packaging, there is paper with

16   words which would be hearsay, your Honor.  So we wouldn't

17   object to the contents.

18             THE COURT:  Are you talking about the evidence log?

19             MS. BAHARANYI:  The log.

20             THE COURT:  Are you talking about the paper or

21   aluminum in which the objects are placed?

22             MS. BAHARANYI:  The evidence log, your Honor.  We

23   believe there is hearsay contained in that log.  But we

24   wouldn't object to the contents of that bag that's in your

25   hand, your Honor, being admitted.

1      THE COURT:  All right.  Your response?

2      MR. LI:  Your Honor, we're not offering anything on

3 the evidence log for its truth.  It's only there to

4 authenticate the document, authenticate the condoms.  Excuse

5 me.

6      THE COURT:  All right.  I'm going to allow it into

7 evidence, having reviewed it to see whether there's anything

8 with probative value that would be substantially outweighed by

9 the danger of prejudice and finding none.

10      Ladies and gentlemen, the accompanying log is not to

11 be considered for the truth of its content, but they go with

12 the objects.  I'm not going to require them to be separated.

13      MR. LI:  Thank you.

14      MS. BAHARANYI:  Your Honor, we would ask to be

15 permitted to inspect the log then.

16      THE COURT:  Of course.  I'm sorry.  You haven't seen

17 the exhibit?

18      MS. BAHARANYI:  No, your Honor.

19      THE COURT:  Mr. Li, in the future, if you offer an

20 exhibit, show it to defense counsel before you offer it,

21 please.

22      MR. LI:  Your Honor, we actually did show it to

23 defense counsel, but we're happy to show it to them again.

24      THE COURT:  Let them see it again.

25      MR. LI:  I'll go retrieve it.

1          Your Honor, may I approach?

2          THE COURT:  You may.

3   BY MR. LI:

4   Q.  Special Agent Spivack, can you please hold up Government

5   Exhibit 10, just the side showing the condoms, to the jury so

6   that the jury can see it.

7   A.  Yes, sir.

8   Q.  You can put it down now.  Thank you.

9          Special Agent Spivack, you testified earlier that you

10  also recovered two phones from the defendant.

11         Was one of the phones recording audio at the time of

12  the arrest?

13  A.  It was.

14  Q.  Can you describe the phone that was recording audio.

15  A.  I believe it was a Samsung.  I know it was an android type

16  of device.

17  Q.  Are you sure as to the manufacturer of the device?

18  A.  I'm not sure of the manufacturer, but I believe it was a

19  non iPhone.

20  Q.  How do you know that the phone was recording audio?

21  A.  The defendant told me so.

22  Q.  Did you personally observe it recording audio?

23  A.  I did.  Yes, sir.

24  Q.  Did you terminate the audio recording?

25  A.  I did.

1    Q.   When did you terminate it?

2    A.   I terminated the audio once we were back at our office.  I

3    requested the defendant's consent to log into the phone to

4    deactivate the recording device.

5    Q.   Have you listened to the audio recording?

6    A.   I have.

7    Q.   Can you describe the audio recording, just in general

8    terms.

9    A.   In general terms, it begins with the defendant, for a

10   fairly extended period of time, sort of speaking to himself,

11   making utterances of such a variety about the pending meet with

12   our undercover.

13           MS. BAHARANYI:  Objection, your Honor.

14           THE COURT:  I'm sorry?

15           MS. BAHARANYI:  Objection, your Honor, to his

16   characterization of what's in this evidence or what's in the

17   recording.

18           THE COURT:  Sustained.

19           Go ahead.

20   BY MR. LI:

21   Q.   Then the recording -- let's move on actually.

22           With the Court's permission, I'll now read a portion

23   of Government Exhibit 102, which is a stipulation between the

24   parties.  The stipulation is very lengthy.  So with the Court's

25   permission, I'm going to read portions of it and then

K2CYBRI3B                          Spivack - Direct

1    additional portions as they become relevant.

2            Government Exhibit 102 reads:  "It is hereby

3    stipulated and agreed, by and between the United States of

4    America by Geoffrey S. Berman, United States Attorney for the

5    Southern District of New York; Alexander Li; and Timothy

6    Howard, assistant United States attorneys, of counsel; and

7    Peter Bright, by and through his counsel, Amy Gallicchio, Esq.;

8    and Zawadi Baharanyi, Esq., as follows:"

9            Paragraph 1:  "Government Exhibit 6 is a compact disc

10   containing clips of an audio recording.  The audio recording

11   was retrieved from the following cell phone with the

12   international mobile equipment identifier 868160030003506 which

13   was seized from Peter Bright at the time of his arrest on

14   May 22, 2019.

15           "The audio recording was created using the same cell

16   phone on May 22, 2019.  The full duration of the audio

17   recording is 1 hour, 34 minutes, and 29 seconds."

18           I'm going to now skip paragraphs 2 through 8 -- we'll

19   get to those later -- and I'll just read the conclusion, which

20   is that:  "It is further stipulated and agreed that this

21   stipulation, Government Exhibit 102, is admissible as a

22   government exhibit at trial."

23           At this time, the government offers Government Exhibit

24   102, which is the stipulation; Government Exhibit 6; and

25   Government Exhibits 6A through 6G, which are the clips

1    contained on Government Exhibit 6.

2              MS. BAHARANYI:  No objection, your Honor.

3              THE COURT:  Received.

4              (Government's Exhibits 102, 6, 6A and 6G received in

5    evidence)

6              THE COURT:  You heard my instruction before about the

7    use of a transcript, and it applies here as well.  Thank you.

8              MR. LI:  Your Honor, may I approach the witness?

9              THE COURT:  You may.

10   BY MR. LI:

11   Q.  Special Agent Spivack, can you turn in your witness binder

12   to Government Exhibit 6.  I'm sorry.  It's in the front flap of

13   your binder.

14   A.  Yes, sir.

15   Q.  Have you reviewed the clips on government 6 in advance of

16   your testimony today?

17   A.  I have.  Yes, sir.

18   Q.  How do you know that?

19   A.  This DVD has my initials on it which I initialed after

20   having reviewed the contents.

21             MR. LI:  With the Court's permission, I'm now going to

22   read another portion of Government Exhibit 102, which is a

23   stipulation in evidence.

24             Ms. Fetman, if you could pull up 102 and take us to

25   paragraph 2, please.

K2CYBRI3B                              Spivack - Direct

1          Paragraph 2 reads:  "Government Exhibit 6A is a clip

2     of the audio recording from its beginning through the time

3     marker 1 hour, 3 minutes, 27 seconds."

4          Ms. Fetman, could we please pull up for identification

5     only Government Exhibit 6T.

6          Special Agent Spivack, do you recognize this document?

7     A.  I do.

8     Q.  What is it?

9     A.  The transcripts derived or created off of the audio from

10    the DVD, Exhibit 6.

11    Q.  Have you reviewed the transcript in advance of your

12    testimony today?

13    A.  I have, sir.

14    Q.  Is it a fair and accurate representation of clips on

15    Government Exhibit 6?

16    A.  It is.

17          MR. LI:  The government offers Government Exhibit 6T

18    as an aid to the jury.

19          MS. BAHARANYI:  No objection, your Honor.

20          THE COURT:  Received.

21          (Government's Exhibit 6T received in evidence)

22          THE COURT:  My instruction about transcripts applies.

23          MR. LI:  At this point, I'm now going to read a third

24    portion of the stipulation, Government Exhibit 102.

25          If we could switch back to that, Ms. Fetman, and take

K2CYBRI3B                          Spivack - Direct

1    us to paragraph 3.

2            "Government Exhibit 6B is a clip of the audio

3    recording from the time marker 21 minutes, 12 seconds, through

4    the time marker, 21 minutes, 59 seconds."

5            Ms. Fetman, please publish Government Exhibit 6T to

6    the jury, and please play Government Exhibit 6B.

7            (Audio played)

8    BY MR. LI:

9    Q.   Special Agent Spivack, whose voice did we hear in that

10   recording?

11   A.   The defendant's, Peter Bright's.

12   Q.   How do you know that?

13   A.   I've met and spoken with him.

14           MR. LI:  Now I'm going to read another portion of

15   Government Exhibit 102, a stipulation in evidence.

16           I'm sorry, Ms. Fetman.  If you could take us to

17   paragraph 4, please.  Actually, Ms. Fetman, no need to pull it

18   up.  I'll just read from it, and you can stay on the other

19   exhibits that way.

20           All right.  Paragraph 4 of Government Exhibit 102

21   reads:  "Government Exhibit 6C is a clip of the audio recording

22   from the time marker 23 minutes, 5 seconds, through the time

23   marker, 23 minutes, 14 seconds."

24           Ms. Fetman, if you could please publish 6T for the

25   jury and play Government Exhibit 6C.

1            (Audio played)

2            MR. LI:  I'll now read paragraph 5 from Government

3    Exhibit 102, a stipulation in evidence.

4            Paragraph 5 reads:  "Government Exhibit 6B is a clip

5    of the audio recording from the time marker 24 minutes, 33

6    seconds, through the time marker, 24 minutes, 42 seconds."

7            Ms. Fetman, if you could please play Government

8    Exhibit 6B.

9            (Audio played)

10           MR. LI:  I'm now going to read paragraph 6 of

11   Government Exhibit 102, a stipulation in evidence.

12           Paragraph 6 reads:  "Government Exhibit 6E is a clip

13   of the audio recording from the time marker 29 minutes, 40

14   seconds, through the time marker 30 minutes, 4 seconds."

15           Ms. Fetman, if you would do the honors and play

16   Government Exhibit 6E, please.

17           (Audio played)

18           MR. LI:  I'm now going to read paragraph 7 from

19   Government Exhibit 102, a stipulation in evidence.

20           Paragraph 7 reads:  "Government Exhibit 6F is a clip

21   of the audio recording from the time marker 50 minutes, 40

22   seconds, through time marker 51 minutes, 38 seconds."

