K3ALBRI1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                          19 CR 521 (PKC)

5  PETER BRIGHT,

6               Defendant.
                                         Trial
7  ------------------------------x

8                                        New York, N.Y.
                                         March 10, 2020
9                                        10:00 a.m.

10 Before:

11
                        HON. P. KEVIN CASTEL,
12
                                         District Judge
13                                       -and a Jury-

14                        APPEARANCES

15 GEOFFREY S. BERMAN
        United States Attorney for the
16      Southern District of New York
   BY:  ALEXANDER LI
17      MICHAEL MAIMIN
        Assistant United States Attorneys
18
   DAVID E. PATTON
19      Federal Defenders of New York, Inc.
        Attorney for Defendant
20 BY:  AMY GALLICCHIO
        ZAWADI S. BAHARANYI
21      Assistant Federal Defenders

22 Also Present:
   Elizabeth Jensen, FBI
23 Ariella Fetman, Government Paralegal
   Alondra Reyes, Defense Paralegal
24 Jason Fisher, Technical Support

25

K3ALBRI1

1          THE COURT:  Good morning.  Please be seated.

2          MR. LI:  Good morning, Judge.

3          THE COURT:  Good morning.

4          (Case called)

5          MR. LI:  Good morning, your Honor.

6          Alexander Li and Michael Maimin, for the government.

7          THE COURT:  Good morning to you both.

8          And good morning to special agent and paralegal.

9          And for the defendant?

10          MS. GALLICCHIO:  Yes.  Good morning, your Honor.

11          From Federal Defenders, Amy Gallicchio and Zawadi

12   Baharanyi.  And we have Mr. Bright.  Also Alondra Reyes, the

13   paralegal, is present.

14          THE COURT:  All right.  Good morning to you all.

15          So I have a number of issues that came up in letter

16   briefing.  The first one, perhaps the easiest to dispose of is,

17   in any jury trial, unless there's an order to the contrary,

18   civil or criminal, the parties are entitled to the jurors'

19   names.  They've always been entitled to the jurors' names.  The

20   Court follows the practice of referring to the jurors in voir

21   dire by their juror number, not because this is an anonymous

22   jury or any jury is an anonymous jury, but because of similarly

23   sounding names and the dangers of mispronunciation.  It has

24   come to my attention that it is much easier for the attorneys

25   during jury selection if I have the jurors identify themselves

K3ALBRI1

1    by juror number.  You, of course, are welcome to know names and

2    get the same information that I get about the jurors.

3                With regard to Dr. Canter, I took a look at *United*

4    *States v. Joseph*, which is a very curious case.  It was

5    abrogated on the grounds of *United States v. Ferguson*, 676 F.3d

6    260.  But there was dictum in the opinion on the use of an

7    expert about explicit role-playing online.  And what had

8    happened was the district court judge had excluded such

9    evidence and, in the opinion authored by John Newman, there was

10   this discussion of perhaps on retrial the district court might

11   want to think of a bunch of different things.

12               And one of the things that Judge Newman said was,

13   "Although some jurors may have familiarity with internet

14   messaging" -- this is something written in 2008, I guess -- "it

15   is unlikely that the average juror is familiar with the

16   role-playing activity that the expert was prepared to explain

17   in the specific context of sexually oriented conversation in

18   cyberspace."  Well, that's precisely the type of testimony that

19   I allowed Dr. Canter to give at the first trial, and I'm going

20   to allow him to give at this trial.  However, there is no basis

21   to allow him to testify that a person who engages in age

22   role-play is less likely to desire sex with an actual minor;

23   that, as I noted before, the Court remains guided by Daubert.

24   And there is no basis for such testimony in the materials that

25   have been presented to me by the defense, none outlined in

K3ALBRI1

1    Dr. Canter's report, and it's straight-up propensity evidence.

2    So I adhere to the rulings that exist with regard to

3    Dr. Canter.

4         Now, the government seeks to preclude, I gather,

5    cross-examination of government witnesses as to whether there

6    was any looking for child pornography on any electronic device

7    of Mr. Bright's and whether any was found.  I realize that

8    there is not unanimity in the case law in this arena, including

9    a summary order from the Eleventh Circuit.  But it seems to me

10   that the question that was asked in the last trial was

11   appropriate, and I'm going to allow it in this trial as well.

12   The implying that that there's a correlation between this fact

13   and a propensity to commit the crime charged by the grand jury

14   is a different story.  I'll take it on a question-by-question

15   basis, and the same for argument.  But the general concept, the

16   defendant will be allowed to ask the question:  Was there a

17   search done and was there any fact?

18        With that, I think we can wait for our jurors to come

19   up and then we can get started.  Thank you.

20        (Recess)

21        (Continued on next page)

22

23

24

25

K3ALBRI1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K3AKBRI2

| | |
|---|---|
| 1 | (A jury of 12 and 6 alternates was previously |
| 2 | impaneled and sworn) |
| 3 | (In open court; jury not present) |
| 4 | THE COURT:  Please be seated. |
| 5 | I'm going to have marked as Court Exhibit No. 1 jury |
| 6 | instructions in this case, which my law clerk is now handing |
| 7 | out. |
| 8 | We are in recess.  Thank you. |
| 9 | MR. MAIMIN:  Thank you. |
| 10 | THE COURT:  And, Mr. Li, you can move the podium for |
| 11 | when we commence. |
| 12 | MR. LI:  Thank you, your Honor. |
| 13 | (Recess) |
| 14 | (Jury present) |
| 15 | THE COURT:  You sit down as soon as you get in, and |
| 16 | we're standing for you. |
| 17 | Be seated, ladies and gentlemen. |
| 18 | Before we begin, I have a certain set of instructions |
| 19 | that I want to give you about the case.  As you heard this |
| 20 | morning, it's my job to instruct you as to the law that governs |
| 21 | or controls this case.  I will give you those instructions at |
| 22 | the conclusion of the trial, and I will give them to you |
| 23 | orally, and I will give you a written copy of the instructions, |
| 24 | which you'll have with you in the jury room.  But I have a few |
| 25 | instructions that I will give you now. |

K3AKBRI2

1        This is a criminal case.  An indictment filed by a

2   grand jury, sitting in this district, has charged the

3   defendant, Peter Bright, with one count of attempted enticement

4   of a minor to engage in illegal sexual activity.  The

5   indictment itself is not evidence.  An indictment simply

6   contains the charge that the government is required to prove to

7   the satisfaction of the trial jury by proof beyond a reasonable

8   doubt.

9        The defendant, Peter Bright, has entered a plea of not

10  guilty to the indictment.  The law presumes Mr. Bright to be

11  innocent of the charge against him.  The burden is upon the

12  government to establish the defendant's guilt beyond a

13  reasonable doubt with respect to each element of the offense

14  charged.  The burden of proof never shifts to the defendant in

15  a criminal case, and the law never imposes on the defendant the

16  obligation of doing anything in a criminal trial.

17       The presumption of innocence remains with the

18  defendant throughout the trial, unless and until, after hearing

19  and considering all the evidence and my final instructions on

20  the law, you, as jurors, unanimously are convinced of the

21  defendant's guilt beyond a reasonable doubt.

22       Until it is time to deliberate at the conclusion of

23  the case, it's important that you keep an open mind.  You must

24  pay close attention to all of the evidence presented.  Evidence

25  consists only of testimony of witnesses, documents, and other

K3AKBRI2

things admitted as evidence, or stipulations agreed by the

attorneys.  Certain things are not evidence and must not be

considered by you.  I will list them for you now.  Statements

and arguments by lawyers are not evidence, nor are my own

statements to you.  I'm not a witness in this trial; none of

the lawyers are witnesses in this trial.

        In a few moments, lawyers will stand at the podium,

and they will give you their view of what they believe the

evidence in the case will be.  That overview is not evidence.

And if any lawyer states something in their opening statement

or in their closing argument that is not supported by the

evidence in this case, it is the evidence, and only the

evidence, that you consider.

        Questions by lawyers are not evidence.  Let's say the

question is asked:  Isn't it true that on July 1st, 2008, you

had a private meeting with Derek Jeter at Yankee Stadium?  That

question has no evidentiary value whatsoever.  You're saying

Derek Jeter 2008, Yankee Stadium, what is this all about?  It's

nothing.  It's the answer of the witness, together with the

question, that becomes evidence.  If the answer is yes, now you

may consider that, but the fact that a question comes out of

the mouth of a lawyer does not mean anything in and of itself.

        Objections to questions are not evidence.  Lawyers

have an obligation to their client to make an objection when

they believe evidence is offered improperly under the rules of

K3AKBRI2

evidence.  You should not be influenced by the fact that an
objection was made or even my ruling on that objection.  If the
objection is sustained, ignore the question and any answer that
may have been given before I said "sustained."  If it's
overruled, treat the answer like any other.  If you're
instructed that some item of evidence is received for a limited
purpose only, you must follow that instruction.

