K3BKBRI1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4             v.                            19 CR 521 (PKC)

 5   PETER BRIGHT,

 6                 Defendant.
                                            Trial
 7   ------------------------------x

 8                                          New York, N.Y.
                                            March 11, 2020
 9                                          10:20 a.m.

10   Before:

11
                         HON. P. KEVIN CASTEL,
12
                                            District Judge
13                                          -and a Jury-

14                         APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     BY:  MICHAEL D. MAIMIN
17        ALEXANDER LI
          Assistant United States Attorneys
18
     DAVID E. PATTON
19        Federal Defenders of New York, Inc.
          Attorney for Defendant
20   BY:  AMY GALLICCHIO
          ZAWADI S. BAHARANYI
21        Assistant Federal Defenders

22   Also Present:
     Elizabeth Jensen, FBI
23   Ariella Fetman, Government Paralegal
     Alondra Rayes, Defense Paralegal

24

25
```

1                (In open court; jury present)

2                THE COURT:  Please be seated.

3                Good morning, ladies and gentlemen.

4                JURY MEMBERS:  Good morning.

5                THE COURT:  Good to see you back for an early start.

6        And that's what we're going to do.

7                Special Agent Jensen, the Court reminds you that you

8        are still under oath.

9                THE WITNESS:  Yes, your Honor.

10               THE COURT:  All right.

11               Mr. Li, whenever you're ready.

12       ELIZABETH JENSEN, resumed.

13       DIRECT EXAMINATION CONTINUED

14       BY MR. LI:

15       Q.  Agent Jensen, we were speaking yesterday about your

16       undercover account on KinkD.  Do you recall that?

17       A.  I do.

18       Q.  In your experience, does KinkD advertise itself for use by

19       adults, children, or both?

20       A.  Typically adults.

21       Q.  When creating an account on KinkD, what is the minimum age

22       that a user can select?

23       A.  Eighteen.

24       Q.  So, if you're investigating crimes against children, why

25       are you setting up a profile on an adult platform like KinkD?

1    A.  We're on multiple adult platforms.  We receive information

2    from either agents, undercovers, other law enforcement

3    officers, or even in interviews with different vendors, as to

4    where they may be online.

5    Q.  Is KinkD the only adult platform on which you set up a

6    profile?

7    A.  No.

8    Q.  What are some of the other platforms on which you've

9    created a profile?

10   A.  NastyKinkPigs, Fet Life, Scruff, Kinkoo.

11   Q.  Do any of these platforms include age play?

12   A.  Yes.

13   Q.  Does KinkD include age play?

14   A.  Yes.

15   Q.  Are you looking to investigate or arrest individuals who

16   are age playing with other consenting adults?

17   A.  No.

18   Q.  Why not?

19   A.  Age play is legal.

20   Q.  Are there actions you take to distinguish between people

21   who are role-playing and people who may be interested in sexual

22   activity with children?

23   A.  Yes.

24   Q.  Did you take some of those actions in this case?

25   A.  I did.

K3BKBRI1                        Jensen - Direct

1    Q.  Can you give us an example?

2    A.  We did the undercover phone call where we talk about the

3    kids, taking them to the park, Braydon has soccer practice.  We

4    sent photos of purported children.

5    Q.  We'll get to the photos.

6              Agent Jensen, after your phone call with Peter on

7    May 17, 2019, did you continue to communicate with each other?

8    A.  Yes.

9    Q.  Did you communicate on WhatsApp?

10   A.  We did.

11             MR. LI:  Ms. Fetman, let's pull up Government

12   Exhibit 3A again, which is in evidence.  Let's turn to page 57,

13   please.

14   Q.  Agent Jensen, can you read the first green chat message on

15   the right, which is dated May 17, 2019, at 4:13 p.m.?

16   A.  "Great chatting with you!"

17   Q.  And you!"

18             What chat were you referring to in exchange?

19   A.  That was to the undercover phone call on May 17 that we

20   just had.

21             MR. LI:  Ms. Fetman, let's turn to page 61, please.

22   Q.  I'll pick up with the last blue chat bubble on the left,

23   which is dated May 17, 2019, at 5:23 p.m.  Agent Jensen, if you

24   could then read the green bubbles on the right, starting with

25   the blue bubble to the left.

K3BKBRI1                        Jensen - Direct

1           "Do you want the lessons to be heteronormative?

2    A.   "Sorry for my ignorance.  What do you mean by that?  As

3    opposed to what?"

4    Q.   "Does Kayla eat flowers and Braydon suck snakes?

5    A.   "Yes.  Kayla licks mommy and Braydon sucks snakes."

6    Q.   Let's stop there.

7           In this conversation, what did you understand

8    "flowers" to mean?

9    A.   Vagina.

10   Q.   And in this conversation, what did you understand "snakes"

11   to mean?

12   A.   Penis.

13          MR. LI:  Ms. Fetman, let's turn to page 68, please.

14   Q.   Let's continue reading, beginning with the last green chat

15   bubble on the right, which is dated May 17, 2019, at 6:42 p.m.

16   A.   "I'm wondering how you teach her how to pleasure yourself

17   and you."

18   Q.   "Some girls at a very early age discover that it feels good

19   to rub certain bits, but, otherwise, help her discover that

20   herself, touching or vibrating her clit, putting a finger

21   inside, or maybe a very tiny toy.  How to hold my snake,

22   showing her where the most sensitive parts of it are, the parts

23   that feel best to lick or rub.  How to take it in her hand and

24   the kinds of motion that feel good."

25   A.   "Yes, helping her discover all the best parts are super

K3BKBRI1                        Jensen - Direct

1   important and can be tricky to master."

2   Q.   "Yes, gentle touching and teasing."

3          "Is Kayla a virgin?"

4   A.   "She's had the tip inside, but not the whole cock."

5   Q.   "Okay."

6   A.   "Does that excite you?  LOL."

7   Q.   "Yes, but I think the tip might be all I can manage."

8          Let's stop there.

9          MR. LI:  Ms. Fetman, let's turn to page 74, please.

10  Q.   Agent Jensen, do you see the second green bubble to the

11  right, which is dated May 19, 2019, at 5:25 p.m.?

12  A.   Yes.

13  Q.   What is that?

14  A.   This is a photo that I had sent to myself, and it has the

15  title "LOL - Me At Work."

16         MR. LI:  Ms. Fetman, let's pull up Government

17  Exhibit 3M, please.

18  Q.   Agent Jensen, what is Government Exhibit 3M?

19  A.   This is a bigger photo of the photo that I had sent.

20  Q.   Why did you send Peter a photo of yourself?

21  A.   He had requested photos.

22  Q.   Did Peter also request any pictures of purported children?

23  A.   Yes.

24  Q.   Did you send Peter any pictures of the purported children?

25  A.   I did.

K3BKBRI1                         Jensen – Direct

1              MR. LI:  Ms. Fetman, let's take down Government

2    Exhibit 3M and turn to page 75 on Government Exhibit 3A.

3    Q.  Agent Jensen, do you see the two small photographs on the

4    right of this page?

5    A.  I do.

6    Q.  Are these the pictures that you sent to Peter of the

7    purported children?

8    A.  That's correct.

9    Q.  Are these the first pictures that you sent Peter of the

10   purported children?

11   A.  Yes.

12   Q.  Were the children wearing clothes?

13   A.  Yes.

14   Q.  Can you see the faces of the children?

15   A.  You cannot.

16   Q.  Where did you obtain these pictures of the children?

17   A.  The FBI has prior approved photos that once you get

18   supervised permission, you're allowed to send for these type of

19   cases.

20             MR. LI:  Let's turn to page 76, please.

21   Q.  Agent Jensen, do you see the second green chat bubble to

22   the right?

23   A.  I do.

24   Q.  Is this one of the pictures that you sent to Peter?

25   A.  Yes.

K3BKBRI1                         Jensen - Direct

1    Q.  What's the timestamp on this chat message?

2    A.  5/19/2019 at 5:30:10 p.m.

3    Q.  Can you read the caption accompanying the photo?

4    A.  "Here's one before playtime."

5    Q.  Now, after you sent this picture to Peter, how long did it

6    take him to respond?

7    A.  Twenty-seven seconds.

8    Q.  What was his response?

9    A.  "Oh."

10   Q.  Can you read on, please?

11   A.  "Playtime sounds fabulous."

12   Q.  Let's continue reading the chat messages following his

13   response.  If you could start with the green chat bubbles on

14   the right, I'll read the blue ones to the left.

15   A.  "Ohhh, yessss, always a fabulous time."

16   Q.  "Kissing her flower, I'm sure it's beautiful."

17           "How big a boy is Braydon"?

18   A.  "Whatcha mean?  How big is what?"

19   Q.  His manhood!"

20   A.  "Ohhh.  LOL."

21           And then I sent a photo, it's of my fingers with the

22   caption, "Like the size of half a crayon."

23   Q.  "Oh, cute."

24   A.  "How big are you?"

25   Q.  "I have a picture if you'd like."

K3BKBRI1                    Jensen - Direct

1    A.  "I was just wondering how big it would be for them.  LOL."

2    Q.  Let's stop here.

3          How did Peter respond to your last message?

4    A.  He sent a photo of his penis.

5    Q.  After this exchange, did Peter continue to request pictures

6    of the children?

7    A.  Yes.

8          MR. LI:  Ms. Fetman, let's turn to page 90, please.

9    Q.  Agent Jensen, could you please read the last blue chat on

10   the left, which is dated May 20, 2019, at 11:42 a.m.?

11   A.  "I must admit, I'd love to have more pictures of the three

12   of you.  The one with you kissing Kayla's thigh is thrilling.

13   I only wish I could see what happens next!"

14   Q.  Did you send Peter any additional pictures of the purported

15   children?

16   A.  I did.

17         MR. LI:  Ms. Fetman, let's turn to page 84, please.

18   Q.  Let's read beginning with the second blue chat bubble to

19   the left, which is dated May 20, 2019, at 8:50 p.m.

20         "So my concern is, am I being set up here?"

21   A.  "What do you mean, set up!"

22   Q.  "I was struck by the fear yesterday that I'd be met by a

23   cop or something."

24   A.  "Funny - I was thinking the same thing about you...like

25   maybe you told on me or something."

1    Q.  "Ha-ha!  I think it's just a little momentary insecurity

2    because I'm also very excited."

3            Let's stop there.

4            Agent Jensen, did there come a time when you met the

5    defendant in person?

6    A.  Yes.

7    Q.  Did you record the meeting with the defendant?

8    A.  I attempted to.

9    Q.  When you say "attempted to," what do you mean by that?

10   A.  So I grabbed an FBI bureau-issued device for recording,

11   turned it on, said my preamble, went to meet.  Unbeknownst to

12   me, when I came back to the office to download the content,

13   there was only six seconds.

14   Q.  Do you know why there was only six seconds?

15   A.  Yes.  The batteries died.

16   Q.  Did anyone else record the meeting with the defendant?

17   A.  Yes.

18   Q.  Who did?

19   A.  The defendant.

20   Q.  When did the meeting occur?

21   A.  On Wednesday, May 22nd, 2019.

22   Q.  When did you realize the meeting was going to happen?

23   A.  Ten of 2:00, 2:00 o'clock, on that day.

24   Q.  Why did you only realize on that same day that it was going

25   to happen?

K3BKBRI1                          Jensen - Direct

1    A.  We had planned to meet that Wednesday.  I hadn't heard from

2    him all morning, until he sent a text message saying he was in

3    the area.

4            MR. LI:  Ms. Fetman, let's actually pull up Government

5    Exhibit 3A again.

6            THE COURT:  What do you mean by "in the area"?

7            THE WITNESS:  We had discussed where to meet

8    previously, and then he sent a text message about he's almost

9    there, something along those lines.

10           THE COURT:  Thank you.

11           MR. LI:  Ms. Fetman, let's turn to Government

12   Exhibit 3A, page 129, please.

13   BY MR. LI:

14   Q.  Agent Jensen, do you see the top blue text bubble to the

15   left, where it says, "I'm a few minutes away"?

16   A.  I do.

17   Q.  Was that the message you were referring to just now?

18   A.  Yes.

19   Q.  When did Peter send you that message?

20   A.  May 22nd, 2019, at 2:02:25 p.m.

21   Q.  Where were you when you saw this message?

22   A.  I was in the FBI office at my desk.

23   Q.  What did you do when you saw the message?

24   A.  I responded, "Okay, I'm not home right now.  I didn't hear

25   from you."

```
 1              And then I turned and looked to the other agents, or
 2    task force officers, and said:  Hey, he's here, we got to go.
 3    Who's available?
 4              We briefed the op, and then we all went on our way
 5    either by foot or by car.
 6              THE COURT:  You said you briefed who?
 7              THE WITNESS:  The other agents that I had grabbed,
 8    like briefed about what the plan was.
 9              THE COURT:  Thank you.
10    BY MR. LI:
11    Q.  And I think you said you briefed "the op."
12              What is an op?
13    A.  Oh.  So the operation.  That's about two other...
14    Q.  How many other law enforcement officers were with you?
15    A.  Approximately eight, including myself.
16    Q.  What was the plan?
17    A.  So the plan was I would go to the park where we had
18    previously set up to meet, I would get out on foot, speak to
19    the defendant.  After the conversation, there had been a
20    prearranged area where the arrest would occur.  Once we walked
21    to that area, then the two of us would both be arrested by
22    other law enforcement agencies, or agents, or detectives.
23    Q.  When you say the two of you would both be arrested, were
24    you actually going to be arrested?
25    A.  For the op, I was put in handcuffs and then into a
```

1    different car.

2    Q.  What was the purpose of that?

3    A.  So that in the post interview, the defendant would think

4    that I was also arrested.

5    Q.  Did the meeting, in fact, occur?

6    A.  It did.

7    Q.  Where did it occur?

8    A.  At Duane Park.  That's on Duane and Hudson.

9    Q.  Is that a public park or a private park?

10   A.  It's public.

11           MR. LI:  Ms. Fetman, let's put up Government Exhibit 7

12   for identification only.

13   Q.  Agent Jensen, do you recognize this?

14   A.  I do.

15   Q.  What is it?

16   A.  This is a photo of the vicinity as to where we met.

17   Q.  Who took this picture?

18   A.  I did.

19   Q.  When did you take it?

20   A.  In January 2020.

21   Q.  Is this a fair and accurate reproduction of the picture you

22   took?

23   A.  That's correct.

24           MR. LI:  The government offers Government Exhibit 7.

25           MS. GALLICCHIO:  No objection.

K3BKBRI1                        Jensen - Direct

1                THE COURT:  Received.

2                (Government's Exhibit 7 received in evidence)

3                MR. LI:  Ms. Fetman, please publish for the jury.

4      BY MR. LI:

5      Q.  Agent Jensen, could you please describe where in this

6      photograph you met the defendant?

7      A.  So probably by the corner fence area to the left of the

8      Staple Street sign.  Yes, that's correct.

9      Q.  Could you please describe the environment in the park on

10     the day that you met the defendant?

11     A.  Sure.

12               It was approximately a little before 3.  It was a nice

13     day out, sunny.  It was populated, people were walking by.  I

14     think there was, like, construction going on in the background.

15     Q.  What happened when you got to the park?

16     A.  Once I got to the park, he was already there waiting.  We

17     walked to that area just described, asked him about his virtual

18     reality meeting.  We talked -- he pulled out the STD panel,

19     talked about logistics and how often to meet.  Asked him about

20     meeting with them and asked if he wanted to walk over.  And

21     then we walked up Duane, and then crossing the street on Hudson

22     where the designated area to be arrested was.

23               On the sidewalk, there was a flock of kids because

24     it's almost 3:00, and they were getting out of school, so we

25     veered a little to the left, and we both got arrested at that

1    point.

2    Q.  When you say the defendant pulled out his STD panel, what

3    do you mean by that?

4    A.  So we had talked about him bringing a hard copy of it.  He

5    didn't have that.  So when we discussed, he pulled it up from

6    his portal and then asked to print it at my apartment.  And

7    then I was able to see that his name was on the panel, and we

8    just continued talking.

9    Q.  Where in the park did you have this conversation with the

10   defendant?

11   A.  It was all in that area described, at the corner portion of

12   the park.

13   Q.  Why did you go to a corner of the park?

14   A.  Just the nature of what we were talking about, it was

15   harder to be, like, right in the middle of it, where people

16   were passing by.  So a little bit offset and away from others.

17   Q.  Why did you want to be able to be a bit away from others?

18   A.  Just because of the nature of what we were talking about.

19   Q.  Were you concerned about being overheard?

20   A.  Yes.

21   Q.  Even though you were in a corner of the park, were there

22   still other people around?

23   A.  Yes.

24   Q.  What happened after you left -- excuse me.

25              So I think you just said that after you left the park,

K3BKBRI1                      Jensen - Direct

1    you walked to a certain location and you were arrested; is that

2    right?

3    A.   That's correct.

4    Q.   And I think you mentioned something about a flock of kids;

5    is that right?

6    A.   Yes.

7    Q.   What did you mean by that?

8    A.   Walking up towards where the spot was, if we had been

9    arrested right on the sidewalk, it would have been in view of

10   all the children, so I kind of went -- veered a little left, to

11   be kind of out of that view.

12   Q.   To be clear, were the children you were talking about, were

13   they part of the arrest plan?

14   A.   No.

15          MR. LI:  Ms. Fetman, let's take down Government

16   Exhibit 7 and put up Government Exhibit 8 for identification

17   only, please.

18   Q.   Agent Jensen, do you recognize this?

19   A.   Yes.

20   Q.   What is it?

21   A.   This is a photo of the designated arrest area that we had

22   previously discussed.

23   Q.   Who took this photograph?

24   A.   I did.

25   Q.   When did you take it?

K3BKBRI1                        Jensen – Direct

1    A.   The same day as the other one, January 2020.

2    Q.   Is this a fair and accurate reproduction of the photo you

3    took?

4    A.   Yes.

5            MR. LI:   The government offers Government Exhibit 8.

6            MS. GALLICCHIO:   No objection.

7            THE COURT:   Received.

8            (Government's Exhibit 8 received in evidence)

9            MR. LI:   Ms. Fetman, please publish for the jury.

10   BY MR. LI:

11   Q.   Agent Jensen, can you describe where on the photo the

12   defendant was arrested?

13   A.   Sure.

14           To the right of the green mailbox, in front of the

15   window, pole area.   Yeah.

16           MR. LI:   Ms. Fetman, we can take down Government

17   Exhibit 8.

18   Q.   Just a few final questions.

19           MR. LI:   Ms. Fetman, let's publish Government

20   Exhibit 3A, which is in evidence, and just the first page,

21   please.

22   Q.   Agent Jensen, how many messages did you and the defendant

23   exchange on WhatsApp?

24   A.   769.

25   Q.   And how many pages are in Government Exhibit 3A in that

K3BKBRI1                          Jensen – Direct

1    folder in front of you?

2    A.   Approximately 132.

3    Q.   Now, do you remember your testimony today and yesterday

4    about these chats?

5    A.   I do.

6    Q.   In your earlier testimony, did you discuss all 132 pages of

7    chats?

8    A.   No.

9    Q.   Have you reviewed all of the chats in preparing for your

10   testimony today?

11   A.   Yes.

12   Q.   I'd like you to now consider all of these chats in their

13   totality.   In those 132 pages of messages, did the defendant

14   ever ask to have sex with you?

15   A.   No.

16   Q.   In those 132 pages of messages, did the defendant ever ask

17   you to pretend to be a child?

18   A.   No.

19   Q.   In those messages, did the defendant ever ask whether your

20   children were really adults?

21   A.   No.

22   Q.   In those messages, did the defendant ever discuss role play

23   of any kind?

24   A.   No.

25   Q.   Did the defendant ever ask about sexual activity with your

K3BKBRI1                        Jensen – Direct

1   purported children?

2   A.  Yes.

3   Q.  Did the defendant ask for pictures of the purported

4   children?

5   A.  Yes.

6   Q.  Did you send the defendant pictures of the purported

7   children?

8   A.  Yes.

9   Q.  After you sent the defendant pictures of the purported

10  children, did the defendant continue to discuss with you?

11  A.  Yes.

12  Q.  Did those conversations include conversations about sexual

13  activity with the purported children?

14  A.  Yes.

15  Q.  After you sent the defendant pictures of the children, did

16  the defendant arrange to meet you in person?

17  A.  Yes.

18  Q.  Did he show up?

19  A.  Yes.

20          MR. LI:  No further questions at this time.

21          THE COURT:  All right.  You may cross-examine.

22          MS. GALLICCHIO:  Thank you.

23          May I proceed, your Honor?

24          THE COURT:  One moment, please.

25          MS. GALLICCHIO:  Sure.

1           (Pause)

2                THE COURT:  All right, Ms. Gallicchio, whenever you're

3      ready.

4                MS. GALLICCHIO:   Thank you.

5      CROSS-EXAMINATION

6      BY MS. GALLICCHIO:

7      Q.  Good morning, Agent Jensen.

8      A.  Good morning.

9      Q.  So, Agent Jensen, in your current job, you are assigned to

10     search for child molesters, right?

11     A.  That's part of our job, yes.

12     Q.  And you search for child molesters online as part of your

13     job, right?

14     A.  We're on various platforms where molesters might occur.

15     Q.  And these platforms are internet online platforms, right?

16     A.  That's correct.

17     Q.  And the FBI has a division that's dedicated to this cause

18     of seeking out online predators, right?

19     A.  That's correct.

20     Q.  And you are part of that division?

21     A.  That's correct.

22     Q.  That division, you testified, is called Crimes Against

23     Children division, right?

24     A.  Correct.

25     Q.  Is it also referred to as the child exploitation unit?

K3BKBRI1                         Jensen - Cross

1    A.   Correct.

2    Q.   And other than you, there are many agents who are

3    dedicated -- or, I'm sorry, who are assigned to this unit,

4    right?

5    A.   Yes.

6    Q.   In addition to the agents, there are also technology

7    experts that are employed by the FBI, right?

8    A.   Yes.

9    Q.   And they are used by the child exploitation unit; is that

10   right?

11   A.   When necessary, yes.

12   Q.   Because part of your job is to search electronic devices,

13   right?

14   A.   That's correct.

15   Q.   You search phones, if they are taken from someone who's

16   arrested, right?

17   A.   That's correct.

18   Q.   And so you do forensic analysis of telephones, right?

19   A.   Correct.

20   Q.   And electronic devices, right?

21   A.   Correct.

22   Q.   And you have experts who are assigned to do that sort of

23   work?

24   A.   Yes.

25   Q.   And who are trained particularly in doing forensic analysis

1    of electronic devices?

2    A.  Yes.

3    Q.  That's a big part of your investigation, right?

4    A.  Yes.

5    Q.  These experts can make duplicates or images of a person's

6    phone or electronic device, right?

7    A.  Yes.

8    Q.  In this case, when Mr. Bright was arrested, he had two

9    phones, right?

10   A.  Correct.

11   Q.  And one of the phones was the phone he was communicating

12   with you on, right?

13   A.  Correct.

14   Q.  And a duplicate was made of his phone, a forensic analysis

15   was made of his phone, right?

16   A.  There was two phones.

17   Q.  Right.

18   A.  Are you referring to --

19   Q.  I'm referring to the one he used to communicate with you.

20   A.  Right.

21   Q.  A forensic analysis was made of that phone, right?

22   A.  Yes.

23   Q.  That phone was imaged and downloaded, right?

24   A.  Correct.

25   Q.  Now, you said, on direct examination, that you look to a

1   variety of platforms or you are on a variety of platforms,

2   right?

3   A.   That's correct.

4   Q.   And those platforms include a variety of dating sites?

5   A.   Dating, yes.  Fetish websites, yes.

6   Q.   They also include vanilla websites, right?

7   A.   From the ones I mentioned or just in general?

8   Q.   In general.

9   A.   Yes.  I mean, we're on Facebook, Twitter, Instagram.

10  Q.   And so would it be fair to say that you are on platforms

11  where children or young adults might be?  Right?

12  A.   That's correct.

13  Q.   And you're also -- in your investigations, you look for

14  predators or child molesters on something called the dark web

15  or the dark net, right?

16  A.   I don't.  There's a division specifically dedicated to that

17  platform in headquarters.  So no one in New York does the dark

18  web either.

19  Q.   But there is a division that does that search, right?

20  A.   That's correct.

21  Q.   And they can search nationwide, right?

22  A.   I don't know what their techniques are.  I just know that

23  headquarters fields that.

24  Q.   But you're familiar with the term "the dark web," right?

25  A.   Yes.

K3BKBRI1                           Jensen – Cross

1    Q.  That is an encrypted browser, right?

2    A.  Correct.

3    Q.  That is part of the internet that isn't indexed by search

4    engines, right?

5    A.  Correct.

6    Q.  And has encrypted IP addresses where people can hide their

7    identity, right?

8    A.  I honestly don't know how the IPs in the network is

9    constructed on the dark web.

10   Q.  Okay.  You do know that that's a location commonly where

11   child molesters share child pornography, right?

12   A.  Correct.

13   Q.  Now, in this case, you signed on to a dating app called

14   KinkD, right?

15   A.  Correct.

16   Q.  That's K-i-n-k-D, right?

17   A.  Correct.

18   Q.  And you know that's an adult kinky dating site, right?

19   A.  That's correct.

20   Q.  And I believe you said on direct examination that you've

21   now been on KinkD, the app, for about a year?

22   A.  Correct.

23   Q.  But you joined in April of last year, 2019, right?

24   A.  That's correct.

25   Q.  And, so, when you met Mr. Bright on KinkD, you had just

K3BKBRI1                          Jensen - Cross

1   joined, right?

2   A.  The KinkD app, yes, but I was on other websites where role

3   play --

4   Q.  I understand that.  But on KinkD, where you encountered

5   Mr. Bright, you had just joined, right?

6   A.  That's correct.

7   Q.  In fact, the first communication on KinkD was -- from

8   Mr. Bright to you was on April the 18th, right?

9   A.  That's correct.

10  Q.  You responded sometime later, May 1st, right?

11  A.  Correct.

12  Q.  But you had only then been on this kinky dating site called

13  KinkD for one month, right?

14  A.  On that one, yes.

15  Q.  And as you said on direct, this is an app, it's a dating

16  app, right?

17  A.  Correct.

18  Q.  You can go to the Apple app store and get that app and

19  download it, right?

20  A.  Correct.

21  Q.  And before you joined KinkD, this dating website, I assume

22  you did some research on this dating app, right?

23  A.  No.  When you download the app, they give a blurb of

24  information and the contents of that platform.

25  Q.  Other than reading the blurb, did you do any of your own

K3BKBRI1                         Jensen - Cross

```
 1   investigation into the website itself -- I'm sorry, the app
 2   itself?
 3   A.  No.
 4   Q.  Did you do any research on the kinky community that you
 5   were about to enter into?
 6   A.  I didn't do any further research on KinkD specifically.
 7   Q.  I'm asking you about the kinky community in general.
 8   A.  So undercover, I already had prior experience engaging in
 9   different conversations.
10   Q.  Okay.  So other than being on these apps, that's the only
11   information you had about the kinky community, right?
12   A.  Correct.
13   Q.  You didn't consult with any experts to help you understand
14   the kinky community?
15   A.  No.
16   Q.  Did you consult with any psychologists or sex researchers
17   to help you understand this community?
18   A.  No.
19   Q.  Did you ever go to the website -- I'm not talking about the
20   app itself -- the actual website for KinkD?
21   A.  I did not.
22   Q.  Now, when you joined the Crimes Against Children unit, that
23   was about three years ago, right?
24   A.  Correct.
25   Q.  And you indicated on direct examination that you had
```

1   training before you joined the unit, right?

2   A.  As part of that, joining the unit, yes.

3   Q.  And you said, correct me if I am wrong, you participated in

4   conferences, legal training, webinars, and virtual academies,

5   right?

6   A.  Correct.

7   Q.  Now, when was that training?

8   A.  Well, legal training, we have every quarter.  Conferences,

9   I had just gone to regarding crimes against children.

10  Q.  Okay.  Was that early on when you first joined?

11  A.  That's correct, yes.

12  Q.  And then you said you had further training when you became

13  an online undercover, right?

14  A.  That's also correct.

15  Q.  That training was a two-week training Upstate somewhere

16  New York, right?

17  A.  Out of state, yes.

18  Q.  Out of state.  I'm sorry.

19  A.  No.  You're good.

20  Q.  And that was two weeks?

21  A.  That's correct.

22  Q.  And that involved investigative techniques, right?

23  A.  Correct.

24  Q.  How to operate online, right?

25  A.  Correct.

