K3CLBRI1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          19 CR 521 (PKC)

5    PETER BRIGHT,

6                   Defendant.
                                           Trial
7    ------------------------------x

8                                          New York, N.Y.
                                           March 12, 2020
9                                          10:05 a.m.

10   Before:

11
                         HON. P. KEVIN CASTEL,
12
                                           District Judge
13                                         -and a Jury-

14                           APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     BY:  ALEXANDER LI
17        MICHAEL MAIMIN
          Assistant United States Attorneys
18
     DAVID E. PATTON
19        Federal Defenders of New York, Inc.
          Attorney for Defendant
20   BY:  AMY GALLICCHIO
          ZAWADI S. BAHARANYI
21        Assistant Federal Defenders

22   Also Present:
     Elizabeth Jensen, FBI
23   Ariella Fetman, Government Paralegal
     Alondra Reyes, Defense Paralegal
24   Jason Fisher, Technical Support

25
```

K3CLBRI1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.

3          I understand there is some issue someone wanted to

4     raise.

5          MS. BAHARANYI:  Yes.

6          So our understanding from the government is that they

7     intend to attempt to elicit from their next witness a social

8     media investigator in their office that is the pill -- or the

9     medication called Slidenafil, is also a Viagra or erectile

10    dysfunction medication.  Your Honor, we have a few issues with

11    that.

12         One is its relevance in this case, when there is no

13    evidence whatsoever that they believe he took this medication,

14    that they know when it was taken, when or how it came into Mr.

15    Bright's possession.  That hasn't been established.  And I

16    think to allow this next witness to testify to it would be

17    misleading.

18         I would say we're not medical experts here,

19    your Honor, but from our research on this, it's not just an

20    erectile dysfunction medication, it's also something used to

21    treat high blood pressure.  I don't think that their witness,

22    who, again, works in social media investigation, is equipped to

23    testify about its uses and what its functions are.  It's a

24    medication --

25         THE COURT:  All right.  Let me ask with regard to your

K3CLBRI1

1    first one.  There are two distinct points, as I understand.  As

2    to your first point, I may be a little fuzzy on this, but it

3    was, I believe, Defendant's Exhibit K that was offered.

4              Who offered Defendant's Exhibit K?

5              MS. BAHARANYI:  We didn't offer it into evidence,

6    your Honor.  It was used to refresh the recollection.  It

7    hasn't been admitted.

8              THE COURT:  So it's not in evidence?

9              MS. BAHARANYI:  That's correct, your Honor.

10             THE COURT:  All right.  Okay.  And so at this stage of

11   the game, is the government going to offer Defendant's Exhibit

12   K or whoever's Exhibit K?

13             Is it Government Exhibit or Defendant's Exhibit K?

14             MR. LI:  Your Honor, just to clarify, on

15   cross-examination yesterday, the defense elicited the contents

16   of the pocket litter in part by refreshing the recollection of

17   the witness.  And then on redirect, we elicited that, in

18   addition to the specific pocket litter the defense had

19   elicited, there was also a packet of what was labeled as

20   "Slidenafil."  So the fact that something called Slidenafil was

21   among the items on the defendant's person has been elicited.

22             THE COURT:  Okay.  So it's not the exhibit, but the

23   fact of this drug.  All right.

24             MR. LI:  Yes, your Honor.

25             THE COURT:  So that's already in the record.

K3CLBRI1

1          MR. LI:  That's correct, your Honor.

2          THE COURT:  Now, what about the defense's point that

3     your paralegal may know some aspect of this drug but doesn't

4     know all aspects of this drug?  You notice defense counsel has

5     not said that -- because it hadn't arisen yet.  And I'm not

6     saying that you need to it say.  But you haven't yet said,

7     because it doesn't arise yet, that they would object to your

8     examining the defendant should he take the stand on this drug.

9          Is that correct?

10         MS. BAHARANYI:  We do actually object to the examining

11    of Mr. Bright about the drug, the medication.  We also would

12    object to the examining Dr. Canter about the drug, again, on

13    this basis of relevance in this case.

14         THE COURT:  Okay.  Well, it's -- a condom is

15    irrelevant too under that logic, but it's not.

16         MS. BAHARANYI:  Your Honor, I will note that condoms

17    are preserved by Agent Spivack because they're considered to be

18    relevant evidence in this case.

19         THE COURT:  No.  If Agent Spivack didn't consider it

20    to be relevant evidence, that's not dispositive of anything in

21    this case.  You can cross-examine all you want, as you did

22    ably, but the fact that an agent said, I don't think this is

23    relevant, doesn't control what the government can do or what

24    you can do in the case.  You're not bound by what the agent

25    thinks, and the government isn't bound by what the agent

K3CLBRI1

1    thinks.

2              MS. BAHARANYI:  Your Honor, I think on the basis of

3    the fact that there's been no foundation for how this

4    medication, this drug, has any relevance in this case --

5    there's been no basis that -- or no reason for the government

6    to assert or for them to believe that it was taken, when it was

7    taken, when it was placed in Mr. Bright's pocket, I think

8    they're throwing it out there at the last minute and have not

9    established any foundation for why it's relevant here.

10             THE COURT:  Well, I don't agree with the last minute.

11   I'll tell you what I do agree with.  I have not been shown

12   anything that would lead me to believe that the paralegal from

13   the U.S. Attorney's Office is qualified to talk about this

14   pharmaceutical substance.  So the good news is I'm inclined to

15   disallow the questioning of the paralegal about:  Is this a

16   generic form of something else and what is it used for?

17             MR. LI:  Your Honor, may I be heard briefly on that

18   point?

19             THE COURT:  Yeah.

20             MR. LI:  Viagra, as the Court knows, is one of the

21   best-selling medications of all time.  It's in very common

22   usage.  And very commonly, people know about it.  It went off

23   brand some time ago, and the generic form of it is called -- I

24   won't try to say it, the generic form of it, it is what it is.

25   I think the witness, as a lay witness, can testify that, based

K3CLBRI1

1    on his common understanding, that this is a drug that is the

2    generic form of something called "Viagra," I think we can leave

3    it at that.

4              THE COURT:  I just like guess or assume that the jury

5    will know what Viagra is and what its properties are and what

6    it's used for.

7              Is that kind of your thought?

8              MR. LI:  Your Honor, I think we --

9              THE COURT:  Or would you elicit through him that it's

10   used for erectile dysfunction?

11             MR. LI:  Your Honor, I think we can actually just

12   leave it at Viagra because I think Viagra is a brand in such

13   common usage that, frankly, everybody on the jury knows exactly

14   what it --

15             THE COURT:  I adhere to my ruling.  I'm not allowing

16   this witness to testify to it.

17             Now, as to Dr. Canter or the defendant, that's a whole

18   different story.  And, again, what I find lacking in the

19   defendant's argument at this point is a little bit of circular

20   reasoning.  This can't go to the issue of intent because it

21   hasn't been established what it is or why he had it.  And that

22   sounds to me like the government wants to establish that.

23             So if the objection is, you haven't yet established

24   what this stuff is, so you can't bear on intent so it's not

25   relevant, that doesn't carry the day because the government is

K3CLBRI1

1     endeavoring to elicit it.  If it is a drug that has multiple

2     properties, one of which is to address erectile dysfunction,

3     that would be probative evidence on the issue of intent, if he

4     came to a meeting with the purported mother with that drug in

5     his pocket.  And you would say:  It's in his pocket; it's not

6     in his mouth; he had it for other reasons.  And he can testify

7     what the other reason was.  All of that.

8             MS. BAHARANYI:  Well, your Honor, it's an empty

9     packet.  There's nothing inside of this actual packet.  And I

10    think the government can confirm that as well.

11            THE COURT:  Is that correct?

12            MR. LI:  I don't think there's any testimony as to

13    whether it's empty or not.  I do not know whether it was empty

14    or not.

15            THE COURT:  I think -- I'll tell you what.  We're

16    going to end it at this.  Go back and look at the testimony of

17    the witness as to whether it was empty or not.  I think you're

18    going to find that there may be testimony on that subject.  But

19    I don't want to prejudge it.  I want you to look at the

20    transcript.

21            MS. BAHARANYI:  Your Honor, would we be able to raise

22    this again after we've reviewed the testimony with the Court?

23            THE COURT:  Yeah.  I've granted your motion as to --

24            MS. BAHARANYI:  Thank you.

25            THE COURT:  -- as to the next witness.  That's all.


SOUTHERN DISTRICT REPORTERS, P.C.

K3CLBRI1

 1              MR. LI:  Your Honor, just to clarify the Court's
 2      ruling.  With respect to Dr. Canter, the Court has generally
 3      limited the scope of his permitted testimony.  Would the Court
 4      allow that he intends to testify about the drug, Slidenafil?
 5              THE COURT:  First, you have to tell me whether -- go
 6      back and look at the agent's testimony.  There is a difference
 7      in my mind if the defendant brought to the meet -- let's call
 8      it "the meet" -- he brought an empty package that once
 9      contained this pharmaceutical, or he brought a package that
10      contained three tablets of this pharmaceutical.  Those are
11      materially different.
12              How is the fact he brought an empty package with him
13      relevant?  That, I don't understand.  I do understand the point
14      -- it would be like, let's say he came to the meet and he had
15      an empty condom wrapper.  I probably wouldn't let that in.
16              How is that probative of anything?
17              Mr. Maimin is chomping at the bale.  Go ahead.
18              MR. MAIMIN:  I finally get to add value by reading in
19      four lines from the transcript.  We've found the testimony.
20      It's on page 257 of the transcript:
21      "Q.  Agent Spivack, were there any other medications found on
22      the defendant during his arrest?
23      "A.  Sir, there was a package of what would appear to be called
24      Slidenafil.  I'm probably not pronouncing that correctly.  I
25      think it was three tablets, I believe it said.

K3CLBRI1

1          MS. BAHARANYI:  And, your Honor, that's what's on the

2     package of Slidenafil.  It says "three tablets, 20 milligrams

3     each."  He's not saying that that's what's inside of the

4     packet.

5          THE COURT:  Listen.  The witness was on the stand.

6     That was his testimony.  That's why we have cross-examination.

7          All right.  Bring our jury in, because it's not

8     happening with this next witness.

9          Who's your next witness?

10          MS. BAHARANYI:  Your Honor, I will note that we

11     objected, and our objection was sustained, and the question was

12     stricken.

13          MR. MAIMIN:  That was to the following question about

14     whether Slidenafil was Viagra.  And, your Honor said:  If you

15     know.  And he said:  I don't know.  So then you struck it.

16          THE COURT:  Right.  Exactly.  Right.

17          And, in fact, I didn't need to strike it because my

18     instruction to the jury is:  Questions of lawyers are not

19     evidence.  But for the sake of good order, I struck the

20     question and the answer.

21          All right.  Bring our jury in.

22          (Jury present)

23          THE COURT:  Please be seated.

24          Good morning, ladies and gentlemen.

25          THE JURY:  Good morning.

1          THE COURT:  You didn't volunteer for jury service; you

2     were called.  And you should be very proud of your service.

3     You're here at a time of caution in our country with the

4     COVID-19 situation.  But you've considered your service and

5     you've recognized your service as being so terribly important

6     to both sides in this case.  I'll talk to you at another point

7     in time, but I think as time goes on, you'll be able to look

8     proudly on the fact that you are serving.

9          Without further adieu, the government may call its

10    next witness.

11         MR. LI:  The government calls Shamel Medrano.

12         THE COURT:  Okay.  Excellent.

13         Whenever you're ready, Mr. Li, you may inquire.

14    SHAMEL MEDRANO,

15         called as a witness by the Government,

16         having been duly sworn, testified as follows:

17    DIRECT EXAMINATION

18    BY MR. LI:

19    Q.   Good morning.

20    A.   Good morning.

21    Q.   Are you currently employed?

22    A.   Yes, I am.

23    Q.   Where do you work?

24    A.   United States Attorney's Office in the Southern District of

25    New York.

1    Q.   What is your title there?

2    A.   I'm an investigative analyst.

3    Q.   How long have you been in that position?

4    A.   I've been in this position approximately six months.

5    Q.   What did you do before you came to the U.S. Attorney's

6    Office?

7    A.   Prior to the U.S. Attorney's Office, I worked at the Bronx

8    District Attorney's Office.

9    Q.   What were your duties there?

10   A.   There I was trial preparation assistant for approximately

11   two years and three months, and an intelligence analyst for six

12   months.

13   Q.   What were your duties as an intelligence analyst?

14   A.   As an intelligence analyst, I assisted assistant district

15   attorneys with investigations.

16   Q.   Turning to your current job.  What are your duties as an

17   investigative analyst at the U.S. Attorney's Office?

18   A.   At the U.S. Attorney's Office, as an investigative analyst,

19   I assist assistant United States attorneys and special agents

20   within the office of investigations.

21   Q.   What kind of investigations do you help with?

22   A.   I specifically help with social media.

23   Q.   In general, how do you collect evidence from social media?

24   A.   Depending on what it may be.  If it's a video, I am able to

25   download it, or if it's a post or photo, I can take a screen

K3CLBRI1                          Medrano - Direct

1    capture and also retrieve that post or whatever it may be.

2    Q.  Are you typically looking at public social media posts or

3    private social media posts?

4    A.  Typically, public.

5    Q.  Have you ever received training in social media

6    investigations?

7    A.  Yes, I have.

8    Q.  What sorts of training have you received?

9    A.  I've received onsite trainings, also in-house trainings,

10   and online webinars.

11   Q.  Are you familiar with the internet platform, *Twitter*?

12   A.  Yes, I am.

13   Q.  What is *Twitter*?

14   A.  It is a micro-blogging social media platform.

15   Q.  What does that mean?

16   A.  It's sort of a blog, but in limited characters so it allows

17   you to actively -- *Twitter* calls it "tweet" throughout the day

18   or however you may choose.

19   Q.  In the course of your duties at the U.S. Attorney's Office,

20   did you review a *Twitter* account by the user @drpizza, spelled

21   @-D-R-P-I-Z-Z-A?

22   A.  Yes.

23   Q.  What were you looking for?

24   A.  I was looking for anything that related to any underage

25   children or anything related to child enticement.

1  Q.  Were the *Twitter* posts you reviewed public or private?

2  A.  They were public.

3          MR. LI:  Ms. Fetman, please pull up, for

4  identification only, Government Exhibits 45 through 48.

5  Q.  Do you recognize these exhibits?

6  A.  Yes.

7  Q.  What are they?

8  A.  These are the screen captures I took.

9  Q.  And what are the face screen captures of?

10  A.  They're from the *Twitter* profile @drpizza.

11  Q.  Are these fair and accurate depictions of the screenshots

12  you took?

13  A.  Yes.

14          MR. LI:  The government offers 45 through 48.

15          MS. BAHARANYI:  No objection, your Honor.

16          THE COURT:  Received.

17          (Government's Exhibit 45-48 received in evidence)

18          MR. LI:  Ms. Fetman, please publish.

19  BY MR. LI:

20  Q.  Mr. Medrano, do you see a photograph in the top part of the

21  screen?

22  A.  Yes.

23  Q.  What is that photograph?

24  A.  It's a photograph of the user of the profile.

25  Q.  And what profile specifically?

K3CLBRI1                          Medrano - Direct

1    A.   The Pumpkin Fright @drpizza.

2    Q.   What does the word "Pumpkin Fright" mean?

3    A.   It's the name that he used to sort of identify himself on

4    this profile.

5    Q.   And what is the words @drpizza mean?

6    A.   That's a unique identifier.  That's how you would find the

7    *Twitter* account.

8    Q.   So when you say "unique," do you mean that there's only one

9    such *Twitter* account?

10   A.   Correct; with that name.

11          MR. LI:  Ms. Fetman, could you please publish

12   Government Exhibit 11 side by side?

13   BY MR. LI:

14   Q.   Mr. Medrano, do you see in Government Exhibit 11 the words

15   "@drpizza?"

16   A.   Yes.

17   Q.   Is that the same *Twitter* handle as in Government Exhibit

18   45?

19   A.   Yes.

20          MR. LI:  Ms. Fetman, if we can take down Government

21   Exhibit 11.

22   BY MR. LI:

23   Q.   Turning now to Government Exhibit 45, do you see some texts

24   underneath the words @drpizza?

25   A.   Yes, I do.

K3CLBRI1                          Medrano - Direct

1    Q.  Could you read that text, please?

2    A.  "Ars Technica writer.  I do not speak for my employer.

3    Retweets are endorsements unless ironic.  Immigrant.  Londoner.

4    New Yorker.  European.  Poly.  Pan.  Pervy.  He.  Him."

5    Q.  Now, how many *Twitter* posts does this @drpizza account

6    have?

7    A.  He had around 200-plus thousand.

8    Q.  Have you you reviewed all 200,000 *Twitter* posts?

9    A.  No, I did not review all.

10   Q.  Why not?

11   A.  It's -- there are too many *Twitter* posts for me to review

12   on my own.

13            MR. LI:  Ms. Fetman, please take down Government

14   Exhibit 45 and publish Government Exhibit 46.

15   BY MR. LI:

16   Q.  Mr. Medrano, what is this?

17   A.  This is a *Twitter* thread.

18            THE COURT:  "Thread," did you say?

19            THE WITNESS:  Correct, thread.

20            THE COURT:  Thread.  Thank you.

21   BY MR. LI:

22   Q.  Who are the participants in the *Twitter* thread?

23   A.  It's at "@Catovich" and "@drpizza."

24   Q.  On what day did this *Twitter* thread occur?

25   A.  May 8th, 2013.

K3CLBRI1                          Medrano - Direct

1    Q.  So let's read the first four posts.

2              THE COURT:  Ladies and gentlemen, again, the limiting

3    instruction I gave you yesterday applies here.  This is

4    evidence that long predates the charged crime in this case.  It

5    is not offered as evidence of the crime charged, it is offered

6    because one party believes that this bears on the defendant's

7    intent at the time of the crime.  That's merely the contention

8    of one of the parties.

9              And you may consider it only for that purpose if you

10   find it's credible and probative.  You may consider it for that

11   purpose.  You're not required to give it any particular weight.

12   The weight you give it is entirely up to you, all right?  But

13   it may not be considered for any other purpose.

14             Go ahead.

15   BY MR. LI:

16   Q.  Mr. Medrano, let's read the first four posts in this

17   thread, starting from the top.  And if you could please read

18   @catovitch, I'll read for @drpizza.

19   A.  "I really think the problem is that some people who

20   committed awful crimes are finally being punished, not the

21   crimes themselves."

22   Q.  "Maybe they think that capacity that doesn't emerge fully

23   formed as soon as someone reaches their 16th birthday."

24   A.  "Then the same argument could be made about reaching

25   maturity at 13."

1    Q.   "I wouldn't disagree.  I think age-based rape laws rather

2    than consent-based are stupid."

3              MR. LI:  Ms. Fetman, please take down Government

4    Exhibit 46 and publish Government Exhibit 47.

5    BY MR. LI:

6    Q.   Medrano, what is this?

7    A.   These are tweets.

8    Q.   Who posted these tweets?

9    A.   @drpizza.

10   Q.   When were they posted?

11   A.   These were posted on October 18th, 2009.

12   Q.   Is the oldest post at the bottom here, or the top?

13   A.   At the bottom.

14   Q.   Let's please read these posts starting at the bottom.  And

15   why don't you do the reading.

16   A.   "There's an astonishing amount of jailbait on this flight.

17   Looks like some school orchestra or similar."

18              "Oh, Jesus Christ, they're talking about fucking

19   Twilight.  Jailbait everywhere.  And yet my -- there's no

20   justice.

21              MR. LI:  Ms. Fetman, please take down Government

22   Exhibit 47 and publish Government Exhibit 48.

23   BY MR. LI:

24   Q.   Mr. Medrano, what is this?

25   A.   This is also a tweet.

K3CLBRI1                          Fisher - Direct

1    Q.  Who posted this tweet?

2    A.  @drpizzas.

3    Q.  When was is this tweet posted?

4    A.  This was posted on May 15th, 2009.

5    Q.  Would you please read the post?

6    A.  "Admiring the jailbait on the train, rowr."

7              MR. LI:  No further questions.

8              THE COURT:  All right.  You may cross-examine.

9              MS. BAHARANYI:  Your Honor, we have no questions for

10   this witness.

11             THE COURT:  All right.  Thank you.  You may step down.

12             Government may call its next witness.

13             MR. LI:  Government calls Kenneth Fisher.

14   KENNETH ROBERT FISHER,

15        called as a witness by the Government,

16        having been duly sworn, testified as follows:

17   DIRECT EXAMINATION

18   BY MR. LI:

19   Q.  Good morning, Mr. Fisher.

20             Are you currently employed?

21   A.  Yes, I am.

22   Q.  Where do you work?

23   A.  I work at *Condé Nast*.

24   Q.  Do you work for a specific unit within *Condé Nast*?

25   A.  Yes.  I work in a business unit called Ars Technica.

K3CLBRI1                          Fisher - Direct

1    Q.   What is Ars Technica?

2    A.   Ars Technica is a technology and science publication.  We

3    cover everything from information technology, like a business

4    would use, to consumer tech, science news and also like geeky

5    culture things, movies and games.

6    Q.   When was Ars Technica founded?

7    A.   1998.

8    Q.   What is your title.

9    A.   I am a founder and editor-in-chief.

10   Q.   Have you been the editor-in-chief since it as founded?

11   A.   Yes.

12   Q.   What are your responsibilities of the editor-in-chief of

13   Ars Technica?

14   A.   I take general oversight of the strategy of the brand.

15   Also I take ownership of our revenue goals and other goals that

16   might come from corporate.  I set the sort of tone of the site,

17   you know, what we cover, how we cover it, how seriously we

18   cover it.  And I also edit and oversee all the hiring and

19   firing and whatnot there.

20   Q.   How many editorial staff work at Ars Technica?

21   A.   Approximately, 20.

22   Q.   And what do you understand editorial staff to mean?

23   A.   Editorial people are going to be people who are paid

24   journalists who are writing, researching, interviewing folks.

25   Their primary job function is to produce written works that

K3CLBRI1                        Fisher – Direct

1    have been published on the site.  Because they're editorials,
2    these would be people that are -- you know, they're not
3    beholden to advertisers, they're not held to revenue or
4    anything like that.  They're just writers.
5    Q.  Do all members of the editorial staff work in the same
6    physical location?
7    A.  No.
8    Q.  Where do they work?
9    A.  Everyone works from home.
10   Q.  And is home in the same city?
11   A.  No.  We are spread out all over the country.
12   Q.  So how do employees communicate with each other?
13   A.  We have three main methods of communication we use.  The
14   most common is an application called "Slack."  It's something
15   you install on your computer, on your phone, and it has
16   chatrooms.  And you can kind of go in and real-time discuss
17   with people.  That's kind of our day-to-day thing.
18          We also have phones, office phones.  And, you know, we
19   do calls, but not a whole lot.  I mean, we're a techy group, so
20   we love to just chat, chat, chat, chat.  And then, of course,
21   for really official stuff, we would use email.
22   Q.  All right.  In the course of your work at Ars Technica, did
23   you come to know someone named Peter Bright?
24   A.  Yes.
25   Q.  How do you know Peter Bright?

1    A.   I first knew Peter as a reader.  I want to say I met him

2    online, naturally, in 1999.  He was a reader for several years

3    and also a contributor to our reader comments section.  And we

4    had really a forum.  And he was a prolific contributor to that.

5              Several years later, we started actually contracting

6    with him for just random bits of work here and there.  He has

7    an expertise in certain areas that we found interesting.  And

8    then after *Condé Nast* acquired my company, Ars Technica, we

9    hired him full time after he had moved to the United States.

10   Q.   So when you say you initially knew him as a reader, what

11   was he reading?

12   A.   He was reading really pretty much anything we would

13   publish.  He was very much into CP architecture at the time.  I

14   mean, this is hard to remember, but at that time, Apple was a

15   company everyone thought was going to die.  So we wrote a lot

16   about Apple.  And Peter was very, very informed about that and

17   participated in those things.

18             But the discussions were usually about technology; in

19   particular, technological advancements and software.

20   Q.   So just to be clear, he was a reader of Ars Technica?

21   A.   Yes.

22   Q.   When did he become a full-time member of the staff?

23   A.   I think approximately 2011.

24   Q.   Did you hire Peter Bright?

25   A.   Yes.

K3CLBRI1                         Fisher - Direct

1    Q.  Do you see the Peter Bright you hired here in the courtroom

2    today?

3    A.  I need to stand.

4              Yes.  He is at the second table back, two over from

5    the young ladies at that third table.

6              THE COURT:  All right.  Identification so noted.

7    BY MR. LI:

8    Q.  What were Mr. Bright's job responsibilities when he worked

9    full-time at Ars Technica?

10   A.  He was our number one person for Microsoft stuff.  That was

11   technically what he was hired to.  But Peter could be brought

12   to bear on anything from CD architecture to software

13   development issues.  It was all the kind of stuff that you

14   frankly had to really know your technology stuff to write

15   about.  It was focused on -- I would call higher-end

16   technology.

17   Q.  How often did Mr. Bright write for Ars Technica?

18   A.  Once he was employed full time, I'd say roughly once a day.

19   Q.  Over the decade or so that Mr. Bright worked at Ars

20   Technica, did he write more than a hundred articles?

21   A.  Yes.

22   Q.  More than a thousand?

23   A.  Yes.  I guess.  Yeah.  Must be.

24   Q.  Were those articles focused on the areas of the technology

25   you just described?

K3CLBRI1                          Fisher - Direct

1    A.  Yes.

2    Q.  Who did Mr. Bright report to?

3    A.  Technically, he would report to me.  I would be the

4    company's supervisor that would consider -- on a day-to-day

5    basis, he would have definitely had more interaction with the

6    managing editor, who was responsible for overseeing daily

7    operations; so, who's doing this, who's going to write that.

8    That was not really my number-one focus.

9    Q.  When Mr. Bright first came on to Ars Technica as a

10   full-time member, how often did you interact with him?

11   A.  I would say fairly frequently at first.  We had to

12   establish what his areas of expertise, you know, would be for

13   us to cover, sort of what we were expecting in the transition

14   from him previously being a contract writer to being full time.

15   That was a very short period because he had written for us

16   before, he sort of knew what he was doing, didn't need a lot of

17   guidance.  So we just essentially needed to confirm what his

18   domain was, if you will.

19   Q.  So in more recent years, how often did you interact with

20   Mr. Bright?

21   A.  Maybe once a week, if we mean like in a substantive way.

22   Because of the aforementioned Slack environment, you know, you

23   can write, Hah hah did you see this.  You know, back and forth,

24   that kind of interaction I would say was almost daily.  But on

25   a substantive sort of what are you working on, or why didn't

1    you turn this on, you've got these grammar problems -- which

2    actually I don't think applied to Peter.  But these are the

3    kinds of things that would come up in discussions that were

4    more formal.

5    Q.  Did Mr. Bright work in the same physical location as you?

6    A.  No.

7    Q.  Did he work in the same city as you?

8    A.  No.

9    Q.  Are you familiar with Mr. Bright's writing?

10   A.  Yes.

11   Q.  Did Mr. Bright get assignments from his managing editor, or

12   did he come up with his assignments?

13   A.  It would be a mix.  It was understood.  Our operating

14   procedure was if there was an issue you wanted to cover that

15   was in your domain in the area of expertise that you were hired

16   to cover, you didn't need to necessarily bring it to us for

17   approval.  If you were going to go -- we would use the language

18   "off the reservation," which was probably a little racist now

19   that I think about it.  But if somebody was going to go outside

20   of their domain, then there would be multiple people involved

21   and, you know, scrutinizing is this stepping on somebody else's

22   toes, is this a good use of our time, etc.

23   Q.  If the defendant, Mr. Bright, had wanted to write about

24   child exploitation, would that have been outside of his usual

25   domain?

K3CLBRI1                          Fisher - Direct

1    A.  Yes.

2    Q.  Would you have expected him to seek approval?

3    A.  Yes.

4    Q.  Who would he seek approval from?

5    A.  He would seek approval from any member of the editorial

6    board.  So that would be myself, the managing editor, the

7    deputy editor, and the senior technology editor.  It's kind of

8    a four-person group.  We do it that way because we want to be

9    quick in responding.  So that would be the group that you'd

10   normally go to to request such a thing.  You might get an

11   immediate answer.  But if there were any questions or concern,

12   they would probably get floated up to my direct attention.

13   Q.  Did Mr. Bright ever seek approval to write about child

14   exploitation?

15   A.  No.

16   Q.  Would you have approved an article by Mr. Bright on child

17   exploitation?

18            MS. BAHARANYI:  Objection, your Honor.  Relevance.

19            THE COURT:  One second please.

20            I'll allow it.

21            THE WITNESS:  Could you repeat the question just so

22   I'm a hundred percent?

23            MR. LI:  Of course.

24   BY MR. LI:

25   Q.  Would you have approved an article by the defendant, Mr.

1   Bright, on child exploitation?

2   A.  No, I don't think so.

3   Q.  Why not?

4   A.  The main reason is because we have a member on staff, the

5   aforementioned deputy editor, who's actually an expert in

6   online law enforcement.  And he had written a book already

7   about the tools and methods that law enforcement uses to, in

8   part, track, you know, sex trafficker, child pedophiles, all

9   these sorts of things.  So we'd had an expert who'd already

10  written a book.  And because our brand, if you will, is

11  expertise, you would have the expert write that.

12  Q.  And did Mr. Bright, in fact, ever write an article at Ars

13  Technica on child exploitation?

14  A.  No.

15  Q.  Are you familiar with the term "investigative journalism?"

16  A.  Yes?

17  Q.  What is investigative journalism?

18  A.  Generally speaking, investigative journalism is where you

19  are going to go typically beyond the realm of normal reporting

20  and you're going to investigate something directly, develop

21  sources, you might go undercover.  Investigative reporting

22  typically is a multi-person project so that a writer or editor,

23  maybe other people, including legal resources, are involved

24  because you're typically putting yourself out there a bit to

25  study or report on a very complex phenomenon.

1    Q.  Was Mr. Bright an investigative journalist for Ars

2    Technica?

3    A.  No.

4    Q.  As a full-time employee, was Mr. Bright paid by the story?

5    A.  No.

6    Q.  As a full-time employee of Ars Technica, was he allowed to

7    write for other publications without permission?

8    A.  No.

9    Q.  Did he ever ask for permission to write an article for

10   another punishable caution?

11   A.  Not that I recall.

12           MR. LI:  No further questions at this time.

13           THE COURT:  All right.  Cross-examination?

14           MS. BAHARANYI:  Yes, your Honor.

15   CROSS-EXAMINATION

16   BY MS. BAHARANYI:

17   Q.  Good morning, Mr. Fisher.

18   A.  Good morning.

19   Q.  So you testified that Ars Technica publishes some articles

20   on internet and law enforcement, right?

21   A.  Yes.

22   Q.  Specifically, Ars Technica has articles on how the internet

23   is used to commit crimes against children, right?

24   A.  Yes.

25   Q.  And how law enforcement investigates those crimes?

1  A.  Correct.

2  Q.  Ars Technica has also published quite a few articles on

3  when teens get caught up in child pornography laws?

4  A.  Yes.

5  Q.  Including articles on teens being charged with crimes for

6  sexting, right?

7  A.  Yes.

8  Q.  Including sexually explicit messaging, right?

9  A.  Yes.

10  Q.  You've written articles on teenagers being caught up in

11  child pornography laws for sending nude selfies?

12  A.  Yes.

13  Q.  And this has actually been a fairly popular subject

14  recently, right?

15  A.  Yes, in the last decade or so.

16          THE COURT:  The articles that you refer to about

17  teenagers caught up in child pornography laws, that wasn't

18  written by you, correct?

19          THE WITNESS:  No, not written by me.

20          THE COURT:  Who was it written by?

21          THE WITNESS:  Most of those would have been written by

22  the deputy editor or one of our -- we have technology policy

23  editors.

24          THE COURT:  All right.  Thank you.

25          Next question.

K3CLBRI1                          Fisher – Cross

1    BY MS. BAHARANYI:

2    Q.  And those articles are published on the Ars Technica

3    website?

4    A.  Yes.

5    Q.  Now, Mr. Fisher, you testified that Mr. Bright never wrote

6    about child exploitation, right?

7    A.  Yes.

8    Q.  But his coworkers did write about that?

9    A.  Yes.

10   Q.  And Mr. Bright and his coworkers all worked remotely; is

11   that right?

12   A.  Yes.

13   Q.  But they're able to stay in contact with one another?

14   A.  Yes.

15   Q.  You described a few of those methods, one being by email,

16   right?

17   A.  Yes.

18   Q.  By phone?

19   A.  Correct.

20   Q.  They also can talk to each other on this platform called

21   Slack, right?

22   A.  Yes.

23   Q.  Now, Slack is like a digital office space; is that right?

24   A.  Yeah.  That's fair.

25   Q.  And you said your employees chat fairly frequently on that?

K3CLBRI1                        Fisher - Cross

1    A.  Yes.

2    Q.  And they're able to talk to each other about their work?