23           Ms. Fetman, could you please play Government Exhibit

24   6F for the jury, please.

25           (Audio played)

BY MR. LI:

Q.  Special Agent Spivack, approximately how long does the
audio run before the defendant meets the undercover agent?

A.  In excess of I believe 30 minutes or so.

Q.  Are the clips we just listened to the only statements the
defendant recorded during that time period?

A.  No, sir.

Q.  Are the other statements the defendant recorded before the
meeting with the undercover agent similar to the clips we just
heard?

A.  I believe so.  Yes, sir.

          MR. LI:  I'm now going to read paragraph 8 from
Government Exhibit 102, a stipulation in evidence.

          Paragraph 8 reads:  "Government Exhibit 6G is a clip
of the audio recording from the time marker 52 minutes, 21
seconds, through the time marker, 1 hour, 3 minutes, 27
seconds."

          Ms. Fetman, if you would please play Government
Exhibit 6G for the jury.

          (Audio played)

          MR. LI:  We can take those down.  Thank you.

Q.  Special Agent Spivack, after you arrested the defendant,
did you ask him to give an interview?

A.  I did.  Yes, sir.

Q.  Did you read him his Miranda rights?

1    A.  I did.

2    Q.  Did he agree to speak with you?

3    A.  Yes, sir.

4    Q.  Did anyone else participate in that interview with you?

5    A.  Yes, sir.

6    Q.  Who was that?

7    A.  During the actual interview portion of it was

8    Special Agent Leslie Adamczyk.  There were other agents in and

9    about for, like, biographical and sort of just general

10   information purposes.  But the interview itself was

11   Agent Adamczyk.

12   Q.  Was the interview recorded on video?

13   A.  Yes, sir.  It was.

14          MR. LI:  Your Honor, may I approach the witness?

15          THE COURT:  You may.

16   BY MR. LI:

17   Q.  Special Agent Spivack, I'm now going to hand you a disc

18   which has been marked for identification as Government Exhibit

19   9.  It should be in your binder right at the beginning.

20          Do you recognize that disc?

21   A.  I do.

22   Q.  What is it?

23   A.  This is a disk containing the clips and the video and audio

24   itself of the interview I did with Mr. Bright.

25   Q.  How do you know that?

K2CYBRI3B                      Spivack - Direct

1    A.  I know that I've read it -- excuse me -- I viewed it -- I

2    watched it -- and placed my initials on the DVD itself.

3    Q.  Based on your review of the clips on the DVD, are those

4    clips fair and accurate excerpts of your recorded interview

5    with the defendant?

6    A.  Yes, sir.  They are.

7              MR. LI:  The government offers Government Exhibit 9

8    and the exhibits that are on it, which are labeled clips 1

9    through 9, 10A and 10B, and 13.

10             MS. BAHARANYI:  No objection, your Honor.

11             THE COURT:  Received.

12             (Government's Exhibit 9 received in evidence)

13             MR. LI:  Ms. Fetman, could we please pull up for

14   identification only Government Exhibit 9T.

15   Q.  There should also be a version in your binder you can look

16   at.

17   A.  Yes, sir.  I see it.

18   Q.  Do you recognize this?

19   A.  I do.

20   Q.  What is it?

21   A.  These are excerpts -- excuse me -- transcripts of the

22   excerpts of Exhibit 9.

23   Q.  Have you reviewed this in advance of your testimony today?

24   A.  Yes, sir.  I have.

25   Q.  Is it a fair and accurate transcript of the clips on

K2CYBRI3B                        Spivack - Direct

1     Government Exhibit 9?

2     A.  It is.  Yes, sir.

3            MR. LI:  The government offers Government Exhibit 9T

4     as an aid for the jury.

5            MS. BAHARANYI:  No objection, your Honor.

6            THE COURT:  All right.  Received subject to my

7     transcript instruction.

8            (Government's Exhibit 9T received in evidence)

9     BY MR. LI:

10    Q.  Special Agent Spivack, was one of the topics of your

11    interview the chats between the defendant and the undercover

12    agent?

13    A.  Yes, sir.  They were.

14           MR. LI:  Ms. Fetman, when you're ready, please publish

15    Government Exhibit 9T for the jury and please play clip 1.

16           (Audio played)

17           (Continued on next page)

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

1      (Continuation of videotape being played)

2                MR. LI:  Please, go on to Clip Two.

3                (Videotape played)

4                MR. LI:  Clip Four, please.

5                (Videotape played)

6                MR. LI:  Clip Five, please.

7                (Videotape played)

8                MR. LI:  Please play Clip Three.

9                (Videotape played)

10                MR. LI:  Ms. Fetman, please play Chip 13.

11                (Videotape played)

12     BY MR. LI:

13     Q.  Special Agent Spivack, what day of the week did you arrest

14     him?

15     A.  Second day of the week.  I believe it was a Tuesday or

16     Wednesday.

17     Q.  Do you remember?

18     A.  If I had a calendar I know I certainly could.

19     Q.  Is there anything that would help you remember?  Would a

20     calendar help you remember?

21     A.  It would, yes, sir.

22                MR. LI:  Your Honor, may I approach?

23                THE COURT:  You may.

24                MR. LI:  I am going to hand you what's been marked for

25     identification only as Government Exhibit 200.  Take a look at

1    this and let me know when you're done.

2                (Pause)

3                THE WITNESS:  OK.

4                MR. LI:  I've retrieved Government Exhibit 200.

5    Q.  Special Agent Spivack, do you now remember what day of the

6    week the arrest occurred?

7    A.  I do.  It was Wednesday.

8                MR. LI:  Ms. Fetman, please play Clip Six.

9                (Videotape played)

10               MR. LI:  Please play Clip Seven.

11               (Videotape played)

12               MR. LI:  Ms. Fetman, please play Clip Eight.

13               (Videotape played)

14               MR. LI:  Ms. Fetman, Clip Nine, please.

15               (Videotape played)

16               MR. LI:  Ms. Fetman, please play Clip 10A and 10B in

17    sequence.  The transcript will show the transition in the clip.

18               (Videotape played)

19               MR. LI:  Ms. Fetman, the last clip which is clip 12

20    please.

21               Oh, I'm sorry.  That was our last clip.

22    Q.  Special Agent Spivack, did the defendant tell you his

23    occupation?

24    A.  Yes, he did, sir.

25    Q.  What was his occupation?

1   A.  He was a journalist for a tech blog.

2   Q.  Did the defendant say he is on assignment when he was

3   engaged in these chats?

4   A.  He did not say that.

5   Q.  Did the defendant say that he was on an assignment when he

6   met the undercover agent?

7   A.  No, he did not.

8   Q.  The defendant say he was writing an article?

9   A.  No, sir, he did not.

10  Q.  During your interview of the defendant, did he tell you

11  his -- email address?

12  A.  He did, sir.

13  Q.  What was it?

14  A.  Dr. Pizza, D-R pizza.

15          MR. LI:  With the Court's permission I'll now read

16  Government Exhibit 100 which is a stipulation between the

17  parties.

18          THE COURT:  Please proceed.

19          MR. LI:  It is hereby stipulated and agreed, by and

20  between the United States of America, by Jeffrey S. Berman,

21  United States Attorney for the Southern District of New York,

22  Alexander Li and Timothy Howard, Assistant United States

23  Attorneys, of counsel, and Peter Bright, by and through his

24  counsel, Amy Gallicchio, Esquire and Zawadi Baharanyi, Esquire,

25  as follows:

1        1, Government Exhibits 40, 41 and 42 are copies of

2   chat logs contained in the account DrPizza@GMail.com as of

3   August 14, 2019.

4        All of the chat logs were maintained on computer

5   serves controlled by Google LLC and were produced to the

6   government pursuant to a court order served on Google LLC on or

7   about July 26, 2019.

8        2, Portions of Government Exhibits 40, 41 and 42 have

9   been redacted.  Other than these redactions, Government

10  Exhibits 40, 41 and 42 are true and accurate copies of chat

11  logs described above.

12       It is further stipulated and agreed that this

13  stipulation, Government Exhibit 100, is admissible as a

14  Government Exhibit at trial.

15       At this time, the government offers Government

16  Exhibits 100 and the highlighted portions of Government

17  Exhibits 40 through 42.  The defense has requested that we

18  include additional portions of the chats and we do not object

19  to that request.  Government Exhibits 40 to 42 therefore

20  include additional portions of the chat requested by the

21  defense.

22       MS. BAHARANYI:  No objection, your Honor.

23       THE COURT:  All right.  Received.

24       (Government's Exhibits 100, 40 – 42 received in

25  evidence)

1          MR. LI:  Please publish Government Exhibit 40 for the

2     jury.

3     Q.  Special Agent Spivack, who are the participants in this

4     chat?

5     A.  Participants are defendant under DrPizza.gMail accountant,

6     individual whose name is partially redacted, first name

7     Anthony.

8     Q.  How do you know that?

9     A.  Looking at the chat the Anthony dot, this portion here,

10    this is the subject line pursuant to a search warrant of a chat

11    log.  The "to" line, the receiver in this case is

12    DrPizza@GMail.com.

13    Q.  What is the date on this chat?

14    A.  It is February 10, 2012.

15    Q.  Let me direct your attention to the second page please and

16    focus on the highlighted portion over here.  Do you see the

17    world me, M-E?

18    A.  I do.

19    Q.  Who does that refer to?

20    A.  It was referring to the user of the DrPizza account.

21         MR. LI:  Let's read the highlighted portion.  I'll

22    read the lines for me and you can read the lines for the

23    Anthony account.

24    "Q.  Someone who friended me on Facebook, I have no idea posted

25    a picture of his daughter.  I guess she's like 13 or something.