Something else that's not evidence is testimony that
the Court has excluded or stricken or I told you to disregard.
That ceases to be evidence and may not be considered by you in
your deliberations in this case.

Anything that you may have seen or heard outside the
courtroom is not evidence and must be disregarded.  You're to
decide the case solely on the evidence presented here in the
courtroom.

In deciding the facts of the case, you will have to
decide the credibility of the witnesses; that is, how truthful
and believable they are.  Now, how do you decide what to
believe and what not to believe?  Well, you're going to listen
to the witnesses, watch them and observe them, and then decide
as you would decide such questions in your ordinary life.  Did
they know what they were talking about?  Were they candid,
open, honest, and truthful?  Did they have a reason to falsify,
exaggerate, or distort their testimony?

Sometimes it's not what a witness says, but how he or

K3AKBRI2

1    she says it that may give you a clue as to whether or not to

2    accept that witness' version of an incident or event as

3    credible or believable.  In short, the way a witness testifies

4    may play an important part in your reaching a judgment as to

5    whether you can accept the witness' testimony as reliable.

6         You will use your common sense and good judgment to

7    evaluate their testimony based on all the circumstances.

8         I cannot emphasize too strongly that you must keep an

9    open mind until all the evidence is in and the trial is over.

10   A case can be presented only step by step, witness by witness,

11   and it would be unfair to one side or the other if you made up

12   your mind before you have heard all the evidence.

13        We know from experience that frequently we'll hear a

14   person give his version of an event which sounds most

15   impressive and even compelling, and, yet, when we hear another

16   person's version of the same events, or even the same witness

17   cross-examined with respect to it, what seemed so very

18   compelling and impressive may be completely weakened.

19        You will use your common sense and good judgment to

20   evaluate the witness testimony.

21        In order to ensure that you decide the case only on

22   the evidence and that you are not influenced in any way by

23   anything that might occur outside the courtroom in your

24   presence, I will give you a specific set of instructions that

25   you must follow:

K3AKBRI2

1          Do not discuss the case among yourselves or with any

2    other person.  What does that mean?  You go back in the jury

3    room on a break, you don't say, gee, wasn't that something or,

4    my goodness, what did you think of that witness?  No, that's

5    discussing the case.  You do not do that.

6          You will have the opportunity, and, indeed, the duty,

7    to discuss the case among yourselves only after all the

8    evidence is in and the case is given to you to discuss and

9    decide in the jury room.

10          You're not to read anything in the newspapers or

11    elsewhere about this case.  Also, you're not to listen or view

12    any reporting on television, radio, or internet.  I don't

13    believe that will happen in this case, but I give that

14    instruction nevertheless.

15          You are not to conduct research about any of the

16    issues, names, events, terminology, laws, legal concepts,

17    people, or any matter touching in any way upon the trial.

18          I want you to think, and I want you to imagine, that

19    you, if somebody you cared about, was involved in a trial with

20    a jury.  You would want that jury to follow the judge's

21    instructions, because when you find something on the internet,

22    it may be that it's something that, if it were known to both

23    sides, it would be a simple explanation for, someone would have

24    the opportunity to respond to it.  They don't have that

25    opportunity when a juror goes and does their own research.

K3AKBRI2

1    It's unfair, and it's wrong, and it's a violation of the

2    instructions.  Don't do it, please.  And that includes even

3    personalities, identities of lawyers or witnesses, et cetera.

4    Don't.  You can do it to your heart's content after the trial

5    is over.

6            Next, do not send or receive any electronic

7    communications about the case.  This means no texting,

8    emailing, blogging, posting information on social media, or

9    using any other electronic communications to discuss or even

10   mention this case.  You're not going to be permitted to discuss

11   this case even with your family and close friends.

12           You know, ladies and gentlemen, sometimes in life,

13   it's not such a bad thing to have a little mystery in your

14   life.  So you can tell everyone, this is going to be a short

15   trial, it will be over soon, and I'll be happy to tell you all

16   about it, but right now, I'm under judge's orders not to

17   discuss the case with anyone, that means you, honey, no one,

18   and we'll talk about it when it's over.  So that's an extremely

19   important rule.

20           But when I say no texting, blogging, emailing, that

21   means you don't say, oh, I was selected to be on a jury today,

22   it's very interesting, and I'll tell you more when I'm off --

23   no, you don't discuss it at all.  At all.  You certainly don't

24   communicate with anyone – no witness, no fellow juror, no

25   lawyer, no spectator – about the case.  That's just forbidden.

K3AKBRI2

1          Now, it may become necessary, in the course of the

2    trial, to send the Court a note.  Maybe it's about something

3    you saw, you heard, you read, you experienced.  You're in the

4    jury room, and human nature being what it is, you're kind of

5    tempted to say, gee, do I think I should tell the judge this,

6    that, or the other thing?  Don't do that.  Resist the

7    temptation.  Send the note to the judge directly, to me,

8    because sometimes there could be in a trial a reason why you

9    would have to step aside as a juror.  But if you share whatever

10   it is with your fellow jurors, that becomes a big problem.

11         So if you see a juror, a fellow juror, writing a note

12   to the judge or handing a note to the judge, resist the

13   temptation to say what was that about?  There's a reason why

14   this should be isolated to the one juror and the judge.  All

15   right?

16         Now, you're not to allow anyone to speak to you about

17   this case.  I doubt that's going to happen here, but if you

18   were approached by anyone to speak about it, politely tell them

19   the judge has directed you not to do so.  If anyone seeks to

20   contact you about the case, you are required to report the

21   incident promptly to me.

22         Now, this is a public courtroom, so it could happen

23   that somebody you know comes into the courtroom.  If that

24   should happen, please send me a note and let me know.  The

25   reason is, it's important that you not hear or know about what

K3AKBRI2

1    happens when the jury is not present.  It may be a procedural

2    matter that is appropriately heard by the attorneys and the

3    Court and is not yet ready or is not permissively disclosed to

4    the jury.  So just let me know if a friend happens to come into

5    court.

6              Now, the attorneys, the defendant, the witnesses, are

7    instructed not to communicate, not to talk to the jury outside

8    the courtroom, not even to offer a friendly greeting.  So if

9    you happen to see them in the elevator, they will treat you

10   like a perfect stranger.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K3ALBRI5

1    THE COURT:  And you should treat them like a perfect

2    stranger.  Oh, they know who you are.  But they're following my

3    instructions when they act like they don't know who you are.

4    And that's it.  You're not being rude.  They're not being rude.

5    You're just following the proper protocol.

6    Finally, let me say a few words about trial procedure.

7    The lawyers have the opportunity, but are not required to make

8    opening statements.  As I told you, the defendant has no burden

9    whatsoever in this case, no obligation to do anything in the

10   trial.  These statements are not evidence, but just a preview.

11   And at the end, they'll have an opportunity to sum up.  What

12   happens is a witness is called, and they're called and they are

13   questioned by the side that called them.  The government, let's

14   say, calls a witness.  Then there is an opportunity to

15   cross-examine the witness.  Again, the defendant has no

16   obligation to cross-examine the witness.  And if the witness is

17   cross-examined, then there will be redirect, and that concludes

18   testimony of the witness.

19   So that's where we are.  And without further adieu, I

20   will give Mr. Li an opportunity to deliver an opening statement

21   on behalf of the government.

22   Whenever, you're ready, Mr. Li.

23   MR. LI:  Thank you, your Honor.

24   We're here today because Peter Bright, that man, tried

25   to have sex with a seven-year-old girl and a nine-year-old boy.

K3ALBRI5

1    In April of 2019, the defendant reached out online to a person

2    he believed to be the mother of two young children.  He told

3    the mother he wanted to teach her kids about sex.  Over

4    hundreds of chat messages, the defendant described in graphic

5    detail exactly what he meant, including inserting a finger in

6    the girl, inserting a small toy in the girl, and having the

7    children play with his penis.  He asked for pictures of the

8    kids and he sent the mother pictures of himself, his STD tests,

9    and his penis.

10          Soon enough, the defendant made plans to meet the

11   children in person.  And so on one Wednesday afternoon, last

12   May, the defendant met the mother right here in Manhattan.  As

13   they began walking to the children's home, sirens blared, and

14   the defendant was stopped and arrested.  As it turned out, the

15   mother was really an undercover FBI agent and the defendant got

16   caught in a sting operation.  When the FBI searched the

17   defendant, they found four condoms, two in his pocket and two

18   in his wallet.  That's why we're here today, because the

19   defendant showed up at a meeting to have sex with two young

20   kids.