```
 1   Q.  And a variety of other things you mentioned yesterday?

 2   A.  Correct.

 3   Q.  Now, your training, in total, did not include anything

 4   about kink, right?

 5   A.  About the website KinkD?

 6   Q.  Kink, in general.

 7   A.  Official training?  No.

 8   Q.  Your official training didn't include anything about the

 9   kink community in general, not the app, not the dating site,

10   just kink, the kink community?

11   A.  So where we work, we're in a small area, and there are six

12   of us that are undercovers, and we are constantly talking about

13   different techniques, different platforms we're on, conversing

14   about what we're seeing.  So the person right next to me is

15   engaging in the same type of platforms that I am.

16   Q.  Okay.  And those people that are sitting right next to you,

17   did they have any training on who the kink community is?

18   A.  One of them is our group undercover coordinator.  So he is

19   constantly in communication with other agents about different

20   outlets on the undercover material.

21   Q.  Well, what I'm asking you:  Does anyone have any training

22   on who the kinky community is?

23   A.  Not to my knowledge.

24   Q.  Any training about the norms and behaviors of people who

25   engage in kinky sex?
```

K3BKBRI1                        Jensen – Cross

1   A.  Aside from being on the platforms and conversing with other

2   agents, not to my knowledge is there a training based on

3   specific kinks.

4   Q.  But you are on kinky dating platforms, right?

5   A.  That's correct.

6   Q.  And before you joined the KinkD app, would it be fair to

7   say that you personally had very little exposure to kink?

8   A.  Say that question one more time?

9   Q.  So before you joined the dating app, KinkD --

10  A.  Any of them?

11  Q.  Well, I'm talking about this one.

12  A.  Okay.

13  Q.  We'll start with this one.

14      Before you joined this KinkD dating app, is it fair to

15  say that you had very little exposure with the kink community?

16  A.  Aside from the other platforms that I'm on, yes.

17  Q.  So you had very little exposure to it before you

18  encountered Mr. Bright on the KinkD dating app, right?

19  A.  I mean, I was on the other apps probably six months prior,

20  so I had interactions with other different users and platforms.

21  Q.  So when you joined the KinkD dating app, had you ever heard

22  of the term "age play"?

23  A.  Yes.

24  Q.  Did you ever do any research on the term "age play"?

25  A.  No.

K3BKBRI1                        Jensen - Cross

1   Q.  Did you ever get any training on the term "age play"?

2   A.  No.

3   Q.  Did you ever see the term "age play" or "age player" before

4   you signed up to KinkD?

5   A.  Yes.

6   Q.  But it would be fair to say that you had very little

7   exposure with age players, right?

8   A.  I mean, a lot of times messages that are sent to my various

9   platforms are asking about fantasy or role play and talking

10  about different ages.  So, aside from communications with those

11  other users that are inquiring about my profiles, no, not

12  outside of that.

13  Q.  So you know that the KinkD dating app is geared toward

14  users that may have unconventional sexual practices, right?

15  A.  Correct.

16  Q.  And it's an adult dating site, right?

17  A.  Correct.

18  Q.  It's not on the dark web?

19  A.  No.

20  Q.  And, as you said, it requires an age verification to be 18

21  to sign up, right?

22  A.  Yes.

23          MS. GALLICCHIO:  If I could have, shown to the witness

24  only, for identification Defendant's Exhibit A.  Can you put up

25  the two pages side by side, Ms. Rayes.

K3BKBRI1                        Jensen - Cross

1   Q.  Agent Jensen, if you could take a look at what's been

2   marked for identification as Defendant's Exhibit A.

3           Do you recognize what that is?

4   A.  I do.

5   Q.  What is it?

6   A.  These are screenshots.  When you go into the app store to

7   download the KinkD application, this is the information that

8   comes up.

9   Q.  Does Defense Exhibit A fairly and accurately represent the

10  pages you see when you download the app?

11  A.  Yes.

12          MS. GALLICCHIO:  Your Honor, I'd ask to move these --

13  Defense Exhibit A into evidence.

14          MR. LI:  No objection if not offered for the truth.

15          THE COURT:  I'll take it.

16          The truth of its content means, ladies and gentlemen,

17  it's not being offered, as I understand it, to prove the

18  statements that are made on this exhibit, if any, but, rather,

19  that is what one sees when one downloads the app.

20          Correct?

21          MS. GALLICCHIO:  Yes, your Honor.

22          THE COURT:  So it's received on that basis.

23          (Defendant's Exhibit A received in evidence)

24          MS. GALLICCHIO:  Can I please have this published to

25  the jury, Ms. Rayes.

```
 1              Thank you.
 2     BY MS. GALLICCHIO:
 3     Q.  So we're looking at Defense Exhibit A.
 4              As you said, this is the -- these are the introductory
 5     pages to the app when you download it, right?
 6     A.  Correct.
 7     Q.  On the first page, we see that KinkD identifies itself as
 8     kink, BDSM dating life, Fet Life, and fetish dating; is that
 9     right?
10     A.  Yes, fet, kinky life, and fetish dating.
11     Q.  And then if we can look on the second page, there is the
12     descriptive portion, right?
13     A.  Correct.
14     Q.  And that's what you said you read before you signed up,
15     right?
16     A.  Correct.
17     Q.  And this is what you testified to was the information you
18     had about the kink community when you signed up for this
19     website, for this dating app, right?
20     A.  This is the information that I read about the KinkD
21     platform prior to downloading it.
22     Q.  What other information, other than these two pages, did you
23     read?
24     A.  Nothing specifically about the KinkD platform, just that
25     it's a dating kinky, BDSM, fetish, it's popular.
```

K3BKBRI1                          Jensen - Cross

1   Q.  But what I'm asking you is:  Before you signed up, before

2   you got into the app itself, this was what you saw, right?

3   A.  Correct, yes.

4   Q.  What's depicted in Defense Exhibit A?

5   A.  Yes.

6   Q.  And this was the information -- the only information you

7   had before you signed up, right?

8   A.  Yes.  About the app, correct.

9   Q.  Let's take a look at the second page.  The first paragraph

10  indicates -- gives a little description, right, and it says

11  that it's -- according to the app, it is the best bondage,

12  kink, fetish, and BDSM dating community, a premiere kinky chat

13  and social network app for kinky singles, couples, and

14  swingers, right?  You read that, right?

15  A.  I did.

16  Q.  And then in the second paragraph, it gives a little more

17  information, in which it says in the middle of that paragraph,

18  "KinkD only caters to openminded people who want to meet, chat,

19  and hook up with other like-minded people.  Whether you're

20  seeking friendship, romance, swinging, or casual partners,

21  KinkD can help you find local kinksters/swingers who share your

22  fetishes and kink," right?

23  A.  Correct.

24  Q.  You read that before you signed up?

25  A.  I did.

K3BKBRI1                          Jensen - Cross

1          MS. GALLICCHIO:  We can take that down.

2     BY MS. GALLICCHIO:

3     Q.  And you know that it's a dating app for people who want to

4     engage in sexual fantasies, right?

5     A.  It's marketed for BDSM, and kinky, and fetish, yes.

6     Q.  And those are fantasies, right?

7     A.  There's different fetishes, which might not be a fantasy.

8     So if you have a fetish to lick a leg or an arm, it's not

9     really fantasy.

10    Q.  Okay.  You were clear, though, when you signed up for this

11    dating site, that the target audience was kinky adults, right?

12    A.  That's correct.

13    Q.  As you said, there are different types of kink, right?

14    A.  Correct.

15    Q.  One of them is fetishes?

16    A.  Correct.

17    Q.  One of them is BDSM?

18    A.  Correct.

19    Q.  There is also a sexual activity that involves role-playing?

20    A.  Correct.

21    Q.  That would be fantasy, right?

22    A.  Correct.

23    Q.  And role-playing is when adults take on a role and act out

24    a scene in a sexual context, right?

25    A.  Yes, that's correct.

K3BKBRI1                        Jensen - Cross

1   Q.  It's like acting, right?

2   A.  Yes.  Two consensual adults discussing what scene or role

3   play they're going to be that day, I guess.

4   Q.  And beyond discussing, acting it out, right?

5   A.  Correct.

6   Q.  Now, you created your own profile, right?

7   A.  That's correct.

8          MS. GALLICCHIO:  Can we put up Government Exhibit 1,

9   please, Ms. Rayes.

10  Q.  Take a look at Government Exhibit 1.

11         MS. GALLICCHIO:  And publish it to the jury, please.

12  Q.  This is your profile, right?

13  A.  That's correct.

14  Q.  Now, you chose the user name Princessmom, right?

15  A.  Yes.

16  Q.  Why did you choose that name?

17  A.  I had it for another application for a text communication.

18  Q.  Were you trying to convey anything using Princessmom?

19  A.  That I was a mom.

20  Q.  You used Princessmom to convey that you were an actual mom;

21  is that your testimony?

22  A.  Correct.  Well, undercover mom.

23  Q.  I get that, you were undercover, of course, right?

24  A.  Yeah.

25  Q.  So you chose the user name of Princessmom to convey that

1    you were a mother?

2    A.   Correct.

3    Q.   And you chose this name because you've used it before?

4    A.   Correct.

5    Q.   In other dating apps, right?

6    A.   Not dating apps.

7    Q.   In other undercover operations?

8    A.   Applications, yes.

9    Q.   Applications.

10          You know now that it is an age-playing term, right?

11   A.   I don't know the word Princessmom is an age-play term.

12   Q.   You know that princess is an age-playing term, right?

13   A.   I think that's a word that people can use in age play or

14   role play, but princess is also a term for endearment.

15   Q.   Okay.  We'll get to that in a minute.

16          When you created your self-summary --

17          MS. GALLICCHIO:  If we can go back to the main page.

18   Q.   -- you indicated that you were looking for a teacher to

19   teach my kids about the birds and the bees?

20   A.   That's correct.

21   Q.   You came up with that summary, right?

22   A.   I did.

23   Q.   Now, you said on direct examination that that summary for

24   you was intending to convey that you were looking for someone

25   interested in sexual activity with actual children?

K3BKBRI1                        Jensen - Cross

1   A.  With kids, yes.

2   Q.  Well, actual kids, right?

3   A.  Yes.

4   Q.  So that was what you intended to convey by writing this

5   self-summary, right?

6   A.  Correct.

7   Q.  And you were writing the self-summary on a kinky dating

8   app, right?

9   A.  Correct.

10  Q.  You knew the receivers were the kinky community, right?

11  A.  Correct.

12  Q.  And you didn't write that you were looking for someone to

13  have sex with your children, right?

14  A.  You can't.  That will be taken down off the platform, and

15  you can't be so obvious when you're on these platforms.

16  Q.  You would agree to me that this is not obvious at all about

17  what you intended to convey, is it?

18  A.  Kids and the birds and the bees is common for sexual

19  activity.

20  Q.  Well, you said to teach your kids about the birds and the

21  bees, right?

22  A.  Correct.

23  Q.  And it's a playful way to refer to sex education?

24  A.  Correct.

25  Q.  You didn't say, as you said, you were looking for someone

K3BKBRI1                          Jensen – Cross

1   to teach your kids about sex, right?

2   A.  I can't say that either.  It would get taken down.

3   Q.  So you were --

4           THE COURT:  "I can't say that either.  It would"?

5           THE WITNESS:  Be taken down.

6           THE COURT:  Thank you.

7   BY MS. GALLICCHIO:

8   Q.  So you were purposely ambiguous here?

9   A.  Correct.

10  Q.  Intentionally so, right?

11  A.  Yes.

12          MS. GALLICCHIO:  If we go back to the original first

13  page.

14  Q.  You also chose a role, right?

15  A.  Yes.

16  Q.  And the role that you chose was mommy?

17  A.  That's correct.

18          MS. GALLICCHIO:  Ms. Rayes, can we actually go to --

19  please publish Government Exhibit 13.

20  Q.  So Government Exhibit 13 is the role selection page that

21  you see when you sign up for the dating app, right?

22  A.  That's correct.

23  Q.  And every person is required to pick a role, right?

24  A.  Correct.

25  Q.  Now, you said on direct examination that out of this list

K3BKBRI1                         Jensen - Cross

1   of 29, you picked mommy because you intended to convey that you

2   were a mom, right?

3   A.  That's correct.

4   Q.  But you knew that these options were roles, right?

5   A.  Correct.

6   Q.  In fact, it's entitled "My Role," right?

7   A.  Correct.

8   Q.  And you know that roles in a kinky dating community don't

9   mean actual identities, right?

10  A.  Correct.

11  Q.  In fact, one of them, one of the roles here, is age player?

12  A.  Correct.

13  Q.  And I believe you already said that before you signed up,

14  you didn't do any research into what an age player is, right?

15  A.  Aside from knowing people can take on different ages and

16  role play, I didn't do further research on, like, the term "age

17  play."

18  Q.  Right.

19          And you said that it was your understanding that an

20  age player is someone who plays another age, right?  You said

21  that on direct examination yesterday?

22  A.  Correct.

23  Q.  That's why you didn't pick this role when you signed on,

24  right?

25  A.  Correct.

K3BKBRI1                        Jensen - Cross

1    Q.  Because you weren't playing a different age; is that right?

2    A.  That's correct.

3    Q.  Now, you knew that these roles that we see in Government

4    Exhibit 13, as you said, aren't actually descriptions of the

5    application user, right?

6    A.  I'm sorry, say that one more time?

7    Q.  These roles aren't actually descriptions of the application

8    user?

9    A.  What do you mean by that?

10   Q.  So, for example, you see some of the roles -- two of the

11   roles are baby boy --

12   A.  Correct.

13   Q.  -- and baby girl?

14   A.  Correct.

15   Q.  Those don't mean that the application user is actually an

16   infant, right?

17   A.  Correct.

18   Q.  You also see some of the roles -- two of the roles are bull

19   and pet?

20   A.  Correct.

21   Q.  They don't mean the application user is an animal, right?

22   A.  Correct.

23   Q.  It's the role they're playing?

24   A.  That's correct.

25   Q.  And there's also a role called little?

K3BKBRI1                          Jensen - Cross

1    A.  That's correct.

2    Q.  And it doesn't mean an actual child is signed up, right?

3    A.  Correct.

4    Q.  You knew the term "little" is a term -- an age-playing

5    term, right?

6    A.  That's correct.

7    Q.  It's when someone who plays a submissive role, they refer

8    to themself as a little?

9    A.  Correct.

10   Q.  Someone who's playing the role of a younger age, right?

11   A.  That's correct.

12   Q.  And so you also knew that mommy and daddy, which are also

13   roles here in this selection list, doesn't necessarily mean

14   that the person is an actual mother or father, right?

15   A.  No.  It takes like a maternal role or the paternal role in

16   the relationship.

17   Q.  You don't have to be a mom or a dad to pick these roles,

18   right?

19   A.  That's correct.

20   Q.  In fact, what they are conveying to the receiver is that

21   the person is playing that role of a mommy or a daddy, right?

22   A.  That's correct.

23   Q.  All of these roles that we see in Government Exhibit 13 are

24   examples of age playing, right, or role play?

25   A.  Well, not necessarily.

1                A dominant role just means that you're taking the

2      control or the power in the relationship.

3      Q.  Some of them are age play terms, correct?

4      A.  That's correct.

5      Q.  Some of them are role play terms, correct?

6      A.  That's correct.

7      Q.  Some of them are BDSM terms?

8      A.  That's correct.

9      Q.  And by selecting these terms, it helps other kinksters

10     identify each other, right?

11     A.  Yes, correct.

12     Q.  And these terms are common in the kinky community, right?

13     A.  Yes.

14     Q.  You also indicated in your profile page that you've been

15     kinky for two years, right?

16     A.  Correct.

17                MS. GALLICCHIO:  Can we show to the witness what has

18     been marked for identification only, and show it only to the

19     witness, Defense Exhibit F?

20     Q.  Agent Jensen, do you recognize that?

21     A.  I do.

22     Q.  What is that?

23     A.  This is a side profile of my face, and it was a photo that

24     I've used on the KinkD platform as my profile image photo.

25     Q.  Is this a fair and accurate representation of your profile

1   picture on KinkD?

2   A.  That's correct, yes.

3          MS. GALLICCHIO:  Your Honor, I move to introduce

4   Defense Exhibit B into evidence.

5          MR. LI:  No objection.

6          THE COURT:  Received.

7          (Defendant's Exhibit B received in evidence)

8          MS. GALLICCHIO:  Publish to the jury, please.

9   BY MS. GALLICCHIO:

10  Q.  So if we take a look at this picture, Agent Jensen, is this

11  a picture that would appear on your profile when somebody looks

12  at your KinkD profile?

13  A.  Yes.

14  Q.  And it's a picture of only you, right?

15  A.  That's correct.

16  Q.  You don't include any children or anybody else in the

17  photo, right?

18  A.  We wouldn't be able to do that.  No.

19  Q.  Now, I want to go back to --

20         MS. GALLICCHIO:  You can take that down.  Thank you.

21  Q.  -- age playing again because you indicated that you do know

22  a little bit about it, right?

23  A.  Correct.

24  Q.  And it's fair to say that age playing, the kink, is like

25  acting, right?

K3BKBRI1                         Jensen – Cross

1   A.   Correct.

2   Q.   Participants take on roles, right?

3   A.   That's correct.

4   Q.   And it's between adults, right?

5   A.   Correct.

6   Q.   And it's consensual, right?

7   A.   Correct.

8   Q.   And there is language that's associated commonly with age

9   players, right?

10  A.   Yes.

11  Q.   There is a basic term in the age play world called Daddy

12  Dom/Little Girl?

13  A.   Correct.

14  Q.   You're familiar with that, right?

15  A.   Correct.

16  Q.   It's sometimes referred to as DDLG, right?

17  A.   That's correct.

18  Q.   So let me break that down.

19       Daddy Dom is the person who plays in an age play

20  scenario the dominant role, right?

21  A.   That's correct.

22  Q.   Often the daddy, right?

23  A.   Correct.

24  Q.   And the little girl is the person who plays the submissive

25  role in the age-play scenario, right?

K3BKBRI1                          Jensen - Cross

```
 1   A.  Yes.
 2   Q.  It's an adult, right?
 3   A.  Correct.
 4   Q.  Who identifies as a little girl?
 5   A.  Yes, that's the role that she's taking on.
 6   Q.  And so the term little, little girl, or littles, is a
 7   common term in the age-play world, right?
 8   A.  Yes.  Littles is common.
 9   Q.  It means something to age players, right?
10   A.  Yes.
11   Q.  As does daddy and mommy, right?
12   A.  Correct.
13   Q.  Also, age players often refer to their submissive partner
14   or their little using pet names, right?
15   A.  Correct.
16   Q.  Like, for example, princess or prince, right?
17   A.  Yes.
18   Q.  Or angel, right?
19   A.  Yes.
20   Q.  They don't -- age players don't refer to their submissive
21   partner or their little as their daughter or their son, right?
22   A.  No, not that I've seen.
23   Q.  Or as their children, right?
24   A.  Correct.
25   Q.  And age players will engage in acting out a scene in these
```

1    roles, right?

2    A.  Yeah, the two age players normally discuss what role or

3    what scene they're going to engage in, correct.

4    Q.  So there's an element of discussion and consent, right?

5    A.  Correct.

6    Q.  And some of the roles might include, for example, the daddy

7    figure putting the little figure to bed, right?

8    A.  Correct.

9    Q.  Or might involve the daddy figure giving the little figure

10   a bath, right?

11   A.  Correct.

12   Q.  These are generally resulting in sexual activities, right?

13   A.  Correct.

14   Q.  These are fantasies, right?

15   A.  Yeah, they're acting out the fantasy in their role-play

16   capacity.

17   Q.  So another scenario that age players might play out is the

18   fantasy or the scene in which the dominant player, the daddy

19   role, would teach the submissive player, the little, about her

20   body?

21   A.  Correct.

22   Q.  The dominant character would teach the little character

23   about sex, right?

24   A.  Correct.

25   Q.  Kind of like what you described, the birds and the bees,

1  right?

2  A.  Correct.

3          MS. GALLICCHIO:  Now, can we please publish Government

4  Exhibit 12?

5  BY MS. GALLICCHIO:

6  Q.  So we're looking at, Agent Jensen, Government Exhibit 12.

7  That's Mr. Bright's KinkD dating app profile page, right?

8  A.  That's correct.

9  Q.  That's what you saw when you began communicating with him,

10  right?

11  A.  Yes.  After he communicated with my undercover profile, I

12  saw his profile.

13  Q.  I would assume that you read his self-summary very

14  carefully, right?

15  A.  I did.

16  Q.  In his profile page, he has a photograph of himself, right?

17  A.  That's correct.

18  Q.  He's not hiding his face in any way, right?

19  A.  No.

20  Q.  And he puts his age on there, right?

21  A.  That's correct.

22  Q.  And he puts that he lives in Brooklyn, New York, right?

23  A.  That's correct.

24  Q.  Let's take a look at his summary.

25          MS. GALLICCHIO:  Can we put up the two pages side by

1   side, please.

2   Q.  So the summary starts on the first page.  It's a bit more

3   detailed than yours was, right?

4   A.  Correct.

5   Q.  So let's take a look at it.

6            MS. GALLICCHIO:  If we could just highlight the first

7   couple of paragraphs.  Yes, great.

8   Q.  So, Mr. Bright writes in his self-summary that, "I'm

9   looking for friends or more" inside the bedroom, kinky filth --

10  I'm sorry, "outside the bedroom and kinky filth inside the

11  bedroom," right?

12  A.  Yes.

13  Q.  He says, "I'm not entirely opposed to hookups, but my

14  strong preference is for substantive, meaningful connections.

15  I want to know what makes you tick.  Mutual caring and

16  understanding makes everything better."

17           Right?  You read that?

18  A.  I did.

19  Q.  He continues to say, "Straightish, I guess, but not

20  straight.  Ethically nonmonogamous."

21           You read that, right?

22  A.  I did.

23  Q.  There was nothing about the self-summary that gives any

24  indication he's interested in having sex with children, right?

25  A.  Correct.

K3BKBRI1                          Jensen – Cross