3    A.  Yes.

4    Q.  Talk to each other about what someone else is writing

5    about, correct?

6    A.  Correct, yeah.

7    Q.  And they're able to share their work with each other as

8    well?

9    A.  Yes.

10   Q.  And, of course, they can see each other's work on the Ars

11   Technica website?

12   A.  Yes.

13   Q.  Your employees talk to each other a fair amount about what

14   they're writing, right?

15   A.  Yes.

16   Q.  And let's talk a bit about Ars Technica company policies.

17              Ars Technica encourages its employees to protect their

18   private information, right?

19   A.  Yes.

20   Q.  On their electronic devices specifically?

21   A.  Absolutely, yes.

22   Q.  So this includes protecting their information on their

23   computers, right?

24   A.  Yes.

25   Q.  On their phones?

K3CLBRI1                        Fisher - Cross

1     A.  Yes.

2     Q.  On laptops?

3     A.  Yes.

4     Q.  They encourage the use of strong passwords?

5              MR. LI:  Objection.

6              THE COURT:  Overruled.

7     BY MS. BAHARANYI:

8     Q.  And Ars Technica encourages its employees to encrypt their

9     devices, right?

10    A.  Yes.

11    Q.  And encourage the public to do so as well?

12    A.  Yes.

13    Q.  You've written guides on that, right?

14    A.  Yes.

15    Q.  It's considered very important?

16    A.  To us, yes.

17    Q.  And part of reason you encourage that is to help protect

18    your work; is that right?

19    A.  Correct.

20    Q.  And let's talk a bit about some of this work that your

21    writers do.  Ars Technica is known as having a reputation as

22    being a trusted source in technology use, right?

23    A.  Yes.

24    Q.  And the company's very passionate about technology, right?

25    A.  Very, yes.

1    Q.  And technology journalism, write?

2    A.  Yes.

3    Q.  And your writers are expected to write well on this topic?

4    A.  Absolutely.

5    Q.  And that means corroborating what they write, right?

6    A.  Yes.

7    Q.  That means finding proof of whatever it is they're going to

8    be writing about, right?

9    A.  Yes.  If it exists.

10   Q.  And gathering information about the subject of their

11   articles, right?

12   A.  Yes.

13   Q.  So your writers frequently interview sources for

14   information, right?

15   A.  Yes.  Yes.

16   Q.  And, in fact, that's expected for them to do, right?

17   A.  Yes; when appropriate.

18   Q.  And in the process of preparing articles, your writers are

19   expected to fact-check, right?

20   A.  Yes.

21   Q.  That's part of being a good journalist, right?

22   A.  Yes.

23   Q.  And Mr. Bright was, in fact, a good journalist, right?

24   A.  Yes.  I would say so, yes.

25   Q.  He started off with Ars Technica as a freelance writer; is

K3CLBRI1                          Fisher - Cross

1   that right?

2   A.   Correct.

3   Q.   And he was promoted to full-time employee, right?

4   A.   Yes.

5   Q.   And you liked his work, right?

6   A.   Yes.

7   Q.   And you've known Mr. Bright for some time now, right?

8   A.   Yes.

9   Q.   Since the late 90s; is that right?

10  A.   Yes.

11  Q.   And you're pretty familiar with Mr. Bright's personality,

12  right?

13  A.   Yes.  I think so.

14  Q.   You know his online persona; is that right?

15  A.   Yes.

16  Q.   You know that Mr. Bright likes to play the devil's advocate

17  online, right?

18  A.   Yes.

19  Q.   And he likes to argue, right?

20  A.   Yes.

21  Q.   And take unpopular opinions just to take them, right?

22  A.   It certainly seems so, yes.

23  Q.   So he's fairly provocative online, right?

24  A.   Yes.  Yeah.

25  Q.   But he was a nice person in person, right?

K3CLBRI1                          Fisher – Cross

1    A.   Absolutely, yeah.

2              MS. BAHARANYI:  No further questions, your Honor.

3              THE COURT:  All right.  Any redirect?

4          (Continued on next page)

K3CKBRI2

1    BY MS. BAHARANYI:

2              MR. LI:  Just a very brief redirect, your Honor.

3              THE COURT:  Sure.

4    REDIRECT EXAMINATION

5    BY MR. LI:

6    Q.  Mr. Fisher, on cross-examination you were asked about

7    articles Ars Technica had written about teenagers sending nude

8    pictures to each other.  Do you recall that?

9    A.  Yes.

10   Q.  Has Ars Technica written any articles on teenagers getting

11   into trouble because their parents sent photographs of them?

12   A.  Not that I recall.

13   Q.  Has Ars Technica written any articles on teenagers getting

14   into trouble because their parents, or anybody, sent clothed

15   pictures of them?

16   A.  Not that I can recall.

17             MR. LI:  No further questions, your Honor.

18             THE COURT:  All right.  Thank you.  You may step down.

19             (Witness excused)

20             THE COURT:  The government may call its next witness.

21             MR. LI:  The government rests.

22             THE COURT:  All right.

23             I'll see counsel at sidebar for a moment, and you may

24   stand up and stretch.

25             (Continued on next page)

K3CKBRI2

1          (At the sidebar)

2          MS. BAHARANYI:  Ms. Gallicchio is stepping out, but

3    I'll handle the Rule 29.

4          THE COURT:  Go ahead.

5          MS. BAHARANYI:  We would, at this time, move for a

6    judgment of acquittal — the basis being:  Even viewing the

7    evidence in the light most favorable to the government, there's

8    not sufficient evidence that Mr. Bright ever attempted to

9    persuade or induce the children through the mother.  There's no

10   evidence that he ever tried to send photos to the children, or

11   ask that photos be sent to the children, that he ever offered

12   anything to the children, offered any promises, or money of the

13   sort.  And, in fact, the evidence shows that the mother already

14   had some preexisting plan involving these children and other

15   teachers.

16         The evidence, in the light most favorable to the

17   government, shows only that Mr. Bright would have been joining

18   some preexisting plan other than inducing children to do

19   something that they weren't already being encouraged to do.

20         For that reason, we would ask that the Court grant

21   this Rule 29 motion.

22         MR. LI:  Your Honor, the law permits the government to

23   prove its case by showing that the defendant attempted to

24   persuade the children through a third party, in this case, the

25   mother.  The defendant engaged in extensive discussions with

K3CKBRI2

1    the mother about specific sexual acts he wanted to undertake

2    with the children, including putting a finger in the girl or a

3    toy in the girl, and, through the mother, he attempted to

4    persuade the children to engage in those sexual activities.

5            MR. MAIMIN:  And I think that it bears addition that,

6    in the conversations that he had, he made clear that he was

7    going to do things to help make them comfortable with it.  He

8    said he wanted to meet with them in advance so he could figure

9    out what their comfort level was, how far they wanted to go,

10   and he discussed how he would teach them so that they could

11   learn, which would be, presumably, an incentive, at least from

12   his mind, to them to learn to engage in adult sexual acts.

13           THE COURT:  All right.  Thank you, both.

14           The motion is denied.

15           Thank you.

16           MR. MAIMIN:  Thank you, your Honor.

17           (Continued on next page)

18

19

20

21

22

23

24

25

K3CKBRI2                     Cantor - Direct

1                (In open court)

2                THE COURT:  Does the defendant wish to call any

3     witnesses?

4                MS. BAHARANYI:  Yes, your Honor.  At this time, we

5     would call Dr. James Cantor.

6                THE COURT:  All right.

7     JAMES MICHAEL CANTOR,

8          called as a witness by the Defendant,

9          having been duly sworn, testified as follows:

10               THE DEPUTY CLERK:  State your name and spell it for

11    the record, please.

12               THE WITNESS:  I'm Dr. James, J-a-m-e-s, Michael,

13    M-i-c-h-a-e-l, Cantor, C-a-n-t-o-r.

14               THE COURT:  All right.  You may inquire.

15               MS. BAHARANYI:  Thank you.

16    DIRECT EXAMINATION

17    BY MS. BAHARANYI:

18    Q.  Good morning, Dr. Cantor.

19    A.  Good morning.

20    Q.  Can you please tell the jury where you're currently

21    employed?

22    A.  I'm a clinical psychologist and the director of the Toronto

23    Sexuality Center in Toronto.

24    Q.  And how long have you been in that position?

25    A.  I left my prior job of 20 years and founded the current

SOUTHERN DISTRICT REPORTERS, P.C.

1    clinic about three years ago.

2    Q.  Can you explain a bit about your educational background?

3    A.  I have an undergraduate degree in interdisciplinary science

4    from -- here it goes -- Rensselaer Polytechnic Institute --

5    R-e-n-s-s-e-l-a-e-r P-o-l-y-t-e-c-h-n-i-c -- Institute.

6              I then did my Master's degree in psychology at Boston

7    University, and I completed my doctoral degree in clinical

8    psychology at McGill, University M-c-G-i-l-l.

9    Q.  Thank you.

10             And in your Ph.D. -- in the Ph.D. training, did you

11   write a dissertation?

12   A.  Yes, I did.  I studied the side effects of different

13   medications on sexual functioning.

14   Q.  Did you have any clinical training as part of your patient

15   program?

16   A.  Yes, I did.  That's a central part of a clinical psychology

17   doctoral degree.

18   Q.  Can you please describe that clinical training?

19   A.  That was primarily in couples therapy and in sex therapy.

20   I did work with couples and with individuals who were suffering

21   different kinds of problems with sexual disfunctions or with

22   their basic contentment with their sex lives.

23   Q.  Currently, you're at the Toronto Sexuality Center; is that

24   right?

25   A.  That's correct.

K3CKBRI2                          Cantor - Direct

1    Q.   What is the work that you do there?

2    A.   Again, I'm a clinical psychologist.  I do frontline

3    clinical work with individuals and couples two days a week.

4    The rest of my time is roughly evenly divided between

5    consultation and, of course, the administrative work for

6    running the rest of the clinic for the other psychologists.

7    Q.   What do clients go to the clinic for?

8    A.   It's a wide variety of things.  For some people, it's a

9    pretty basic sexual dysfunction, such as erectile disorder,

10   premature ejaculation, lack of orgasm.  For some people, it's

11   more specific to their sexual identities or how to integrate

12   their sexual interests into their lives.  For some people, that

13   can be, for example, somebody having trouble coming out as gay

14   or lesbian, somebody trying to integrate whatever kind of kink

15   or atypical sexualities into their lives, and sometimes these

16   are couples who are either fighting a great deal or are

17   dissatisfied with their sex lives with each other.

18   Q.   So, fair to say you spend a lot of time talking about sex?

19   A.   Yes, absolutely.

20   Q.   And studying sex as well?

21   A.   Yes, very much.

22   Q.   Have you ever taught on the subject of sexual behavior?

23   A.   Yes, quite a bit.

24   Q.   Where?

25   A.   At each of Boston University and McGill University.  And

K3CKBRI2                          Cantor - Direct

1    I'm also very frequently invited to speak very specifically on

2    atypical sexualities at various conferences and professional

3    events throughout the world.

4    Q.   Have you ever written about sexual behavior?

5    A.   Yes, I have.  I have, at last count, 63 peer-reviewed

6    publications and invited book chapters.

7    Q.   Are you a member of any journal editorial awards?

8    A.   Yes, I am.  I'm on the editorial board for the Journal of

9    Sex Research, for a journal called Sexual Abuse, and for the

10   Archives of Sexual Behavior.

11   Q.   Do you have any leadership positions on these editorial

12   boards, or have you ever?

13   A.   Yes, I have.  I was editor in chief of the Journal of

14   Sexual Abuse.

15   Q.   And, as the editor in chief, what did that entail?

16   A.   That's essentially being the head of the peer-review

17   system.  The backbone of any scientific enterprise or any

18   researcher is, of course, to submit the results of our work to

19   a journal for formal publication.  The journal's decision about

20   which manuscripts to publish are made by -- are made by a

21   series of blind reviewers; they don't know where the paper came

22   from or who the authors are.  So, essentially, the editor was

23   selected by the people of the field in order to manage that

24   peer review system.

25   Q.   As both editor in chief and as a member of editorial

K3CKBRI2                        Cantor - Direct

1    boards, have you ever reviewed research on sexual behavior?

2    A.  Yes, very much.

3    Q.  How frequently?

4    A.  Nearly on a daily basis, essentially.  Again, because so

5    many of the papers, even unpublished papers, sooner or later

6    end up under my eyes, I'm roughly exposed to each of them, and,

7    of course, the major ones become a center point of my own

8    writings on the subject, where I then pass that information

9    forward.

10   Q.  Dr. Cantor, have you previously been qualified as an expert

11   in sex research?

12   A.  Yes, I have.

13   Q.  Have you been qualified as an expert in clinical

14   psychology?

15   A.  Yes, I have.

16   Q.  How many times?

17   A.  This is the 11th case.

18           MS. BAHARANYI:  At this time, your Honor, we would

19   like to show Dr. Cantor Defense Exhibit H.

20           THE COURT:  All right.

21           MS. BAHARANYI:  If I may approach the witness?

22           THE COURT:  You may.

23   Q.  Dr. Cantor, what is Defense Exhibit H, in front of you?

24   A.  It is my CV, more formally called a curriculum vitae.

25   Q.  Does this accurately reflect your employment history?

K3CKBRI2                          Cantor - Direct

1   A.  Yes, it does.

2   Q.  And your academic background?

3   A.  Yes, it does.

4   Q.  Does it reflect your past publications?

5   A.  Yes, it does.

6   Q.  As well as your membership on editorial boards?

7   A.  Yes, that is correct.

8           MS. BAHARANYI:  At this time, your Honor, we would

9   move to admit Defense Exhibit H into evidence.

10          MR. LI:  Objection.

11          THE COURT:  Yes, I don't think the CV goes into

12  evidence, as such.  You can elicit what you need to elicit.

13          Let me see the document, Doctor.

14          Yes, if there's something you want to elicit from the

15  witness, that's fine.

16          MS. BAHARANYI:  Your Honor, we would ask that at least

17  the first two pages go back with the jury, which describe --

18  that corroborate and describe his educational and academic

19  background.

20          THE COURT:  Let me see.

21          Any objection to the first two pages of Exhibit H?

22          MR. LI:  Your Honor, the government continues to

23  object that this is hearsay.

24          THE COURT:  All right.  I'll allow the first two pages

25  to go back.  Go ahead.  The first two pages of Exhibit H are

K3CKBRI2                          Cantor - Direct

1    received into evidence.

2              (Defendant's Exhibit First two pages of Exhibit H

3    received in evidence)

4              MS. BAHARANYI:  Thank you, your Honor.

5              And, your Honor, at this time we do ask that

6    Dr. Cantor be qualified as an expert in clinical psychology and

7    sex research.

8              THE COURT:  All right, for the limited purposes which

9    have been discussed in pretrial proceedings.

10             MS. BAHARANYI:  Thank you, your Honor.

11             THE COURT:  You may proceed.

12   BY MS. BAHARANYI:

13   Q.  Dr. Cantor, let's talk a bit about kink.

14             Are you familiar with kink?

15   A.  Yes, I am.

16   Q.  What is it?

17   A.  Kink is a broad term basically that describes anything

18   that's out of the ordinary.  People will debate over exactly

19   where the line should be, but pretty much it involves sexual

20   behaviors or interests in sexual behaviors that are somewhat

21   atypical.

22   Q.  How prevalent is kink?

23   A.  It's tough to tell because nontraditional sexual behaviors

24   are so stigmatized, they're very difficult to survey; we can

25   never tell when someone is telling the truth.  Most estimates

1    say that a handful of a percent of actively pursuing a kink

2    lifestyle or participate in kink regularly.  Surveys also

3    indicate that a larger proportion, perhaps a quarter to a third

4    of people, have at least the occasional sexual fantasy or

5    sexual fantasy involving some kinky element.

6    Q.  Are you familiar with how people in the kink community find

7    each other?

8    A.  Yes, I am.

9    Q.  Where do they find each other?

10   A.  These days, it's primarily over the internet.  There are

11   several internet sites or sites that are made for people to

12   find each other, to find sexual partners, that have a portion

13   dedicated specifically to kink, and there are other websites

14   and social media venues designed specifically for kinky people.

15          The other major way that they find each other are at

16   clubs, which sometimes cater to kinks or various clubs that

17   have a night dedicated to one or another or several types of

18   kinks.

19   Q.  Are you familiar with norms within the kink community?

20   A.  Yes, I am.

21   Q.  Are you familiar with the -- can you explain the

22   significance of consent in the kink community?

23   A.  Consent is taken exquisitely seriously within the kink

24   community.  There are many kinds of kinks, such as BDSM, where

25   some people want to be humiliated or want to be slapped, which,

K3CKBRI2                          Cantor - Direct

1   in a normal circumstance, would, of course, be far outside of

2   any consent.  Because these groups want to willfully

3   participate in those kinds of activities, the usual assumptions

4   of what a person is consenting to no longer apply.  Therefore,

5   there is a much more conscious effort to know just what it is a

6   person wants to participate in and what other kind of behaviors

7   remain outside of what they want to participate in.

8           It's usually the activity of the kinksters themselves

9   to find people who match and want to participate in the

10  corresponding part of whatever it is that they themselves want

11  to participate in.

12  Q.  And is consent always an explicit conversation, or is it

13  sometimes implied?

14  A.  It can be either.  It almost always -- it's not part of

15  every particular conversation of every particular dyad.  For

16  the circumstances, for example, where somebody is participating

17  in a club, it's a policy of the club, and people are

18  acknowledging that.  When people are meeting on websites, it's

19  a policy of the website, and people normally need to agree to

20  that.

21          When people are meeting face to face, they often want

22  to maintain the fantasy of engaging in whatever behavior it is

23  that they want, and, in those circumstances, it would be more

24  likely to be indirect acknowledgment.

25  Q.  Dr. Cantor, do you ever treat your clients for kink?

K3CKBRI2                        Cantor - Direct

1   A.  I don't treat them for kink, in the sense of trying to

2   convert them into nonkinky.  There's no research to support

3   that we can change a person's basic sexual interest pattern,

4   but there are people who have difficulty integrating kink into

5   their lives or they believe that their kinky interests mean

6   that there's something wrong with them.  So treatment usually

7   means helping a person become more comfortable with their kinky

8   interests and to find healthy ways of integrating it into their

9   life and love life.

10  Q.  Dr. Cantor, are you familiar with age play?

11  A.  Yes, I am.

12  Q.  Is this a type of kink?

13  A.  Yes, it is.

14  Q.  Can you explain what it is?

15  A.  Age play is one of several different kinds of role play.

16  In the world of kink and in the world of role playing, people

17  want to treat others, and be treated, as if they were someone,

18  or sometimes something, other than they are.  Age play is one

19  of the popular ones.  Other very common ones include puppy play

20  and pony play, where people will pretend that one or the other

21  is a puppy or an animal to be ridden.

22           Within age play, one of the other -- or sometimes both

23  of the -- participants are pretending that they're a different

24  age than what they are; typically, it's younger, sometimes

25  somebody is pretending that they're somebody -- that one of

K3CKBRI2                        Cantor - Direct

1   them is much older.

2   Q.   Have you conducted research on age play specifically?

3   A.   Not specifically age play, no, just on kink in general.

4   Q.   Are you aware of any published research on age play in the

5   kink context?

6   A.   There haven't been any surveys or specific research

7   targeting age play.  Most of the research targets people who

8   are -- who engage in behaviors that pose genuine harm.  So,

9   usually, age play is just considered one of the variants of --

10  one of the variants of typical sexuality -- that's not a good

11  way to describe it -- as an atypical sexuality, but, basically,

12  a harmless one, usually it's not high on the priority of things

13  of activities that we want to do heavy research on.

14         So it gets mentioned, it gets talked about, it's often

15  talked about in the context of other kinks, or to distinguish

16  it from truly dangerous or more overtly dangerous sexual

17  behaviors.

18  Q.   Is age play any sort of disease?

19  A.   It's not officially listed as so anywhere, no.

20  Q.   Are you familiar with the diagnostic and statistical mental

21  disorders, also known as DSM-5?

22  A.   Yes, I am.

23  Q.   What is that?

24  A.   It's the official manual used by the American Medical

25  Association and the American Psychiatric Association as a list

K3CKBRI2                        Cantor - Direct

1    of what formally would count as a mental disorder or a

2    psychiatric illness.

3    Q.   Is age play included in the DSM-5?

4    A.   No, it is not.

5    Q.   Now, Dr. Cantor, who participates in age play?

6    A.   That's a good question.  As I say, there aren't a lot of

7    surveys we have to go on.  We can only go by the people who

8    come into offices or ask for help about some aspect of their

9    sexuality, which sometimes includes age play.  As best as we

10   can tell, this is a wide diversity of people, from pretty young

11   themselves to the elderly, both male and female.  Often the

12   people who engage in age play, or are interested in engaging in

13   age play, do so together with other atypical sexual interests

14   that they have; that is, they might also be interested in other

15   kinds of kink.

16   Q.   Do kids engage in age play, children?

17   A.   No.  It doesn't really make sense to think of children

18   participating in it because their genuine position in life is

19   to be very young, so they're not playing a role; that is their

20   genuine status at that time.

21   Q.   Are you familiar with the way that age players refer to one

22   another?

23   A.   Yes, I am.

24   Q.   What are some terms that age players might use to refer to

25   each other?

K3CKBRI2                          Cantor - Direct

1  A.  It generally depends, of course, on the role that they're

2  playing within that.  The goal of the interactions are to

3  create an illusion or some theater in order to help the two

4  participants feel like they're engaging in the scene.

5          So the person -- usually it's a parent-child kind of

6  interaction or at least an adult-child interaction, so the

7  name, depending on the gender of the adult participant or the

8  person playing the role of an adult, would be Mommy or Daddy or

9  whatever language, you know, usually is familiar to those

10 people themselves, even from their own childhood.  The terms

11 for the child, again, vary widely; sometimes they're called

12 littles, if they're teenage they would be called middles,

13 sometimes they, again, would use whatever kind of nicknames or

14 diminutive name for themselves - for example, if their name was

15 John, they could be Johnny or Little Johnny.  The goal of the

16 names, again, is to help convince each other and produce the

17 illusion that there's a large age difference or power

18 difference between them.

19 Q.  Do age players ever use terms like Prince or Princess?

20 A.  Yes; those would be very common also.

21 Q.  What about Baby Boy or Baby Girl, are those common terms?

22 A.  Yes, they are.

23 Q.  What words do age players use to describe private parts?

24 A.  Again, they will use any of a range of terms, basically,

25 that either children use or they believe that children would

K3CKBRI2                        Cantor - Direct

1   use, as part of creating that same kind of theater.  For

2   example, instead of saying penis, they would say pee-pee;

3   instead of saying vulva or vagina, they would say vu-vu -

4   again, anything that helps participate in creating the illusion

5   that they want for each other.

6   Q.  Do the words "play" or "playtime" have any significance in

7   the age play context?

8   A.  Yes.  Indeed, not even just in age play, it's a common

9   amongst many of the kink communities.  The word "play" is used

10  as a euphemism for sex, so time set aside for sex would be play

11  time, the people participating would be players, an area that

12  they set aside with their sex toys or whatever other implements

13  that they want to use would be a playroom, and so on.

14  Q.  You said earlier that age players will sometimes meet each

15  other online, right?

16  A.  That is correct.

17  Q.  Can you describe some of the settings where they might meet

18  each other?

19  A.  The online settings, again, can either be an online

20  community or a website designed specifically for kinksters.

21  Sometimes it's a website designed for people to find romantic

22  partners or sexual partners, and people indicate on that site

23  what kind of sex that they're interested in participating in,

24  and, correspondingly, what kind of partners that they're

25  looking for.

1          So, typically, again, these would include, you know,

2    some agreement or acknowledgment of what consent means to each

3    of the participants.  Then it would include an area where they

4    would describe, sometimes in a couple of keywords, sometimes in

5    a paragraph-length biography describing what it is that they

6    enjoy, the kind of partners that they're looking for, and

7    depending on the website, there's sometimes a profile picture

8    or an opportunity to ask for such pictures.

9    Q.  Are you familiar with some of the scenarios that age

10   players play out with each other?

11   A.  Yes, I am.

12   Q.  Can you describe some of these scenarios?

13   A.  Most of these are to set up a scene, again, that would

14   naturally predispose itself to becoming a sexual situation.

15   So, for example, these might be doctor-student -- these might

16   be doctor-patient, it might be teacher and student.  The

17   interest for a lot of these people is to engage in something

18   naughty but within the kinky context; of course, that's the

19   purpose of it - they want to push the limits of what feels

20   acceptable for the adrenaline rush associated with it.

21          So, very often, it would be some context which would

22   naturally engage some kind of disrobing, which then would lead

23   to touching and, of course, the kind of sex for which they've

24   set up the entire encounter.  For example, this might be a

25   swimming coach disrobing and putting on a bathing suit,

1   especially a little Speedo or something, would be a natural

2   part of engaging in that scene.

3   Q.   Is age playing always sexual?

4   A.   Almost always.  The caveat I would have to add is that it

5   doesn't always look sexual to an outsider or to somebody who's

6   not themselves a kinkster.  For example, some of the

7   interactions, it's the trading of power, it's the domination,

8   it's the humiliation which feels sexy to the participants;

9   that's what makes them sexually atypical, even though the rest

10  of us would look at that and experience a very different set of

11  emotions, it wouldn't feel sexual to the rest of us.

12  Q.   Is age play an activity between adults?

13  A.   Yes, it is.

14            MS. BAHARANYI:  No further questions.  Thank you.

15            THE COURT:  All right.  Cross-examination?

16            MR. LI:  Yes, your Honor.

17  CROSS-EXAMINATION

18  BY MR. LI:

19  Q.   Good morning, Dr. Cantor.

20  A.   Good morning.

21  Q.   Are you familiar with a medication called Sildenafil?

22  A.   Yes, I am.  That's the chemical name for Viagra.

23  Q.   What is Viagra used for?

24  A.   It enhances male sexual function, it facilitates the

25  production of an erection.

K3CKBRI2                    Cantor - Cross

1    Q.  Dr. Cantor, age play is a practice between consenting
2    adults, correct?
3    A.  That is correct.
4    Q.  And you testified that consent is an important principle,
5    right?
6    A.  Yes, it is.
7    Q.  In fact, consent is really the number one principle in age
8    play, right?
9    A.  That would be pretty fair to say of the entire kink
10   community, yes.
11   Q.  And consent is important, at least in part, because age
12   play is unconventional, right?
13   A.  Correct.  What one would take for granted that one is
14   consenting to, versus not consenting to, would be out of the
15   ordinary -- because it's atypical, it often requires a more
16   direct consideration because we're not following the
17   traditional social norms.
18   Q.  So, participants in age play typically want to make sure
19   that everyone's on the same page, correct?
20   A.  In one way or another, yes.
21   Q.  Now, consent has to exist among all the parties in an age
22   play scenario, correct?
23   A.  Correct.
24   Q.  So, if one party wants to engage in age play and another
25   party does not, that's not consent, right?

K3CKBRI2                        Cantor - Cross

1    A.  It depends on the situation in which that occurs.  For

2    example, if one person is looking for one kind of kink and

3    another person is looking for another kind of kink, they're

4    simply a mismatch and they don't look for -- go look for other

5    partners.

6    Q.  But, at some point, there has to be a meeting of the minds,

7    if you will, if the consent is to happen, right?

8    A.  In one way or another, yes.

9    Q.  Now, consent is normally explicit, right?

10   A.  I hesitate to say normally because there is such a wide,

11   wide range of it.  In typical encounters, people have in their

12   heads an idea of what such an interaction would include, and,

13   "Hey, do you want to get out of here?" has a certain -- even

14   though they haven't spelled out each of the sex acts that

15   they're planning on engaging in or not, the general ballpark is

16   reasonably familiar to both people.

17   Q.  So, other than when it's implied in the kind of group

18   setting that you're talking about, consent is normally

19   explicit, right?

20   A.  Again, it's explicit in one way or another.  It's not

21   necessarily explicit within each individual dyad.  When it's

22   not, it's usually made explicit by the context that they're in.

23            THE COURT:  Can you just explain the word "dyad,"

24   please?

25            THE WITNESS:  I'm sorry.  The word "dyad" is the

1   particular pair of people involved.

2            THE COURT:  Thank you.

3            THE WITNESS:  No problem.

4   A.  So, even though it's not necessarily an overt conversation

5   between the two people, they are acknowledging it when they go

6   into a website or they're acknowledging it when they're

7   participating in a particular club, which, in turn, asks people

8   to acknowledge what they're about to engage in and possibly

9   see.

10  Q.  And in the kind of club setting you describe, oftentimes

11  that consent is written down, right?

12  A.  Very often, yes.

13  Q.  So, very often, the participants in age play, in a club

14  setting, are actually signing something saying that they

15  explicitly agree?

16  A.  Signing or initialing, yes.

17  Q.  And another way to make consent explicit is simply to have

18  a conversation about age play, right?

19  A.  Yes, it is -- yes, it is in most circumstances.  The

20  exceptions are when somebody is afraid that the explicit

21  conversation starts to interfere with the creation of the

22  scene, that is, when there is some amount of distance or at

23  least psychological distance between when the person clicked

24  on, yeah, yeah, yeah, I affirm, I know what it is I'm getting

25  into, but when I'm flirting with a specific person, I don't

K3CKBRI2                         Cantor - Cross

1   want to repeat that conversation because it takes away from the
2   feeling that it's happening more spontaneously.
3   Q.   But, ultimately, one way or the another, all the
4   participants become sure that this is what they're engaging in,
5   right?
6   A.   Yes, that is correct.
7   Q.   So, one way or the another, they do consent?
8   A.   Yes, they do.
9   Q.   Another way to make consent explicit would be to use
10  unambiguous age play language, right?
11  A.   I hesitate to say that there exists unambiguous language.
12  Much of the language, as I say, is in order to create an
13  illusion, and so the ambiguous language would sometimes be used
14  purposefully.
15  Q.   Would you agree that using the term DDLG is unambiguous age
16  play?
17  A.   I'm sorry, what was the --
18  Q.   Sure.  The term "DDLG."
19  A.   Yes.  Usually, that's Daddy Dom/Little Girl, which is one
20  of the most common combinations, and that is very common lingo
21  within that community.
22  Q.   And that's really unambiguous lingo in that community,
23  right?
24  A.   I can't think of any other context where it would be used,
25  no.

K3CKBRI2                        Cantor - Cross

1    Q.  So, if two participants in a conversation were talking

2    about DDLG, then it would be clear that they were talking about

3    age play, right?

4    A.  Yes.

5    Q.  So, fair to say it's important to set out the rules of

6    engagement to make sure there's consent?

7    A.  Either to set up or to acknowledge that one is already

8    aware of them, yes.

9    Q.  If the rules aren't set out, if there's no consent, there

10   can be a risk of misunderstanding, right?

11   A.  A risk of it?  Yes.

12   Q.  And that misunderstanding could occur in a sexual

13   situation, right?

14   A.  Well, all of these situations are pretty much, by

15   definition, a sexual situation, unless I'm misunderstanding the

16   question.

17   Q.  So, a misunderstanding in that kind of a sexual situation,

18   that could be a problem, right?

19   A.  It can be, yes.  Usually, the more -- the larger the

20   departure from typical, and the more potential danger that one

21   is putting themselves in, is associated with a greater need for

22   more -- for more explicit consent.  For example, if somebody is

23   going to be blindfolded and bound, then exactly what's going to

24   happen to the person who is going to be doing that to them is

25   much more important than when a person is in a situation where

K3CKBRI2                          Cantor - Cross

1    they will remain clothed and can more easily get out of the

2    situation as soon as they want to.

3    Q.  And so age players want to make sure there's no

4    misunderstanding, right?

5    A.  None of the participants want there to be any

6    misunderstanding, no.

7    Q.  And I think you testified on direct examination that if an

8    actual child is involved, then it is not age play, right?

9    A.  Correct.

10   Q.  So there is a difference between an adult pretending to be

11   a child, on the one hand, and actually bringing a child into a

12   scene, correct?

13   A.  Yes, absolutely.

14   Q.  So, I'd like now to turn to the academic literature on age

15   play.  I think you testified on direct examination that --

16            THE COURT:  Well, let's do this, ladies and gentlemen:

17   Let's take our mid-morning break.  Please could not discuss the

18   case among yourselves or with anyone else.  We'll be back in

19   action in ten minutes.  Keep an open mind.  Thank you.

20            (Continued on next page)

21

22

23

24

25

K3CKBRI2                         Cantor - Cross