1   It's all I can do to not post, I'd hit it.  Ha, ha ha.  And

2   there's a URL link?

3   "A.   Then, LOL.  You're a sick man.  You're a sick, sick man.

4   "Q.   She looks ripe enough?

5   "A.   LOL.

6   "Q.   I mean, I'm not saying it'd be legal except in the

7   Vatican, age of consent 12, but like I'd better wear a condom.

8   We don't need more teen-age mothers.

9            MR. LI:  Ms. Fetman, please publish Government Exhibit

10  41 for the jury.

11           (Pause)

12  Q.   Special Agent Spivack, who are the participants in this

13  chat?

14  A.   In this case the DrPizza@GMail account is communicating

15  with an individual that's redacted the.W.

16  Q.   When is this chat dated?

17  A.   Dated July 29, 2011.

18           THE COURT:  All right.  Ladies and gentlemen, let me

19  explain to you that this evidence, the chat that was just

20  reviewed and the ones that are coming up now have been admitted

21  for a limited purpose.  These are not evidence of the crime

22  charged which took place at a different period of time.  They

23  are items of evidence that you may consider if you find that

24  they bear on the defendant's intent at the time of the charged

25  crime.  They may only be considered for that purpose, not for

1    whether the defendant, on the defendant's character or

2    propensity of anything of that sort.  It's only if you find

3    that this evidence sheds light on his later intent.  You may

4    consider it for that purpose and that purpose only.  All right?

5    Thank you.

6    Q.  Special Agent Spivack, let me direct your attention to the

7    second page, please.

8              MR. LI:  Let's focus on highlighted portion.

9    Q.  Who does the word "me" refer to?

10   A.  The user of the DrPizzaGMail.com account.

11             MR. LI:  Let's read these five lines.  Again, I'll

12   read the lines for "me" and you can read the line for the.W and

13   redacted.

14   "Q.  Next you'll be banging RB Rebecca Black?

15   "A.  You are not allowed to do her either.  She's 13.

16   "Q.  Oh, yeah.  Good point.  Too old.  LOL.

17             MR. LI:  Stop there.

18             Ms. Fetman, please publish Government Exhibit 42 for

19   the jury.

20             (Pause)

21   Q.  Who are the participants in this chat?

22   A.  Again, the DrPizza account.  This time with BR and it's

23   redacted.

24   Q.  When is this chat dated?

25   A.  September 27, 2010.

1              MR. LI:  Could we focus on the highlighted portion of

2        the body please.  Let's read these chat messages.  I'll read

3        the lines for me and you.

4        "Q.  There's no such thing as too young.

5        "A.  Ah, there is when the deli checkout guy looks like he's

6        maybe 15.

7        "Q.  I would bone a 15-year-old girl in an instant.  There's an

8        emoji.  It's a colon, then a "P"?

9        "A.  Ha, ha, ha.  I know you would but I'm not like that sadly.

10       Frowning face emoji.

11       "Q.  Your loss.

12             MR. LI:  You can stop there.

13             Ms. Fetman, please put up Government Exhibit 11 for

14       identification only.

15             (Pause)

16       Q.  Special Agent Spivack, do you recognized Government Exhibit

17       11?

18       A.  I do.

19       Q.  What is?

20       A.  Photograph of defendant's phone with the Twitter settings

21       account on the screen.

22       Q.  How do you know that?

23       A.  I've seen it.

24       Q.  And when you say you've seen it, have you seen the original

25       phone?

1    A.   I have.  I've seen that exhibit.  I've also seen the phone

2    with the screen that is up currently.

3    Q.   Does that picture fairly accurately depict what you saw on

4    the phone?

5    A.   It does.

6              MR. LI:  The government offers Government Exhibit 11?

7              MS. GALLICCHIO:  No objection, your Honor.

8              THE COURT:  Received.

9              (Government's Exhibit 11 received in evidence)

10             MR. LI:  Ms. Fetman, please publish Government Exhibit

11   11.

12             (Pause)

13   Q.   Special Agent Spivack, what are we seeing on the screen of

14   this phone?

15   A.   This is the Twitter settings for the Twitter account that

16   was on installed on the defendant's phone and this is actually

17   photograph of the defendant's phone.

18   Q.   Do you see the line @DrPizza?

19   A.   I do.

20   Q.   What is that?

21   A.   It's a Twitter handle for the Twitter account on the

22   defendant's phone.

23             MR. LI:  Just one moment, your Honor.

24             No further questions.

25             THE COURT:  All right.  Ladies and gentlemen, let's

1   take our midafternoon break.  Please do not discuss the case

2   among yourselves or with anyone.  We'll be back in action in

3   ten minutes.

4               Thank you.

5               (Jury not present)

6               THE COURT:  All right.  We are in recess.

7               (Recess)

8               (Jury present)

9               THE COURT:  All right.  Please be seated.

10              Ms. Baharanyi, whenever you're ready?

11              MS. BAHARANYI:  Thank you, your Honor.

12   CROSS-EXAMINATION

13   BY MS. BAHARANYI:

14   Q.  Good afternoon, Special Agent Spivack.

15   A.  Good afternoon, ma'am.

16   Q.  Let's talk about your arrest of Mr. Bright.

17              You were part of the arrest team that approached

18   Mr. Bright in the park?

19   A.  That is correct, ma'am.

20   Q.  And when you approached, Mr. Bright didn't run from you,

21   right?

22   A.  That is correct.

23   Q.  He was compliant, right?

24   A.  Yes, ma'am.

25   Q.  When you arrested him he told you he wasn't going to have

1  sex with any kids, right?

2  A.  I believe that is correct, yes, ma'am.

3  Q.  And he told you that he was recording the meeting that he'd

4  just had with the undercover, right?

5  A.  He did.

6  Q.  That this recording was on his phone, right?

7  A.  Yes, ma'am.

8  Q.  And during his actual arrest, Mr. Bright was wearing some

9  cargo patients, right?

10  A.  I don't recall exactly what he was wearing.  I know he had

11  pockets.

12  Q.  He was wearing pants with pockets, right?

13  A.  Yes, ma'am.

14  Q.  And there are a couple of pockets on his pants, correct?

15  A.  That's correct.

16  Q.  And his pockets were pretty full, right?

17  A.  I can't say.  I mean, I did not toss him personally.  So, I

18  can't say how full they were but I know they had stuff in them.

19  Q.  When you say "toss him", you mean search him?

20  A.  Yes, ma'am, like pull out the items from his pocket.

21  Q.  But what you are aware that there were items taken off of

22  his person?

23  A.  Yes, ma'am.

24  Q.  You are aware that there were numerous items taken off of

25  his person, right?

1    A.  Yes, ma'am.

2    Q.  And removed from his pockets, right?

3    A.  Yes, ma'am.

4    Q.  You know that he had money in his possession at this time

5    of his arrest, right?

6    A.  I believe so.

7    Q.  Well, you're aware that he also had keys on him at the time

8    of his arrest?

9    A.  Yes, ma'am.

10   Q.  That he had gum on him at the time of his arrest?

11   A.  I don't know everything specifically that he had in his

12   pockets.  I know he had a bunch of miscellaneous items to

13   include some of the things that you just mentioned but I can't

14   recall every specific item that was sort of benign or everyday.

15   Q.  You prepared a FD-302 in relation to this case, right?

16   A.  That's correct.

17   Q.  That's an interview form, right?

18   A.  That is correct, yes, ma'am.

19   Q.  And it's an interview form used by the FBI frequently,

20   right?

21   A.  Yes, it is.

22   Q.  And in one of the forms this interview form is prepared the

23   day after his arrest, right?

24   A.  I can't say.  If do you have a copy of it, I know the date

25   that I drafted the 302 would be on there.  I don't know if it

1   was the day after but it certainly would have been within the

2   couple of days.

3          MS. BAHARANYI:  Mr. Fisher, could you show the witness

4   3504-05.

5          MR. LI:  Objection, your Honor.  Can you clarify the

6   purpose of what's going on here?

7          THE COURT:  Is it to refresh the witness's

8   recollection.

9          MS. BAHARANYI:  At this point the witness said he does

10  not recall what was on Mr. Bright's person and he prepared the

11  report.

12          THE COURT:  So the answer to my question is "yes"?

13          MS. BAHARANYI:  Yes, your Honor.

14          THE COURT:  OK.  Thank you.

15          (Pause)

16  Q.  Do you see the form in front of you?

17  A.  I do yes, ma'am.

18  Q.  That's the FD-302, right?

19  A.  That is correct.

20  Q.  And that was prepared on May 23rd, right?

21  A.  That is correct.

22  Q.  The day after Mr. Bright's arrest?

23  A.  Yes, ma'am.

24  Q.  And in that form you list the items --

25          THE COURT:  Whoa.  Whoa.  You can't read from the

1    content of a document not in evidence.

2              MS. BAHARANYI:  Apologies.

3              THE COURT:  You may, this is what can you do.  What

4    exhibit is it?

5              MS. BAHARANYI:  This is the 3500 for Agent Spivack.

6              THE COURT:  3504-09?

7              MS. BAHARANYI:  Yes, your Honor.

8              THE COURT:  OK.  So, Special Agent Spivack, please

9    review the document and see whether it refreshes your

10   recollection on the subject about which you've been asked.

11   After you've finished reading it fully, let counsel know and

12   Ms. Baharanyi will take it off the screen and then you can ask

13   the question of whether your review of it refreshes your

14   recollection.

15             THE WITNESS:  Understood, sir.

16             THE COURT:  OK.

17             (Pause)

18             THE WITNESS:  OK.

19   Q.  There are two pages there.  Have you reviewed the second

20   page, as well?