21          Ladies and gentlemen, this opening statement is the

22   government's opportunity to give you a preview of what we

23   expect to prove at trial.  I'd like to spend this time on three

24   things:  First, I want to explain the crime that the defendant,

25   Peter Bright, is charged with committing; second, I want to

K3ALBRI5

1   tell you what I expect the evidence will show; third, I'll walk

2   you through how the government will prove it.

3          So let me start with the crime.  The defendant is

4   charged with attempted enticement of a minor.  And that is

5   exactly what it sounds like.  The defendant is charged with

6   trying to persuade a seven-year-old girl and a nine-year-old

7   boy to engage in sexual activity.  That is a federal crime,

8   regardless of whether the defendant succeeded, regardless of

9   whether the children are real, and regardless of whether he was

10  trying to reach the children through a third party, like an

11  adult or an undercover agent.

12         And now I'd like to spend a few minutes on what I

13  expect the evidence will show.  But before I do that, let me

14  just say in advance that you may find some of the evidence in

15  this trial disturbing.  We're going to present that evidence to

16  you because it shows what the defendant said and what he did.

17  And it's that evidence that proves the defendant is actually

18  guilty.  So here's what the evidence will show:

19         The evidence will show that in April 2019, the

20  defendant contacted an undercover FBI agent on an online fetish

21  network called KinkD.  The undercover agent was posing as the

22  mother of a seven-year-old girl and a nine-year-old boy, and

23  her profile said she was looking for someone to teach her kids

24  about the birds and the bees.  I'll refer to the undercover

25  agent as "the mother."

K3ALBRI5

1          The defendant and the mother exchanged hundreds of

2   messages, initially over KinkD, and then over another

3   application called WhatsApp.  In those messages, the defendant

4   told the mother that he wanted to teach the kids how to please

5   others and themselves.  He said he could train the

6   seven-year-old girl by putting a finger inside her, or a tiny

7   toy, or the tip of his penis.  He developed a lesson plan to

8   teach the children about the foreskin of his penis.  He sent

9   the mother pictures of himself, his STD tests, and his penis;

10  and he asked for pictures of the kids.

11         In May 2019, the defendant spoke with the mother by

12  phone.  On the call, the defendant confirmed his first lesson

13  would be to teach the children about his foreskin and he

14  suggested that they schedule weekly lessons.  The defendant and

15  the mother made plans for the first lesson.  The mother told

16  the defendant that she would meet him outside.  When they met,

17  the defendant showed the mother his STD test results on his

18  phone.  The defendant confirmed that he was ready to meet the

19  kids, and he started walking with the mother to the house.

20  That piece when the FBI arrested the defendant and found the

21  four condoms on him.

22         But there's a twist to this story.  Two days before

23  the meeting, the defendant told the mother that he was -- and I

24  quote: "Struck by the fear yesterday that I'd be met by a cop

25  or something."  And so with that fear on his mind, the

K3ALBRI5

1   defendant created a cover story.  He created a way to protect

2   himself in case he got caught.  What he did was make a secret

3   audio recording of the meeting with the mother.  Right after he

4   was arrested, the defendant gave the FBI his cover story.  He

5   told the FBI that he was a journalist for a technology website

6   and that he recorded the meeting.  He told the FBI that he was

7   gathering evidence on the mother's child exploitation and that

8   he was planning to turn over that evidence to law enforcement.

9   But the defendant's cover story was full of holes.

10          The FBI asked the defendant what steps he had actually

11   taken to report the mother to law enforcement.  The defendant

12   admitted he hadn't turned over the mother's phone number or

13   username.  He hadn't turned over the hundreds of messages.  He

14   didn't even tell anybody he was meeting the mother.  When the

15   FBI asked why the defendant didn't simply report the chats he

16   had, he said he never thought of it.  At the end of the day,

17   the evidence will show that the defendant's cover story makes

18   no sense and it is simply not consistent with what the

19   defendant said and what the defendant did.

20          So that's what the evidence will show, that the

21   defendant met up with someone he found online in order to have

22   sex with her children and that he created an elaborate cover

23   story in case he got caught.  To prove it, the government will

24   call four witnesses.  First, the government will call the FBI

25   undercover agent who posed as the mother of the children.  She

K3ALBRI5

1    will walk you through the chats, the phone call, and the

2    meeting with the defendant.  You will see the chats, and you

3    will hear portions of the call and the meeting.

4            Second, the government will call another FBI agent,

5    who will testify that he led the team that arrested the

6    defendant and found the four condoms on him.  The agent will

7    also tell you that he interviewed the defendant after his

8    arrest.  You will see portions of that interview, which was

9    video-recorded, including the portion where the defendant spun

10   his cover story.

11           Third, the government will call an investigative

12   analyst from the U.S. Attorney's Office.  The analyst will

13   testify that he reviewed the defendant's social media for

14   public posts about sexual activity with children.  The analyst

15   will show you what he found, including a Twitter post in which

16   the defendant declared that age-based rape laws, the same laws

17   that he told the FBI that he was trying to help enforce, are,

18   quote, "stupid."

19           Finally, the government will call the editor-in-chief

20   of the website where the defendant worked as a journalist.  The

21   editor-in-chief will testify that the defendant was not an

22   investigative journalist.  His job was to write about

23   technology, such as Microsoft consumer technology, the

24   defendant had never written about child exploitation, and would

25   not have been allowed to write about that topic without first

K3ALBRI5

1   seeking approval, which he never did.

2          Ladies and gentlemen, at the end of this case, both

3   sides will have the opportunity to talk to you again.  Between

4   now and then, you'll see and you'll hear all of the evidence.

5   During that time, I'd ask that you do three things:  First, pay

6   careful attention to the evidence; second, follow the Judge's

7   instructions on the law; third, use your common sense, the same

8   common sense you use every day, and let that common sense guide

9   your interpretation of the evidence.

10          If you do those three things, you will have done your

11   duty as jurors, the defendant will get a fair trial, and you

12   will come to the only verdict consistent with the evidence:

13   That the defendant, Peter Bright, is guilty as charged.

14          THE COURT:  Thank you.

15          Ms. Baharanyi?

16          MS. BAHARANYI:  Mr. Bright has no desire to have sex

17   with children.  He has never had sex with children.  He's here

18   because an undercover officer, looking for a predator, cast her

19   net so widely that she caught a man who is innocent.  That's

20   Mr. Bright.

21          So who is Mr. Bright?  Well, Mr. Bright is a

22   journalist.  He's a self-proclaimed tech nerd, and he's a proud

23   member of the KinkD community.  When I say "KinkD," that's just

24   any nontraditional alternative sexual practice between

25   consenting adults.  KinkD often involves role playing, fantasy,

K3ALBRI5

1    sometimes around things of bondage and submission.  Mr. Bright

2    likes kinky sex.  He likes kinky sex with other kinky

3    consenting adults.  And that's what he went looking for when he

4    logged onto the KinkD App.  This app, you will hear, is for

5    people looking for role playing, looking for fantasy, people

6    who might be interested in dressing up,  interested in bondage

7    or submission.

8              The first thing you do when you log-on to the KinkD

9    app is confirm that you're over the age of 18.  The second

10   thing, you create your KinkD profile.  On this profile, you

11   describe your own kinky interests.  You write your interests in

12   the profile so anyone looking at your profile can see exactly

13   what you're into.  The profile also asks you to select the

14   roles that you want to play, gives you 29 options, roles like:

15   "Dominant," "submissive," "baby boy" or "baby girl."  You have

16   will have a chance to look at Mr. Bright's KinkD profile.  You

17   will see that on his KinkD profile, he selected the roles that

18   he was interested in playing.  He selected "dominant."  He

19   selected "daddy."  He selected "age player."

20             Now, before you walked through those doors, you may

21   have never heard of the term "age play" or "age player" before.

22   And that's okay.  The defense will call Dr. James Canter.  Dr.

23   Canter is a clinical psychologist, a sex researcher.  And he'll

24   explain to you this phenomenon of age play, where adults

25   role-play, one often pretending to be a different age than they

K3ALBRI5

1    actually are.  Sometimes it's an adult pretending to be a

2    preteen; sometimes it's an adult pretending to be a toddler.

3    The adult who acts along with them plays the role of mommy or

4    the role of daddy.

5         Now, Dr. Canter will explain age play, and you're

6    going to hear that it's all sexual.  And you may be quite

7    confused by age play.  You may be disturbed by age play.

8    Frankly, you may not approve of adults dressing up as children

9    and having sex with one another.  And that's okay.  Whatever

10   you think about age play is between consenting adults and is

11   perfectly legal.

12        When Mr. Bright went onto the KinkD app and messaged

13   someone named Princessmom, he thought he'd found another person

14   to age play with.  But it turns out that Princessmom is an

15   undercover officer.  This undercover went on KinkD, this app

16   for people who like role play and fantasy.  She created a kinky

17   profile.  She gave herself the name "Princessmom," and she said

18   that she's been kinky for two years.  She selected the role of

19   "mommy."  Between the 29 different kinky options, she selected

20   "mommy," and she said that she was looking for someone to teach

21   her kids about the birds and the bees.