```
 1   Q.  And then on the second page, there is a description
 2   about -- the first paragraph -- "I'm a big nerd in general;
 3   science and technology are keen interests.  I game.  I spend
 4   too much time considering politics, given the currently
 5   miserable state of affairs in both countries that I have
 6   citizenship in."
 7            You read that, right?
 8   A.  I did.
 9   Q.  And so you had a little bit of information about him when
10   you communicated with him, right?
11   A.  That's correct.
12   Q.  And you saw his role selections?
13   A.  Correct.
14   Q.  His role selections include a variety of -- well, let's go
15   through them.  Dominant, right?
16            You know what that means, right?
17   A.  Yes.
18   Q.  And master, you know what that means, right?
19   A.  Yes.
20   Q.  They also include fetishes, kinkster, age player, daddy,
21   hedonist, vanilla, and TO, dot dot dot, right?
22   A.  That's correct.
23   Q.  Now, you testified on direct examination about what you
24   understood master, age player, and vanilla to mean, right?
25   A.  Correct.
```

K3BKBRI1                          Jensen - Cross

1   Q.  You also understand what daddy means in this context,

2   right?

3   A.  Correct.

4   Q.  You didn't think he was identifying himself as a father,

5   right?

6   A.  I mean, he could.

7   Q.  You knew this was an age play -- this was a role selection,

8   right?

9   A.  I think part of my question, when I spoke with him, was

10  asking if he had kids.

11  Q.  I know that.  But I'm asking, when you first looked at his

12  profile picture --

13  A.  Correct.

14  Q.  -- and you saw amongst the roles that the website requires

15  you to select was daddy, right?

16  A.  Correct.

17  Q.  You didn't think he was identifying himself as a father

18  here, did you?

19  A.  No.

20  Q.  You realized he was identifying himself as an age player,

21  right?

22  A.  Among the other roles, yes.

23  Q.  And daddy is an age-play term, right?

24  A.  Correct.

25  Q.  And you know --

K3BKBRI1                         Jensen - Cross

1          MS. GALLICCHIO:  We can take that down.  Thank you.

2   Q.  You know now, even after Mr. Bright was arrested, that he

3   engages in age play, right?

4   A.  Correct.  Among other roles, yes.

5   Q.  You have his phone, as we've already talked about, right?

6   A.  Correct.

7   Q.  And you know that when -- after he was arrested, he gave

8   the FBI consent to search his phones, both phones, right?

9   A.  Correct.

10  Q.  Let's talk about the phone that he used to communicate with

11  you.

12  A.  Okay.

13  Q.  All right?

14          He signed a consent form giving the FBI permission to

15  search his phone and all its contents, right?

16  A.  That's correct.

17  Q.  He gave the FBI his password, right?

18  A.  That's correct.

19  Q.  And the phone itself is in the FBI's possession, right?

20  A.  Correct.

21  Q.  It's in your possession, right?

22  A.  Correct.

23  Q.  You have access to it whenever you want, right?

24  A.  That's correct.

25  Q.  You still have access to it?

1   A.  Yes.

2   Q.  And you examined it carefully, I'm sure?

3   A.  Correct.

4   Q.  You spent weeks, if not months, looking through the content

5   of his phone; is that correct?

6   A.  That's correct.

7   Q.  And the chats that you engaged in with him, the WhatsApp

8   chats, were still on his phone, right?

9   A.  Right.

10   Q.  They were not deleted, right?

11   A.  No.

12   Q.  The FBI did a forensic analysis of his phone that we talked

13   about earlier, right?

14   A.  Correct.

15   Q.  In addition to you, were there other FBI agents that went

16   through Mr. Bright's phone?

17   A.  Yes.

18   Q.  They looked at every video and every photo, right?

19   A.  Correct.

20   Q.  They looked at all of his chats, right?

21   A.  Yes.

22   Q.  And you discovered, as you did that, that Mr. Bright is on

23   a lot of other adult dating sites, right?

24   A.  That's correct.

25   Q.  And you looked at his communications that you could see on

K3BKBRI1                          Jensen - Cross

1    the phone on these other dating sites, right?

2    A.  Yes.  We attempted.  When we got the phone from Mr. Bright,

3    we put it in airplane mode, so that no more messages would be

4    received.  So when we reviewed it, we could only see what was

5    available with the airplane mode on.

6    Q.  Well, if you take airplane mode off, you could see

7    everything, right?

8    A.  We didn't do that.

9    Q.  But you looked at everything that was on his phone in

10   airplane mode, right?

11   A.  Correct.

12   Q.  And then the FBI makes a forensic image of the phone,

13   right?

14   A.  Yes.

15   Q.  So more than just the texts are available at that point,

16   right?

17   A.  Correct.  But some of the apps don't transfer over when the

18   FBI does the forensic review.

19   Q.  Right.  So you have to go back to the phone?

20   A.  Yes.

21   Q.  And look at those apps on the phone, right?

22   A.  Yes, to the best we can.

23   Q.  And you did that?

24   A.  We did.

25   Q.  Would it be fair to say that Mr. Bright is very explicit

1    about his sexual interests on these dating sites that you saw?

2    A.  That's correct.

3    Q.  His phone, from what you observed in your investigation of

4    his phone and its contents, contained lots of chats, texts,

5    communications with a lot of people about sex, right?

6    A.  That's correct.

7    Q.  With both men and women, right?

8    A.  That's correct.

9    Q.  And all of the content you reviewed and analyzed were

10    communications with adults, right?

11    A.  That's correct.

12    Q.  A lot of them were sexually explicit?

13    A.  Correct.

14    Q.  A lot of them involved kink?

15    A.  Correct.

16    Q.  A lot of them involved age-playing scenarios, right?

17    A.  I can recall two or three that come to mind, yes.

18    Q.  But you certainly saw that on his phone, right?

19    A.  I did.

20    Q.  And in these chats on which -- texts or chats that you saw

21    on his phone where Mr. Bright was engaging in age-play

22    communication, you saw the term "princess" referred to, right?

23    A.  I did.

24    Q.  So it was a term he was using to refer to some of his

25    partners, right?

K3BKBRI1                          Jensen – Cross

1   A.  That's what I gathered, yes.

2   Q.  You saw the term "daddy" being used extensively to refer to

3   himself, right?

4   A.  That's correct.

5   Q.  You saw where he discussed with other people his and their

6   sexual fantasies, right?

7   A.  That's correct.

8   Q.  And you saw, for example, him discussing his interest in

9   certain kink, right?

10  A.  Correct.

11  Q.  Some of them similar to the things that he texted with you

12  about, right?

13  A.  That's correct.

14  Q.  And, in particular, you looked at a communication with

15  someone by the name -- on his phone, a text communication with

16  someone on his phone, by a person by the name of Stevie, right?

17  A.  Correct.

18  Q.  And these text communications with this person known as

19  Stevie were around the same time that he was communicating with

20  you, right?

21  A.  That's correct.

22  Q.  They were in April and May of 2019, right?

23  A.  That's correct.

24  Q.  And it was clear that his communications with Stevie were

25  about age-playing scenarios, right?

K3BKBRI1                       Jensen - Cross

1   A.  Yes.  That's all the DDLG specifically, yes.

2   Q.  That, again, means Daddy Dom/Little Girl, right?

3   A.  That's correct.

4   Q.  The conversations with Stevie were very sexual and graphic,

5   right?

6   A.  Correct.

7   Q.  And in this conversation with Stevie, Mr. Bright referred

8   to himself as daddy?

9   A.  He did, yes.

10  Q.  He discussed his sexual fantasies?

11  A.  Correct.

12  Q.  He discussed some of his kink like he did with you, right?

13  A.  That's correct.

14  Q.  On some of those kinks included things like, to use the

15  language, piss play, right?

16  A.  That's correct.

17  Q.  And that's something he's discussed with you, right?

18  A.  Also correct.

19  Q.  He discussed with Stevie limits and boundaries, right?

20  A.  Yes.

21  Q.  Yes?

22  A.  Oh, correct, yes.

23  Q.  Those are things that he discussed with you, right?

24  A.  I asked him limits, yes.

25  Q.  And with Stevie, he also discussed his fantasy where the

K3BKBRI1                          Jensen – Cross

1    little, the submissive adult, is 11 or 12 years old, and her

2    body is developing, and the daddy teaches her about the changes

3    and what they mean, right?

4    A.   Yes, I saw that.

5    Q.   And that's similar to what he discussed with you, right?

6    A.   Correct.

7    Q.   In his chats with Stevie, Mr. Bright asks Stevie to send

8    photos and videos, right?

9    A.   Correct.

10   Q.   And that's what he asked of you?

11   A.   Photos, yes.

12   Q.   In his chats with Stevie, he discussed playing and

13   playdates, right?

14   A.   Yes.

15   Q.   And those are similar to what he talked about with you,

16   right?

17   A.   Similar, yes.

18   Q.   And you know that playdates, or playing, in the kink

19   community or the age-play community is referring to sex, right?

20   A.   Correct.

21   Q.   You saw that he calls Stevie his little boy, right?

22   A.   Yeah.  I think it was like DDLB at one point.

23   Q.   And, at some point, he also discusses with Stevie his

24   interest in keeping things vanilla at first and getting to know

25   one another, right?

K3BKBRI1                         Jensen - Cross

1    A.  Yes.

2    Q.  And that's similar to the sort of conversation he had with

3    you, right?

4    A.  Correct.

5    Q.  And you know Stevie is an adult, right?

6    A.  I do.

7            THE COURT:  All right, ladies and gentlemen.  We are

8    going to take our midmorning break.  Please do not discuss the

9    case among yourselves or with anyone.  There's a lot more to

10   come in this case.  See you back in ten minutes.  Thank you.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K3BKBRI1                        Jensen – Cross

1              (Jury not present)

2              THE COURT:  See you in ten minutes.

3              MR. MAIMIN:  Thank you, your Honor.

4              (Recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K3BLBRI2                         Jensen - Cross

1           (Juror present)

2           THE COURT:  Please be seated.  Ms. Gallicchio, you may

3    continue.

4    BY MS. GALLICCHIO:

5    Q.  So, Agent Jensen, the first communication that you received

6    was on April the 18th, from Mr. Bright on the KinkD app, right?

7    A.  That's correct.

8    Q.  He reached out to you, right?

9    A.  Correct.

10          MS. GALLICCHIO:  Can we please publish Government

11   Exhibit 2A in evidence?

12   BY MS. GALLICCHIO:

13   Q.  So, taking a look at Government Exhibit 2A, Mr. Bright's

14   first communication with you on the KinkD app is where he says

15   Hi, I'm Peter.  Can you elaborate a little further on your

16   profile?"  Right?

17   A.  Correct.

18   Q.  And you actually don't reply until May the 1st, at 7:40

19   a.m., right?

20   A.  That's correct.

21   Q.  Okay.  And between April the 18th and May the 1st, Peter --

22   Mr. Bright did not reach out to you at in any other fashion,

23   right?

24   A.  That's correct.  No.

25   Q.  Now, you didn't respond because you didn't see his

K3BLBRI2                         Jensen - Cross

1   communication on April the 18th?

2   A.  I don't recall why I didn't respond immediately.

3   Q.  All right.  So in his question to you, he's asking you to

4   explain -- you understood him to be asking you to explain your

5   self-summary, right?

6   A.  Correct.

7   Q.  Which you've already agreed was ambiguous?

8   A.  Correct.

9   Q.  Right?  And you indicated to him that in your response --

10  in your response that:  "My princess is seven and my prince

11  charming is nine"?

12  A.  That's correct.

13  Q.  You didn't say my daughter is seven and my son is nine?

14  A.  No.

15  Q.  You didn't refer to them as your children, right?

16  A.  No.  IT said kids, so I responded --

17  Q.  Okay.  But?

18          THE COURT:  Keep your voice up, please.

19          THE WITNESS:  Sorry.

20  BY MS. GALLICCHIO:

21  Q.  But he asked you to elaborate on what you meant by:  "I

22  want someone to teach my kids about the birds and the bees,"

23  right?

24  A.  Correct.

25  Q.  And in your elaboration, you said that:  "My princess is

1    seven and my prince charming nine?"

2    A.   That's correct.

3    Q.   You used age-player terms, right?

4    A.   I used them as terms of endearment.

5    Q.   But you know they're age-player terms, right?

6    A.   You can use them in both formats.

7    Q.   But you know you're on a kinky dating app, right?

8    A.   That's correct.

9    Q.   And then Mr. Bright responded --

10            MS. GALLICCHIO:   Can we see Government Exhibit 2C

11   please and publish?

12   BY MS. GALLICCHIO:

13   Q.   He responds:   "I'd love to hear more about the prince and

14   princess," right?

15   A.   Correct.

16   Q.   He uses your terms, right?

17   A.   Yes.

18   Q.   He doesn't refer to them as your children, right?

19   A.   No.

20   Q.   Or your son or your daughter, right?

21   A.   No, he did not.

22   Q.   Or your kids even, right?

23   A.   Correct.

24   Q.   He uses age-play terms, right?

25   A.   Correct.

K3BLBRI2                              Jensen - Cross

1    Q.  And you don't make any effort to -- in the KinkD

2    communication that you had, any effort to distinguish or to

3    spell out that your prince and princess are actual children,

4    right?

5    A.  Well, I said the ages of seven and nine.

6    Q.  But you know that age-players play different ages, right?

7    A.  Correct.  But there is a conversation about age-playing.

8    Q.  Well, you're on a kinky dating site, right?

9    A.  Yes.

10   Q.  You chose a role as "mommy," right?

11   A.  That's correct.

12   Q.  And you chose a username as "Princessmom," right?

13   A.  Correct.

14   Q.  And you referred to the kids as "prince" and "princess,"

15   right?

16   A.  Correct.

17   Q.  And you know what those words mean to the kinky community,

18   for people who engage in age play, right?

19   A.  If you engage in age play, you can use those words, yes.

20   Q.  And you know now that Mr. Bright engages in age play,

21   right?

22   A.  Yes.  Now I know that, along with those other roles.

23   Q.  And you also knew it at the time that you communicated with

24   him on KinkD, right?

25   A.  That he was an age player with those other roles, yes.

K3BLBRI2                         Jensen - Cross

1    Q.  Right.  Because he said that he was an age player in his

2    role selection, right?

3    A.  Correct; amongst other roles.

4    Q.  One of those other roles was "daddy," right?

5    A.  Right.

6    Q.  Those words have meaning in the KinkD community, right?

7    A.  Correct.

8    Q.  You said moments ago that you took actions to distinguish

9    your communication from age-play communication to make it clear

10   that you were talking about sex with children, right?

11   A.  Yes.  Talking about children, yes.

12   Q.  That you were talking about children.  All right.

13          And you said you did that in two ways, in the

14   undercover phone call --

15   A.  Correct.

16   Q.  -- and by sending the photos of children, right?

17   A.  Yes.

18   Q.  There's nothing about this initial communication on KinkD

19   that you did, or any action you took, that made that

20   distinction, right?

21   A.  A lot of times in the undercover role, you'll have

22   different conversations.  And, as we discussed, as certain

23   things and how the conversation goes, we're assessing where

24   we're going with that.

25   Q.  Okay.  But according to your own testimony, it wasn't until

K3BLBRI2                          Jensen - Cross

1   the phone call and the photos that you made that took action to

2   distinguish this from age play, right?

3   A.   Those are just two actions I stated.

4   Q.   Okay.  But there's nothing here -- there's no action here

5   that you took to distinguish this communication as anything

6   other than age play, is there?

7   A.   Stating the ages of the children in my past experience has

8   responded with:  You're an awful person; you're an awful mom;

9   do you know what you're condoning here?  So, a lot of backlash

10  as to an awful person that my profile is.

11  Q.   And so, sometimes you get that response, right?

12  A.   A hundred percent, yes.

13  Q.   When you say, for example, my son is seven, my daughter is

14  nine, you would get that response, right?

15  A.   Or the ages of the kids.  How old are the kids?  Seven and

16  nine.

17  Q.   All right.  But you used "prince" and "princess," right?

18  A.   Correct, as terms of endearment.

19  Q.   To you, they were terms of endearment?

20  A.   Correct.

21  Q.   Now, at some point then, you switch from KinkD to WhatsApp,

22  right?

23  A.   Correct.

24  Q.   And that is something that you suggested, right?

25  A.   The WhatsApp platform, yes.

K3BLBRI2                          Jensen - Cross

1   Q.  And Mr. Bright, at some point, then gave you his WhatsApp

2   phone number, right?

3   A.  Correct.

4   Q.  And as you said, the WhatsApp communications -- or WhatsApp

5   app is encrypted, right?

6   A.  Right.

7   Q.  So that means that the texts themselves only live on the

8   device, right?

9   A.  True.  You can also like log into a computer.

10  Q.  So they only live on the device that you're using, right?

11  A.  Correct.

12  Q.  They can't be subpoenaed, right?

13  A.  No.

14  Q.  And if they're deleted, they're gone for good, right?

15  A.  To my knowledge, yes.

16  Q.  They can't be retrieved by the FBI, for example, right?

17  A.  To my knowledge, no.

18  Q.  Now, we've already said Mr. Bright, when he showed up for

19  the meeting with you on May 22nd, had his phone, right?

20  A.  Correct.

21  Q.  And on his phone were the chats, the texts with you, right?

22  A.  That's correct.

23  Q.  None of them were deleted, right?

24  A.  No.

25  Q.  Now, the first communication you had on WhatsApp was on May

K3BLBRI2                          Jensen - Cross

1  the 14th, right?

2  A.  Correct.

3  Q.  And so that was about ten days after the last WhatsApp

4  communication, right?

5  A.  That's correct.

6  Q.  And during that period of time, in those ten days, Mr.

7  Bright didn't reach out to you and pursue the conversation with

8  you, right?

9  A.  That's correct.

10        MS. GALLICCHIO:  And can we take a look at Government

11  Exhibit 3A, page two?

12  BY MS. GALLICCHIO:

13  Q.  Now, this is on May the 15th, right, these texts that are

14  in this exhibit, page two?

15  A.  I'm sorry.  My eyes are so bad -- yes.  May 15th.  Sorry.

16  Q.  That's okay.  And the third blue box, this is a

17  communication -- text sent by Mr. Bright to you, right?

18  A.  Yes.

19  Q.  And he says:  "So I'd love to hear more about what you're

20  looking for," right?

21  A.  Correct.

22  Q.  Again, he's asking you to clarify what you're looking for,

23  right?

24  A.  That's correct.

25  Q.  Okay.  And your response is:  "We used do have a very hands

K3BLBRI2                        Jensen - Cross

1    on patient teacher who taught them how to please and be pleased

2    but he left and now we're back to square one."

3            MS. GALLICCHIO:  Can we go to the next page please --

4    actually, we can take that down for a minute?

5    BY MS. GALLICCHIO:

6    Q.  And he then says to you that -- you say to him:  "I really

7    want my little princess to learn how to be a good girl," right?

8            MS. GALLICCHIO:  Can we go to page four?

9    BY MS. GALLICCHIO:

10   Q.  That's your response to him, right?

11   A.  Yes.

12   Q.  And that's on the same day, May 15th?

13   A.  Yes.

14   Q.  Now, in this communication, when he's asking again for what

15   you're looking for, you continue to use the terminology "little

16   princess," right?

17   A.  I did use that, yes.

18   Q.  And you know the term "little" has meaning in the KinkD

19   community, right?

20   A.  Yes.  "A little."

21   Q.  And you know "princess" is an age-play term, right?

22   A.  "Princess" can also be used as a term of endearment.

23   Q.  But you know it's age-play term, right?

24   A.  You can use it in age play, yes.

25   Q.  Now, you here continue to be ambiguous, right?

K3BLBRI2                           Jensen - Cross

1   A.   I think that's how I was describing my purported

2   seven-year-old daughter.

3   Q.   But you don't say "my seven-year-old daughter," right?

4   A.   Correct.

5   Q.   Now, this is no longer a public profile, right?

6   A.   Correct.

7   Q.   You had a reason to be ambiguous when you were on KinkD,

8   right?

9   A.   Yes.

10  Q.   Because you didn't want the profile to be flagged and taken

11  down, right?

12  A.   Correct.

13  Q.   But here, you're now in an encrypted private communication,

14  right?

15  A.   Correct.

16  Q.   No one else can see this but the two participants, right?

17  A.   Correct.

18  Q.   So you no longer need to be ambiguous, do you?

19  A.   I don't need to be.

20  Q.   But you continue to be, right?

21  A.   That's how I decided to choose to call the purported

22  seven-year-old, as "my little princess."

23  Q.   Right.  You continued to use the terminology you used on

24  KinkD, right?

25  A.   Correct.

K3BLBRI2                        Jensen – Cross

1             MS. GALLICCHIO:  Okay.  Now, let's go to page six,

2      please, the second green box.

3      BY MS. GALLICCHIO:

4      Q.  This is your text.  You say further:  "Do you have any

5      experience with little prince charming?" right?  You wrote

6      that?

7      A.  I did, yes.

8      Q.  Again, you continue to refer to the nine-year-old as a

9      "little prince charming," right?

10     A.  That's correct.

11     Q.  And in general, you have experience with little prince

12     charming; that's what you're asking, right?

13     A.  Correct.

14     Q.  Okay.  And, again, you're using age-play terms, right?

15     A.  Yes.  That term can be used in age play.

16     Q.  You don't take this opportunity to distinguish between age

17     play and actual children, right?

18     A.  No.

19     Q.  And throughout this initial communication, you continue to

20     refer to the seven and nine-year-old as "a little prince

21     charming" and "a princess," right?  Not this particular, but in

22     general.

23     A.  I think I used their names, "Kayla and Brayden."

24     Q.  So at some point you give them names, right?

25     A.  Yeah.  I think this was just the first day of really

K3BLBRI2                          Jensen - Cross

1   communicating.

2   Q.  But you do give them names, right?

3   A.  That's correct.

4   Q.  There's nothing about the names that identifies them as

5   actual children?

6   A.  Just that I refer to them as kids.

7   Q.  Well, you refer to them as "little prince charming," right?

8   A.  Correct.

9   Q.  And you refer to them as "princess?"

10  A.  Within the communications.

11  Q.  Okay.  And you continue to use this terminology, "little

12  prince charming," "prince," "princess" intentionally, right?

13  A.  As terms of endearment, yes.

14  Q.  Well, but you also know that these are terms of art in the

15  KinkD community, right?

16  A.  Terms of what?

17  Q.  Terms of art?

18  A.  Of art.

19  Q.  Common usage.

20  A.  If that's what the age-players are using, then, yes.

21  Q.  But you know that's what age-players use, right?

22  A.  There's other language that you can use within the -- you

23  can say "my little" or "a little."

24  Q.  But you can also say "prince" and "princess?"

25  A.  Yes.

1          MS. GALLICCHIO:  Can we go to page eight, please, the

2     second green box.

3     BY MS. GALLICCHIO:

4     Q.  This is a text from you, again, on that same day, May 15th,

5     right?

6     A.  Correct.

7     Q.  "When you last teach a little girl?"  Right?  You wrote

8     that?

9     A.  I did, yes.

10    Q.  Okay.  And you were familiar at the time you wrote this

11    with the concept of "Daddy Dom", "little girl," right?

12    A.  Correct.

13    Q.  And so you know a little girl has meaning in the KinkD

14    community, right?

15    A.  I know "a little," yes.  If at that moment when I sent it,

16    was I referring to a little girl in the KinkD community?  No.

17    Q.  That's not what you were referring to, right?

18    A.  Correct.

19    Q.  But you don't know how it's being received, do you?

20    A.  Correct.

21    Q.  You know that the communication with Mr. Bright started in

22    the KinkD dating app, right?

23    A.  That's correct.

24    Q.  You know he's part of the KinkD community, yes?

25    A.  Also correct, yes.

K3BLBRI2                         Jensen – Cross

1    Q.   So did you think at all how the KinkD community would

2    receive your language?

3    A.   But he also had other roles that he identified with, and

4    that was maybe like an hour into communicating.

5    Q.   Okay.  So even in this hour of communicating, you made no

6    effort to clarify what you were referring to, right?

7    A.   I think at one point I asked him that we might be looking

8    for different things.

9    Q.   Right.  You had some doubts about whether you were on the

10   same page, right?

11   A.   Correct.

12   Q.   Okay.  I'm going to get to that in a second.

13   A.   Okay.

14   Q.   In your text communications, you never referred to Kayla

15   and Brayden as your children, did you?

16   A.   I never said "children."

17   Q.   In the 700-plus text communications that are part of this

18   Government Exhibit, you never once said "children," right?

19   A.   Correct.

20   Q.   You never once said your children in the telephone call,

21   right?

22   A.   No.  I said "my kids."

23   Q.   You never once said any children when you met in person,

24   right?

25   A.   No.  I said "my kids."

K3BLBRI2                         Jensen - Cross

1    Q.  Now, you never referred to Kayla and Brayden as your son or

2    your daughter, right?

3    A.  I did not.

4    Q.  Not in any of these texts -- 700-plus text communications,

5    right?

6    A.  No.

7    Q.  Not on the phone conversation, right?

8    A.  No.  I said Brayden has to go to soccer practice.

9    Q.  And neither does Mr. Bright?

10   A.  Correct.

11   Q.  He uses your language often right?

12   A.  I think he says "kids" when referring to them at the park

13   in the phone call.

14   Q.  Well, we'll talk about this in a minute, okay?

15   A.  Okay.

16   Q.  And you never, in all of your communication, refer to

17   yourself as a mother, do you?

18   A.  No.

19   Q.  So you mentioned that you had doubts, right?

20   A.  Right.

21        MS. GALLICCHIO:  Can we take a look at page three in

22   the second green box?

23   BY MS. GALLICCHIO:

24   Q.  This is where you express the doubt.  You say: "Hmmmm we

25   may be looking for different things," correct?

K3BLBRI2                         Jensen - Cross

1   A.  Right.

2   Q.  Now, this would be the perfect opportunity for you to

3   clarify what you're looking for, right?

4   A.  Correct.  But then he texted back something about a

5   similar.

6   Q.  Well, let's look at his text.  He writes:  "I think

7   teaching them how to please and be pleased is very much the

8   same kind of thing.  That's what I mean by using their bodies."

9        That's his answer, right?

10  A.  Correct.

11  Q.  Okay.  So when you say, "Hmmm I think we may be looking for

12  different things," you were doubting whether -- who you were

13  communicating with, whether he was a real age player or not,

14  right?

15  A.  Excuse me?

16  Q.  When you said, "Hmmm, I think we may be looking for

17  different things," that was your expression of doubt about

18  whether he was an age player or a child molester?

19  A.  That was in reference to the two blue bubbles above, when

20  he responds:  "If you have any teaching experience."

21  Q.  Okay.

22  A.  And then he clarifies after what he meant.

23  Q.  All right.  Did you take this opportunity to say that

24  you're talking about real children?

25  A.  What do you mean by that?

K3BLBRI2                          Jensen - Cross

Q.  Do you clarify that I'm looking for someone to teach real

children?

A.  No.

Q.  You don't use the word "son" and "daughter," again, right?

A.  No.

Q.  Let's go to page four, the next page.

        You say in the second green bubble:  "I really want my

little princess to learn how to be a good girl," right?

A.  Right.

Q.  Now, the second time you, express some doubt on your text

with Mr. Bright, right?

A.  Correct.

        MS. GALLICCHIO:  Let's go to page 57, please --

actually, page 58, the second and third green bubble.

BY MS. GALLICCHIO:

Q.  So you say -- and this is May 17th, 2019, right?

A.  Correct.

Q.  And this is after the phone call, right?

A.  That's correct.

Q.  Now, you say -- you text:  "I think I'm looking for a more

involved approach to help them understand, kind of like our

last teacher.  We may be looking for different things.  It

sounds like you're thinking of something different."

        MS. GALLICCHIO:  And then the next page, please, in

the second green bubble:

K3BLBRI2                          Jensen - Cross

Q.  "Maybe I'm misunderstanding you, which is totally possible

over text, lol."

And then the next green bubble: "Meaning is often

misconstrued."

A.  Correct.  I wrote that.

Q.  So you don't take this opportunity to clear up the

misunderstanding, right?

A.  So that was in reference to the telephone call that we'd

just gone off when I referred to taking the kids to the park,

Brayden has soccer practice.  He asked what my involvement

would be.  I said, "I'm more of a greeter.  The lessons are for

them."  And then after we got off that phone call, he

responds -- on May 17th, at 4:16 p.m., his response, clarifying

why he asked about my involvement.

Q.  Right.  Okay.  And so you were confused, right?

A.  I wanted to clarify, yes.

Q.  Okay.  And did you clarify? Did you take this opportunity

to clarify or to specifically say:  I'm talking about teaching

my son and my daughter about sex?

A.  In those words, no.

Q.  Okay.  Do you say:  I'm looking for someone to have sex

with my children?

A.  I say --

Q.  So you say:  I'm looking for someone to have sex with my

children?

K3BLBRI2                        Jensen - Cross

1    A.  I do not say that.

2    Q.  Do you ever say that?

3    A.  No.

4    Q.  Now, Mr. Bright asks you for photographs on several

5    occasions, right?

6    A.  Yes.

7    Q.  You testified on direct examination that Mr. Bright asked

8    for pictures of your children, right?

9    A.  Yes; of family.

10   Q.  He never said:  Can I see pictures of your children?

11   A.  Correct.  He never said that.

12   Q.  He didn't say:  Can I see pictures of your purported

13   children?

14   A.  No, he did not say that.

15          MS. GALLICCHIO:  Let's take a look at page 23, the

16   second blue bubble.

17   BY MS. GALLICCHIO:

18   Q.  So this is a text from Mr. Bright on May 15th, 2019, right?

19   A.  That's correct.

20   Q.  Okay.  And this is the first time that he asked you for a

21   picture, right?

22   A.  That's correct.

23   Q.  And he says:  "Got any family photos?"  Right?

24   A.  Correct.

25   Q.  And this is early on in your conversations with him, right?

K3BLBRI2                          Jensen - Cross

1   A.  Yes.

2   Q.  This is before the phone call, right?

3   A.  Yes.  This is day one on WhatsApp--

4            THE COURT:  Keep your voice up.  I didn't hear your

5   last answer.

6            THE WITNESS:  I said, essentially, day one on the

7   WhatsApp.

8            THE COURT:  Thank you.

9   BY MS. GALLICCHIO:

10  Q.  And he doesn't say here:  Can you send pictures of your son

11  and your daughter?

12  A.  He does not, no.

13  Q.  Or your children?

14  A.  No.

15  Q.  He never does that, right?

16  A.  I think later he asked for more photos.

17  Q.  Okay.  But I'm saying, does he ever say:  I want to see a

18  picture of your son and daughter?

19  A.  He says "Kayla."

20  Q.  That's not my question.

21  A.  Sorry.  No.

22  Q.  Does he ever say:  I'd like to see a picture of your

23  children?

24  A.  No.

25  Q.  And you don't send a picture?

K3BLBRI2                         Jensen – Cross

1    A.  I don't.

2    Q.  This would have been the perfect opportunity to set the

3    record straight, right?

4    A.  So when we send photos, we have to get permission from

5    supervisor, and you don't send photos like right away.

6    Q.  Why not?

7    A.  It's just part of using the photos.

8    Q.  Why wouldn't you send it, by the way?

9               THE COURT:  Wait a minute.  Let me see you at sidebar.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K3BLBRI2                          Jensen - Cross

 1                (At sidebar)

 2                THE COURT:  How is this relevant?

 3                MS. GALLICCHIO:  Well, because our whole theory is,

 4     your Honor, that she reeled him in as an age-player and

 5     continued to play the role, and without clarifying and

 6     distinguishing what she was actually talking about.  And so my

 7     question is:  Why wouldn't she send a photo of the actual

 8     children?

 9                THE COURT:  You asked that question.

10                MS. GALLICCHIO:  Yes.

11                THE COURT:  And you got an answer.

12                MS. GALLICCHIO:  Okay.

13                THE COURT:  Right?

14                MS. GALLICCHIO:  So I was asking why she didn't.

15                THE COURT:  No, no.  You got an answer to that.

16                MS. GALLICCHIO:  Yeah.

17                THE COURT:  That wasn't the question.

18                MS. GALLICCHIO:  Why wouldn't you, was the question I

19     asked?

20                THE COURT:  No.  Well, why wouldn't you ask your

21     supervisor for permission?  I believe the question -- we'll go

22     back and look at it.  But I believe the question was -- you

23     asked her why she didn't send the picture.  She said at the

24     early stage of an investigation, you would need a supervisor's

25     approval.  In fact, you would need a supervisor's approval, and

K3BLBRI2                          Jensen - Cross

1    you wouldn't seek it in the early stages of an investigation.

2              MS. GALLICCHIO:  Uh-huh.

3              THE COURT:  And then you said:  Why is that?

4              MS. GALLICCHIO:  I don't know if those were my exact

5    words.

6              THE COURT:  That's fine.  Rephrase your question.

7    You'll be fine.  The point is, law enforcement techniques are

8    not on trial here.  This is not about what techniques the

9    government could have used but didn't use, or why they used

10   certain techniques.  That is not relevant evidence.  But you

11   can ask your question.  Go ahead.

12             MS. GALLICCHIO:  Okay.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

K3BLBRI2                          Jensen – Cross

1                   (In open court)

2        BY MS. GALLICCHIO:

3        Q.  Agent Jensen, so in response to this question about the

4        family photos, you didn't send photos, right?

5        A.  I did not.

6        Q.  Why didn't you?

7        A.  No.  I didn't hear what you said.

8        Q.  You didn't send photo, correct?

9        A.  At that point, no.

10       Q.  Yes.  Why didn't you?

11       A.  Because we don't send photos initially when communicating.

12                   THE COURT:  All right.  Let me see you at the sidebar.

13                   (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

K3BLBRI2                          Jensen – Cross

1              (At side bar)

2              MS. GALLICCHIO:  I'm confused.

3              THE COURT:  How is that relevant?

4              MS. GALLICCHIO:  Because our theory is, your Honor,

5       that she was reeling him in talking as an age player without

6       clarifying what she was actually looking for.  And maybe I can

7       ask about this picture.  Sending a photograph would clear up

8       any ambiguity.  So I can ask that question:

9              Would you agree with me that sending a photo would

10      clear up any ambiguity about whether you're communicating as an

11      age player or --

12             THE COURT:  That's a different question.  But the

13      reason you're here is -- again, as the question appeared to

14      me -- to delve into the realm of why a particular law

15      enforcement technique was or was not used.

16             MS. GALLICCHIO:  I understand that.  Yeah.

17             THE COURT:  Okay.

18             (Continued on next page)

19

20

21

22

23

24

25

1          (In open court)

2    BY MS. GALLICCHIO:

3    Q.  So, Agent Jensen, you said that, I believe on direct

4    examination, that you took actions to distinguish from an age

5    player to an actual mom with actual kids, right?

6    A.  Correct.

7    Q.  And you indicated that you did that in the undercover phone

8    call and by sending the photos on May 19th, right?

9    A.  Correct.

10   Q.  Okay.  Would you agree with me that sending photographs on

11   May 15th in response to this picture of actual children would

12   clear up any ambiguity about what you're talking about?

13   A.  The purported -- the photos that we have in stock, approved

14   by the FBI, don't get disseminated immediately.  And we don't

15   have a plethora of them, so we have to get approvals when we

16   think it's necessary.

17   Q.  Okay.  Did you -- so you didn't get or seek approval?

18   A.  No.

19          MS. GALLICCHIO:  Can we look at page 28 of the second

20   blue box?

21   BY MS. GALLICCHIO:

22   Q.  This is a text from Mr. Bright to you on May the 16th; is

23   that right?

24   A.  That's correct.

25   Q.  That's the next day?

K3BLBRI2                         Jensen - Cross

1    A.   Right.

2    Q.   From what we were just talking about?

3    A.   Yes.

4    Q.   Okay.  And this is the second time that he asked you for

5    photos, right?

6    A.   That's correct.

7    Q.   And he says:  "I would love to see my students," right?

8    A.   That's correct.

9    Q.   He refers to -- he doesn't refer to them as your children,

10   right?

11   A.   No.

12   Q.   Or your son or your daughter?

13   A.   He does not.

14   Q.   He uses the words you used, right?

15   A.   Correct.

16   Q.   And, again, you don't send any pictures?

17   A.   Correct.

18   Q.   You don't take this opportunity to clear up any ambiguity,

19   right?

20   A.   At this moment, do I not send the photos, correct.

21   Q.   And then in your phone call with Mr. Bright on May, the

22   17th, he also asks you for pictures?

23   A.   In the phone call?

24   Q.   Right.

25   A.   I don't recall.

K3BLBRI2                          Jensen - Cross

1    Q.  You don't recall "I'd love to see a picture of you all?"

2    A.  I know -- I thought it was text.

3    Q.  But after the phone call on the 17th, you don't send any

4    photographs, right?

5    A.  So we converse on the 17th, which is a Friday night.  And

6    then we texted after.  I don't think we had any communications

7    on the 18th.  And then the 19th is when I sent them, yes.

8    Q.  But on the 17th, after the phone call, you don't send any

9    photographs of children, right?

10   A.  Correct.

11   Q.  Now, you ask him for a picture of himself, right?

12   A.  I do.

13   Q.  Look at page 30.  You say you have a photo, right?

14   A.  Correct.

15   Q.  And that's shortly after he asked you for a photo, right?

16   A.  Yes; an hour and ten minutes.

17   Q.  And he sends you one?

18   A.  That's correct.

19          MS. GALLICCHIO:  If we can look on page 31, please?

20   BY MS. GALLICCHIO:

21   Q.  And then the two of you engage in some banter about the

22   photographs, right?

23   A.  Correct.

24          (Continued on next page)

25

KEBKBRI3                          Jensen - Cross

1   BY MS. GALLICCHIO:

2   Q.  If we can look at -- and I will just read through it with

3   you, "And you used it" -- you comment --

4            MS. GALLICCHIO:  We don't need to highlight it.

5   Q.  -- "And you used it for your profile on KinkD.  You must

6   really love that photo or the straw."

7            You say that, right?

8   A.  Correct.

9   Q.  And he writes:  "Double fisting Starbucks amuses me.  My

10  beard is a bit longer at the moment because it's cold."

11           And you write:  "I was about to use the same word,

12  double fisting," right?

13  A.  That's correct.

14  Q.  That was sexual banter between the two of you, right?

15  A.  No.

16  Q.  Well --

17  A.  I then say, "You've asked to be hot and cold.  LOL,"

18  referring to having two drinks in your hand, a cold one and a

19  hot one.

20  Q.  You said:  "I was about to use the same word, double

21  fisting"?

22  A.  Correct.

23  Q.  You know that term has sexual connotation?

24  A.  I mean, it's more in, like, the U.K. as opposed to in the

25  U.S.

KEBKBRI3                         Jensen – Cross

1    Q.  Double fisting?

2    A.  Correct.  It's commonly referred to as having two drinks in

3    your hand.

4    Q.  Okay.  Did you know that when you made that comment?

5    A.  What did I know?

6    Q.  That it was a sexual connotation?

7    A.  Yes.

8    Q.  And you knew that Mr. Bright was from the U.K. at this

9    point, right?  He's British?

10   A.  I don't recall.

11   Q.  He sends you a second picture.

12        MS. GALLICCHIO:  If we can go to page 32.

13   Q.  This is the picture we've seen earlier.  That's him

14   shirtless, right?

15   A.  Correct.

16   Q.  The two of you then engaged in some banter about his beard,

17   right?

18   A.  Yes.  I said:  "What a great beard.  The two colors are so

19   cool."

20   Q.  And you have some conversation about his age, right?

21   A.  Yes.  I tell him he's not old.

22   Q.  And so these chats, these texts with him, it's fair to say

23   these were adult conversations, right?

24   A.  Yes.

25   Q.  And throughout your communications, your text

KEBKBRI3                          Jensen - Cross

1    communications, with Mr. Bright --

2              MS. GALLICCHIO:  You can take that down for now.

3    Q.  -- you have a lot of adult conversations with him, right?

4    A.  Yeah.

5    Q.  You discuss your jobs, right?

6    A.  Correct.

7    Q.  You tell him that you're a trainer; obviously, it's not

8    true, but you tell him you're a trainer, right?

9    A.  Yeah, a fitness trainer.

10   Q.  He tells you he's a journalist, right?

11   A.  That's correct.

12   Q.  And he is a journalist, right?

13   A.  Yes.

14   Q.  He tells us he writes about technology, right?

15   A.  Correct.

16   Q.  He told you the truth about that, correct?

17   A.  Correct.

18   Q.  He told you that he works from home, right?

19   A.  Yes.

20   Q.  That he lives in Brooklyn?

21   A.  Correct.

22   Q.  All that's true?

23   A.  Correct.

24   Q.  He tells you that he's in a relationship and that his

25   partner is vanilla, right?

1   A.  Yes.

2   Q.  In your communications overall, you discuss weekend plans

3   and movie plans, right?

4   A.  Yes.

5   Q.  These are all adult conversations, right?

6   A.  Correct.

7   Q.  So I think you just said a moment ago that you initially

8   communicated on May the 14th was the first communication on

9   WhatsApp; is that right?

10  A.  Correct.

11  Q.  And you had communication on WhatsApp on May the 14th, May

12  the 15th, May the 16th, and May the 17th, right?

13  A.  Correct.

14  Q.  And during that period of time, you sent no photos of

15  children, right?

16  A.  Correct.

17  Q.  Then you had a phone call on May the 17th?

18  A.  Correct.

19  Q.  That's a Friday night?

20  A.  That is.  I think it was Friday afternoon.

21  Q.  And then after the phone call, you chatted for a couple of

22  hours on that same night, May the 17th, right?

23  A.  I know we chatted.  I don't recall how many hours.

24          MS. GALLICCHIO:  Let's just take a look at page 72.

25  If we can look at the two middle green boxes.

KEBKBRI3                         Jensen - Cross

1   Q.  So we can see that the time gap here, right, so you say on

2   May 17th, at 9:47, "I'm very serious about that aspect."  And

3   then the next communication is May the 19th, at 4:52 p.m.,

4   right?

5   A.  Correct.

6   Q.  You ask him how was the movie, right?

7   A.  Yes.

8   Q.  So that was the weekend, right?

9   A.  Correct.

10  Q.  And, as you said, on May the 18th, which was Saturday, you

11  had no communication whatsoever?

12  A.  Correct.

13  Q.  And he had told you that he was going to the movies that

14  weekend, right?

15  A.  Yeah, over the phone.

16  Q.  And he had told you that he had a date as well, right?

17  A.  Correct.

18          MS. GALLICCHIO:  We can take that down.

19          We can turn to page 34, please.

20  Q.  Just for reference sake --

21          MS. GALLICCHIO:  I'm sorry, if I could have a moment,

22  your Honor?

23          (Pause)

24  BY MS. GALLICCHIO:

25  Q.  Just for reference, the photos that you sent of your

KEBKBRI3                          Jensen - Cross

1   purported children aren't sent -- begin on page 75, right?

2   A.  Yes.

3   Q.  So, we're on page 34.  This is before the photos, right?

4   A.  Correct.

5   Q.  And this is before the phone conversation, correct?

6   A.  Correct.

7   Q.  And so in the second blue box, Mr. Bright comments, "Oh,

8   uh, I don't know if it matters, but I'm not circumcised,"

9   right?

10  A.  Correct.

11          MS. GALLICCHIO:  We can zoom out of that.

12  Q.  And then you have a conversation about that?

13  A.  Yeah.  I say:  "I've never seen an uncircumcised cock.  It

14  still teaches the same.  LOL."

15  Q.  So you continue to have a conversation about that, correct?

16  A.  Correct.

17  Q.  And this is before any photographs are sent?

18  A.  Correct.

19          MS. GALLICCHIO:  And then could we turn to page 46?

20          THE COURT:  Well, is that a question?

21          MS. GALLICCHIO:  Oh, I'm sorry, yes.  I didn't hear a

22  response.

23  BY MS. GALLICCHIO:

24  Q.  Is it?

25  A.  Yes.

1          MS. GALLICCHIO:  Could we turn to page 46.

2     BY MS. GALLICCHIO:

3     Q.  Now again, on page 46, we are -- this is before the phone

      call, right?

4

5     A.  Correct.

6     Q.  And this is before the photos of the children are sent?

7     A.  Correct.

8     Q.  And these communications are on May 16th, right --

9     A.  Correct.

10    Q.  -- as they appear on this page?

11    A.  Yes.

12    Q.  And you ask him, you ask Mr. Bright, you thought about what

      kind of lesson you would like to start with?

13

14    A.  Correct.

15    Q.  And you ask him:  "Does anything excite you?"

16    A.  Correct.

17    Q.  And his response is:  "It depends on their experience, but

18    I'm thinking maybe something involving foreskin is the way to

19    start because it's kind of unusual over here," right?

20    A.  Yes.

21    Q.  He goes on to the next page to communicate with you about

22    his experience in the United States with American women and his

23    uncircumcised penis, right?

24    A.  Correct.

25    Q.  And you knew, in these communications, that he was talking

1    about adult women, right?

2    A.  Correct.

3    Q.  And you ask him, on page 47, on the top of the page, the

4    second green bubble:  "Does the other girl you teach like it?"

5    A.  Yes.  I was referring to the 11-year-old.

6    Q.  Okay.  So I want to talk about that.

7            MS. GALLICCHIO:  I'm sorry, your Honor, can I just

8    have a moment?

9            THE COURT:  Yes.

10   BY MS. GALLICCHIO:

11   Q.  In reference to the 11-year-old --

12           MS. GALLICCHIO:  Can we go back to page 8, please.

13   Q.  -- we've already been over this, but on the bottom of the

14   page, you ask:  "When did you last teach a little girl?  I

15   don't want just anyone teaching them."

16           And then on the top of the next page, Mr. Bright texts

17   to you:  "I have a girl I've been teaching off and on for a

18   couple of months now, but she's in the Bronx, which makes the

19   logistics even harder."

20           You ask him:  "As old as my princess?"

21           And he says:  "A bit older, 11."

22           So that was the first time that he talked about an

23   11-year-old in the Bronx, right?

24   A.  Correct.

25   Q.  Now, you know there's no 11-year-old in the Bronx now,

1   right?

2   A.   Correct, yes.

3   Q.   You know that he was referring to another age player,

4   right?

5   A.   Yes.

6   Q.   And I assume the FBI did an investigation to make sure

7   there wasn't an 11-year-old in the Bronx, right?

8   A.   He said that, and we didn't have any communications

9   involving a child.

10   Q.   So you were confident that there was no 11-year-old in the

11   Bronx, right?

12   A.   Yes.

13          MR. LI:  Objection.  I would just ask that counsel fix

14   a point in time for the witness' knowledge.

15          MS. GALLICCHIO:  Okay, sure.

16   BY MS. GALLICCHIO:

17   Q.   After Mr. Bright was arrested, right?

18   A.   Correct.

19   Q.   In fact -- well, you weren't present when Mr. Bright was

20   questioned by another agent --

21          THE COURT:  No, I think -- let me ask the witness:  At

22   the time that there was a reference in the communication to an

23   11-year-old in the Bronx, did you know that there was no

24   11-year-old in the Bronx?

25          THE WITNESS:  No, I did not.

1              THE COURT:  Okay.

2              Next question.

3              MS. GALLICCHIO:  Can we turn back to page 47.

4    BY MS. GALLICCHIO:

5    Q.  This is, again, back to where you were discussing his

6    uncircumcised penis, right?

7    A.  Correct.

8    Q.  He comments to you that:  "In fact, every American I've

9    been with except one enjoyed it, but the one, we were back at

10   her place, we got naked, and she said no because I wasn't

11   circumcised.  Much eye rolling here," right?

12             You knew that he was referring to an adult there,

13   right?

14   A.  I asked him:  "Does the other girl you teach like it?

15             He said:  "Yes."  And then continued with that.

16   Q.  But his answer is:  "We were back at her place, we got

17   naked, and she said no because I wasn't circumcised"?

18   A.  Correct.

19   Q.  You didn't think he was talking about a child?

20   A.  No.

21   Q.  Would you agree with me that it's clearly not a concern

22   that's relevant to a seven and a nine-year-old?

23   A.  Correct.

24   Q.  And then on page 49, on the bottom of the page, he says,

25   "Maybe you'll need a lesson, too," right?

KEBKBRI3                    Jensen - Cross

1    A.  Correct.

2    Q.  And he there was suggesting sexual activity with you,

3    right?

4    A.  I think he was just responding to my question about the

5    uncircumcised penis.

6    Q.  And so --

7          THE COURT:  I didn't hear the last words.  "Responding

8    to my question about"?

9          THE WITNESS:  "The uncircumcised penis."

10         THE COURT:  Thank you.

11   BY MS. GALLICCHIO:

12   Q.  And he is suggesting to give you a lesson, right?

13   A.  Correct.

14   Q.  And then on page 51 -- I'm sorry, that may be the wrong

15   page.

16         I'm sorry, page 50, the bottom of the page, the green

17   box, "I'm excited to watch my little angels learn," right?

18   A.  Correct.

19   Q.  That's what you text?

20   A.  I did, yes.

21   Q.  You don't say children?

22   A.  I don't say children, no.

23   Q.  You don't say your son or your daughter, right?

24   A.  I think I was just referencing their names from --

25   Q.  In this text, I'm asking.

KEBKBRI3                    Jensen - Cross

1   A.  No.

2   Q.  You've already testified previously that the term angel is

3   often used as a pet name in age play, right?

4   A.  Correct.  It can be, yes.

5   Q.  Now, I want to talk about the phone call.  We've heard

6   some --

7              MS. GALLICCHIO:  You can take that down.

8   Q.  We've heard some clips from that phone call, right?

9   A.  Correct.

10  Q.  The phone call was a bit longer than that, right?

11  A.  Correct.

12  Q.  In that phone call, you never identified Braydon and Kayla

13  as your son or your daughter, right?

14  A.  Correct.

15  Q.  You never say they're your children?

16  A.  Yeah, I say kids.

17  Q.  You don't take this opportunity --

18             THE COURT:  I didn't hear the last answer.

19             THE WITNESS:  I said, yes, I just said kids.

20             THE COURT:  Thank you.

21             Keep your voice up.

22             THE WITNESS:  Sorry.

23  BY MS. GALLICCHIO:

24  Q.  You say the kids, right?

25  A.  Yes.

KEBKBRI3                          Jensen - Cross

1  Q.  You don't refer to them as my kids?

2  A.  Correct.

3  Q.  Mr. Bright doesn't ask you any questions about the identity

4  of Kayla and Braydon, right?

5  A.  No.

6  Q.  He doesn't call them your children or your son and

7  daughter, right?

8  A.  On the phone call or --

9  Q.  On the phone call.

10 A.  I think he says kids, take the kids to the park.

11 Q.  Well, that's the clip we heard, right?

12 A.  Yeah.

13 Q.  You say you want to go to the park, right?

14 A.  Correct.

15 Q.  It's much easier to entertain the kids there, right?

16 A.  Correct.

17 Q.  And so in your familiarity with age play, you are aware,

18 aren't you, that some age players age play outside of the

19 bedroom, right?

20 A.  Correct.  To my knowledge of -- 24/7 is what they call it.

21 The age players will have a conversation about when they're

22 going to be in age-play roles outside of, like, work or

23 something.  So, yes, I am familiar --

24 Q.  I'm sorry.

25 A.  Yes, I'm familiar with the 24/7 --

1  Q.  So some age players live the fantasy 24/7?

2  A.  Yes, aside from, like, responsibilities and work.

3  Q.  Okay.  And so some of what they engage in is nonsexual

4  behavior, right?

5  A.  Correct.

6  Q.  For example, they might go to the park with their littles,

7  right?

8  A.  Correct.

9  Q.  They might go to a restaurant, like Chuck E. Cheese?

10  A.  My understanding is that they're conversing about it, and

11  they have a dialogue, or a scene, or communication about when

12  they're going to be in the 24/7 role, then, yes, Chuck E.

13  Cheese, or the park, or something could encompass that role.

14  Q.  And so these are activities playing a little role in

15  public, right?

16  A.  Correct.

17  Q.  Now, the phone call that you had, you said on direct

18  examination that you took an action to distinguish this from

19  age play during the phone call, right?

20  A.  Correct.

21  Q.  Is it your testimony that the manner in which you chose to

22  distinguish it was to say that you were going to the park to

23  entertain the kids?

24  A.  So, among other things, we did talk about the kids going to

25  the park, how to entertain them, easier than to be in the

KEBKBRI3                         Jensen - Cross

apartment, taking Braydon to soccer practice, and then we had

other conversations about the nature of the kids.

Q.  Right.

        But you, at this point, didn't identify them as your

son or your daughter, right?

A.  I didn't say my son, Braydon, or my daughter, Kayla.  I

never said that.

Q.  Or your children, right?

A.  I said my kids.  I used "kids" throughout the entire --

Q.  You never said my kids, did you?

A.  I don't recall that.

        In the undercover meet, when we met, I said my kids.

Q.  Right.

        On May 22nd, you said my kids?

A.  Correct.

Q.  That's the first time?

A.  I believe so.

Q.  So, after the phone call, as you've already testified to,

you continued to have text communication on that same day,

May 17th, right?

A.  Correct.

Q.  And they continued to be sexual, right?

A.  Correct.

Q.  During those text communications on that same day, May the

17th, you asked Mr. Bright about what his limits might be,

1   right?  Page 63.

2   A.  Thank you.

3        Yes.  I say:  "Do you have limits or something you

4   don't like?"

5   Q.  So, on the first green box, you say:  "Do you have limits

6   or something you don't like?"

7   A.  Correct.

8   Q.  And then you ask:  "Well, do you have stuff you like?"

9   A.  Correct.

10  Q.  Right.

11       And so you know that the concept of limits is an

12  important concept in the kink community?

13  A.  Again, yes.  It's a conversation that they have regarding

14  limits involving kinks and when it's too much or --

15  Q.  And that was a conversation you were having, right?

16  A.  I asked:  "Do you have limits?"

17       And he said:  "I can't think of anything relevant."

18  Q.  But you were engaging in that conversation?

19  A.  Yes, I asked the question.

20  Q.  And then on page -- on the bottom of the page, he says:  "I

21  have a few kinks of my own, but I'm not sure anything

22  appropriate," right?

23  A.  Correct.

24  Q.  And then he goes on to describe what his kinks are that

25  he's interested in, right?

1   A.  Correct.  I guess -- yes.

2   Q.  And on page 64, you ask him:  "Like what?"

3           And he says:  "I enjoy piss play, squirting, forced

4   orgasms, like making a girl climax 15, 20, 25 times in a row."

5           You say:  "That sounds like a great teacher," right?

6   You had that conversation, right?

7   A.  Right.  He says I'm not sure anything appropriate, and

8   then, yes.

9   Q.  But these kinks that he's describing -- making a girl, for

10  example, climax 15, 20, 25 times in a row -- are adult

11  activities, right?

12  A.  Right, that's what I took it as, but I'm not sure anything

13  appropriate, when he sent that.

14  Q.  But you certainly didn't think he was talking about what he

15  would do with a seven and nine-year-old, right?

16  A.  No.

17  Q.  Multiple orgasms are relevant to adults, right?

18  A.  Correct.

19  Q.  And you didn't take this opportunity to clarify that you

20  were talking about real children, right?

21  A.  No.

22  Q.  And on page 65, there's conversations about peeing, right?

23  A.  Correct.

24  Q.  And Mr. Bright says, on the second to the last blue box:

25  "I enjoyed it.  She gulped it down and asked for more.  It was

KEBKBRI3                         Jensen - Cross

1   part of a broader dom/sub thing," right?

2   A.   Correct.

3   Q.   You knew he was talking about adult activity, right?

4   A.   I knew he was talking about the part of the dom and sub,

5   yes.

6   Q.   This is not age-play activity?

7   A.   Correct.

8   Q.   And then on page 68, the second blue box, he said:  "I

9   think it's more of a mommy thing than a princess thing," right?

10  A.   Sorry.

11          Where are we?

12  Q.   Page 68.

13  A.   Sorry.

14          Yes.

15  Q.   He used your term, "mommy," right?

16  A.   Correct.

17  Q.   And your term, "princess"?

18  A.   Correct.

19          So I took that as a mommy versus a child.

20  Q.   That's how you took it?

21  A.   Correct.

22  Q.   Mommy was the role you chose on KinkD, right?

23  A.   Correct.

24  Q.   And princess was the term you chose to refer to Kayla?

25  A.   Correct.

KEBKBRI3                    Jensen - Cross

1   Q.  And, again, here you didn't clarify that you're talking

2   about an actual child, right?

3   A.  No, I didn't say anything about child.

4          MS. GALLICCHIO:  Now, we can take that down.

5   Q.  On May 19th -- this is Sunday -- he asks -- Mr. Bright asks

6   you again for a picture, right?  On page 74.

7   A.  Thank you.

8          Yes.

9   Q.  And, again, he doesn't ask for a picture of the children,

10  right?

11  A.  Right.

12  Q.  Let's take a look at the first bubble.  He texts:  "I'd

13  love to get a picture of y'all," right?

14  A.  Correct.

15  Q.  And that's when you finally send pictures?

16  A.  That's correct.

17  Q.  Now, after the photos are sent, the content of your

18  communication on WhatsApp changes, right?

19  A.  What do you mean by that?

20  Q.  Well, there's no more teaching scenarios discussed, right?

21          MS. GALLICCHIO:  You can take that down.

22          THE WITNESS:  I think we moved past teaching and on

23  to --

24  BY MS. GALLICCHIO:

25  Q.  Logistics?

KEBKBRI3                          Jensen - Cross

1    A.  Correct.

2    Q.  So we're clear, though, after the photograph, the sexual

3    conversation stops, right?

4    A.  No.  I think he says kissing her flower, I'm sure it's

5    beautiful, and, like, talking about Braydon's manhood.

6    Q.  That's when the photos are sent, right?

7    A.  Correct.  And then after.

8    Q.  Thereafter, though, there's no further conversation about

9    teaching scenarios, right?

10   A.  He asked about family playtime.

11   Q.  Okay.

12   A.  And then I think he asks about questions -- or photos of

13   playtime and what comes next.

14   Q.  Okay.  But beyond that, he doesn't discuss teaching sex,

15   right?

16   A.  I'd have to look through to --

17   Q.  Go ahead.

18            THE COURT:  All right.  We are going to break for

19   lunch, ladies and gentlemen.  Please do not discuss the case

20   among yourselves or with anyone.  Keep an open mind.  We'll be

21   back in action for 2:00 p.m.  Thank you.

22            (Jury not present)

23            THE COURT:  Have a pleasant lunch.

24            MR. MAIMIN:  Thank you.  You, too, Judge.

25            (Luncheon recess)