```
1          (Jury not present)

2          THE COURT:  We are in recess.  Thank you.

3          MR. LI:  Thank you.

4          (Recess)

5          THE COURT:  Somebody wanted to raise something?

6          MS. BAHARANYI:  Yes, your Honor, briefly.

7          THE COURT:  Yes.

8          MS. BAHARANYI:  Before we get into the rest of our

9    testimony, we know that the issue of the Sildenafil -- we'd

10   like to address that.

11         So we've gone through the transcript again, your

12   Honor.  It does say, and Agent Spivack testified, that he

13   thinks -- "I think it was three tablets, I believe it said."

14   So he wasn't testifying to that there are three packets in the

15   packaging but, rather, that's what the packaging said.  So we

16   did want to correct that sort of misunderstanding perhaps.

17         THE COURT:  Whoa, whoa, whoa.  You want to correct the

18   misunderstanding about his testimony?

19         MS. BAHARANYI:  That there was testimony -- I believe

20   we talked about it earlier, your Honor, and it seemed like the

21   understanding at that time was that the agent said there were

22   three tablets in this packaging.

23         THE COURT:  No.  Mr. Maimin read the exact words of

24   the testimony, did he not?

25         Mr. Maimin, did you read the exact words of the
```

K3CKBRI2                        Cantor - Cross

1    testimony, or did you paraphrase?

2                MR. MAIMIN:  I read the exact words, your Honor.

3                THE COURT:  Okay.  That's what I wanted to --

4                MS. BAHARANYI:  What those words mean, your Honor, is

5    that he is reading -- "he" the agent is reading -- the

6    packaging on the tablet.  It said:  I believe it said there

7    would be three tablets.

8                That, your Honor, we believe, goes back to our

9    question of relevance here.  There has been no testimony by

10   this agent that there were actually any Sildenafil tablets?

11               THE COURT:  Read the quote.  It's up on the screen.

12               MS. BAHARANYI:  And we spoke -- well, here's the other

13   issue, your Honor.  Excuse me.  The government has now spoken

14   to Agent Spivack, they've spoken to the other agent who

15   searched him, and neither of them recall whether the packaging

16   was full or empty.  They have no recollection of it.

17               THE COURT:  Go ahead.

18               MS. BAHARANYI:  So, it's not just a matter of what the

19   transcript says; we've now confirmed with these witnesses that

20   they actually don't know what was in the packaging.

21               So I think to allow the government to make arguments

22   about this packaging, about these tablets, when we know now

23   that they don't have the basis to make that argument, I think

24   it would be misleading to the jury.

25               (Continued on next page)

K3CLBRI3

1          THE COURT:  All right.  I'm only a trial judge here,

2     okay?  I have a different kind of role than the attorneys in

3     this case.  I was presented with the following question and

4     answer:

5     "Q.  Agent Spivack, were there any other medications found on

6     the defendant during his arrest?

7     "A.  Sir, there was a package of what would appear to be called

8     Slidenafil.  I'm not probably pronouncing that correctly.  I

9     think it was three tablets, I believe it said."

10         Okay.  That was the testimony of the witness.

11         MS. BAHARANYI:  That's correct.

12         THE COURT:  Now -- no.  Wait I'm not nearly done.  Why

13    don't you have a seat.

14         Okay.  So what you have proffered is that when he was

15    asked, were there other medications, that his answer should be

16    read as a "no" rather than a "yes."  I don't think that's a

17    fair reading of his answer.

18         "Sir, there was a package of what would appear to be

19    called Slidenafil.  I'm probably not pronouncing that

20    correctly.  I think it was three tablets, I believe it said."

21         Now, we have in a trial something called

22    cross-examination.  And you could say:  Agent Spivack, did you

23    testify on direct that there were other medications?  And he

24    would have said:  Yes, I did, or if I did, I misspoke, or

25    that's not what I recall.  I recall a wrapper.  I didn't ask

K3CLBRI3

1    you if there was a wrapper.  Were there medications?  And you

2    would nail that down, whether there were medications.  His

3    answer to the question, are there other medications, is not an

4    answer to are their wrappers, or is there a package or any such

5    things.  It's medications.  And that was his testimony.

6            MR. LI:  Your Honor, if I may?

7            THE COURT:  Yeah.

8            MR. LI:  Just in fairness to the defense, this

9    question and answer was elicited on redirect because part of

10   the cross-examination was about the pocket litter.

11           THE COURT:  I'm sorry.  So it was on redirect.

12           MR. LI:  And for this reason, your Honor, we have

13   offered to stipulate with the defense that the agent does not

14   recall how many, if any, tablets were actually in the packet.

15           THE COURT:  All right.  So then we continue.  But

16   thank you; it was on redirect.

17           I have had applications to recross witnesses.  And

18   while I do not ordinarily favor the grant of such applications

19   where somebody says, Well, this was in the nature of new

20   testimony, that's a factor that counsel's in favor of allowing

21   a recross on something.  Then, again, we had the testimony from

22   Dr. Cantor here, in which it was elicited that this medication

23   is a generic form of Viagra.  And that question was asked

24   without objection.  So what I'm going to do is I'm going to

25   allow the parties' stipulation into evidence.

K3CLBRI3

1          And I suppose I would say -- and I will say to the

2     jury, along with the stipulation, that if you conclude that

3     there was no Slidenafil on the defendant's person at the time

4     that his pockets were searched, or whatever you want to call

5     it, then the fact that there's a wrapper has no probative value

6     in this case and should be disregarded by you.  If, on the

7     other hand, you find it was there -- and you say, well, how do

8     you know -- I think there might be another witness to come in

9     this trial who might have personal knowledge on that.  So --

10          MS. GALLICCHIO:  Yes.  That's right, your Honor.

11     There certainly is going to be now testimony about that from

12     Mr. Bright.  And I think we can work out the stipulation

13     probably during his testimony when the subject comes up.  I

14     will read the stipulation, if that's all right with the Court.

15          THE COURT:  That's fine.  That's fine.

16          And does that work for the government, including the

17     Court's instruction?

18          MR. MAIMIN:  Your Honor, the only two things I would

19     ask are:  One, we had discussed the possibility of a

20     stipulation, also including the photograph that was used to

21     refresh the agent's memory.  This is one of those things where

22     I think the lawyers can argue back and forth.  We look at it

23     and we think we see what looks like a bulge in it.  The defense

24     counsel say they look at it and think it's too flat to have

25     something in it, but it will give the jury more of a basis to

K3CLBRI3

1    be able to make a determination --

2            THE COURT:  Well, here's how this goes now.  We're on

3    the defense's case.

4            MR. MAIMIN:  Uh-huh.

5            THE COURT:  If at the close of the defense's case, the

6    government wishes to offer a rebuttal case, I'll deal with that

7    when that comes up.

8            MR. MAIMIN:  And then the only concern that I would

9    have about your Honor's instruction is presumably the jury

10   could also reasonably infer that the reason he had a packet of

11   Slidenafil, even if it was empty, is because he had just taken

12   Slidenafil on his way to a meeting to have sex with children.

13           THE COURT:  I want to hear --

14           MS. BAHARANYI:  One, they have no basis to make that

15   argument, to suggest that the jury make that an inference,

16   your Honor.

17           THE COURT:  Well, the evidence isn't closed yet, so we

18   don't know, yet.

19           MS. BAHARANYI:  We do believe that what's coming, they

20   won't have a basis to make that argument or to request that

21   inference.  We would ask the Court adhere to the instruction

22   that it proposed.

23           THE COURT:  All right.  Okay.

24           In any event, I'm allowing the parties' stipulation

25   and I will consider the nature of what instruction is

K3CLBRI3

1    appropriate.  And it may be that it's best dealt with in a

2    final instruction to the jury and not at the time of the

3    stipulation.  All right?

4              MS. GALLICCHIO:  Yes.

5              MS. BAHARANYI:  Thank you.

6              MR. LI:  Thank you, your Honor.

7              THE COURT:  Bring our jury in.

8              (Jury present)

9              THE COURT:  All right.  Where's our witness?

10             MR. LI:  Thank you.

11   BY MR. LI:

12   Q.  Good afternoon, Dr. Cantor.

13   A.  Good afternoon.

14   Q.  I believe you testified on direct examination -- and I'm

15   paraphrasing here, so correct me if I got this wrong -- that

16   peer-review is the backbone of scientific enterprise.

17             Is that correct?

18   A.  Yes, it is.

19   Q.  There are no peer-review studies specifically of age

20   partners, correct?

21   A.  That's correct.

22   Q.  Let me turn now to your clinical practice.  You practice in

23   Canada, correct?

24   A.  That's correct.

25   Q.  And you personally see patients approximately once a week?

K3CLBRI3

1    A.  For two days a week.

2    Q.  Two days a week.  And in your practice, you've treated

3    patients with sexual issues, right?

4    A.  Yes.  That's correct.

5    Q.  And you see a range of sexual issues?

6    A.  Yes, I do.

7    Q.  You're well known in the field of atypical sexualities,

8    right?

9    A.  Yes, I am.

10   Q.  And many patients you see throughout specifically for

11   treatment in atypical sexualities?

12   A.  Yes, that is correct.

13   Q.  And some of your patients are, to use your words, "kinky?"

14   A.  Yes, they are.

15   Q.  But not every one of your patients is kinky, correct?

16   A.  Correct.

17   Q.  So only a fraction of your patients are kinky?

18   A.  Correct.

19   Q.  And not every one of your kinky patients participates in

20   age-play, right?

21   A.  Correct.

22   Q.  So only a fraction of the your kinky patients participate

23   in age-play?

24   A.  Correct.

25   Q.  You were retained by defense counsel in this matter, right?

K3CLBRI3

1    A.   Yes.

2    Q.   And you are paid for your work in this case?

3    A.   Yes, I am.

4    Q.   Do you have a contract with defense counsel where they

5    agreed to pay you for your time?

6    A.   That's correct.

7    Q.   And that includes time preparing for your testimony here

8    today?

9    A.   Yes, it does.

10   Q.   And that includes your time for your testimony here today?

11   A.   Yes, it does.

12   Q.   So you're not working for free on this case?

13   A.   That's correct.

14   Q.   And you receive an hourly rate for your work, right?

15   A.   Yes, I do.

16   Q.   And that rate was $400 per hour?

17   A.   That's correct.

18   Q.   And how many hours had have you spent preparing for your

19   testimony and testifying here today?

20   A.   Eight.

21   Q.   About eight hours?

22   A.   Yes.

23   Q.   So your payment on this matter is simply the product of

24   $400 an hour, times eight hours, and that's $3200.

25            Did I get that right?

K3CLBRI3                    Cantor - Redirect

1   A.   That's correct.

2             MR. LI:  No further questions your Honor.

3             THE COURT:  All right.  Redirect?

4             MS. BAHARANYI:  Yes, your Honor.

5   REDIRECT EXAMINATION

6   BY MS. BAHARANYI:

7   Q.   Dr. Cantor, have you met Mr. Bright before?

8   A.   No, I have not.

9   Q.   And is your testimony today at all in influenced by the

10  fact that you are paid?

11  A.   No, it is not.

12  Q.   And, Dr. Cantor, you testified on cross-examination that

13  DDLG is a term that comes up in age-play?

14  A.   That is correct.

15  Q.   Does someone have to utter the words "DDLG" in order to

16  engage in age-play?

17  A.   No.  It's one of many nicknames and abbreviations.

18  Q.   Does someone have to use the word "age-play" to engage in

19  you age-play?

20  A.   No, they don't.

21  Q.   Dr. Cantor, have you testified before for the state?

22  A.   Yes, I have.

23  Q.   Or also known as the government?

24  A.   Yes, I have.

25  Q.   Thank you.

1          MS. BAHARANYI:  No further questions.

2          THE COURT:  Thank you, Doctor.  You may step down.

3          Call your next witness.

4          MS. GALLICCHIO:  Your Honor, we call Mr. Bright.

5          THE COURT:  All right.

6          MS. GALLICCHIO:  Do we need to take a short break?

7          THE COURT:  Yes, we do.

8          Ladies and gentlemen, I'm going to invite you to go to

9    the jury room for a moment.  This will not take very long, and

10   then I'll have you back out here.  So I figure about three

11   minutes.  Thank you.

12         (Jury not present)

13         THE COURT:  All right.  Mr. Bright, as I believe we

14   discussed before, you have the right to testify if you choose

15   to do so.  You also have the right not to testify, and I would

16   instruct the jury that they may not draw any inference or

17   suggestion of guilt by reason of the fact that you decided not

18   to testify.

19         Do you understand all that?

20         THE DEFENDANT:  Yes, I do.

21         THE COURT:  And do you also understand that no lawyer

22   may tell you to testify or tell you not to testify; they may

23   give you advice, but the decision to testify or not to testify

24   is personal to you?

25         Do you understand that?

K3CLBRI3                        Bright – Direct

1          THE DEFENDANT:  Yes, I do.

2          THE COURT:  Do you wish to testify?

3          THE DEFENDANT:  Yes, I do.

4          THE COURT:  All right.  Come on up.

5          (Jury present)

6          THE COURT:  All right.  Please be seated.

7          You may remain standing, Mr. Bright.  And if you'll

8   turn around and look at me, sir, and raise your right hand.

9   PETER BRIGHT,

10        called as a witness by the Defendant,

11        having been duly sworn, testified as follows:

12  DIRECT EXAMINATION

13  BY MS. GALLICCHIO:

14  Q.  Good afternoon, Mr. Bright.

15  A.  Good afternoon.

16  Q.  Now, Mr. Bright, on May 22nd, 2019, did you go to the

17  meeting with a person you knew as "Liz," with the intention of

18  having sex with a seven and nine-year-old?

19  A.  No.  Absolutely not.

20  Q.  Did you ever intend to have six with a seven and

21  nine-year-old?

22  A.  No.

23  Q.  Did you ever intend to entice a seven and nine-year-old to

24  engage in sexual activity?

25  A.  No, I did not.

1   Q.  Are you sexually attracted to seven and nine-year-olds?

2   A.  No, not at all.

3   Q.  Are you sexually attracted to children?

4   A.  No.

5   Q.  When you first began chatting with Liz, did you think there

6   was actually a seven and nine-year-old?

7   A.  No.

8   Q.  Did you think that Liz was an actual mother looking for

9   someone to molest her children?

10  A.  No.

11  Q.  Why not?

12  A.  I mean, that's a -- the -- we met on a kinky dating app.

13  Everything about her profile, everything that I knew of her,

14  and even the scenario she described, shouted to me age-play.

15  The idea that it would be a real mother doing that to her own

16  kids, that's horrific.  No.  It didn't occur.  It just -- my

17  mind wouldn't even go there.

18  Q.  Okay.  Mr. Bright, have you ever been convicted of a crime?

19  A.  No.

20  Q.  Prior to your arrest in this case, have you ever been

21  arrested for a crime?

22  A.  No.

23  Q.  Have you ever been accused of a crime?

24  A.  I have not.

25  Q.  Where were you born and raised?

K3CLBRI3                        Bright - Direct

1    A.   I was born and raised in the UK.

2    Q.   And how old are you today?

3    A.   Thirty-nine.

4    Q.   What is your educational background?

5    A.   I finished high school.  I went to university for a short

6    time.  I then stopped going to university and worked instead.

7    Q.   When did you come to the United States?

8    A.   I immigrated in 2013.

9    Q.   What brought you here?

10   A.   I married an American girl, and we wanted to live together.

11

12   Q.   She lived in the states?

13   A.   Yes, she was in the states.

14   Q.   Can you tell the jury a little bit about your job, your

15   employment history?

16   A.   When I quit university, I worked as a software developer

17   for a number of years -- from about 2000 to, I think, 2006.  I

18   then -- yeah.

19        I then worked at the British library in a field called

20   digital preservation, where we try to preserve and safeguard

21   access do digital media and electronic data.  And then from

22   2010, I have been writing, more or less, full time for Ars

23   Technica, first as a freelance contractor and then as an

24   employee.

25   Q.   You saw Ken Fisher testify?

1  A.  Yes, I did.

2  Q.  Who is he?

3  A.  He is the editor-and-chief of Ars Technica.  He's the guy

4  who hired me.

5  Q.  What was your title at Ars Technica?

6  A.  Initially, it was Microsoft editor, because I was brought

7  in to cover Microsoft technology.  After some time we changed

8  that to technology editor, to reflect my very broad technical

9  expertise.

10  Q.  Did you have a particular focus or specialty at Ars

11  Technica?

12  A.  Yeah.  Microsoft was still the sort of main topic of my

13  daily beat, but I covered a wide range of other stuff.  So

14  computer programming architecture, computer security, video

15  gaming, occasionally like sort of tech culture.  Yeah.  Quite a

16  lot of other things.

17  Q.  Where was your place of employment?

18  A.  Well, Ars Technica has no office, so we all work from home.

19  So I was working from my apartment in Brooklyn.

20  Q.  And how many -- what were your work hours?

21  A.  Approximately, 9:00 till 6:00 every day.

22  Q.  And how was that enforced, given that you worked from home?

23

24  A.  As Mr. Fisher testified, we used Slack to communicate with

25  each other.  Among other things, Slack says if there's someone

1    at the keyboard or away from their keyboard.  So it shows when

2    we're there and when we're not.  And we have various -- each

3    morning we're meant to check in to say what we're working on,

4    that kind of thing.

5    Q.  And you work on -- what sort of device do you work on at

6    home?

7    A.  My main working device was my home-built desktop PC.  We do

8    have some corporate equipment, but most of us are big nerds and

9    we're much more comfortable on our own machines than on the

10   company machines.

11   Q.  Do you use any security protections or password protection

12   on the device you use for work?

13   A.  Yes.  Our corporate policy is every device should be

14   password protected with a strong password and encrypted when it

15   can be.  And I do both of those things.

16   Q.  Are you an investigative journalist?

17   A.  No.

18   Q.  Do you employ any aspects of investigative journalism in

19   your job?

20   A.  I would say so, yes.  In particular, we do -- we're experts

21   in our field.  We talk to people in our field.  And sometimes

22   the people talking to us are confidential sources.  You know,

23   they're not authorized to talk for their companies.  They may

24   be leaking us secret information for one reason or another, and

25   they expose themselves, I think, both to criminal liability.

1    So we have to protect their identities as much as an

2    investigative journalist would.

3    Q.  Now, when you showed up to meet with Liz on May 22nd, 2019,

4    were you on assignment that day?

5    A.  No.

6    Q.  Did you tell anyone you were on assignment that day?

7    A.  No, I did not.

8    Q.  Were you planning on writing an article about your

9    encounter with Liz?

10   A.  At the time, I had no intention.  It's always possible --

11   you know, we write about our life experiences.  So after the

12   fact, it could have happened.  But at no time did I ever

13   express that I was going there to write an article.  And at no

14   point was that ever my purpose.

15   Q.  Now, I want to talk about your sexuality.  How would you

16   describe it?

17   A.  I think about sex a lot.  It's an important part of my life

18   and my lifestyle.  I think the best description I have is the

19   best concise description is the one I have on my *Twitter*

20   profile.

21   Q.  Let me stop you there.  Why don't we take a look at that.

22           MS. GALLICCHIO:  If we could publish for the jury

23   Government Exhibit 45, please.

24   BY MS. GALLICCHIO:

25   Q.  Mr. Bright, take a look at what's in evidence as Government

K3CLBRI3                    Bright - Direct

Exhibit 45.

Do you recognize what that is?

A.  Yes.  That is a screenshot of my *Twitter* profile.

Q.  Tell us a little bit about your *Twitter* presence, first of

all.

A.  I use *Twitter* a great deal, both professionally and --

well, my editor-and-chief would say "unprofessionally."  But I

use it for my personal life and for my professional life.  So

professionally, I talk about technology.  I publish things to

my articles.  I talk to readers about my articles.  Sometimes

they give me corrections or letter opinions on the articles.  I

talk to a number of sources on *Twitter*, mainly privately

through direct messages.

Q.  And what about personal?

A.  Personally, I make a lot of jokes.  I love talking about

topics like politics and sex and religion; hot-button issues

that get people upset.  But, yeah, the devil's advocate role is

one that I enjoy, so I talk about those sort of issues.  And my

style is pretty irreverent.  I make a lot of comments and jokes

that are not to be taken completely seriously.

Q.  Can you tell us a little bit about your handle?  That's

what it's called?

A.  Yeah.  I'm Dr. Pizza.  I've used that name online for

probably 20 years now.  It's a weak play on words because pizza

and Peter sound similar.

K3CLBRI3                    Bright - Direct

1   Q.  And can you describe your descriptive part of your profile?

2   A.  It reinforces my irreverent tone.  So the name I have on

3   *Twitter* is Pumpkin Fright.  There's a thing on *Twitter* that

4   during the month of October for Halloween, people pick spooky

5   names, plays on their normal names meant to be "Halloweeny."

6   To poke fun at this, I use my Halloween name all year around,

7   except for October when I call myself "Peter Bright."

8        Similarly, a common disclaimer that people have on

9   their *Twitter* profiles is retweets, which is when you make

10  tweets when somebody else appears in your stream of tweets.

11  People often say retweets are not endorsements -- so to

12  disclaim the contents of anything they retweet.  So to make fun

13  of that, I say:  Retweets are endorsements unless I write --

14  that's the joke.

15       Similarly, I list my location as Brooklyn, New York

16  and "Airstrip One," which is a reference to the novel *1984*, by

17  George Orwell.  In that novel the UK is named Airstrip One.

18  And it's political commentary but slightly tongue in cheek.

19  Q.  Okay.  So let's look at what you were referring to earlier

20  where you say you describe your sexuality on your *Twitter*

21  profile, right?

22  A.  Yes.

23  Q.  I believe you're referring to something on your Twitter

24  profile as "poly" and "pervy;" is that right?

25  A.  Yes.

K3CLBRI3                          Bright - Direct

1    Q.  Can you describe each of those terms, please?

2    A.  So it means polyamorous, pansexual, and pervy --

3    "perverted."

4    Q.  Can you start with polyamorous?

5    A.  Okay.  So my wife and I are in a polyamorous relationship.

6    This means that we have romantic, sexual, emotional

7    relationships with multiple partners with the full knowledge of

8    everyone involved.  So we're not cheating.  We don't hide our

9    married status to other partners, but we have -- you know, we

10   go on dates.  We may have other girlfriends or boyfriends.

11   Q.  And what about "pan?"

12   A.  Pan is a more inclusive version of bisexual.  I have dated

13   men, women, transmen, transwomen.  I'm not picky.

14   Q.  And the word "pervy?"

15   A.  Pervy is because I have a wide range of what Dr. Cantor

16   called atypical sexual interests; namely, I engage in kinky

17   sex.

18   Q.  Well, now we've heard already from Dr. Cantor, who

19   described some patients' sexual practices.

20         Can you tell us about how kinky sex manifests itself

21   in your life?

22   A.  I'd say at its core, kinky sex is any sex that plays around

23   with the idea of consent and uses it in -- typically consenting

24   to activities that people might not normally consent to.  Like,

25   consent is really the crux and consent is what I'm looking for.

K3CLBRI3                         Bright - Direct

1    Q.  What is your preferred kink?

2    A.  The broad term -- well, within the sort of -- there's a --

3    so the broad term would be BDSM.  That is within that space,

4    within that setting, I would say dom/sub.  And then one of the

5    manifestations of dom/sub would be "age-play."

6    Q.  Now you mentioned briefly consent.

7    A.  Yes.

8    Q.  Can you explain a little bit more about why that's

9    important to you?

10   A.  Well, consent, to me, I think -- I think a lot of people

11   treat consent quite trivially:  He or she said yes, so let's

12   have sex.  For me, consent is much more important than that.

13   It has to have a number of elements to be valid.  It has to be

14   informed.  You have to know what you're consenting to.  You

15   have to know who you are consenting to.  It has to be

16   voluntarily given.  So it can't be coerced by authority.  It

17   can't be coerced by threat.  It can't be sort of hindered

18   through drink or drugs.  And it has to be meaningful.  Someone

19   needs to have both the physical maturity, the emotional

20   maturity to actually consent to a particular act.

21        On top of that, I think consent has to be affirmative.

22   I don't buy that "no means no."  I say that "yes means yes."

23   Sex doesn't happen until someone says yes.  It's not -- in

24   contrast, it's not:  Sex happens until someone says no.  It has

25   to be affirmative.  They have to say yes first.  And it has to

K3CLBRI3                        Bright - Direct

1    be continuous.  So someone could withdraw that consent at any

2    time.  And that puts a hard stop on activities.

3    Q.  Now, when you engage in kinky sex, whether it be a dom/sub,

4    age-play, some other form, who do you engage with?

5    A.  Consenting adult partners.

6    Q.  Are children ever involved?

7    A.  No.

8    Q.  So in age-play, can you describe for us what age-play means

9    to you?

10   A.  Well --

11   Q.  And what attracts you.

12   A.  Well, I will briefly take you on my journey through kink.

13          Consent is important to me.  And in particular, I like

14   partners who can give themselves over to me.  So they will give

15   me free access to their bodies to do whatever we've agreed, but

16   whatever I enjoy doing with them.  And it has to be voluntary.

17   I don't want them to ever feel coerced into this.  It has to be

18   they are freely giving this to me.  That's what fundamentally

19   gets me off, having that power that they have given to me.

20          So dom/sub is a way of establishing that kind of power

21   of relationship, where, in a very explicit way, the submissive

22   person gives control of the situation to the dominant person

23   and the dominant person has control -- has that power.

24          Age-play is one way of practicing dom/sub.  By

25   establishing this age differential, it becomes in some ways

K3CLBRI3                    Bright - Direct

1   easier for the person in the submissive role to cede their

2   power, because, after all, they're playing someone much

3   younger.  And young people are supposed to defer to mommy and

4   daddy or to their teacher or whoever it may be.  So to

5   establish a kind of context in which that power differential

6   can be created.

7   Q.  Now, for someone to identify as an age-player, does it

8   refer to the person playing the younger role or to both

9   partners?

10  A.  I think I would use it to refer to both partners.  But I

11  could see that people might not.

12  Q.  Now, have you heard the term "daddy dom, little girl"?

13  A.  Yes.

14  Q.  Do you have any particular interest in that?

15  A.  Yes.  That's a particular age-play scenario where it

16  establishes a male figure in the older dominant role --

17              THE COURT:  Did you hear the question that was asked?

18              THE WITNESS:  Yes.

19              THE COURT:  Do you understand the question?

20              THE WITNESS:  Yes.

21              THE COURT:  All right.  Do your best to try and

22  answer.

23              THE WITNESS:  Okay.  Sorry.

24              Can you repeat the question?

25              MS. GALLICCHIO:  Honestly, I forget the question.

1    I'll ask another question.

2              Sorry, Judge.

3              THE COURT:  All right.

4    BY MS. GALLICCHIO:

5    Q.  So you're familiar with the term "daddy dom, little girl,"

6    right?

7    A.  Yes.

8    Q.  What does that -- are you interested in that?

9    A.  Yes.  It has that dom/sub that interests me.

10   Q.  Okay.  So your practice -- your age-play practice or kinky

11   practice, does any of this mean that you are attracted to

12   children?

13   A.  Not in the least bit, no.

14   Q.  Does any of this mean that you actually want to have sex

15   with actual children?

16   A.  No.

17   Q.  When are you looking for partners on dating sites, are you

18   looking for children?

19   A.  No.

20   Q.  Are you looking for adults whose bodies physically resemble

21   children?

22   A.  No.  I'm normally looking for the reverse of that, in fact.

23   Q.  What do you mean by that?

24   A.  I prefer my partners to be physically hairy.  I like that

25   sign.  I like hair and pubic hair.

1    Q.  Where do you meet partners for kink or age-play?

2    A.  All over the place.  I'm on a wide range of dating apps.

3    Some of them are conventional vanilla dating apps; some are

4    kink-oriented.  And I find partners in both places.

5    Q.  In your experience, what kind of people engage in age-play

6    or kink that you have encountered?

7    A.  I've had partners, or prospective partners, who are

8    religious ministers, lawyers, teachers, computer programmers,

9    all kinds of things.  Even law enforcement.

10   Q.  So are you familiar with "KinkD," the dating app?

11   A.  Yes, I am.

12   Q.  How are you familiar with it?

13   A.  It is a kink-oriented dating app that I use.  I have it

14   installed on my phone.

15   Q.  Are you familiar with the KinkD website, aside from the

16   app?

17   A.  A little, yes.  I've read some parts of it.

18           MS. GALLICCHIO:  Can we publish for the jury

19   Government Exhibit 12? I think there are two pages.  Can we

20   show it side by side, please?

21   BY MS. GALLICCHIO:

22   Q.  So, Mr. Bright, take a look at Government Exhibit 12.

23           Do you recognize what it is?

24   A.  Yes.  That's my KinkD profile.

25   Q.  Who created this profile?

1    A.   I did.

2    Q.   Who selected the username?

3    A.   Me.

4    Q.   And who wrote the self-summary?

5    A.   I did.

6    Q.   I want to take a look on the first page in your

7    self-summary.  You write that:  "I'm not opposed to hookups but

8    my strong preference is for substantive meaningful connections.

9    I want to know what makes you tick.  Mutual caring and

10   understanding makes everything better."

11            Did you write that?

12   A.   Yes, I did.

13   Q.   Why did you include that in your profile?

14   A.   Because it's important to me.  The kind of the

15   relationships and submission I seek can't really be achieved

16   with strangers.  You have to know your partner and understand

17   your partner, establish trust with your partner before you can

18   submit to them.  And so meaningful connections are pretty key

19   to that.

20   Q.   Now, on that page, on the bottom it says:  S* -- and an

21   asterisk -- is ridiculous, and a sense of humor about it is

22   essential.

23            Can you explain that to us?

24   A.   For reasons that completely escape me, KinkD censors

25   profiles.  If you write "sex," it turns into "S*."  So that

1    should read:  "Sex is ridiculous and a sense of humor about it

2    is essential."

3    Q.   Okay.  Let's take a look at your bio section.  Now, your

4    bio has the section for "my role."

5    A.   Yes.

6    Q.   And you selected a variety of things, right?

7    A.   Yes.

8    Q.   Okay.  You selected, amongst other things, "daddy?"

9    A.   Yes.

10   Q.   By the way, where did you select these roles that you have

11   in your bio?

12   A.   From that list of 29 roles that we see.

13   Q.   Now, when you selected "daddy," what were you intending to

14   convey?

15   A.   That I play the daddy role.  It's asking for roles, and so

16   that is a role that I play.

17   Q.   Are you a father?

18   A.   No.

19   Q.   And you selected age-player as well, right?

20   A.   Yes.

21           MS. GALLICCHIO:  We can take that down.  Thank you.

22   BY MS. GALLICCHIO:

23   Q.   Are you familiar with the language of age-players?

24   A.   Yes.

25   Q.   Do you use that in your practice, your sexual practice?

1   A.  Yes.

2   Q.  Can you describe some of the common terms that you are

3   familiar with in age-play?

4   A.  Yeah.  Yes.  So the different roles have names.  So "daddy"

5   and "mommy" are the obvious ones.  Not the only ones.  Age-play

6   may be "teacher/student."  In this case, I'd be "Mr. Bright" or

7   "Ms. Gallicchio" or whatever your teacher name was.  The

8   "littles," which are the people playing the younger role --

9   Q.  Let me stop you right there for a second.  You used the

10  word "little"?

11  A.  Yes.

12  Q.  What does that mean in the age-play community?

13  A.  Little is a gender-neutral way of referring to people who

14  play the younger role.

15  Q.  Continue.

16  A.  The littles will often be referred to in either childish

17  language or sort of a parody of childish language and

18  euphemisms people use with children.  So calling your "little

19  princess" or your "little prince" would be very typical.

20  Q.  What about playtime?

21  A.  Right.  So beyond the participants, there's a whole

22  vocabulary used for things that you do.  "Play" and "playtime"

23  and even a "playroom" are all sort of sex-related.  So play is

24  sex.  Playtime is the time you're having sex.  You may have a

25  playroom where you have sex.

1       There's a substantial element of fantasy to these
2  scenes.  So if you're playing the role of a doctor, you might
3  have a medical examination and you might even have like a
4  stethoscope or some sort of prop.  If you're playing the role
5  of a teacher, you might have lessons and talking in terms of
6  teaching.  It's all about creating these fantasy scenarios
7  where it's okay for one partner to submit to the other and then
8  exploring what happens when they do.
9  Q.  Are there any scenarios, age-play scenarios, that are
10 particularly attractive to you?
11 A.  Yes.  There's a scenario that I described a great many
12 times to prospective partners.  I would have it more as
13 "daddy/daughter" or "daddy/son," that kind of dynamic, but
14 where the little is 11, 12 years old, something around that.
15 And --
16 Q.  Let me stop you right there.  Actually 11 or 12, or
17 playing?
18 A.  Playing.  Playing as if they were 11 or 12.  So daddy would
19 help them explore their bodies, understand their bodies,