21   A.  No, ma'am.  If somebody could -- there we go.

22   Q.  Thank you much.

23   A.  OK.

24   Q.  You're aware of items, are you now refreshed on the items

25   that were found on Mr. Bright's person?

1   A.  Yes, ma'am, with the caveat that the phrase "pocket litter"

2   in the 302 refers to a variety of miscellaneous everyday items.

3   So to the extent there's something specific, that's not

4   referenced in 302.

5           THE COURT:  Here is the question.  Did reading the 302

6   give you a new and refreshed recollection of the subject about

7   which you were asked?

8           THE WITNESS:  Yes, sir.

9           THE COURT:  OK.  All right.  Thank you.

10          MS. BAHARANYI:  So let's discuss the items that were

11  found on Mr. Bright including this pocket litter?

12          THE COURT:  Ask him what his recollection is.

13  Q.  Are you now aware or do you now remember what was found on

14  Mr. Bright at the time of his arrest?

15  A.  I do, yes, ma'am.

16  Q.  There was pocket litter found on Mr. Bright at the time of

17  his arrest, right?

18  A.  Yes, ma'am.

19  Q.  And let's discuss his pocket litter.  Pocket litter can be,

20  there are miscellaneous items, right?

21  A.  Yes, ma'am.

22  Q.  So pieces of paper?

23  A.  Yes, ma'am.

24  Q.  Receipts?

25  A.  Yes, ma'am.

K2CAABRI4                          Spivack - Cross

1   Q.  Business cards?

2   A.  Yes, ma'am.

3   Q.  And on Mr. Bright you found numerous miscellaneous items in

4   his pockets, right?

5   A.  We found pocket litter.  I don't know how much.

6   Q.  You didn't take pictures of items found on Mr. Bright,

7   right?

8   A.  I did not, no, ma'am.

9   Q.  You didn't bring to court the items that were found on

10  Mr. Bright?

11  A.  No, ma'am.

12  Q.  But you do recognize there were a number of items in his

13  pockets, right?

14  A.  Yes, ma'am.

15  Q.  At the time of his arrest?

16  A.  Yes, ma'am.

17  Q.  Now, you interviewed Mr. Bright immediately after his

18  arrest, right?

19  A.  Yes, ma'am.

20  Q.  And during this interview you discussed his devices, right?

21  A.  Yes, ma'am.

22  Q.  And he actually gave you permission to search his

23  electronic devices; is that right?

24  A.  That is correct.

25  Q.  His computer?

1    A.  Yes, ma'am.

2    Q.  And his computer was located in his apartment, right?

3    A.  That is correct.

4    Q.  So he gave you permission to go inside of his apartment and

5    get his computer, right?

6    A.  That is correct.

7    Q.  In order to search it, right?

8    A.  That is correct, yes, ma'am.

9    Q.  He also gave you permission to search his phones; is that

10   right?

11   A.  That is correct.

12   Q.  And his Google account, right?

13   A.  I can't be certain if he gave us permission for the Google

14   account or if we obtained a search warrant for that.

15   Q.  So he gave you permission to search his DrPizza Google

16   account, right?

17   A.  I can't be certain if we obtained the Google account

18   pursuant to consent or if we obtained a search warrant.

19          MS. BAHARANYI:  Mr. Fisher, could you please show the

20   witness 35004, please.

21          (Pause)

22   A.  Oh, OK.  Yes, ma'am.

23   Q.  So, Agent Spivack, 3504-08 is a consent?

24          THE COURT:  Whoa, whoa, whoa.

25          MS. BAHARANYI:  I'm sorry.

1              THE COURT:  Let me see you at side bar.

2              (side bar)

3              MS. BAHARANYI:  I'm sorry, your Honor.  I can ask a

4    proper question.  I apologize.

5              THE COURT:  OK.  So what you do is you ask the

6    witness, does this refresh your recollection and was your

7    refreshed recollection?  You can't, lawyers can't, you can't,

8    prosecutors can't quote from or read from or refer to the

9    contents of a piece of something that was marked for

10   identification but hasn't been received into evidence.  All

11   right?

12             MS. BAHARANYI:  OK.

13             THE COURT:  Good.

14             (Continued on next page)

1              (In Open Court)

2    Q.   Agent Spivack, would you please review 3504-08 and let me

3    know when you have had a moment to review it.

4              Can you see 3504-08?

5    A.   Yes, ma'am, and it refreshes my recollection.

6    Q.   So viewing it, does in fact refresh your recollection?

7    A.   It does.

8    Q.   About whether he gave you permission to search his Google

9    account?

10   A.   Yes, ma'am.

11   Q.   And he did in fact give you permission to search his Google

12   account?

13   A.   He did, yes, ma'am.

14   Q.   And in doing so, this meant you could search his e-mails,

15   right?

16   A.   Yes.

17   Q.   His e-mails sent on Google, right?

18   A.   Yes, ma'am.

19   Q.   The e-mails that he received?

20   A.   Yes.

21   Q.   You could search his Google search history, right?

22   A.   Yes, ma'am.

23   Q.   Did you access his Google search history?

24   A.   Correct.

25   Q.   You could search that search history?

1    A.  Correct.

2    Q.  You could access his Google chats, right?

3    A.  Correct.

4    Q.  The chats that you received, right?

5    A.  Potentially, yes, ma'am.

6    Q.  And those that he sent, right?

7    A.  Yes, ma'am.

8    Q.  This also gave you access to Google Drive, right?

9    A.  I believe, yes, it does.

10   Q.  And so you can see whatever is saved on his Google Drive,

11   right?

12   A.  That's correct.

13   Q.  Any videos that are saved there, right?

14   A.  Yes, ma'am.

15   Q.  Any photos, right?

16   A.  Correct.

17   Q.  You had access to his entire Google account, right?

18   A.  Consent gives us access to that entire account, correct.

19   Q.  He gave you permission to search his entire Google account?

20   A.  Correct.

21          MS. BAHARANYI:  No further questions, your Honor.

22          THE COURT:  All right.  You may redirect.

23   REDIRECT EXAMINATION

24   BY MR. LI:

25   Q.  Special Agent Spivack, you were asked just now about the

K2CAABRI4                          Spivack – Redirect

1    devices and accounts that the defendant authorized the FBI to

2    search; do you recall that discussion?

3    A.  I do.

4    Q.  What were those devices and accounts again?

5    A.  The GMail account, DrPizza@GMail.com, two cellular

6    telephones, and iPhone and Hauwei cellular telephone and large

7    desktop computer.

8    Q.  Was the FBI technically able to get into all of those

9    devices?

10   A.  No, sir.

11   Q.  What are the devices that were actually reviewed for child

12   pornography?

13   A.  We were able to review the GMail and Hauwei cellular

14   telephone.

15            MR. LI:  No further questions.

16            THE COURT:  All right.  You may step down.

17            Let me see the lawyers at side bar very briefly.

18            Sorry, ladies and gentlemen.  This will only take a

19   second.

20            (Continued on next page)

21

22

23

24

25

1          (side bar)

2          THE COURT:  OK.  Very unobtrusively and not all at the

3    same time, I want you to look to the back of the courtroom and

4    tell me if you know the lady dressed in red.

5          (Pause)

6          MS. GALLICCHIO:  Yes, we do.  She is the paralegal's

7    girlfriend's grandmother.

8          THE COURT:  Paralegal on your team's girlfriend's

9    grandmother?

10          MS. GALLICCHIO:  Yes.

11          THE COURT:  OK.  So this is the note and it's at 4:13

12    and it's from my deputy Flo to me and it reads:

13          When the jury entered the courtroom, Juror No. Four

14    said that the woman with the red sweater on in the back of the

15    courtroom asked him where the restroom was and he answered her

16    and then he said she said something else but he didn't hear it

17    and just went into the jury room.

18          So, I'm going to ask you to instruct your paralegal to

19    instruct this individual or you can instruct her, cannot do

20    that.  All right?

21          MS. GALLICCHIO:  Yes, of course.

22          (Continued on next page)

23

24

25

K2CAABRI4                     Medrano - Direct

1                    (In Open Court)

2                    THE COURT:  The Government may call its next witness.

3                    MR. LI:  The government calls Shamel Medrano.

4         SHAMEL MEDRANO,

5              called as a witness by the Government,

6              having been duly sworn, testified as follows:

7         DIRECT EXAMINATION

8         BY MR. LI:

9         Q.  Good afternoon, Mr. Medrano.

10        A.  Good afternoon.

11        Q.  Are you currently employed?

12        A.  Yes, I am.

13        Q.  Where do you work?

14        A.  I work at the United States Attorney's Office.

15        Q.  Which United States Attorney's Office?

16        A.  The Southern District of New York.

17                   THE COURT:  All right.  Pull your chair a little

18        closer.  Pull the microphone a little closer so you don't have

19        to bob every time you answer.  OK?

20                   THE WITNESS:  Yes, sir.

21        Q.  What is your title there?

22        A.  I am an investigative analyst at the United States

23        Attorney's Office.

24        Q.  How long have you been in that position?

25        A.  I have been at this position for approximately six months

1    or so.

2    Q.  What did do you before you went to the U.S. Attorney's

3    Office?

4    A.  Prior to my position at the U.S. Attorney's Office I was at

5    the Bronx District Attorney's Office.

6    Q.  What did you do there?

7    A.  I was trial preparation assistant for approximately two

8    years and three months and I was an intelligence analyst for

9    about six months or so.

10   Q.  What were your duties as an intelligence analyst at the

11   Bronx DA's Office?

12   A.  My duties, I assisted assistant district attorneys with

13   investigations.

14   Q.  Turning now to your current job, what are your duties as an

15   investigative analyst at the U.S. Attorney's Office?