22        You will never hear the undercover refer to herself as

23   a mother.  She will never talk about her son and her daughter,

24   and you certainly never hear Mr. Bright ask to have sex with a

25   real seven-year-old and a real nine-year-old, contrary to what

K3ALBRI5

Mr. Li just told you in his opening.  You're not going to hear
any of that.  Instead, what you'll hear, you'll hear an
undercover officer talking with Mr. Bright, using the language
of age play, using the labels of age play, from an app for
people looking to age play.  She didn't go searching for a
predator on an AOL chatroom.  She wasn't on social media, on
Facebook or Instagram, places where you might think a real
child molester might be lurking.  She went on KinkD, an
adult-dating app for people who role-play, for people who like
fantasy, for adults who are looking for other adults.  You'll
hear that the undercover officer talked to Mr. Bright for days,
using this language of age play before she gave him any reason
to believe she was talking about real kids.

          Now, the first sign that something might be off came
in a phone call, a call between Mr. Bright and this undercover
officer.  Mr. Bright will tell you that during this call, he
thought this Princessmom person sounded a little different, a
little off for age play.  And then she sent three photos.  She
sent a photo of herself, a blond attractive woman in her mid
30s, and she sent two photos of children, what looked like they
could be real children.  Now, Mr. Bright was confused.  He was
upset.  Before these red flags, it never crossed his mind that
Princessmom could be a real mother looking for someone to
molest her real children.  Before these red flags, their
conversations had just been like other age-play conversations

K3ALBRI5

1    he'd had with other adults.  But now Mr. Bright feared that

2    Princessmom was a real mother, a real predator, and so he

3    decided that he was going to figure out if exactly what she was

4    up to, he had to keep her talking, he had to gather some

5    evidence, he had to meet her and record everything.  This way,

6    if Princessmom turned out to be a real predator, he had the

7    best evidence to turn her in.  So that's what he did.

8            Mr. Bright made a plan to meet Princessmom in a park,

9    in Duane Park.  He got there a little bit early and he waited.

10   And you'll hear that he set his phone to record.  You'll get a

11   chance to listen to this recording.  You'll hear Mr. Bright

12   wonder out loud of a possibility of a mother going against

13   every maternal instinct to offer her children online to a

14   stranger.  You will hear the amazement in his voice that

15   someone could do something so terrible so openly.  And then

16   you'll hear Princessmom arrive.  And everything is going

17   according to plan until FBI agents swarm in, surround Mr.

18   Bright, and place him under arrest.

19           The problem, ladies and gentlemen, is they got it

20   wrong.  Mr. Bright is not a predator.  He was not there to have

21   sex with a real seven-year-old and a real nine-year-old.

22   You'll know this from the government's own witnesses.  FBI

23   agents will get on the stand.  They will tell you the very

24   first thing they looked for in Mr. Bright's possession and

25   devices was child pornography.  And they didn't find child

K3ALBRI5

1    pornography because Mr. Bright is not attracted to children.

2    How else will you know that he didn't show up at the park to

3    have sex with a seven-year-old and nine-year-old?  Because he

4    wasn't hiding anything.  When Mr. Bright spoke to Princessmom,

5    this undercover officer, he used his real name, his real photo.

6    He told her what he did for work.  He told her where in

7    Brooklyn he lived.  He used his real phone number.  And then

8    when FBI agents arrested him, he continued to be an open book.

9    He gave them access to his phone, his computer.  He gave them

10   access to his Google account.  So what that means is they could

11   search every email, search his browser history, his search

12   list, all of his photos in his Google drive, all of the videos.

13   He did this because he wasn't hiding anything.  And he's still

14   not hiding.

15          Mr. Bright will take the stand.  He will swear to tell

16   the truth, and then he will walk you through everything.  He

17   will talk about his kinks.  He will talk about his sex life.

18   And he will walk you through his plan to catch Princessmom.

19   And he will tell you that when he showed up at the Duane Park,

20   he had no intention of having sex with children.  He's here,

21   accused of something he would never do because an undercover

22   officer made a mistake.  He's never wanted to have sex with

23   children.  Mr. Bright has never had sex with children.  He's

24   never attempted to entice anyone.  And after you've heard all

25   of the evidence in this case, I will ask you to return the only

K3ALBRI3                          Jensen - Direct

1    verdict consistent with that evidence, the only just verdict:

2    Not guilty.

3               THE COURT:  Thank you, Ms. Baharanyi.

4               The government may call its first witness.

5               MR. LI:  Thank you.  The government called Elizabeth

6    Jensen.

7    ELIZABETH JENSEN,

8          called as a witness by the Government,

9          having been duly sworn, testified as follows:

10   DIRECT EXAMINATION

11   BY MR. LI:

12   Q.  Good afternoon.  Are you currently employed?

13   A.  I am.

14   Q.  Where do you work?

15   A.  I work at the Federal Bureau of Investigation.

16   Q.  Will you understand me if I refer to that agency as "the

17   FBI?"

18   A.  I will.

19   Q.  What is your title at the FBI?

20   A.  It's special agent.

21   Q.  How long have you been a special agent with the FBI?

22   A.  Five years.

23   Q.  Are you assigned to a particular unit within the FBI?

24   A.  I am.

25   Q.  What is that unit?

K3ALBRI3                          Jensen - Direct

1   A.  I work crimes against children.

2   Q.  And what sorts of crimes against children do you

3   investigate?

4   A.  So we do overseas distribution, possession of child

5   pornography, international parental kidnapping matters, human

6   trafficking, enticement of minors.

7   Q.  How long have you been investigating crimes against

8   children?

9   A.  Three years.

10  Q.  Have you been trained in the investigation of crimes

11  against children?

12  A.  I have.

13  Q.  What sorts of training have you received?

14  A.  Interviews, legal, conferences, webinars, virginal

15  academies.

16  Q.  Is that a portion of the training you received or is that

17  all of the training?

18  A.  That's correct.  A portion.

19  Q.  Are you familiar with the term "online undercover?"

20  A.  I am.

21  Q.  What is an online undercover?

22  A.  It's an agent typically operating online in an undercover

23  capacity.

24  Q.  In the course of your work as a special agent, have you

25  ever operated an online undercover account?

K3ALBRI3                          Jensen - Direct

1   A.  I have.

2   Q.  Have you been trained to operate an online undercover

3   account?

4   A.  Yes.

5   Q.  What sorts of training have you received specifically for

6   undercover operations?

7   A.  So we went out of state for two weeks.  We went over

8   different investigative techniques, legal facets, operating how

9   to.  In addition, we have a platform dedicated solely to

10  undercovers.  And I work in a squad where everyone around me is

11  also undercover.

12  Q.  When you operate an online undercover account, what sort of

13  person do you pretend to be?

14  A.  Typically, I'm a mom.

15  Q.  And when you say you're a mother, do you, in fact, have any

16  real children?

17  A.  I do not.

18  Q.  Did there come a time when you operated an online

19  undercover account on an application called KinkD?

20  A.  It has.

21  Q.  What is KinkD?

22  A.  KinkD is an online platform geared towards users that may

23  have unconventional sexual desires, behaviors.

24  Q.  How does a user access KinkD?

25  A.  Typically, you download it from an app store.

K3ALBRI3                         Jensen - Direct

1    Q.  And where does one download it to?

2    A.  Either their cell phone or a computer.

3    Q.  How long have you operated an account on KinkD?

4    A.  Almost a year.

5    Q.  And what sorts of fetishes have you seen on KinkD?

6    A.  We have the BDSM; you have role-play, water sports; you

7    have spanking, different fetishes, whether like a foot fetish

8    or a leg fetish.

9    Q.  When you say "BDSM," what do you mean by that?

10   A.  So it's a basically a combination of like domination,

11   sadomasochism.

12           THE COURT:  Keep your voice up please.

13           MR. LI:  Ms. Fetman, can we please pull up Government

14   Exhibit 1 for identification only?

15   BY MR. LI:

16   Q.  Special Agent Jensen, do you recognize this?

17   A.  I do.

18   Q.  What is it?

19   A.  This is my KinkD profile.

20   Q.  Who took this?

21   A.  Did I.

22   Q.  When did you take it?

23   A.  I took it in May of 2019.

24           MR. LI:  Your Honor, may I proceed?

25           THE COURT:  What do you mean by "proceed?"

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

K3ALBRI3                          Jensen - Direct

1          MR. LI:  I think there may be some confusion among the

2    jury because they're not seeing anything on their screens, but

3    I'm going through the identification process.

4          THE COURT:  I understand that.  You may proceed.  I

5    don't know what you mean by that question.