```
 1                          AFTERNOON SESSION

 2                              2:00 p.m.

 3             (Trial resumed; jury present)

 4             THE COURT:  Ms. Gallicchio, whenever you're ready.

 5             Welcome back, ladies and gentlemen.  Good to see you.

 6   BY MS. GALLICCHIO:

 7   Q.  Good afternoon, Agent Jensen.

 8   A.  Good afternoon.

 9   Q.  So I think before we broke, you were looking through the

10   texts, right?

11   A.  Yes.

12   Q.  If you want to continue that -- I guess the question I was

13   asking you was about the content of the texts after the photos

14   of the children were sent.

15   A.  Yes.

16   Q.  Okay.

17   A.  One second.

18   Q.  Sure.  Okay.

19             Have you had a chance to look through them?

20   A.  Yes.

21   Q.  Okay.  So it's fair to say that there were no -- after the

22   photos were sent of the children -- the first photos were sent,

23   there were no further conversations about sexual lessons with

24   the prince and princess or Kayla and Brayden, correct?

25   A.  Correct.
```

K3BLBRI4                    Jensen - Cross

1    Q.  You did have quite a bit of text communication after the

2    photos though, right?

3    A.  Yes.

4    Q.  And some of the communications were Mr. Bright asking you

5    some questions about your own sexual experiences, right?

6    A.  Yes.

7    Q.  You discussed his boarding school experiences, for example?

8    A.  Correct.

9    Q.  Okay.  He asked you on page 91 --

10             MS. GALLICCHIO:  Ms. Reyes, if we can pull up Exhibit

11   3A, page 91, the second blue box.

12   BY MS. GALLICCHIO:

13   Q.  He asked you:  "How many other people have you been in

14   contact with through KinkD?" Right?

15   A.  That's correct.

16   Q.  And you replied back that he was the only person that you

17   had responded to, right?

18   A.  I think I was saying -- hold on -- that he was the only one

19   I was talking to on WhatsApp.

20   Q.  I'm sorry.  On WhatsApp.

21   A.  Right.

22   Q.  Well, his question to you is:  "How many other people have

23   you been in contact with through KinkD?"  Right?  And you

24   answered:  "What you mean?  How many messages do I have?" And

25   he said: "Yeah."  And you said:  "I think I have a lot but

K3BLBRI4                           Jensen - Cross

1    haven't replied," right?

2    A.  Correct.

3    Q.  You also had some conversations with him about your

4    experiences in other arenas, dating arenas with Sugar Daddies,

5    right?

6    A.  Yeah.  Like if they wanted to be a Sugar Daddy or like

7    asking him.

8    Q.  And Mr. Bright expressed his interest in seeing some of the

9    messages that you had received, right?

10   A.  Correct.

11   Q.  You then spent some time talking about arranging the

12   meeting, the in-person meeting, right?

13   A.  Correct.

14   Q.  And you actually had a plan to meet on May 22nd, right?

15   A.  Correct.

16   Q.  So it wasn't a surprise that your meeting would be May

17   22nd, right?

18   A.  I hadn't heard from him that day until he said essentially

19   he was there.

20   Q.  But you knew -- the expectation was that it was going to be

21   on May 22nd, right?

22   A.  Correct.  Yes.

23   Q.  And in your conversations -- your text conversations with

24   Mr. Bright after the photos were sent, he also discussed with

25   you the fact that he had a date the night before, right?

1           MS. GALLICCHIO:  Let's go to page 123.

2    BY MS. GALLICCHIO:

3    Q.  You asked on the second green bubble and then the next

4    green bubble –– this is May 22nd at 5:55 p.m.

5           You asked:  "Busy night ahead of you?"

6           And he answers:  "I'm not sure, might be hanging out

7    with a girl I'm seeing." Right?

8    A.  Right.

9    Q.  That's the day before the meeting?

10   A.  Correct.

11          MS. GALLICCHIO:  Can you go to page 125, starting with

12   the second blue bubble at the bottom.

13   BY MS. GALLICCHIO:

14   Q.  So this is, again, on May 22nd, the day before the meeting,

15   he asks you what's your address, right?

16   A.  May 21st.

17   Q.  I'm sorry.  I keep saying that.  May 21st.

18   A.  Right.

19   Q.  And you respond:  "I'm on Hudson Street; New York, New

20   York."  Right?

21   A.  Correct.

22   Q.  He asks you for the number of your apartment, correct?

23   A.  Correct.

24   Q.  And then on the next page you say:  "I figured I'd meet you

25   outside first."  And he says, "Okay."

K3BLBRI4                    Jensen - Cross

1    A.  Correct.

2    Q.  And then on the bottom of that page in the green bubble,

3    you say:  "Hah hah, there's a park right across the street,

4    it's super easy?"

5    A.  Correct.

6    Q.  You're giving him directions to where the meeting would be

7    on the next day, the 22nd, right?

8    A.  That is correct.

9    Q.  And you knew based on your conversations with Mr. Bright

10   that on the day, May 22nd, he was going to be in Manhattan for

11   a meeting, right?

12   A.  Yes.

13   Q.  And he had talked to you about what that meeting was?

14   A.  That's correct.

15   Q.  And I think you had mentioned on direct examination that he

16   was going to a meeting having something to do with technology

17   involving virtual reality, right?

18   A.  Correct.

19   Q.  And that he told you that he would communicate with you

20   after the meeting -- or you would see him after the meeting,

21   right?

22   A.  Yeah.  I think he said something along the lines of after

23   the meeting he would be able to meet -- or he'd be available.

24   Q.  Okay.

25           MS. GALLICCHIO:  So we go to page 127.

1    BY MS. GALLICCHIO:

2    Q.  On the top of the page:  "Which subway?"  You ask him where

3    he's coming from.  He says "26th Street."  You tell him you can

4    take the one, two, or three.  He says "okay."  And then you

5    say:  "Then get off at chambers on Hudson to Duane Park,"

6    right?

7    A.  Correct.

8    Q.  And this is on the 22nd, the day before -- I keep doing

9    that.  I'm sorry.

10          This is on the 21st, the day before the meeting,

11   right?

12   A.  Correct.

13   Q.  Okay.  And then if we go to the next page, the top of the

14   page is May 21st, and it says --

15          MS. GALLICCHIO:  Zoom in on the first two boxes.

16   Q.  May 21st, at 6:30, Mr. Bright says "Okay," right?

17   A.  Correct.

18   Q.  And that's the last communication that you and he had on

19   May 21st?

20   A.  Correct.

21   Q.  Okay.  And then on May 22nd, at 1:51, Mr. Bright then says

22   "Hi, is today still good?"  Right?

23   A.  Yes.

24   Q.  That's the first time you heard from him on May 22nd,

25   correct?

K3BLBRI4                          Jensen - Cross

1   A.  Correct.

2   Q.  I just want to go back a minute to page 125 -- I'm sorry,

3   129 on the bottom of the page, the last blue bubble.

4           This is on the 22nd, the day of the meeting, right?

5   A.  Correct.

6   Q.  You're on your way there, or getting your squad together,

7   right?

8   A.  We're scrambling, yes.

9   Q.  You're scrambling, but you did know -- you did have an

10  expectation the meeting was going to be that day, right?

11  A.  Yes.  We had talked about it and, yes, it could happen.  I

12  just didn't hear from him.  So it wasn't set in stone.

13  Q.  Okay.  So while you're on your way, you and he are having

14  -- are texting?

15  A.  I was still in the office at that time.

16  Q.  So on that day while he's there waiting for you, or on his

17  way, you're texting, right?

18  A.  Correct.

19  Q.  And he says to you:  "I was hoping we might talk a little

20  before they get home?"

21  A.  Correct.

22  Q.  And we're looking for the next page.  You say: "Okay.  Talk

23  about what?"

24          And his answer is:  "Mainly just practicalities,

25  availability, that kind of thing," right?

K3BLBRI4                          Jensen - Cross

1   A.  Correct.

2   Q.  Okay.  Now, you testified that you did send additional

3   photos, right, after the first initial photos; right?

4   A.  Correct.

5         MS. GALLICCHIO:  Can we look at page 115, please?

6   BY MS. GALLICCHIO:

7   Q.  And this is on May the 20th, right?

8   A.  Correct.

9   Q.  You send a picture -- the second green bubble, a picture

10  saying:  "Sleeping beauty."  It appears there's a child in a

11  bed, right?

12  A.  Correct -- purported child, yes.

13  Q.  Purported child.  The child is clothed, right?

14  A.  Correct.

15  Q.  And Mr. Bright's response to that is:  "What a cutie,"

16  right?

17  A.  Correct.

18  Q.  Nothing sexual about that response, right?

19  A.  Correct.

20  Q.  Then the next picture you send is another picture which you

21  caption "Sweet dreams," right?

22  A.  Correct.

23  Q.  It's a clothed child, right?

24  A.  That's correct.

25  Q.  And Mr. Bright on the next page writes:  "Such delights,"

K3BLBRI4                         Jensen - Cross

1    right?

2    A.  Right.

3    Q.  Nothing sexual about that?

4    A.  No.

5    Q.  Now, you said that when you were going to the meeting, you

6    had hoped to record the encounter with Mr. Bright, right?

7    A.  Correct.

8    Q.  And recording an encounter such as this would be a regular

9    part of your investigation, right?

10   A.  Yes.

11   Q.  It would be a standard thing you would do in all types of

12   cases like this, right?

13   A.  Correct, yes.

14   Q.  Because it's important that you capture everything that's

15   said?

16   A.  Yes.

17   Q.  Recording can be and is important evidence, right?

18   A.  Definitely.  Yes.

19   Q.  But you failed because your battery died?

20   A.  Correct.

21   Q.  Now, you asked Mr. Bright early on in the conversations for

22   his STD test, right?

23   A.  Correct.

24   Q.  You talked quite a bit about cleanliness, right, and how

25   that was important to you?

K3BLBRI4                        Jensen - Cross