20 understand his body, understand how sex works, how to give
21 pleasure to yourself and other people.  That kind of teaching
22 scenario is one that I've recounted many times -- not the only
23 one but one of them.
24 Q.  Now, when you engage in these encounters, or you play these
25 scenes, are there boundaries or limits that are involved?

K3CLBRI3                    Bright - Direct

1   A.  Yes.  Indeed, limits is a very sort of basic fundamental
2   piece of kink, BDSM terminology.  Your limits are those sexual
3   practices that you won't entertain.
4   Q.  Now, do you always meet -- I'm sorry.
5           Do these relationships -- age-play relationships
6   always happen in person?
7   A.  No.  There's a lot of online fantasy, so people will
8   role-play in chatrooms or role-play in private messages one on
9   one.  They will sext back and forth.  They may even phone-sex
10  with each other.  So I mean, I prefer meeting my partners, but
11  playing online is fun too.
12  Q.  And have you engaged in that practice?
13  A.  Yes.  Extensively.  Yes.
14  Q.  Now, what kind of age-play relationship are you looking
15  for?  And by that, I mean a one-time affair or something --
16  A.  I prefer -- as my profile suggests, I prefer longer-term
17  relationships, because the trust and understanding is
18  important.
19  Q.  Is age-play the only kink you're interested in?
20  A.  Not by any means.
21  Q.  And how often -- well, for how long have you been engaged
22  in age-play kink?
23  A.  I think at this point, in a sort of coherent way, it will
24  be three years now.
25  Q.  So prior to your arrest in this case, May of last year --

1    A.  About two years.  Sorry.

2    Q.  Just let me finish the question.

3         So prior to your arrest in this case, May 22nd, 2019,

4    how long had you been involved in or engaged in age-play?

5    A.  About two years.

6    Q.  Okay.  So there was some discussion with Agent Jensen about

7    some text communication with someone named Stevie?

8    A.  Yes.

9    Q.  Can you elaborate on who Stevie is and what your

10   relationship was with Stevie?

11   A.  Stevie is a transman that I met on a vanilla dating app

12   called "Scruff."

13   Q.  And do you recall when you met Stevie?

14   A.  I think we were talking probably around April or May 2019.

15   Q.  Now, did you ever meet Stevie?

16   A.  Yes.

17   Q.  Is Stevie an adult?

18   A.  Yes, he is.

19   Q.  How do you know that?

20   A.  He -- I mean, he drinks, he has a job, he works.  I think

21   he now works in Wisconsin at a university somewhere.

22   Q.  And how many times did you meet him?

23   A.  Twice, I think.

24   Q.  Now, did you communicate with him on any online platform?

25   A.  Yes.  Initially, we met on Scruff, then we switched to

K3CLBRI3                        Bright - Direct

1   texting.

2   Q.   Can you describe the nature of your communications online

3   with him?

4   A.   It's a mix of sexual and nonsexual, like just learning

5   about who each other is.  But then there is some role-playing

6   and sexting.

7   Q.   Did you have any conversation with Stevie about the nature

8   of the relationship at its inception?

9   A.   Yes.  My Scruff profile mentioned that I like BDLG, and

10  Stevie talked to me about that.  We -- I said to Stevie that I

11  prefer to start things vanilla to have that getting to know

12  someone and establishing the trust relationships.  But Stevie

13  said he was interested in -- well, in his case, DDLB,

14  "daddy/dom, little boy."  And that was something we didn't get

15  a chance to explore it in person, but we did online.

16  Q.   Does your interest in the teaching scenario that you

17  described a minute ago relevant to your communication with

18  Stevie?

19  A.   Yes, very much.  It was a lot of the scenarios I described

20  to him, and they appealed to him.

21  Q.   In your conversations with Stevie, you specifically used

22  the words "DDLB," right?

23  A.   Yes.

24  Q.   And why did you use those words specifically with him?

25  A.   Well, with Stevie, our initial contact was through this

1    vanilla dating app.  So there was no implication of kink, no

2    assumption that the other person shared your kink.  So we

3    actually had to talk to one another to discover that shared

4    interest in the first place.  And so that was the terminology

5    we used to describe the shared interest.

6    Q.  And why didn't you use the explicitly use "DDLG" or

7    "age-play" when you were communicating with Liz, those words?

8    A.  Because in contrast, I met Liz on a kinky website, where I

9    clearly established interest in age-play.  Her profile and her

10   scenario that she described to me both in her profile and

11   subsequently screamed out to me that they were age-play.  There

12   was no need at all to say the word specifically "age-play" or

13   "DDLG."  To my mind, there was no other way of reading her

14   profile.

15   Q.  So your communications with Stevie -- I'm sorry.

16            Did you say they were on Scruff?

17   A.  On Scruff, and then on texting, SMS.

18   Q.  So where do your communications with Stevie live?

19   A.  They're on my phone.

20   Q.  And who has your phone?

21   A.  The government.

22   Q.  Is there someone by the name of "Denesy?"

23   A.  Yes.

24   Q.  Who is Denesy, and how do you know this person?

25   A.  She is a cis woman from Philadelphia, I think.  I met her

1    on Tinder.

2    Q.  What is Tinder?

3    A.  Another vanilla dating app.

4    Q.  Is that as opposed to to a kinky dating app?

5    A.  Yes.

6    Q.  Can you describe what your relationship was with her?

7    A.  It followed a similar pattern to Stevie, in fact.  We sort

8    of talked generally -- well, sorry.  We made our introductions

9    on Tinder, we then switched to texting.  There were signs of

10   general getting-to-know-you chats like, what do you do, where

11   do you live, that kind of thing.  Again, we established shared

12   interest in DDLG.  We role-played, sexted in the sort of DDLG

13   capacity.  And then she came to New York, and we met each

14   other.

15   Q.  Okay.  Did you use age-play terms in your text

16   communications with both Stevie and Denesy?

17   A.  Yes, very much.

18   Q.  Can you give us some examples?

19   A.  So Stevie was my "little prince," Denesy was my "little

20   princess."  Denesy was asking explicitly that she wanted

21   playtime with daddy.  Stevie called me daddy.  That kind of

22   thing.

23          MS. GALLICCHIO:  If we could publish please,

24   Government Exhibit 46.

25   BY MS. GALLICCHIO:

K3CLBRI3                              Bright - Direct

1   Q.  Mr. Bright, take a look at Government Exhibit 46.

2               Do you recognize what that is?

3   A.  Yes, I do.

4   Q.  What is that?

5   A.  That is a conversation between me and a *Twitter* user called

6   "Meowski Catovitch."

7   Q.  And how long ago was that *Twitter* conversation?

8   A.  Nearly seven years ago.

9   Q.  And who is Meowski Catovitch?

10  A.  I don't know Meowski Catovitch personally.  We haven't met.

11  I know he's a he.  He lives, I think, in the UK.

12  Q.  Where you were you living, by the way, when you had this

13  exchange?

14  A.  In the UK.

15  Q.  And do you recall this *Twitter* exchange?

16  A.  Somewhat, yes.

17  Q.  Now, I'd like to take a look at the fourth tweet where you

18  say:  "I think age-based rape laws rather than consent-based

19  are stupid."

20  A.  Yes.

21  Q.  You wrote that?

22  A.  Yes.

23  Q.  Can you explain what you mean by that?

24  A.  Yes.

25  Q.  What you meant by that -- excuse me.

K3CLBRI3                    Bright - Direct

1   A.  Well, can we look at the second tweet for context?

2   Q.  Sure.

3            MS. GALLICCHIO:  If we can have the first four tweets

4   together.

5            THE WITNESS:  Yeah.  So I spoke earlier of consent

6   being a number of elements:  Got to be informed, meaningful,

7   voluntary.  Taken together, those three things are what's

8   called the "capacity to consent."  Consent is not simply saying

9   yes or no.  It has to have this sort of depth to it.  And that

10  ability to give that genuine consent generally comes with age

11  and maturity.

12           What it doesn't do, in my belief -- so, in the UK, the

13  age of consent is 16.  And the kind of implication that the age

14  of consent is that if you are 15 years and 364 days old, then

15  you do not have the capacity to consent.  But as soon as it

16  hits midnight and you become 16 years old, all of a sudden,

17  this capacity to consent is a fully formed part of your psyche,

18  part of your character.  I don't think that's the case.  I

19  think there can be people who are above the age of consent but

20  for one reason or another, cannot possibly give their consent

21  in a meaningful way.

22  Q.  Now, do --

23           THE COURT:  Whoa, whoa, whoa.  Let the witness finish

24  the answer.

25           Mr. Bright, did you want to finish your thought?

1          THE WITNESS:  Yes, sir.

2          So the second tweet, I'm just in a rather concise way

3    making that point.  And then so the fourth tweet is within that

4    context.  To my mind, these laws with a -- I should preface,

5    I'm not proposing legislation here.  It is for the purpose of

6    discussion on *Twitter*.  You know, I think that these laws,

7    where they do have a hard age, create some peculiarities such

8    as this implication of, Oh, as soon as you hit, 16, 17 or 18,

9    or whatever it may be, all of a sudden, your brain changes,

10   your character changes and you can consent to sex.  I think

11   that's silly.  I think consent is the critical issue, and your

12   age isn't necessarily the best guide to that.

13   BY MS. GALLICCHIO:

14   Q.   Now, when you're talking about age-based rape laws, what

15   kind of rape laws are you referring to?

16   A.   This is statutory rape laws.

17   Q.   Did your comment in 2013 mean or suggest that you want to

18   have sex with underage girls?

19   A.   No.

20   Q.   Does it mean that now?

21   A.   No.

22   Q.   Does it mean that you are opposed to laws prohibiting

23   sexual contact with children?

24   A.   No.

25   Q.   Does it mean, then or now, that you were looking to violate

1   those laws?

2   A.  No.  I mean, in fact, it was the reverse.  I think the -- I

3   don't remember if it's -- as part of this discussion with me

4   asking, I'm not sure if it's in the -- but it's part of the

5   discussion.  I say that protection should be afforded to people

6   who may be above the age of consent because they lack the

7   emotional maturity to consent to sex.

8           MS. GALLICCHIO:  Let's move on to Government Exhibits

9   47 and 48.  If we can put them up side by side.

10  BY MS. GALLICCHIO:

11  Q.  Mr. Bright, take a look at Government Exhibits 47 and 48 in

12  evidence.

13          Do you recognize what they are?

14  A.  Yes, I do.

15  Q.  What are they?

16  A.  They are admittedly rather crass tweets that I made in

17  2009.

18  Q.  How old were you when you made these tweets?

19  A.  That should be an easy question to answer.  Twenty-eight.

20  Q.  Do you recall making these tweets?

21  A.  Specifically, no.  No.

22  Q.  So --

23  A.  They're in character.

24  Q.  I'm sorry?

25  A.  They're in character.  They're the kind of irreverent,

1    maybe slightly bad-taste thing that I would post on *Twitter*.

2    Q.  What do you mean by "jailbait?"

3    A.  Jailbait is a very widely used term used to refer to

4    teenagers; I think normally teenage girls.

5    Q.  You may have just said this.  But how would you describe

6    the tone of your comments?

7    A.  They're not in the best taste.  They are meant to be

8    irreverent.

9    Q.  Now, did you use that expression "jailbait" to mean that

10   you wanted to have sex with young people on the train or the

11   plane?

12   A.  No.

13   Q.  Were you attracted to young girls?

14   A.  No.

15   Q.  Did you tweet that because you wanted to have sex with

16   them?

17   A.  No.

18          MS. GALLICCHIO:  If we could publish, please,

19   Government Exhibit 40.

20   Q.  Mr. Bright, take a look at Government Exhibit 40.

21          MS. GALLICCHIO:  Can we have both pages side by side?

22   BY MS. GALLICCHIO:

23   Q.  Mr. Bright, do you recognize what is Government Exhibit 40

24   in evidence?

25   A.  Yes, I do.

1   Q.  What is?

2   A.  It is a transcript of a chat between me and my friend,

3   Anthony.

4   Q.  How long ago was this?

5   A.  Eight years.

6   Q.  Do you remember having this chat with Anthony?

7   A.  No.  It looks like the kind of discussion we would have,

8   but I don't remember the specific chat.

9   Q.  How do you know Anthony?

10  A.  We met online in a Linux chatroom.  It's a

11  computer-operating system.  He's another nerd.  We were talking

12  about tech.

13  Q.  And did you ever meet him in person?

14  A.  A few times, yes.

15  Q.  Now, in general, what are you discussing here?  Or is

16  there's something specific you'd like to point out?

17  A.  We're discussing a few things.  He initially messaged me to

18  complain about -- I think it was -- it was something related to

19  Obama Care and the mandate to offer contraception and,

20  specifically, the exemptions for religious institutions.

21  Anthony was deeply unimpressed of giving them an exemption.  I

22  don't think I was in favor of that either.  And so we're

23  talking in a rather comedic and irreverent way about the

24  legislation, legislation about contraceptive, and abortion, and

25  religion.

1    THE COURT:  Ladies and gentlemen, with that, we'll

2    take our lunchtime break.  Please do not discuss the case among

3    yourselves or with anyone.  Please have a relaxing lunch break.

4    We'll be back in action at 2:00 o'clock.

5            Thank you so much.

6            (Jury not present)

7            THE COURT:  You may step down, Mr. Bright.

8            May I have those letters?  Thank you.

9            Please be seated.

10           I want to thank both sides for their letters.  I have

11    the defense's letter of March 12th, filed as Document 69; the

12    government's letter of March 12, filed as Document 68; and a

13    further reply, docketed at Document 70.

14           Mr. Li, is there anything that the government wishes

15    to supplement or expand upon with regard to the jury

16    instructions not set in your letter?

17           MR. LI:  No, your Honor.

18           THE COURT:  Same question for the defense.

19           MS. BAHARANYI:  No, your Honor.

20           My only question regarding our prior objection to jury

21    instructions from the last trial, if those would just remain.

22           THE COURT:  Well, you'd have to be specific.  What are

23    the objections?

24           MS. BAHARANYI:  I know that we had proposed certain

25    jury instructions to the Court.  I think we filed those maybe a

K3CLBRI3                         Bright - Direct

1    week or so before --

2            THE COURT:  No.  I understand that.  But what I did in

3    the last trial and I'm doing here is I've received your

4    proposed jury instructions, I received the government's.  Then

5    I look at them and I produce a draft set of jury instructions

6    and I timely give it out.  It's then incumbent upon the parties

7    to tell me if in the draft there is something that they object

8    to.  They may not simply say, Well, I submitted a proposed jury

9    instruction on a bunch of things, and now you have a draft jury

10   instructions, and if there's any variance between the two, that

11   amounts to an objection.  That's not specifically calling the

12   matter to the Court's attention so I can focus on it.

13           So happy to hear you on anything you want to argue.

14           MS. BAHARANYI:  We don't have anything further on the

15   second charge, your Honor, other than what's noted in our

16   letter.

17           THE COURT:  Okay.

18           MS. BAHARANYI:  I think, given the nature of this

19   case, we would still object to the Court's instruction on law

20   enforcement techniques --

21           THE COURT:  Right.

22           MS. BAHARANYI:  -- not being subject to, you know,

23   jury consideration.

24           Your Honor, I think so much of what our case revolves

25   around is how law enforcement conducted itself here.  We think,

K3CLBRI3                        Bright - Direct

1    giving that instruction might make the jury believe that they

2    can actually consider it or consider any issues with it.  So I

3    think in this type of case, we think that sort of instruction

4    would actually prejudice Mr. Bright.

5              THE COURT:  Thank you.  Anything else?

6              MS. BAHARANYI:  No, your Honor.

7              THE COURT:  All right.  Thank you.

8              Have a very pleasant lunch.  Thank you.

9              MR. MAIMIN:  Thank you, your Honor.

10             (Luncheon recess)

K3CKBRI4

                          AFTERNOON SESSION

                               2:05 PM

 3          (In open court; jury not present)

 4          MR. MAIMIN:  Just before we bring in our jury, as

 5   procedural type question, we've spoken about -- right now, the

 6   guesstimate, and we understand it's just a guesstimate, is that

 7   the case will probably not finish until 4:00 or 4:30 and we

 8   were wondering if it made sense, therefore, to push all the

 9   closings until tomorrow morning rather than breaking them up

10   overnight.

11          THE COURT:  I haven't decided on anything yet.  Let me

12   have my jury come in.

13          MR. MAIMIN:  Okay.  Sure thing.

14          THE COURT:  Thank you.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

K3CKBRI4                    Bright - Direct

1              (Jury present)

2              THE COURT:  Ms. Gallicchio, whenever you're ready.

3    Thank you.

4              MS. GALLICCHIO:  Thank you.

5              Ms. Reyes, can we publish Government Exhibit 40 again,

6    in evidence.

7    PETER BRIGHT, resumed.

8    DIRECT EXAMINATION CONTINUED

9    BY MS. GALLICCHIO:

10   Q.  So, Mr. Bright, before lunch, we were discussing Government

11   Exhibit 40, which is a Gchat with Anthony, and I believe you

12   were describing, in general, what your conversation was about,

13   right?

14   A.  Yes.

15   Q.  Did you finish that answer?

16   A.  Can we read it back?  Sorry, I don't --

17   Q.  Well, let me ask you this:  In general, then, just can you

18   give us the tone of this Gchat?

19   A.  It's two friends bantering together.  You know, it's

20   irreverent, where we're joking with each other, we kind of know

21   each other's sense of humor, and so there's just some

22   back-and-forth about -- I mean, yeah, it's that kind of thing,

23   yeah.

24   Q.  Let me direct your attention to the highlighted portion.

25              So, in the highlighted portion, the first "Me" --

1    that's you right?

2    A.  Yes.

3    Q.  -- you write, "Someone who friended me on Facebook (I have

4    no idea) posted a picture of his daughter, I'm guessing she's

5    like 13 or something.  It's all I can do not to post.  'I'd hit

6    it,'" and Anthony M. says, "hahahahaha, okay."

7           Can you characterize your comment here?

8    A.  Yeah, I'm joking around.  "I'd hit it" is sort of common

9    phrase to mean I have sexual interest in that person.  And I'm

10   joking that I would post this to the father of the girl because

11   I know it would rile him, it would annoy him; and at the time I

12   posted this -- I hope I wouldn't do it tomorrow, but at the

13   time I posted this -- sorry, wrote this, annoying people in

14   that way was something I quite enjoyed.

15   Q.  Were you being serious when you said, "I'd hit it"

16   regarding the 13-year-old?

17   A.  No.  And I think Anthony knew that, given the "hahahaha"

18   response.

19   Q.  Going on, Anthony writes, "LOL" -- means what?

20   A.  Laugh out loud.

21   Q.  Anthony says, "You are a sick man."  You say, "She looks

22   ripe enough."  Anthony says, "LOL."

23   A.  Yes.

24   Q.  Again, you go on to say, "I mean, I'm not saying it'd be

25   legal except in the Vatican (age in consent:  12) but like I'd

1    better wear a condom.  We don't need more teenage mothers"?

2    A.  Yeah, this is continuing the same theme.  It's calling back

3    to the earlier discussion where we discussed, among other

4    things, Roman Catholicism and contraception, so it's, like,

5    making humor, tying in the previous conversation.

6    Q.  Were you then attracted to 13-year-old girls?

7    A.  No.

8    Q.  Have you ever had sex with a 13-year-old girl?

9    A.  No.

10   Q.  Are you now attracted to 13-year-old girls?

11   A.  No.

12          MS. GALLICCHIO:  All right.  Can we publish, please,

13   Government Exhibit 41 in evidence.

14   Q.  Mr. Bright, take a look at Government Exhibit 41 in

15   evidence.

16          What is this?

17   A.  This is an online chat with The W.

18   Q.  Who is The W?

19   A.  The W is actually -- her name is Melissa.  At the time of

20   writing this, we were dating less than two years.  After this,

21   we were married.  She's why I immigrated to the U.S., in fact.

22   Q.  How long ago was this communication?

23   A.  Eight and a half years ago.

24   Q.  Can you summarize the first page, the conversation on the

25   first page, please?

K3CKBRI4                    Bright - Direct

1    A.  Yeah.  The W is venting to me about her coworkers and how

2    annoying they are.

3    Q.  And then, on the second page, on the top of that page, The

4    W writes, "You like Bieber but not by Drunk Kitchen.  She is so

5    much better than the Bieb."

6          Can you describe what that what you're talking

7    about -- she's talking about?

8    A.  She's joking about Justin Bieber, who's a Canadian, I

9    think, pop star.  My Drunk Kitchen is a YouTube channel where a

10   woman who, at the time, quite resembled Justin Bieber, would

11   get drunk and then try to cook recipes, often quite badly.

12   And, yeah, she -- The W is joking about the physical

13   similarity.

14   Q.  And then further on you continue a conversation about

15   Justin Bieber?

16   A.  Yes.

17   Q.  Let's look at the highlighted portion.  Now, you write,

18   "Next you'll be banning RB Rebecca Black!"  The W says, "You

19   are not allowed do her either.  She's 13."  And you say, "Ah,

20   yeah, good point.  Too old," in all caps, "LOL."

21   A.  Yes.

22   Q.  First of all, who is RB Rebecca Black?

23   A.  Rebecca Black is a -- I mean, I guess you'd call her a pop

24   star.  Please don't check.  It's hard enough -- I guess you'd

25   call her a pop star.  She made a video on YouTube that went

K3CKBRI4                    Bright - Direct

1    viral.  It became very well-known.  It's a song called Friday.

2    It's appalling, but she's -- yeah, she's a sort of teen

3    starlet, I guess, or was.

4    Q.  At the time that you wrote this, did you know how old she

5    is?

6    A.  No.  Well, I did shortly because -- I mean, when I wrote

7    the first line, no.  When I wrote subsequently, yes, because

8    The W tells me how old she is.

9    Q.  When you say, "Too old, LOL," do you mean that?

10   A.  No, that's a joke.  Hence the "LOL."  And in actual fact,

11   The W is -- as I say, she's my wife, she's also a couple of

12   years older than me, and she is significantly older than 13.

13   So 13 is not, by any stretch, too old.

14   Q.  How would you characterize this exchange?

15   A.  I was bantering with my girlfriend.  You know, she was a

16   bit stressed from work, so this was some lighthearted

17   back-and-forth to kind of ease her tensions.

18         MS. GALLICCHIO:  Let me publish Government Exhibit 42.

19   Q.  Mr. Bright, take a look at Government Exhibit 42.  Do you

20   recognize it?

21   A.  Yes.

22   Q.  What is it?

23   A.  This is a chat between me and BR, who's a friend who

24   lived -- I think still lives -- in Colorado.

25   Q.  How long ago was this chat?

K3CKBRI4                    Bright - Direct

1   A.  Nine and a half years ago.

2   Q.  Can you just describe, generally, what the content of this

3   chat was?

4   A.  Well, as background, this person and I, we often talked

5   about relationships.  At one point I had a bit of a crush on

6   her, but she wasn't interested.  We were still friends, and we

7   talked about our respective love lives and the success or lack

8   thereof in them.

9        She was telling me that she had been getting a lot of

10  sexual attention, from the shirts she was wearing, but she

11  wasn't interested in that sexual attention.

12       MS. GALLICCHIO:  And then let's go to the highlighted

13  portion, and maybe the sentence just above it.

14       Great.  Thank you.

15  Q.  BR writes, "Sadly, all the attention was waaay too old or a

16  tad too young," with a sad face emoji.  And you write, "Haha."

17  Then you write, "There's no such thing as too young."  Were you

18  serious about that?

19  A.  No.

20  Q.  BR writes, "Uh, there is when the deli checkout guy looks

21  like he's maybe 15," with a tongue-out emoji.  And you say, "I

22  would bone a 15-year-old girl in an instant," tongue-out emoji.

23  BR writes, "Hahahaha!  I know you would," wink emoji.  "I'm not

24  like that, sadly," sad face emoji.  And you say, "Your loss!"

25  A.  Yes.

K3CKBRI4                        Bright - Direct

1    Q.   Can you explain your responses here?

2    A.   Yeah.  I'm joking and teasing my friend, joking with and

3    teasing my friend, like she recognizes that these guys are into

4    her but they're too young, and so I'm joking, like too young is

5    her description, and I'm kind of repeating it back to her, as

6    humor.

7             MS. GALLICCHIO:  Can we pull up the rest of the chat.

8    Q.   And then in the rest of this conversation, what are you

9    chatting about?

10   A.   We continue talking about sex and cougars.

11   Q.   Did this comment that you made in Government Exhibit 42

12   express a desire, on your part, to have sex with 15-year-olds?

13   A.   No.

14   Q.   Did you have a desire then in 2010?

15   A.   No.

16   Q.   Do you now?

17   A.   No.

18   Q.   So, in general, the three Google Chats that we looked at,

19   the government exhibits, 40, 41 and 42, how would you

20   characterize them together?

21   A.   Banter with friends, they're joking around, they're not

22   meant to be taken seriously, and they're certainly not

23   indicative of how I feel about sex with 15- or 13-year-olds.

24             MS. GALLICCHIO:  We can take that down.

25   Q.   Now, before you were arrested, back in April of 2019, did

1   you have some communication with a 17- and a 14-year-old?

2   A.  Yes.

3   Q.  Did the 17- and 14-year-old have any relationship to each

4   other?

5   A.  I believe they were sisters.

6   Q.  What form of communication or contact did you have with

7   either of them?

8   A.  We communicated by Google Chat.

9   Q.  Who initiated the first communication?

10  A.  The 17-year-old girl.

11  Q.  And how did she do that?

12  A.  I am not entirely sure.  I'm not -- I mean, my Google

13  address is -- it might be on my professional web page -- maybe

14  that's where she found it -- but I got a message from her.  She

15  was in high school, she was writing an article -- not an

16  article, an essay about women in STEM, I think, Science,

17  Technology, Engineering and Medicine, I think -- and I had

18  recently written an article about a lawsuit brought by a number

19  of women against Microsoft, alleging various discriminatory

20  practices, and so she had seen this article and she wanted to

21  ask me some questions.

22  Q.  Did you ever meet with the 17-year-old in person?

23  A.  No.

24  Q.  What about the 14-year-old, did you ever meet with her?

25  A.  No.

K3CKBRI4                         Bright - Direct

1   Q.  Did you communicate with her in some form?

2   A.  We sent a few messages.

3           The oldest --

4           THE COURT:  I'm sorry, I didn't hear what you said.

5           THE WITNESS:  We sent a few messages.

6           THE COURT:  Who is "we"?

7           THE WITNESS:  Me and the 14-year-old girl.

8           THE COURT:  Okay.  Thank you.

9   A.  The older sister had mentioned to her sister that she had

10  been talking to some British guy, and the 14-year-old girl

11  wanted to hear my accent because she thinks that English

12  accents are sexy.

13  Q.  She said that?

14  A.  Yeah.

15  Q.  Did you ever speak to her on the phone?

16  A.  No.

17  Q.  Did you ever ask her for photos?

18  A.  No.

19  Q.  Suggestive photos?

20  A.  No.

21  Q.  Did you ever ask her for nude photos?

22  A.  No.

23  Q.  Did you download any photos that she sent you?

24  A.  No.

25  Q.  Did you send either the 14-year-old or the 17-year-old any

K3CKBRI4                    Bright - Direct

1   pictures of yourself?

2   A.  No.

3   Q.  What did you do and/or say when the 14-year-old sent you a

4   suggestive photo?

5   A.  I told her not to do that, that it can get her in trouble,

6   it can get me in trouble, that I wasn't interested.  And then I

7   think I stopped talking to her.

8   Q.  Now, I believe we saw in your postarrest interview with

9   Agent Spivack you said that the photos were deleted

10  automatically?

11  A.  Yes.

12  Q.  Can you explain what you mean by?

13  A.  Google Chat has a setting where, after -- you can have it,

14  sort of 24 hours after a message is sent, it expires, it gets

15  deleted.  And that includes any -- that includes the text, any

16  pictures, or anything else you send.

17  Q.  Did you have that setting on your computer?

18  A.  I didn't, but they had set it, both sisters had set it.

19  Q.  And if one person set it, does it have any impact on the

20  other persons?

21  A.  It applies to both ends, yeah.

22  Q.  What happens if you download the photograph?

23  A.  Yeah, I guess you could save it if you choose to.

24  Q.  Where does it get stored?

25  A.  Wherever you choose to save it, but I didn't.

K3CKBRI4                     Bright - Direct

1    Q.  Do you have any sexual interest in 14-year-olds?

2    A.  No.

3    Q.  What did you think of the 14-year-old?

4    A.  I thought she was a dumb teenager.

5    Q.  So, why didn't you report the 14-year-old for sending you a

6    suggestive photo?

7    A.  As Mr. Fisher said, we've -- well, not me personally, but

8    my colleagues have written about teenagers falling afoul of

9    laws on child pornography, for pictures they have created of

10   themselves and sent to other people.  I think it's fair to say

11   that it ruins their lives, massive attention from law

12   enforcement, from the courts.  I think most teenagers would not

13   welcome that kind of attention, to their sex lives in general.

14           I mean, who is -- in this crime of -- I mean, the

15   picture that I remember was clothed anyway, but,

16   hypothetically, if there were naked pictures, who is the victim

17   in this crime?  The 14-year-old girl.  Who is the perpetrator

18   of this crime?  The 14-year-old girl.  And I am not going to go

19   to law enforcement and say, yeah, this 14-year-old girl has

20   victimized herself by taking these selfies and she should be

21   arrested, she should be prosecuted, she should get a criminal

22   record, whatever might happen from that.  That's just -- it's

23   not something I'm willing to do because I don't think it does

24   anything at all to help the girl.  I told her not to do it, and

25   I told her why not to do it, and as far as I'm concerned, that

K3CKBRI4                          Bright - Direct

1   was the right thing to do.

2   Q.  And why didn't you report the 17-year-old girl to the

3   police for what she said to you, that she was having sex for

4   money?

5   A.  For much the same reason.  I didn't think -- I can't think

6   there are many people in this world whose lives are improved by

7   having a solicitation charge on their criminal record, like it

8   wouldn't have helped her in any way.

9   Q.  Do you write about child exploitation?

10  A.  No.

11  Q.  Have you ever?

12  A.  No.

13  Q.  Have you ever told anyone you did?

14  A.  Nope.

15  Q.  Are you aware of the articles that were written by your

16  colleagues at Ars Technica about these issues?

17  A.  Yes.  I try to read or -- try to read most of them, my

18  colleagues'.

19          MS. GALLICCHIO:  Can we publish, please, Government

20  Exhibit 1 in evidence.

21  Q.  Mr. Bright, take a look at Government Exhibit 1.  Do you

22  recognize it?

23  A.  Yes.

24  Q.  Do you recognize it?

25  A.  Yes.

K3CKBRI4                         Bright - Direct

1    Q.  What is it?

2    A.  It's Liz's profile, Princessmom's profile, on KinkD.

3    Q.  When you saw this profile picture, did you know her name

4    was Liz?

5    A.  I don't see -- when I saw the profile?  No.

6    Q.  I'm sorry, not the picture.

7    A.  The profile no.

8    Q.  And so what did this -- again, you saw this profile where?

9    A.  On KinkD, a kinky dating app.

10   Q.  Do you recall when you first saw it?

11   A.  I think in April of 2019.  I have a paid profile on KinkD,

12   and, among other things, that shows me when someone else has

13   read my profile.  Liz was listed -- Princessmom was listed as

14   having read my profile, so I tapped on her profile to see what

15   she was all about.

16   Q.  When you tapped on her profile and you saw this, what did

17   her profile convey to you?

18   A.  It conveyed that she's an age player.

19   Q.  Why?

20   A.  Everything about it.  Her user name, Princessmom.  In the

21   kink space, "mommy" is a role.  There is -- I don't think it's

22   an exaggeration to say that there is nobody with a profile on

23   KinkD who is using "mommy" to mean mother; it means a kinky

24   role, the mother role, the female dominant role, in a kind of

25   age play scenario.  That is the only thing it means.

K3CKBRI4                    Bright - Direct

1              So her role, her name, the fact that she had been --

2      she says she's been kinky for two years, and then the

3      self-summary looking for a teacher to teach my kids about the

4      birds and the bees, like that's -- you're not recruiting

5      educators on a kinky dating app.  This is clearly fantasy, it's

6      euphemism, it's a kind of playful way of talking about sex and

7      kinky sex, and, to me, abundantly obvious that it was age play.

8      Q.  When the self-summary says "Teach my kids" --

9      A.  Yeah.

10     Q.  -- did that change your opinion at all about the intention?

11     A.  No.  What it said to me was that she has littles already,

12     that she has some kind of prior relationship with multiple

13     littles.  And that's -- in this space, I would say that's not

14     exceptional.  People in the dominant role making plans for and

15     on behalf of their submissives is commonplace because it helps

16     establish that power differential, you know, it sets the tone

17     of who's in charge and who's not.  That's doubly true in age

18     play, where it really reinforces the fantasy; it's mommy who

19     makes the sort of social engagements for the kids, not like,

20     hey, you know, you're going to see your friends or you're going

21     to, you know, whatever the play date may be.  So, yeah, it made

22     me say that she had littles and that she had this preexisting

23     situation.

24     Q.  When you read this profile, did you have any doubts or

25     concerns that the kids were adults?

K3CKBRI4                      Bright - Direct

1   A.  Sorry?

2   Q.  Did you have any doubts or concerns that the kids were

3   actual children?

4   A.  No.

5   Q.  Was this self-summary, for what it tells you, something

6   that interested you?

7   A.  Yes.  The teaching, like teaching about the birds and the

8   bees, that's really very similar to the scenario that I've

9   described to Stevie and Denesy and many others.  It's not

10  identical but it's very close.

11  Q.  Is this a typical for you, Daddy Dom/Little Girl scenario

12  or age play scenario?

13  A.  Yes, the scenario that I have actually most explicitly

14  looked for and described, and, like I say, there is a slight

15  difference in that I'd be the outside teacher rather than daddy

16  or stepdad or something like that, but the whole teaching and