16   A.  My duties here as an investigative analyst, I also assist

17   Assistant United States Attorneys and the special agents within

18   the U.S. Attorney's Office.

19   Q.  What kind of assistance do you provide?

20   A.  Depending, varies on the case.  But what I normally do, I

21   specify in social media.

22   Q.  In general how do you provide assistance on social media?

23   A.  Well, depending on the circumstances, I can assist by

24   identifying defendants' social media profile or what I can also

25   do is if the social media profile is public, I also, I extract

1   anything that's on the social media profile.

2   Q.  Have you received training in social media investigations?

3   A.  Yes.  I've received in-house trainings.  I've also attended

4   on-site training and I've also taken online webinars.

5   Q.  In the training you've received, have you become familiar

6   with some of the lingo commonly used on social media?

7   A.  Yes, I have.

8   Q.  Are you familiar with the internet platform Twitter?

9   A.  Yes.

10  Q.  What is Twitter?

11  A.  Twitter is a micro-blogging social media platform.

12  Q.  Can you explain what that means?

13  A.  It means sort of you are able to share your thoughts as you

14  would with blogging, Twitter sort of limits it to a specific

15  amount of characters.  They call it specifically a "tweet".

16  Q.  Who can see a tweet?

17  A.  Well, depending on how your profile is set up --

18          MS. BAHARANYI:  Objection, your Honor.

19          THE COURT:  Basis?

20          MS. BAHARANYI:  This witness has not been tendered as

21  an expert on matters of social media or Twitter.  I'm not sure

22  that this is proper.

23          THE COURT:  I think this is just general background.

24  This is not expert opinion here and I won't allow any --

25  objections to any opinions.

K2CAABRI4                    Medrano - Direct

1           Go ahead.

2   Q.   Without stating any opinions, who can see a tweet?

3   A.   Depending on how your profile setup.  If it's private only,

4   your followers.  But if you have a public profile, then anybody

5   who has Twitter can see your platform.

6   Q.   In the course of your duties at the U.S. Attorney's Office

7   did you review a Twitter account by the user at DrPizza spelled

8   D-R-P-I-Z-Z-A?

9   A.   Yes.

10  Q.   What were you are looking for?

11  A.   I was looking for anything specifically related to the

12  case.

13  Q.   When you say "specifically related to the case", what do

14  you mean by that?

15  A.   Anything that had to do with any child enticement or

16  anything relating to that matter.

17  Q.   Were the Twitter posts you reviewed public or private?

18  A.   They were all public.

19  Q.   Can any member of the public view the Twitter post you were

20  looking at?

21  A.   Correct, as long as they have the --

22          MR. LI:  Please pull up Government Exhibit 45 through

23  48.

24          (Pause)

25  Q.   Mr. Medrano, do you recognize these exhibits?

1    A.  Yes, I do.

2    Q.  What are they?

3    A.  These are, one is a Twitter handle with the bio and the

4    others are tweets and tweet threads from the Twitter profile

5    @DrPizza.

6    Q.  Are what we are looking at, are they screen shots?

7    A.  Correct, they are screen shots.

8    Q.  Are these fair and accurate screen shots of the Twitter

9    profile as you reviewed them?

10   A.  Yes.

11            MR. LI:  The government offers Government Exhibit 45

12   through 48.

13            MS. BAHARANYI:  No objection, your Honor.

14            THE COURT:  All right.  Now, ladies and gentlemen,

15   this comes into the category of my prior limiting instruction.

16   This evidence is not evidence of the crime charged.  All right?

17   It doesn't relate to the crime charged in the indictment.  It's

18   evidence relating events and conduct at an earlier point in

19   time which the party offering it, the government, contends

20   sheds light on the intent of the defendant at the time of the

21   crime.  You may only consider this evidence for that limited

22   purpose.

23            Received.

24            (Government's Exhibits 45 - 48 received in evidence)

25            MR. LI:  Ms. Fetman please publish Government Exhibit

1    45 for the jury.

2                 (Pause)

3    Q.  Mr. Medrano, do you see the photograph in the center of

4    this screen shot?

5    A.  Yes.

6    Q.  What is this photograph?

7    A.  It's a photograph of the user of this profile can post to

8    sort of identify themselves.

9                 MR. LI:  Ms. Fetman, can you please publish Government

10   Exhibit 3B which is in evidence side-by-side with Government

11   Exhibit 45.

12                (Pause)

13                MR. LI:  You can take down now Government Exhibit 3B.

14                (Pause)

15   Q.  Mr. Medrano, do you see underneath the photograph where it

16   says the words "Pumpkin Fright"?

17   A.  Yes.

18   Q.  What is that?

19   A.  That is a name that he used to identify himself as with the

20   profile.

21   Q.  And do you see beneath that the words @DrPizza?

22   A.  Yes.

23   Q.  What does that mean?

24   A.  @DrPizza is a unique identifier.  So that one specifically

25   pertains to his profile.  That's how you would sort of find him

1  on Twitter using that handle.

2  Q.  Can two Twitter accounts have the same handle?

3  A.  No.

4          MR. LI:  Ms. Fetman, could you please publish

5  Government Exhibit 11 side-by-side with Government Exhibit 45.

6          (Pause)

7  Q.  Turning your attention to Government Exhibit 11, do you see

8  the words Pumpkin Fright?

9  A.  Yes, I do.

10 Q.  Do you see the words @DrPizza?

11 A.  Yes.

12         MR. LI:  We can take down Government Exhibit 11.

13         (Pause)

14 Q.  Turning your attention now to Government Exhibit 45, do you

15 see -- excuse me one second.

16         MR. LI:  Can you turn back to Government Exhibit 11,

17 please.

18         (Pause)

19         MR. LI:  I apologize.  Back to Government Exhibit 45,

20 please.

21         (Pause)

22 Q.  When you reviewed the @DrPizza account, approximately, how

23 many tweets were on that account?

24 A.  He, approximately, had over two hundred thousand tweets.

25 Q.  Did you review all two hundred thousand tweets?

1    A.  No, I did not.

2    Q.  Why not?

3    A.  That's too excessive, too many tweets for myself to be able

4    to do on my own.  It would take more than a month to do that.

5           MR. LI:  All right.  Ms. Fetman, please take down

6    Government Exhibit 45 and public Government Exhibit 46.

7           (Pause)

8    Q.  Mr. Medrano, what is Government Exhibit 46?

9    A.  This is a Twitter thread.  So this is sort of a

10   conversation between two people, two individuals on Twitter.

11   Q.  Who are the two individuals that were communicating in this

12   thread?

13   A.  One is @Catovich and other is @DrPizza.

14   Q.  When did this exchange occur?

15   A.  May 8, 2013.

16   Q.  All right.  Let's read the first four posts starting at the

17   top.  If you could read the posts by @Catovich, I'll read the

18   post by @DrPizza.

19   "A.  They really think the problem is a some of the people who

20   committed all of the crimes are finally being punished, not the

21   crimes themselves.

22   "Q.  Maybe they think that the capacity to consent doesn't

23   emerge fully formed as soon as someone reaches their 16

24   birthday?

25   "A.  Then the same argument could be made about reaching

K2CAABRI4                          Medrano - Direct

1    maturity at 13.

2    "Q.  I wouldn't disagree.  I think age based rape laws rather

3    than consent based are stupid.

4              MR. LI:  We can stop there.

5              Ms. Fetman, please take down Government Exhibit 46 and

6    publish Government Exhibit 47.

7              (Pause)

8    BY MR. LI:

9    Q.  Mr. Medrano, what is this.

10   A.  These are tweets from the profile @DrPizza.

11   Q.  When were these tweets posted?

12   A.  On October 18, 2009.

13   Q.  Is the oldest tweet at the bottom or the top?

14   A.  It is at the bottom.

15   Q.  Would you please read the post starting at the bottom?

16   A.  Correct.

17             There is an astonishing amount of jail bait on this

18   flight.  Looks like some school -- or similar.  Oh, Jesus

19   Christ.  They're talking about fucking Twilight.

20             The next one reads:  @.bender fortunately they seem to

21   be seated at the back of the plane.  Jailbait every where and

22   yet my row is old women.  There's no justice.

23   Q.  What do you understand the term "jailbait" to mean?

24             MS. BAHARANYI:  Objection, your Honor.

25             THE COURT:  Yes.  Sustained.

1           MR. LI:  Ms. Fetman, please take down Government

2     Exhibit 47 and publish Government Exhibit 48.

3           (Pause)

4     Q.  Mr. Medrano, what is this?

5     A.  This is also a tweet.

6     Q.  Who posted this tweet?

7     A.  @DrPizza.

8     Q.  When was it posted?

9     A.  May 15, 2009.

10    Q.  Please read the post.

11    "A.  Admiring the jailbait on the train.  Rowr.

12          MR. LI:  Just a moment, your Honor, please.

13          No further questions.

14          THE COURT:  All right.  You may cross-examine.

15          MS. BAHARANYI:  Brief Court's indulgence, your Honor?

16          THE COURT:  Sure.

17          (Pause)

18          MS. BAHARANYI:  Your Honor, we have nothing for this

19    witness.

20          THE COURT:  All right.  You may step down.

21          THE WITNESS:  Thank you, judge.

22          THE COURT:  Call your next witness.

23          MR. LI:  The government calls Kenneth Fisher.

24     KENNETH ROBERT FISHER, III,

25          called as a witness by the Plaintiff,

1    having been duly sworn, testified as follows:

2    DIRECT EXAMINATION

3    BY MR. LI:

4    Q.  Good afternoon, Mr. Fisher.

5        Are you currently employed?

6    A.  Yes.

7    Q.  Where do you work?

8    A.  I work at Conde Nast in a business unit called Ars

9    Technica.

10   Q.  What is Ars Technica?

11   A.  It's a technology publication.  We cover high-end tech.  We

12   cover consumer technology.  We also cover science,

13   particularly, science as it relates to recent discoveries,

14   things like this and then also lastly, kind of cultured stuff

15   that, let's say people who are really into tech would be

16   interested in like geeky movies and things like that.