6          MR. LI:  Sure.

7    BY MR. LI:

8    Q.  Is this a fair and accurate reproduction of the screenshot

9    you took?

10   A.  That's correct.

11         MR. LI:  The government offers Government Exhibit 1.

12         THE COURT:  Any objection?

13         MS. GALLICCHIO:  No objection.

14         THE COURT:  Received.

15         (Government's Exhibit 1 received in evidence)

16         MR. LI:  Ms. Fetman, please publish Government Exhibit

17   1 for the jury.

18         THE COURT:  Is it up on your screens, ladies and

19   gentlemen?

20         THE JURY:  Yes.

21         THE COURT:  Thank you.

22         Now.  It is okay.  Thanks.

23   BY MR. LI:

24   Q.  Agent Jensen, when did you create this profile on KinkD?

25   A.  April of 2019.

K3ALBRI3                        Jensen - Direct

1  Q.  Was this approved FBI undercover account?

2  A.  Yes.

3  Q.  Was the information shown on this screenshot visible to

4  other KinkD users?

5  A.  That's correct.

6  Q.  Would you please read the text in the section "my

7  self-summary?"

8  A.  "Looking for a teacher to teach my kids about the birds and

9  the bees."

10  Q.  What were you trying to convey when you wrote that?

11  A.  I was looking for someone who was interested in having

12  sexual activity with my kids.

13  Q.  Why did you not explicitly say that?

14  A.  Why did I not?  If you put it out too explicitly, the

15  website will take it down.

16  Q.  Are there any other reasons why you didn't explicitly write

17  that?

18  A.  Just putting it out there so obvious, it will draw

19  attention and it won't look -- it will be taken down.

20  Q.  Are the kids described in the sentence that you just real

21  people?

22  A.  Yes.

23  Q.  Let me now turn your attention to the "my bio" section.

24          Do you see where it says "my role?"

25  A.  I do.

K3ALBRI3                        Jensen - Direct

1              MR. LI:  Ms. Fetman, can we please pull up Government

2      Exhibit 13 for identification only?

3      BY MR. LI:

4      Q.  Agent Jensen, do you recognize this?

5      A.  I do.

6      Q.  What is it?

7      A.  It's a screenshot of when you select the roles.  Those are

8      the options that you can take.

9      Q.  What specifically does -- excuse me.

10             How do you know that?

11     A.  When I set up my profile, the screen came up and I selected

12     "mommy."

13     Q.  Is this a fair and accurate reproduction of that

14     role-selection page?

15     A.  Yes.

16             MR. LI:  The government offers Government Exhibit 13.

17             MS. GALLICCHIO:  No objection.

18             THE COURT:  Received.

19             (Government's Exhibit 13 received in evidence)

20             MR. LI:  Ms. Fetman, please publish Government Exhibit

21     13 for the jury.  And if you wouldn't mind, put it side by

22     side, Government Exhibit 1.

23     BY MR. LI:

24     Q.  Special Agent Jensen, could you just explain for the

25     benefit of the jury what we're looking at in Government Exhibit

K3ALBRI3                          Jensen - Direct

1    13?

2    A.   Sure.  So underneath my self summary within the bio, it

3    says "my role."  And then to the right it says "mommy."  When

4    you tap to fill that in, Government Exhibit 13 is a list of

5    those options that you can choose from.

6    Q.   How many roles in total are available?

7    A.   Twenty-nine.

8    Q.   Are KinkD users required to select a role?

9    A.   Yes.

10   Q.   What was the role you selected?

11   A.   I selected "mommy."

12   Q.   Did you select any other roles?

13   A.   No.

14   Q.   Now, what did you intend to convey when you selected

15   "mommy?"

16           MS. GALLICCHIO:  Objection.

17           THE COURT:  No.  I'll allow it.

18           THE WITNESS:  That I was a mom.

19           MR. LI:  Ms. Fetman, we can take down Government

20   Exhibit 13.

21   BY MR. LI:

22   Q.   Agent Jensen, did there come a time when you began

23   communicating on KinkD with someone using the profile name

24   "randomanon?"

25   A.   Yes.

K3ALBRI3                          Jensen - Direct

1   Q.  When did these communications begin?

2   A.  The randomanon account contacted my account in April of

3   2019.

4           MR. LI:  Ms. Fetman, can we please pull up Government

5   Exhibit 12 for identification only?  There are three pages

6   here, so if you could just flip through them for Agent Jensen.

7   BY MR. LI:

8   Q.  Agent Jensen, do you recognize this document?

9   A.  I do.

10  Q.  What is it?

11  A.  This is the profile of the randomanon account on KinkD.

12  Q.  And who took these screenshots?

13  A.  I did.

14  Q.  Is this a fair and accurate reproduction of the screenshots

15  you took?

16  A.  That's correct.

17          MR. LI:  The government offers Government Exhibit 12.

18          MS. GALLICCHIO:  No objection.

19          THE COURT:  Received.

20          (Government's Exhibit 12 received in evidence)

21          MR. LI:  Ms. Fetman, please publish Government Exhibit

22  12 side by side with Government Exhibit 1.

23  BY MR. LI:

24  Q.  Agent Jensen, do you see a photograph on the top of

25  Government Exhibit 12?

K3ALBRI3                          Jensen - Direct

1    A.  I do.

2    Q.  Who posted that photograph?

3    A.  The user of the randomanon account.

4    Q.  Was that photograph public or was it private?

5    A.  It's public.

6           MR. LI:  Ms. Fetman, please turn to the second page of

7    Government Exhibit 12.

8    BY MR. LI:

9    Q.  Agent Jensen, do you see in the "my bio" section where it

10   says "my role?"

11   A.  I do.

12   Q.  What roles did the randomanon user select?

13   A.  It states "dominant," "master," "fetishist," "kinkster,"

14   "age player," "daddy," "hedonist," "vanilla," and then a "TO"

15   ellipsis.

16   Q.  What do you understand "master" to mean?

17   A.  Someone that has ownership of somebody within the

18   relationship.

19   Q.  In this context, what do you understand "vanilla" to mean?

20   A.  Someone that may have conventional sexual tastes and

21   desires.

22   Q.  And in this context, what do you understand "age player" to

23   mean?

24   A.  Someone that role-plays typically within the relationship.

25   Q.  And what specific kinds of roles do they play?

K3ALBRI3                        Jensen - Direct

 1   A.  Different ages.

 2   Q.  Did you select "age player" in your profile?

 3   A.  I did not.

 4   Q.  What was the role you selected?

 5   A.  "Mommy."

 6          MR. LI:  Ms. Fetman, let's turn to the third page of

 7   Government Exhibit 12.

 8   BY MR. LI:

 9   Q.  Agent Jensen, do you see at the very bottom of Government

10   Exhibit 12 an age range?

11   A.  I do.

12   Q.  What is the age range that the randomanon user selected?

13   A.  Eighteen to 99.

14   Q.  Is it possible to select an age lower than 18?

15   A.  No.

16          MR. LI:  Ms. Fetman, we can take down Government

17   Exhibits 1 and 12.

18          Let's pull up Government Exhibit 2A through 2D for

19   identification only.

20   BY MR. LI:

21   Q.  Agent Jensen, please take a look at these exhibits.

22          Do you recognize them?

23   A.  I do.

24   Q.  What are these?

25   A.  These are screenshots of the KinkD communications between

K3ALBRI3                         Jensen – Direct

1   myself and the randomanon account.

2   Q.  Who took these screenshots?

3   A.  I did.

4   Q.  Are these fair and accurate reproductions of the

5   screenshots you took?

6   A.  Yes.

7               MR. LI:  The government offers Government Exhibit 2A

8   through 2D.

9               MS. GALLICCHIO:  No objection.

10              THE COURT:  Received.

11              (Government's Exhibit 2A-2D received in evidence)

12              MR. LI:  Ms. Fetman, please publish Government Exhibit

13  2A for the jury.

14  BY MR. LI:

15  Q.  Agent Jensen, let me direct your attention to the top part

16  of the screen.

17              Do you see a small photograph and a text "randomanon?"

18  A.  I do.

19  Q.  Is that the account with which you were communicating?

20  A.  That's correct.

21  Q.  Let me direct your attention now to the first, white, chat

22  bubble on the left.

23              Do you see that?

24  A.  I do.

25  Q.  Who wrote that message?

K3ALBRI3                          Jensen - Direct

A.   That message came from the randomanon account.

Q.   Throughout this KinkD exchange, were all the messages in
the white bubble on the left sent by the randomanon account?