```
 1   A.  Correct.
 2   Q.  And this was, I think, early on, like May 15th; is that
 3   right, if you recall?
 4   A.  I think so.
 5   Q.  It was before the phone call, right?
 6   A.  Yeah -- I think in the phone call we discussed it too.
 7   Q.  Right.  But before the phone call, you received
 8   screenshots, right?
 9   A.  Correct.
10   Q.  And it was obviously before the photos of the children were
11   sent that you got these screenshots, right?
12   A.  That's correct.
13   Q.  And you testified about why you asked for them?
14   A.  Correct.
15   Q.  And you said that it is an overt act that someone has to
16   take to show an interest in having sex with children, right --
17   or your kids?
18   A.  Correct.
19   Q.  Would you agree with me though that sharing STD tests is
20   also something responsible adults do before having sex?
21   A.  Correct.  Yes.
22   Q.  And it's an important part of your investigation to get
23   what you call an "overt act?"
24   A.  Yes.  It goes to the totality of the investigation, yes.
25   Q.  Okay.  It's a common technique that you use in your
```

1    investigation, to ask for an overt act?

2    A.  Yes; different things that when we ask for, yes.

3    Q.  You ask the suspect to bring something to the meeting,

4    right?

5    A.  Typically, yes.

6    Q.  Okay.  And if they bring it, it's proof -- it can add to

7    proof of their intention, right?

8    A.  Correct.

9    Q.  And in this case, as you said, in the phone call, you asked

10   Mr. Bright to bring a copy of his STD test, right?

11   A.  Correct.

12   Q.  So all you have is the screenshot, right?

13   A.  Originally, right.

14   Q.  Originally.

15   A.  Yes, correct.

16   Q.  And you wanted to see if he would show up with it, right?

17   A.  Yeah.  More so his name.  It wasn't on the first one, so I

18   wanted to make sure it wasn't just like taken from the internet

19   or something.

20   Q.  Okay.  Well, so you asked him to bring it there, right?

21   A.  That's correct.

22   Q.  And if he brought it, you would have confiscated it as

23   evidence against him, right?

24   A.  Yes.

25   Q.  And as we heard in the phone call, you asked him if he

K3BLBRI4                          Jensen - Cross

1    could print it out, right?

2    A.  Yes.

3    Q.  And in your mind, it would be strong evidence of his elicit

4    purpose, right?

5    A.  Yes.

6    Q.  It would be an overt act?

7    A.  Yes.

8    Q.  Okay.  But when he arrived, you asked him for it, right?

9    A.  Yeah.  We discussed it.  And he said he didn't have it --

10   Q.  So -- I'm sorry.  I didn't mean to cut you off.

11   A.  Sorry.  And then he logged into the portal where it was so

12   I could actually verify that it was his and his name.

13   Q.  Okay.  So he did not show up with a printout of the STD

14   test, right?

15   A.  Correct.

16   Q.  He didn't even have a screenshot on his phone, right?

17   A.  I don't think so.

18   Q.  He had to login to a website, right?

19   A.  Yes.

20   Q.  Of the testing facility where he got tested, right?

21   A.  I think he said "portal."  I -- I imagine where the results

22   get downloaded or whatever portal you log into.

23   Q.  And this is while you're standing on the street, he's

24   trying to find the website on his phone, right?

25   A.  Right.

K3BLBRI4                        Jensen - Cross

1   Q.  And it took several minutes for him to do that, right?

2   A.  Yes.

3   Q.  Now, part of your job is to investigate the receipt and

4   possession and distribution of child pornography, right?

5   A.  Correct.

6   Q.  In your experience, you have found that child molesters are

7   likely to possess child pornography?

8               MR. LI:  Objection.

9               THE COURT:  Sustained.

10  BY MS. GALLICCHIO:

11  Q.  Well, in your experience, you look for child pornography

12  every time you arrest someone?

13              MR. LI:  Objection.

14              THE COURT:  Sustained.

15  BY MS. GALLICCHIO:

16  Q.  Well, is the presence of child pornography relevant to your

17  investigation?

18              MR. LI:  Objection.

19              THE COURT:  Sustained.

20              MS. GALLICCHIO:  Your Honor, can we see you at

21  sidebar?

22              THE COURT:  Ask your next question.

23              MS. GALLICCHIO:  I'd like to note my objection at

24  sidebar.

25              THE COURT:  Go ahead.

 1          (At sidebar)

 2          MS. GALLICCHIO:  Your Honor, these were questions that

 3     I'd asked in the original trial, and the Court allowed me to

 4     ask these questions.  And I understood this was the parameters

 5     of the Court's ruling.

 6          MR. LI:  I believe the Court did not allow this line

 7     of questioning during the first trial.  In fact, what the Court

 8     allowed was the review done in this case for child pornography,

 9     and that in this case child pornography was not found.  We

10     objected at that last trial to the line of questioning to the

11     effect that in every such case, child pornography would be

12     searched for.

13          MS. GALLICCHIO:  Judge, if I could -- I just wanted to

14     get a quick look at the transcript.  I believe that I did ask

15     the question, and you allowed it.

16          THE COURT:  Okay.  I brought you over because you

17     wanted to put something on the record.  And I'm giving you the

18     opportunity to do that.

19          MS. GALLICCHIO:  Okay.  So what -- I'm just -- my

20     understanding was from the Court's ruling yesterday that I

21     would be allowed to ask these questions.  So I'm not

22     understanding why the Court is not allowing me to do it here.

23          THE COURT:  Because you haven't asked the question

24     that I would allow.

25          MS. GALLICCHIO:  I asked the question at the last

1    trial, your Honor:

2    "Q.  In your experience, you look for child pornography every

3    time you arrest someone?

4    "A.  Yes, correct.

5    "Q.  It's relevant to your investigation, right?

6    "A.  Yes."

7              The Court allowed that -- permitted that question.

8              THE COURT:  That, I'm sustaining the objection to.

9    What I will allow is you can -- well, I don't know why I have

10   to give instructions on what I will allow.  You haven't asked

11   the question that I will allow in this area.

12             MS. GALLICCHIO:  Okay.  I'll keep trying.

13             THE COURT:  But the question is -- since you want to

14   know, this was not the purpose of the sidebar.  But in any

15   event, the purpose of the sidebar was to allow you to make a

16   record.

17             MS. GALLICCHIO:  Okay.  Thank you.

18             THE COURT:  But I will tell you that I will allow to

19   you ask the question:  Did you, in fact, search for child

20   pornography?  And what was the outcome of your search?

21             MS. GALLICCHIO:  Okay.

22             THE COURT:  All right?

23             MS. GALLICCHIO:  Yes.  Thank you.

24        (Continued on next page)

25

K3BKBRI5                     Jensen - Cross

 1   BY MS. GALLICCHIO:

 2   Q.  So you looked for child pornography as an overt act, right?

 3   A.  We look for the existence of it, yes.

 4   Q.  Okay.  And you looked for it after you arrested Mr. Bright?

 5   A.  Correct.

 6   Q.  You had his phone, right?

 7   A.  Yes.

 8   Q.  And you spent a great deal of time looking through his

 9   phone specifically for child pornography, right?

10   A.  Yes.  We reviewed the device for child pornography, right.

11   Q.  You found lots of photos on his phone, right?

12   A.  Correct.

13   Q.  Lots of nudes?

14   A.  Correct.

15   Q.  All adults, right?

16   A.  Correct.

17   Q.  Lots of pictures of himself nude, right?

18   A.  Correct.

19   Q.  And his private parts, right?

20   A.  Correct.

21   Q.  Similar to one of the photographs received, right?

22   A.  Correct.

23            (Pause)

24            THE COURT:  All right.  You may proceed.

25   Q.  On his phone, you discovered lots of sexual photos and

K3BKBRI5                    Jensen - Redirect

1    videos, right?

2    A.   Yes.

3    Q.   All of adults?

4    A.   Correct.

5    Q.   You didn't find one single picture of child pornography on

6    his phone, right?

7    A.   Correct.

8    Q.   No videos, right?

9    A.   Correct.

10   Q.   No nudes of children at all?

11   A.   Correct.

12   Q.   No nudes or suggestive photos of teenagers?

13   A.   Correct.

14   Q.   You also reviewed Mr. Bright's Google account, right?

15   A.   Correct.

16   Q.   And you didn't find any child pornography on that either?

17   A.   Correct.

18          MS. GALLICCHIO:  No further questions.

19          THE COURT:  All right.  Redirect?

20          MR. LI:  Yes, your Honor.

21          THE COURT:  Okay.

22   REDIRECT EXAMINATION

23   BY MR. LI:

24   Q.   Agent Jensen, defense counsel was asking you just now about

25   your text messages on the 21st and the 22nd of May 2019.  Do

1  you recall that discussion?

2  A.  Yes.

3  Q.  And you went through those conversations, those text

4  messages, in some detail, right?

5  A.  Yes, I reviewed them.

6  Q.  And I believe defense counsel asked you to confirm that as

7  of the 21st and the 22nd, the defendant was no longer talking

8  about lessons.  Do you recall that?

9  A.  Correct.

10  Q.  Did you look at pages 130 and 131 as part of your

11  cross-examination?

12          MR. LI:  Ms. Fetman, could you pull up Government

13  Exhibit 3A and turn to 130.

14  Q.  Do you see the second blue chat bubble on the bottom here

15  of the screen?

16  A.  Yes.

17  Q.  Could you read that, please?

18  A.  "Just making sure we're on the same page about their

19  lessons, that their lessons will be frequent enough, that kind

20  of thing."

21  Q.  What's the date of that message?

22  A.  May 22nd, 2019.

23  Q.  And who sent that message?

24  A.  The defendant.

25  Q.  Let's go to page 131, please.

1          MR. LI:  Ms. Fetman, could you blow up the first green

2     bubble to the right.

3     Q.  Could you read this message, please?

4     A.  "Okay.  That works well.  What are you interested in doing

5     today with them?"

6     Q.  Who sent this message?

7     A.  I did.

8     Q.  And when did you send it?

9     A.  May 22nd, 2019, at 2:15:02 p.m.

10    Q.  Did the defendant respond to your message?

11    A.  Yes.

12    Q.  What did he say?

13    A.  "Introductions, showing me what they know already.  Getting

14    familiar with each other."

15    Q.  And did you further reply?

16    A.  I did.

17    Q.  What did you say?

18    A.  "Okay.  They know a lot about sucking.  It could be a long

19    afternoon.  LOL."

20    Q.  So when defense counsel asked you whether the defendant and

21    you continued to talk about lessons after the 21st, did you, in

22    fact, continue to talk about lessons?

23          MS. GALLICCHIO:  Objection.  That mischaracterizes my

24    question.

25          THE COURT:  All right.  Without the leading, after

1  the -- rephrase your question without the leading.  The jury

2  was here; they heard the questioning.  Go ahead.

3  BY MR. LI:

4  Q.  After May 21st, 2019, did you and the defendant continue to

5  talk about lessons?

6  A.  Yes.  I missed that section.

7          MR. LI:  Ms. Fetman, could we turn to page 75, please.

8  Could we blow up the last green bubble to the right, please.

9  Q.  Agent Jensen, what is this message?

10  A.  This is the photograph of my purported seven-year-old

11  daughter.

12  Q.  And when did you send this message?

13  A.  May 19th, 2019, at 5:28:49 p.m.

14          MR. LI:  Ms. Fetman, could we turn to the next page,

15  please.

16  Q.  What did the defendant reply to your message?

17  A.  "She looks like a cutie."

18  Q.  And when did he send that message?

19  A.  May 19, 2019, at 5:29:09 p.m.

20  Q.  Now, on cross-examination, defense counsel asked you

21  whether this message was sexual.  Do you recall that

22  conversation?

23          MS. GALLICCHIO:  Objection.  It's not this photo.

24  Q.  Let me rephrase.

25          This message, this response, "She looks like a cutie,"

K3BKBRI5                          Jensen - Redirect

1   is that a sexual response?

2   A.  She's -- he is referring to the purported seven-year-old

3   daughter and described her as a cutie.

4   Q.  In your mind, is that a sexual response?

5   A.  Yes.

6   Q.  Why is that a sexual response?

7   A.  Because he's referring to the seven-year-old purported

8   daughter who's wearing underpants.

9   Q.  Let's continue on the same page.  Do you see a green chat

10  bubble to the right?

11  A.  Yes.

12  Q.  What is the content of that message?

13  A.  "Here's One Before Play Time."

14  Q.  Is there an image attached?

15  A.  That's correct, yes.

16  Q.  What is the image?

17  A.  So that's an image of the purported seven-year-old daughter

18  with my lips on her upper thigh.

19  Q.  And, again, just to be clear, are these real kids?

20  A.  No.

21       MR. LI:  Ms. Fetman, could we see the last two blue

22  bubbles to the left, to the bottom left.

23  Q.  Could you read the defendant's responses to the image that

24  you sent?

25  A.  "Oooh.  Play time sounds fabulous."

K3BKBRI5                    Jensen - Redirect

1   Q.  Did you understand this to be a sexual response?

2   A.  Yes.

3   Q.  Why?

4   A.  Because I had just sent a photo of the purported

5   seven-year-old wearing underpants and my face on her upper

6   thigh.

7           MR. LI:  Ms. Fetman, let's turn to page 77, please.

8   Blow up the first two blue bubbles to the left, please.

9   Q.  Agent Jensen, could you read the first blue bubble here?

10  A.  "Kissing her flower, I'm sure it's beautiful."

11          "How" --

12  Q.  I'm sorry, go ahead.

13  A.  "How big a boy is Braydon?"

14  Q.  So, starting with the first message, "Kissing her flower,

15  I'm sure it's beautiful," who sent that message?

16  A.  The defendant.

17  Q.  Did he send it before or after you sent him pictures of the

18  purported children?

19  A.  After.

20  Q.  Did you understand this message, this first message here,

21  to be sexual?

22  A.  Yes.

23  Q.  Why did you understand it to be sexual?

24  A.  We discussed flower as vagina, so "Kissing her flower, I'm

25  sure it's beautiful."

K3BKBRI5                        Jensen - Redirect

1    Q.  Do you see the second message here on the bottom?

2    A.  I do.

3    Q.  Did you understand that message to be sexual?

4    A.  I think when it got sent, I did not, until I clarified.

5    Q.  Okay.  Let's see the clarification.

6            Could you read the two green chat bubbles to the

7    right?

8    A.  "Whatcha mean?  How big is what?"

9    Q.  And who sent those two messages?

10   A.  I did.

11   Q.  Did the defendant respond to that?

12   A.  He did.

13   Q.  What did he say?

14   A.  "His manhood!"

15   Q.  What did you understand the defendant to be referring to?

16   A.  His penis.  The purported nine-year-old's penis.

17   Q.  Did you understand that message, in context, to be sexual?

18   A.  Yes.

19           MR. LI:  All right.  Ms. Fetman, we can take down

20   Government Exhibit 3A.

21   Q.  On cross-examination, you were asked about your review of

22   the defendant's devices for child pornography.  Do you recall

23   that?

24   A.  I do.

25   Q.  What devices and accounts did the FBI collect from the

K3BKBRI5                          Jensen – Redirect

1    defendant?

2    A.   We collected the phone that we were communicating on.  We

3    collected another phone, an iPhone, and then we collected his

4    Gmail accounts.  And then later, we collected a homemade

5    computer.

6    Q.   Did the defendant provide his passcode to any of those

7    devices?

8    A.   Yes.  For the Huawei phone.

9    Q.   Did he provide his passcode to the --

10            MS. GALLICCHIO:  Objection.

11            THE COURT:  Basis?

12            MS. GALLICCHIO:  Can we see you at sidebar, Judge?

13            THE COURT:  Sure.

14            (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MS. GALLICCHIO:  Well, my understanding of the

3   evidence in this case is that the agents never asked for his

4   password of any of the other devices, so it's misleading to say

5   he didn't provide them.

6          MR. LI:  I don't think it's a misleading question.

7   The question is did he provide them.  I think the answer is

8   going to be no.  I mean, if you prefer, I'm happy to ask --

9          MS. GALLICCHIO:  Did you ask him for his passwords?

10          MR. LI:  -- did you have the passcodes, did you have

11   the passcode to the second?

12          MS. GALLICCHIO:  No, that's still misleading.

13          THE COURT:  No.  The point is if you want to bring it

14   out, you have to do -- if it's accurate -- I don't know whether

15   it's accurate, I wasn't there -- that he was never asked for

16   them, then you can elicit that he was never asked for it and it

17   was never searched, that's fine, that's not misleading.  But

18   creating the impression that he was asked for it and declined

19   is misleading.

20          MR. LI:  I understand the point.  I would just note,

21   though, for the record, that after the interview and after

22   defense counsel was retained, we did ask defense counsel

23   whether the defendant would be willing to provide the passcode

24   to the phone, and that --

25          THE COURT:  That's a different story.

1        MR. LI:  I understand.  But with respect to the

2   implication that the question would be misleading, I just do

3   want to correct that record.

4        THE COURT:  So rephrase your question.

5        MR. LI:  I understand the Court's ruling.

6        THE COURT:  The objection is sustained and the

7   question is stricken.  Ask a new question.

8        MR. LI:  Understood.

9        (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K3BKBRI5                          Jensen - Redirect

1              (In open court)

2      BY MR. LI:

3      Q.  So, Agent Jensen, I believe you testified just now that the

4      defendant provided a passcode to the Huawei phone; is that

5      correct?

6      A.  Correct.

7      Q.  Was he asked for the passcode for the other phone?

8      A.  No.

9      Q.  Did the FBI have the passcode to the other phone?

10     A.  No.

11     Q.  What are the devices and accounts that the FBI was actually

12     able to review for child pornography?

13     A.  The Gmail account and the Huawei phone.

14     Q.  What were the devices and accounts you were unable to

15     review?

16     A.  The iPhone and his homemade desktop computer.

17     Q.  Can you describe the desktop computer?

18     A.  It was homemade.  It had four hard drives within the

19     desktop computer.

20     Q.  Was the FBI able to review any of those hard drives?

21     A.  No.

22     Q.  Now, on cross-examination, I believe you were asked about

23     your experience with the kink community prior to joining KinkD.

24     Do you recall that?

25     A.  Yes.

K3BKBRI5                         Jensen – Redirect

1   Q.   And I believe you testified that you had no formal training

2   on the kink community prior to downloading the KinkD

3   application; is that correct?

4   A.   Correct.

5   Q.   Do you have any knowledge of the kink community based on

6   your own undercover work?

7   A.   Yes.

8   Q.   Did some of that work include other fetish platforms?

9   A.   Yes.

10  Q.   Did you also have knowledge of the kink community based on

11  the experience of other agents doing similar work?

12  A.   Yes.

13  Q.   Did you have that experience prior to downloading the KinkD

14  app?

15  A.   Yes.

16  Q.   Now, on cross-examination, defense counsel asked you about

17  the role selection page on the KinkD application.  Do you

18  recall that?

19  A.   I do.

20          MR. LI:  Ms. Fetman, let's pull up Government

21  Exhibit 13, please.

22  Q.   Now, Agent Jensen, I think you testified that for some of

23  these roles, a person is not literally the role they select,

24  but just pretending; is that correct?

25  A.   Correct.

K3BKBRI5                          Jensen - Redirect

1   Q.  So, as an example, when someone selects pet -- or I should

2   say when someone selects -- let me start over.

3            As an example, when someone selects pet, are they

4   saying that they are literally a pet or pretending to be a pet?

5   A.  No, they're not literally a pet.

6   Q.  So, are they saying that they are pretending to be a pet?

7   A.  Yes.

8   Q.  Now, is that pattern true for every one of these roles on

9   Government Exhibit 13?

10  A.  No.

11  Q.  When someone selects masochist, for example, are they

12  saying they are literally a masochist or pretending to be a

13  masochist?

14  A.  That's part of their kink, yes.

15  Q.  When someone selects masochist, are they saying they are

16  literally a masochist or that they are pretending to be a

17  masochist?

18  A.  No, they're not literally.

19            MS. GALLICCHIO:  Objection.  It was asked and

20  answered.

21  Q.  What's a masochist?

22  A.  A person that involves pain or pleasure in their role.

23  Q.  When someone selects age player, are they saying that they

24  are literally an age player or that they are pretending to be

25  an age player?

K3BKBRI5                          Jensen - Redirect

1   A.  They're pretending to be an age player.

2   Q.  What do you mean when you say they're pretending to be an

3   age player?

4   A.  When they select it, that's part of the role or role play

5   that they could encompass.

6   Q.  But when they select the word age player, are they saying

7   they are actually an age player?

8   A.  No.

9           MS. GALLICCHIO:  Objection; asked and answered.

10  Q.  Did the defendant select age player as one of several roles

11  on his profile?

12  A.  Yes.

13  Q.  Did you select the role age player on your profile?

14  A.  No.

15  Q.  Would someone viewing your profile have seen the words "age

16  player"?

17  A.  No.

18  Q.  What was the role you selected?

19  A.  Mommy.

20  Q.  When you selected the role mommy, were you trying to convey

21  that you were pretending to be a mommy?

22  A.  Yes, I was conveying I was a mom.

23  Q.  Sorry, when you say "Yes," what do you mean by that?

24          MS. GALLICCHIO:  Objection.  Yes means yes.

25          THE COURT:  No, I'll allow it.

1   BY MR. LI:

2   Q.  Why don't I restate the question.

3           When you selected the role mommy, were you trying to

4   convey that you were literally a mommy or pretending to be a

5   mommy?

6   A.  Pretending to be a mom in my undercover capacity, yes.

7   Q.  Did you want someone seeing your profile to believe that

8   you were pretending to be a mommy or that you were actually a

9   mommy?

10  A.  Be a mom, yes.

11  Q.  Who reached out to who on KinkD?

12  A.  He reached out -- or the defendant reached out to my

13  profile.

14  Q.  So, on cross-examination, I think you were asked whether

15  the word "princess" is sometimes used in the age play.  Do you

16  recall that?

17  A.  I do.

18  Q.  Does princess have any meaning outside of the age play

19  context?

20  A.  Yes.

21  Q.  What can it mean?

22  A.  It can be a term of endearment, part of the royal family --

23  Q.  What meaning did you intend to convey when you used the

24  word princess in your chats with the defendant?

25  A.  I was using it as a term of endearment.

K3BKBRI5                    Jensen - Redirect

1    Q.  Is the same true with the word prince?

2    A.  Yes.

3    Q.  Did you say or do anything in your communications with the

4    defendant that was not consistent with age play?

5    A.  I talked about them being in school.  I used "kids."  Sent

6    photos.

7    Q.  When you say you sent photos, what photos do you have in

8    mind?

9    A.  Of the purported children.

10   Q.  Why is that inconsistent with age play?

11   A.  Because age players are taking on different ages that

12   they're going to encompass in whatever scene or role that

13   they're playing.

14   Q.  Are age players adults or children?

15   A.  Adults.

16   Q.  If there's actually a child involved, is that age play?

17   A.  No.

18   Q.  Now, I think you testified on cross-examination that play

19   time is sometimes used in age play.  Do you recall that?

20   A.  I do.

21        MR. LI:  Ms. Fetman, could you please pull up

22   Government Exhibit 3A again and turn to page 76.

23   Q.  Agent Jensen, do you see the photograph to the right here

24   in a green bubble?

25   A.  I do.

K3BKBRI5                          Jensen - Redirect

1    Q.  Could you remind the jury again, what is this photograph?

2    A.  This is a photo of my purported seven-year-old daughter

3    wearing panties; my lips are on the upper thigh of her leg.

4    Q.  Is there a caption to this photo?

5    A.  Yes.

6    Q.  What is that caption?

7    A.  "Here's One Before Play Time."

8    Q.  Now, when you wrote "play time" in this caption, were you

9    referring to age play?

10   A.  No.

11   Q.  How does the defendant respond to this message?

12   A.  "Oooh.  Play time sounds fabulous."

13          MR. LI:  We can take down 3A.  Thank you.

14   Q.  Agent Jensen, I think you also mentioned just now that you

15   said the word "kids."  What do you understand the word "kids"

16   to mean?

17   A.  Your kids, son, daughter, your children.

18   Q.  To your knowledge, is "kids" an age-play term?

19   A.  No.

20   Q.  Now, on cross-examination, you were asked whether you had

21   ever said "my kids" as opposed to "the kids."  Do you remember

22   that?

23   A.  Yes.

24          MR. LI:  Ms. Fetman, let's pull up Government

25   Exhibit 1, please.

K3BKBRI5                          Jensen - Redirect

1   Q.  Now, in your KinkD profile, did you ever describe your

2   purported children as kids?

3   A.  Yes.

4   Q.  Did you specifically refer to them as "my kids"?

5   A.  Yes.

6          MR. LI:  We can take that down.

7   Q.  Turning your attention now to the WhatsApp chats, did you

8   ever describe your purported children as kids on WhatsApp?

9   A.  Yes.

10  Q.  In your conversations with the defendant on WhatsApp, did

11  the defendant ever refer to your purported children as kids?

12  A.  Yes.

13         MR. LI:  Ms. Fetman, let's pull up 3A again, please,

14  Government Exhibit 3A, and turn to page 83.

15  Q.  Agent Jensen, can you read the first green chat bubble to

16  the right, which is timestamped May 19, 2019, at 6:37 p.m.?

17  A.  "When the kids are off from school, it's more."

18  Q.  Do you use the word "kids" in that message?

19  A.  Yes.

20         MR. LI:  Ms. Fetman, let's turn to page 120, please.

21  Q.  Agent Jensen, can you read the last blue text bubble to the

22  left?

23  A.  "What's the kids' schedule at the moment?  They're in

24  school?"

25  Q.  And what's the timestamp on this?

1   A.  5/21/2019, at 5:18:30 p.m.

2   Q.  Who sent this message?

3   A.  The defendant.

4   Q.  Did the defendant expressly use the word "kids" in that

5   message?

6   A.  Yes.

7           MR. LI:  Ms. Fetman, let's turn to page 125, please.

8   Q.  Agent Jensen, can you read the first green chat bubble to

9   the right?  And this one is timestamped May 21st, 2019, at

10  6:12 p.m.

11  A.  "I'm gonna go next-door to get the kids and probably stay

12  and hang out for a little with my friend - with drinks.  LOL."

13  Q.  And in this message, do you expressly use the word "kids"?

14  A.  Yes.

15  Q.  Agent Jensen, in your phone call with the defendant, did

16  you use the word "kids"?

17  A.  Yes.

18          MR. LI:  Ms. Fetman, can you please play Government

19  Exhibit 5A2.

20          Yes, and please publish the accompanying transcript,

21  5T.  Thank you.

22          (Audio playback)

23          MR. LI:  We can take that down.  Thank you.

24  BY MR. LI:

25  Q.  Agent Jensen, when was that phone call with the defendant?

K3BKBRI5                          Jensen - Redirect

1    A.  That was Friday, May 17th, 2019.

2    Q.  Was that before or after you sent the pictures of the

3    purported children to the defendant?

4    A.  That was before.

5    Q.  Now, on cross-examination, I think defense counsel spoke

6    with you about age players who act out a role 24/7.  Do you

7    recall that?

8    A.  Yes.

9    Q.  And I believe you testified that when age players go 24/7,

10   they typically have explicit discussion.  Did I get that right?

11   A.  Correct.

12   Q.  Did that happen in any of your conversations with the

13   defendant?

14   A.  No.

15   Q.  In the call we just heard, Government Exhibit 5A2, was it

16   ambiguous to you whether you were talking about real children?

17           MS. GALLICCHIO:  Objection; relevance.

18           THE COURT:  Overruled.

19           THE WITNESS:  No.

20   BY MR. LI:

21   Q.  Now, on cross-examination, defense counsel asked you about

22   certain chat messages you reviewed on the defendant's phone

23   with what appeared to be other adults engaging in age play.  Do

24   you recall that?

25   A.  I do.

K3BKBRI5                        Jensen - Redirect

1   Q.   And you testified that those conversations were with what

2   appeared to be adults; is that correct?

3   A.   Correct.

4   Q.   Now, without going into the content, did you see any

5   conversations between the defendant and what appeared to be a

6   14-year-old girl and a 17-year-old girl?

7   A.   Yes.

8   Q.   Now, you testified that you saw multiple chats involving

9   age play with what appeared to be adults; is that right?

10  A.   Yes.

11  Q.   In general, was it clear to you from those chats that there

12  was role play?

13  A.   Yes.

14  Q.   How was that clear to you?

15  A.   They used words like fantasy, or role play, or DDLG, or

16  Daddy Dom/Little Girl.

17  Q.   Did any of that happen in your 769 WhatsApp messages with

18  the defendant?

19  A.   No.

20  Q.   Now, on cross-examination, defense counsel specifically

21  asked you about a conversation on the defendant's phone with

22  someone named Stevie.  Do you recall that?

23  A.   Yes.

24  Q.   In the Stevie conversation, did the defendant explicitly

25  discuss DDLG?

1   A.  Yes.

2   Q.  And what is DDLG again?

3   A.  Daddy Dom/Little Girl.

4   Q.  In your conversations with the defendant, did he ever

5   explicitly discuss DDLG with you?

6   A.  No.

7   Q.  In your conversations with the defendant, did he ever

8   explicitly discuss age play with you?

9   A.  No.

10  Q.  In the Stevie conversation, did the defendant explicitly

11  describe a DDLG scene as a, quote, fantasy?

12  A.  Yes.

13  Q.  In your conversations with the defendant, did he ever

14  explicitly describe sexual activity with your purported

15  children as a fantasy?

16  A.  No.

17  Q.  In your conversations with the defendant, did he ever