17  that aspect of it is exactly what I've been looking for.

18  Q.  How did you contact Princessmom?

19  A.  I messaged her on KinkD.

20  Q.  Was Princessmom the only person you were communicating with

21  on KinkD or other dating websites at the time?

22  A.  No.

23  Q.  Let's take a look at your initial message on KinkD.

24          MS. GALLICCHIO:  If we could publish Government

25  Exhibit 2A.

K3CKBRI4                      Bright - Direct

1    Q.  Do you recognize that, Mr. Bright?

2    A.  Yes.  That's our KinkD conversation.

3    Q.  When did you -- when did you send your message?

4    A.  April 18th.

5    Q.  What do you say?

6    A.  "Hi.  I'm Peter.  Can you elaborate a little further on

7    your profile?"

8    Q.  Why did you ask her that?

9    A.  Because I wanted to -- the situation here was clearly, she

10   had a scenario already in mind, I wanted to find out what that

11   scenario was in a little more detail.

12   Q.  She responds to you, "Hi, Peter.  Sorry - I was swamped

13   with finals but free to discuss now," with a smiley face.  And

14   then she says, "My princess is 7 and my prince charming is 9."

15            What, if anything, did that say to you, convey to you?

16   A.  That reinforced my belief that this was age play.  The very

17   fact that she was introducing them using these kind of

18   euphemisms said age play, because that's what we do in age

19   play.

20   Q.  Now, she, in her profile, she didn't select age player,

21   like you?

22   A.  No.

23   Q.  Did that change your impression at all or have any effect

24   on your impression of what she was conveying?

25   A.  No, because, I mean, she had picked mommy, and mommy is

1   kind of a more specific term, so the fact that she hadn't

2   picked the general term didn't really matter.  You know, the

3   fact that she had picked mommy already implied age player.

4   Q.  What about the fact that she gave the kids' ages of seven

5   and nine, did that affect your understanding of what was being

6   conveyed here at all?

7   A.  No.  As part of our age play scenario, you pick the ages or

8   you set the ages.  Some people have particular preferences for

9   their ages; some people are more flexible or will change the

10  scenario.  I don't know how to put it.  You can change the age

11  based on the scenario you want to play or you change the

12  scenario based on the age you want to play, it could go either

13  way.  So, no, it just said she has this existing situation with

14  these littles, and that was their situation.

15  Q.  Now, did you move your communications to another platform?

16  A.  Yes.  Princessmom requested that we switch to using

17  WhatsApp.

18  Q.  Before we go there, actually, can we take a look at

19  Government Exhibit 2B.  This is a continuation of that

20  conversation.

21        You say, "Okay.  Do they need educating?"

22  A.  "And they need educating?"

23  Q.  "And they need educating."  Thank you.

24        What do you mean by that?  Why did you write that?

25  A.  It's continuing in the sort of theme of the role play.  She

K3CKBRI4                        Bright - Direct

1   said she was looking for someone to teach them, and so I was

2   trying to again get her to explain the sort of parameters, the

3   bounds of the scenario she had.

4   Q.  Now, the next communication with her on KinkD, you say,

5   "This might be better over text, messaging here is not very

6   reliable," and you give your phone number?

7   A.  Yeah, yes.

8   Q.  Why did you suggest that and do that?

9   A.  Oh.  KinkD is very annoying, it's not very good, and

10  sending the push notifications to your phone, you know, someone

11  can send you a message and it won't alert you, so it's easy to

12  lose track of conversations.

13  Q.  The phone number you included in this text, is that your

14  real phone number?

15  A.  Oh, no.  I think it's a Google Voice number.

16  Q.  But does that belong to you?

17  A.  It belongs to me, yeah, yes.

18  Q.  How do you access that Google --

19  A.  I'd suggested that because I can access that on my PC very

20  easily, and I prefer typing on a computer keyboard to a phone

21  keyboard.

22  Q.  Now, as you said, she suggested WhatsApp?

23  A.  Yes.

24  Q.  You noted, "No" -- she asks, "You got WhatsApp?"  And you

25  said, "No, just SMS"?

K3CKBRI4                         Bright - Direct

1    A.  Yeah; the Google Voice number doesn't have WhatsApp.

2    Q.  Did you, at some point, obtain WhatsApp?

3    A.  Yes.  I gave her my WhatsApp number.

4    Q.  Do you use WhatsApp in any other contexts other than the

5    dating context?

6    A.  Yes.  I use it for talking to family members and I use it

7    for dating.

8    Q.  Now, when you met Liz on KinkD, did you have any thought

9    whatsoever that she was a real mom looking for someone to have

10   sex with her children?

11   A.  At this point, no.

12   Q.  Did there ever come a time, in all of your

13   communications - WhatsApp or KinkD, WhatsApp, just in

14   general - that that changed?

15   A.  Yes.

16   Q.  And, generally speaking, when was that?

17   A.  That was when she sent me some photographs on May 19th, I

18   think.

19   Q.  So you began your communication on WhatsApp.  Do you recall

20   what date?

21   A.  I think it was May 14th.

22           MS. GALLICCHIO:  Can we take a look at -- can we

23   publish, I'm sorry, Government Exhibit 3A.

24   Q.  Just take a look at the first page.

25           Now, do you recognize Government Exhibit 3A?

K3CKBRI4                          Bright - Direct

1   A.  Yes.

2   Q.  What is it?

3   A.  This is a transcript of the WhatsApp communication between

4   me and Princessmom.

5   Q.  So, on -- it appears that on May 14, 2019, you write:  "Hi

6   there.  I'm from KinkD"?

7   A.  Yes.

8   Q.  Did you get a response?

9   A.  Yes.

10  Q.  When did you get that response?

11  A.  May 15th.

12  Q.  And is that the beginning part of your communication?

13  A.  Yes.

14  Q.  In general, was there anything unusual about the

15  communications with Liz as opposed to the littles in your chats

16  on WhatsApp?

17  A.  I'm not sure I understand the question.

18  Q.  Let me rephrase.  I'm sorry.

19       You communicated with Liz, right?

20  A.  Oh, right, yes.

21  Q.  According to your testimony, there -- she was proposing a

22  play scenario --

23  A.  Yes.

24  Q.  -- with two others, right?

25  A.  Yes.

K3CKBRI4                        Bright - Direct

1    Q.  Did you have any communication with these two others?

2    A.  No.

3    Q.  Was there anything unusual about that?

4    A.  No.

5    Q.  Why not?

6    A.  As I say, it's not unusual for dominants, mummies, daddies

7    to make arrangements on behalf of their submissives and

8    littles.

9    Q.  At some point, you had a phone call with Liz, right?

10   A.  Yes.

11   Q.  Do you recall when that was?

12   A.  May the 17th.

13   Q.  I want to talk about the chats that you had with Liz before

14   the phone call.

15   A.  Yes.

16   Q.  In general terms -- and we'll go into more specifics, but,

17   generally, can you describe the nature and the content of these

18   communications before the phone call?

19   A.  They were -- I think it was a mix.  There was some sort of

20   sexual content.  I think there was sort of just more general

21   getting to know you type messaging.  It was -- I think the

22   sexual content was clearly age play because, again, she kept

23   using these words like princess, and little girl, and things

24   like that.

25   Q.  Let's take a look at page 2.

1    So, on page 2, in the third blue bubble, you write:

2    "So I'd love to hear more about what you're looking for"?

3    A.  Yes.

4    Q.  Why do you write that?

5    A.  Again, this is a fantasy that Liz is inviting me into, and

6    I want to learn more about what it is.

7    Q.  Then on page 3, Liz asks you in the first green bubble:

8    "Do you have any teaching experience?"

9    A.  Yes.

10   Q.  And you respond:  "A little, yes.  Teaching girls about the

11   changes their bodies go through, that kind of thing.  Helping

12   them learn how to use their bodies or those of other people."

13       So what did you believe she was asking you, and why

14   did you respond in this way?

15   A.  Well, throughout -- you know, I don't think she ever says

16   explicitly by teaching, I mean, like, sex, but it's strongly

17   implied.  And so I think she's asking me have you engaged in

18   this kind of scenario, this sort of teacher-student scenario,

19   before.

20   Q.  When you say "Teaching girls about the changes their bodies

21   go through, that kind of thing," are you referring to children

22   or something else?

23   A.  Adult women.

24   Q.  You use the word "girls"?

25   A.  Yes.

1   Q.  Do you use the word "girls" frequently?

2   A.  Yes.

3   Q.  When you use it, what are you referring to?

4   A.  Women, adults.

5   Q.  Now, let's go to page 4.

6           On the second green box, Liz texts you:  "I really

7   want my little princess to learn how to be a good girl and

8   understand how to feel good."

9           So when Liz said to you "I really want my little

10  princess to learn how to be a good girl," what did that convey

11  to you?

12  A.  This is like one of the most age-play dom/sub sort of

13  sentences I've ever read.  The surest way to make a submissive

14  girl happy is to tell her she's a good girl and little

15  princess.  I mean, it's just blatant age-play language.

16  Q.  Let's look further on that page.  She continues to write:

17  "And understand how to feel good."

18          And then you say:  "To teach her to best pleasure boys

19  and how to get herself off.  That kind of thing sounds very

20  much like what I've done before, and I'm looking to do."

21          So when you refer to "boys," who are you referring to?

22  A.  People like me, men.

23  Q.  And you say:  "That kind of thing sounds very much like

24  what I've done before and what I'm looking to do"?

25  A.  Yes.

1    Q.  What are you saying here?

2    A.  This is the kind of adult experience I've had and look for.

3    Q.  And then let's go to page 5.

4         MS. GALLICCHIO:  If we can just do the first half of

5    the page.  Zoom in on that.

6    Q.  Liz says to you:  "That's exactly what I hope that she can

7    learn from the lessons.  She already knows the basics of

8    sucking a cock and licking."

9         You say:  "That's great.  And you want this to be very

10   hands-on and interactive?"

11        She says:  "Of course, interactive.  How have you

12   taught in the past?"

13        Can you just talk us through this conversation and

14   what you're saying?

15   A.  Again, like, lessons, we're not literally talking about

16   lessons, we're talking about sexual play.  And, you know,

17   she's, again, describing the scenario, the history, they've

18   already had play of this kind before, and that's what we hoped

19   to continue, what I hoped to continue.

20        MS. GALLICCHIO:  Let's zoom in on the last two boxes.

21   Q.  So she asked you how you taught in the past, and you say:

22   "Interactively.  Just wanted to be sure we're on the same page.

23   Do they play with each other or just with the teacher?"

24        Why did you ask that question?

25   A.  Again, establishing how she runs the scene, the scenario.

K3CKBRI4                        Bright - Direct

1   Q.  Who was in charge here?

2   A.  Liz.  You know, she was the one -- I mean, of her and the

3   littles, she was the one in the dominant role.  And, again,

4   this is her scenario that she was inviting me into.  So I'm

5   using the same language because I want to entertain that

6   fantasy, and enjoy that fantasy, and share in that fantasy, but

7   I'm getting her to tell me more about what it is because it's

8   in her head, it's not in my head.

9           MS. GALLICCHIO:  Page 6, please.  Let's go to the

10  first five boxes.

11  Q.  So she responds:  "No, they play with each other and

12  teacher."

13          You say:  "Okay, good."

14          And then she asks you:  "You have any experience with

15  little prince charmings?"

16          You say:  "Yes, but I know how boys work, so I don't

17  think it will be an issue.  I'd love to see them"?

18  A.  Yes.

19  Q.  So what did you believe she was conveying when Liz said,

20  "No, they play with each other and teacher"?

21  A.  I mean, exactly -- the sex is -- it's, I guess, sort of a

22  three-some scenario, not just parents.

23          THE COURT:  All right.  Ladies and gentlemen, we're

24  going to take a midafternoon break.  Please do not discuss the

25  case among yourselves or with anyone.  We'll be back in action

K3CKBRI4                    Bright - Direct

1     in ten minutes.

2                  Thank you.

3                  (Jury not present)

4                  THE COURT:  We are in recess.  Thank you.

5                  MR. MAIMIN:  Thank you, your Honor.

6                  (Jury present)

7                  THE COURT:  I've been reading that standing is good

8     for everyone.

9                  All right.  Please be seated.

10                 Ms. Gallicchio, whenever you're ready.

11                 MS. GALLICCHIO:  Thank you, your Honor.

12                 So I think I'd go back to Government Exhibit 3A, page

13    6.

14                 So, from the second green bubble, Ms. Reyes, down, if

15    we can highlight that.

16    BY MS. GALLICCHIO:

17    Q.  So, Mr. Bright, you were -- back on May 15th, back to this

18    conversation, Liz wrote to you:  "You have any experience with

19    little prince charmings?"

20                 And then you go on to say:  "I know how boys work, so

21    I don't think it will be an issue."

22                 When you received this text, do you have any

23    experience with little prince charmings, what did you take that

24    to mean?

25    A.  Do you have experience with people playing the little role

1  who are male, in age play.

2  Q.  Did this convey to you that the prince or princess were

3  actual children, prince was an actual child?

4  A.  No.

5  Q.  Why not?

6  A.  It would be really bizarre, I think, to refer to real

7  children like that.  Like it's -- you know, it's one thing

8  for -- I can imagine someone calling their own kids prince

9  charming, prince -- but she's just talking about other littles,

10  other people.  Like you wouldn't use prince charming

11  generically like this to mean real children.  Like it's clearly

12  establishing it, to me, as an age-play term.

13  Q.  Now, you say -- sorry, did I interrupt you?

14  A.  No.

15  Q.  "I'd love to see them."

16  A.  Yeah.

17  Q.  What did you mean by that?

18  A.  I mean, an important part of any internet dating and

19  sexting is pictures.  I wanted to see the littles, yeah.

20  Q.  She asks you, at the bottom of the page:  "Where are you

21  from, by the way?"

22          And on the top of the next page, you say:  "London,

23  U.K. originally.  I live in Bushwick now."

24  A.  Yes.

25  Q.  Is that all true?

1    A.  Yes.

2             MS. GALLICCHIO:  We can go to page 8.

3    Q.  On the bottom, the green two green bubbles, Liz asks you,

4    on May 15th:  "When you last teach a little girl?  I don't want

5    just anyone teaching them."

6    A.  Yes.

7    Q.  What did you think she was conveying when she said, "when

8    you last teach a little girl?

9    A.  No, I mean, again, this is age play.  Like the LG in DDLG

10   stands for little girl.  It couldn't have been clearer to me

11   that this was what she was talking about.

12            MS. GALLICCHIO:  Let's go to page 9, please.  The top

13   three boxes.

14   Q.  You respond:  "I have a girl I've been teaching off and on

15   for a couple of months now, but she's in the Bronx, which makes

16   the logistics much harder."

17            Liz writes:  "As old as my princess?"

18            And you say:  "A bit older, 11."

19            So, can you please describe who this girl in the Bronx

20   is that you've been teaching?

21   A.  So this refers to a woman in her thirties.  She's called

22   Alicia.  We met on OkCupid.  She lives in the Bronx.  She's

23   into age play.

24   Q.  Have you ever met this woman, Alicia, in person?

25   A.  Yes.

K3CKBRI4                    Bright - Direct

1    Q.  And so when you're referring here, "I have a girl I've been

2    teaching off and on for a couple of months now," are you

3    referring to a child or an adult?

4    A.  An adult.

5    Q.  You are asked, "As old as my princess," and you say, "A bit

6    older, 11"?

7    A.  Yes.

8    Q.  So why do you say that if Alicia is an adult?

9    A.  Because, in the fantasy world, and we're clearly in the

10   fantasy world, she was asking me about a little girl.  She's

11   telling me about her princess.  So, clearly, we're in this

12   fantasy space, and in the fantasy space, that's how old Alicia

13   was.

14   Q.  Did you ever clarify or tell Liz that this 11-year-old in

15   age-play years was an adult age player?

16   A.  No.  I mean, that would be like clarifying that she's human

17   or that she's alive.  It's so obvious, like we're talking about

18   age play here, that the clarification would be unnecessary.

19           MS. GALLICCHIO:  Now, let's look at the last two green

20   bubbles.

21   Q.  Liz asks you:  "What are you good at teaching?"  And she

22   says:  "We have started the basics with Kayla."

23           MS. GALLICCHIO:  If we can go to the next page,

24   please.  And the top three boxes.

25   Q.  You write:  "I think masturbation and anal sex are probably

K3CKBRI4                    Bright - Direct

1    my favorite subjects.  Helping girls find those special places

2    to touch, it's very rewarding, especially as so many grow up

3    without ever really learning these things."

4            So, can you describe your responses here to her

5    question, "What are you good at teaching?"

6    A.  It seemed like she's into what she's wanting to know, kind

7    of what I'm going to add to the fantasy, how I'm going to play

8    my role as the fantasy teacher.  And so I'm talking about sex

9    subjects that I figure would be fun to engage with -- engage

10   in.

11   Q.  When you say "Helping girls find those special places to

12   touch, it's very rewarding," are you speaking about children or

13   adults?

14   A.  Adults.

15   Q.  Now, further down, the last green bubble, Liz writes to

16   you:  "We haven't introduced Kayla to anal yet."

17           And on the next page, you write:  "I know it's not

18   everyone's thing, but there's important lessons for boys, too.

19   So many boys just try to stick it in without preparation."

20           Now, are you talking about adults or children?

21   A.  Adults.

22   Q.  And why are you having this conversation?

23   A.  So the first bubble, "I know it's not everyone's thing,"

24   clearly, the little has to consent to this.  Like if they --

25   plenty of people have anal sex as a limit and refuse to do it,

K3CKBRI4                    Bright - Direct

1    refuse to have anything to do with it.  So, you know, I

2    recognize it may not be an option because consent may be

3    denied.  But if it is a thing that's happening, then it's got

4    to be done right, to be safe and pleasant.

5           And I've heard -- you know, when I say "for boys," I

6    mean for adult men.  I've heard a lot of adult women

7    complaining about adult men who kind of don't know what they're

8    doing and end up injuring people.

9    Q.  Now, the bottom three green bubble responses, Liz's text,

10   she says:  "I agree...watching them experience pleasure makes

11   me so happy."

12          "You teach boys, too, about anal?  You definitely need

13   a lesson in preparation.  LOL."

14          So the first one, where she says, "I agree, and

15   watching them experience pleasure makes me so happy," what did

16   that convey to you?

17   A.  At the very least, she's going to be watching lessons.

18   Later on, I try to establish more of a role for her, but, at

19   the very least, she'll be watching.  And she enjoys watching,

20   and that's, again, a common thing that people -- dominants like

21   seeing their submissives engaging in sex.

22   Q.  And she asks you:  "You teach boys, too, about anal?"

23   A.  Yes.

24   Q.  Who did you believe she was referring to?

25   A.  Adult men.

1     MS. GALLICCHIO:  Can we go to page 12, please.

2  Q.  At the top of the page, you write:  "So learning about

3  lube, gently getting the anus more relaxed and open, this is so

4  important."

5     Are you referring to children or adults?

6  A.  Adults.

7  Q.  You are asked by Liz:  "How did the 11-year-old like anal?

8  Were you a good teacher?"

9     MS. GALLICCHIO:  And if we could go to the next blue

10  bubbles, please.

11  Q.  You write:  "I think boys need to be taught about it,

12  because I've heard so many horror stories from girls with

13  uneducated boys.  We are still going slow on that front,

14  getting her comfortable with touching that part, exploring it

15  with her fingers."

16     Can you break this down for us?

17  A.  So the first one, as I alluded to earlier, I've heard many

18  adult women complaining about adult men who, for want of a

19  better term, just try to stick it in, and real people are not

20  porn stars, and so they end up getting injured.

21     And, again, this is not female children telling me

22  about male children who've done this; this is about adults

23  telling about other adults who've done this.

24  Q.  And then you refer to her question about --

25  A.  Yeah.

K3CKBRI4                        Bright - Direct

1    Q.  One moment.

2            You refer to her question about, "Did the 11-year-old

3    like anal?"

4    A.  Yes.

5    Q.  And you respond?

6    A.  Yes.

7    Q.  Can you describe that response, please?

8    A.  Alicia is, in fact, one of these girls who's had bad

9    experiences, but she wanted to have good experiences.  And so

10   that's literal truth.  She wants to try anal sex, but she

11   doesn't want to get injured in the process, and these are how

12   we're doing that.

13   Q.  How did you communicate with Alicia?

14   A.  She was on OkCupid initially and then primarily through

15   Signal.

16   Q.  Are those apps you have on your phone?

17   A.  Yes.

18           MS. GALLICCHIO:  Let's go to the next page, page 13,

19   and the top two bubbles, please.

20   Q.  So this is what you were referring to before, but Liz says:

21   "Yeah, they rip the inside and just force it in."

22           And you say:  "Yeah, and it puts girls off for life.

23   Such a waste"?

24   A.  Yes.

25   Q.  Is this what you're referring to?

K3CKBRI4                    Bright - Direct

1   A.  This is what I'm referring to.  "It puts girls off for

2   life," I mean they refuse -- these are adult women who refuse

3   to have anal sex, and they won't consent to it.

4                MS. GALLICCHIO:  If we could turn to page 26.  The top

5   of the page, the top two bubbles, please.

6   Q.  This is on same day, May 15th, 2019, Liz asks you:  "How do

7   you wanna start?"

8                And you answer:  "Gently.  I could come over, make our

9   introductions, get them to tell me about themselves, and show

10  me what they've learned already, something along those lines?"

11  A.  Yeah.

12  Q.  Can you describe what you were conveying in your response

13  here?

14  A.  Like -- as I said, like I feel that I need to actually know

15  my partners and my partners need to know me, and there needed

16  to be mutual trust and understanding.  I wouldn't be willing to

17  just dive into something like this without establishing that

18  initial understanding.  I need to know what the littles' limits

19  are, for example, and Liz can't tell me that.  Liz can say what

20  her limits are, but the littles need to give me their limits

21  themselves.  It needs to be me and them interacting.

22               So, I figured we would meet, we would talk, we would

23  learn about each other, we would make sure we're actually all

24  kind of into the same thing, make sure that they're consenting,

25  obviously.

SOUTHERN DISTRICT REPORTERS, P.C.

1          And, again, by "showing me what they learned already,"

2     so, again, me to learn more about their scenario, about the

3     existing role play dynamic that exists with Liz.

4          MS. GALLICCHIO:  Can we look at the rest of that page.

5     Q.  Liz writes:  "That's kind of how we started with our last

6     teacher, too, gentle and interactive.  Have you used teaching

7     tools before?"

8          You state:  What kind of teaching tools?"

9          And Liz says, "Wasn't sure if you used anything.  We

10    do."

11         MS. GALLICCHIO:  And then the next page, please.

12    Q.  You ask:  "What do you use?"

13         And she says:  "Vibrator."

14         You respond:  "Ah, okay.  I don't have anything like

15    that myself, but could certainly use one, if available."

16         And the next bubble is:  "Should probably be part of

17    any girl's education."

18         So what did that convey to you, this conversation

19    about teaching tools, vibrator, et cetera?

20    A.  Initially, I wasn't quite sure what she meant.  Like she's

21    clearly using this fantasy language, like teaching tools, but I

22    didn't immediately click what she was talking about.  She then

23    clarifies to say she means vibrators.

24         Again, clearly, vibrators are not, in actual fact,

25    teaching aids.  I'm pretty sure they're not used in classrooms,

1    but they are in the fantasy space, where we're having this

2    sexual fantasy and role play.  It makes perfect sense to use a

3    vibrator as a kind of teaching tool.

4           So, yeah, again, she's further defining the fantasy as

5    she sees it and inviting me into it.

6           MS. GALLICCHIO:  I want to go back for a minute to

7    page 14, the last two bubbles.  Actually, I'm sorry, can we go

8    to the bottom four.

9    Q.  So Liz says to you -- this is, again, on May 15, 2019 -- "I

10   think so, but it's important to get it right and experience it

11   in a caring environment."

12          And you say:  "Absolutely."

13          What did that say to you, this concept of "in a caring

14   environment" in the age-play context?

15   A.  Well, actually, I'm not sure I would say anything within

16   age play specifically, but within the broader dom/sub context,

17   scenes can be quite emotionally taxing.  People can find them

18   just draining, exhausting.  And it is really very important

19   that the dominant expresses to the submissive that they do

20   care, that the submissive is wanted, and desirable, and safe,

21   and, you know, helping them recover from the scene.

22          So, again, talking about a caring environment, it

23   brings to mind this sort of caring or aftercare, as it's

24   called, in the kink world.

25   Q.  Now, Liz asks you:  "How do you teach?"

1          And you say:  "In the past, it's been one-on-one in a

2     bedroom setting."

3          MS. GALLICCHIO:  And if we can go to the next page.

4     Q.  The first three bubbles, you write:  "I do find the idea of

5     teaching two together is very exciting."

6          And she writes:  "Would that be too much for you?"

7          And you answer:  "I don't think so."

8          So, again, are you referring to children or adults?

9     A.  Adults.

10    Q.  And when you say "The idea of teaching two together is very

11    exciting," what are you suggesting or referring to?

12    A.  A threesome with three adults, I think that's a pretty

13    common practice.  Certainly one I share.

14    Q.  So this whole fantasy of Liz's, is this something that

15    you're finding attractive at this point?

16    A.  Oh, very much so.

17         MS. GALLICCHIO:  Now, if we can go to page 16, the

18    second green bubble.

19    Q.  Liz asks you:  "So personal question, but any diseases?"

20         Was that significant to you in any way or convey

21    anything to you?

22    A.  I mean, it conveyed that she was responsible.  My

23    experience is -- frankly, my experience is that the monogamous

24    heterosexual world is not great about STD testing and safe sex

25    practices, but the kinky world and the polyamorous world take

K3CKBRI4                        Bright - Direct

1    it more seriously.  It is so routine to ask your partner or

2    partners about STDs, about whether they've been tested

3    recently, about what their safe sex practices are.

4              So this -- her profile said she'd been kinky for two

5    years, and this kind of thing establishes, yeah, she operates

6    in this world, she knows the kind of things that are important.

7    Q.  Now, did you send her -- you sent her photos of your STD

8    test?

9    A.  Yes.

10   Q.  Is that something that was unusual for you to do?

11   A.  No.  Like, I know people who have screenshots or

12   photographs of their STD results on their dating profiles.  I

13   know someone who periodically tweets them out each time she

14   gets tested.  I've had partners ask me to see printouts or

15   online results before.  So, no, this was not unusual at all.

16   Q.  Now, you asked Liz for photos a few times, right?

17   A.  Yes.

18   Q.  Why did you do that?

19   A.  Again, I think, as I said before, it's like a common

20   feature of internet dating, it's a common feature of sexting,

21   and you want to know what your partners look like.

22   Q.  Were you asking for photos to see if they were children or

23   adults?

24   A.  No.

25             MS. GALLICCHIO:  Let's look at page 23.  The third

SOUTHERN DISTRICT REPORTERS, P.C.

K3CKBRI4                    Bright - Direct

1   blue and the second green.  I'm sorry, the second blue and the
2   second green.
3   Q.  So this is on May 15th again.  You ask:  "Any family
4   photos?"
5          And Liz responds:  "Of course, but I'm not sending
6   their faces until I know for sure you are serious about this."
7          So why did you use "family photos"?
8   A.  Because I'm playing into -- you know, I'm buying into her
9   fantasy.  A general -- I think it's generally considered polite
10  to keep up the fantasy.  You know, you maintain the illusion,
11  you respect the scenario, unless there's some really good
12  reason not to.
13  Q.  Now, she says that she's not sending their faces until she
14  knows you're serious about this.
15         Did this raise any red flags with you or any concerns
16  about what was going on here?
17  A.  No.  Again, this is a thing that is very common in this
18  space.  I am quite open -- I am very open about my sex life and
19  sexuality, but a lot of people are much less open, particularly
20  when it comes to kink.  Many of the profiles you see on KinkD
21  will have maybe someone's face in shadow, or hidden profile, or
22  partially cut off, so you can't identify them.  People even go
23  further.  Like if they have tattoos or other distinguishing
24  marks, they'll blur them out or black them out, so you can't
25  use these pictures to figure out who they are.

1         I think Liz's own profile picture even is kind of
2    semiobscure.  It's the kind of picture that someone would use
3    like -- they don't want to shout out to the whole world here I
4    am and I'm on this site.
5    Q.  Now, you shared some, early on, photos of yourself?
6    A.  Yes.
7    Q.  I'm not referring to the penis picture.  When you shared
8    photos, did you share -- make any attempt to hide your
9    identity?
10   A.  No.  As I say, I think I've been fortune enough, that I can
11   actually be fairly open about these things.  I don't honestly
12   care if someone takes my pictures and spreads them all over the
13   internet.  In fact, I suspect that some of my pictures are
14   already all over the internet.
15   Q.  You sent one photo of you holding two Starbucks cups?
16   A.  Yes.
17   Q.  And you and Liz had some back-and-forth about double
18   fisting?
19   A.  Yes.
20   Q.  What was your intent in that exchange?
21   A.  Well, I mean, the whole reason I used that picture is it's
22   kind of a visual sort of dual entendre.  Yes, I'm double
23   fisting my drinks, but I know that double fisting has another
24   sexual meaning.  It's a way I can make a sex joke even in
25   innocuous circumstances, frankly.  And I thought Liz was

K3CKBRI4                     Bright - Direct

1    acknowledging that sex joke and joking along with me.

2    Q.  Now, you then sent a photograph of yourself shirtless,

3    right?

4    A.  Yes.

5    Q.  Was that a photograph you took in the moment and sent?

6    A.  Yes, it was.

7    Q.  And why were you shirtless?

8    A.  One of the greatest joys of working from home is that a

9    great deal of time, much to my wife's annoyance, I can work at

10   home in a bathrobe, or in my boxer shorts, or sometimes wearing

11   nothing at all.  And I think I had pants on that day, but I

12   didn't have a shirt.

13   Q.  Now, in your communications with Liz overall, did you share

14   any of your personal information?

15   A.  I told her quite a lot about myself.  You know, I talked

16   about my job, I talked about where I grew up, I talked about

17   other relationships I had.  Yeah, I think -- she had my phone

18   number.

19   Q.  Were you truthful?

20   A.  Yes.

21          MS. GALLICCHIO:  Can we look at page 34, please.  The

22   second blue bubble.

23   Q.  This is the next day, on May 16th, 2019.  You say:  "Oh,

24   um, I don't know if it matters, but I'm not circumcised."

25          Why did you send this text?

K3CKBRI4                     Bright - Direct

1    A.  I've had people withdraw their consent when they've

2    discovered that I'm not circumcised.  Well, one person, one

3    adult woman, withdrew her consent when she found out I wasn't

4    circumcised.  And it was a frustrating experience because, you

5    know, we'd chatted, we had been on a date together, we'd gone

6    back to her place, we'd got undressed, and then she said, oh,

7    no, we're not having sex.  And I respected that, but it was,

8    nonetheless, disappointing to have all that buildup and then

9    have to cancel at the last minute.

10           And so I wanted to preempt that ever happening again

11   by saying it upfront, because I thought Liz or her littles

12   might not want to play with me because I wasn't circumcised.

13           MS. GALLICCHIO:  Let's look at the next four boxes.

14   Q.  In response to that, Liz says:  "They have never seen an

15   uncircumcised cock.  It still teaches the same.  LOL."

16           And you say:  "Yeah."

17           And she says:  "It may just add to the lesson.  LOL."

18           Was there anything about this exchange that caused you

19   any unease or raised any red flags about who the prince and

20   princess were?

21   A.  No.  I mean, I'd already presumed that they were American,

22   and a lot of Americans have not seen -- certainly not seen

23   firsthand an uncircumcised penis.

24   Q.  I'm referring to whether they were adult children.

25   A.  Yeah, no, right, adults.

1    MS. GALLICCHIO:  If we can go to page 46, please.
2    From the second green bubble to the end.
3    Q.  Now, this is on May 16th.
4         By the way, is May 16th before or after the phone
5    call?
6    A.  It's before.
7    Q.  And is it before or after you received the photos of the
8    children?
9    A.  Before.
10   Q.  Liz asks you:  "You thought about what kind of lesson you
11   would like to start with?"  And she then asks you:  "Anything
12   excite you?"  With a smiley face and a question mark.
13        And then you respond by saying:  "It really depends on
14   their experience, but I'm thinking maybe something involving
15   foreskin is the way to start because it's still kinda unusual
16   over here."
17        So it may be repetitive, but describe what this
18   conversation conveyed to you.
19   A.  So, in asking me about the lesson I wanted to start with,
20   it's, again, she's now asking me for my input into the fantasy.
21   And there is a -- to play this role of a teacher, and it's
22   like, well, what are you going to teach?
23        And, yeah, the foreskin thing seemed like a kind of
24   teachable moment.  So, yeah, that's -- it's extending the
25   fantasy and giving my input.

K3CKBRI4                        Bright - Direct