17   Q.  When was Ars Technica founded?

18   A.  1998.

19   Q.  What is your title there?

20   A.  Founder and editor-in-chief.

21   Q.  Have you been the editor-in-chief since the founding?

22   A.  Yes.

23   Q.  What are your responsibilities as the editor-in-chief?

24   A.  I am in charge of setting the strategy for the brand,

25   meeting revenue goals as dictated by corporate.  I also

1    overlook, basically, daily operations, quality control, hiring,

2    firing and sort of big projects and occasionally I actually

3    edit something.

4    Q.   How many employees work at Ars Technica?

5    A.   About 30.

6    Q.   How many of those are editorial staff?

7    A.   Approximately, 20.

8    Q.   What do you understand editorial staff to mean?

9    A.   Editorial staff for us would be people who are essentially

10   paid journalist who operate according to journalistic efforts

11   in order to cover the issues I mentioned before, the sort of

12   stuff, where they go out, they find stories, they report, we

13   edit it, that kind of thing.  So it wouldn't include anything

14   like shooting video or taking photographs.  It's basically

15   mostly writing and reporting for us.

16   Q.   Do all of Ars Technica employees work at the same physical

17   location?

18   A.   No.

19   Q.   How do employees communicate with each other?

20   A.   We have a few methods.  The primary method of communication

21   is a collaborative app called "Slack".  It's something

22   everybody installed on their computer.  They join a chat room

23   and chat back and forth.  The second way is that everyone has a

24   good old fashioned desk phone that we connect over the Internet

25   so it acts like you are all in the office so you can dial an

1    extension.  Lastly, there's of course the old fashioned e-mail.

2    I suppose I should add, we also do phone calls.  We actually do

3    talk to each other and have conferences and things.

4    Q.  In the course of your work at Ars Technica, did you come to

5    know someone named Peter Bright?

6    A.  Yes.

7    Q.  How do you know Peter Bright?

8    A.  I knew Peter first as reader of the site.  For the first

9    five or six years I think he was a reader and a contributor.

10   We had an online portion where anyone could write, share ideas

11   insights, et cetera.  And essentially he started writing for us

12   on a contract basis and then after Ars Technica was acquired by

13   Conde Nast in 2008 we formalized those contracts and then he

14   was eventually hired about Conde Nast approximately 2011, I

15   think so.

16   Q.  Do you see the Peter Bright who worked at Ars Technica

17   sitting in the courtroom today?

18              THE COURT:  You can stand up.

19   A.  Yes.

20   Q.  Please identify him by where he is sitting and an article

21   of clothing.

22   A.  He is at the second table back, three from the two young

23   women there to my left wearing a, looks like a gray blazer.

24              THE COURT:  Identification noted.

25   Q.  What were Mr. Bright's job responsibilities at Ars

1    Technica?

2    A.  He was our technologist who focused on Microsoft but really

3    he was a resource for any kind of deep technical issue.  So he

4    could cover CPU architecture.  He could cover things going on

5    at Apple.  He could cover pretty much anything that took a

6    degree of expertise in the kind of computer field.  But it was

7    all essentially supposed to be mostly Microsoft stuff but

8    Microsoft sometimes didn't do a lot of exciting things and he

9    would need to cover other things.

10   Q.  How often did Mr. Bright write for Ars Technica?

11   A.  Roughly, would submit one thing a day, give or take.

12   Q.  Over the decade or so that Mr. Bright worked at Ars

13   Technica, do you have any idea how many articles he wrote?

14   A.  I do not.  It would be in the hundreds.

15   Q.  So, of the hundreds of articles that he wrote, were they

16   focused on the areas of technology that you just described?

17   A.  Yes.

18   Q.  Who did Mr. Bright report to?

19   A.  Technically, he reported to me in terms of the company's

20   reporting structure.  But on a day-to-day operational

21   standpoint he would have reported to the managing editor.

22   Q.  When Mr. Bright first came on to work at Ars Technica, how

23   often did you interact with him?

24   A.  Quite a bunch initially.  We brought him on to cover things

25   that we were struggling with.  And you know, so in the initial

1    phases there was a lot of contact just sort of setting up what

2    he would do, what he is covering, what our specific needs might

3    be, how to combine notes with his interests.  Through the years

4    Peter achieved, you know, a level of comfort and just facility

5    with his job such that at least as far as I am concerned, I did

6    not have the need to have common contact with him.

7    Q.  So in more recent years, how often did you interact with

8    Mr. Peter -- excuse me -- Mr. Bright?

9    A.  I would say a couple times a week if we could exclude

10   someone making a joke in the aforementioned Slack channel and

11   somebody saying ha, ha, not real interaction but.

12   Q.  Did Mr. Bright work in the same physical location as you?

13   A.  No.

14   Q.  Did Mr. Bright work in the same city as you?

15   A.  No.

16   Q.  Are you familiar with Mr. Bright's writing?

17   A.  Yes.

18   Q.  How are you familiar with it?

19   A.  Well, it was published on our site.  So ostensibly I try to

20   read everything we publish.  It's not possible any longer.  But

21   I would have read or edited most of his work at some point.

22   Q.  Did Mr. Bright get assignments from his managing editor or

23   did he come up with his own science?

24   A.  It would have been a mix.  It was essentially understood

25   that Peter could decide to cover a specific issue on his own if

1    it were in the established areas that he covered.  So he didn't

2    necessarily he didn't need any of us to tell him.  If something

3    was newsworthy from Microsoft, for instance, he knew that

4    already but in those times when there weren't, things

5    assignments could be made.

6    Q.   And was child exploitation in that usual area that you just

7    described?

8    A.   No.

9    Q.   If Mr. Bright wanted to write about child exploitation,

10   would you have expected him to pitch that idea by you?

11   A.   Yes.

12              MS. BAHARANYI:  Objection, your Honor.

13              THE COURT:  No.  I'll allow it.

14              Go ahead.

15   Q.   Did he ever pitch an article on child exploitation?

16   A.   No.

17   Q.   Did he ever write an article on exploitation at Ars

18   Technica?

19   A.   Not that I can recall.

20   Q.   Was there a way at Ars Technica for you to generally keep

21   track of what Mr. Bright was writing about?

22   A.   Yes.  We had a couple different systems that we used to

23   track what people are doing mostly to keep people from sort of

24   stepping on each other's toes, if that makes sense, who's doing

25   what.  So we would have had the benefit of something we called

1    "The Dashboard" which is sort of a near term record of what's

2    happening and then the analytic software we have makes it

3    extremely easy to review anyone's work over any period of time

4    that you might wish to do so.

5    Q.  Was there also any more informal methods of keeping track

6    of what different reporters were writing about?

7    A.  There was in the last four or five years that we've created

8    something called daily updates.  And daily updates was just a

9    channel in the end slack that you would pop into and say, I'm

10   doing this.  And the point of doing that was two-fold.  One, it

11   let us know that you were working on something which was

12   critical.  But secondly, it gave us the opportunity to put the

13   brakes on anything that we didn't think should be done or if we

14   thought someone else would want it or was more qualified to

15   cover it.

16   Q.  Were you a member of that channel?

17   A.  Yes.

18   Q.  Did Mr. Bright ever pitch anything on that channel about

19   child exploitation?

20   A.  Not that I recall.

21   Q.  Would you approve an article by Mr. Bright on child

22   exploration?

23           MS. BAHARANYI:  Objection, your Honor.

24           THE COURT:  No.  I'll allow it.

25           Based on your practice an experience.

1    A.  Based on my practice and experience, no.

2    Q.  Why not?

3    A.  We actually have a deputy editor at Ars Technica who's been

4    with us for a very long time who's written extensively on these

5    topics.  She's authored a book, not specifically about child

6    exploitation but more generally about the new error of law

7    enforcement, digital age and that was a significant component

8    of it.  So, in other words, were that something that would be

9    explored, we would naturally go to the person who's the subject

10   matter expert in it and have them do that.

11   Q.  Are you familiar with the term "investigative journalism"?

12   A.  Yes.

13   Q.  What is investigative journalism?

14   A.  Investigative journalism usually involves identifying a

15   complex cluster of problems or questions that not easy answers

16   to find.  Typically, if you are doing investigative journalism

17   you are developing sources across a wide field.  You are

18   talking to those sources, trying to learn what they know.  Get

19   information from the back channel, get background et cetera.

20   Investigative journalism is typically done as part of a team so

21   that everyone is on the same page with the strategy that you

22   are implementing and if it's a sensitive issue it would also

23   involve legal.

24   Q.  Was Mr. Bright an investigative journalist at Ars Technica?

25   A.  No.

1   Q.  Was Mr. Bright a full-time employee at Ars Technica?

2   A.  Yes.

3   Q.  As a full-time employee was he paid by the story?

4   A.  No.

5   Q.  As a full-time employee of Ars Technica was he allowed to

6   write for other publications without permission?

7           MS. BAHARANYI:  Objection, your Honor; leading.

8           THE COURT:  No.  I'll allow it.

9   A.  No, not without approval from the company.

10  Q.  Did he ever ask for permission to write an article for

11  another publication?

12  A.  No.

13  Q.  Is Mr. Bright still employed at Ars Technica?

14  A.  No.

15  Q.  Have you read the criminal complaint in this case?

16          MS. BAHARANYI:  Objection, your Honor; relevance.

17          THE COURT:  Yes.  What's the relevance?

18          MR. LI:  Lack of bias, your Honor.

19          THE COURT:  I'll allow it.

20  A.  Yes, I have.

21  Q.  Has your review of that complaint altered your testimony in

22  any way here today?