A.   That's correct.

Q.   Now, do you see the messages in the blue bubbles to the
right?

A.   I do.

Q.   Who sent those messages?

A.   I did.

Q.   Throughout this KinkD message exchange, were all of the
messages in the blue bubbles on the right sent by you?

A.   Yes.

Q.   How does this KinkD conversation begin?

A.   It states:  "Hi, I'm Peter.  Can you elaborate a little
further on your profile?"

Q.   Was this the first message between you and Peter on KinkD?

A.   That's correct.

Q.   When did Peter send that first message?

A.   April 18th, 2019, at 11:29 a.m.

Q.   When did you respond to that first message?

A.   May 1st, 2019, at 7:40 a.m.

Q.   Would you please read your messages to Peter shown on this
screenshot?

A.   "Hi, Peter.  Sorry, I was swamped with finals but free to
discuss now.  My princess is seven and my prince charming is

K3ALBRI3                          Jensen - Direct

1    nine."

2    Q.  What did you intend to convey when you wrote, "My princess

3    is seven?"

4    A.  The age of my purported seven-year-old daughter.

5    Q.  What did you intend to convey when you wrote, "My prince

6    charming is nine?"

7    A.  The age of my purported son.

8    Q.  Why did you provide that information?

9    A.  In his message it says:  "Can you elaborate a little

10   further on your profile?"  And my profile's limited.  It has

11   kids and the birds and the bees, so I chose to tend to the

12   kids.

13          MR. LI:  Ms. Fetman, could you please pull up

14   Government Exhibit 1 be side by side?

15   BY MR. LI:

16   Q.  Agent Jensen, what portion of your profile did you

17   understand Peter to be asking for elaboration on?

18   A.  My self-summary section.

19   Q.  And what was the elaboration you provided?

20   A.  The ages of my purported children.

21   Q.  Did you also tell him their genders?

22   A.  Yes.

23          MR. LI:  Ms. Fetman, if we can take down Government

24   Exhibit 1.  Let's go to Government Exhibit 2D, which is in

25   evidence.

K3ALBRI3                          Jensen - Direct

1    BY MR. LI:

2    Q.  Agent Jensen, please read Peter's first two messages on the

3    top left here.

4    A.  It says:  "No worries.  I hope everything went okay.  Okay.

5    And they need educating?"

6    Q.  What did you understand Peter to mean when he asked "And

7    they need educating?"

8              MS. GALLICCHIO:  Objection.

9              THE COURT:  What did you understand his message?  What

10   did it mean to you?  What did you read from that?

11             THE WITNESS:  I understood that as him asking about

12   teaching the kids about the birds and the bees.

13   BY MR. LI:

14   Q.  And when you say "the birds and the bees," what do you mean

15   by that?

16   A.  Sexual activity with the children.

17   Q.  Are the kids real?

18   A.  No.

19   Q.  Did there come a time when you and Peter moved your

20   conversation off KinkD and onto another platform?

21   A.  Yes.

22   Q.  What platform did you use?

23   A.  We moved over to WhatsApp

24   Q.  What is WhatsApp?

25   A.  WhatsApp is an online messaging app where users can send

K3ALBRI3                        Jensen - Direct

1    videos, image, texts.

2    Q.  Are messages on WhatsApp encrypted?

3    A.  Yes.

4    Q.  Are messages on WhatsApp transmitted over the internet?

5    A.  Yes.

6    Q.  How does a user access WhatsApp?

7    A.  Download it to your phone or computer, and then it gets

8    installed.

9    Q.  How are users identified on WhatsApp?

10   A.  By their telephone numbers.

11          MR. LI:  Ms. Fetman, please turn to Government Exhibit

12   2D, which is in evidence.

13   BY MR. LI:

14   Q.  Agent Jensen, could you please read Peter's final message

15   on the bottom here.

16   A.  Okay.  My WhatsApp number is (832) 907-0710.

17   Q.  Did you communicate with Peter using that telephone number

18   on WhatsApp?

19   A.  That's correct.

20   Q.  Agent Jensen, do you have a binder in front of you?

21   A.  Not that I see.

22          MR. LI:  Your Honor, may I approach?

23          THE COURT:  You may.

24   BY MR. LI:

25   Q.  Agent Jensen, let me direct your attention to what is

K3ALBRI3                          Jensen - Direct

1    marked in your binder as Government Exhibit 3A through 3O.

2              Do you recognize these exhibits?

3    A.  I do.

4    Q.  What are they?

5    A.  These are the text message communications between myself

6    and the 832 number on WhatsApp.

7    Q.  Did they also include the attachments to those

8    communications?

9    A.  That's correct.

10   Q.  Where did these chats and attachments come from?

11   A.  They came from my undercover cell phone.

12   Q.  Are there any redactions in the exhibits in front of you?

13   A.  There are.

14   Q.  Other than the redactions, are the extracted chat messages

15   and attachments in Government Exhibits 3A through 3O a fair and

16   accurate representation of the chats and attachments that you

17   actually exchanged with Peter?

18   A.  Yes.

19   Q.  And how do you know that?

20   A.  I sent them, I reviewed them, and I initialed them.

21             MR. LI:  The government offers Government Exhibits 3A

22   through 3O.

23             MS. GALLICCHIO:  No objection.

24             THE COURT:  All right.  Received.

25             (Government's Exhibit 3A-3O received in evidence)

K3ALBRI3                         Jensen - Direct

1          THE COURT:  Ladies and gentlemen, a redaction is the

2   removal of irrelevant material.  This is done through a process

3   which is subject to the Court's supervision.  So any redacted

4   or blacked-out material is deemed to be irrelevant, and you

5   should not speculate or dwell upon why that may be the case.

6          Go ahead.  You may publish.

7          MR. LI:  Ms. Fetman, please publish Government Exhibit

8   3A for the jury.

9   BY MR. LI:

10  Q.  Agent Jensen, what is this?

11  A.  This is the extraction for the text message communications

12  on WhatsApp between myself and the 832 telephone number.

13  Q.  What is an extraction?

14  A.  So basically we have an undercover cell phone.  We take a

15  file system extraction of the data.  And this is an extraction

16  from that report.

17  Q.  Let me direct your attention to the participant section at

18  the top of the page.

19          Do you see a small photograph and a text, 1(832)

20  907-0710?  And it goes on.  Do you see that?

21  A.  Do I.

22  Q.  Is the number (832) 907-0710, the same phone number that

23  randomanon provided you on KinkD?

24  A.  Yes.

25  Q.  Do you see a small photograph on the participants box next

SOUTHERN DISTRICT REPORTERS, P.C.

K3ALBRI3                           Jensen - Direct

1    to the text we just read?

2    A.   I do.

3    Q.   Is that the profile picture corresponding to the 832

4    account?

5    A.   That's correct.

6    Q.   Who sets a profile picture for a WhatsApp account?

7    A.   The user of that account.

8              MR. LI:  Ms. Fetman, please publish Government Exhibit

9    3B, that's in evidence, side by side.

10   BY MR. LI:

11   Q.   Agent Jensen, what is Government Exhibit 3B?

12   A.   That's a larger photograph of the smaller photograph found

13   in the participant section.

14             MR. LI:  With permission of the Court, I'll now read

15   Government Exhibit 101, which is a stipulation between the

16   parties.

17             THE COURT:  All right.

18             Ladies and gentlemen, a stipulation is an agreement

19   between the parties that a certain fact is true.  And you must

20   establish that fact as having been proven.  However, the

21   weight, if any, to be given to that fact is entirely up to you

22   to decide.

23             Go ahead.

24             MR. LI:  I'm reading now from Government Exhibit 101:

25             "It is hereby stipulated and agreed by and between the

K3ALBRI3                          Jensen - Direct

1   United States of America, by Geoffrey S. Berman, United States

2   attorney for the Southern District of New York; Alexander Li

3   and Timothy Howard, assistant United States attorneys of

4   counsel; and Peter Bright, by and through his counsel, Amy

5   Gallicchio, Esq. and Zawadi Baharanyi, Esq. as follows:

6           Paragraph one, records from the cellular telephone

7   provider, T-Mobile U.S. Inc., indicate that between at least

8   May 1, 2019 and May the 21, 2019, the customer name associated

9   with the telephone number, 832-907-0710, was 'Peter Bright.'

10          It is further stipulated and agreed that this

11  stipulation, Government Exhibit 101, is admissible as

12  government exhibit at trial."

13          The government offers Government Exhibit 101.

14          MS. GALLICCHIO:  No objection.

15          THE COURT:  Received.

16          (Government's Exhibit 101 received in evidence)ing

17  BY MR. LI:

18  Q.  Agent Jensen, in the course of your investigation, did you

19  come to meet Peter Bright in person?