18  explicitly describe your purported children as adults

19  pretending to be children?

20  A.  No.

21  Q.  In the Stevie conversation, was the conversation focused on

22  sexual activity with Stevie or some other person?

23  A.  Yes, with Stevie.

24  Q.  In your conversations with the defendant, was the

25  conversation focused on sexual activity with you?

K3BKBRI5                          Jensen - Redirect

1    A.  No.

2    Q.  In the Stevie conversation, did Stevie ever suggest

3    bringing his own children into the age play?

4    A.  No.

5    Q.  In the Stevie conversation, did the defendant receive

6    pictures of what appeared to be actual children?

7    A.  No.

8    Q.  Did the FBI arrest the defendant based on his sexual

9    activities with adults?

10   A.  No.

11   Q.  Did the FBI arrest the defendant immediately after he

12   started chatting with you on KinkD?

13   A.  No.

14   Q.  Did the FBI arrest the defendant immediately after he

15   started chatting with you on WhatsApp?

16   A.  No.

17   Q.  Did the FBI arrest the defendant immediately after he

18   received photos of the purported children from you?

19   A.  No.

20   Q.  Did the FBI arrest the defendant immediately after he spoke

21   with you by telephone?

22   A.  No.

23   Q.  When did the FBI arrest the defendant?

24   A.  After we were leaving the park and crossing the street

25   towards the purported apartment.

K3BKBRI5                        Spivack - Direct

1              MR. LI:  Just one moment, your Honor?

2              (Pause)

3              MR. LI:  No further questions.

4              THE COURT:  All right.

5         Thank you.  You may step down.

6              THE WITNESS:  Thank you.

7              (Witness excused)

8              THE COURT:  Call your next witness.

9              MR. LI:  The government calls Special Agent Aaron

10   Spivack.

11   AARON SPIVACK,

12        called as a witness by the Government,

13        having been duly sworn, testified as follows:

14             THE DEPUTY CLERK:  State your name and spell it for

15   the record, please.

16             THE WITNESS:  Aaron Spivack, A-a-r-o-n S-p-i-v-a-c-k.

17             THE COURT:  All right.

18             Mr. Li, you may inquire.

19   DIRECT EXAMINATION

20   BY MR. LI:

21   Q.  Are you currently employed?

22   A.  Yes, sir, I am.

23   Q.  Where do you work?

24   A.  I work for the Federal Bureau of Investigation.

25   Q.  Will you understand me if I refer to that agency as the

1    FBI?

2    A.  Yes, sir.

3    Q.  What's your title at the FBI?

4    A.  I'm a special agent.

5    Q.  How long have you been a special agent with the FBI?

6    A.  Approximately 12 years, 12ish years.

7    Q.  Are you assigned to a particular unit within the FBI?

8    A.  I am, yes, sir.

9    Q.  What is that unit?

10   A.  It is now called the Child Exploitation and Human

11   Trafficking Task Force.

12   Q.  What sorts of crimes do you investigate as a member of that

13   unit?

14   A.  I investigate all matters pertaining to the sexual

15   exploitation of children, trafficking of minors and adults,

16   child abductions, kidnappings, things of this sort.

17   Q.  How long have you been investigating child exploitation

18   crimes?

19   A.  Approximately ten years.

20   Q.  Have you been trained in the investigation of child

21   exploitation cases?

22   A.  I have.

23   Q.  What sorts of training have you received?

24   A.  Among other things, been trained in online and in-person

25   undercover trainings, forensic types of trainings.  Specific to

K3BKBRI5                         Spivack - Direct

1  the online undercover trainings, it includes a lot of training

2  specific to the sexual exploitation of children, the types of

3  platforms, the technology, things of that sort.

4  Q.  Is that all of your training or just a portion of it?

5  A.  It's just a portion of it.

6  Q.  Agent Spivack, are you familiar with the websites on which

7  the FBI conducts child exploitation undercover operations?

8  A.  I am.

9  Q.  How are you familiar with that?

10  A.  One, I've been, obviously, investigating these crimes for

11  approximately ten years; and, two, I'm an instructor for the

12  FBI in child exploitation undercover investigations.  So I've

13  become very familiar with these platforms just through my work

14  and interaction with others in the field.

15  Q.  When you say you're an instructor, who do you teach?

16  A.  I teach -- well, with specific to child exploitation

17  undercover investigations, I teach agents as well as our task

18  force officers and local law enforcement in different methods,

19  techniques, and procedures for investigating child exploitation

20  cases, specifically what we in the bureau, in the FBI, classify

21  as enticement related cases, where an undercover is assuming

22  the persona, adult or child persona, with the investigation

23  goal to identify individuals who may be interested in engaging

24  a minor in sex.

25  Q.  Have you ever conducted an online undercover operation?

1    A.  Many, sir.

2    Q.  How many have you conducted?

3    A.  Operations?  Oh, I've conducted thousands of undercover

4    chat sessions.  Operations?  It's hard to put a number on, but

5    it'd be dozens or hundreds.  I mean, I've had probably hundreds

6    of subjects that I've investigated, dozens of different

7    operations.

8    Q.  Have you ever conducted any undercover operations in

9    person?

10   A.  I have.

11   Q.  And how many of those have you conducted?

12   A.  Including -- so as an undercover, I work not just child

13   exploitation, I also do other variety of crime.  Specific to

14   child exploitation undercover meetings, I've done from probably

15   25, 50, maybe more.  It's hard to say.  It's a lot.

16   Q.  How does the FBI select websites on which to conduct

17   undercover online operations for child exploitation?

18   A.  Every site that we investigate in an undercover capacity

19   came to us from somebody, somewhere, somehow.  We learn of

20   various sites through a couple of different ways.  One is

21   through offenders.  Some offenders tell us when we're arresting

22   them.  During the execution of a search warrant or an arrest,

23   they will tell us about other sites that they have been on,

24   that they've been trading child pornography on, or trying to

25   meet children on.  Some are still through the offenders, but

1   them telling us as undercovers.  They don't know that we're law

2   enforcement, but they are telling us check out this site, go to

3   this site, things like that.

4          The other way we learn about it is through the -- it's

5   called the National Center for Missing & Exploited Children, or

6   NCMEC.  It's a repository for child pornography located down in

7   Maryland, the D.C. area.

8          Companies like Google and Facebook, or any of these

9   applications that are out there right now, if they're a U.S.

10  company, then, by law, if they identify child pornography or

11  child pornographic content on their sites, they must report

12  that to NCMEC.  NCMEC then, in turn, sort of evaluates it and

13  then sends it out to law enforcement.  So they are a number --

14  or, excuse me, they are another manner in which we identify

15  different sites to have OCEs active on.

16  Q.  What are some of the websites on which the FBI has

17  conducted online undercover operations for child exploitation?

18  A.  Just to name a few, I suppose -- the list is obviously

19  endless -- Kik, Telegram, WhatsApp, Instagram, Facebook,

20  Twitter, KinkD, LiveMe, Fet Life.  I mean, I could go on, of

21  course, but to name a few.

22  Q.  Are some of those platforms advertised towards minors?

23  A.  Yes.

24  Q.  Are some of those platforms advertised towards adults?

25  A.  Yes, sir.

K3BKBRI5                          Spivack - Direct

1    Q.  Are some of those platforms advertised towards both minors

2    and adults?

3    A.  Yes, sir.

4    Q.  Do they include adult dating websites?

5    A.  They do.

6    Q.  Do they include adult social networks?

7    A.  They do.

8    Q.  Do they include adult fetish networks?

9          MS. BAHARANYI:  Objection, your Honor; leading.

10          THE COURT:  Overruled.

11   BY MR. LI:

12   Q.  Do they include adult fetish networks?

13   A.  Yes, sir, they do.

14   Q.  Do they include kink?

15   A.  They do.

16   Q.  Let me turn your attention now to May 22nd, 2019.

17          Did you participate in an arrest on that day?

18   A.  I did.

19   Q.  Who did you arrest?

20   A.  Peter Bright.

21   Q.  Do you see that person who you arrested sitting here in the

22   courtroom today?

23          THE WITNESS:  May I stand, sir?

24          THE COURT:  You may.

25          THE WITNESS:  I do, sir.

K3BKBRI5                              Spivack - Direct

1    BY MR. LI:

2    Q.  Could you please identify that person by the location and

3    article of clothing?

4    A.  Yes, sir.  He's sitting at the defense table.  He's wearing

5    a gray suit jacket and glasses.

6            THE COURT:  All right.  Identification noted.

7    Q.  Where did the arrest occur?

8    A.  It occurred in the vicinity of Duane Park in Manhattan,

9    New York.

10   Q.  What was your role during the arrest?

11   A.  That day, I was the on-scene commander.

12   Q.  What does it mean to be the on-scene commander?

13   A.  It essentially means I was in charge of the operation for

14   the day for that particular operation.

15   Q.  How many other participants were on the arrest team?

16   A.  I believe, in total, there was probably between eight and

17   nine of us, give or take.

18   Q.  Was there a plan leading up to the arrest?

19   A.  There was.

20   Q.  What was the plan?

21   A.  The operations plan for that day, like all of these cases,

22   was a bit fluid.  We had sort of a general concept of what we

23   were planning to do, but it's all contingent upon timing and

24   sort of factors that we can't anticipate.

25           Generally speaking, we had an undercover agent,

K3BKBRI5                        Spivack - Direct

1    Jensen, who had been communicating with the defendant, and

2    there was a plan to have the defendant was going to travel to

3    our fictitious apartment, which is located -- we sort of

4    proffer that it's located just a block or two away from Duane

5    Park.  The plan was that she, Agent Jensen, in an undercover

6    capacity, was going to meet with the defendant in the park, and

7    then after a short conversation, we're going to walk to this

8    fictitious apartment, at which point we would effect the

9    arrest.

10   Q.  And where did you plan to arrest the defendant?

11   A.  So, Duane Park, just north of the park is sort of where it

12   starts, there's some buildings and apartment buildings, and our

13   plan was to effect the arrest just north of the park, sort of

14   where those apartment buildings are located.

15   Q.  And why that location?

16   A.  We picked Duane Park for a number of reasons.  In this

17   case, one, logistics, officer and community safety.  We like to

18   pick a place that we can control, and Duane Park gives us that

19   opportunity.  It's kind of -- it's a park, it's got a little

20   fence around it, and it's easy for us to have agents in and

21   around the park, God forbid, if anything were to go wrong, we

22   can respond quite rapidly.

23        Additionally, the park is picked because of the

24   location of the defendant.  We picked the park based on where

25   the defendant lives and/or works.  We never want to pick a park

1    that is immediately next to where the defendant may live or

2    work because part of picking the location of the meet is to

3    have an offender demonstrate their willingness to engage their

4    child in sexual conduct.  So having them travel out of their

5    way, outside of their normal course of path, is something that

6    is helpful in our investigations.

7    Q.  Where, relative to the park, did you plan to arrest the

8    defendant?

9    A.  Just on the other side of the street.

10   Q.  Why did you want to arrest him there, as opposed to

11   somewhere later?

12   A.  So, working these cases is quite difficult, unlike drug

13   buys or things like that, where you can have an exchange of

14   contraband, or perceived contraband.  In a case like this, we

15   do what we can -- our job working these cases is to determine

16   whether or not somebody is looking to actually engage a minor

17   in sex.  It happens, so we try and be proactive about it.  And

18   in a case like this, the reason why we execute the arrest where

19   we do is because we, as investigators, want to try and take the

20   case as far as we can possibly go without actually having real

21   children involved.

22          And, in this case, in order to determine whether

23   somebody would follow through with a particular plan -- I mean,

24   the only real way to do it would be to have an actual child

25   involved.  Since we obviously cannot, will not, would never

K3BKBRI5                        Spivack - Direct

1     even think of doing anything like that, the thing that is

2     closest to that line is essentially walking towards that

3     apartment, that last sort of step before we would have to

4     conceive of introducing a real child.

5               MR. LI:  Ms. Fetman, please pull up, for

6     identification only, Government Exhibit 8B.

7     Q.  Agent Spivack, do you recognize this document?

8     A.  I do.

9     Q.  What is it?

10    A.  This is a map of the park.

11    Q.  And is that the same park where the defendant met the

12    undercover agent?

13    A.  Yes, sir, it is.

14    Q.  Is this a fair and accurate representation of the area

15    around Duane Park?

16    A.  It is, sir.

17              MR. LI:  The government offers Government Exhibit 8B.

18              MS. BAHARANYI:  No objection, your Honor.

19              THE COURT:  Received.

20              (Government's Exhibit 8B received in evidence)

21              MR. LI:  Ms. Fetman, please publish.

22    BY MR. LI:

23    Q.  Agent Spivack, please describe where on this map the

24    meeting occurred.

25    A.  The meeting, as I recall, occurred sort of almost exactly

1   where on the map it says "Duane Park" in the middle of the

2   green colored area there.  It's, generally speaking, where the

3   meeting took place.

4   Q.  Where were you during the meeting?

5   A.  I was on -- there's a street, Hudson Street, you can sort

6   of see the name of it towards the bottom of the screen.  I was

7   across, with an eye view of Agent Jensen and the defendant on

8   Hudson Street, sort of on the -- I guess it's the east side of

9   the park.

10   Q.  Where were the other agents during the meet?

11   A.  So I had cars parked on either side, on all three sort of

12   main streets that surround the park, as well as agents on foot

13   who are actually in the park physically.

14   Q.  Where did the arrest occur?

15   A.  So, just north of Duane Park, sort of -- there's an H&H

16   building, consulting, icon sort of towards the top of the

17   screen.  Yep, right, in that area.  It occurred on the sidewalk

18   in that vicinity, so just sort of, you know, probably within

19   feet of where that arrow is.

20   Q.  Now, did you observe the meeting between the undercover

21   agent and the defendant?

22   A.  I did.

23   Q.  What did you see?

24   A.  I observed the two walking, I believe standing for some

25   period of time as well, and just engaging in conversation.

K3BKBRI5                          Spivack - Direct

1   Q.  Were you able to hear any of the conversation?

2   A.  I was able to hear some of it, yes, sir.

3   Q.  How were you able to hear it?

4   A.  We were using -- it's a live -- it's called a Kel, a live

5   recording device -- excuse me, a live transmitting device.  It

6   did not record, rather, transmitted live, so that those of us

7   on surveillance could overhear the conversation.

8   Q.  Now, is Duane Park a public park --

9   A.  It is.

10  Q.  -- or a private market?

11  A.  I'm sorry, sir.  It's a public park.

12  Q.  What time of the day did the meeting occur?

13  A.  I want to say it was around 2:00, 2:30ish, in the

14  afternoon.

15  Q.  Was it a nice day?

16  A.  It was.

17  Q.  Were the undercover agent and the defendant alone in the

18  park?

19  A.  No, they were not.

20  Q.  Who else was in the park?

21  A.  Well, aside from the agents that I had in the park -- there

22  were probably four, five of them, three or four of them --

23  there were also -- as there always is in the park when we do

24  these, there were non-FBI, there were civilians, in the park as

25  well.

K3BKBRI5                         Spivack - Direct

1    Q.   Now, after the conversation ended and the defendant was

2    arrested, did that arrest occur where you had planned for it to

3    occur?

4    A.   It did not.

5    Q.   Why not?

6    A.   So I initially wanted to effect the arrest sort of right as

7    they crossed the street.  However, around this time, there were

8    a bunch of school children and chaperones -- I don't know if

9    the school let out or there was something going on, but there

10   were a number of kids and adults with them that were sort of

11   right in that area.  So we sort of waited a little bit to allow

12   sort of the group of people to pass before I gave the signal

13   for the arrest.

14   Q.   Now, were you present when the defendant was arrested?

15   A.   I was.

16   Q.   Was the defendant searched during the arrest?

17   A.   He was.

18   Q.   Did you observe that search?

19   A.   I did.

20   Q.   Did he have anything on him?

21   A.   Yes, sir, he did.

22   Q.   What did he have?

23   A.   As I recall, he had a wallet, keys.  He had, I believe, two

24   cell phones, some identification, job-related identification.

25   He had four condoms.  And then he had what we call pocket

K3BKBRI5                          Spivack - Direct

1   litter, so just miscellaneous items in his pocket.

2   Q.  Now, you mentioned condoms.  Where were the condoms

3   located?

4   A.  There were two condoms that were located in his wallet and

5   two condoms that were located in his pocket.

6   Q.  Agent Spivack, in your binder should be something marked

7   for identification as Government Exhibit 10.  Do you see that?

8         It should be in the front of your binder.  Or the back

9   of your binder.

10  A.  I do see it, yes, sir.

11        MR. LI:  Just one second, please?

12        (Counsel confer)

13  Q.  Agent Spivack, do you recognize Government Exhibit 10?

14  A.  I do.

15  Q.  What is it?

16  A.  These are the condoms that were taken off Mr. Bright when

17  he was arrested.

18  Q.  How do you know that?

19  A.  I recognize the seals, the packaging that it's in, it's in

20  our evidence bag.

21        MR. LI:  The government offers Government Exhibit 10.

22        MS. BAHARANYI:  No objection, your Honor.

23        THE COURT:  Received.

24        (Government's Exhibit 10 received in evidence)

25

K3BKBRI5                          Spivack - Direct

1    BY MR. LI:

2    Q.  Agent Spivack, could you please hold up Government

3    Exhibit 10, so that the jury can see it?

4    A.  Sure.

5    Q.  Just the side with the condoms.  Thank you.

6            THE COURT:  Let me see it.

7            THE WITNESS:  Sure.

8            THE COURT:  Thank you.

9    BY MR. LI:

10   Q.  Could you describe the four condoms in that bag?

11   A.  Yes, sir.  All four are Trojan brand condoms.  Two of them

12   are in blue packaging, and they appear to have been, I guess,

13   in a wallet.  They're kind of smashed.

14           MS. BAHARANYI:  Objection, your Honor.

15           THE COURT:  Leave out the -- unless you know where

16   they were located, leave out the characterization.  You can

17   describe them as they appeared smashed, but if you don't know

18   if they were in the wallet, you can't testify to it.

19           THE WITNESS:  Sure.

20           Two, the blue condoms, appear worn out packagingwise.

21   The other two condoms are in a gold package, and they're Trojan

22   Magnums.

23   BY MR. LI:

24   Q.  Do you know which of those condoms were in the defendant's

25   wallet?

1    A.  I believe I do, yes, sir.

2    Q.  Do you or do you not?

3    A.  I do, sir.  Based off of my involvement with other agents

4    and law enforcement, I know.

5    Q.  Which of the condoms were found in the defendant's wallet?

6            MS. BAHARANYI:  Objection, your Honor.  I believe this

7    will be based off of hearsay, your Honor.

8            THE COURT:  I'm going to sustain the objection.

9            Go ahead.

10   BY MR. LI:

11   Q.  Just to clarify, do you have any independent knowledge,

12   outside of what anybody else has told you, of where the condoms

13   were located?

14   A.  I might have put in that in the 302.  I'm not a hundred

15   percent sure if I put in the 302 exactly which condoms came

16   from where.  I did not, as I sit here today, recall personally

17   seeing which condoms came from which pocket personally, but I

18   don't recall if I put that in the 302 or not.

19           MR. LI:  Give me just one second here.

20           (Pause)

21   Q.  Agent Spivack, you were present during the arrest, right,

22   you just testified?

23   A.  I was.

24   Q.  Did you observe the search?

25   A.  I did.

K3BKBRI5                          Spivack - Direct

1    Q.  Did you observe the recovery of the condoms?

2    A.  I did, yes, sir.

3    Q.  And during that recovery of the condoms, setting aside what

4    you currently remember, but at the time that you recovered the

5    condoms, did you know where the condoms were located?

6    A.  I did.

7    Q.  Is there anything that would help you remember where the

8    condoms were located?

9    A.  Perhaps, again, my 302 would, I think, be helpful.

10   Q.  Sure.

11          Why don't you take a look in your binder at what's

12   marked for identification as 3504-09.  And you can take a look

13   specifically at the second page.  Just read it to yourself and

14   let me know when you're done.

15   A.  Oh, yes, sir.  I'm sorry.

16          THE COURT:  Whoa, whoa, let him know when you're done.

17          THE WITNESS:  Yes, sir.  I'm sorry, I said, I'm sorry,

18   I'm done.

19          THE COURT:  All right.  Thank you.

20   BY MR. LI:

21   Q.  Okay.  You can close your binder, if you don't mind.

22          MR. LI:  Ms. Fetman, please pull it down.

23   Q.  Do you now remember where the condoms were located?

24   A.  I do.

25   Q.  Sitting here today, now that your memory has been

1    refreshed, where were the blue condoms located?

2    A.  The blue condoms were located in the defendant's wallet.

3    Q.  And where were the gold condoms located?

4    A.  In his pocket.

5    Q.  Did the gold condoms have any labeling on them?

6    A.  They do, sir.

7    Q.  What does the label say?

8    A.  May I look at the --

9    Q.  Yes, you can look at it.

10   A.  They say --

11            THE COURT:  This is -- you're looking at the condoms?

12            THE WITNESS:  Yes, sir.

13            THE COURT:  Okay.  Go ahead.

14            THE WITNESS:  They say "Trojan Magnum" on them, sir.

15   BY MR. LI:

16   Q.  And just looking at their appearance, do they appear to be

17   worn out like the blue ones?

18   A.  No, they do not.

19   Q.  Agent Spivack, you testified earlier that you also

20   recovered two phones from the defendant's person.  Do you

21   recall that?

22   A.  I do.

23   Q.  Was one of the two phones recording audio at the time of

24   the defendant's arrest?

25   A.  It was.

K3BKBRI5                           Spivack - Direct

1    Q.  Can you describe the phone that was recording audio?

2    A.  It was a Huawei cell phone.

3    Q.  What is Huawei?

4    A.  Huawei is a Chinese-manufactured cell phone with an android

5    operating system.

6    Q.  How do you know that phone was recording audio?

7    A.  The defendant told me.

8    Q.  Did you personally observe it recording audio?

9    A.  I did.

10   Q.  Did you terminate the audio recording?

11   A.  I did.

12   Q.  When did you do that?

13   A.  I did that once we got back to our office.

14   Q.  Have you listened to the audio recording?

15   A.  I have.

16   Q.  Can you describe, just in very general terms, what the

17   audio recording is?

18   A.  The audio recording consists of the defendant speaking

19   prior to the arrival of Special Agent Jensen, and then it does

20   pick up the conversation the defendant had with Agent Jensen.

21          MR. LI:  With the Court's permission, I'll now read a

22   portion of Government Exhibit 102, which is a stipulation

23   between the parties.  I won't read all of it because it's very

24   lengthy, but I'll read additional portions as they become

25   relevant.

K3BKBRI5                        Spivack - Direct

1          "It is hereby stipulated and agreed by and between the

2     United States of America, by Geoffrey S. Berman, United States

3     Attorney for the Southern District of New York, Alexander Li

4     and Timothy Howard, Assistant United States Attorneys, of

5     counsel, and Peter Bright, by and through his counsel, Amy

6     Gallicchio, Esq., and Zawadi Baharanyi, Esq., as follows:

7          "(1) Government Exhibit 6 is a compact disk containing

8     clips of an audio recording.  The audio recording was retrieved

9     from the Huawei cell phone with the international mobile

10    equipment identifier 868160030003506, which was seized from

11    Peter Bright at the time of his arrest on May 22nd, 2019.  The

12    audio recording was created using the same cell phone on

13    May 22nd, 2019.  The full duration of the audio recording is

14    one hour, 34 minutes, 29 seconds."

15         I'm going to skip paragraphs 2 through 8 and just go

16    to the end where it reads:  "It is further stipulated and

17    agreed that this stipulation, Government Exhibit 102, is

18    admissible as a government exhibit at trial."

19         At this time, the government offers Government

20    Exhibit 102, Government Exhibit 6, and Government Exhibit 6A

21    through 6G, which are the clips contained on Government

22    Exhibit 6.

23         MS. BAHARANYI:  No objection, your Honor.

24         THE COURT:  Received.

25         (Government's Exhibits 102, 6, and 6A through 6G

1   received in evidence)

2   BY MR. LI:

3   Q.  Agent Spivack, do you see a disk labeled Government

4   Exhibit 6 in your binder?

5   A.  I do.

6   Q.  Have you reviewed the clips on Government Exhibit 6 in

7   advance of your testimony today?

8   A.  I have.

9   Q.  How do you know that?

10  A.  This DVD has my initials on it.

11          MR. LI:  With the Court's permission, I'll now read

12  the number portion of Government Exhibit 102, which is now in

13  evidence.

14          I'm reading now at paragraph 2, which reads:

15  "Government Exhibit 6A is a clip of the audio recording from

16  its beginning through the time marker 1 hour, 3 minutes, 27

17  seconds."

18          Ms. Fetman, could we please pull up, for

19  identification only, Government Exhibit 6T.

20  BY MR. LI:

21  Q.  Agent Spivack, do you recognize this?

22  A.  I do, sir.

23  Q.  What is it?

24  A.  It's a transcript of the recordings contained on this DVD.

25  Q.  Have you reviewed this in advance of your testimony today?

K3BKBRI5                           Spivack - Direct

1   A.  I have, sir.

2   Q.  Is it a fair and accurate transcription of the clips on

3   Government Exhibit 6?

4   A.  It is.

5         MR. LI:  The government offers Government Exhibit 6T

6   as an aid for the jury.

7         MS. BAHARANYI:  No objection, your Honor.

8         THE COURT:  Received.

9         (Government's Exhibit 6T received in evidence)

10         MR. LI:  I'm now going to read another portion of

11   Government Exhibit 102, a stipulation in evidence.  So this is

12   paragraph 3, which reads:  "Government Exhibit 6B is a clip of

13   the audio recording from the time marker 21 minutes, 12

14   seconds, through the time marker 21 minutes, 59 seconds."

15         Ms. Fetman, please go ahead and publish Government

16   Exhibit 6T, the transcript, to the jury, and please play

17   Government Exhibit 6B.

18         THE COURT:  No.  We're going to take our midafternoon

19   recess, ladies and gentlemen.  Please do not discuss the case

20   amongst yourself with anyone.  Keep an open mind.  We'll be

21   back in action in ten minutes.  Thank you.

22         (Recess)

23         (Jury not present)

24         THE COURT:  We're in recess.

25         MR. LI:  Your Honor, may the parties be heard, just

1    very briefly, on an issue?

2              THE COURT:  Sure.

3              MS. BAHARANYI:  Your Honor, we are going to be calling

4    Dr. James Cantor again, as your Honor is aware.  I know that

5    the government expects to ask him again about his payment on

6    the case.  We certainly don't want to imply, or have the jury

7    know in any way, that there was a previous trial, so we have

8    come, I think, up with a solution we'd like to propose to the

9    Court, that when they ask that question, he can give his

10   payment regarding just his work on this second trial and not

11   with respects to, like, prior work from the prior trial.

12             THE COURT:  Well, what about work preparing for the

13   trial?

14             MS. BAHARANYI:  Sorry, right, including the

15   preparation, but not the time that he took to travel, for

16   example, for the first travel, the time to testify on the first

17   trial.  We want to excise that from his calculation of how

18   much --

19             THE COURT:  And you've discussed this with the

20   government?

21             MS. BAHARANYI:  We have, yes.

22             THE COURT:  And there's an agreement on this?

23             MR. LI:  That's correct, your Honor.

24             THE COURT:  Okay.  That's fine.

25             MR. MAIMIN:  The only reason that we wanted to raise

K3BKBRI5                              Spivack – Direct

1    it, your Honor, is technically because we don't want to prepare

2    a question and then explain to him we wanted your blessing on

3    what's effectively a slightly off answer.

4              THE COURT:  So blessed.

5              MR. MAIMIN:  Thank you.

6              (Recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  All right.  Please be seated.

3          Whenever you're ready, Mr. Li.

4          MR. LI:  All right.  Ms. Fetman, please go ahead and

5    publish Government Exhibit 16 for the jury, and please play

6    Government Exhibit 6B.

7          (Audio recording played)

8    BY MR. LI:

9    Q.  Mr. Spivack, who's voice do we hear in this recording?