```
 1                MS. GALLICCHIO:  Let's turn to page 47.
 2   Q.  Without going into all of this, you've seen this text
 3   exchange, right?
 4   A.  Yes.
 5   Q.  Does this relate to what you referred to, the girl who
 6   turned you away?
 7   A.  Yes.
 8   Q.  But, in particular, the second green bubble and the first
 9   blue bubble, does the other -- Liz asks you:  "Does the other
10   girl you teach like it?"
11                And you answer:  "Yes"?
12   A.  Yes.
13   Q.  Who are you referring to in that?
14   A.  Alicia, the 30-something.
15   Q.  Now, the fact that Liz gave the littles' names, Kayla and
16   Braydon, did that have any impact on your belief as to whether
17   they were children or adults?
18   A.  No.  I think it was literally -- the first thing I said to
19   Liz was to give her my name.  Having names is -- we all have
20   names, and giving people's names is not significant in any way.
21   Q.  Now, in general, what was your impression of Liz during
22   these initial chats before the phone call?
23   A.  It seemed like she had a fairly -- she had an existing
24   relationship with two adults who played littles, who played a
25   boy and a girl, and she was inviting me in to join that
```

K3CKBRI4                    Bright - Direct

1  role-playing fantasy.

2  Q.  She mentioned a few times in the chats about a teacher they

3  had in the past?

4  A.  Yes.

5  Q.  That had left and maybe gone back to Italy, correct?

6  A.  Yes.

7  Q.  What impact did that have on your impression of this

8  relationship?

9  A.  It made it clear that this relationship had been going on

10  for some time, and that they kind of knew the roles they were

11  playing, and had a very well-defined idea of what the scenario

12  was, but nothing more than that.

13          MS. GALLICCHIO:  Ms. Reyes, if we could publish/play,

14  for the jury, Government Exhibit 9 and if we could put up 9T,

15  clip 5, of Government Exhibit 9.

16  Q.  So, Mr. Bright, I want to have you listen to this part of

17  your interview with the police.

18          MS. GALLICCHIO:  Okay, Ms. Reyes, if we could begin.

19          (Video playback)

20          MS. GALLICCHIO:  Thank you.

21  BY MS. GALLICCHIO:

22  Q.  Now, do you recall -- Mr. Bright, do you recall this moment

23  in the questioning by Agent Spivack?

24  A.  Yes.

25  Q.  Can you describe what it was that you were explaining or

K3CKBRI4                         Bright - Direct

1    trying to explain?

2    A.  I was explaining -- as we just saw, at the time I told the

3    foreskin story to Liz, I thought we were talking about adults,

4    I thought it was age play, and so I was trying to explain to

5    him -- like, I don't think I understood what his question

6    really meant because he never quite said what he meant.  I was

7    asking the sort of surface level question, like why are you

8    talking about this, and I was talking about this because Liz

9    asked me about the lesson.

10            What I think he really meant was why were you talking

11   about this when you knew it was about kids, and the answer to

12   that is, I didn't know it was about kids.  Like I never -- I

13   wasn't talking about this because I expected children to see my

14   penis; I was talking about this because I expected adults to

15   see my penis and for adults to say, no, you're not having sex

16   with me because I don't like that.

17            (Continued on next page)

18

19

20

21

22

23

24

25

K3CLBRI5                     Bright - Direct

1   BY MS. GALLICCHIO:

2   Q.  So you that's a phone call, right?

3   A.  Yes.

4           MS. GALLICCHIO:  If we can turn to Government Exhibit

5   3A again, page -- let's go to page 57, top of the page.

6   BY MS. GALLICCHIO:

7   Q.  So on May 17, at 4:13, Liz sends a text:  "Great chatting

8   with you," right?

9   A.  Yes.

10  Q.  When was the phone call in relationship to this text?

11  A.  I think immediately prior to that.

12  Q.  Okay.  Was it -- and why did you speak on the phone?  Who

13  asked to speak on the phone?

14  A.  Liz asked to.

15  Q.  Was it unusual for you to speak on the phone before a

16  playdate?

17  A.  No.  I've had dates who even before our first date wanted

18  to speak on the phone.  I've had some who wanted to video call

19  me on Facetime or on Skype.  It seems quite a common thing that

20  people do to kind of establish that sort of initial connection,

21  establish that initial compatibility.

22  Q.  Now, we heard a few clips from that phone call, right?

23  A.  Yes.

24  Q.  Was that the entire phone call?

25  A.  No, I don't believe so.

1   Q.  In that phone call, you did talk about the first lesson

2   having to do with foreskin?

3   A.  Yes.

4   Q.  At that point, did you have any -- I'm sorry.  Let's just

5   be clear.

6           Was this before the photograph of the children were

7   sent?

8   A.  Yes.

9   Q.  And during this phone call, Liz asks you to bring a

10  printout of the STD test?

11  A.  Yes.

12  Q.  Right?

13  A.  Yes.

14  Q.  Did that concern you in any way, cause you any unease?

15  A.  No.  As I say, it's a thing that is often asked in the kink

16  and the polyamorous space.

17  Q.  In the conversation with Liz, she mentions that she's

18  taking -- she may take the kids to the playground, right?

19  A.  Yes.

20  Q.  And you make some comment about "let's have at it," right?

21  A.  Yes.

22          MS. GALLICCHIO:  If I can have a moment, your Honor?

23          THE COURT:  You may.

24  BY MS. GALLICCHIO:

25  Q.  If you could just look at the transcript, Government

K3CLBRI5                    Bright - Direct

1    Exhibit 5T A-2.

2              So just looking at the transcript without listening to

3    the audio, Mr. Bright, Liz says:  "I'm just hoping it's nice

4    out.  It's so much easier to entertain the kids when it's not

5    so rainy or not stuck inside."

6              And you respond:  "Yeah, yeah" some unintelligible

7    comment.

8              "Just go to the park or playground or something."

9              And you say here:  "Have at it."  Right?

10             Okay.  So when you Liz said this to you, what did you

11   think she was conveying?

12   A.  So -- well, as Dr. Cantor said -- well, he said that all

13   age-players are sexual even things that don't seem sexual.  I

14   would call these things "nonsexual."  Within age-play, yes,

15   there's the obvious bedroom stuff, but there can be way more

16   beyond that.  There can be like having a tea party or Teddy

17   bear picnic; going to Chuck E. Cheese for a meal, making the

18   kids order off a kids menu; going to the park, riding the

19   swing, that kind of thing.

20             And I have some interest in these sort of nonsexual

21   activities.  I think they can be fun.  They can help reinforce

22   the power of a relationship.  It sounded to me like Liz was a

23   lot more into them -- her littles was a lot more into them than

24   I was.  But I was familiar enough with the space -- the world

25   of age-play to understand the kind of things she meant.

K3CLBRI5                        Bright - Direct

1    Q.  All right.  So when she's referring to the kids here, did

2    this suggest to you in any way that she was talking about

3    actual children?

4    A.  On its own, no.  But on later reflection, it did stand out

5    to me just as maybe -- maybe I was misunderstanding her and

6    that these weren't "littles."

7    Q.  When you say on reflection --

8    A.  Yeah.

9    Q.  -- when were you -- when was this, the reflection?

10   A.  The real reflection was the -- mainly the -- on the 17th, I

11   think.  Mainly the 18th.

12            So after the call and we chat, a bit after the call

13   things are sort of going around in my head, thinking of some of

14   the things she's said some of the things she's written.  And,

15   yeah, the more I think about it, the more it seems, well, she

16   said -- she said these things, which are reasonable, but then

17   these one or two things that stood out and seemed a bit

18   strange.  And, yeah, it was over -- so this was on Friday, so I

19   think it was the Saturday that it really sort of came together.

20   Q.  Okay.  We'll get there in a minute.

21            In your communication with Liz, were you attracted to

22   Liz as well as the littles?

23   A.  Oh, God, yes.  She's an attractive woman.  And a number of

24   times I tried to encourage some kind of involvement from her,

25   because I definitely wanted to play with her.

K3CLBRI5                        Bright - Direct

1   Q.  Okay.  And, for example --
2           MS. GALLICCHIO:  If we could look at page 49 of
3   Government Exhibit 3A?
4   BY MS. GALLICCHIO:
5   Q.  If you could just look at this whole -- can you read that,
6   the whole chat?
7   A.  Yes.
8           MS. GALLICCHIO:  Let's just highlight the last three
9   bubbles.
10  BY MS. GALLICCHIO:
11  Q.  What were you chatting about here?
12  A.  We were talking about my foreskin again.
13  Q.  Okay.  And you say at the bottom of this page:  "Maybe
14  you'll need a lesson too?"
15  A.  Yes.  So lesson in this context clearly means some kind of
16  sex-play session.  You know, throughout we've been using
17  "teaching," and "lessons," and "education," these kind of
18  euphemisms for sex.  So, yeah, I'm saying:  Maybe you and I
19  will need to have sex as well.
20  Q.  Okay.  Let's look at page 57.  So, again, this was right
21  after your phone call, Mr. Bright.  You say in the second blue
22  bubble:  "Oh yeah, the reason I was curious about your
23  involvement is that I was thinking that for explaining things
24  like the clitoris, the proximity of the vagina and anus, etc.,
25  it would probably be easier to show them on you"?

1   A.   Yes.

2   Q.   What were you suggesting there?

3   A.   So what I actually had in mind here was having Liz serve

4   almost as a kind of anatomical model in a lesson so she would

5   be naked and I could point out her body parts, show them.  So

6   we would both be building on the teaching fantasy, the

7   scenario, but also Liz would be there naked, which I would have

8   enjoyed a great deal.

9   Q.   Okay.  Look at page 61.

10           At the bottom of the page, you ask -- the last blue

11   bubble:  "Do you want the lessons to be hetero normative?"

12   A.   Yes.

13   Q.   Why did you ask that question?

14   A.   Because there was a little boy and a little girl involved.

15   And so there would be some boy-on-boy action.

16   Q.   When you say "little boy and little girl involved" --

17   A.   I mean, male adult, female adult, but playing these roles.

18           MS. GALLICCHIO:  Now, let's go to the next page and

19   the first four bubbles, please.

20   BY MS. GALLICCHIO:

21   Q.   Liz says to you:  "Sorry for my ignorance.  What do you

22   mean by that?  As opposed to what?"

23           And you say:  "Does Kayla eat flowers and Braydon suck

24   snakes."  And Liz says:  "yes, Kayla eats flowers, and Braydon

25   sucks snakes."

1          So is there anything about this exchange that stood

2     out for you?

3     A.   You know, it -- it surprised me that Liz didn't know what I

4     meant by the question.

5     Q.   Why?

6     A.   In any situation where two men are sort of naked and

7     possibly touching each other, those kinds of questions of will

8     they or won't they touch each other, interact with each other

9     seems like quite an important question when you have two men

10    and a woman in a room together.

11    Q.   The question you asked --

12    A.   It's like -- so for Liz to not understand, I'm asking is

13    there going to be same-sex contact here or are we going to

14    stick with traditional heterosexual norms.  Like, it seems like

15    an obvious thing to ask and the thing that would be understood

16    in this world.

17    Q.   And the fact that she didn't?

18    A.   It seemed weird.  Like, it -- everything -- maybe my

19    expectations of other people are too high.  But it just seemed

20    weird that she wouldn't understand what I meant.

21    Q.   Now, you say, "does Kayla eat Flowers and Braydon suck

22    snakes" --

23    A.   Yes.

24    Q.   -- where did you come up with those?

25    A.   That was Liz's terminology.

1  Q.  Where did you learn that?

2  A.  She told me on the phone call.

3  Q.  Was that captured in the clips that we saw?

4  A.  I don't think so, no.

5  Q.  Was there anything about the use of that terminology,

6  "flowers and snakes" for private parts that you found

7  concerning?

8  A.  The opposite.  It, again, speaks to this being age-play,

9  because they use these sort of silly euphemistic terms.

10             MS. GALLICCHIO:  Let's go to page 63, the first green

11  bubble.

12  BY MS. GALLICCHIO:

13  Q.  Liz asks you:  "Do you have any limits or something you

14  don't like," right?

15  A.  Yes.

16  Q.  And let's look at the rest of that page.  You respond:  "I

17  can't think of anything relevant."

18             She asks:  "Well do you have stuff you like, like

19  anything particular you'd like covered in lesson one?"

20             And you say:  "I have a few kinks of my own but I'm

21  not sure of anything appropriate."

22             Okay.  So these questions about limits and things that

23  you like, did that speak to you in any way?

24  A.  Yeah.  The use of the word "limits."  Again, that is core

25  kink terminology, sort of the most basic term in the kink

K3CLBRI5                      Bright - Direct

1    space.  So it reaffirmed to me that she's talking about kinky

2    sex.

3              MS. GALLICCHIO:  Let's look at page 64, please.

4    BY MS. GALLICCHIO:

5    Q.  You describe your kinks, right?

6    A.  Some of them.

7    Q.  Okay.  And you indicate:  I enjoy piss plays, forced or --

8    like making a girl climax 15, 20, 25 times in a row.

9    A.  Yes.

10   Q.  Now, are you describing activities with adults or children?

11   A.  Adults.

12   Q.  Is this age-play?

13   A.  No, not to me.  I didn't think that these -- well, I mean,

14   I could imagine age-play situations where these things did

15   arise.  But in this teaching context, no, not at all.

16   Q.  Let's look at page 65 and the top four bubbles.

17             You describe watching girls pee, peeing on them,

18   peeing in them.  Are you referring to adults or children?

19   A.  Adults.

20   Q.  Liz asks you:  "You peed on a girl before?"

21             And you said:  "in her mouth, in her ass."

22             And she asks:  "How was that?"

23             Now, when Liz said "in a girl before," did you take

24   that to mean a child or an adult?

25   A.  An adult.

K3CLBRI5                      Bright - Direct

1   Q.  And the last two bubbles you write:  "I enjoyed it.  She
2   gulped it down and asked for more.  It was part of a broader
3   Dom/sub thing."
4           So what did you mean by expressing it was part of a
5   broader dom/sub thing?
6   A.  I was establishing that I wasn't doing this as part of
7   age-play but it was still dom/sub, which I think dom/sub is a
8   wider umbrella than age-play.
9   Q.  Let's look on page 66, the top three bubbles.
10          Liz asks you:  "Was that the little princess?"
11          And you say:  "No.  A girl I met from Craig's list."
12          She says:  "ah.  She was an eager student and loved
13  it."
14          So is there a distinction here in your mind of little
15  princess and the girl you met on Craig's list?
16  A.  Yes.  A little princess would be an age-player, whereas the
17  girl from Craig's list was not an age-player.
18  Q.  Now, in these conversations with Liz, did she ever correct
19  you and tell you she was looking for something different?
20  A.  No.  And she had a bunch of opportunities to.  You know, I
21  said this is part of al broader dom/sub thing, and she never
22  stopped to say, Oh, I'm not talking about dom/sub, we're
23  talking about something completely different.  And there were
24  other times as well.
25  Q.  Did you ever ask her if she was talking about sexual

1  activity with adults or children --

2  A.  No.

3  Q.  -- at this point?

4  A.  No.  At this point, I -- I wouldn't have any real reason

5  to.

6  Q.  Let's look at the bottom of page 66, your text.  The bottom

7  two boxes, please.

8          "Liz asks you:  "Would those be the kinds of things

9  you would be teaching?"

10         And you say:  "I mean, if you thought they were worth

11 teaching, I could but I would be concerned that they're a bit

12 too extreme."

13         What did you mean by this?

14 A.  Generally, it didn't fit my idea of scenario.  I think Liz

15 described things as being gentle.  I think I said similar sort

16 of things.  And there's nothing gentle about these things.  It

17 just doesn't fit this whole sort of teaching, exploring your

18 body, learning out to please yourself and please other people.

19 It's not a part of that.  It would break the fantasy to be

20 doing these things.

21 Q.  Let's look on page 67, the first four.

22         So Liz says:  "I was trying to understand what your

23 thoughts were.  I'm not sure peeing on them was ideal.  Lol.  I

24 was curious if you did it with a child and wondering how that

25 went over."  And you wrote:  "No, lol."

1       Is there anything about the language there that was

2  odd to you?

3  A.  Yes.  I don't -- I don't think I would say that "child" is

4  never used in age-play, but her sudden use of this word stood

5  out.  Every time before it would be "little girl," "little

6  prince," "little princess."  And then for her to suddenly say

7  "child," it stood out.  It sounded wrong.

8  Q.  Did you at that point ask for any clarification or follow

9  up with questions to her about it?

10 A.  No.  I thought maybe it's just like a slip of the mind,

11 maybe her using terminology is a little different from mine.

12 At the time I was still thinking of it in isolation.

13       MS. GALLICCHIO:  One moment.

14       If we could turn to page 68, the top three bubbles.

15 BY MS. GALLICCHIO:

16 Q.  You comment:  "I think things like in excess of back to

17 back orgasms need a certain level of maturity too."

18       And Liz writes:  "Yes.  Leading up to that is

19 certainly a good goal though, lol."

20       And you write:  "I think it's more of a mommy thing

21 than a princess thing."

22       Can you explain your communication?

23 A.  So the first paragraph, again, it's -- the first speech

24 bubble is like I don't think that this fits in with age-play,

25 certainly not the age-play we discussed.  But in my second

1   bubble, I'm kind of obliquely saying to Liz:  If you and I want
2   to do that, I'm down for that.
3   Q.  Okay.  Now, let's look at the second green bubble.
4           Liz says:  "Teaching a princess the orgasm is very
5   important."
6           Is there anything about this that caused you any
7   concern or unease about what she was talking about?
8   A.  No.
9           MS. GALLICCHIO:  Can we look at the next page, page
10  69?
11  BY MS. GALLICCHIO:
12  Q.  If you can just take a general look at this page.  And if
13  you could, explain what you were describing here.
14  A.  So in the first bubble, I'm alluding actually to another
15  fantasy I have.  It's not one that I discussed with Liz,
16  because, again, she is inviting me into her fantasy, so I'm not
17  going to try to superimpose like:  Here's what I want to do.
18  It's her world, and I'm just living in it.  But it's a fantasy
19  I've described to other people, such as Stevie and Denesy and
20  others, where the situation is reversed a little.  Rather than
21  daddy teaching the little girl his how your body feels good,
22  the little girl instead would say:  Daddy, it feels nice when I
23  touch here, you have a go.  So at least as much the same kind
24  of sexual encounter but just changing around sort of the
25  fiction around it.

1    Q.   Okay.  Let's look at the second bubble in blue.  So you

2    write:

3              "But otherwise help her discover that herself,

4    touching or vibrating her clit, putting a finger inside or

5    maybe a very tiny toy."

6              Are you talking about this activity with a child or an

7    adult?

8    A.   With an adult.

9              MS. GALLICCHIO:  Let's go to page 70, please, the top

10   three boxes.

11   BY MS. GALLICCHIO:

12   Q.   You asked Liz, on May 17th.  Is this after the phone call?

13   A.   This is after the phone call, yes.

14   Q.   Is this before the photo of the children?

15   A.   Yes.

16   Q.   You ask her:  "Is Kayla a virgin?"

17             And her response is:  "She's had the tip inside but

18   not the whole cock."

19             And you say:  "Okay."

20             Why do you ask that question?

21   A.   Again, trying to define the boundaries and parameters of

22   her fantasy.  Part of it was she said they had had lessons for,

23   I think she said, two years from their first teacher.  And so I

24   was wanting to know, well, you know, how far did things go in

25   this fantasy world.

K3CLBRI5                      Bright - Direct

1   Q.  Now, on the bottom of that page, page 70, you ask Liz:

2            "How old were you when you first took a whole cock?"

3            And then the next page on the top of the page she

4   says:  "I was nine but I wasn't eased into it at all."

5            And you respond:  "Ouch."

6   A.  Yeah.

7   Q.  All right.  So why did you ask her that question?

8   A.  Something -- I think it was something she said on the phone

9   call was nagging at the back of my mind.  Like, I think she

10  alluded to having been molested.  And I was trying to learn

11  more about that, because that wouldn't -- I mean, that's the

12  kind of thing that sets off alarm bells.  And so I wanted to

13  further kind of understand what it was that she was talking

14  about.  And like, you know:  Is this something in the fantasy

15  space, or is this something that really happened to you?  And

16  it sounded like something that really happened to her, which is

17  not the right thing, you know.  It's -- it kind of threw me.

18  Q.  Okay.  Now, this was Friday?

19  A.  Yes.

20  Q.  All right.  Let's just take a look at page 72.  And if we

21  look at the middle -- the second and third green bubble, we see

22  -- in these two bubbles -- a gap in time?

23  A.  Yes.

24  Q.  Okay.  What is it?

25  A.  It is about 43 hours.

K3CLBRI5                         Bright - Direct

1    Q.  So what was the time of the last communication that you had
2    with Liz on May 17th?
3    A.  9:47 p.m.
4    Q.  When was the next time you communicated with Liz?
5    A.  On Sunday, at 4:52 p.m.
6    Q.  And who reached out to who on that Sunday?
7    A.  Liz reached out to me.
8    Q.  She asked:  "How was the movies?"
9    A.  Yes.
10   Q.  Had you and she discussed the weekend plans?
11   A.  Yes.  I hoped to go and see a movie.
12   Q.  Did you have any communication with Liz on Saturday, May
13   18th?
14   A.  No.
15   Q.  And at the end of the day, on the 17th, what impressions
16   were you left with about Liz, if any?
17   A.  I'd been thinking she was an age-player.  But she had just
18   said a few things, and they were -- each on their own, they
19   were only, I think, small things, like going to the park or
20   playground or whatever it was.  Fine on its own.  But then she
21   had that.  She had this slip, I thought, where she said
22   "child."  She strongly implied that she had been molested as a
23   kid.  And so these were sort of like -- like I look back at the
24   texts and I was thinking about them.  And I started to think
25   maybe this isn't age-play after all.  Maybe it is something

1    else going on here.

2    Q.  And you said you started looking back at the texts.  When

3    did that happen?

4    A.  Mainly on Saturday --

5    Q.  Okay.

6    A.  -- the 18th.

7    Q.  Did you have plans that weekend?

8    A.  I went out on a date on the Friday night.

9    Q.  Did you tell Liz about that?

10   A.  I think I did.

11   Q.  Who did you have a date with?

12   A.  I had a date with a girl that I met on Grinder a few days

13   previously.

14   Q.  What is her name?

15   A.  She's called Red.

16   Q.  And how did you communicate with Red?

17   A.  Initially on Grinder and subsequently through texts.

18   Q.  And where are those texts?

19   A.  They're on my phone.

20   Q.  When specifically was that date with Red?

21   A.  It was -- I met her at a bar like 9:00 or 10:00 p.m. on

22   Friday evening, something around there.  We decided then to get

23   a hotel room and spend the night together.  So we left the bar,

24   I think, maybe -- I don't know -- midnight, 1:00 a.m.,

25   something like that.  We went to a drugstore.  I bought condoms

K3CLBRI5                        Bright - Direct

1    at the drugstore.  She bought some other essentials.  We then

2    went to the hotel and stayed there till checking out time.

3    Q.  Now, you had condoms on you when you were arrested, right?

4    A.  Yes.

5    Q.  Did you bring the condoms to the meeting purposefully for

6    the meeting?

7    A.  No.

8    Q.  Do you use condoms?

9    A.  Regularly.  My wife and I use condoms because she's not on

10   any birth control.  I don't want kids, I don't want to spread

11   diseases, I don't want to catch diseases, so I try to be a

12   responsible sexually active -- I mean, sexually promiscuous

13   adult.  Not because of any specific plans, just because sex

14   happens.  You know, sometimes you get dates on short notice on

15   Tinder, so it's good to be prepared.

16   Q.  Now, you said you bought condoms on Friday night, right?

17   A.  Yes.

18   Q.  The condoms that you bought were in your pockets on

19   Wednesday?

20   A.  Yes.

21   Q.  Okay.  So can you describe why you still had condoms in

22   your pockets -- other than what you've already said, but these

23   condoms in your pockets on Wednesday?

24   A.  Yeah.  Not through any conscious thought but just because,

25   frankly, the best word for it is I have a lot of crap in my

1    pockets at all times.  I stick stuff in my pockets and then I

2    leave it there for sometimes weeks, you know.  Every now and

3    then, I will go through, clear them out, and check out all the

4    old receipts and other things that I don't need.  But I stick

5    stuff in my pockets and forget about it.

6    Q.  Now, when you were arrested, do you recall what you were

7    wearing?

8    A.  Yes.

9    Q.  What were you wearing?

10   A.  Short-sleeve shirt and cargo shorts.

11   Q.  Had you worn those cargo shorts before?

12   A.  Yes.

13   Q.  When?

14   A.  I'm pretty sure I wore them on Friday night.  I'd also worn

15   them, I think, for most of that week.

16           MS. GALLICCHIO:  Could we have shown to the witness

17   only for identification, Defense Exhibit O?

18   BY MS. GALLICCHIO:

19   Q.  Mr. Bright, take a look at Defense Exhibit O.

20           Do you recognize what's depicted in that photo?

21   A.  It is me in the FBI's interrogation room.  And I am wearing

22   cargo shorts.

23   Q.  Does that photo accurately depict the clothing you were

24   wearing on the day you were arrested?

25   A.  Yes.

1         MS. GALLICCHIO:  Your Honor, at this time I'd seek to

2    move in Defendant's Exhibit O into evidence.

3         MR. LI:  No objection.

4         THE COURT:  Received.

5         (Defendant's Exhibit O received in evidence)

6         MS. GALLICCHIO:  Can I have it published to the jury

7    please?

8    BY MS. GALLICCHIO:

9    Q.  Take a look at Defense Exhibit O.

10        Mr. Bright, you see you in that picture, yeah?

11   A.  Yes.

12   Q.  Who else is in that photograph, if you know?

13   A.  I think the guy in the exciting shirt is the NYPD officer,

14   I think.  And I think the person near the door is -- I think

15   it's agent -- the other agent in the FBI interrogation.

16   Q.  Are those the shorts you were wearing, the cargo shorts you

17   were referring to?

18   A.  Yes.

19        MS. GALLICCHIO:  We can take that down.  Oh, actually,

20   put that back up again.  I'm sorry.

21   BY MS. GALLICCHIO:

22   Q.  Do you recall in which pocket you had the condoms?

23   A.  Probably my --

24   Q.  If you recall?

25   A.  No, I don't recall.

1   Q.  You had four condoms on you?

2   A.  I did.

3   Q.  If you recall, where were the four condoms?

4   A.  Two of them, which I didn't know I had until I was informed

5   by the FBI were in my wallet.  They were rather old and

6   squashed and not in good condition.  The other two were just

7   loose in my pockets -- one of my pockets.  Yeah.

8   Q.  Do you recall you had other things in your pockets?

9   A.  Yeah.  I had all sorts of other things.

10  Q.  What sorts of other things?

11  A.  So I had a conference pass for a conference that I'd been

12  to about two and a half weeks before I was arrested.  I had a

13  flight stub from the flight home from that conference.  The

14  conference was in Seattle.  So the flight stub from the plane

15  ticket.  I had a receipt from the -- I went to the movie

16  theater on Sunday to watch the third John Wick movie.  I bought

17  food at the movie theater, and I had a receipt for that.  I had

18  gum.  I had a cloth to clean my glasses.  I don't know.  Yeah.

19  Lots of things.

20  Q.  Can we --

21  A.  Business cards.  Yeah.

22          THE COURT:  I'm sorry, sir?

23          THE WITNESS:  Business cards.

24          THE COURT:  Thank you.

25          MS. GALLICCHIO:  Can we show, for identification only

1    to Mr. Bright, Defendant's Exhibit K?

2    BY MS. GALLICCHIO:

3    Q.  Do you recognize what's depicted in this photograph?

4    A.  Yes.

5    Q.  What is it in general?

6    A.  It is some of the contents from my pocket.

7    Q.  Does that fairly and accurately reflect some of the

8    contents in your pocket?

9    A.  Yes.

10          MS. GALLICCHIO:  Your Honor, can I have this published

11   to the jury?

12          THE COURT:  You want to offer it into evidence?

13          MS. GALLICCHIO:  Oh, yes.  I'm sorry.  I move this

14   into evidence.

15          THE COURT:  Any objection to Defendant's Exhibit K?

16          MR. LI:  No objection.

17          THE COURT:  Received.

18          (Defendant's Exhibit K received in evidence)

19          MS. GALLICCHIO:  May I publish it to the jury?

20          THE COURT:  You may.

21   BY MS. GALLICCHIO:

22   Q.  So, Mr. Bright, let's take a look at K.

23          MS. GALLICCHIO:  If we could zoom in on the boarding

24   pass.

25   Q.  Mr. Bright, is that the boarding pass you're referring to?

1    A.   Yes.

2    Q.   What is the date of that boarding pass?

3    A.   The 9th of May.

4    Q.   Why do you still have it in your pocket on May 22nd?

5    A.   Because on May the 9th when I boarded that plane, I put it

6    in my pocket.

7    Q.   Okay.

8    A.   And I never subsequently removed it from my pocket.

9              MS. GALLICCHIO:  Can we zoom in on the Union Square

10   Theater receipt?

11   BY MS. GALLICCHIO:

12   Q.   Take a look at that, Mr. Bright.  Do you recognize it?

13   A.   Yes.

14   Q.   What is that?

15   A.   That is the food I got from the concession stand -- the

16   receipt for the food I got from the concession stand at the

17   movie theater on that Sunday.

18   Q.   What date?

19   A.   May the 19th.

20   Q.   And why was that still in your pocket on May the 22nd?

21   A.   Because I put it in my pocket on May the 19th, and there it

22   remained.

23   Q.   We see in there other things, business cards, etc., that

24   you referred to, right?

25   A.   Yes.  There's also the hotel key card from my Friday

K3CLBRI5                        Bright - Direct

1    night/Saturday morning.

2            MS. GALLICCHIO:  Can we zoom in on that please?

3            THE WITNESS:  Oh.  I think it's the little wallet that

4    the key cards come in.  But it may just be some other piece of

5    paper that the hotel gave me.

6    Q.  That's from when?

7    A.  That's from Friday night/Saturday morning.

8            MS. GALLICCHIO:  Let's zoom in on the bottom packet.

9    BY MS. GALLICCHIO:

10   Q.  What is this, Mr. Bright?

11   A.  This is an empty packet of a single dose of generic Viagra.

12   Q.  Does that belong to you?

13   A.  Yes.

14   Q.  Is this packet open or closed?

15   A.  It's open.

16   Q.  Are the contents -- are there contents in it?

17   A.  No.  It's empty.

18   Q.  When did you take this Viagra?

19   A.  I took it on, I think, technically Saturday morning.

20   Q.  For what purpose?

21   A.  I was with Red in a hotel room.  I had a few drinks

22   previously, so I wanted the chemical to enhance my performance.