23  A.  No.

24          MR. LI:  No further questions.

25          THE COURT:  All right.  You may cross-examine.

1   CROSS-EXAMINATION

2   BY MS. BAHARANYI:

3   Q.  Good afternoon, Mr. Fisher.

4   A.  Good afternoon.

5   Q.  Ars Technica publishes many types of article, correct?

6   A.  Correct.

7   Q.  And this includes articles in the realm of law enforcement

8   in the digital age, as well?

9   A.  Yes.

10  Q.  And you specifically or the website has specifically

11  published articles on how the Internet is used to commit crimes

12  against children, right?

13  A.  Yes.

14  Q.  Also publish articles on child exploitation, right?

15  A.  Yes.

16  Q.  Ars Technica is also published on the topic of when teens

17  get caught up in child pornography laws, right?

18  A.  Yes.

19  Q.  And published on teens being prosecuted for sext-ing, for

20  example?

21  A.  Correct.

22  Q.  Prosecuted for sending nude selfies, right?

23  A.  Yes.

24  Q.  This has been a popular subject area recently, right?

25  A.  Yes.

1    Q.  Within the past few years, right?

2    A.  Last decade, I'd say.

3    Q.  Now, you testified that Mr. Bright himself never wrote

4    about child exploitation, right?

5    A.  Correct.

6    Q.  But his co-workers did, right?

7    A.  Yes.

8    Q.  Mr. Bright worked remotely, right?

9    A.  Yes.

10   Q.  As did his other co-workers?

11   A.  Yes.

12   Q.  But they're able to communicate with each other, right?

13   A.  Right.

14   Q.  You listed a few different ways.  So, like you communicated

15   by phone, right?

16   A.  Yes.

17   Q.  Phone over the Internet, correct?

18   A.  Yes.

19   Q.  They can communicate by e-mail?

20   A.  Yes.

21   Q.  And they also communicate on Slack, right?

22   A.  Correct, yeah.

23   Q.  So Slack is this platform that all of your employees have

24   to check into, right?

25   A.  We don't require its use but not using it would be a

1    massive inconvenience or anyone.

2    Q.   So your employees are expected to check-in to Slack?

3    A.   Yes.

4    Q.   They communicate with each or the Slack platform?

5    A.   Yes.

6    Q.   Rather frequently?

7    A.   Oh, yes.

8    Q.   They communicate, they talk to each other about what

9    they're working on, right?

10   A.   Yep.

11   Q.   They talk to each other about what they're writing, right?

12   A.   Correct.

13   Q.   And there are also ways for your employees to read each

14   other's work, right?

15   A.   Correct, yes.

16   Q.   They could read their co-workers work on the website, for

17   example?

18   A.   Yes.

19   Q.   And you testified as well that there's this Dash Board,

20   right?

21   A.   Um-hmm.  Yes.

22   Q.   That Dashboard is another way for employees to know who's

23   working on what, right?

24   A.   Correct.

25   Q.   And so Mr. Bright had access to Slack while he was working

1   at Ars Technica, right?

2   A.  Yes.

3   Q.  He had access to Dashboard when he was working at Ars

4   Technica?

5   A.  Yes.

6   Q.  And he was able to freely communicate with the other

7   employees at Ars Technica, right?

8   A.  Yes.

9   Q.  And talk to them about what they were writing, right?

10  A.  Yes.

11  Q.  And he talked a bit about what's expecting of your writers

12  at Ars Technica.

13  A.  Yes.

14  Q.  Ars Technica has a representation of being a trusted source

15  in technology use, right?

16  A.  Yes.

17  Q.  Your writers are expected to write well, right?

18  A.  Absolutely.

19  Q.  They're expect to report technology used accurately, right?

20  A.  Yes.

21  Q.  That means corroborating what they write, right?

22  A.  Generally, yes, demonstrating that they're correct.

23  Q.  So generally, backing up what it is that they're writing

24  right?

25  A.  Yes.

1   Q.   They sometimes interview sources for information, right?

2   A.   Yes.

3   Q.   They certainly engage in fact checking when they're

4   preparing an article, right?

5   A.   Yes.

6   Q.   And you expect your writers to engage in sort of fact

7   checking, right?

8   A.   Most certainly, right.

9   Q.   It's part of being a good journalist?

10  A.   Yes.

11  Q.   Mr. Bright was good journalist, right?

12  A.   Yes.

13  Q.   And he started off with your company as a freelancer,

14  right?

15  A.   Yes.

16  Q.   On contracts?

17  A.   Yes.

18  Q.   And then you promoted him at Ars Technica, right?

19  A.   Correct.

20  Q.   To full-time work?

21  A.   Yes.

22  Q.   And you knew Mr. Bright fairly well when he worked at Ars

23  Technica?

24  A.   Yes.

25  Q.   And you knew him before then?

K2CAABRI4                    Fisher – Cross

1    A.  Yes.

2    Q.  You know his personality fairly well, right?

3    A.  I would think so.

4    Q.  You are familiar with his online persona, right?

5    A.  Yes.

6    Q.  Mr. Bright likes to play the devil's advocate online,

7    right?

8    A.  Yes, does.

9    Q.  He likes to argue, right?

10   A.  Yes.

11   Q.  He would take unpopular positions just to take them, right?

12   A.  It certainly seemed that way, yes.

13           MR. LI:  Objection.

14   Q.  This is a difference between Mr. Bright in person that you

15   noticed and Mr. Bright online, right?

16   A.  Yeah, a degree of difference, yes.

17   Q.  He was a provocative person online, right?

18   A.  Generally, yes.

19           MS. BAHARANYI:  No further questions, your Honor.

20           THE COURT:  All right.  Redirect?

21           MR. LI:  No redirect, your Honor.

22           THE COURT:  All right.  Thank you, sir.  You may step

23   down.  You are excused.

24           Government may call its next witness.

25           MR. LI:  The government rests, your Honor.

K2CAABRI4                    Fisher - Cross

1           THE COURT:  All right.  The defendant may call their

2      first witness.

3           MS. GALLICCHIO:  Your Honor, we have just a motion.

4           THE COURT:  All right.  You want to come to side bar

5      for a second.

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K2CAABRI4                        Fisher - Cross

1          (side bar)

2          MS. GALLICCHIO:  This will be brief.  We do have a

3     motion pursuant to Rule 29 for a judgment of acquittal and that

4     the evidence is insufficient to support this charged crime.

5          THE COURT:  All right.  Thank you.  I will take the

6     motion under advisement.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K2CAABRI4                          Dr. Cantor - Direct

1              (In Open Court)

2              MS. BAHARANYI:  Your Honor, we call Dr. James Cantor.

3              THE COURT:  All right.

4    DR. JAMES MICHAEL CANTOR,

5         called as a witness by the Defendant,

6         having been duly sworn, testified as follows:

7    DIRECT EXAMINATION

8    BY MS. BAHARANYI:

9    Q.  Good afternoon, Dr. Cantor.

10   A.  Good afternoon.

11   Q.  Dr. Cantor, where are you currently employed?

12   A.  I am a psychologist and director at the Toronto Sexuality

13   Center.

14   Q.  Can you please describe your educational background?

15   A.  I have a PhD in clinical psychology and a masters degree in

16   psychology.  Mostly, I am a sex therapist and sex researcher

17   and I studied primarily atypical sexualities.

18   Q.  As part of your PhD program, did you complete a

19   dissertation?

20   A.  Yes, I did.

21   Q.  What was that dissertation on?

22   A.  It was in neurochemistry.  At that time prozac will just

23   come out and very quickly it was recognized that there were

24   certain antisexual side effects of prozac.  In meant it would

25   reduce ejaculation and it would sometimes decrease sex drive.

1   I had an hypothesis of exactly how and what in the brain was

2   causing that side effect and so my dissertation was to find a

3   way and to actually test in rats a way to fix that side effect.

4            THE COURT:  Thank you, Dr. Cantor.

5   Q.  Thank you, Dr. Cantor.

6            When did you complete this dissertation?

7   A.  1999.

8   Q.  And can you also describe the training that you've received

9   in psychology?

10  A.  Certainly.  I started with as I say, a master degree from

11  Boston University in general psychology and then I did my PhD

12  in clinical psychology at McGill University.  I then did a

13  post, set of post doctoral studies in the neuroscience of

14  atypical sexuality.

15  Q.  Did you have any clinical training as part of your

16  educational background?

17  A.  Yes, I did.  The standard part of a PhD in clinical

18  psychology is a series of practical placement over the course

19  of the degree, followed by a full-time full year clinical

20  placement in clinical psychology.

21  Q.  And your training and educational background has there been

22  a particular focus of that training?

23  A.  The training itself was about human sexuality and then over

24  time I specialized more and more deeply in atypical

25  sexualities.

K2CAABRI4                    Dr. Cantor - Direct

1   Q.  Let's get back to where you are.  You are currently at the
2   Toronto Sexuality Center?
3   A.  That's correct.
4   Q.  What is your position there?
5   A.  I am the director and founder.
6   Q.  As the director, what do you do?
7   A.  I see clients directly myself one or two days a week.  A
8   large portion of that is also supervising and doing the
9   administrative work of other psychologists in my employ and I
10  do a certain amount of consultation and some witness testimony
11  like today's.
12  Q.  And when you see clients, what do you see them for?
13  A.  It's a range of things.  Because my name is well-known in a
14  typical sexualities I'm often sought out by people specifically
15  to address those kinds issues.  For some people, they're unsure
16  about exactly what their sexualities are, what they mean,
17  whether they shuled be integrating them into their lives or to
18  deal with the discontent or unease some people have when they
19  don't fit into a regular mode of being into regular plain
20  vanilla everyday kinds of sex.
21          A portion of that is also people who are kinky.  They
22  also, but aren't suffering any kinds of problems because of
23  their kink directly but have the same kinds of depression
24  problems and anxiety problem and problems living that everybody
25  else has but because relatively few psychologists have any

K2CAABRI4                    Dr. Cantor - Direct

1    expertise specifically with atypical sexualities, they find

2    that a lot of psychologists kind of attribute all problems to

3    the kink --

4              THE COURT:  All right.  I think you're answered the

5    question.