20  A.  I did.

21  Q.  Is the person you met also the same person in Government

22  Exhibit 3B?

23  A.  Yes.

24  Q.  Do you see that same person here in the courtroom today?

25  A.  I do.

K3ALBRI3                        Jensen - Direct

1    Q.  Could you please identify that person by location and an
2    article of clothing?
3    A.  Sure.  He's sitting at the second table wearing the white
4    shirt and the gray jacket.
5            MR. LI:  Identifying the defendant, your Honor.
6            THE COURT:  Yes.  So noted.
7            MR. LI:  Ms. Fetman, if we can take down Government
8    Exhibit 3B.  Thank you.
9    BY MR. LI:
10   Q.  So turning back to Government Exhibit 3A, Agent Jensen, do
11   you see the second blue bubble on the left, dated May 14th,
12   2019, at 8:12 p.m.?
13   A.  I do.
14   Q.  What does that message say?
15   A.  It says:  "Hi there.  I'm from KinkD."
16   Q.  And above the text of that message, do you see the small
17   title 1(832) 907-0710, and it goes on?  Do you see that?
18   A.  I do.
19   Q.  Turning now to the right-hand side of the page.
20           Do you see a text bubble in green?
21   A.  I do.
22   Q.  What does that text bubble say?
23   A.  "Hey there."
24   Q.  Who sent that message?
25   A.  I did.

K3ALBRI3                    Jensen - Direct

1  Q.  Throughout this WhatsApp exchange, were all of the text

2  messages in the green bubble on the right sent by you?

3  A.  Yes.

4  Q.  And throughout this WhatsApp exchange, were all of the text

5  messages in blue bubbles to the left sent by Peter?

6  A.  Yes.  They all came from the 832 number.

7  Q.  Let me turn your attention now to the redacted black box

8  above the text "Hey there."

9       You see that redacted black box?

10 A.  I do.

11 Q.  What's been redacted?

12 A.  Undercover telephone number.

13 Q.  And turning your attention now to the top part of the

14 exhibit under the section participants.

15      Do you see two additional black box redactions?

16 A.  I do.

17 Q.  What has been redacted there?

18 A.  Again, my undercover telephone number and then the name of

19 the account, my undercover name.

20      MR. LI:  Ms. Fetman, let's turn to page two please.

21 BY MR. LI:

22 Q.  Agent Jensen, I'll read the text in the blue boxes.  And if

23 you wouldn't mind, please read the text in the green boxes.

24 I'll start from the last blue bubble on the left, which is

25 dated May 15, 2019 at 10:40 a.m.  Reading from that box:

K3ALBRI3                         Jensen - Direct

1          "So I'd has love to hear more about what you're
2     looking for."
3     A.   "We used to have a very hands on and patient teacher who
4     taught them how to please and be pleased.  But he left and now
5     we're back to square one.  You have any teaching experience?"
6     Q.   "A little.  Yes.  Teaching girls about the changes their
7     bodies go through, that kind of thing.  Helping them learn how
8     to use their bodies or those of other people."
9     A.   "Hmmm.  We may be looking for different things."
10    Q.   "I think teaching them how to please and be pleased is very
11    much the same kind of thing.  That's what I mean by using their
12    bodies."
13    A.   "Oh, then yes.  We may be on the same page.  I really want
14    my little princess to learn how to be a good girl and
15    understand how to feel good."
16    Q.   "To teach her how best to pleasure boys and how to get
17    herself off?  That kind of thing sounds very much like what
18    I've done before and what I'm looking to do."
19          We can stop there.
20          MR. LI:  Ms. Fetman, let's turn to page eight, please.
21    BY MR. LI:
22    Q.   Agent Jensen, please read the green boxes, starting with
23    the second-to-last one on the right, which is dated May 15th,
24    2019, at 11:31 a.m., and I'll continue to read the blue boxes
25    on the left.

K3ALBRI3                         Jensen - Direct

1    A.   "When did you last teach a little girl?  I don't want just

2    anyone teaching them."

3    Q.   "I have a girl I've been teaching off and on for a couple

4    of months now.  But she's in the Bronx, which makes logistics a

5    little harder."

6    A.   "As old as my princess."

7    Q.   "A bit older.  Eleven."

8    A.   "Ahh, okay.  A little bit.  What are you good at teaching.

9    We have started the basics with Kayla."

10   Q.   Let's stop there.  Who is Kayla?

11   A.   Kayla is my purported daughter.

12   Q.   And when you say "purported daughter," is she a real

13   person?

14   A.   No.

15   Q.   What was her purported age?

16   A.   Seven.

17   Q.   Did you tell Peter her age?

18   A.   Yes.

19   Q.   What was the name of your purported son?

20   A.   Brayden.

21   Q.   And what was his purported age?

22   A.   Nine.

23   Q.   Did you tell Peter Brayden's purported age in the KinkD

24   app?

25   A.   Yes.

K3ALBRI3                          Jensen - Direct

1   Q.  Let's continue reading where we left off.  Let's turn to
2   page ten, please.
3          So I'm picking up now with Peter's message on May 15,
4   2019, at 11:37 a.m.
5          "I think masturbation and anal sex are probably my
6   favorite subjects.  Helping girls find those special places to
7   touch is very rewarding.  Especially as so many grow up without
8   ever really learning these things."
9   A.  "You took the words right out of my mouth."
10          MR. LI:  We can stop there.
11          Ms. Fetman, let's turn to page 11, please.
12   BY MR. LI:
13   Q.  Agent Jensen, if you could begin with the second-to-last
14   screen box on the right, dated May 15, 2019, at 11:48 a.m.?
15   A.  "You teach boys too about anal?  He definitely needs a
16   lesson in preparation, lol."
17   Q.  "So learning about lube, gently getting the anus more
18   relaxed and open, this is so important."
19   A.  "How did the 11-year-old like anal.  Were you a good
20   teacher?"
21   Q.  "I think boys need to be taught about it because I've heard
22   so many horror stories from girls with uneducated boys.  We're
23   still going slow on that front, getting her comfortable with
24   touching that part, exploring it with her fingers."
25   A.  "Yeah.  They rip the inside, and just force it in."

K3ALBRI3                          Jensen - Direct

1    Q.  "Yeah.  And it puts girls off it for life.  Such a waste."

2          MR. LI:  Let's stop there.

3          Ms. Fetman, let's turn to page 14.

4    BY MR. LI:

5    Q.  Agent Jensen, if you could begin with the last green box on

6    the right, which is dated May 15th, 2019, at 11:55 a.m.

7    A.  "How do you teach?"

8    Q.  "In the past it's been one on one in a bedroom setting.  I

9    do find the idea of teaching two together is very exciting."

10   A.  "Would that be too much for you?"

11   Q.  "I don't think so."

12          MR. LI:  We can stop there.

13          Ms. Fetman, let's turn to page 18, please.

14   BY MR. LI:

15   Q.  Agent Jensen, do you see the first blue bubble to the left,

16   which is dated May 15th, 2019, at 12:14 p.m.?

17   A.  I do.

18   Q.  What is the content of this message?

19   A.  This is an STD test screenshot.

20   Q.  Who sent you that screenshot?

21   A.  Peter.

22          MR. LI:  Ms. Fetman, let's pull up Government Exhibit

23   3O, which is in evidence and put it side by side.

24   BY MR. LI:

25   Q.  Agent Jensen, what is Government Exhibit 3O?

K3ALBRI3                         Jensen - Direct

1   A.  The same shot that's in the text message.  And it has the

2   STD panel.

3   Q.  Has personal information on this image been redacted?

4   A.  Yes.

5   Q.  Other than the redactions, is Government Exhibit 3O, the

6   same image that Peter sent you, in the WhatsApp chat?

7   A.  Yes.

8           MR. LI:  Ms. Fetman, let's take down Government

9   Exhibit 3O and replace it with Government Exhibit 3I, which is

10  in evidence.

11  BY MR. LI:

12  Q.  Agent Jensen, what is Government Exhibit 3I?

13  A.  This is a screenshot of the attachment and text message,

14  and it's the HIV screenshot.

15  Q.  Has personal information on this attachment been redacted?

16  A.  Yes.

17  Q.  And other than the redactions, is Government Exhibit 3I

18  another image that Peter sent you in the WhatsApp chat?

19  A.  That's correct.

20  Q.  Did you ask Peter to send you STD tests?

21  A.  I did.

22  Q.  Why did you ask Peter to send you STD tests?

23  A.  Two reasons.  As a mom, I wanted to make sure they were

24  clean, no diseases.  And then second reason, it's another overt

25  act to show interest in sexual activity with the children.

K3ALBRI3                         Jensen – Direct

1    Q.  And when you say "mom," you mean in your undercover

2    capacity, or as a real mom?

3    A.  No.  Undercover capacity.

4             (Continued on next page)

K3AKBRI4                     Jensen - Direct

1              MR. LI:  Ms. Fetman, let's take down Government

2    Exhibit 3I.

3    BY MR. LI:

4    Q.  So turning back to Government Exhibit 3A, which are the

5    chats, let's turn to page 32, please.