10   A.  Peter Bright.

11   Q.  How do you know that?

12   A.  I've heard him speak.

13         MR. LI:  At this point, I'll read another portion of

14   Government Exhibit 102 stipulation into evidence.  I'm reading

15   now from paragraph four, which reads:

16         "Government Exhibit 6C is a clip of the audio

17   recording from the time marker 23 minutes, five seconds,

18   through the time marker 23 minutes, 14 seconds."

19         Ms. Fetman, please play Government Exhibit 6C.

20         (Audio recording played)

21         MR. LI:  Now, reading another portion of Government

22   Exhibit 102 stipulation in evidence.  Reading now from

23   paragraph five, which states:

24         "Government Exhibit 6D is a clip of the audio

25   recording from the time marker 24 minutes, 33 seconds, through

K3BLBRI6                          Spivack - Direct

1   the time marker, 24 minutes, 42 seconds.

2            Ms. Fetman please play Government Exhibit 6D.

3            (Audio recording played)

4            MR. LI:  I'll now read another portion of Government

5   Exhibit 102 stipulation in evidence.  Paragraph 6 reads:

6            "Government Exhibit 6E is a clip of the audio

7   recording from the time marker 29 minutes, 40 seconds, through

8   the time marker, 30 minutes, four seconds."

9            Ms. Fetman, please play Government Exhibit 6E

10           (Audio recording played)

11           MR. LI:  I'll now read another portion of Government

12  Exhibit 102.  Paragraph seven reads:

13           "Government Exhibit 6F is a clip of the audio

14  recording from the time marker 50 minutes, 40 seconds through

15  the time marker 51 minutes, 38 seconds."

16           Ms. Fetman, please play Government Exhibit 6F.

17           (Audio recording played)

18  BY MR. LI:

19  Q.  All right.  Agent Spivak, are the statements we just heard

20  the only statements the defendant recorded during the first 50

21  or so minutes of the audio recording?

22  A.  No, sir.

23  Q.  Are the other statements the defendant recorded during the

24  first 50 minutes similar to the clips we just heard?

25  A.  They are.  Yes, sir.

K3BLBRI6                        Spivack - Direct

1           MR. LI:  I'll now read another portion of Government

2    Exhibit 102 stipulation in evidence.  Paragraph 8 reads:

3           "Government Exhibit 6G is a clip of the audio

4    recording from the time marker 52 minutes, 21 seconds through

5    the time marker one hour, three minutes, 27 seconds."

6           Ms. Fetman, please play Government Exhibit 6G.

7           (Audio recording played)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. LI:

2    Q.  Agent Spivack, is the clip we just heard the meeting

3    between the defendant and the undercover agent?

4    A.  Yes, sir, it was.

5    Q.  At that time, when the defendant was arrested, was the

6    undercover agent also placed in handcuffs?

7    A.  Yes, she was.

8    Q.  Was she placed in handcuffs in front of the defendant?

9    A.  Yes, she was.

10   Q.  Why did the FBI do that?

11   A.  We placed the undercover in custody to demonstrate the

12   reality of what is taking place, so that individuals we arrest

13   are under the belief, during questioning, that the person that

14   they were encountering was not, in fact, a law enforcement

15   officer, in fact, a real person.  It generally gets the most

16   genuine type of conversation or statement from them.

17          MR. LI:  Ms. Fetman, we can take down what's on the

18   screen.  Thank you.

19   Q.  Agent Spivack, after you arrested the defendant, did you

20   ask him to give an interview?

21   A.  I did.

22   Q.  Did you read him his Miranda rights?

23   A.  I did.

24   Q.  Did he agree to speak with you?

25   A.  He did.

1   Q.  Did anyone else participate in the interview with you?

2   A.  Yes, sir.

3   Q.  Was the interview recorded on video?

4   A.  It was.

5   Q.  Agent Spivack, do you see a disk in your binder that's been

6   marked for identification as Government Exhibit 9?

7   A.  I do.

8   Q.  Do you recognize that disk?

9   A.  I do, sir.

10   Q.  What is it?

11   A.  This is a disk containing the interview clips, postarrest

12   interview.

13   Q.  How do you know that?

14   A.  My initials are on it as well, something I have reviewed.

15   Q.  Based on your review, are the clips on this disk fair and

16   accurate excerpts of your recorded interview with the

17   defendant?

18   A.  They are, yes, sir.

19          MR. LI:  The government offers Government Exhibit 9

20   and the clips that are on it, which are labeled clips 1 through

21   9, 10A and 10B, and 13.

22          MS. BAHARANYI:  No objection, your Honor.

23          THE COURT:  Received.

24          (Government's Exhibit 9 received in evidence)

25          MR. LI:  Ms. Fetman, could you please pull up, for

K3BKBRI7                        Spivack - Direct

1    identification only, Government Exhibit 9T.

2    BY MR. LI:

3    Q.   Agent Spivack, do you recognize this?

4    A.   I do.

5    Q.   What is this?

6    A.   This is a transcript of the recorded postarrest interview,

7    which is on this DVD.

8    Q.   Have you reviewed that transcript in advance of your

9    testimony here today?

10   A.   Yes, sir, I have.

11   Q.   Is this a fair and accurate transcription of the clips on

12   Government Exhibit 9?

13   A.   It is.

14          MR. LI:   The government offers Government Exhibit 9T,

15   as an aid for the jury.

16          THE COURT:   Any objection?

17          MS. BAHARANYI:   No objection, your Honor.

18          THE COURT:   Received.

19          (Government's Exhibit 9T received in evidence)

20   BY MR. LI:

21   Q.   Agent Spivack, was one of the topics of your interview the

22   chats between the defendant and the undercover agent?

23   A.   Yes, sir.

24          MR. LI:   Ms. Fetman, please publish Government

25   Exhibit 9T for the jury and please play clip 1 on Government

1    Exhibit 9.

2              (Video playback)

3              MR. LI:  Ms. Fetman, please play clip 2.

4              (Video playback)

5              MR. LI:  Ms. Fetman, please play clip 4.

6              (Video playback)

7              MR. LI:  Ms. Fetman, please play clip 5.

8              (Video playback)

9              MR. LI:  Ms. Fetman, please play clip 3.

10             (Video playback)

11             MR. LI:  Ms. Fetman, please play clip 13.

12             (Video playback)

13   BY MR. LI:

14   Q.  Agent Spivack, during your interview, did the defendant

15   tell you he had ever previously recorded evidence of crimes

16   against children to law enforcement?

17             MS. BAHARANYI:  Objection, your Honor.

18             THE COURT:  Basis?

19             MS. BAHARANYI:  Relevance.

20             THE COURT:  I'll allow it.

21             THE WITNESS:  No, sir, he did not.

22   BY MR. LI:

23   Q.  What day of the week did the arrest occur?

24   A.  I believe it was a Wednesday, sir.

25             MR. LI:  Ms. Fetman, please play clip 6.

1            (Video playback)

2            MR. LI:  Ms. Fetman, please play clip 7.

3            (Video playback)

4            MR. LI:  Ms. Fetman, please play clip 8.

5            (Video playback)

6            MR. LI:  Ms. Fetman, please play clip 9.

7            (Video playback)

8            MR. LI:  Ms. Fetman, please play clip 10A and then 10B

9    in sequence.  The transcript will show the transition between

10   the two clips.

11           (Video playback)

12           MR. LI:  All right, Ms. Fetman.  We can take that

13   down.

14   BY MR. LI:

15   Q.  Agent Spivack, during your interview with the defendant,

16   did he tell you his occupation?

17   A.  Yes, sir, he did.

18   Q.  What did he tell you his occupation was?

19   A.  That he was a journalist.

20   Q.  Did the defendant say he was on assignment when he engaged

21   in the chats?

22   A.  He did not.

23   Q.  Did he say he was on assignment when he met the undercover

24   agent?

25   A.  No, he did not.

1  Q.  Did he say he was writing an article?

2  A.  No, he did not.

3  Q.  Now, during your interview of the defendant, did he tell

4  you his Google email address?

5  A.  He did, sir.

6  Q.  What was it?

7  A.  It was drpizza@gmail.com.

8           MR. LI:  With the Court's permission, I'll now read

9  Government Exhibit 100, which is a stipulation between the

10 parties.

11          "It is hereby stipulated and agreed, by and between

12 the United States of America, by Geoffrey S. Berman, United

13 States Attorney for the Southern District of New York,

14 Alexander Li and Timothy Howard, Assistant United States

15 Attorneys, of counsel, and Peter Bright, by and through his

16 counsel, Amy Gallicchio, Esq., and Zawadi Baharanyi, Esq., as

17 follows:

18          "(1) Government Exhibits 40, 41, and 42 are copies of

19 chat logs obtained in the account drpizza@gmail.com as of

20 August 14, 2019.  All of the chat logs were maintained on

21 computer servers controlled by Google LLC and were produced to

22 the government pursuant to a court order served on Google LLC

23 on or about July 26, 2019.

24          "(2) portions of Government Exhibits 40, 41, and 42

25 have been redacted.  Other than these redactions, Government

1     Exhibits 40, 41 and 42 are true and accurate copies of the chat

2     logs described above.

3             "It is further stipulated and agreed that this

4     stipulation, Government Exhibit 100, is admissible as a

5     government exhibit at trial."

6             At this time, the government offers Government

7     Exhibit 100 and the highlighted portions of Government Exhibits

8     40 through 42.  The defendant has requested that we include

9     additional portions of the chats, and the government does not

10    object to that request.  Government Exhibits 40 through 42,

11    therefore, include the additional portions of the chats

12    requested by the defense.

13            MS. BAHARANYI:  No objection, your Honor.

14            THE COURT:  All right.  Received.

15            (Government's Exhibits 100, 40, 41, and 42 received in

16    evidence)

17            THE COURT:  You may publish.

18            MR. LI:  Ms. Fetman, please publish Government

19    Exhibit 40 for the jury.

20    BY MR. LI:

21    Q.  Agent Spivack, who are the participants in this chat?

22    A.  This chat is the user, drpizza@gmail and an individual by

23    the name Anthony.  The remaining portion of his name is

24    redacted.

25    Q.  How do you know that?

1    A.   These are excerpts of the chats just referenced, and the

2    names of the individuals are present in the chat log.

3    Q.   When is this chat dated?

4    A.   This chat is dated February 10, 2012.

5    Q.   Let me direct your attention to the second page.  Do you

6    see a highlighted portion?

7    A.   I do.

8    Q.   Do you see the word "me," M-e?

9    A.   Yes.

10   Q.   Who does that refer to?

11   A.   It refers to the Dr. Pizza account.

12   Q.   All right.  Let's read the highlighted portion.  I'll read

13   the lines for me, M-e, and you can read the lines for Anthony,

14   and then the rest is redacted in the name.

15            So beginning with the first line:

16            "Someone who friended me on Facebook (I have no idea)

17   posted a picture of his daughter, I'm guessing she's like 13 or

18   something.  It's all I can do to not post 'I'd hit it.'"

19   A.   "Ha-ha ha-ha ha-ha."

20   Q.   At this point, there's a URL that's partially redacted.

21   A.   "LOL.  You are a sick, sick man."

22   Q.   "She looks ripe enough."

23   A.   "LOL."

24   Q.   "I mean, I'm not saying it'd be legal, except in the

25   Vatican (age of consent:  12), but, like, I'd better wear a

1    condom.  We don't need more teenage mothers."

2              MR. LI:  Ms. Fetman, please publish Government

3    Exhibit 41 for the jury.

4    BY MR. LI:

5    Q.  Agent Spivack, who are the participants in this chat?

6    A.  This is the Dr. Pizza account, as well as the user the, and

7    then it is redacted.

8    Q.  What's the date of this chat message?

9    A.  July 29, 2011.

10   Q.  Let me direct your attention to the second page.  Do you

11   see a highlighted portion?

12   A.  I do, yes, sir.

13   Q.  Who does the word "me," M-e, refer to?

14   A.  The Dr. Pizza account.

15   Q.  Let's read these chat messages again.  I'll read the lines

16   for me, and you can read the lines for the dot W, and the

17   remainder is redacted.

18              "Next you'll be banning RB, Rebecca Black."

19   A.  "You are not allowed to do her either.  She is 13."

20   Q.  "Ah, yeah, good point.  Too old.  LOL."

21              MR. LI:  We can stop there.

22              Ms. Fetman, please publish Government Exhibit 42 for

23   the jury.

24   Q.  Agent Spivack, who are the participants in this chat?

25   A.  This is, again, the Dr. Pizza account, with the user BR,

K3BKBRI7                         Spivack - Direct

 1   and it's redacted.

 2   Q.  And what's the date of this chat exchange?

 3   A.  September 27, 2010.

 4   Q.  Do you see the highlighted portion on the page?

 5   A.  I do.

 6   Q.  Who does the word "me," M-e, refer to?

 7   A.  The Dr. Pizza account.

 8   Q.  Let's read these chat messages again.  I'll read the lines

 9   for me, M-e, and you can read the lines for BR, and the

10   remainder is redacted.

11            "There's no such thing as too young."

12   A.  "There is when the deli checkout guy looks like he's maybe

13   15."  Tongue out emoji.

14   Q.  "I would bone a 15-year-old girl in an instant."  Another

15   emoji.

16   A.  "Ha-ha ha-ha.  I know you would.  I'm not like that,

17   sadly."  Smiley face emoji.

18   Q.  "Your loss."

19            We can stop there.

20            THE COURT:  Ladies and gentlemen of the jury, I want

21   to give you a special instruction with regard to these chat

22   logs.

23            This is not evidence of the crime charged.  It's

24   evidence that has been received into the trial record, received

25   into evidence, on the limited issue of whether or not it bears

1  on the defendant's intent and state of mind at the time of the

2  charged offenses.

3          So, you may not convict the defendant because you

4  don't like the content of these chat messages.  These are not

5  crimes charged in this case, and they may not be crimes at all.

6  In fact, they're not crimes at all.  The chat messages may bear

7  on intent, and only on that.

8          The same is also true with the portions of the

9  interview of the defendant regarding communications with the

10 14-year-old girl or alleged communications with the 14-year-old

11 girl.  They may only be considered on the issue of the

12 defendant's intent at the time of the charged conduct.

13         The other communication with regard to the

14 17-year-old, the government contends, relates to a different

15 issue, of intent, which they are free to argue in summation,

16 but these can only be considered on that issue.  They are not

17 evidence of a bad character or a propensity to commit crimes;

18 they only bear on the limited question of the defendant's

19 intent at the time of the crime charged here, and may not be

20 used for any other purpose.

21         The other important thing to tell you is the weight,

22 if any, that you give to this evidence is entirely up to you,

23 the jury.

24         So you're not required to consider this as evidence of

25 intent.  You may or may not find that it bears on that issue.

K3BKBRI7                          Spivack - Direct

1              You may proceed.

2              MR. LI:  Ms. Fetman, please put up Government

3    Exhibit 11 for identification only.

4    BY MR. LI:

5    Q.  Agent Spivack, do you recognize this exhibit?

6    A.  I do.

7    Q.  What is this?

8    A.  This is a photograph of the defendant's Huawei cell phone

9    with the Twitter settings opened up.

10   Q.  How do you know that?

11   A.  I know that because I've seen it, and I've seen the Twitter

12   settings profile.

13   Q.  Does this picture fairly and accurately depict what you saw

14   on the phone?

15   A.  Yes, sir, it does.

16             MR. LI:  The government offers Government Exhibit 11.

17             MS. BAHARANYI:  No objection, your Honor.

18             THE COURT:  Received.

19             (Government's Exhibit 11 received in evidence)

20             MR. LI:  Ms. Fetman, please publish.

21   BY MR. LI:

22   Q.  Agent Spivack, what are we seeing on the screen?

23   A.  You're looking at the settings portion of the Twitter

24   application on the phone.  And it's showing you the user name

25   and handle at the top of the screen, along with the number of

K3BKBRI7                        Spivack – Cross

1   followers and those the user is following.

2   Q.  And what is the Twitter handle?

3   A.  It is @drpizza.

4   Q.  And just for the jury's clarification, what is a handle?

5   A.  User name and identifier that represents the particular

6   account.

7            MR. LI:  No further questions at this time.

8            THE COURT:  All right.

9            You may cross-examine.

10           MS. BAHARANYI:  Thank you, your Honor.

11  CROSS-EXAMINATION

12  BY MS. BAHARANYI:

13  Q.  Good afternoon, Agent Spivack.

14  A.  Good afternoon, ma'am.

15  Q.  Let's talk about your arrest of Mr. Bright.

16           You and other agents approached Mr. Bright in the --

17  in Duane Park, right?

18  A.  That is correct.

19  Q.  You announced to him that you were FBI, right?

20  A.  Police or FBI, yes, ma'am.

21  Q.  Law enforcement of some type?

22  A.  Correct.

23  Q.  Then when you approached, he didn't try to run from you,

24  right?

25  A.  That is correct.

1    Q.  He didn't resist you in any way, right?

2    A.  No, ma'am.

3    Q.  He was completely compliant with you, right?

4    A.  Yes, he was.

5    Q.  And when you arrested him, or as you approached him, he

6    told you he wasn't there to have sex with kids, right?

7    A.  I don't remember exactly what he said, but he indicated

8    that much.

9    Q.  In fact, he told you that he was recording the meeting he

10   just had with the person who turned out to be an undercover,

11   right?

12   A.  That is correct.

13   Q.  And he was doing this recording on his cell phone, right?

14   A.  Yes, ma'am.

15   Q.  And he gave you this recording, right?

16   A.  He did.

17   Q.  And this is the only recording that you actually have of

18   the meeting between Mr. Bright and this undercover, right?

19   A.  That is correct.

20   Q.  You testified on direct that there was a Kel recorder in

21   use during this operation, right?

22   A.  Yes, ma'am.

23   Q.  But that wasn't set to record the conversation, right?

24   A.  That is correct.

25   Q.  Now, during the arrest, Mr. Bright was wearing pants,

K3BKBRI7                            Spivack - Cross

1    right?

2    A.  Yes, ma'am.

3    Q.  He was wearing specifically cargo shorts, right?

4    A.  I believe so.  I know they were cargo type -- I don't know

5    if it was a pant or shorts, but something with cargo pockets.

6    Q.  So some sort of pants with cargo pockets, right?

7    A.  Yes, ma'am.

8    Q.  And you were able to observe the search of Mr. Bright,

9    right?

10   A.  Correct.

11   Q.  Now, during this search, you mentioned that pocket litter

12   was recovered; is that right?

13   A.  Correct.

14   Q.  And this pocket litter just means miscellaneous items,

15   right?

16   A.  Yes, ma'am.

17   Q.  And one of these miscellaneous items was a boarding pass,

18   right?

19   A.  I do recall that, yes, ma'am.

20   Q.  And this is a boarding pass for a flight from Seattle to

21   New York on May 9th; is that right?

22   A.  I don't recall the details of it, but I do recall there was

23   an older boarding pass.

24   Q.  Would seeing a photograph of the boarding pass help refresh

25   your recollection?

K3BKBRI7                        Spivack - Cross

1  A.  Yes, ma'am.

2          MS. BAHARANYI:  Ms. Rayes, could you please show Agent

3  Spivack Defense Exhibit K.  Just to the witness.  Will you

4  please zoom in on the boarding pass.

5  BY MS. BAHARANYI:

6  Q.  Agent Spivack, will you let me know when you have had a

7  chance to review this?

8  A.  Yes, ma'am.  I just want to make sure.

9          There it is, yes, ma'am.

10 Q.  Agent Spivack, is your recollection now refreshed with

11 respect to the date of the boarding pass?

12 A.  Yes, ma'am.

13 Q.  And was it, in fact, a board pass for a flight on May 9th?

14 A.  Yes, it was.

15 Q.  And there was also -- among this pocket litter, there was

16 also a receipt for a movie theater concession stand, right?

17 A.  There was a receipt.  Again, I don't recall the specifics

18 but there was certainly a receipt.

19 Q.  Would seeing a photograph of the receipt help refresh your

20 recollection?

21 A.  Yes, it would.

22          I'll try to remember everything on this photograph

23 this time.

24          MS. BAHARANYI:  Ms. Rayes, will you please show Agent

25 Spivack the photograph of the receipt.

K3BKBRI7                          Spivack - Cross

1    Q.  And, Agent Spivack, will you let me know when you have had

2    a moment to review the photograph?

3    A.  Yeah, okay, yes, ma'am.

4            (Pause)

5    Q.  Agent Spivack, is your recollection now refreshed about the

6    date from this concession stand receipt?

7    A.  Yes, ma'am.

8    Q.  And it is, in fact, a receipt from May 19?

9    A.  It is.

10   Q.  And you don't know when the items in his pockets were

11   placed in his pockets, right?

12   A.  I do not.

13   Q.  But we know he has items in his pockets from days before

14   May 22nd, right?

15   A.  That is correct.

16   Q.  The day of his arrest, right?

17   A.  That is correct.

18   Q.  And you didn't bring any of these pocket litter or

19   miscellaneous items to the -- you didn't give these to the

20   government, right?

21   A.  No, ma'am.

22   Q.  You didn't bring them with you to court today; is that

23   right?

24   A.  That is correct.

25   Q.  But these are all items found on Mr. Bright during his

1     arrest, right?

2     A.   That is correct.

3     Q.   Now, after Mr. Bright's arrest, you took him to the FBI

4     field office; is that right?

5     A.   Yes, ma'am.

6     Q.   You interviewed him there, right?

7     A.   Yes, ma'am.

8     Q.   And during that interview, you discussed his devices,

9     right?

10    A.   Yes, ma'am.

11    Q.   And Mr. Bright gave you permission to search his electronic

12    devices, right?

13    A.   That is correct.

14    Q.   He gave you permission to search his computer, correct?

15    A.   Yes, he did.

16    Q.   His computer was at his home, right?

17    A.   Correct.

18    Q.   So he gave you permission to go inside of his home to

19    retrieve the computer and search it, right?

20    A.   Gave us permission to search the computer.  The issue of

21    going inside of his home we still had to negotiate with his

22    wife.

23    Q.   But you were able to go inside of his home, right?  You

24    were in fact able to go inside --

25    A.   Yes, ma'am, I was.

K3BKBRI7                              Spivack - Cross

1   Q.  And you were able to retrieve his computer, right?

2   A.  Yes, ma'am.

3   Q.  And you were also given permission to search his phone,

4   right?

5   A.  Correct.

6   Q.  And he gave you permission, as well, to search his Google

7   account, right?

8   A.  That is correct.

9   Q.  In fact, he gave you written permission to access his

10  Google account; is that right?

11  A.  That is correct.

12  Q.  And this written permission allows you to assume his

13  identity on Google, right?

14  A.  It allows us to search the account.

15  Q.  And it allows you to see everything within his account; is

16  that right?

17  A.  Correct.

18  Q.  So you were able to search his emails, right?

19  A.  Yes, ma'am.

20  Q.  Emails that he received, right?

21  A.  Yes, ma'am.

22  Q.  Emails that he sent out, right?

23  A.  Yes, ma'am.

24  Q.  You were able to search his search history, right?

25  A.  Yes, ma'am.

K3BKBRI7                          Spivack - Cross

1   Q.  His browser history?

2   A.  Yes, ma'am.

3   Q.  Any Google chats, right?

4   A.  Yes, ma'am.

5   Q.  And you were able to see photos on his Google drive, right?

6   A.  That's correct.

7   Q.  As well as any videos there?

8   A.  Whatever was posted, yes, ma'am.

9   Q.  So, whatever videos and photos were in the Google account,

10  you had entire access to them; is that right?

11  A.  Based on the consent, that is correct.

12  Q.  And you didn't need Mr. Bright's physical phone to be able

13  to access his Google account, right?

14  A.  No, ma'am.

15  Q.  And you didn't need his physical computer to be able to

16  access his Google account, right?

17  A.  We did not, no, ma'am.

18  Q.  So he gave you permission to search his Google account, and

19  you did, in fact, search it, right?

20  A.  I don't know that I personally did, ma'am, but the Bureau,

21  the FBI, did, yes, ma'am.

22  Q.  The FBI did search it?

23          MS. BAHARANYI:  One moment, your Honor?

24          (Pause)

25          MS. BAHARANYI:  No further questions for this witness.

K3BKBRI7                        Spivack - Redirect

1          THE COURT:  All right.  Redirect?

2   REDIRECT EXAMINATION

3   BY MR. LI:

4   Q.  Agent Spivack, you were just asked on cross-examination

5   about the items found on Mr. Bright during his arrest.  Do you

6   recall that?

7   A.  I do, sir.

8   Q.  Did those items include any medication?

9   A.  It does, yes, sir.

10  Q.  What medication?

11  A.  Adderall.

12  Q.  Was there anything else?

13  A.  Medicationwise, sir, or --

14  Q.  Do you recall whether there was any other medication?

15          MS. BAHARANYI:  Objection, your Honor.

16          THE COURT:  Excuse me?

17          MS. BAHARANYI:  Objection, your Honor.

18          THE COURT:  Basis?

19          MS. BAHARANYI:  Your Honor, it seems irrelevant.

20          THE COURT:  The door has been opened.  You may

21  inquire.

22  BY MR. LI:

23  Q.  Do you recall whether there was anything any other

24  medication found in his pockets?

25  A.  I don't recall top of my head, sir, no.

1   Q.  Would it help you remember if you saw the picture that

2   defense counsel showed you?

3   A.  It would.

4          MR. LI:  Ms. Fetman, can we show the witness only --

5   the witness and the parties and the Court Defense Exhibit K,

6   please.

7   Q.  Agent Spivack, take a look at this.  Let me know when

8   you're done with it.

9          (Pause)

10  A.  Yes, sir.

11  Q.  Is your recollection now refreshed?

12  A.  Yes, sir.

13         MR. LI:  We can take that down.

14  Q.  Agent Spivack, were there any other medications found on

15  the defendant during his arrest?

16  A.  Sir, there was a package of what would appear to be called

17  Sildenafil.  I'm probably not pronouncing that correctly.  I

18  think it was three tablets, I believe it said.

19  Q.  Another word for that is "Viagra," right?

20  A.  I have no --

21         MS. BAHARANYI:  Objection, your Honor.

22         THE COURT:  Well, do you have any knowledge?

23         THE WITNESS:  I have no idea, sir.

24         THE COURT:  Okay.

25         That's sustained and stricken.

K3BKBRI7                          Spivack - Redirect

1   Q.  Agent Spivack, you were asked about the pocket litter in

2   Mr. Bright's pockets.  Do you recall that?

3   A.  Yes, sir.

4   Q.  Can you remind us, what is pocket litter?

5   A.  Pocket litter is items, miscellaneous items, that fit in a

6   pocket -- generally, receipts, business cards, things of the

7   sort -- usually, again, just stuff that is derived from an

8   individual's pocket.

9   Q.  Did the FBI keep the pocket litter found in Mr. Bright's

10  pants or shorts?

11  A.  No, we did not.

12  Q.  Why not?

13  A.  It was irrelevant.  We only seize evidence that is relevant

14  or related to the crime for which they're being arrested.  Any

15  and all other items -- to include the wallets, the keys, things

16  of that sort -- are all returned to the defendant, their family

17  or their lawyers.

18  Q.  What evidence did the FBI keep?

19  A.  The FBI kept the two cell phones, kept the four condoms,

20  and then eventually, again, after obtaining the computer, we

21  kept the computer.

22  Q.  You mentioned the four condoms.  Were they in the same

23  pocket or were they in different pockets?

24  A.  They were in different pockets.

25  Q.  Did the condoms appear to be the same age?

1    A.  No, they --

2              MS. BAHARANYI:  Objection, your Honor.  Beyond the

3    scope and asked and answered.

4              THE COURT:  I'll allow it.

5    Q.  Did the condoms appear to be the same age?

6    A.  They did not.

7              MR. LI:  No further questions.

8              THE COURT:  All right.

9              You may step down.

10             THE WITNESS:  Yes, sir.

11             THE COURT:  Thank you.

12             (Witness excused)

13             THE COURT:  Call your -- well, this is an interesting

14   dilemma I have:  It's 4:58.  Do I have them call the next

15   witness or do I say we round that up to 5:00 o'clock?  I'm

16   going to round it up to 5:00 o'clock.

17             JUROR:  Great.

18             THE COURT:  So it's been a long day.  Now I really

19   feel like I've known you for two lifetimes.  But I do hope you

20   have a very pleasant evening.  I do realize that, because

21   you're on a jury, you have to cram a lot of errands and

22   responsibilities into fewer hours -- I know that, I know it's

23   hard -- but it's important, and all trials in this courthouse

24   are important to the participants.

25             So you are wonderful people for serving as you are,

K3BKBRI7

1     and for being here on time.  So, please, it's daylight out,

2     safe home, and see you tomorrow for a 10:00 o'clock sharp

3     start.

4               Thank you.

5               (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K3BKBRI7

1          (Jury not present)

2          THE COURT:  Please be seated.

3          Yesterday, I handed out Court Exhibit 1, which are the

4    draft instructions in this case.  They are not materially

5    different from the instructions that were given at the first

6    trial, with one exception, with regard to the charge on

7    attempt, and that appears to be on pages 24 to 26.  And I'm

8    going to ask that if you have any comments on the charge, that

9    you deliver a letter, upload a letter on ECF, by the opening of

10   court tomorrow at 10:00 o'clock.

11         Have a pleasant evening, and see you tomorrow.

12         COUNSEL:  Thank you, your Honor.

13         (Adjourned to March 12, 2020 at 10:00 a.m.)

14                            * * *

15

16

17

18

19

20

21

22

23

24

25