23   Q.  You said you were with whom?

24   A.  Red.

25   Q.  Why do you have this in your pocket still on the 22nd?

1    A.   I -- after taking the pills, I put the packet in my pocket

2    because I didn't -- I'm open about a lot of things in my sex

3    life, but taking these pills is not one of them.  So I didn't

4    want Red to see the packet in the trash, so I stuck it in my

5    pocket and forgot about it.

6    Q.   Did you take Viagra before you went to meet Liz?

7    A.   No.

8    Q.   Are there any pills in this packet?

9    A.   No.

10   Q.   Is there any evidence in this photograph that demonstrates

11   it was opened?

12   A.   Yes.

13   Q.   What?

14   A.   You could see along the top of the packet there's a sort of

15   silver strip.  That's where the packet had been torn open.

16   They're foil packets, so there is silver where you tear them

17   open.

18   Q.   And it says on here "three tablets, 20 milligrams each?"

19   A.   Yes.

20   Q.   Did you take all three of them?

21   A.   One standard dose of Viagra is 60 milligrams.  So although

22   the packets have three different pills, you pop them all at the

23   same time.

24   Q.   Okay.

25        MS. GALLICCHIO:  Thank you.  You can take that down.

K3CLBRI5                         Bright - Direct

1              Can I have shown to the witness Defendant's Exhibit L

2      for identification, shown to the witness only?

3      BY MS. GALLICCHIO:

4      Q.  Mr. Bright, do you recognize what is in Defendant's Exhibit

5      L?

6      A.  Yes, do I.

7      Q.  What is it?

8      A.  That is my conference badge to Microsoft Build, which is a

9      technology conference.

10     Q.  Does is that fairly and accurately reflect your badge?

11     A.  Yes.

12             MS. GALLICCHIO:  Your Honor, at this time I would seek

13     to move defense Exhibit L into evidence.

14             THE COURT:  No objection?

15             MR. LI:  No objection.

16             THE COURT:  Received.

17             (Defendant's Exhibit L received in evidence)

18             MS. GALLICCHIO:  And may I publish it to the jury?

19             THE COURT:  You may.

20     BY MS. GALLICCHIO:

21     Q.  So Mr. Bright, take a look at Defendant's Exhibit L.

22             When was this conference that you had the badge for?

23     A.  You know, I'm not sure exactly.  I think it was May 5th

24     through May 8th.  It may have run through May 9th.

25     Q.  Where was this badge?

K3CLBRI5                    Bright - Direct

1   A.  This was in my cargo shorts.

2   Q.  Why did you still have it in your pocket on May 22nd?

3   A.  Because I stuck it in my pocket coming out of the

4   conference and left it there.

5           MS. GALLICCHIO:  Your Honor, at this time may I read a

6   stipulation?

7           THE COURT:  You may.

8           MS. GALLICCHIO:  Thank you.

9           Defers Exhibit P:  "It is hereby stipulated and agreed

10  by and between the United States of America, by Geoffrey S.

11  Berman, United States attorney for the Souther District of New

12  York; Alexander Li and Michael D.  Maimin, assistant United

13  States of counsel; and Peter Bright by and through his counsel,

14  Amy Gallicchio, Esq. and Zawadi Baharanyi, Esq. as follows:

15  Special Agent Aaron Spivack has no recollection of where the

16  packet labeled "Slidenafil" was empty or contained any amount

17  of pills.  It is further agreed and stipulated that this

18  stipulation, Defense Exhibit P, is admissible as a defense

19  exhibit at trial."

20          Thank you.  I move Defendant's Exhibit P into

21  evidence.

22          THE COURT:  Without objection, that's received.

23          (Defendant's Exhibit P received in evidence)

24          MS. GALLICCHIO:  Can we show to the witness only for

25  identification Defendant's Exhibit M?

K3CLBRI5                    Bright - Direct

1   BY MS. GALLICCHIO:

2   Q.  Mr. Bright, do you recognize what's in Defendant's Exhibit

3   M?

4   A.  Yes.

5   Q.  What is it?

6   A.  That's my wallet.  It's showing my New York State ID card.

7   Q.  Does that fairly and accurately represent your wallet?

8   A.  It's a lot emptier than normally, but that fairly and

9   accurately represents my wallet.

10          MS. GALLICCHIO:  Your Honor, I'd like to seek to move

11   this into evidence.

12          THE COURT:  This is?

13          MS. GALLICCHIO:  Defendant's Exhibit M.

14          THE COURT:  Any objection?

15          MR. LI:  No objection.

16          THE COURT:  Received.

17          (Defendant's Exhibit M received in evidence)

18          MS. GALLICCHIO:  May I publish it to the jury?

19   Q.  You may.

20   BY MS. GALLICCHIO:

21   Q.  Mr. Bright, where was this wallet when you were arrested?

22   A.  That would have been in my right-hand pocket.

23   Q.  And is this the wallet that contained two of the condoms?

24   A.  Yes.

25   Q.  Do you know where in the wallet they were contained?

1   A.  I think they would have been in like the section for bills

2   -- for paper money.

3          MS. GALLICCHIO:  We can take that down.  And if we

4   could show the witness Defense Exhibit N for identification

5   only?

6   BY MS. GALLICCHIO:

7   Q.  Mr. Bright, do you recognize what's depicted in Defense

8   Exhibit N?

9   A.  Yes.

10  Q.  What is it?

11  A.  It is a couple of things that were in my pockets and some

12  clothing accessories, I suppose you'd call them.

13  Q.  When?  When were these things?

14  A.  These were things that I had with me when I was arrested.

15  Q.  Did these things fairly and accurately reflect what you had

16  when you were arrested?

17  A.  Yes.

18         MS. GALLICCHIO:  Your Honor, I would seek to November

19  Defendant's Exhibit N into evidence.

20         MR. LI:  No objection.

21         THE COURT:  Received.

22         (Defendant's Exhibit N received in evidence)

23         MS. GALLICCHIO:  May I publish it to the jury?

24  BY MS. GALLICCHIO:

25  Q.  Mr. Bright, can you just describe what these items are in

K3CLBRI5                          Bright - Direct

1    Defendant's Exhibit N?

2    A.  From left to right, we have a cloth cleaning my glasses.

3    We have my wristwatch.  We have a bottle of Adderall.  I think

4    it has some pills in it.  And we have my belt.

5    Q.  Is that your prescription?

6    A.  Yes.

7    Q.  What do you take that medication for?

8    A.  ADD.

9            MS. GALLICCHIO:  We can take that down.  Thank you.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K3CKBRI6                    Bright - Direct

1  BY MS. GALLICCHIO:

2  Q.  Now, I believe you were saying that over the weekend, you

3  were mulling things over in your head?

4  A.  Yes.

5  Q.  Can you describe a little bit further about what your

6  thought process was regarding Liz?

7  A.  Well, I was thinking Liz just seemed -- she seemed off.

8  She seemed something not quite right about her.  When I took

9  those few things I mentioned before together, there was

10  something not right about Liz.  I wasn't quite sure at first

11  what was not right about her.  I had a few possibilities

12  running through my head.

13  Q.  What were they?

14  A.  I thought -- I thought -- well, the most benign, I thought

15  she might just appear a fantasist, that there were no littles,

16  she just enjoyed talking about this online.  And she had been

17  really pushing me for details about the lessons, and I thought

18  maybe she was getting some kind of titillation from that.

19       I thought she might be something more sinister.  I

20  thought she might be either trying to run some kind of a scam.

21  There's a lot of people running extortion scams online, and I

22  thought she might be one of those.  I thought she might be a --

23  there are a lot of people who -- there was a TV show, "Catch a

24  Predator," where people get kind of set up talking online to

25  people who they think are young girls and they get caught out.

1    And I thought -- I know there are a lot of people online who

2    run similar kind of stings, they chat to people online and then

3    try to set them up, so I thought she might be that.

4              And I also thought she might be a child predator

5    herself, a child molester.

6    Q.  What did you do about any or all of those possibilities, if

7    anything?

8    A.  I was hoping that it was something benign.  You know, if

9    she had just been an out-and-out fantasist, I'm fine with that.

10   Yeah, that's cool.

11             If she was a scammer, I wasn't bothered.  If she was

12   an internet vigilante, I wasn't bothered because I had no

13   reason to be bothered, but I thought if she turned out to be

14   more sinister, like a child molester, I had to do something

15   because that's beyond the pale.  That's nasty.

16   Q.  So in that weekend, as you were mulling these

17   possibilities, were you confident in any of those

18   possibilities?

19   A.  No.  I wasn't sure what she was like.  She'd seemed so --

20   she'd really been talking the talk of age play, so it was still

21   kind of hard for me to think of her as anything other than

22   that, but now I just -- I wasn't sure.  I thought I've got to

23   say I think the most likely was trying to run a scam or maybe a

24   vigilante.  Those were the strongest possibilities to me.

25   Q.  So if she was the worst-case scenario, had you formulated

1   any plan if that materialized?

2   A.  Yeah, I did.

3   Q.  What was it?

4   A.  I knew that she needed to be reported to the law.  I

5   thought, initially, the obvious thing to do would be, like,

6   hand over my phone, but for a whole bunch of reasons, I just

7   didn't want to do that, didn't feel comfortable doing that.  So

8   I thought, well, I could do the sort of "Catch a Predator" type

9   thing myself.  I can keep on talking to her, see if she sort of

10  settles things one way or the other what she is, see if she

11  says something.

12          You know, at this point, nothing she'd said was

13  criminal or even, like, hinted at being criminal, so I didn't

14  think -- nothing at the time was pointing in any direction, but

15  I thought if she gives me -- if she tells me something that is

16  unambiguously criminal, then I can go to the police, but my

17  thought was to play along with her and try to record her, so I

18  wouldn't have to hand over my phone or, you know, a recording.

19  I could just send the audio file or a video file, wouldn't need

20  to hand over the phone, and would have something to incriminate

21  her.

22  Q.  So, in this moment over that weekend, did you think you had

23  enough information to go to the police?

24  A.  No.

25  Q.  So let's talk about the next time you communicated with

1    her.

2            And that was, as we saw, on May the 19th.  Is that

3    right?

4    A.  Yes.

5    Q.  That was Sunday?

6    A.  Yes.

7    Q.  And it was the first communication we just saw a moment

8    ago, she reached out to you and said how was the movie?

9    A.  Yes.

10   Q.  Now, on page --

11           MS. GALLICCHIO:  If we can go to page 74 of

12   Exhibit 3A.

13   Q.  At the top of the page, on May 19th, at 5:00 o'clock, you

14   text to her:  "I'd still love to get a picture of y'all"?

15   A.  Yes.

16   Q.  And then you receive a photograph, right?

17   A.  Yes.

18   Q.  Let's take a look at that photograph.

19           That's at what time?

20   A.  5:25 p.m.

21   Q.  On 5/19?

22   A.  Yes.

23   Q.  And that's a picture of whom?

24   A.  Liz.

25   Q.  And you respond to that in what way?

1    A.  "Looking thrilled to be there," because she said she was at

2    work.

3              MS. GALLICCHIO:  If we can look at those two

4    photographs together, those two boxes together.

5    Q.  You responded how many seconds after she sent the

6    photograph?

7    A.  Twenty-nine.

8              MS. GALLICCHIO:  Let's go to the next page, page 75.

9    Can we zoom in on the first three boxes.

10   Q.  Liz responds at 5:25:55:  "Ha-ha.  Exactly."

11             And then at 5:27:32, Liz sends a photograph saying:

12   "Braydon watching TV"?

13   A.  Yes.

14   Q.  And that's at 5:27:32?

15   A.  Yes.

16   Q.  Now, you respond on 5/19 at 5:27:33 --

17   A.  Yes.

18   Q.  -- and you write:  "You are certainly very easy on the

19   eye!"?

20   A.  Yes.

21   Q.  What were you responding to?

22   A.  Still Liz's picture.

23   Q.  Had you seen the picture of Braydon when you responded,

24   "You're certainly very easy on the eye"?

25   A.  Not that I recall.

K3CKBRI6                    Bright - Direct

1    Q.  I'm sorry?

2    A.  Not that I recall.  I think it arrived just as I was

3    sending a message, and I think I didn't immediately notice it.

4             MS. GALLICCHIO:  Let's look at the next picture -- or

5    the next box, I'm sorry.

6    Q.  This is now 5:28:49.  There's a photograph of what appears

7    to be a girl, a child, right?

8    A.  Yes.

9    Q.  And it's entitled "Kayla Not Listening to Me and Playing

10   with The Phone.  LOL"?

11   A.  Yes.

12   Q.  And that's 5:29:49.

13             Can you look at the next page, please.

14             I'm sorry, that's 5:28:49.  The next page, at the top

15   of the page, at 5:29:09, you respond:  "She looks like a

16   cutie"?

17   A.  Yes.

18   Q.  What is going on in your mind when you receive these two

19   photographs of the children -- of children?

20   A.  It seems like one of the sinister outcomes.  You know, I

21   was worried she could be a scammer or a child molester.  It

22   seemed like she's probably one of those two things.

23   Q.  You responded to a picture of Kayla; she identified the

24   person as Kayla?

25   A.  Yes.

K3CKBRI6                          Bright - Direct

1    Q.  And that was the name that she had used to refer to her

2    little princess, right?

3    A.  Yes.

4    Q.  So you responded:  "She looks like a cutie"?

5    A.  Yes.

6    Q.  Why didn't you say or express your concern to her about the

7    fact that this is a child?

8    A.  I had previously decided to play along, because a scammer,

9    I don't care, I'm not going to do anything with it.  I'm just

10   going to -- I wish they wouldn't do it, but I don't want to get

11   tangled up with law enforcement if it's just someone trying to

12   extort people.

13          If she was a child molester, I had already decided,

14   well, I need to play along and get some evidence, get a

15   recording, and give that recording to law enforcement.

16   Q.  Now, you told the police, in your postarrest interview,

17   that it clicked, in this moment --

18   A.  Yeah, yes.

19   Q.  -- that she was talking about children, right?

20   A.  Yes.

21   Q.  Is that what was going on here?

22   A.  Yeah.  This is it clicking.  I mean, the third picture is

23   the one that I think most squarely pushed me in that direction.

24          MS. GALLICCHIO:  Let's take a look at the third

25   picture -- the third picture.  Just the first green box on

K3CKBRI6                    Bright - Direct

1    page 76.

2    Q.  So, this is a picture of Liz presumably kissing the leg of

3    a child.  And Liz writes:  "Here's one before play time,"

4    right?

5    A.  Yes.

6    Q.  And your response is --

7         MS. GALLICCHIO:  If we can look at the next two blue

8    boxes.

9    Q.  You say, "Oooh, and play time sounds fabulous"?

10   A.  Yes.

11   Q.  Why do you respond in that way?

12   A.  I resolved already to play along.  I had no interest in the

13   pictures.  It was pretty disgusting.  The whole thing was

14   disgusting, but I felt I had to play the part to -- I wanted to

15   get information from her.  I wanted to -- if I just say that's

16   disgusting, then she's going to stop talking to me, and that

17   will be that.  And, you know, at this time, I didn't know

18   where -- I had a phone number, you know, that could be a burner

19   phone, can't necessarily be traced, and I had a chat log that

20   was suggestive, but, you know, stopped short of anything

21   criminal.  If I'd said, look, that's gross, what the hell are

22   you doing, the conversation would have gone no further, I would

23   have learned nothing more, and I felt I wouldn't be able to do

24   anything.

25   Q.  Then on the next page --

1      MS. GALLICCHIO:  If we go to page 77.

2   Q.  -- you comment on the next two blue boxes:  "Kissing her

3   flower, I'm sure it's beautiful."

4      "How big a boy is Braydon?"

5      So why do you comment in this way?

6   A.  Again, I felt I had to play a part.  I thought my first

7   responses were -- they were lukewarm at best.  Like, you know,

8   they were sort of positive, but, to my mind, they certainly

9   weren't sort of sexually explicit, they weren't raunchy, and I

10  felt I'm not playing the part very well here, so, you know, I

11  thought about it for a few minutes, and I thought I've got to

12  get her to believe me because I need to get information from

13  her, so she's got to believe me.

14      So these were me playing like -- like, I don't really

15  know what I should be saying in this situation.  You know, this

16  is not a role I've ever played, it's not a role I want to play,

17  it's not a role I was comfortable playing, but I felt, well,

18  I've got do something, and I've got to get her to trust me and

19  incriminate herself.

20  Q.  Now, between these two texts that you write, approximately

21  how many minutes elapses?

22  A.  About eight minutes.

23  Q.  You then -- the rest of these text messages -- these chats,

24  excuse me, Liz asks you what you mean, how big is what, and you

25  say, "His manhood," right?

1    A.  Yes.

2    Q.  So you're asking her about the size of his penis --

3    A.  Yes.

4    Q.  -- is that fair to say?

5    A.  Yes.

6    Q.  And, again, your reasoning is the same?

7    A.  Yeah.  I felt -- well, I thought that's the part I have to

8    play.  I also thought it would establish once and for all what

9    the hell she's talking about.

10   Q.  Liz asks you, on page 78, "How big are you," and you

11   volunteer that you have a picture if you like?

12   A.  Yes.

13   Q.  You then -- we don't need to pull that up.

14        You then send a photograph of your penis, right?

15   A.  Yes.

16   Q.  Now, where did that photo come from?

17   A.  That was stored on my phone.

18   Q.  Was that a photograph you were taking of your penis in the

19   moment you were chatting with her?

20   A.  No.  In the moment, I think I may have been on the subway,

21   actually, so, no.  That picture was -- oh, I think at the time

22   I sent it, I think the picture was about two years old.  It was

23   from an apartment I no longer lived in.  It was taken on my old

24   iPhone, and it's a picture that I'd been comfortable sharing.

25   It was a low-value picture to me.  It's one I've sent to lots

1   of people, and it's just -- it was a convenient picture to

2   respond to her question.

3   Q.  All right.  So, do you have photographs of your penis in

4   your phone library?

5   A.  I have a few, yes.

6   Q.  Have you shared them with people before?

7   A.  Many people, yes.

8   Q.  In what context?

9   A.  Sexting.

10  Q.  Why did you send this picture here?

11  A.  Because in response to her question, "How big are you,"

12  like that's the kind of picture that she would expect, I think.

13  Q.  Did you ask her or tell her to show this picture to anyone?

14  A.  No, no, no.

15  Q.  Did you have some conversation with her about your

16  genitals?

17  A.  Yeah, a little.  She seems to respond positively to it.

18          THE COURT:  "She seems to respond"?

19          THE WITNESS:  Positively to it.

20          THE COURT:  Thank you.

21  BY MS. GALLICCHIO:

22  Q.  Is the conversation involving children or adults?

23  A.  Adults.

24          MS. GALLICCHIO:  Let's turn to page 83.  If we can go

25  to the last two bubbles.

1   Q.  So between May 19th and May 20th -- I'm sorry, on May 19th,

2   it appears there's a text, right?  What time is that?

3   A.  10:32:49 p.m.

4   Q.  You say:  "So I have a question/concern"?

5   A.  Yes.

6   Q.  The next time you communicate with Liz is what?

7   A.  May 20th -- well, she texted me on May 20th at 7:01:58 a.m.

8           MS. GALLICCHIO:  Can we go to the next page.  Just the

9   top four.

10  Q.  She's now responding about what is your question and

11  concern, right?

12  A.  Yes.

13  Q.  This is on May 20th?

14  A.  Yes.

15  Q.  You say:  "Definitely worth it."

16          What are you referring to?

17  A.  The movie, John Wick, Part 3.

18  Q.  So you say:  "My concern is am I being set up here"?

19  A.  Yes.

20  Q.  And then if we can go to the rest of the chats, you say, "I

21  was" -- she asks, "What do you mean by set up?"  And you say,

22  "I was struck by the fear yesterday that I'd be met by a cop or

23  something"?

24  A.  Yes.

25  Q.  Explain why you asked this question and made these

K3CKBRI6                    Bright - Direct

1    comments.

2    A.  I really -- I thought I was being clever here.  I need to

3    record her, I would have to meet her.  And for her to meet me,

4    she would have to trust me and trust that I wasn't a cop or

5    going to report her or anything like that.  And I thought,

6    well, if I just tell her, oh, I'm not a cop, that wouldn't seem

7    very trustworthy at all, like that's -- it would seem weird,

8    but, in my mind, by sort of reversing it, and throwing out to

9    her sort of "haha, I thought you were a cop," it would reassure

10   her that I wasn't a cop, and would help establish the meeting.

11   Q.  Now, after you received --

12            MS. GALLICCHIO:  We can take that down.

13   Q.  After you received these photographs and had these

14   comments, did you continue chatting with Liz on WhatsApp?

15   A.  Yes.

16   Q.  Did you ever let on that you were now concerned that she

17   was talking about children?

18   A.  No.  I felt that would defy the point because she would

19   clam up and stop talking.

20            THE COURT:  "I felt that that would"?

21            THE WITNESS:  Defy the point, she would clam up and

22   stop talking.

23            THE COURT:  Thank you.

24   Q.  Can you describe the tone or the content of the

25   communications you had after the photos were sent?

K3CKBRI6                          Bright - Direct

A.   Yeah.  I think I'm much more probing, trying to find out
things from her.  And before the photos and before the phone
call, there'd been quite a lot of fairly graphic sexual detail
about what lessons would be and like that kind of thing, when I
thought we were talking about adults.  That stopped, that
stopped completely because I just -- even just thinking about
it and when it was -- she was talking about children, was just
too gross to contemplate, like I couldn't, I couldn't play the
role that way, I couldn't keep up the sort of sexual talk, and
talking about lessons and what I would do, now that I was
thinking they were kids, no, it was not going to happen.
Q.   So what was your intent, if any, in continuing the
conversation with her?
A.   To get -- well, to get her to say something, preferably in
person, so I could record it.  That was properly incriminating,
to get hard information about her.  So, for example, I asked
her what her address was.

         I also wanted to figure out, like, if anyone else was
going to report her, like I asked her to see -- yeah, I asked
her, like, did other people message you on KinkD, what kind of
messages did they send, can I see them?  Because if she'd been
sent a barrage of responses with, like, hey, lady, you're
disgusting, I'm reporting your profile, I'm telling the cops,
whatever, I figure I could walk away with -- and still feel
that the right thing was being done.

1   Q.   And when you asked her whether she was communicating with

2   anyone else on KinkD, what did she tell you?

3   A.   Unfortunately, she said that I was essentially the only

4   person she was having any real conversation with.

5   Q.   So what did that mean to you?

6   A.   That meant to me that if I didn't do this, then nobody

7   would.  So I had to do something to stop her.

8   Q.   Now, did you and she plan to meet?

9   A.   We do, yes.

10  Q.   And do you discuss in these text conversations, after the

11  photos are sent, your plans to meet?

12  A.   Yes.

13          MS. GALLICCHIO:  If we could turn to page 120.

14  Q.   So, on the bottom of the page, the last blue text, this is

15  on May 21st?

16  A.   Yes.

17  Q.   At 5:18 p.m., you ask, "What's the kids' schedule at the

18  moment?  They're in school?"  Why do you ask that question?

19  A.   I want to arrange to meet her, but, actually, I wanted to

20  arrange to meet her when the kids wouldn't be there.

21  Q.   Why?

22  A.   I didn't want to meet the kids; I wanted to record Liz.

23  The kids were -- I was worried about the kids, but I had no

24  interest in them all.  All I needed to do was get her to say

25  something incriminating when I was recording her.

K3CKBRI6                    Bright - Direct

1           MS. GALLICCHIO:  Let's go to page 129.

2    Q.  So, on May 22nd, before we take a look at this, on

3    May 22nd, what was the plan, as you understood it, for the

4    meeting?

5    A.  My plan, from my perspective, was, I wanted to meet her and

6    go to her house so I would learn where she lived, and talk to

7    her.  I even said, like, make sure we're on the same page.  I

8    wanted to get her to actually invite me, in explicit terms, to

9    do something to hurt the kids, and I would record this, and

10   then I would leave.

11   Q.  Had you and Liz agreed to meet on the 22nd?

12   A.  We had, yes.

13   Q.  So, if we can go to page 129, at the bottom of the page --

14   I'm sorry, let's stop at the top of the page.

15           You write, "I'm a few minutes away"?

16   A.  Yes.

17   Q.  And this is at 2:02?

18   A.  Yes.

19   Q.  Did you have a specific time that you were going to meet

20   her?

21   A.  Yeah.  I wanted to meet her before 3:00.  She had told me

22   previously that the kids got out of school at 3:00.  So I felt

23   as long as I got to her place sort of 2:00/2:15, something

24   around then, then I'd be good, like, that would give us enough

25   time to talk but the kids wouldn't be there.

K3CKBRI6                        Bright - Direct

1   Q.  Where were you coming from?

2   A.  I was coming from Chelsea, I think.

3   Q.  What were you doing in Chelsea?

4   A.  I had a meeting with a technology company -- they were

5   showing me some virtual reality hardware -- and I rushed from

6   that meeting to Duane Park, where she had previously said to

7   meet her, to make sure that I got there good and early.

8   Q.  Let's take a look at the rest of the boxes.

9           So, Liz responds to you, "Okay, I'm not home right

10  now.  I didn't hear from you.  Kids aren't home till 2:45."

11          And you respond, "Sorry, my morning was a little

12  busy."

13          She says, "No worries."

14          And then you say, "I was hoping we might talk a little

15  before they get home"?

16  A.  Yes.

17  Q.  Why did you say that?

18  A.  I didn't -- I mean, she'd brought up the time they get

19  back -- the kids get home, earlier, it had been 3:00 o'clock

20  before, but I didn't want her to try to delay me coming until

21  2:45.  I really wanted to be there before the kids because I

22  didn't want to meet the kids, I didn't want to talk to the

23  kids, I didn't want to see the kids.

24          MS. GALLICCHIO:  Can we go to page 130.  The first

25  four boxes.

K3CKBRI6                    Bright - Direct

1    Q.  Liz asks you, "Okay, talk about what?"  And you respond,

2    "Mainly just practicalities, availability, that kind of thing."

3             She questions, "Practicalities?"

4             And you say, "Just making sure we're on the same page

5    about the lessons, that their lessons will be frequent enough,

6    that kind of thing"?

7    A.  Yes.

8    Q.  So, at this point, you know they're children?

9    A.  Yes.

10   Q.  Why do you respond in this way?

11   A.  Well, she asked --

12            THE COURT:  I would just ask you to please avoid

13   leading.

14            MS. GALLICCHIO:  Yes, your Honor.  Do you want me to

15   rephrase that question?

16            THE COURT:  It's already been answered.

17   Q.  Why do you respond in this way?

18            THE COURT:  Let me just find out:  What point in time

19   did your question speak to?

20            MS. GALLICCHIO:  To May 22nd at 2:08, when he texted.

21            THE COURT:  Thank you.

22   A.  Yeah, and 2:11, when I clarified in response to Liz's

23   question.

24   Q.  Yes.  Can you answer the question?

25   A.  Yeah, I mean, I couldn't very well tell her, yeah, I want

1     to record you incriminating yourself, because, obviously, she

2     wouldn't agree to that.  So, I'm trying to use the same

3     language as we'd used before, but I was actually telling the

4     truth, like I wanted her to tell me about their lessons and

5     what she expected me to be doing with the kids.

6     Q.  Now, did you --

7              THE COURT:  All right, Ms. Gallicchio.  Can you please

8     give me a time estimate on the balance of your direct

9     examination of this witness?

10             MS. GALLICCHIO:  Your Honor, I would say maybe a half

11    an hour.

12             THE COURT:  Thank you very much.

13             We'll break for the day, ladies and gentlemen.

14             This is what I anticipate:  Tomorrow we will finish

15    the evidence in this case.  I can't ever be positive of the

16    thing, but that's what I expect.  I also expect that tomorrow

17    three other things will happen:

18             We will have closing arguments from each side.  This

19    has been a very short trial, so I'm hoping that the closing

20    arguments will not be very long, but each side has the

21    opportunity to sum up to you, though not the obligation to do

22    so.

23             And then, at that point, I would deliver my final

24    instructions to you on the law.  So, we finish up the

25    testimony, we have the closing arguments, and then I would give

K3CKBRI6                        Bright - Direct

1    you my final instructions on the law.  And then, at that point,

2    the case would be yours for purposes of deliberation.

3              It's important to keep an open mind.  There's more to

4    come tomorrow.  Get a good night's sleep, stay safe, do not

5    discuss the case among yourselves or with anyone.  Please be

6    here on time tomorrow, as you have been all along, so we can

7    get a good start.  And tomorrow, your lunch will be provided

8    for you, so Flo is going to take care of that with menus.  And

9    we'll see you bright and early tomorrow morning, fresh and

10   relaxed.

11             Put the case out of your mind.  Okay?  Please do that

12   till tomorrow morning.  And you and your families, your loved

13   ones, stay safe.

14             All right?

15             JURY MEMBERS:  You too.

16             JUROR:  10:00 a.m.?

17             THE COURT:  10:00 a.m.  Thank you.  I know many of you

18   travel from a distance, and I'm assuming that this is working,

19   and I don't want to mess up what's been working so well.  So

20   let's stay with the 10:00 a.m.

21             (Continued on next page)

22

23

24

25

K3CKBRI6                    Bright - Direct

1           (Jury not present)

2           THE COURT:  Please be seated.

3           I'm going to have my -- yes, you may step down.

4           (Witness temporarily excused)

5           THE COURT:  I'm going to have my law clerk pass out

6      what will be marked as Court Exhibit 2, which are merely

7      changed pages from the draft previously distributed as Court

8      Exhibit 1, reflecting my rulings on the matters that we talked

9      about.

10          How long does the government think it wants for

11     closing arguments?

12          MR. LI:  Your Honor, we're prepared to proceed on the

13     same schedule the Court permitted at the initial trial, which

14     is 30 minutes for our closing statement and 15 minutes for

15     rebuttal.

16          THE COURT:  And for the defense?

17          MS. GALLICCHIO:  Your Honor, I'm prepared to proceed

18     on the same time frame, of 45 minutes.

19          THE COURT:  All right.

20          Okay.  See you tomorrow.  Thank you.

21          MR. MAIMIN:  Have a good evening, your Honor.

22          THE COURT:  Thank you.

23          (Adjourned to March 13, 2020 at 10:00 a.m.)

24                          * * *

25