6              THE WITNESS:  OK.

7              THE COURT:  Have you been briefed on the Court's

8    rulings in this case?

9              MS. BAHARANYI:  He has, your Honor.

10             THE COURT:  I'm asking the witness.

11             THE WITNESS:  No, I don't think so.

12             THE COURT:  OK.  Well, then we're going to recess

13   right at this point and I am going to make sure that you are.

14             So, ladies and gentlemen, please have a very pleasant

15   evening.  We should all be optimistic when we look out the

16   window and it's five o'clock and there's actually daylight.  It

17   wasn't the case that long ago.

18             And you know what I'm going to tell you next.  Keep an

19   open mind.  Do not discuss the case among yourselves or with

20   anyone.  Do not do any research on your own.  And I will see

21   you tomorrow morning for a good ten o'clock start.

22             And thank you.

23             (Jury not present)

24             THE COURT:  All right.  Please be seated.

25             Dr. Cantor, you do neuroscience and psychology.  I do

K2CAABRI4                          Dr. Cantor - Direct

1   law.  And in the legal process an issue arises from the

2   arguments of the parties.  And the matter on which I am going

3   to instruct you is a matter in which there was argument and

4   briefing from the parties and then there was a ruling made by

5   the Court which has been communicated to the parties and this

6   relates to your testimony.  It's not a reflection on your

7   expertise in any way or your knowledge on certain subjects.

8   It's what under the rules of evidence in a federal proceeding

9   can come in.

10          So I have ruled that you may testify on the fact that

11  there is such a thing as I understand you're prepared to

12  testify.  There is such a thing as age-based role play that

13  adults engage in.  And you may testify as to what age-based

14  role play is based on your experience provided.  You can do

15  that based on your actual experience in your practice and in

16  your studies.  That is the only area that you may testify in.

17          You may not testify as to the propensity or likelihood

18  that a person who engages in age-based role play would or would

19  not be likely to commit any act with a flesh and blood child.

20  You may not testify as to the characteristics of pedophiles and

21  what their profile is.

22          So, do you understand my ruling?

23          THE WITNESS:  Yes, I do.

24          THE COURT:  Are parties in agreement with that

25  instruction?

1          MS. BAHARANYI:  Yes, your Honor.

2          MS. GALLICCHIO:  Yes, your Honor.  He was instructed.

3          THE COURT:  I'm not faulting anybody.

4          Mr. Li?

5          MR. LI:  We are, yes, your Honor.

6          THE COURT:  That's wonderful.

7          I'll see tomorrow morning.  We'll get started.  You

8    have to go through the security a little bit before ten.

9    That's the way it works.  So please arrive early and we'll have

10   a good start at ten o'clock.

11         THE WITNESS:  Understood.

12         THE COURT:  All right.  Have a pleasant evening and

13   enjoy New York.

14         THE WITNESS:  Thank you very much.

15         THE COURT:  You may step down.

16         I am going to get comments on the charge and let me

17   inquire.

18         You may step out, Dr. Cantor.

19         Please be seated for a moment.  Let me inquire, after

20   Dr. Cantor, what's next?

21         MS. GALLICCHIO:  Your Honor, we intend to call

22   Mr. Bright.

23         THE COURT:  OK.  And are there any witnesses after

24   Mr. Bright?

25         MS. GALLICCHIO:  No, your Honor.

1          THE COURT:  All right.  I don't know how long

2     Mr. Bright's testimony will be but, an hour sound about right?

3          MS. GALLICCHIO:  No.  I think it's going to be,

4     there's quite a bit to cover.

5          THE COURT:  OK.

6          MS. GALLICCHIO:  So I would say a couple hours at

7     least.

8          THE COURT:  Well, fine.  As long as it's relevant

9     testimony, that's fine with me and then we'll have

10    cross-examination.

11         But the time has come for me to inquire, how long does

12    the government anticipate on its closing argument and what I

13    will allow you to do and this is my practice in I think it's

14    probably everybody's practice but I want to find out about your

15    closing summation and the defendant's closing summation.  How

16    much time do you think you want for your closing summation in

17    this extremely short trial?

18         MR. LI:  Your Honor, we think maybe 45 minutes.

19         THE COURT:  Wow.  That's what I get as a request in a

20    week and a half trial.  So that, I don't think is going to

21    happen.  So how long does the defense wish for their summation?

22         MS. GALLICCHIO:  I would estimate an hour.

23         THE COURT:  What could you possibly cover in a trial

24    that's gone on for two days and will go, with jury selection

25    that won't be two days?

1        MS. GALLICCHIO:  Your Honor, there are pages and pages

2    of text.  There's 404(b) evidence that has to be covered.

3    There's recordings.  There's my client's testimony.

4        THE COURT:  All right.  Well, if you are going to go

5    for an hour, how long do you think I should give the defendant

6    to rebut a one-hour summation?

7        MS. GALLICCHIO:  The government.

8        THE COURT:  The government.  Three minutes, something

9    like that maybe?

10        MS. GALLICCHIO:  I'm not making any suggestion, your

11    Honor.

12        THE COURT:  I'm inviting you to.  OK?  You don't want

13    to make a suggestion, that's OK.

14        How long would the government like for their rebuttal

15    summation?

16        MR. LI:  Twenty minutes, your Honor.

17        THE COURT:  OK.  I will think about this overnight.

18    It seems awfully unnecessary in a trial this long.

19        (Continued on next page)

20

21

22

23

24

25

K2CYBRI5

1          MS. GALLICCHIO:  Your Honor, Mr. Bright has a lot at

2     stake.

3          THE COURT:  He has an awful lot at stake.  That

4     doesn't mean that because he has a lot at stake that,

5     therefore, a lot of time should be spent in a two-day trial.

6     The jury has paid attention.  They've heard the evidence.  So I

7     don't get your point.

8               If this were a murder trial that lasted two days, it

9     would still be the same situation.  Of course a lot at stake.

10    A lot is at stake no matter who is accused of what crime.  We

11    can agree on that.  Right?

12         MS. GALLICCHIO:  Of course.  Of course.

13         THE COURT:  That doesn't justify --

14         MS. GALLICCHIO:  I have to defend my client.  I'm not

15    going to ramble on and on, but there is a lot to cover here.

16    Obviously your Honor has a different opinion of it, but I don't

17    think an hour is excessive.

18         THE COURT:  I'm going to take it under advisement.

19         MS. GALLICCHIO:  Thank you.

20         THE COURT:  And I'm taking the government's request

21    under advisement because, again, I think the jury heard it.

22    They heard the evidence.  And they have a job to do, to decide

23    whether or not, after they hear all of the evidence in the

24    case, the government has or has not, based on the evidence and

25    the lack of evidence, proven its case beyond a reasonable

K2CYBRI5

1    doubt.

2          So that's where we are, and I'll see you tomorrow

3    morning.  Don't forget to get the written comments uploaded.

4    I'm going to ask you to do that by 9:15 tomorrow morning so

5    that we can take a look at it.  All right?  Thank you all very

6    much.  Have a pleasant evening.

7          MS. GALLICCHIO:  Thank you.

8          (Adjourned Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          INDEX OF EXAMINATION

2     Examination of:                              Page

3     ELIZABETH JENSEN

4     Direct By Mr. Li . . . . . . . . . . . . . .60
      Cross By Ms. Gallicchio  . . . . . . . . . .81
5     Redirect By Mr. Li . . . . . . . . . . . . 155

6     AARON SPIVACK

7     Direct By Mr. Li . . . . . . . . . . . . . 167
      Cross By Ms. Baharanyi . . . . . . . . . . 195
8     Redirect By Mr. Li . . . . . . . . . . . . 205

9     SHAMEL MEDRANO

10    Direct By Mr. Li . . . . . . . . . . . . . 208

11    KENNETH ROBERT FISHER

12    Direct By Mr. Li . . . . . . . . . . . . . 218
      Cross By Ms. Baharanyi . . . . . . . . . . 227
13    DR. JAMES MICHAEL CANTOR

14    Direct By Ms. Baharanyi  . . . . . . . . . 235

15                         GOVERNMENT EXHIBITS

16    Exhibit No.                            Received

17     5T  . . . . . . . . . . . . . . . . . . .61

18     7  . . . . . . . . . . . . . . . . . . . .75

19     8  . . . . . . . . . . . . . . . . . . . .77

20     8B  . . . . . . . . . . . . . . . . . . 170

21     102, 6, 6A and 6G  . . . . . . . . . . . 178

22     6T  . . . . . . . . . . . . . . . . . . 179

23     9  . . . . . . . . . . . . . . . . . . . 184

24     9T  . . . . . . . . . . . . . . . . . . 185

25     100, 40 - 42  . . . . . . . . . . . . . 189
```

246

11     . . . . . . . . . . . . . . . . . 194

1    45 – 48  . . . . . . . . . . . . . . . . 212
2                    DEFENDANT EXHIBITS
3    Exhibit No.                          Received
4    C  . . . . . . . . . . . . . . . . . . .93
5    D  . . . . . . . . . . . . . . . . . . .99
6    F  . . . . . . . . . . . . . . . . . . 102
7    A  . . . . . . . . . . . . . . . . . . 104

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25