6              Agent Jensen, do you see the first blue bubble to the

7    left, which is dated May 16, 2019, at 12:14 p.m.?

8    A.  I do.

9    Q.  What is the content of that message?

10   A.  This is a photo.

11   Q.  Who is it a photo of?

12   A.  Of Peter.

13             MR. LI:  Ms. Fetman, please pull up Government Exhibit

14   3H, which is in evidence, and let's put it side by side.

15   Q.  Agent Jensen, what is Government Exhibit 3H?

16   A.  Just a bigger photo of the attachment in the text messages,

17   and it's a photo of Peter.

18             MR. LI:  All right, Ms. Fetman.  We can take down

19   Government Exhibit 3H.

20   Q.  So, turning back to Government Exhibit 3A, Agent Jensen,

21   could you please read the last green bubble on the right, which

22   is dated May 16, 2019, at 12:23 p.m.

23   A.  "You are not old.  How old are you?"

24   Q.  And what does Peter respond?

25   A.  "Thirty-eight."

K3AKBRI4                      Jensen - Direct

1   Q.  Let's turn to page 46, please.

2           Agent Jensen, let's continue reading, beginning with

3   the second green chat bubble to the right, which is dated May

4   16, 2019, at 3:48 p.m.

5   A.  "You found out what kind of lesson you would like to start

6   with?  Anything excite you?"

7   Q.  "It really depends on their experience, but I'm thinking

8   maybe something involving foreskin is the way to start."

9           Let's stop there.

10           Agent Jensen, whose foreskin did you understand Peter

11   to be referring to?

12   A.  His own.

13   Q.  Let's continue.  I'm on Peter's message, now at May 16,

14   2019, at 3:51 p.m.

15           "Because it's still kind of unusual over here.  Yeah,

16   I think it is kind of rare here.

17   A.  "Does the other girl you teach like it?"

18   Q.  "Yes.  In fact, every American I've been with except one

19   enjoyed it.  But the one?  We were back at her place, we got

20   naked and she said no because I wasn't circumcised.  Much eye

21   rolling there."

22   A.  "Wow!  Really?  Why did she say no?"

23   Q.  "She thought it looked 'wrong,' had never seen one before."

24   A.  "What a bitch.  LOL."

25   Q.  "Yeah, it was pretty ridiculous."

K3AKBRI4                              Jensen - Direct

1    A.  "Kayla and Braydon will be delighted to be taught about it.
2    Very inquisitive and good students LOL."
3    Q.  "Cool.  Let them handle it, see how it pulls back,
4    et cetera."
5            Let's stop there.
6            MR. LI:  Ms. Fetman, we can take down Government
7    Exhibit 3A for now.
8    Q.  Agent Jensen, did there come a time when you and Peter
9    arranged a telephone call?
10   A.  Yes.
11   Q.  When was the call?
12   A.  May 17th, 2019.
13   Q.  Was the call recorded?
14   A.  Yes.
15   Q.  Who recorded it?
16   A.  I did.
17   Q.  Agent Jensen, you'll find in your binder what's been marked
18   for identification as Government Exhibit 5.  Do you see that
19   disk?
20   A.  I do.
21   Q.  Do you recognize the disk?
22   A.  I do.
23   Q.  What is it?
24   A.  This is different clips from that recording on May 17,
25   2019.

K3AKBRI4                    Jensen - Direct

1   Q.  How do you know that?

2   A.  I listened to it, and I initialed it.

3   Q.  Based on your review, are the clips on the disk true and

4   accurate excerpts from your recorded telephone call with Peter?

5   A.  Yes.

6            MR. LI:  The government offers Government Exhibit 5

7   and the exhibits that are on it, which are numbered Government

8   Exhibits 5A through 5D.

9            MS. GALLICCHIO:  No objection.

10            THE COURT:  Received.

11            (Defendant's Exhibits 5, 5A through 5D received in

12   evidence)

13            MR. LI:  Ms. Fetman, can we please pull up, for

14   identification only, Government Exhibit 5T.

15   Q.  There's also a copy in your binder, if that's easier for

16   you, Agent Jensen.

17            Agent Jensen, do you recognize Government Exhibit 5T?

18   A.  I do.

19   Q.  What is it?

20   A.  This is the transcript from undercover telephone call, the

21   segments.

22   Q.  Have you reviewed this transcript in advance of your

23   testimony today?

24   A.  I have.

25   Q.  Is it a fair and accurate transcription of the clips on

SOUTHERN DISTRICT REPORTERS, P.C.

K3AKBRI4                      Jensen - Direct

1    Government Exhibit 5?

2    A.   Yes.

3            MR. LI:   The government offers Government Exhibit 5T

4    as an aid for the jury.

5            MS. GALLICCHIO:   No objection.

6            THE COURT:   All right received.

7            (Defendant's Exhibit 5T received in evidence)

8            THE COURT:   Ladies and gentlemen, let me tell you

9    about the use of the transcript.   The transcript is not

10   evidence of what was said on the call.   The recording is the

11   evidence of what was said on the call.   The transcription is an

12   aid to your listening to the call.   If you find a variance

13   between what you hear on the call and the transcript, it's what

14   you hear on the call.

15           Proceed.

16           MR. LI:   Ms. Fetman, please publish government exhibit

17   5T for the jury, and please play Government Exhibit 5A.

18           (Audio played)

19   Q.   Agent Jensen, what is the video shown in this clip?

20   A.   At the time of the call, all I had is my cell phone, so I

21   took a video recording of the audio.   And that's the video you

22   see.

23   Q.   And what is showing on that video?

24   A.   My "like."

25   Q.   Are you the woman on the call?

K3AKBRI4                          Jensen - Direct

1    A.  That's correct.

2             MR. LI:  Ms. Fetman, please play Government Exhibit

3    5A2.

4             (Audio playback)

5             MR. LI:  Ms. Fetman, please play Government Exhibit

6    5B.

7             (Audio playback)

8             MR. LI:  Ms. Fetman, please play Government Exhibit

9    5C.

10            (Audio playback)

11            MR. LI:  Ms. Fetman, please play Government Exhibit

12   5D.

13            (Audio playback)

14            MR. LI:  We can take that down.

15   Q.  Agent Jensen, after your phone call with Peter on May 17,

16   2019, did you continue to communicate with each other?

17   A.  We did.

18            THE COURT:  All right.

19            Ladies and gentlemen, we are going to end the day

20   right here.  I feel like I've known you for much of my life --

21   I feel like you've been in my courtroom for the longest

22   while -- but we only really met this morning.

23            So, what did I tell you that is so vitally important

24   for you to remember tonight?  That is, you do not discuss the

25   case with anyone.  When you go home, you may report to your

K3AKBRI4                        Jensen - Direct

1   family, "I was selected to be on a jury."  "What's it about?

2   What kind of a case?"  You will report that you're under the

3   judge's instructions not to talk about the case, that the case

4   is not a long trial, and that as soon as it's over, you'll be

5   happy to discuss it with them.  Remember what I said about a

6   little bit of mystery in life.

7            The other thing is to keep an open mind.

8            Now, tomorrow you're going to arrive here so we can

9   get a good 10:00 a.m. start.  That means you really have to be

10  going through security at ten to 10:00 or so, so that you can

11  get up here to get a good start.

12           Get a good night's sleep, put this case out of your

13  mind, keep an open mind because there's so much more to come,

14  and have a pleasant evening.

15           Thank you very much, ladies and gentlemen.  And

16  remember, when you arrive in the morning, you do not discuss

17  the case.  Thank you.

18           (Jury not present)

19           THE COURT:  Have a pleasant evening.

20           MR. LI:  Thank you, your Honor.

21           MR. MAIMIN:  Thank you.  You too, Judge.

22           MS. GALLICCHIO:  Thank you, your Honor.

23           (Adjourned to March 10, 2020 at 10:00 a.m.)

24                              *  *  *

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                           Page

 3   ELIZABETH JENSEN

 4   Direct By Mr. Li . . . . . . . . . . . . . . . .27

 5                       GOVERNMENT EXHIBITS

 6   Exhibit No.                               Received

 7    1    . . . . . . . . . . . . . . . . . . . .31

 8    13    . . . . . . . . . . . . . . . . . . . .33

 9    12    . . . . . . . . . . . . . . . . . . . .35

10    2A-2D   . . . . . . . . . . . . . . . . . . .38

11    3A-3O   . . . . . . . . . . . . . . . . . . .43

12    101   . . . . . . . . . . . . . . . . . . . .46

13                       DEFENDANT EXHIBITS

14   Exhibit No.                               Received

15    5, 5A through 5D  . . . . . . . . . . . . .58

16    5T    . . . . . . . . . . . . . . . . . . . .59

17

18

19

20

21

22

23

24

25
```