```
 1                         INDEX OF EXAMINATION

 2   Examination of:                               Page

 3   ELIZABETH JENSEN

 4   Direct By Mr. Li . . . . . . . . . . . . . . .64

 5   Cross By Ms. Gallicchio  . . . . . . . . . . .82

 6   Redirect By Mr. Li . . . . . . . . . . . . . 186

 7   AARON SPIVACK

 8   Direct By Mr. Li . . . . . . . . . . . . . . 209

 9   Cross By Ms. Baharanyi . . . . . . . . . . . 248

10   Redirect By Mr. Li . . . . . . . . . . . . . 256

11                         GOVERNMENT EXHIBITS

12   Exhibit No.                              Received

13    7   . . . . . . . . . . . . . . . . . . . .76

14    8   . . . . . . . . . . . . . . . . . . . .79

15    8B  . . . . . . . . . . . . . . . . . . . 218

16    10  . . . . . . . . . . . . . . . . . . . 222

17    102, 6, and 6A through 6G  . . . . . . . . 228

18    6T  . . . . . . . . . . . . . . . . . . . 230

19    9   . . . . . . . . . . . . . . . . . . . 237

20    9T  . . . . . . . . . . . . . . . . . . . 238

21    100, 40, 41, and 42  . . . . . . . . . . . 242

22    11  . . . . . . . . . . . . . . . . . . . 247

23

24

25
```

DEFENDANT EXHIBITS

Exhibit No.                                          Received

A     . . . . . . . . . . . . . . . . . . . .93

B     . . . . . . . . . . . . . . . . . . 105