```
 1                      INDEX OF EXAMINATION
 2    Examination of:                          Page
 3    SHAMEL MEDRANO
 4    Direct By Mr. Li . . . . . . . . . . . . . . 273
 5    KENNETH ROBERT FISHER
 6    Direct By Mr. Li . . . . . . . . . . . . . . 281
 7    Cross By Ms. Baharanyi . . . . . . . . . . . 290
 8    Redirect By Mr. Li . . . . . . . . . . . . . 298
 9    JAMES MICHAEL CANTOR
10    Direct By Ms. Baharanyi  . . . . . . . . . . 301
11    Cross By Mr. Li  . . . . . . . . . . . . . . 316
12    Redirect By Ms. Baharanyi  . . . . . . . . . 332
13    PETER BRIGHT
14    Direct By Ms. Gallicchio . . . . . . . . . . 334
15                      GOVERNMENT EXHIBITS
16    Exhibit No.                          Received
17     45-48   . . . . . . . . . . . . . . . . . . 276
18                      DEFENDANT EXHIBITS
19    Exhibit No.                          Received
20     First two pages of Exhibit H    . . . . . . 307
21     O   . . . . . . . . . . . . . . . . . . . . 432
22     K   . . . . . . . . . . . . . . . . . . . . 434
23     L   . . . . . . . . . . . . . . . . . . . . 438
24     P   . . . . . . . . . . . . . . . . . . . . 439
25     M   . . . . . . . . . . . . . . . . . . . . 440
```

465

1    N    . . . . . . . . . . . . . . . . . . 441
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25