K3DKBRI1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                              19 CR 521 (PKC)

5   PETER BRIGHT,

6                Defendant.
                                            Trial
7   ------------------------------x

8                                           New York, N.Y.
                                            March 13, 2020
9                                           10:05 a.m.

10  Before:

11
                         HON. P. KEVIN CASTEL,
12
                                            District Judge
13                                          -and a Jury-

14                         APPEARANCES

15  GEOFFREY S. BERMAN
         United States Attorney for the
16       Southern District of New York
    BY:  MICHAEL D. MAIMIN
17       ALEXANDER LI
         Assistant United States Attorneys
18
    DAVID E. PATTON
19       Federal Defenders of New York, Inc.
         Attorney for Defendant
20  BY:  AMY GALLICCHIO
         ZAWADI S. BAHARANYI
21       Assistant Federal Defenders

22  Also Present:
    Elizabeth Jensen, FBI
23  Ariella Fetman, Government Paralegal
    Alondra Reyes, Defense Paralegal

24

25

K3DKBRI1

1          (In open court; jury present)

2          THE COURT:  Please be seated.

3          Ladies and gentlemen, before we begin, what I'm going

4     to say has nothing whatsoever to do with the specifics of this

5     trial, but I can't let this morning go by without again

6     complimenting you on your diligence in serving, serving at a

7     time when I know there are other things on your mind.  This is

8     a trial that is taking place while conditions and advice are

9     changing with regard to the COVID-19 circumstance.

10         I will just simply say, we're going to get to a period

11    of time when the weather will be even nicer, and your jury

12    service may be a distant recollection to you.  It may be at a

13    family barbecue or a picnic -- yes, we'll have picnics and

14    family barbecues -- and I don't want you ever to be mean to

15    anyone, but it may come up that someone says to you that they

16    evaded jury service, and I want you to think back on your own

17    service because you know how important it truly is to all

18    parties involved in a trial.

19         So I'll leave it at that, ladies and gentlemen, and

20    we'll get back to the business at hand.

21         Mr. Bright, the Court reminds you that you are still

22    under oath.

23         Whenever you're ready, Ms. Gallicchio.

24

25

K3DKBRI1                          Bright - Direct

1    PETER BRIGHT, resumed.

2    DIRECT EXAMINATION CONTINUED

3    BY MS. GALLICCHIO:

4    Q.  Good morning, Mr. Bright.

5    A.  Good morning.

6    Q.  So, Mr. Bright, before you went to the meeting on May 22nd,

7    2019, with Liz, had you told anyone about your plan?

8    A.  No.  I didn't really feel I had anyone who I could tell.

9    Q.  What about your wife?  Why didn't you tell your wife?

10   A.  So, polyamory -- my relationship with my wife is

11   polyamorous.  Polyamory isn't something you just choose on the

12   spur of the moment.  We had many months of kind of negotiation

13   and discussion between ourselves and with our couples therapist

14   about how we would handle the relationship because there are

15   lots of questions that wouldn't otherwise arise, like how much

16   do you tell your partner about other partners, about your

17   dating, about your sex life.

18        And we had decided that, for the most part, our sex

19   lives would be kept private; we didn't need to share those kind

20   of details.  This was doubly so for kink.  My wife is vanilla;

21   she had no interest in kinky sex.  She understood that I did,

22   and that I wanted to satisfy these desires, but she wanted to

23   play no part in it, she didn't want to hear the details, she

24   wasn't very excited to hear the kinds of things I was into

25   except at a very high level.

1          So, while, in some ways, she would seem the obvious

2     person to turn to and talk to, I felt that would be -- doing so

3     would be breaking the terms of our marriage.  It would be

4     bringing her into my kinky world, in my other relationships, in

5     a way that I felt would trample what we had worked so hard to

6     build.

7     Q.  Were you at all concerned about your safety when you went

8     to the meeting on May 22nd?

9     A.  No.

10    Q.  Why didn't you go to the police right away?

11    A.  I thought about that, but I -- the evidence, such as it

12    was, was the chat log on my phone, and I felt very

13    uncomfortable giving this to the police for a few reasons.  I

14    knew that the police, or FBI, or whoever, would want to take a

15    forensic copy of my phone.  I know that's what they do.  They

16    do it for phones that are in evidence; they do it even for

17    witnesses and others.  This is the sort of standard process

18    they do to get information from the phone.

19    Q.  How do you know that?

20    A.  My colleagues have written about it, and I have -- in my

21    job at the British library, I worked in -- I wasn't working

22    with law enforcement, but I was working with data recovery

23    companies who sometimes offered services to law enforcement.

24    So I became broadly familiar with extracting data from

25    electronic devices and some of the techniques used.

K3DKBRI1                    Bright - Direct

1    Q.  By the way, do you have the equipment to do that at home?

2    A.  No.

3    Q.  Go ahead.  You can continue.

4    A.  So, yeah, I thought, well, what if I give them my phone for

5    the chat log?  I didn't want to do that.

6         I think there probably, I would say, three big

7    reasons.  First of all, the chat log itself, while, to me, it

8    was very clear that we were talking about age play up until it

9    became clear that we weren't, I felt that it was liable to be

10   misinterpreted by a layperson.  I know the world of kink is not

11   everyone's world, I know the world of age play is not

12   everyone's world, and parts of the chat log, for example, about

13   the -- Alicia, or the purported 11-year-old, in the Bronx could

14   be very easily misinterpreted in a way that would cause me a

15   great deal of trouble.

16        The second reason:  I sext a lot.  I'm on many dating

17   apps.  Many people entrust me with their personal information,

18   their naked pictures, the exciting and/or dirty details of

19   their sex lives, and this is not information that I felt

20   comfortable sharing with anyone.  It was entrusted to me.

21        The third reason is:  Again, I have friends who trust

22   me, and some of -- well, one friend, in particular, has told me

23   about certain criminal activities she is involved with, and it

24   incriminates both herself and a very senior, very well-known

25   politician, and I didn't feel comfortable in the slightest

1    letting law enforcement have this.

2    Q.  You were interviewed by Agent Spivack and Agent Adamczyk;

3    is that right?

4    A.  Right.

5    Q.  You saw portions of your interview --

6    A.  Yes.

7    Q.  -- in this trial?

8    A.  Yes.

9    Q.  Can you just describe how you felt during the interview

10   with the FBI agents?

11   A.  Well, they bore -- they proved some of my fears correct.

12   They were -- they didn't know what I was talking about when it

13   came to age play.  They were very hostile.  They didn't seem

14   very interested in anything I had to say.  A number of times,

15   they shouted at me.

16          One agent would ask a question, and then the other

17   agent would immediately interrupt and not even let me give a

18   full answer.  I think, at one point, one of the agents sort of

19   bangs their pen on the desk in sort of frustration or anger.

20   Q.  Now --

21          THE COURT:  Wait, wait, wait.  The question was:  How

22   did you feel?

23          THE WITNESS:  Okay.  So I felt threatened.  I felt

24   like the -- like nothing I could say would ever be the right

25   answer for them.  I felt -- I certainly felt I can't trust

1    them.  They lied to me repeatedly.  I felt I can't -- I

2    certainly can't entrust them with anything that would be

3    sensitive or confidential.

4              MS. GALLICCHIO:  Could we play, for the witness and

5    the jury, Government Exhibit 9, clip 1.  And just the -- I'll

6    tell you when to stop.

7              (Video playback)

8    BY MS. GALLICCHIO:

9    Q.  Do you recall that exchange with the FBI agents?

10   A.  Yes.

11   Q.  And what was your reaction to that communication?

12             THE COURT:  Refine your question, if you will, please.

13             MS. GALLICCHIO:  Sure.  Sorry.

14   Q.  How did you feel during that exchange?

15   A.  I felt like they didn't have a clue.  I felt they had no

16   understanding of the world I was in.  Yeah --

17             MS. GALLICCHIO:  Can we play --

18   Q.  I'm sorry.

19   A.  Yeah, I felt they were complete outsiders.

20             MS. GALLICCHIO:  I'd like to play, this time, clip 8.

21             (Video playback)

22             MS. GALLICCHIO:  Thank you.

23   BY MS. GALLICCHIO:

24   Q.  Mr. Bright, how were you feeling during that exchange?

25   A.  Again, it reinforced they -- we were almost speaking

K3DKBRI1                        Bright - Direct

1    different things.  They knew nothing about -- I mean, even more

2    broadly, asking, well, if your role player is a 14-year-old,

3    wouldn't a 14-year-old be the same?  It's not that they didn't

4    understand age play; they don't understand sexual role playing

5    at all.  I don't think they understand any kind of role playing

6    at all.  It sounds like they don't understand acting.  It felt

7    like we were on a completely different planet.

8            THE COURT:  All right.  Ladies and gentlemen, there's

9    an instruction I want to give you at this juncture.

10           There is no legal requirement that law enforcement

11   agents investigate crimes in a particular way or that the

12   government prove its case through any particular means.  While

13   you are to carefully consider the law enforcement evidence

14   introduced by the government, you are not to speculate as to

15   why they used the techniques they did or why they did not use

16   other techniques.  The government is not on trial.  Law

17   enforcement techniques are not your concern.  Your concern will

18   be to determine whether, on the evidence or lack of evidence,

19   the government has proven the defendant's guilt by proof beyond

20   a reasonable doubt.

21           Next question.

22           MS. GALLICCHIO:  Your Honor, may I note my objection?

23           THE COURT:  Absolutely.

24           MS. GALLICCHIO:  Thank you.

25

1   BY MS. GALLICCHIO:

2   Q.   Now, Mr. Bright, Agent Spivack asked you why couldn't you

3   go to the police or the FBI and say, here's my chats, here's my

4   phone, and you said you didn't think of that?

5   A.   Yes.

6   Q.   Do you recall that clip that was played earlier?

7   A.   Yes.

8   Q.   Or yesterday?

9        Why did you say that?  First of all, was that the

10  truth?

11  A.   No.  That was a lie.

12  Q.   Why did you say that?

13  A.   To protect my friends in particular.  At this point, I knew

14  they had the chat log, and I knew they were using it to try to

15  incriminate me, but if I told them the truth, if I said I

16  didn't want to hand over my phone because it has stuff on it

17  that incriminates other people, then I would be signaling them

18  to directly look on my phone for this stuff, look on my phone,

19  and you will find stuff that incriminates other people in other

20  crimes.  So I couldn't say that, because that would be painting

21  a big target on my friends.  So I said, no, I didn't think of

22  that.

23  Q.   Did you lie to the FBI about anything else?

24  A.   No.

25  Q.   Now, when you went to the meeting, you indicated that you

K3DKBRI1                    Bright - Direct

1   were planning to record it?

2   A.  Yes.

3   Q.  Can you just describe what your plan was and how you

4   carried it out?

5   A.  My plan was -- well, what I wanted to get was (a) some

6   concrete information from Liz, like where she lived, her

7   address; and, (b) for Liz to make some positively incriminating

8   statement.  So not using the euphemism she had been using

9   before, not leaving it all a little ambiguous for her to say

10  something that was unambiguously inviting me to hurt the kids.

11          So, I used the -- android has a sound recording

12  program for taking voice notes, that kind of thing.  So I

13  started that recording and switched out of the app, it carries

14  on recording even in the background, and went to the meet where

15  Liz would be.

16  Q.  When did you start the recording?

17  A.  I started the recording shortly before -- I think I was on

18  the subway riding to the station to meet her.

19          MS. GALLICCHIO:  Can we play Government Exhibit 6B

20  through F, but we'll start with 6B.

21          (Audio playback)

22  BY MS. GALLICCHIO:

23  Q.  Mr. Bright, can you explain why you were making this

24  commentary?

25  A.  To kind of contextualize the recording.  It was an audio

1    recording, so I wanted to sort of explain what was going on.  I

2    was also trying to explain, like, some of my thoughts and

3    thinking as I went to the meet.

4    Q.  Did you have a script with you?

5    A.  No.

6    Q.  When you say, "I think it's amazing," what do you mean by

7    that?

8    A.  I mean, it's -- I was amazed, it's stunning, it's

9    extraordinary, it's -- I mean, you read about child molesters

10   and things in the newspaper, online, but it's not a mother just

11   sort of pimping her kids on the internet.  That's -- I was

12   shocked by that.  It was unthinkable.

13              MS. GALLICCHIO:  Could we play Government Exhibit 6C,

14   please.

15              (Audio playback)

16   BY MS. GALLICCHIO:

17   Q.  Mr. Bright, where are you at this point when you're making

18   this comment?

19   A.  At the park.  Duane Park, I think it is.

20              MS. GALLICCHIO:  Play Government Exhibit 6D.

21              (Audio playback)

22   Q.  Mr. Bright, can you explain what you were meaning by that?

23   A.  As I said yesterday, I thought there was a chance that Liz

24   was some kind of internet vigilante.  So I thought it was quite

25   possible we were going to this meeting with the idea of

K3DKBRI1                        Bright - Direct

1    catching the other person, which I thought would have been

2    quite funny, and I figured we would compare notes, like compare

3    techniques, talk about their story, my story, and go our

4    separate ways.

5              MS. GALLICCHIO:  Can we play Government Exhibit 6E.

6              (Audio playback)

7    BY MS. GALLICCHIO:

8    Q.  Mr. Bright, explain your comment.

9    A.  So the first part, I had actually tried to -- instead of

10   using the audio app, I tried using the camera video app, but I

11   discovered when you turn the screen off, that app stops

12   recording, so I had to stick to the audio app.  Video would

13   have been nicer, obviously.

14             Then the second part, when I say it's remarkable,

15   it's, again, my complete astonishment at who this person was

16   purporting to be and what she was apparently doing.

17             MS. GALLICCHIO:  If we could play Government

18   Exhibit 6F.

19             (Audio playback)

20             MS. GALLICCHIO:  Ms. Reyes, if we could just display

21   the transcript of 6F.  Leave that on the screen.

22   BY MS. GALLICCHIO:

23   Q.  So, Mr. Bright, I want to break this down into a couple of

24   areas.

25             You first comment:  "26 minutes, where on earth is

1    she?"  What do you mean by that?

2    A.  So I'd been waiting in the park quite some time, and that

3    was frustrating.  I wanted to meet her at a particular time

4    because I knew that would be a time when the kids weren't

5    there.  And we were getting later and later to when the kids

6    were expected back from school, which I didn't really want.

7    Q.  And then you say:  "Beginning to think I'm being stood up"?

8    A.  Yeah, I thought she might not turn up at all.

9    Q.  Now, you write:  "Typing."  What are you meaning by that?

10   A.  I was looking at the WhatsApp conversation at the time, and

11   WhatsApp gives you an indication when the person on the other

12   end is typing a message, but before you see their message, so

13   when I said "Typing," she was writing me a message.

14   Q.  And then you say:  "What do you have to say for yourself

15   pedo-mum?"  Can you describe what you mean by "pedo-mum"?

16   A.  It's kind of a disparaging riff on Princessmom because she

17   seemed to be a pedophile.

18   Q.  What does "pedo" mean?

19   A.  Pedo is short for pedophile.

20   Q.  Then you say:  "Okay, ten more seconds."  What are you

21   referring to there?

22   A.  I'm not sure.  I think that must be the message she finally

23   sent me on WhatsApp.

24           MS. GALLICCHIO:  If we could take a look at Government

25   Exhibit 3A, page 132.

K3DKBRI1                        Bright - Direct

1              THE WITNESS:  Oh, yeah.

2     BY MS. GALLICCHIO:

3     Q.  Let's just take a look at all of those boxes.  The top box,

4     Mr. Bright, is on 5/22 at 2:18.  You say:  "I'm at the park."

5     Right?

6     A.  Right.

7     Q.  What park are you referring to?

8     A.  Duane Park.

9     Q.  Then you get a message from Liz at 2:20:55, which says:

10    "Okay, give me a few minutes.  I'm trying to get back.  LOL.  I

11    was literally in the dressing room!!"

12             You respond:  "LOL.  Okay."

13             And then at 2:47:01, Liz writes:  "Ten seconds.  Just

14    getting on Hudson."

15    A.  So that must be the ten seconds I was referring to.

16    Q.  Were you looking at your phone while you were recording?

17    A.  Yes.

18    Q.  Did you --

19             MS. GALLICCHIO:  We can take that down.

20    Q.  Did you take screenshots of Liz's profile?

21    A.  Yes.

22    Q.  Why did you do that?

23    A.  I figured that would be something that I could also hand

24    over with the recording to show where I'm at and how she was

25    advertising.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

1   Q.   Now, on the phone call between you and Liz, she asked you

2   to bring a printout of your STD test results, right?

3   A.   Yes.

4   Q.   Did you?

5   A.   I did not, no.

6   Q.   Why not?

7   A.   Because I wasn't there to have sex with anyone.  I was

8   there to record her incriminating herself and to leave.  So why

9   would I need to print out my test results?

10  Q.   So when you got to the meeting, did Liz ask you for the

11  test results?

12  A.   She did, yes.

13  Q.   Did you have them at the ready?

14  A.   No.

15  Q.   What did you do to produce them?

16  A.   I spent several minutes searching for them on my phone, to

17  get the website up that I'd shown her previously.  In fact, she

18  even had to prompt me to help me find them because I was

19  struggling to find them.

20  Q.   Prompt you with what?

21  A.   She told me, I think, the date that they were from.  I

22  think she said it was May the 4th or something like that.

23  Q.   Now, when you were arrested, did you tell the police you

24  were recording the interaction with Liz?

25  A.   Yes.

K3DKBRI1                         Bright – Direct

1    Q.  Did you tell them what you were doing?

2    A.  Yes.

3    Q.  Did you agree to speak with them?

4    A.  Yes.

5    Q.  Did you give them consent to search your phone?

6    A.  Yes.

7    Q.  Did you give them consent to go to your apartment and

8    take -- and search your desktop computer?

9    A.  So I think, technically, I gave them consent to seize and

10   search my computer.  I don't know if I actually gave them

11   consent to enter the apartment, but, to me, that was implied.

12   But I know for law enforcement, you need to be very particular

13   about these things.

14   Q.  Did you give consent to search your Google account?

15   A.  Yes.

16   Q.  All of your emails?

17   A.  Yes.

18   Q.  Your Google searches?

19   A.  Yes.

20   Q.  And why?  Why did you do all of those things?

21   A.  Because I was an innocent guy here.  I was trying to stop a

22   bad person.  I felt I had nothing to hide.

23   Q.  Now, Mr. Bright, do you possess any child pornography?

24   A.  No.

25   Q.  Do you exchange any child pornography?

1   A.  No.

2   Q.  Do you search for any child pornography?

3   A.  No.

4   Q.  Do you have any interest in child pornography?

5   A.  No.

6   Q.  Did you at any time have any intention to entice a minor to

7   engage in sexual activity?

8   A.  No, never.

9   Q.  Did you at any time have any intention to have sexual

10  contact with a seven and nine-year-old?

11  A.  No.

12  Q.  Are you sexually attracted to a seven and nine-year-old?

13  A.  No.

14  Q.  Are you sexually attracted to children?

15  A.  No.

16  Q.  When you showed up at the meeting with Liz, were you hoping

17  to have sexual contact with a seven and nine-year-old?

18  A.  No.

19           MS. GALLICCHIO:  I have no further questions, your

20  Honor.

21           THE COURT:  All right.  Thank you.

22           You may cross-examine.

23  CROSS-EXAMINATION

24  BY MR. LI:

25  Q.  Mr. Bright, your user name on KinkD is Randomanon, correct?

1    A.  Yes.

2    Q.  In April of 2019, you reached out on KinkD to someone you

3    later knew as Liz, correct?

4    A.  Yes.

5    Q.  At some point, she told you she was a mom, right?

6    A.  I don't believe she ever said that.

7    Q.  At some point, she told you she had two children, right?

8    A.  I don't believe she ever said that either.

9    Q.  At some point, she told you she had kids, right?

10   A.  Yes.

11   Q.  She told you the names of her kids, right?

12   A.  Yes.

13   Q.  They were Kayla and Braydon, right?

14   A.  Yes.

15   Q.  She told you that Kayla was seven, correct?

16   A.  Yes.

17   Q.  She told you that Braydon was nine, correct?

18   A.  Yes.

19   Q.  Now, you exchanged some messages with the mother on KinkD,

20   right?

21   A.  The purported mother, yes.

22   Q.  You gave her your phone number, right?

23   A.  Yes.

24   Q.  And that phone number was (832)907-0710, right?

25   A.  Yes.

K3DKBRI1                    Bright - Cross

1   Q.  You used that phone number to chat with her on WhatsApp,

2   correct?

3   A.  Yes.

4   Q.  You also got the mother's phone number, right?

5   A.  Yeah, I expect so, yes.

6   Q.  You exchanged some messages on WhatsApp with her, right?

7   A.  Quite a few, yes.

8   Q.  You exchanged some photographs with her, right?

9   A.  Yes.

10  Q.  At some point, you also spoke with her on the phone,

11  correct?

12  A.  I heard her voice, yes.

13  Q.  Did you also say anything --

14          THE COURT:  Whoa, whoa, whoa.

15          The question was:  At some point, you also spoke with

16  her on the phone, correct?

17          THE WITNESS:  I don't strictly remember if it was a

18  telephone call made over the telephone network or a WhatsApp

19  call made through the WhatsApp app.  The effect is the

20  same - you speak to the other person in realtime, but I just

21  don't remember specifically the technology that was being used.

22          THE COURT:  Thank you.

23  BY MR. LI:

24  Q.  When you spoke with the mother in that conversation you

25  just described, you personally used a phone, correct?

K3DKBRI1                        Bright - Cross

1   A.  Yes.

2   Q.  At some point after that, you met with the mother in person

3   here in Manhattan, right?

4   A.  The purported mother, yes.

5   Q.  And that was in Duane Park, correct?

6   A.  Yes.

7   Q.  Your Gmail address is drpizza@gmail.com?

8   A.  Yes.

9   Q.  And your Twitter handle is @drpizza?

10  A.  Yes.

11  Q.  You said on direct examination that you are not sexually

12  attracted to children, correct?

13  A.  Yes.

14  Q.  You do enjoy DDLG, right?

15  A.  Yes.

16  Q.  And DDLG is a form of age play?

17  A.  Yes.

18  Q.  DDLG stands for Daddy Dom/Little Girl?

19  A.  Yes.

20  Q.  Now, your preference is to be the daddy, right?

21  A.  Yes.

22  Q.  So that means someone else normally plays the little girl,

23  right?

24  A.  Or little boy, but, yes.

25  Q.  DDLG involves a little girl, right?

K3DKBRI1                         Bright - Cross

1   A.  Yes.

2   Q.  Now, your ideal little girl is 11 or maybe 12, right?

3   A.  Yes.

4   Q.  DDLG is a fantasy you enjoy, right?

5   A.  Yes.

6   Q.  So another way of saying that is you like the idea of

7   sexual activity with an adult who is pretending to be an

8   11-year-old girl, correct?

9   A.  Yes.

10  Q.  Now, DDLG is a consensual activity, right?

11  A.  Very much so, yes.

12  Q.  And it requires a lot of trust between partners?

13  A.  Yes.

14  Q.  It requires a lot of knowledge between partners?

15  A.  I would say so, yes.

16  Q.  Boundaries have to be discussed?

17  A.  Yes.

18  Q.  Expectations have to be set?

19  A.  Yes.

20  Q.  One reason for this is DDLG is a sexual activity?

21  A.  Often, yes.

22  Q.  And it's important to make sure that everyone's on the same

23  page before any sexual activity occurs?

24  A.  Yes.

25  Q.  Now, on direct examination, you described some of the

1    language that you've heard in age play.

2    A.  Yes.

3    Q.  Do you remember that?

4            And I think you testified that some of those words are

5    mommy, and princess, and prince, correct?

6    A.  Among many others, yes.

7    Q.  Those words help maintain the fantasy, right?

8    A.  Yes.

9    Q.  They help maintain the fantasy because it's language that

10   might be used with children?

11   A.  Yes.

12   Q.  It's language appropriate for the age, right?

13   A.  Yes.

14   Q.  It also means that those words are sometimes used outside

15   of the age-play context, correct?

16   A.  Yes.

17   Q.  In fact, mommy is a word of common usage?

18   A.  On the KinkD app, mommy has a very particular meaning that

19   is not the common usage, and nobody on the app would be using

20   it in its common usage.

21   Q.  I understand.  But --

22   A.  It has usage in other contexts that is different from the

23   one on KinkD, yes.

24   Q.  I understand what you're saying, but please just answer the

25   question I'm asking.

K3DKBRI1                      Bright - Cross

1            So the question is:  Mommy is a word of common usage,

2       correct?

3       A.   Yes.

4       Q.   When someone says mommy, sometimes they mean mother, right?

5       A.   Depending on context, yes.

6            MR. LI:  Ms. Fetman, let's pull up Government

7       Exhibits 1 and 12 side by side, please.  And for Government

8       Exhibit 12, let's turn to the second page, please.

9       BY MR. LI:

10      Q.   Government Exhibit 1 is the mother's KinkD profile, right?

11      A.   Yes.

12      Q.   And Government Exhibit 12 is your KinkD profile, right?

13      A.   Yes.

14      Q.   Now, in your KinkD profile, you selected, as one of your

15      roles, age player, correct?

16      A.   Yes.

17      Q.   And in the mother's KinkD profile, she selected the role

18      mommy, right?

19      A.   Yes.

20      Q.   She did not select age player, correct?

21      A.   Not explicitly, but mommy is a subset of age player.

22      Q.   In the my role selection in Government Exhibit 1, we do not

23      see the words age player, correct?

24      A.   I don't see those words, no.

25           MR. LI:  Now, if we could zoom out of Government

1    Exhibit 1, please, Ms. Fetman.

2    Q.  Do you see the text of the my self-summary section where it

3    says, "Looking for a teacher to teach my kids about the birds

4    and the bees"?

5    A.  Yes.

6    Q.  The words "my kids" are in here, correct?

7    A.  Yes.

8    Q.  She doesn't use the word littles, right?

9    A.  No.

10   Q.  She doesn't say the words age play, correct?

11   A.  There are many words she doesn't say, yes.

12   Q.  She doesn't say the words role play, correct?

13   A.  Correct.

14   Q.  In fact, you found her profile a bit unusual because it

15   suggested to you that other people might be involved, right?

16   A.  Yeah.  Most age play tends to be -- what is the word

17   Dr. Cantor used -- dyads, so one-on-one.  The prospect of

18   having a threesome or a foursome was relatively unusual, yes.

19   Q.  So your experience with DDLG is normally one-on-one, right?

20   A.  Mostly, yes.

21   Q.  So this idea of having three or four people involved was

22   unusual to you, right?

23   A.  Not unheard of, but not the norm.

24   Q.  To be clear, isn't it true that you never had a

25   conversation with a mother in which you explicitly discussed

1    age play?

2    A.  We never used that specific word, but you don't need to

3    have that specific word.

4    Q.  Isn't it true that you never had a conversation with the

5    mother in which she explicitly said her children were actually

6    adults?

7    A.  That's true.

8    Q.  Isn't it true that you never had a conversation with her in

9    which you explicitly asked whether her children were actually

10   adults?

11   A.  In the same way that I didn't ask if they were human, yes.

12   Q.  You testified about the 11-year-old that you spoke with on

13   the mother in the chats.  Do you recall that?

14   A.  Yes.

15          MS. GALLICCHIO:  I am going to object to the continued

16   use of the word "mother."

17          THE COURT:  The jury has been here for the trial.

18   They understand the use of the word in some contexts can mean

19   the purported mother, or a person pretending to be a mother, or

20   a mother.  I think that's what this trial has been about.

21   There is no evidence here that the individual with whom the

22   defendant was communicating is, in fact, a mother.  The only

23   testimony in the trial is that that individual is not a mother.

24   So I'm not grasping the import of the objection.

25          MS. GALLICCHIO:  I was just referring to the word

1    "mother" itself.  That's not how it was ever referred to in any
2    of the communications.
3              THE COURT:  All right.  Overruled.
4              Go ahead.
5    BY MR. LI:
6    Q.  Mr. Bright, will you understand me if I use the word
7    "mother" to refer to the person with whom you communicated, the
8    person who you knew as Liz?
9    A.  Yes.
10   Q.  Now, you testified about the 11-year-old that you spoke
11   with in the chats with the mother earlier.  Do you recall that?
12   A.  Yes.
13   Q.  And you said she was a 30-something person age playing as
14   an 11-year-old.  Do you recall that?
15   A.  Yes.
16   Q.  Isn't it true that you never had a conversation with the
17   mother in which you explicitly told her that the 11-year-old
18   was doing DDLG?
19   A.  Yeah, I guess.
20   Q.  You've had age-play relationships with adults in the past,
21   right?
22   A.  Yes.
23   Q.  One of those adults was Stevie?
24   A.  Yes.
25   Q.  And you met with Stevie in person?

1  A.  Yes.

2  Q.  Now, before you met with Stevie, you exchanged text

3  messages with him, right?

4  A.  Yes.

5  Q.  You had a discussion with Stevie about DDLG?

6  A.  Yes.

7  Q.  Now, DDLG is not a term of common usage, right?

8  A.  I suppose, yes.

9  Q.  DDLG is specific to age playing?

10  A.  Yes.

11  Q.  In fact, you used the age-play specific term DDLG with

12  Stevie, right?

13  A.  Correct.  Because Stevie, I met on a vanilla site, so there

14  was no implication of kink.  There was no assumption of this

15  shared interest.

16  Q.  You used the exact term DDLG with Stevie, correct?

17  A.  Yes.

18  Q.  You also had an explicit discussion with Stevie about your

19  usual DDLG fantasy, right?

20  A.  Yes.

21  Q.  And that's a fantasy involving an 11 to 12-year-old girl,

22  right?

23  A.  Yes.

24  Q.  You described that to Stevie specifically as a fantasy,

25  correct?

1   A.  Yes.  I was trying to invite Stevie into my fantasy, yes.

2   Q.  And you used the word "fantasy"?

3   A.  Probably, yes.

4   Q.  Do you recall whether you used it?

5   A.  I don't know if I said fantasy, or scenario, or scene,

6   or -- you know, there are many words with the same kind of

7   meaning.  I don't remember which specific word I used, but --

8   Q.  Sure.

9          Is there anything that will help you remember whether

10  you used the word "fantasy"?

11  A.  I could look at the defense exhibits, but they're not up

12  here.

13  Q.  Sure.

14         MR. LI:  Ms. Fetman, could you please pull up Defense

15  Exhibit I just for identification and turn to page 8, please.

16  Q.  Take a look and let me know when you're done.

17         MR. LI:  I'm sorry.  Let's turn to page 7, please.

18  Q.  I apologize.

19  A.  Oh, yes.

20  Q.  The last --

21  A.  I describe it as a fantasy rather than a scene or scenario,

22  but, yes.

23  Q.  Do you now remember whether you used the word "fantasy"?

24  A.  Yes.

25         MR. LI:  We can take this down, please.

K3DKBRI1                        Bright - Cross

1    Q.  Did you use the word "fantasy" with Stevie?

2    A.  Yes.

3    Q.  You also had a discussion with Stevie about DDLB, right?

4    A.  Yes.

5    Q.  DDLB stands for Daddy Dom/Little Boy?

6    A.  Yes.

7    Q.  DDLB is not a term of common usage, right?

8    A.  No.

9    Q.  DDLB is specific to age playing?

10   A.  Yes.

11   Q.  And isn't it true that you used the age-play specific term

12   DDLB with Stevie?

13   A.  Yes.

14   Q.  So you agree that with Stevie, you used the explicit

15   age-play terms DDLG and DDLB, correct?

16   A.  Yes.

17   Q.  Another one of your prior DDLG relationships was with

18   Denesy, right?

19   A.  Yes.

20   Q.  And you chatted with Denesy?

21   A.  Yes.

22   Q.  You had a discussion with Denesy about DDLG, correct?

23   A.  Yes.

24   Q.  And in your conversation with Denesy, you, again, used the

25   specific age-play term DDLG, right?

K3DKBRI1                    Bright - Cross

1    A.   Yeah.  Again, because we met on a vanilla site, and so we

2    had to establish that shared interest and establish that

3    context.

4    Q.   Did you use the word "DDLG" -- excuse me.  Did you use the

5    term "DDLG" with Denesy?

6    A.   I just said yes.

7    Q.   Isn't it true that in your 769 chat messages with the

8    mother, you never once used the age-play term "DDLG"?

9    A.   Yes.

10   Q.   Isn't it true in that your 769 chat messages with the

11   mother, you never once used the age-play term "DDLB"?

12   A.   Yes.

13   Q.   Isn't it true that in your 769 chat messages with the

14   mother, you never said specifically that your plan with her

15   children was a fantasy?

16   A.   I mean, it was abundantly clear from words like teacher and

17   lessons, but I don't think I ever said the word fantasy, no.

18   Q.   So you agree you never said the word "fantasy"?

19   A.   Correct.

20   Q.   Isn't it true that in your phone call with the mother, you

21   never said the terms DDLG or DDLB or used the word fantasy?

22   A.   Yes.

23        MR. LI:  Ms. Fetman, let's pull up Government

24   Exhibit 3A, please, and let's turn to page 23.

25   Q.   Do you see a message here where it says, "Got any family

1    photos"?

2    A.  Yes.

3    Q.  You sent this message from your phone, right?

4    A.  Yes.

5    Q.  You sent this on May 15th, 2019, correct?

6    A.  Yes.

7    Q.  And this was before you had the phone call with the mother,

8    right?

9    A.  Yes.

10   Q.  And this was before you received any pictures from the

11   mother, right?

12   A.  Yes.

13           THE COURT:  And, again, so there's no confusion here,

14   when you used that term, you're referring to Liz, the person

15   with whom he was communicating?  Is that accurate?

16           MR. LI:  That is accurate, your Honor.

17           THE COURT:  All right.  Then I think you should use

18   the word Liz --

19           MR. LI:  Of course, your Honor.

20           THE COURT:  -- going forward.

21   BY MR. LI:

22   Q.  You claim that you believe the children were actually

23   adults when you said, "Got any family photos," right?

24   A.  Yes.

25           MR. LI:  Let's turn to page 49, please.

1    Q.   Do you see a message that says:  "Cool.  Let them handle

2    it.  See how it pulls back, et cetera"?

3    A.   Yes.

4    Q.   You sent that message, right?

5    A.   Yes.

6    Q.   And you sent it to Liz, right?

7    A.   Yes.

8    Q.   You sent it from your phone?

9    A.   Yes.

10   Q.   And you sent it on May 16th, 2019, correct?

11   A.   Yes.

12   Q.   And this was, again, before you had the phone call with

13   Liz, right?

14   A.   Yes.

15   Q.   So, this was also when you believed the children were

16   actually adults, right?

17   A.   Yes.

18   Q.   The "it" you're referring to in this message is your

19   foreskin, correct?

20   A.   Yes.

21   Q.   And the "them" you're referring to in this message is Kayla

22   and Braydon, correct?

23   A.   Yes.

24   Q.   And Kayla and Braydon were the names that Liz had given you

25   for her purported children, correct?

K3DKBRI1                        Bright - Cross

1   A.  At the time, I thought they were purported littles, but,

2   yes.

3   Q.  Sure.  People you believed at the time were adults,

4   correct?

5   A.  Yes.

6   Q.  So at the time you sent this message, you sent this to --

7   in regards to people who you thought were adults?

8   A.  Yes.

9           MR. LI:  Ms. Fetman, we can not blow this up.  Thank

10  you.

11  Q.  You testified on direct examination that at some point,

12  some of the things that Liz said seemed to be a bit strange; is

13  that right?

14  A.  Yes.

15  Q.  Fair to say you started to see some red flags?

16  A.  I think that is a word that has been used, that I have

17  agreed to, but it's not a word I have introduced, I think.

18  Q.  Would you agree that you started to see red flags?

19  A.  I don't think they were -- any of the individual things on

20  their own, I think, would be innocuous, but when I looked back

21  at them in their totality, then I could describe them as red

22  flags.

23  Q.  So, at some point, you started to see red flags, right?

24  A.  In retrospect, yes.

25  Q.  You began to become concerned that she might be talking

K3DKBRI1                    Bright - Cross

1    about actual kids, correct?

2    A.   Among other options, yes.

3    Q.   And in retrospect, one of those red flags was your call

4    with Liz, correct?

5    A.   Yes.

6    Q.   And even then, you thought it was a bit strange that she

7    was talking about taking her kids to the playground, right?

8    A.   Yeah, that level of play is a little more than I would

9    normally do.  I am familiar with nonsexual age play, I have

10   participated in nonsexual age play, but when I'm on a dating

11   app, I'm mainly looking for the sexual stuff.  So it was a

12   little outside what I would be ideally looking for.

13   Q.   Mr. Bright, I'm just going to ask you to please listen to

14   the question I'm asking you and please try to answer the

15   question.

16            The question is:  Even then, during the call with the

17   mother -- with Liz, excuse me, you thought it was a little bit

18   strange that she was talking about taking her kids to the park;

19   isn't that correct?

20   A.   To repeat, yes.

21   Q.   You also were concerned because the mother had alluded to

22   being molested, right?

23   A.   Yes.

24   Q.   That set off alarm bells for you, right?

25   A.   In retrospect.  You know, it seemed strange at the time,

1    but in retrospect, when I looked at it together, it was more
2    than just strange, it was a red flag, I think is the word you
3    used.
4             MR. LI:  Ms. Fetman, let's turn to page 57, please, of
5    Government Exhibit 3A.
6             So, here on, we'll just blow up the top two bubbles,
7    please, Ms. Fetman.
8    Q.  So, here, on May 17, 2019, at 4:13 p.m., Liz writes:
9    "Great chatting with you!"  Do you see that?
10   A.  Yes.
11   Q.  And you respond:  "And you!," correct?
12   A.  Yes.
13   Q.  So this was the time, approximately, that you had your call
14   with Liz, right?
15   A.  This was, I think, immediately after the call, yes.
16   Q.  So this was immediately after things began to seem a little
17   bit strange?
18   A.  Strange, but I hadn't put them together and realized that
19   there was something sinister going on.
20   Q.  But it began to seem a little bit strange, right?
21   A.  Yes, but no more than strange.
22            MR. LI:  Let's turn to page 68, please.  Let's blow up
23   the top message on the left, please.
24   Q.  Do you see the message where it says:  "I think things like
25   an excess of back-to-back orgasms need a certain level of

K3DKBRI1                          Bright - Cross

1    maturity, too"?  Do you see that?

2    A.  Yes.

3    Q.  You sent that message to Liz, right?

4    A.  Yes.

5    Q.  And you sent this on May 17th, 2019, correct?

6    A.  Yes.

7    Q.  And that was the same day as your call with Liz, right?

8    A.  Yes.

9    Q.  You sent the message at 6:34 p.m., correct?

10   A.  Yes.

11   Q.  So a couple of hours and change after your call, correct?

12   A.  Yes.

13   Q.  So when you sent this message, it was after things had

14   started to seem strange, right?

15   A.  Yes.  But no more than strange.

16        MS. GALLICCHIO:  Let's turn to page 69, please.  Let's

17   blow up the first four messages, please.

18             (Continued on next page)

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.

K3DLBRI2                          Bright - Cross

1    BY MR. LI:

2    Q.  Do you see here a message that says:  "Some girls at a very

3    early age discover that it feels good to rub certain bits."

4          Do you see that?

5    A.  Yes.

6    Q.  You sent that message, right?

7    A.  Yes.

8    Q.  And you sent it to Liz, right?

9    A.  Yes.

10   Q.  And you sent this on May 17th, 2019 at, 6:43 p.m., correct?

11   A.  Yes.

12   Q.  And that's, again, just a few hours after your call with

13   Liz, correct?

14   A.  Yes.

15   Q.  So that's after things had begun to seem strange, correct?

16   A.  Yes.

17   Q.  Do you see where it continues:  "But otherwise help her

18   discover that herself, touching or vibrating her clit, putting

19   a finger inside or maybe a very tiny toy."

20          Do you see that?

21   A.  Yes.

22   Q.  You sent that message as well, right?

23   A.  I did, yes.

24   Q.  And you sent that on the same day, which was May 17th,

25   2019, correct?

1    A.  Yes.

2    Q.  And you sent that at 6:46 p.m., correct?

3    A.  Yes.

4    Q.  And, again, that was after things had become strange?

5    A.  Yes, but no more than strange.  Not yet sinister.

6    Q.  Do you see where it continues:  "How to hold my snake,

7    showing her where the most sensitive parts of it are, the parts

8    that feel best to lick or rub."

9            Do you see that message?

10   A.  Yes.

11   Q.  You sent that message, right?

12   A.  Yes.

13   Q.  And you sent to it the mother -- excuse me, to Liz,

14   correct?

15   A.  To Liz, yes.

16   Q.  And you sent that on the same day as your phone call with

17   Liz, right?

18   A.  Yes.

19   Q.  And you sent that a few hours after your phone call with

20   Liz, correct?

21   A.  Yes.

22   Q.  Do you see the fourth message here where it says:  "How to

23   keep it in her hand and the kind of motion that feel good?"

24   A.  Yes.

25   Q.  You sent that message as well, correct?

1    A.  Yes.

2    Q.  And you sent that on May 17th, 2019?

3    A.  Yes.

4    Q.  And that was the same day as your call with Liz?

5    A.  Yes.

6    Q.  And so this was also after things had become strange, yes?

7    A.  But not yet sinister.

8          MR. LI:  Let's turn to page 70, please.  We'll pull up

9    the first message.

10   BY MR. LI:

11   Q.  Do you see where it says "Is Kayla a virgin?"

12   A.  Yes.

13   Q.  You wrote that message, correct?

14   A.  Yes.

15   Q.  And you sent that to Liz, right?

16   A.  Yes.

17   Q.  And you sent that on May 17th, 2019, at 8:15 p.m., correct?

18   A.  Yes.

19   Q.  So that's about four hours after your call with Liz, right?

20   A.  Yes.

21   Q.  And this is after things had started to seem strange,

22   right?

23   A.  Yes.

24   Q.  And this evening is when you had started to really think

25   about the strangeness of it, correct?

K3DLBRI2                    Bright - Cross

1   A.  There were things she said, I think, after this that also

2   seemed strange.  And it was after that that I started to put

3   things together.

4              THE COURT:  I'm sorry.  I didn't hear the last words

5   you said.

6              THE WITNESS:  It was after that that I started to put

7   things together.

8              THE COURT:  Thank you.

9              MR. LI:  Ms. Fetman, can we zoom out, please?  Let's

10  zoom in on the last two messages, please.

11  BY MR. LI:

12  Q.  You see where it says:  "Yes, but I think the tip might be

13  all I can manage."  Do you see that?

14  A.  Yes.

15  Q.  You sent this message, right?

16  A.  Yes.

17  Q.  And the tip you're referring to in this message is the tip

18  of your penis, correct?

19  A.  Yes.

20  Q.  You sent this message on May 17th, 2019, at 8:30 p.m.,

21  correct?

22  A.  Yes.

23  Q.  So this was about four hours and change after your phone

24  call with Liz, correct?

25  A.  Yes.

1   Q.  And that was after things started to seem strange?

2   A.  But no more than strange.  Indeed, one of the next things

3   that seemed strange was shortly after this message.

4   Q.  All right.  Let's get to that.  So the next message on this

5   page is:  "How old were you when you first took a whole cock?"

6           Do you see that message?

7   A.  Yes.

8   Q.  You sent that message, right?

9   A.  Yes.

10  Q.  And you sent it the same evening as all the other messages

11  that we've just been discussing, right?

12  A.  Yes.

13  Q.  And let's look at the response to that.

14          MR. LI:  Can we blow up the green bubble on the right,

15  please?

16  BY MR. LI:

17  Q.  So Liz responds to your message, right?

18  A.  Yes.  She alluded to being molested again.

19  Q.  So she said:  "I was nine but wasn't eased into it at all,"

20  right?

21  A.  Yes.

22  Q.  So you saw that message, correct?

23  A.  Yes.

24  Q.  And at this point it had been nagging at you because of

25  something that Liz had said on the phone call, right?

1   A.  Yes.

2   Q.  She had alluded to being molested on the phone call, right?

3   A.  Yes.

4   Q.  And that was bothering you?

5   A.  It seemed like an unusual thing to say, yes.

6   Q.  And you wanted to know whether this was fantasy or if it

7   was real, right?

8   A.  Yes.  It sort of -- it stepped beyond what I would consider

9   tasteful for fantasy.  It's definitely a thing that people

10  fantasize about but it's not a thing that I fantasize about.

11  Q.  So it had occurred to you at this point that maybe she was

12  real, right?

13  A.  Among other things.

14  Q.  And one of the reasons you asked her the question was

15  because you wanted to figure out if she was real or just

16  fantasy, right?

17  A.  Yes.

18  Q.  And so her response is:  "I was nine but wasn't eased into

19  it at all."  And that response suggested to you that she might

20  be real, right?

21  A.  Among other things, yes.

22  Q.  And at that point, you began to wonder if maybe this wasn't

23  age-play, right?

24  A.  Among other things, yes.

25  Q.  You began to wonder --

K3DLBRI2                        Bright - Cross

1   A.  I still hadn't given it deep consideration.  That came

2   later.

3   Q.  At this point, you started to wonder if maybe there might

4   be real kids involved, right?

5   A.  It still seemed like a remote possibility, but yes.

6   Q.  But it was something you thought about, right?

7   A.  Briefly.

8   Q.  So is it fair to say the alarm bells were starting to ring

9   a little louder now?

10  A.  I would say -- I mean alarm bells sounds quite strong for

11  me.  I would say the alarm bells didn't really ring until the

12  following day when I actually had time to think about it

13  together and read back through the message and think about the

14  phone call.  Because the rest of that evening I was quite

15  distracted because I was on a date.  So it was nagging at the

16  back of my mind but I didn't give it a ton of thought.

17  Q.  So are you saying that you did not view this as alarm

18  bells?

19  A.  In retrospect, yes.

20  Q.  At the time.

21  A.  At the time, it was just another really odd, surprising

22  strange thing that -- it gave me pause for thought.  But an

23  alarm bell sounds very strong to me and I don't think I would

24  have thought of it that strong.

25  Q.  So you testified yesterday on direct examination about this

K3DLBRI2                          Bright - Cross

1   set of chats; do you recall that?

2   A.  Yes.

3   Q.  And you were asked some questions and you gave some

4   answers; do you recall that?

5   A.  Yes.

6   Q.  And, of course, you were under oath yesterday just like you

7   are today, right?

8   A.  Yes.

9   Q.  And isn't it true that you --

10          MS. GALLICCHIO:  Page, please.

11          MR. LI:  Sure.  This is yesterday's transcript, page

12   427.

13   BY MR. LI:

14   Q.  You were under oath yesterday, right?

15   A.  Yes.

16   Q.  And your oath was to tell the truth, correct?

17   A.  Yes.

18   Q.  And you swore to tell the truth when you took the stand,

19   right?

20   A.  Yes.

21   Q.  Isn't it true that when you were asked the following

22   question, you gave the following answer:

23   "Q.  All right.  So why did you ask her that question?

24   "A.  Something -- I think it was something she said on the

25   phone call that was nagging at the back of my mind.  Like, I

1  think she alluded to having been molested.  And I was trying to

2  learn more about that, because that wouldn't -- I mean, that's

3  the kind of thing that sets off alarm bells.  And so I wanted

4  to further understand what it was that she was talking about.

5  And like, you know:  Is this something in the fantasy space or

6  is this something that really happened to you?  And it sounded

7  like something that really happened to her, which is not the

8  right thing, you know.  It's -- it kind of threw me."

9          Isn't it true that when you were asked that question I

10  read, that you gave the response I read?

11  A.  Yes.  I said it is the kind of thing that sets off alarm

12  bells, but I did not say it set off an alarm bell and I did not

13  say it set off an alarm bell at that time.

14  Q.  So you agree that talking about being molested sets off --

15  is the kind of thing that sets off alarm bells, right?

16  A.  Yes.  But I didn't specify any kind of temporal constraint

17  to that.

18  Q.  And you agree that in the chats we were just looking at,

19  Liz talked about being molested, right?

20  A.  Yes.

21  Q.  So at that point, when Liz told that you she had been

22  molested, you didn't call the cops, right?

23  A.  No.

24  Q.  At that point, you didn't try to get more information from

25  Liz that evening, right?

1  A.  No.  As I testified, this was before I really had thought

2  that it was likely that she was a child molester.

3  Q.  Sure.  In fact, I think you just said that you had other

4  plans that evening, right?

5  A.  I did, yes.

6  Q.  So instead of calling the cops or asking Liz for more

7  information after you learned she had been molested, you went

8  on your date, right?

9  A.  Yes.

10  Q.  Now, when Liz sent you pictures of what appeared to be

11  actual children, that was a turning point, right?

12  A.  Yes.  It made it seem that -- I mean, I still felt there

13  were possibilities.  I felt she could have been a scammer, but,

14  yes, it was a big turning point.

15  Q.  It was a big turning point?

16  A.  Yes.

17  Q.  So that's when things really clicked, right?

18  A.  Yes.

19  Q.  And when you got the pictures, you had a flurry of

20  emotions, right?

21  A.  Yes.

22  Q.  You were angry?

23  A.  Yes.

24  Q.  You were disgusted?

25  A.  Very much so, yes.

K3DLBRI2                    Bright - Cross

1    Q.  You were disappointed?

2    A.  Yes.

3    Q.  But you kept going because you wanted to get evidence for

4    law enforcement, right?

5    A.  Yes.

6    Q.  And you had no sexual interest in the chats after that

7    point, right?

8    A.  No.

9    Q.  You were just concerned about the kids?

10   A.  Yes.

11   Q.  Now, you received the first three pictures of the purported

12   children on May 19th, 2019, correct?

13   A.  Yes.

14        MR. LI:  Ms. Fetman, please turn to page 75 of

15   Government Exhibit 3A.  If you could just focus on the middle

16   green bubble, please.

17   BY MR. LI:

18   Q.  Now, you received the first photograph of the purported

19   children at 5:27 p.m., correct?

20   A.  Yes.

21   Q.  And you saw the photograph after receiving it right?

22   A.  I think so, yes.

23   Q.  It was a picture of Brayden, the boy, right?

24   A.  Purported to be, yes.

25   Q.  The caption of the photograph says:  Brayden watching TV,

1   right?

2   A.  Yes.

3           MR. LI:  Ms. Fetman, let's zoom out please and blow up

4   the last green bubble to the right.

5   BY MR. LI:

6   Q.  You received the second photograph of the purported

7   children at 5:28 p.m., correct?

8   A.  Yes.

9   Q.  So that was about a minute after the first photograph,

10  right?

11  A.  Yes.

12          MR. LI:  Ms. Fetman, could you please pull up

13  Government Exhibit 3N side by side.

14  BY MR. LI:

15  Q.  Government Exhibit 3N on the right is the picture you

16  received, right?

17  A.  Yes.

18  Q.  And you saw that picture?

19  A.  I saw the thumbnail of it, yes.

20  Q.  It was a picture of Kayla, the girl, right?

21  A.  Yes.

22  Q.  And the picture clearly shows a child, right?

23  A.  Yes.

24  Q.  The caption of the photo says:  "Kayla not listening to me

25  and playing with the phone, lol," right?

K3DLBRI2                         Bright - Cross

1    A.  Yes.

2    Q.  And you saw that caption, correct?

3    A.  Yes.

4    Q.  And the mother had previously told you --

5            MS. GALLICCHIO:  Objection.

6            MR. LI:  Excuse me.  Liz.

7            Let me restate the question.

8    BY MR. LI:

9    Q.  Liz had previously told you that Kayla was seven years old,

10   right?

11   A.  Yes.

12   Q.  And when you saw the picture, you realized that there might

13   be a real child involved, right?

14   A.  Yes.

15   Q.  It was pretty obvious from the photo, right?

16   A.  It's obvious that the person in the photo is a child, yes.

17   Q.  Now, you say you're not sexually attracted to children,

18   right?

19   A.  Correct.

20   Q.  You testified yesterday that you are sexually attracted to

21   people who actually have the opposite physical characteristics

22   as children, right?

23   A.  Yes.

24   Q.  You actually prefer your partners to be physically hairy,

25   right?

SOUTHERN DISTRICT REPORTERS, P.C.

1    A.  Very much so, yes.

2            MR. LI:  Ms. Fetman, let's turn to page 76, please and

3    blow up the first bubble on the left.

4    BY MR. LI:

5    Q.  Now, you responded to the picture of Kayla at 5:29:09 p.m.,

6    correct?

7    A.  Yes.

8    Q.  That's 20 seconds after you got the picture of Kayla,

9    correct?

10   A.  Yes.

11   Q.  And at that time, you were shocked?

12   A.  Among other things.  I realized I had to do what I'd

13   previously decided and play along to get information from her.

14   Q.  At the time that you received the message from Kayla --

15   excuse me.

16           At the time that you received the message from Liz

17   with a picture of Kayla, you were shocked, right?

18   A.  I just said yes.

19   Q.  You were angry, right?

20   A.  Yes.

21   Q.  You were disappointed, right?

22   A.  Yes.

23   Q.  And in your flurry of shock, and anger, and disappointment,

24   your response, 20 seconds later, was:  "She looks like a

25   cutie," right?

1    A.  Yes, because I was playing along.  Yes.

2              MR. LI:  Ms. Fetman, let's pull up the second green

3    bubble to the right here.

4    BY MR. LI:

5    Q.  You got a third picture of the purported children at 5:30

6    p.m., correct?

7    A.  Yes.

8    Q.  And that was about two minutes after you got the first

9    photo, right?

10   A.  I think so, yes.

11   Q.  In the picture it looks like the mother is between the

12   thighs of al child, right?

13   A.  Yes.

14   Q.  And the caption says:  "Here's one before playtime," right?

15   A.  Yes.

16   Q.  You saw the picture after she -- you saw this picture,

17   right?

18   A.  I saw the thumbnail, yes.

19   Q.  You saw the caption too, right?

20   A.  Yes.

21   Q.  And you responded to this message, correct?

22   A.  Yes.  At this point it seemed less likely that she was a

23   scammer, and more likely that she was a child molester.  And so

24   I felt I had to continue to play along.

25   Q.  And at that time, since it seemed less likely she was a

K3DLBRI2                          Bright - Cross

1    scammer, you were really shocked, right?

2    A.  Yes.

3    Q.  You were really angry now, right?

4    A.  No.  I wasn't -- I don't think I was any more angry.

5    Maybe -- but maybe a little more angry.  But I don't -- I can't

6    say I can precisely remember the exact levels of my emotions at

7    the time.

8    Q.  You were feeling strong emotions at the time, right?

9    A.  Yes.

10   Q.  You responded to this photograph 27 seconds later, correct?

11   A.  Yes.

12   Q.  Twenty-seven seconds later while you were shocked and angry

13   and disappointed, you responded:  "Oooh"?

14   A.  Oh.

15   Q.  You responded:  "Oh"?

16   A.  Yes.

17   Q.  But then you wrote:  "Playtime sounds fabulous?"

18   A.  Yes.

19   Q.  You sent those two messages, right?

20   A.  Yes.

21          MR. LI:  Let's turn to page 77, please.  Let's pull up

22   the two blue bubbles on the left please.

23   BY MR. LI:

24   Q.  Do you see where it says here:  "Kissing her flower, I'm

25   sure it's beautiful?"

K3DLBRI2                         Bright - Cross

1    A.  Yes.

2    Q.  You sent that message, right?

3    A.  Yes.  It was a few minutes elapsed, but yes.

4    Q.  You sent that message to Liz, right?

5    A.  Yes.

6    Q.  And you sent it on May 19th, 2019, at 5:35 p.m., correct?

7    A.  Yes.

8    Q.  That's five minutes after the last picture of the children

9    we just saw, correct?

10   A.  Yes.

11   Q.  And you sent this message in your whirlwind of confusion --

12   excuse me -- of anger and disappointment, correct?

13   A.  No.  By this time, I was feeling a little more analytical.

14   I had looked back at the previous messages.  I can't say I

15   seemed very enthused about -- in terms of the messages I'd

16   sent, they didn't seem very enthused.  I felt I wasn't playing

17   the part very well.  So I sent this message to try to bolster

18   my credibility with Liz.

19   Q.  Did you just say that five minutes after getting that last

20   picture, you were no longer angry?

21   A.  I don't think I said I was no longer angry at all.  I said

22   I was feeling a bit more analytical.

23   Q.  So you were still angry when you sent this message, right?

24   A.  Somewhat.

25   Q.  You were still disappointed when you sent this message,

K3DLBRI2                          Bright - Cross

1    right?

2    A.   Yes.

3    Q.   You were still shocked when you sent this message, right?

4    A.   Yes.

5    Q.   And even though you were shocked and disappointed and

6    angry, you wrote:  "Kissing her flower.  I'm sure it's

7    beautiful?"

8    A.   Yes.

9    Q.   Do you see the next message where it says:  "How big a boy

10   is Brayden?"

11   A.   Yes.

12   Q.   You sent that message too, right?

13   A.   Yes.

14   Q.   And you sent that on May 19th, 2019, at 5:43 p.m., correct?

15   A.   Yes.

16   Q.   "Brayden" is the name of the purported son, right?

17   A.   Yes.

18   Q.   And Liz had told you he was nine years old, correct?

19   A.   Yes.  I was asking, trying to affirm that.

20   Q.   You sent this message after you realized Brayden might

21   really be a real child, right?

22   A.   Yes.  When I was putting my plan into action, yes.

23            MR. LI:  Ms. Fetman, let's zoom out of this and zoom

24   in on the last blue bubble to the left.

25   BY MR. LI:

K3DLBRI2                        Bright - Cross

1   Q.  Do you see the message:  "His manhood?"

2   A.  Yes.

3   Q.  You sent that message, right?

4   A.  Yes.

5   Q.  And you sent it to Liz, right?

6   A.  Yes.

7   Q.  You're referring here to a penis, right?

8   A.  Yes.

9   Q.  Specifically you're referring to the penis of Brayden?

10  A.  Yes.

11  Q.  And that was someone who you thought might really be a

12  nine-year-old boy?

13  A.  Yes.

14  Q.  You sent this message on May 19th, 2019, right?

15  A.  Yes.

16  Q.  5:45 p.m.?

17  A.  Yes.

18  Q.  And this was just minutes after you had gotten the pictures

19  of Brayden and Kayla, right?

20  A.  Yes.

21          MR. LI:  Let's turn to page 79, please.

22  BY MR. LI:

23  Q.  Do you see a small picture on the left?

24  A.  Yes.

25  Q.  You sent that picture, right?

K3DLBRI2                         Bright - Cross

1    A.   Yes.

2    Q.   It's a picture of your penis, right?

3    A.   Right; in response to Liz asking how big it was.

4    Q.   It's your erect penis, right?

5    A.   That's normally what people mean when they ask how big your

6    penis is, yes.

7    Q.   At some point you took that picture of your penis, right?

8    A.   Some years ago, yes.

9    Q.   And you sent it from your phone?

10   A.   Yes.

11   Q.   And you sent it to Liz?

12   A.   Yes.

13   Q.   And you sent this on May 19th, 2019, at 5:55 p.m., right?

14   A.   Yes.

15   Q.   And that was just minutes after you saw the pictures on

16   Kayla and Brayden, right?

17   A.   Yes.

18   Q.   And that was after you thought they might be real children,

19   right?

20   A.   Yes.  It's when I felt I had to play along with Liz, yes.

21   Q.   You were also worried that she might be a scammer, right?

22   A.   I thought it was definitely possible, yes.

23   Q.   And even knowing that she might be a scammer, you sent her

24   a picture of your penis, right?

25   A.   Yes.  Why wouldn't I?  I'm sorry.

1   Q.  And even knowing that she might be a child molester, you

2   sent her a picture of your penis, right?

3   A.  Yes.

4   Q.  And then you follow up --

5            MR. LI:  Can we blow up the next message, please.

6   Q.  You say:  "I think it's a reasonable size, though far from

7   huge," right?

8   A.  Yes.

9   Q.  You sent that message on the same day, May 19th, at 5:55

10  p.m., right?

11  A.  Yes.

12  Q.  Again, this was on the same day just minutes after you got

13  the pictures of Kayla and Brayden, correct?

14  A.  Yes.

15           MR. LI:  Let's turn to page 90, please.  Let's blow up

16  the last blue bubble on the left.

17  BY MR. LI:

18  Q.  Do you see where it says:  "I must admit, I'd love to have

19  more pictures of the three of you.  The one with you kissing

20  Kayla's thigh is thrilling.  I only wish I could see what

21  happens next?"

22  A.  You yes.

23  Q.  You wrote that message, right?

24  A.  I did.  I felt that the pictures I had had little

25  evidentiary value because Liz's face is obscured in the picture

K3DLBRI2                         Bright - Cross

1    of her kissing Kayla's thigh.  I was hoping to get something

2    that was more incriminating.

3    Q.  You sent this message to Liz, right?

4    A.  Yes.

5    Q.  You sent this on May 20th, 2019?

6    A.  Yes.

7    Q.  And this was after you received the pictures of Kayla and

8    Brayden, right?

9    A.  Yes.

10   Q.  And so this was after you thought they might be real

11   children, right?

12   A.  Yes.

13   Q.  And so even knowing that Kayla might be a real

14   seven-year-old girl, you wrote:  "I only wish I could see what

15   happens next?"

16   A.  Yes.

17          MR. LI:  Let's turn to page 115 please.  Let's blow up

18   the first picture on the right, please.

19   BY MR. LI:

20   Q.  Do you see the small picture shown here?

21   A.  Yes.

22   Q.  That's another picture of Kayla, right?

23   A.  Purported Kayla, yes.

24   Q.  The picture clearly shows a child, right?

25   A.  Yes.

K3DLBRI2                          Bright - Cross

1   Q.  The caption says:  "Sleeping beauty" with a smiley face,

2   correct?

3   A.  Yes.

4   Q.  You received this picture from Liz, right?

5   A.  Yes.

6   Q.  You got it on May 20th, 2019, right?

7   A.  Yes.

8   Q.  And you saw this picture after receiving it, right?

9   A.  I saw the thumbnail.

10  Q.  And you saw the caption too, right?

11  A.  Yes.

12  Q.  And you responded to the message, right?

13  A.  Yes.  I gave a pretty banal response, yes.

14  Q.  Sure.  Why don't we pull up your response.

15       You responded on May 20th, 2019, at 10:33 p.m. and two

16  seconds, right?

17  A.  Yes.

18  Q.  That is less than 30 seconds after you got the picture,

19  correct?

20  A.  I -- I think so.  Can we see both together?

21  Q.  So the picture --

22  A.  Yes.

23  Q.  -- was received -- I'm sorry.  Why don't I rephrase the

24  question.

25       You responded to the picture of Kayla shown on this

K3DLBRI2                         Bright - Cross

1    page less than 30 seconds after you received it, correct?

2    A.  Yes.

3    Q.  And your response was:  "What a cutie," correct?

4    A.  Yes.

5          MR. LI:  Ms. Fetman, let's blow up the second picture

6    on the same page, please.

7    BY MR. LI:

8    Q.  Now, you received a second photograph of Kayla on the same

9    day, right?

10   A.  Yes.

11   Q.  And you got that picture on May 20th, 2019 at 10:35 p.m.,

12   correct?

13   A.  Yes.

14   Q.  This picture also clearly shows a child, right?

15   A.  Yes.

16   Q.  And the caption says "Sweet dreams," right?

17   A.  With three exclamation points, yes.

18   Q.  You received this message in this caption from Liz, right?

19   A.  Yes.

20   Q.  And you saw it, right?

21   A.  I saw the thumbnail, yes; and the caption, yes.

22   Q.  And you responded, correct?

23   A.  I think so, yes.

24         MR. LI:  Why don't we go to the response, Ms. Fetman.

25   BY MR. LI:

1    Q.  You responded at 10:36 p.m., correct?

2    A.  Yes; another fairly banal nonsexual response.

3    Q.  You responded less than a minute after you got the picture,

4    correct?

5    A.  Yes.

6    Q.  And your response was:  "Such delight," right?

7    A.  Yes.

8    Q.  And you sent this message after you thought that Kayla

9    might be a real seven-year-old girl, correct?

10   A.  Yes.

11          MR. LI:  Let's turn to page 102, please.  Let's blow

12   up the second blue bubble to the left.

13   BY MR. LI:

14   Q.  Do you see where it says:  "At risk of sounding crude, I've

15   been feeling unimaginably horny today and it has been

16   phenomenally distracting?"

17   A.  Yes.

18   Q.  You sent that message, right?

19   A.  I did, yes.

20   Q.  You sent it to Liz, right?

21   A.  Yes.

22   Q.  And you sent this message on May 20th, 2019, at 4:52 p.m.,

23   right?

24   A.  Yes.

25   Q.  You sent this message unprompted, right?

K3DLBRI2                    Bright - Cross

1    A.  Yes.

2    Q.  And you sent this message after you received the first set

3    of pictures of Kayla and Brayden, right?

4    A.  Yes.

5    Q.  You got those pictures on May 19th, 2019, the day before,

6    right?

7    A.  Yes.

8    Q.  And so you sent this message after you realized Kayla and

9    Brayden might be real children, right?

10   A.  Yes.  I mean, I think I would say I'm fairly skilled and

11   experienced in the art of sexting.  That was a role I knew how

12   to play.  So I was playing that role.

13   Q.  So the answer to the question is yes?

14   A.  To repeat myself, yes.

15   Q.  Now, you claimed that your plan was to meet the mother --

16   excuse me.

17            You claimed your plan was to meet Liz on May 22nd to

18   catch her and report her to law enforcement, right?

19   A.  Yes.

20   Q.  And two days before your plan sting, you told Liz you were

21   worried she was a cop, right?

22   A.  Yes.

23            MR. LI:  Ms. Fetman, let's turn to page 84.

24            THE WITNESS:  May I correct myself?

25            I told her that I was worried that I would be met by a

K3DLBRI2                        Bright - Cross

1   cop.  I don't think I explicitly said I was worried that she

2   was a cop.

3   BY MR. LI:

4   Q.  So on May 20th, 2019, at 8 50 p.m., you wrote:  "So my

5   concern is am I being set up here," right?

6   A.  Yes.

7   Q.  And then you wrote:  "I was struck by the fear yesterday

8   that I'd be met by a cop or something," correct?

9   A.  Yes.

10  Q.  You wrote those messages to Liz, right?

11  A.  Yes; to try to set her mind at ease.

12  Q.  This was all part of your effort to gather evidence, right?

13  A.  Yes.

14  Q.  And this was in order to reassure Liz that you were not a

15  cop, right?

16  A.  Correct.

17  Q.  Now, up until this point, you and Liz had not been talking

18  about the police, right?

19  A.  Correct.

20  Q.  But it's your testimony here today that you wanted to

21  reduce her concern about the police by bringing up the police?

22  A.  Yes.

23        MR. LI:  Ms. Fetman, we can take down this exhibit.

24  BY MR. LI:

25  Q.  You met Liz on May 22nd, 2019, right?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

1   A.  Yes.

2   Q.  When you met her, you were on assignment for work, right?

3   A.  No; nor have I claimed to be.

4   Q.  You weren't writing an article?

5   A.  No; nor I have claimed to be.

6   Q.  You were there on your own?

7   A.  Yes.

8   Q.  You were there to meet someone who you thought might be a

9   criminal?

10  A.  Yes.

11  Q.  Specifically, you thought she might be someone offering up

12  her kids for sex?

13  A.  Yes.

14  Q.  You didn't tell your wife about the meeting?

15  A.  I couldn't.  But, no.

16  Q.  You didn't tell your editor about the meeting?

17  A.  Why on earth would I tell my editor?  No.

18  Q.  You didn't tell anybody about the meeting?

19  A.  Didn't have anybody to tell.

20  Q.  You had met Liz in Duane Park, right?

21  A.  Yes.

22  Q.  You went to a corner of the park, right?

23  A.  Yes.

24  Q.  You spoke with her for a few minutes?

25  A.  Yes.

K3DLBRI2                    Bright - Cross

1    Q.   You showed her your STD test results on your phone?

2    A.   Eventually, yes.

3    Q.   You were recording the whole conversation, right?

4    A.   Yes.

5    Q.   And you didn't actually want to meet the kids, right?

6    A.   Correct, which is why I chose a time to meet before the

7    kids were meant to be there.

8    Q.   Your plan was to simply record Liz saying something

9    incriminating, right?

10   A.   Yes.

11   Q.   After you got that evidence, you could leave, right?

12   A.   Yes.

13          MR. LI:  Ms. Fetman, could you please play Government

14   Exhibit 6G?

15          THE COURT:  All right.  We're going to take a pause.

16   This is a good point for a mid-morning break.

17          Please do not discuss the case among yourselves or

18   with anyone.  We'll be back in action in ten minutes.

19          (Jury not present)

20          THE COURT:  See you in ten minutes.

21          MR. MAIMIN:  Thank you, your Honor.

22          (Recess)

23          (Jury present)

24          THE COURT:  Please be seated.

25          You may continue.

K3DLBRI2                          Bright - Cross

1    BY MR. LI:

2    Q.  Before we broke, we were talking about your plan to meet

3    with Liz; do you recall that?

4    A.  Yes.

5    Q.  And you didn't actually want to meet with the kids, right?

6    A.  Correct; hence the choice of time.

7    Q.  Your plan was to record her saying something incriminating,

8    correct?

9    A.  Yes.  Until that point, she had never been actually

10   sexually explicit.  You know, she had never said, have sex with

11   the kids, or anything along those lines.  So I wanted to get

12   something that was more explicitly incriminating from her.

13   Q.  I understand, Mr. Bright.  Just for the sake of time, I'll

14   ask you to just answer the questions that I ask you, please?

15             MS. GALLICCHIO:  Your Honor.  He is answering them.

16             THE COURT:  Just put your next question to the witness

17   please.

18   BY MR. LI:

19   Q.  Your plan was to record Liz saying something explicitly

20   incriminating, right?

21   A.  Yes.

22   Q.  You wanted her to talk about sexual activity with the

23   children so you could record it?

24   A.  Yes.

25   Q.  And once you had that incriminating evidence, you could

K3DLBRI2                        Bright - Cross

1    leave?

2    A.  Yes.

3            MR. LI:  Ms. Fetman, please play Government Exhibit 6G

4    from the timestamps 7:27 to 8:07.  And please publish the

5    accompanying transcript, which is Government Exhibit 6, at page

6    nine.

7            (Audio recording played)

8    BY MR. LI:

9    Q.  Mr. Bright, we just heard a portion of your meeting with

10   Liz, right?

11   A.  Yes.

12   Q.  And you recorded it?

13   A.  Yes.

14   Q.  That's correct?

15           Now, during the meeting, she says:  "Oh, you said

16   practicalities."

17           Do you see that on line ten?

18   A.  Yes.

19   Q.  And you responded, right?

20   A.  Yes; to the practicalities, part.

21   Q.  Sure.  So you're responding to the practicalities.

22           What you didn't say is:  Yeah, let's talk about

23   practicalities.  You did not say that, right?

24   A.  No.  I was expecting this conversation to occur in her

25   house.  The park was busy.  There were people within earshot

K3DLBRI2                        Bright – Cross

1    all around.  So maybe I'm wrong, but I did not expect someone

2    to tell me about having sex with their kids in a public park,

3    in a very public place.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K3DKBRI3                          Bright - Cross

1    BY MR. LI:

2    Q.  Do you see, on lines 12 to 14, Liz says:  "No.  I know we

3    talked a little bit about the stuff, like, um, like your kinks

4    and stuff, so I don't know"?  Do you see that?

5    A.  Yes.

6    Q.  Now, you don't respond to that and say, oh, let's talk

7    about the kinks and stuff; you don't say that, right?

8    A.  Why would I say that we weren't talking about kinks.  I

9    mean, kinks had no role in this at this point.

10   Q.  You don't say let's talk about what you want me to teach

11   the kids, right?

12   A.  No.  Again, that was going to happen in her home.

13   Q.  You don't say, at this point, let's talk about the lesson

14   plan you want me to give, right?

15   A.  No.  Again, because that kind of explicit talk would not

16   occur on the street where the people could hear.

17   Q.  So you agree you didn't say any of those things?

18   A.  The very first word I said was "No," so I'm agreeing with

19   you, yes.

20   Q.  After the conversation ended, you started walking with Liz

21   to the house, right?

22   A.  Yes.

23   Q.  And you agree that on line 9, it says here, from Liz, "Oh,

24   yeah, so they'll actually be home"?

25   A.  Yes.

1    Q.  That's what it says, right?

2    A.  It does, though I have no recollection of her saying that

3    at the time.  I think I heard the practicalities, and that

4    occupied all my thinking.

5            MR. LI:  Ms. Fetman, we can pull that down.

6    Q.  You were arrested on May 22nd, 2019, correct?

7    A.  Yes.

8    Q.  I believe you testified on direct that you did not go to

9    law enforcement before then because you did not want to provide

10   your phone.  Did I get that right?

11   A.  Yes.

12   Q.  Before going to the meeting, you knew you had some evidence

13   on your phone, right?

14   A.  Pretty marginal.  Yeah, there's nothing explicit.  There's

15   no -- she didn't send me any child pornography, she didn't

16   explicitly invite me to have sex with her kids.  I didn't think

17   it had very much evidential value.  I thought it was more

18   incriminating to me than her, where I say I've been doing

19   things with her 11-year-old girl.

20   Q.  You had Liz's phone number, right?

21   A.  Yes.

22   Q.  You did have Liz's user name that she used on KinkD, right?

23   A.  Yes.

24   Q.  You had the chats with Liz on KinkD, right?

25   A.  The minimal chats, yes.

K3DKBRI3                     Bright - Cross

1   Q.  You had Liz's 132 pages of chats with you on WhatsApp,

2   right?

3   A.  Yes.  Which, as I just said, I felt were actually quite

4   incriminating for me, not so much for her.

5   Q.  And you had on your phone the attachments to those chats,

6   correct?

7   A.  Yes.

8   Q.  Those attachments included a picture of Liz, right?

9   A.  Yes.

10  Q.  They also included pictures of the purported children,

11  Kayla and Braydon, right?

12  A.  Yes.  Clothed, nonpornographic, legal pictures, yes.

13  Q.  You had a set of three pictures of the purported children

14  from May 19, 2019, right?

15  A.  Yes.

16  Q.  And you had another set of pictures of Kayla on May 20th,

17  2019, correct?

18  A.  Yes.  Again, clothed, nonpornographic, legal pictures.

19  Q.  You knew you had all of that evidence on your phone before

20  you were arrested, right?

21  A.  If you really want to call it evidence, yes.  I mean, I

22  felt it was not evidence of very much.

23  Q.  In the chats, you discuss with Liz the things that you

24  could do with her purported children, correct?

25  A.  Prior to the phone call, yes.

1   Q.  And some of those things included sexual activity, right?

2   A.  Yes.

3   Q.  They include penetrating the girl, Kayla, right?

4   A.  Yes.

5          MS. GALLICCHIO:  Objection to the characterization.

6          THE COURT:  The witness has answered it.  The question

7   was not objectionable.

8          THE WITNESS:  At the time I didn't think it was a

9   child, but, yes.

10  BY MR. LI:

11  Q.  Liz said that it was okay for you to do those things in the

12  chats, correct?

13  A.  Yes, but she was still using sort of euphemistic fantasy

14  language, like lessons and teachings.  It still didn't seem

15  particularly explicit to me.

16  Q.  You don't think it's explicit that she agreed for you to

17  penetrate the girl?

18  A.  I mean, yes, but it was, again, within a fantasy scenario,

19  so it had an unreal element to it.

20  Q.  So, you agree that, at least to some degree, these chats

21  were incriminating for Liz, too, right?

22  A.  I've said already to some degree, but I felt myself to a

23  greater degree.

24  Q.  Now, you knew you had those chats on your phone, right?

25  A.  Yes.

K3DKBRI3                          Bright - Cross

1    Q.  And you said on direct examination you knew you had it, but

2    you didn't want to go to law enforcement because you didn't

3    want to turn over your phone, correct?

4    A.  Yes.

5    Q.  You didn't want them to look through your phone, correct?

6    A.  Correct.

7    Q.  You didn't want them to make a forensic image of your

8    phone?

9    A.  Correct.

10   Q.  Isn't it true that you could have printed the chat

11   messages?

12   A.  I don't know.  Are there apps that will do that?

13   Q.  Well, you're a technology editor for Ars Technica, correct?

14   A.  There are literally millions of apps available for android,

15   and as broad as my technological knowledge is, I do not know

16   the purpose and function of every single one of those apps.

17   Q.  Do you know how to take a screenshot?

18   A.  Yes.

19   Q.  Do you know how to print a screenshot?

20   A.  Yes.

21   Q.  Do you know how to email a screenshot?

22   A.  Yes.

23   Q.  You could have printed screenshots of your chats with Liz,

24   correct?

25   A.  That would have removed the metadata from those chats.

K3DKBRI3                      Bright - Cross

1    Q.  You could have printed them, and they would have shown the

2    content, correct?

3    A.  They would have shown the content, but nothing else.

4    Q.  You could have printed the attachments of the chats,

5    correct?

6    A.  Yes.  Again, that would strip the metadata.

7    Q.  You could have emailed the chats, correct?

8    A.  I don't know.  I could have emailed pictures of the chats,

9    but, again, that would strip the metadata.

10   Q.  Okay.  So you agree you could have emailed screenshots of

11   the chats, correct?

12   A.  Yes, I suppose.

13   Q.  You could have emailed the attachments of the chats,

14   correct?

15   A.  I could have done many things, I'm sure, yes.

16   Q.  You could have printed the pictures of Liz -- excuse me,

17   the one picture of Liz that she sent you, correct?

18   A.  Yes, I -- yes.

19   Q.  You could have printed the pictures of Kayla that she sent

20   you, correct?

21   A.  You mean the nonpornographic, legal pictures?  Yes, I could

22   have printed them, I suppose.

23   Q.  And you could have also printed the accompanying chats,

24   correct?

25   A.  Again, but that would have stripped them of their metadata.

K3DKBRI3                          Bright - Cross

1    It would have made them inauthentic.

2    Q.  Now, if you had printed or emailed the chats, you wouldn't

3    have had to give up your phone, right?

4    A.  No.  I would have had to buy a whole ton of paper and

5    printing ink, and I would have had to give over something that

6    struck me as something that seems very low value, but, yeah, I

7    could have.

8    Q.  So --

9    A.  I mean --

10   Q.  Is it your testimony that the messages of the texts have

11   low value?

12   A.  It is my testimony that stripped of all their metadata,

13   stripped of any authenticity, stripped of any evidence that

14   they actually came from a particular person, yes, they are of

15   low value.

16   Q.  So, you said one of your concerns is that it's unclear who

17   the participants are.  Did I get that right?

18   A.  Yes.

19   Q.  You had Liz's phone number, right?

20   A.  Yes.

21   Q.  And on the top of the -- excuse me.  As part of the

22   WhatsApp chats, you can see her phone number, correct?

23   A.  Right.  But if you print something out, you could print

24   anything out.  I could change the phone number.  I mean, it's

25   not authentic anymore.  That's why the FBI, indeed, takes

K3DKBRI3                         Bright - Cross

1    forensic images of phones, to make sure that all of its
2    metadata is preserved and to make sure that the data taken from
3    the phone can be sort of linked back to the phone.  Printing
4    would destroy all of that.
5    Q.  Would you agree that there is some evidentiary value to
6    seeing the chats where Liz says, as you agreed, incriminating
7    things?
8    A.  I already acknowledged that there is, yes.
9    Q.  Would you agree that there's evidentiary value in the
10   pictures that she sent you?
11   A.  I've already acknowledged that there is.
12   Q.  And you could have emailed those items that had evidentiary
13   value, right?
14            MS. GALLICCHIO:  Objection; asked and answered.
15            THE COURT:  Sustained.
16   BY MR. LI:
17   Q.  If you had emailed them, it wouldn't have wasted paper or
18   ink, right?
19   A.  No.  Just...
20   Q.  So, it's your testimony today that you knew you had all of
21   this evidence on your phone, but you just weren't comfortable
22   giving up your phone, right?
23   A.  In part, that was my testimony, yes.  I also say I think
24   the evidence was, in and of itself, quite low value.  I saw
25   that the pictures were not, in and of themselves, evidence of

K3DKBRI3                    Bright - Cross

1   anything illegal whatsoever.  And I have said that, you know,
2   an authentic chat log is one thing, but a screenshot of a chat
3   log is quite another.
4   Q.  But you agree that you knew you had the evidence on your
5   phone, right?
6   A.  Of very low value, yes.
7   Q.  And, in fact, you thought about it because you've been
8   thinking -- you were thinking about the metadata problems,
9   right?
10  A.  Yeah.  I mean, I used to work at a library, so, yeah,
11  metadata is pretty important.
12  Q.  So you gave these issues of the evidence some serious
13  thought, right?
14  A.  A little.  It wasn't my overriding concern.  My overriding
15  concern was that they would incriminate me and that the rest of
16  my phone would incriminate other people.
17  Q.  Now, the testimony you're giving here today is true, right?
18  A.  Yes.
19  Q.  You swore an oath to tell the truth?
20  A.  Yes.
21  Q.  And you swore that oath yesterday, right?
22  A.  Yes.
23  Q.  But you understand you're still under oath today, correct?
24  A.  Yes.
25              MR. LI:  Ms. Fetman, please play Government Exhibit 9,

1    clip 13.

2              (Video playback)

3    BY MR. LI:

4    Q.  When speaking with the FBI, you did not tell them you were

5    uncomfortable giving up your phone, right?

6    A.  I couldn't.  I had to protect my friends.

7    Q.  Now, the FBI did ask you why you didn't turn over the

8    chats, right?

9    A.  He did it as a kind of combined question.  He asked about

10   the chats and the phone together.

11   Q.  The topic came up, right?

12   A.  Yes.

13   Q.  And you explained why you didn't give up the chats, right?

14   A.  I think I said to him I didn't even think of that, didn't

15   I?  Or is there something else?

16   Q.  So you agree you said, honestly, I didn't even think of

17   that?

18   A.  I agree that I lied to Special Agent Spivack, yes.

19   Q.  And you said that to the FBI after you were arrested?

20   A.  Yes.

21   Q.  You knew it was for a serious crime?

22   A.  Yes.

23   Q.  And the FBI agents had asked you to be honest, right?

24   A.  Yes.  But I also felt that the consequences of them finding

25   this information could be even more serious.

K3DKBRI3                          Bright - Cross

1   Q.  You told the FBI agents that you were going to be honest,

2   right?

3   A.  Yes.

4   Q.  But as you just said, you were not honest with them when

5   you said, "I honestly didn't even think of that"?

6   A.  On this one occasion, yes.

7   Q.  So, on that occasion, when you said, "Honestly, I didn't

8   even think of that," you lied to the FBI?

9   A.  Yes.  I've already acknowledged that.

10   Q.  And I think you just said earlier one of the reasons you

11   lied was because you didn't want to show them the incriminating

12   evidence on your phone; is that right?

13   A.  One of several reasons, yes.

14          MR. LI:  Ms. Fetman, we can pull that down.

15   Q.  When you were arrested last year, you were 38 years old,

16   right?

17   A.  Yes.

18   Q.  And you say you were not sexually attracted to children,

19   correct?

20   A.  Correct.

21          MR. LI:  Ms. Fetman, please pull up Government

22   Exhibit 40.

23   Q.  We're looking at a chat conversation between you and

24   someone whose first name is Anthony, correct?

25   A.  Yes.

K3DKBRI3                          Bright - Cross

1              MR. LI:  Let's turn to the second page, please.  Blow

2      up the highlighted text.

3      BY MR. LI:

4      Q.  So back in 2012, someone you didn't know posted a picture

5      of his daughter on Facebook, right?

6      A.  Yes.

7      Q.  You thought she might be 13, right?

8      A.  Or something, yes.

9      Q.  Around 13, right?

10     A.  Yes.

11     Q.  And you took a link to that photograph, correct?

12     A.  Yes.

13     Q.  And you sent the link to that photograph to Anthony?

14     A.  Yes, when joking around with him.

15     Q.  You also wrote, "It's all I can do to not post 'I hit it,'"

16     right?

17     A.  Yes.

18     Q.  When you say "hit it," you mean have sex with, right?

19     A.  Yes.

20     Q.  You also wrote to the Anthony person, "She looks ripe

21     enough," correct?

22     A.  Yes.

23     Q.  And you wrote, "I'm not even saying it'd be legal," right?

24     A.  No.

25     Q.  And then you go on to say --

K3DKBRI3                          Bright - Cross

1              THE COURT:  Whoa, whoa, whoa.  I think the question
2       was -- restate your question for the witness, if you will.  And
3       then you wrote.
4       BY MR. LI:
5       Q.  And then you wrote, "I mean, I'm not saying it'd be legal,"
6       correct?
7       A.  Yes.
8              You didn't say that the first time.
9              THE COURT:  No, no.
10             THE WITNESS:  Sorry.  He looked confused.
11             THE COURT:  Your answer to the last question is?
12             THE WITNESS:  Yes.
13             THE COURT:  Thank you.
14             All right.
15      BY MR. LI:
16      Q.  And then you wrote, "Except in the Vatican (age of consent:
17      12)," correct?
18      A.  Yes.
19      Q.  And then you wrote, "But like" -- and then the next
20      sentence is, "I'd better wear a condom."  The next sentence is:
21      "We don't need more teenage mothers."  You wrote all of those?
22      A.  Yes, alluding to an earlier conversation about Roman
23      Catholicism and contraception, yes.
24      Q.  When you said, "I'd better wear a condom," you were
25      referring here to the girl whom you thought looked like she was

1    13 years old or so, correct?

2    A.   In a -- I mean, not in a serious way, but, yes.

3    Q.   And you say you were joking when you wrote this, right?

4    A.   Yes.

5    Q.   Is sending a picture of someone's 13-year-old daughter a

6    joking matter to you?

7    A.   It's context for the joke, yes.

8         MR. LI:  Let's pull up Government Exhibit 42.

9    Q.   This is a message exchange from your Google, correct?

10   A.   Yes.

11        MR. LI:  If we could blow up the highlighted portion.

12   Q.   You wrote in this chat, "There is no such thing as too

13   young," correct?

14   A.   Yes.

15   Q.   You also wrote in this chat, "I would bone a 15-year-old

16   girl in an instant," correct?

17   A.   Yes.  And then I followed it with a tongue-sticking-out

18   smiley.

19   Q.   So you agree you wrote those words, right?

20   A.   Yes.  But the tongue makes it clear that I'm not being

21   serious.

22   Q.   Okay.  So you were joking when you wrote this, too?

23   A.   Very clearly, yes.

24        MR. LI:  Let's pull up Government Exhibit 47.

25   Q.   These are your tweets, correct?

K3DKBRI3                        Bright - Cross

1    A.  Some of them, yes.

2    Q.  You posted these tweets publicly, right?

3    A.  Yes.

4    Q.  Now, you wrote, on the very bottom tweet here, "There is an

5    astonishing amount of jailbait on this flight.  Looks like some

6    school orchestra or something."  You write that, right?

7    A.  Yes.  It's a descriptive tweet of what's happening in my

8    life.  That's what people use Twitter for.

9    Q.  One of the descriptive words you used was jailbait, right?

10   A.  Yes.

11   Q.  And jailbait means a young girl, right?

12   A.  It means teenage girls, I think.

13   Q.  The reason it's called jailbait is because it's someone who

14   is typically below the age of consent, right?

15   A.  Yes.

16   Q.  And then you go on to write --

17          MR. LI:  Let's see the next message, please,

18   Ms. Fetman.

19   Q.  Then you go on to say, "Oh, Jesus Christ, they're talking

20   about fucking Twilight," right?

21   A.  Yes.

22          MR. LI:  Let's go on to the next one, please.

23   Q.  Then you say, replying to @darthbender, you write,

24   "Fortunately, they seem to be seated at the back of the plane."

25   You wrote that, too, right?

1    A.  Yes.

2    Q.  When you wrote that, you were still talking about the girls

3    you referred to as jailbait, right?

4    A.  I think so.

5    Q.  And this next message, you wrote, "Jailbait everywhere,

6    and, yet, my" -- excuse me.  Let me restate that.

7         And now you wrote, "Jailbait everywhere, and, yet, my

8    row is old women.  There's no justice," correct?

9    A.  Correct.

10   Q.  And when you say "jailbait" here, again, you're referring

11   to young girls, right?

12   A.  Teenage girls, yes.

13   Q.  And you say you were joking when you wrote these, too,

14   right?

15   A.  Yeah.  I mean, it's irreverent social poetry.  Nobody likes

16   to have old people on their row in the plane because they get

17   up to use the bathroom a lot.

18        MR. LI:  Let's blow up Government Exhibit 48, please.

19   Q.  You wrote this tweet, right?

20   A.  Yes.

21   Q.  You posted it publicly, right?

22   A.  Yes.

23   Q.  And what you wrote was, "Admiring the jailbait on the

24   train.  Rowr."  You wrote that, right?

25   A.  Yes.

K3DKBRI3                          Bright - Cross

1    Q.  Jailbait, in this context, again, means young girls,

2    correct?

3    A.  It means teenagers, yes.

4    Q.  It means teenage girls typically below the age of consent,

5    correct?

6    A.  Yes, maybe.

7    Q.  You were joking when you wrote that, too, right?

8    A.  I mean, I'm not joking that there were teenage girls on the

9    train, but it's -- again, it's a lighthearted commentary on the

10   daily happenings of my life.  That's what my Twitter is a great

11   deal of the time.

12   Q.  But when you refer to them as jailbait, that's what you

13   were joking about, right?

14   A.  Yeah.  It's a -- it's very widely used, but, you know, I'm

15   knowingly using it in bad taste.

16           MR. LI:  Ms. Fetman, let's go back to Government

17   Exhibit 47, please.

18   Q.  In this top post, you wrote, "There is no justice," right?

19   A.  Correct.

20   Q.  When you wrote, "There is no justice," what you meant was

21   you wanted to be seated nearer jailbait, right?

22   A.  I think, actually, I meant more that I didn't want to be

23   seated near old women, but...

24   Q.  But the contrast you set up in this sentence is between the

25   jailbait that's everywhere --

1   A.  Yes.

2   Q.  -- and the old women in your row, correct?

3   A.  Yes.  Jailbait would be preferable to old women, yes.

4            MR. LI:  Let's pull up Government Exhibit 46, please.

5   If we can blow up the fourth post, please.

6   Q.  This is your tweet, right?

7   A.  Yes.

8   Q.  You posted it publicly?

9   A.  Yes.

10  Q.  And you wrote here to @realnudel, "I wouldn't disagree.  I

11  think age-based rape laws (rather than consent-based) are

12  stupid," correct?

13  A.  Correct.

14  Q.  You say you posted this because you believe it's arbitrary

15  to distinguish between someone who is 16 and someone who is,

16  say, 15 years and 364 days old when it comes to the capacity to

17  consent.  Did I get that right?

18  A.  Yes.  But I just want to make clear that at the time I

19  wrote this, I was in the U.K., where the age of consent is 16.

20  So that's the critical age, yes.

21  Q.  But the point is that there's an arbitrary distinction

22  based on that biological one-day age difference?

23  A.  Yes.

24  Q.  As it relates to the capacity to consent, correct?

25  A.  Yes.

K3DKBRI3                          Bright - Cross

1    Q.  So in some cases, at least in the U.K., you believe that a
2    15-year-old could be capable of consent, correct?
3    A.  I can imagine that someone a few minutes before they're
4    16th birthday could have the capacity to consent, I think, yes.
5    Q.  Could a 14-year-old be capable of consent?
6    A.  I don't know.  Maybe.  I don't know.  I have never -- I
7    haven't met every 14-year-old.  I would be surprised.
8    Q.  Can you conceive of a possibility where a 14-year-old
9    person was mature enough to have the capacity to consent?
10   A.  I don't think there's any likely circumstance, no.
11   Q.  So, you believe that it is possible for a 15-year-old girl
12   to be capable of consent, but not a 14-year-old?
13   A.  I don't know.  Again, as I said, at the time, I'm not
14   proposing legislation here; I am trying to have a discussion
15   about some of the implications of the law.  I think it's -- I
16   don't think I've met every single 15-year-old in the world, so
17   I don't think I could say with any certainty one way or the
18   other.
19   Q.  So you think it is possible that in the U.K., that there is
20   a 15-year-old girl out there with the capacity to consent?
21              MS. GALLICCHIO:  Objection.
22              THE COURT:  Yes.  Sustained.
23              MR. LI:  Just one moment?
24              (Pause)
25              MR. LI:  No further questions.

K3DKBRI3

1          THE COURT:  All right.

2          Redirect?

3          MS. GALLICCHIO:  I have no redirect, your Honor.

4          THE COURT:  All right.

5          Mr. Bright, you may step down.

6          I'm sorry?

7          MS. GALLICCHIO:  Can we take a brief break?

8          THE COURT:  Yes.

9          But you may step down.  Thank you.

10          (Witness excused)

11          THE COURT:  Do you want to see me at sidebar?

12          MS. GALLICCHIO:  No, no, your Honor.  I'm sorry.

13          THE COURT:  Okay.

14          Do you want to call your next witness?

15          MS. GALLICCHIO:  Your Honor, at this time, the defense

16    rests.

17          THE COURT:  All right.

18          Is there any rebuttal case from the government?

19          MR. LI:  There is not, your Honor.

20          THE COURT:  All right.

21          Ladies and gentlemen, that completes the evidence in

22    this case.  It does not complete this case.  The government has

23    an opportunity to sum up, defense counsel may, if they choose,

24    also sum up, but as I've told you, the defendant in a criminal

25    trial has no burden, and that's their choice, whether they

K3DKBRI3

1    choose to do so.  I've been told that they do.

2              And I believe the lunch has arrived.  I'm going to

3    have Flo check on that.

4              If the lunch has not arrived, then what we will do is

5    the way the closing arguments work is that, because the

6    government is the party with the burden of proof -- and there

7    is no burden of proof on the defendant -- the government gets

8    to deliver an opening closing statement, then the defendant may

9    respond, and then the government may have a brief rebuttal.  So

10   that's the way the order of summations would go, and I'm

11   advised that the government's initial closing would be

12   approximately 30 minutes.

13             So what we'll do is we'll proceed now with that

14   closing statement, then we'll break for lunch, and it's going

15   to be a short lunch today -- we're not going to go a full hour,

16   your lunch will be brought in -- and then we will hear from

17   defense counsel, and the government's final rebuttal, and then

18   I will deliver my instructions.  And then, and only then, may

19   you discuss the case amongst yourselves.

20             So, with that, are you ready, Mr. Li?

21             MR. LI:  Your Honor, may we have a few minutes just to

22   prepare the technology?

23             THE COURT:  That's fine.

24             So why don't I do this, ladies and gentlemen, I'm just

25   going to send you in the jury room for what I hope will be

K3DKBRI3                        Summation - Mr. Li

1    under five minutes.  So please do not discuss the case among

2    yourselves or with anyone.

3              (Jury not present)

4              THE COURT:  Please be seated.  We're in recess.

5              (Recess)

6              (Jury present)

7              THE COURT:  Please be seated.

8              Mr. Li, whenever you're ready.

9              MR. LI:  Ladies and gentlemen, this is a case about a

10   crime.  It is not about unconventional sex.  It is about a

11   simple rule:  No sex with kids.

12             We are not here because Peter Bright was interested in

13   unconventional sex.  We are here because Peter Bright was

14   interested in having sex with children, with seven-year-old

15   Kayla and nine-year-old Braydon, because he went to Duane Park,

16   just a few blocks from here, so that he could arrange to have

17   sex with Kayla and Braydon and entice them into engaging in

18   sexual acts with him and with each other.  That is against the

19   rules.  It's against the law.

20             Ladies and gentlemen, this summation is the

21   government's opportunity to walk you through the evidence and

22   show you how it proves the defendant committed the crime of

23   attempted child enticement.  I'll do that in three parts:

24             First, I'll cover the facts that are not in dispute or

25   that can't be seriously disputed;

1          Second, I'll talk about the central question in this

2    case, which is whether the defendant really intended to have

3    sex with a seven-year-old girl and nine-year-old boy.  I'll go

4    through with you the overwhelming evidence that proves he did;

5          Third, I'll say just a few words about the law and how

6    you know that the defendant is guilty of the crime of attempted

7    child enticement beyond a reasonable doubt.

8          So let's first talk about what's not in dispute or

9    that can't be seriously disputed.

10         First, there is no dispute that the person who chatted

11   with the mother on the internet, who spoke with the mother on

12   the phone, and who showed up to meet the mother, was the

13   defendant.  You know this because he admitted it.

14         Second, there's no dispute the defendant used a phone.

15   I know it sounds trivial, but it's actually quite important for

16   reasons I'll explain in a bit.  Again, you know the defendant

17   used a phone because he admitted it.

18         Third, there is no dispute that, at some point, the

19   defendant believed the children, Kayla and Braydon, were under

20   the age of 18.  You saw the chats.  The mother told the

21   defendant, right from the beginning, that her kids were seven

22   and nine.

23         Now, the defendant has said that he initially thought

24   the kids were adults pretending to be children.  That's not

25   true.  But it's also not important because even the defendant

1    admitted, because he had to admit, that by May 19th, 2019, when

2    he got the pictures of the children, he believed the children

3    were real and both under 18 years old.  And, under the law, it

4    does not matter when he decided they were real children, just

5    that he believed they were real children by the time he showed

6    up for that May 22nd meeting.

7           Fourth, there is no dispute that the subject matter of

8    the defendant's chats, calls, and meetings with the mother was

9    sexual activity.  The chats speak for themselves.

10          "It really depends on their experience, but I'm

11   thinking maybe something involving foreskin is the way to

12   start."

13          "How to hold my snake, showing her where the most

14   sensitive parts of it are, the parts that feel best to lick or

15   rub."

16          "How to take it in her hand and the kinds of motion

17   that feel good."

18          It goes on, and on, and on.

19          When you go back to the jury room, take a look at all

20   of those WhatsApp chats, all 132 pages of them, but take a look

21   at the attachments, too.  That's the STD tests that, yes, the

22   defendant sent to the mother, that's the picture that the

23   defendant sent of his penis after he admittedly realized the

24   children were real, and there's the phone call where the

25   defendant talked about his lesson plan to teach the kids about

1   his foreskin.  There is no real dispute that all of these

2   communications were about sexual activity.  So that's what's

3   not in dispute or can't be seriously disputed.

4          The defendant was the person communicating with the

5   mother.  The defendant used a phone to do it.  The

6   communications were about sexual activity, and at some point

7   before meeting with the mother, the defendant believed the

8   children were minors.

9          So what is in dispute?  One fact, and one fact only:

10  Did the defendant actually intend to have sex with the kids?

11  Did the defendant mean the explicit words that he said and he

12  wrote?  Or did he think he was just role playing with adults

13  pretending to be children up until May 19th, 2019, when he

14  suddenly realized they were children and decided to catch the

15  mother in the act?  You already know the answer.  You know the

16  defendant meant every word he wrote and said.  You know it

17  because you had a chance to sit through this trial, and read

18  the defendant's words, and hear about his actions.  You know it

19  for at least six reasons.  Each of these reasons, standing

20  alone, is enough to prove beyond any reasonable doubt that the

21  defendant intended to have sex with the children.  Together, in

22  combination, they are overwhelming.

23         First, the defendant continued to pursue Kayla and

24  Braydon even after he admits he realized that they were real.

25  Now, the defendant says he started to get suspicious when he

K3DKBRI3                    Summation - Mr. Li

had the phone call with the mother on May 17th, 2019.  He
agreed, at least in retrospect, it was a red flag.  But what
did the defendant do after he got that red flag?  Did he ask
the mother, hey, just to be clear, we're all adults here,
right?

Did he pump the brake on the sex talk while he figured
out what was going on?  He didn't skip a beat.

Here's what he did:  Right here, we see the defendant
acknowledging that red flag call he had just finished, "Great
chatting with you!"

"And you!"

The time was May 17, 4:13 p.m.  No expression of
concern.  None at all.

Now, at 5:23 p.m., about an hour later, he writes:
"Do you want the lessons to be heteronormative?"  Then he
explains:  "Does Kayla eat flowers and Braydon suck snakes?"

One hour and ten minutes after the call, when he
supposedly started to get suspicious.  These aren't the words
of someone who has reservations or concerns, who's starting to
get worried.  These are the words of someone still discussing
his plan to have sex with the children.

An hour and change after that:  "Some girls at a very
early age discover that it feels good to rub certain bits, but,
otherwise, help her discover that herself, touching or
vibrating her clit, putting a finger inside, or maybe a very

K3DKBRI3                    Summation - Mr. Li

tiny toy."

        And it goes on and on.

        The simple truth is the defendant never saw any red
flags.  He wasn't looking for any red flags.  He was only
looking for a green flag, for go.

        But here's the real kicker:  The defendant said his
aha moment, the time when everything clicked, was when he saw
the pictures of the kids on May 19, 2019.  But, again, what was
his response?  Did he take a pause to sort out the shock of his
life?  Did he ask the mother what was going on?  Did he call
911?  No.  Here's what he did:  20 seconds after receiving a
picture of the girl, 20 seconds, "She looks like a cutie."

        27 seconds after he gets another picture, he replies,
"Ooooh, play time sounds fabulous."  Minutes later, "Kissing
her flower, I'm sure it's beautiful."

        "How big a boy is Braydon?"

        What does he mean?  Oh, his manhood.

        And then a picture of his own penis.  Let's pause for
a moment here.

        If the defendant really had this aha moment, if he had
really developed this deep concern that children were involved,
why would he send the mother a picture of his penis?  Why would
he expose this extremely personal photo to someone he believed
was a child abuser?  Someone who he supposedly was going to
report to law enforcement?

K3DKBRI3                    Summation - Mr. Li

1          The answer, ladies and gentlemen, is that the

2     defendant sent a picture of his penis because he thought this

3     was all real.  He knew that children were involved, and he

4     wanted to get involved himself.  That is the only logical

5     reason, the only reason that makes any sense why the defendant

6     would send a picture of his penis.  The defendant's conduct is

7     not the behavior of some concerned citizen who suddenly

8     realized that the person he was talking to was offering her

9     children for sex.  It's not someone who's suddenly scared and

10    disgusted.  It's the behavior of someone who thought he was

11    going to have sex with kids, who knew that he was talking about

12    kids, who was excited about it, and who was delighted to

13    finally see pictures of them.

14          The second reason you know the defendant's intent is

15    because he brought condoms to the meet.  Now, why was he

16    showing up with condoms?  Well, he explained that during the

17    chats, too.  Here, we see the defendant's chats on May 19th, a

18    few minutes after he sent a picture of his penis and less than

19    an hour after he commented and saw the pictures of Kayla and

20    Braydon.  He explains he likes partners who are clean because

21    condoms are much less fun.

22          The mother responds, she points out that he doesn't

23    have to use condoms when he's teaching.  She says:  "Who wants

24    to have to use condoms when teaching?"

25          He replies:  "Well, yes, indeed.  That way, condoms

K3DKBRI3                    Summation - Mr. Li

can be restricted to lessons about condoms."  So the defendant

is bringing condoms as part of his lessons about condoms, for

his demonstrations.

        The third reason we know the defendant's intent is the

rape law tweet.  You saw that in 2013, the defendant posted on

Twitter:  "I think age-based rape laws rather than consent

based are stupid."  Plain and simple.  That's the defendant, in

his own words, telling you that there should be no laws against

children having sex with minors -- excuse me, no laws against

adults having sex with minors based on their age.  He does not

agree with statutory rape laws.  But now the defendant wants

you to think that he went to meet the mother with condoms in

his pocket, STD tests, had them ready on his phone, to prevent

adults from having sex with children.  It is ridiculous.

        Think about it for a second.  There are folks out

there who don't believe marijuana should be illegal.  That's a

legitimate debate.  But do you think that folks who think

marijuana should be illegal are out there trying to set up

people who smoke marijuana for arrest?  Of course not.  Just

like the defendant was not there to enforce the same age-based

rape laws that he thought were stupid.  He was there to have

sex with the kids.

        Fourth, the defendant admitted that he was also

chatting online with a 14-year-old girl.  Here's the defendant

in his own words:

K3DKBRI3                    Summation - Mr. Li

1              (Video playback)

2              MR. LI:  Ladies and gentlemen, you just heard the

3    defendant say, in his own words, that he had flirty

4    conversations with a 14-year-old girl, that he received

5    pictures of her wearing panties and a T-shirt, and that he kept

6    chatting with her because he found her attention flattering.

7    This is not an example of Daddy Dom/Little Girl with a

8    consenting adult partner.  This is direct communication between

9    the defendant and a 14-year-old girl.  It shows you that the

10   defendant's claim that he is not sexually attracted to children

11   is false.

12             Fifth, the defendant has been talking about being

13   sexually attracted to minors for a long time.  You saw his

14   Twitter posts about jailbait on a train, jailbait on a plane.

15   You saw the defendant's personal Google chats where he talks

16   freely about being attracted to young girls, a 15-year-old girl

17   here, a 13-year-old girl there.  I want to pause for a moment

18   on one of these Google chats.  This is Government Exhibit 40.

19   This is a 2012 chat in which the defendant goes on the Facebook

20   profile of a stranger, he grabs a picture of that stranger's

21   daughter, he sends a picture of that girl to his friend, and

22   then laughs about she looks like she's 13, but she's ripe

23   enough for him to have sex with.

24             The defendant wants you to believe that he didn't

25   intend to have sex with seven-year-old Kayla and nine-year-old

K3DKBRI3                        Summation - Mr. Li

Braydon, but what do the jailbait tweets, the Google chats, and
the flirty conversations with the 14-year-old girl tell you
about his intent in this case?  That he did intend to have sex
with the children on the day he was arrested.

        The sixth reason you know the defendant's intent is
because he made up this elaborate cover story, this
get-out-of-jail-free card in case he got caught.  The cover
story was that he was this concerned journalist gathering
evidence of child exploitation.  He told that cover story to
the FBI after he was arrested, and he told you that cover story
again on the stand.

        Now, ladies and gentlemen, the defendant did not have
to testify.  He didn't have to take the stand.  The burden of
proof beyond a reasonable doubt is, and always remains, on the
government.  We embrace that burden.  But, in this case, the
defendant did take the stand, and you have to evaluate his
credibility just like any other witness.  Ask yourself:  What
does the defendant have to gain by lying?  And what does he
stand to lose?

        You saw his demeanor on direct examination, when he
was trying to spin his story, and you saw him on
cross-examination, when all the holes in his story came out.
Ultimately, you have to ask yourself if his story makes any
sense.  The answer is no.

        So how do you know the cover story is false?  Let's

K3DKBRI3                    Summation - Mr. Li

talk about all the holes in it.

          The first, and most important, reason you know the
defendant's cover story is false is because it changed.  When
he was arrested, he told the FBI that he was gathering
evidence, and the only reason he didn't turn over the 132 pages
of chat messages was because he hadn't thought of it.  But now,
on the stand, he claims he knew he had that evidence all along,
but he didn't want to turn it over because he was afraid the
chats were "quite incriminating for me, not so much for her,"
and because he didn't want the FBI to see what was on his
phone.  And he didn't think of just printing the chats out, or
the attachments, or emailing them to the FBI.

          This makes no sense.  The defendant wants you to
believe that he was smart enough to make a secret audio
recording on a second phone, smart enough to write about
Microsoft technology for a living, smart enough to think
through the metadata issues with the chats, but he was too
stupid to realize he could have just printed or emailed 132
pages of chats where the mother is talking about offering her
kids up for sex?  It's preposterous.

          You know what really happened.  The defendant knew he
had the chats all along, but he never planned to turn them
over, because they showed that he wanted to have sex with
seven-year-old Kayla and nine-year-old Braydon.  When the
defendant got caught, and the FBI asked why he didn't turn over

K3DKBRI3                    Summation - Mr. Li

1    the chats, he panicked, he said he forgot.  But by the time he

2    had testified in front of you, he realized what he told the FBI

3    also doesn't make any sense, because how could he possibly

4    forget that he had 132 pages of incriminating chats?  How could

5    he possibly forget about all of his conversations with

6    Princessmom, the mother?

7              So he tried to cover it up again by telling you that

8    he only pretended to forget.  Lies, upon lies, upon lies.

9              The next set of reasons you know the cover story is

10   false is common sense, and we've gone over these.  Vigilantes

11   don't need to bring condoms to meet with kids.  Vigilantes

12   don't need to send pictures of their penises.  And they

13   certainly don't need to be asked, after confirming that the

14   kids are real, what the size of a boy's penis is.  There's no

15   evidence-gathering purpose to bringing condoms or to finding

16   out the size of a nine-year-old boy's penis.  What was he going

17   to do with that?  Tell the FBI how big the boy's penis is?

18             And the defendant's own statements on Twitter and in

19   his personal Google chats tell you that he thinks the age of

20   consent is a joke, it's stupid, and it's certainly not

21   something that he needs to go around enforcing.

22             The sixth reason you know the cover story is false is

23   that the defendant never reported all the evidence he had.  He

24   had the mother's phone number, he had the mother's picture, he

25   had the exact date, and time, and location of a meeting with

K3DKBRI3                    Summation - Mr. Li

1    her, he had 132 pages of chats describing, in graphic detail,

2    all the sexual activity that he was going to engage in with

3    Kayla and Braydon.  That is the exact same evidence that is at

4    the core of this case.  If the defendant was such a concerned

5    citizen, why didn't he go to the police with the amount of

6    evidence he already had?  Did he really believe he had to be in

7    a bedroom with two kids and four condoms before he had enough

8    evidence to go to the police?  Of course not.

9            He never gave any evidence to the police because he

10   never planned to give any evidence to the police.

11           Seventh, he started creating his cover story only

12   after he decided there was a chance that the mother was a cop.

13   You know that when he decided -- excuse me.  You know when he

14   decided that there was a risk.  He told her on May 20th, two

15   days before the meet.  So now he's got a conundrum.  He still

16   wants to have sex with Kayla and Braydon, he still wants to

17   teach them, but what if it's a setup?  He figures out a simple

18   way to bridge the divide.  He continues to talk with the

19   mother, to arrange the meeting, and he shows up to have sex.

20   But he also creates an elaborate cover story about wanting to

21   go to the police.  Of course, he doesn't actually go to the

22   police, that would ruin everything if it turns out that all his

23   hopes had come true, that he could have sex with Kayla and

24   Braydon, but -- but -- if there was a problem, he covered

25   himself.

K3DKBRI3                    Summation - Mr. Li

1        So what does he do all about contacting the police?

2   Takes two screenshots, and he makes a secret audio recording of

3   the meet.  Why?  Because he thought there was a chance it might

4   be a sting and he needed a cover story in case he got caught.

5   And the evidence is crystal clear that the fear of a sting was

6   on the defendant's mind.  He said so himself.  May 20th, 2019,

7   "So my concern is, am I being set up here?  I was struck by the

8   fear yesterday that I'd be met by a cop or something."

9        Now, you heard the defendant's explanation on the

10   stand.  He was double-faking the mother.  He said he brought up

11   the police to convince her that he was not the police.  That is

12   absurd.  It's absurd.

13        The defendant meant exactly what he said in these

14   messages.  He was afraid the mother was a cop.  That's when he

15   decided to set up his cover story in case he got caught.

16        Eighth, and finally, the defendant never told anybody

17   he was going to meet the mother.  If he was planning to catch a

18   predator, why didn't he call the police?  It would have avoided

19   any risk that he was walking into a sting, and it would have

20   given the police a chance to use all the information he

21   gathered.  Why wouldn't he talk to his deputy editor, someone

22   who literally wrote a book on catching child predators?  Why

23   didn't he tell anybody at all?  He didn't tell anybody because

24   he wanted to keep the meeting a secret, and he wanted to keep

25   it a secret because he was there to have sex with the kids.

K3DKBRI3                    Summation - Mr. Li

1          Ladies and gentlemen, the defendant's cover story
2     about gathering evidence for law enforcement is ridiculous.  It
3     defies all common sense.  It is a stunt to try to trick law
4     enforcement, and now you, into giving him a
5     get-out-of-jail-free card.  And the fact that the defendant
6     came up with such an elaborate cover story is powerful proof of
7     what he really intended to do all along — to have sex with
8     seven-year-old Kayla and nine-year-old Braydon.
9          Now, let me speak very briefly about age play —
10          THE COURT:  You have five minutes left.
11          MR. LI:  Yes, your Honor.
12          Let me speak very briefly about age play, which the
13     defense has spent a lot of time on in this case.  Put simply,
14     the defendant has told you that when he first spoke with the
15     mother on KinkD, he thought the children were age playing as
16     adults.  The defense puts a lot of stock in the language used
17     in the chats, words like mommy, which has simple everyday
18     meanings.  But you know what language does not appear in any of
19     the 132 pages of chats between the defendant and the mother?
20     DDLG, DDLB, fantasy.  That's the kind of explicit consent-based
21     language that the defendant said he used with Stevie and
22     Denesy, where the defendant said he had age-play relationships
23     with.  That is not the language in this case.
24          But you don't need to spend a lot of time analyzing
25     the chats because the age-play issue is a distraction, it's a

K3DKBRI3                        Summation - Mr. Li

mirage.  Even if the defendant mistakenly believed he was

engaging in age play when he first started talking with the

mother, he admits that by the time he got the pictures of Kayla

and Braydon on May 19, 2019, he realized they were real.

So, after he got those pictures, he can't use age play

to explain away his actions anymore.  No matter what the

defendant supposedly thought at the beginning, he certainly

believed the children were real at the end.

I now want to go quickly through the elements of the

crime of attempted child enticement.  The government must prove

each of these elements beyond a reasonable doubt.  I expect

Judge Castel will tell you that the first element is that the

defendant used a facility of interstate commerce, which can

include a telephone.  This element is not in dispute.

The second element of the crime of attempted child

enticement is that the defendant knowingly attempted to

persuade, induce, entice, or coerce someone to engage in sexual

activity.  Now, I've spoken to you at length about how you know

the defendant intended to engage in sexual activity with the

children, but I haven't said much about how he intended to do

it.

Now, I mention this because the second element does

require that the defendant persuade, induce, entice, or coerce

the minors to engage in that sexual activity, but can do the

persuading either directly or through a third party, like the

K3DKBRI3                          Summation - Mr. Li

1    mother.  In this case, the defendant intended to persuade Kayla

2    and Braydon by giving them lessons, by offering to help them

3    develop sexually.  He also intended to persuade, induce,

4    entice, or coerce them through the mother, who obviously could

5    just tell her seven-year-old daughter and nine-year-old son

6    what to do.

7         The second element of the crime of attempted child

8    enticement also requires that the defendant take a substantial

9    step towards committing the offense.  I expect Judge Castel

10   will tell you that a substantial step is something more than

11   mere preparation, but it can be less than the last step

12   necessary before actually committing the crime.  That's why

13   it's attempted child enticement.

14        Ladies and gentlemen, the defendant did not just talk

15   about having sex with the children; he sent a picture of his

16   penis and a copy of his STD test to assuage the mother he would

17   be an acceptable teacher.  He showed up to meet Kayla and

18   Braydon with condoms in his pocket.  Showing up is much more

19   than mere preparation.  It is a substantial step.

20        The third element of the crime of attempted child

21   enticement is that the sexual activity violates New York law.

22   I expect Judge Castel will explain to you that a variety of

23   sexual contacts with someone under the age of 17 is illegal

24   under New York law.  The evidence plainly shows the defendant,

25   a 38-year-old man, made lesson plans to teach a seven-year-old

1   girl and a nine-year-old boy about the foreskin of his penis,

2   and he planned to penetrate the seven-year-old girl with his

3   finger, a toy, or the tip of his penis.  That violates New York

4   law.

5          The fourth, and final, element of the crime of

6   attempted child enticement is that the defendant believed the

7   person he was enticing was under the age of 18.  And that,

8   we've already discussed.

9          Ladies and gentlemen, at the end of the day, one of

10  two things is true:  Either the defendant went to a meeting in

11  Duane Park to gather evidence for law enforcement or he went to

12  have sex with kids.  All the evidence you have seen or heard

13  points to one conclusion - the defendant is not an age player

14  turned vigilante.  He did not try to arrange a threesome of two

15  adults pretending to be children only to learn they were

16  children, only to then try to set up the mother for law

17  enforcement, only to then accidentally bring condoms to the

18  scene.  He is a grown man who tried to have sex with a

19  seven-year-old girl and a nine-year-old boy, and he --

20          THE COURT:  All right, bring it to an end.

21          MR. LI:  Very soon, this case will be yours.  You will

22  have heard the arguments, but when you go to the jury room to

23  deliberate, it's the evidence that matters the most.

24          So take a close look at the evidence.  When you do

25  that, and when you apply your common sense, you will reach the

K3DKBRI3                        Summation - Mr. Li

1    only verdict consistent with the facts and the law – that the

2    defendant, Peter Bright, is guilty as charged.

3             THE COURT:  Thank you, Mr. Li.

4             All right.  Ladies and gentlemen, this is what we're

5    going to do:  We're going to break for lunch, your lunch is in

6    the jury room, and we'll take 30 minutes for lunch.  Does that

7    sound reasonable?

8             I don't want anybody to get indigestion, so if you

9    need more time, I can give you more time, and then we'll come

10   back, and we'll hear from defense counsel.

11            So, please do not discuss the case among yourselves.

12   Enjoy lunch.  See you in a half an hour.

13            (Jury not present)

14            THE COURT:  All right.  Enjoy lunch.

15            MR. MAIMIN:  Thank you.

16            MR. LI:  Thank you.

17            (Luncheon recess)

18

19

20

21

22

23

24

25

K3DLBRI4                    Summations

                        AFTERNOON SESSION

                           1:38 p.m.

1        THE COURT:  All right.  Please stand for the jury.

2        (Jury present)

3        THE COURT:  Please be seated.

4        How is everyone doing?  Good.

5        Ms. Gallicchio, you may begin, whenever you're ready.

6        MS. GALLICCHIO:  Thank you, your Honor.

7        The FBI went on a fishing expedition.  They went
8   fishing for a child molester.  They threw out a net to catch a
9   predator, but not in a pond where child molesters lurk.  They
10  targeted kinky people in a kinky dating site, and they went in
11  blindly.  Agent Jensen had little understanding of, and little
12  regard for, the kinky community.  She did no research or
13  investigation other than reading the blurb on the KinkD dating
14  app.  She consulted no experts to understand who her target
15  audience was.  No psychologists, no sex researchers -- like Dr.
16  Cantor, for example -- to better understand the kink community,
17  the kink norms, and the kink language, or to help her
18  understand who would be receiving the messages she was
19  intending to convey.

20       Shockingly, she only had two weeks of training on how
21  to be an online undercover.  But she had no training on kink,
22  other than conversations she had with other agents who sat next
23  to her in the squad room.  And they didn't have any training

1    either.  She did no research on the term "age-play."  And, in

2    fact, you heard her understanding of that term was off.  She

3    admitted that she had very little exposure to the kink of

4    age-play before she encountered Peter Bright.  She's a trained

5    law enforcement professional searching out child molesters.  An

6    incredibly worthy cause.  But she entered a world she knew

7    little about.  That's reckless and dangerous.  And even Agent

8    Spivack, a trainer with the FBI, as you heard in the two

9    interview clips that I played with Mr. Bright, had limited, if

10   any, understanding of the kinky community, despite his claims

11   to the contrary.  And more importantly, he had absolutely no

12   knowledge of Mr. Bright's kink of DDLG.  Despite the lack of

13   training and information, Agent Jensen created a profile on a

14   kinky dating site, calling herself "Princessmom" and

15   identifying her role as "mommy."

16            Now, Agent Jensen and Agent Spivack are the two

17   witnesses, the most important witnesses, upon whose testimony

18   the government is asking you to rely.  And need you to rely to

19   convict Mr. Bright of this very serious and horrendous crime.

20   Agent Jensen is their star witness.  But when she testified,

21   she actually had the audacity under oath to tell you with a

22   straight face that when she picked the role of mommy out of 29

23   kinky role options, that included "bold, pet, baby boy, baby

24   girl" on a kinky dating site, that she intended to convey that

25   she was an actual mother.  Astonishing.  And she had the

further gall to tell you that she intended her self-summary to
convey that she was looking for someone to molest her children,
even though she admitted that she was intentionally ambiguous.
She is either completely clueless or intentionally lying.
Either option is disturbing.

      If you think she is lying about that -- or quite
honestly, even if you think she's just clueless about that
world, it puts her entire testimony and the government's case
into serious question.  The only explanation for this lie is to
attempt to cover up and fix a major problem in the government's
case; that is, that no kinky person would ever have looked at
Princessmom's profile and have seen an invitation to molest
children.  But that is, in fact, the government's theory.  They
have asked you to accept and believe beyond a reasonable doubt
that from day one, Mr. Bright wanted to molest Princessmom's
children.  They're asking you to believe that he looked at her
profile and recognized a fellow child molester, that he looked
at her KinkD profile, and despite the fact that he's never
molested children before and was into kinky sex with kinky
adults, he saw the perfect opportunity to switch things up and
now, at 38 years old, start molesting children.  This is
absurd.  It insults your intelligence and common sense.  Even
if Agent Jensen really believed that the mommy option on a
kinky dating site was meant to convey that she was a mother,
her belief is irrelevant.

1        What is relevant is how it would be received and

2   perceived by a practicing kinkster, or an age-player, on a

3   kinky dating site.  No age-player looking at her profile would

4   think she was a mother looking for a child molester to have sex

5   with her children.  As Mr. Bright told you on the witness

6   stand, her profile shouted age-play.  It never ever has

7   occurred to him of anything else.  There is only one

8   interpretation of her profile that makes sense, it's that

9   Princessmom, with the role of "mommy," was a kinky person, a

10  role-player, and an age-player.  But in this fishing expedition

11  of the FBI, not surprisingly, they caught the wrong fish.

12  Unbeknownst to him, Mr. Bright got caught in this net.  Not

13  surprisingly, given where the net -- where they were fishing,

14  they caught a real age-player and not a child molester.  They

15  reeled him in, talking at cross purposes, and they arrested an

16  innocent man.

17        Can we put up the exhibit, please?

18        Remember these chats from Agent Jensen?

19        "Hmmm, may be looking for different things.  It sounds

20  like you are thinking about something different.  Maybe I'm

21  misunderstanding you, which is totally possible over text,

22  lol."

23        Meaning is often misconstrued.  These texts of Agent

24  Jensen speak volumes.  It's exactly what this case is about.

25  This is exactly how mistakes are made and innocent people are

1  arrested.  Meaning is often misconstrued.  It is no surprise

2  that a self-proclaimed age-player took the bait and got caught

3  in the FBI's net.  Mr. Bright messaged Princessmom because she

4  was an attractive woman and he was interested in her, and asked

5  her to elaborate on her admittedly ambiguous profile.  And what

6  does she say in response?  "My princess is seven, and my prince

7  charming is nine."  She used the language that's used to

8  age-players, whether she intended to or not.

9          And Mr. Bright responds in kind:  "I'd love to hear

10  more about the prince and prince charming, using the language

11  he's used with handfuls of kinky people.  And Agent Jensen

12  doesn't say it's her real kids.  She doesn't say her son or

13  daughter or her children.  In fact, in over 700 chats and a

14  phone call, she never once utters the words "son," "daughter,"

15  or "children."  She refers to them as her "kids" on the KinkD

16  app, and then only again at the meeting at Duane Park.  And by

17  then, Mr. Bright was already caught in their net and was

18  already well-aware.

19          Before I go on, I want to take a minute or two to talk

20  about you and your task, the jury, in this case.  It's a solemn

21  duty to decide the guilt or innocence of a fellow citizen.  You

22  should treat this decision as one of the most important

23  decisions you will ever make in your lives.  It certainly is

24  for Mr. Bright.  Mr. Bright is protected by the presumption of

25  innocence.  In order to overcome that presumption, the

government must present evidence that leaves you so firmly

convinced that Mr. Bright is guilty, that you have no reason to

doubt the proof of each and every element of the crime charged.

Ask yourselves when analyzing this case.  And after a

careful analysis of the testimony, especially that of Agent

Jensen, if you are persuaded by her story and have the

confidence in her testimony that it overcomes the presumption

of innocence, or does her testimony raise doubts, a careful

analysis will reveal that her testimony is riddled with

inconsistencies, it's confusing, at best, and implausible.  We

should expect more from law enforcement and the government when

they arrest someone and bring charges.  We should demand more.

Your verdict can do that.  We are confident that you will see

that the government's evidence, their case against Mr. Bright,

is full of holes and full of reasons to doubt.

And so now that you all have been educated on the

subject of kink and age-play by Dr. Cantor, the director of

Toronto's Sexuality Center; and by Mr. Bright, a practicing

age-player, when you examine the chats -- and I ask that you do

very carefully -- I ask that you look at them through the eyes

of an age-player.  And you will see that there are plenty of

reasons to doubt.  You know a lot more than you did when you

first entered this courtroom about age-play, maybe even more

than you wanted to know.  And you know a lot more than Agent

Jensen and Agent Spivack knew when they arrested Mr. Bright.

1   You know it's a fantasy, you know it's acting, and you know

2   it's legal.  If you do that, if you look at the chats through

3   the eyes of an age-player, you will see that the conversations

4   about teaching the prince and princess about their body parts

5   is classic age-play.  You will see that the discussions of

6   kinks and limits is classic age-play and kink.  You will see

7   that the discussions about getting to know the princess and

8   prince is classic age-play.

9              You have heard from Mr. Bright and from Agent Jensen

10  that this is the very language he has used in many other

11  age-play scenarios.  Agent Jensen, specifically, recalled one,

12  Stevie, where Mr. Bright texted the same interests, the same

13  desires, the same fantasies, and used the same language that he

14  was discussing with Liz.  Mr. Bright told you of many, many

15  more age-players that he's engaged with.  He was a documented

16  practicing age-player at the same time he was texting with Liz

17  and long before.  And by "document" I mean it's all over his

18  phone, which is in the FBI's possession.

19             It doesn't matter, as the government suggests, that

20  Liz wasn't playing the role of a child, like Stevie did, or it

21  doesn't matter that the word "age-play" or "DDLG" doesn't

22  appear in the chats.  In this particular scenario, under these

23  circumstances in a kinky dating site, it would have been

24  unnecessary.  Where the roles are clearly selected and age-play

25  is assumed, there was no need to spell it out.  There isn't a

1    rule book for age-players.  It's the fantasy that matters.  And

2    if Mr. Bright found an opportunity to age-play with three

3    adults, even better for him.  All of it is an opportunity to

4    explore the body of an adult man or a woman in a playful, legal

5    way.  Mr. Bright doesn't look for women or men who physically

6    resemble children, just the opposite, as he told you.  The

7    age-play scenario is a means to an end:  Sex with consenting

8    adults.  And Mr. Bright's age-play fantasy is exactly what Liz

9    was offering.

10           Now, Mr. Bright's lifestyle may not be one that you

11   understand or approve of.  And some period of time sexual

12   practices that you learned about during this trial may have

13   shocked you a bit.  And kink is certainly not everybody's cup

14   of tea, but it is for a world of people.  Mr. Bright's sexual

15   practices are perfectly legal.  Mr. Bright engages in kinky sex

16   with consenting adults who are very open about their needs and

17   their wants.  He describes himself publicly on *Twitter* as "pan,

18   poly, pervy."  He enjoys kinky sex and he's openly kinky.

19           When you look at Mr. Bright's profile on KinkD, you

20   will see that it's a far cry from a child molester.  It reveals

21   that he refers meaningful connections.  Kink for him is about

22   consent.  It's about mutual satisfaction.  It's about respect.

23   It's about the appreciation of limits.  You saw that he's

24   passionate about these things.  He's interested in long-term

25   relationships with his kinky partners.  He writes in his

K3DLBRI4                    Summations

profile:  "Mutual caring and understanding makes everything better."  He communicates his desires to prospective partners and listens to their needs.  He's comfortable, as you saw, talking about it.  He's actively sexual.  He has condoms ready. We will talk about that more in a bit.  He's also principled about his sexual practices.  What he isn't interested in is sexual contact with children.  His interests couldn't be further from what I could only imagine are the interests of a child molester.  There isn't a stitch of evidence that suggests otherwise.

In Mr. Bright's vast library of kinky chats and photos, there isn't one hint of a desire for actual children. There is no doubt that the vast resources of the FBI were employed to see if he was a child molester.  They spent months examining his phone, his Google account, his search history, his *Twitter* account, looking for evidence that he was a child molester.  They had FBI agents examining every photo, every chat, every email contact, every message contained on his phone and his Google account.  They were looking for child pornography because Agent Jensen said it's an overt act.  They found nothing.  Not one photo, not one video of child pornography, nothing even close, because he didn't possess any, he didn't search for any, he didn't exchange any.  There's another reason for that.

The government has asked questions about the fact that

1    they haven't been able to get into one of his other phones or

2    his desktop computer.  But that's not what's important here,

3    because what's important here is the fact that Mr. Bright gave

4    the FBI full consent, free reign, to search all of his

5    electronic devices.  That's because he has nothing to hide and

6    he did nothing wrong.

7            So what's next?  Well, the FBI dug far and wide in

8    search of examples in Mr. Bright's past that might suggest that

9    in May of 2019, during his encounter with Liz, he intended to

10   entice a seven and nine-year-old to engage in illegal sexual

11   activity.  They had a technology expert, who you heard from,

12   who searched 50,000 tweets.  They searched his Google account.

13   And what did they find?  Tweets and chats containing off-color,

14   crude, inappropriate and cheeky comments made eight, nine, ten,

15   11 years ago, some on public forums and some in private chats.

16   And now they want to twist their meaning and argue that these

17   comments somehow suggest that ten years later, Mr. Bright

18   intended to entice a seven and nine-year-old to engage in

19   sexual activity.  When you look at this evidence, look at the

20   comments and the context in which they were made, which is why

21   you heard in the stipulation we asked the government to include

22   the whole thing.  Don't just look at the highlighted portion

23   that the government wants you to look at.

24           Let's start with the *Twitter* exchange with Meowski

25   Catovitch.  That's when Mr. Bright -- seven years ago, Mr.

K3DLBRI4                    Summations

Bright makes the comment:  "I think age-based rape laws rather
than consent-based are stupid." It's a personal position on the
arbitrariness of statutory rape, on the absurdity of the fact
that the age of consent could differ from state to state and
from day to day.  Mr. Bright was engaged in a debate on what
might be an unpopular position to take, just like his former
boss, who you saw testify said he often did.  He's provocative,
especially online.

          In Mr. Li's opening, and here in his summation, he
said that Mr. Bright was declaring in this tweet that age-based
rape laws, the same laws that the FBI was trying to enforce,
are stupid.  We're talking about apples and oranges.  Mr.
Bright is not stating that he doesn't believe in laws against
having sex with children or advocating for legislation.
Statutory rape laws are not the same as the laws prohibiting
forcible rape of children.  Mr. Bright's opinion expressed in
this tweet has no bearing on his intention in this case.  It's
not an expression of a desire to have sex with children.  As
Agent Jensen said, meaning is often misconstrued.

          And then we have the jailbait tweets made ten years
ago when Mr. Bright was 28 years old.  He's obviously joking.
Perhaps crude and off-color, but a joke.  It's a term we've all
heard, I'm sure used jokingly and, of course, inappropriately.
But it's absurd to think that the use of that term about
teenagers suggests that, ten years later, Mr. Bright intended

1    to entice a seven and nine-year-old into illegal sexual

2    activity.  It's not an expression of a desire to have sex with

3    children.  Mr. Bright does not have any desire to have sex with

4    children.

5         And then we have the Google chats, the chats amongst

6    friends and someone who turned out to be Mr. Bright's wife.

7    Remember, Mr. Bright consented to the search of his account.

8    And please, again, read the whole portion, the whole context of

9    those Google chats before you pass any judgment on them.  Not

10   just the highlighted portion the government wants you to focus

11   on.  And when you do, you will see the absurdity of the

12   government's arguments regarding their relevance.

13        In particular, let's start with the one from Anthony

14   M, where Mr. Bright said, "I hid it," a comment in reference to

15   a profile photo of a man on *Facebook*, what looks to be his

16   13-year-old daughter.  It's obviously a joke.  It's a crude

17   joke, no doubt, made in the context of other provocative, often

18   offensive statements about the draft, about abortion, about the

19   Catholic church and about the pope.  Clearly Anthony M thought

20   it was a joke by his responses.  And you'll see that:  "Hah hah

21   hah hah, lol."  And then we have the Google chat with his

22   then-girlfriend-now wife.  It's humorous banter between a

23   boyfriend and a girlfriend about pop stars.  Referring to a

24   13-year-old pop star, Rebecca Black, his girlfriend says:

25   "You're not allowed to do her either."  She's joking.  And Mr.

Bright says, in all caps: "Too old? Lol." Is the government

really, really arguing that Mr. Bright was serious when he said

in all caps: "A 13-year-old is too old?" Are they really

asking you to consider this comment relevant to his intention

in this case? It seems that they are. Mr. Bright makes this

comment to his adult girlfriend, who he later marries. It's

not an expression of a desire to have sex with children. It's

irrelevant to Mr. Bright's intentions. What it is, is the

government grasping at straws.

        And then finally there's this Google chat ten years

ago. A woman is commenting about getting attention that's all

too young. And jokingly, Mr. Bright says: "There's no such

thing as too young. I'd bone a 15-year-old. In a minute,"

with a tongue-out emoji, which tells you the tone of this

comment. It's crude, and it's vulgar, but it's a joke. Then

they go on to banter about her being a cougar. Her response is

clearly suggestive that it's a joke.

        Remember, they searched 50,000 chats looking for

evidence of child exploitation, and this is all that they

found. There's only one thing that these three Google chats

tell you: Mr. Bright can be raunchy, vulgar, crude, offensive,

and, as his former boss said, provocative. Mr. Bright told you

himself about his online persona and admitted that he's

irreverent, contrary, purposefully annoying, and often

inappropriate. It's really scary to think that comments made

K3DLBRI4                        Summations

1    in jest with friends, girlfriends, or off-color jokes, or crude

2    jokes made ten years ago, could actually be used against you in

3    such an absurd way.  It's astonishing that the government is

4    actually asking you to infer from these off-color jokes and

5    crude comments that Mr. Bright intended to molest a seven and

6    nine-year-old.  It's a distraction and nothing more.

7            Lastly, the government offers Mr. Bright's own

8    statements about his contact with a 17 and a 14-year-old on

9    Google chats.  Let's be perfectly clear.  Mr. Bright never

10   sought out the attention of a 14-year-old or a 17-year-old.  He

11   was not online looking for teenagers.  He never asked for

12   suggestive photos.  In fact, he told her:  Don't send photos.

13   Don't.  And he didn't download those photos.  He cut her off.

14   He never invited her to his house.  He never spoke to her on

15   the phone.  He never met.  He never sexted her.  Mr. Bright

16   thought she was a dumb teenager, as he told the police in his

17   interview.  Yes, it was stupid to engage with her.  There can

18   be no doubt about that.  And people say dumb things online.

19   But it's a giant leap to suggest that this one stupid act has

20   anything to do with Mr. Bright's intent in this case.  One has

21   nothing to do with the other.

22           And the fact that he didn't call the police on this 14

23   and 17-year-old has no bearing on his intent in this case to

24   notify the authorities if it turned out that Liz was an actual

25   child molester.  Mr. Bright explained the obvious difference.

1   And you heard that over the last decade, Ars Technica, where

2   Mr. Bright was working, they wrote extensively about legal

3   repercussions of law enforcement in the lives of teenagers:

4   Pot, sexting, sending nude selfies, and being prostitutes.  Mr.

5   Bright told Agent Spivack:  "we've written stories about, for

6   example, minors sexting each other.  And it kind of ruins their

7   lives when law enforcement gets involved."  It's something he

8   understands now.  Mr. Bright's limited communication with this

9   14 and 17-year-old -- ill-advised, of course -- is irrelevant

10  to his intention in this case.

11          Now, Ms. Baharanyi told you in her opening statement

12  that Mr. Bright had nothing to hide.  Not then, not now.  He

13  took the witness stand and bared it all.  You know more about

14  him now than maybe you needed to know.  And I'm sorry, Mr.

15  Bright, but he does tend to ramble.  But he is an open book,

16  and he hid nothing.  He told you that he had no clue that he

17  saw Liz's profile as a mother looking for someone to molest or

18  rape her kids.  He had no clue she was a real mother.  And why

19  would he?  The idea to him was preposterous.  First of all,

20  what are the chances that an actual mother who was looking for

21  someone, a random stranger online to molest her actual

22  children, even existed?  As Mr. Bright said, it goes against

23  everything the maternal spirit says it should.  Why would

24  anyone ever think that was real?  Why would it ever cross your

25  mind?  And why would a mother do so brazenly advertise for the

1   world to see?  Why would she advertise on a kinky dating site

2   and not on the dark web, where molesters look?  She wouldn't.

3   And on the flip side, why would Agent Jensen think she reeled

4   in a predator when she saw Mr. Bright's KinkD profile, other

5   than the fact that she had little exposure to age-play and

6   little understanding of the community she had inserted herself

7   into?  Why would a child molester look on a kinky dating site?

8   Why would they reveal their real identity?  Why would they

9   reveal their personal information?  Why would they send

10  pictures of themself and their penis?  Why would they send

11  copies of their STD tests?  A child molester wouldn't.  Mr.

12  Bright did.

13          Mr. Bright is indeed a tech savvy guy and a tech man.

14  He of all people would know how to hide his identity if he was

15  looking for a child to molest.  If he created a published

16  story, like the government said, it would have deleted his

17  WhatsApp.  Chat when it showed up.  It wouldn't have such a

18  public and open profile.  When you look at these chats, I want

19  to you look at them very carefully and think about maybe

20  breaking them down into sections.  And I would suggest looking

21  at the chats before the phone call, pages one to 56; and then

22  chats after the phone call, but before the photos of the

23  children, pages 57 to 75; and then look at the chats after the

24  photos of the children from page 75 on.  You'll see that's

25  clearly demarcated in the chats.  You will see the progression

K3DLBRI4                      Summations

1      of Mr. Bright's realization that something sinister is going

2      on.

3                There's nothing about the chats before the phone call

4      that would create any doubt or concern that this wasn't just

5      another kinky conversation.  It was so clear that Mr. Bright

6      was talking about sexual activities with consenting adults, not

7      a single concern.  Instead, these texts create a reasonable

8      doubt when you look at them and put a big hole in the

9      government's theory.  He and Liz spoke in age-play terms using

10     age-play language.  In these chats, Mr. Bright and Liz

11     discussed teaching scenarios with a princess and a prince

12     charming.  It's sexual, it's graphic.  They discuss playtime,

13     lessons, vibrators.  He offers that he's uncircumcised.  And

14     the idea of a lesson involving his foreskin.  He talks about

15     his experience with other women, American women, in that

16     regard.  He talks about the eleven-year-old in the Bronx who's

17     actually a 30-something woman named Alicia.  He talks about

18     teaching multiple orgasms.  They talk about limits and kinks.

19     They're talking about age-play.  And these are obviously adult

20     concerns.  Let's be honest.  If you are a child molester

21     planning to teach a seven and nine-year-old about sex, would

22     you be worried about their reaction to your uncircumcised

23     penis?  The same goes for multiple orgasms.  How in the world

24     is that relevant?  It's not, because Mr. Bright is clearly

25     talking about age-play with adults.  Even in the face of this

1   absurdity, this disconnect, Agent Jensen never once sets the

2   record straight.  She never comes out of the "mommy" role-play

3   character.  She never stops using the classic age-play terms.

4   She never said, by the way, these are my children, my actual

5   kids, my son, my daughter.  And even when there's no need for

6   ambiguity, she never sets the record straight, despite numerous

7   opportunities.

8        But Mr. Bright tells you that there was something off

9   during this phone call.  It was strange but not sinister.  It

10  was a red flag, but in retrospect.  She mentioned taking the

11  kids to park and Brayden to soccer.  He didn't know what to

12  make of it.  He knew of age-players who lived a fantasy 24-7,

13  but it wasn't that common and it wasn't really his thing.  But

14  it was her fantasy, and he was being invited in.  He began to

15  wonder though, could there be something else going on,

16  something more sinister.  But there really wasn't anything else

17  to indicate that.  The communication up to this point was

18  classic age-play and fantasy and continued on the rest of that

19  Friday night.

20       But in light of the peculiarity of this phone call and

21  after the call, Mr. Bright begins picking up on a few more

22  oddities in her language that caused some uneasiness.  She

23  asked if he had ever peed on a child, using the word, "child"

24  when they were talking about his kink, instead of "little," or

25  "little girl," or "little princess."  She didn't understand

1   what the term "heteronormative" meant, which was strange to

2   him.  And she revealed that she'd been molested as a child.

3          Over the next couple of days, that Friday night, all

4   day Saturday, when he didn't have any communication with Liz,

5   until he communicates with her again on Sunday when he receives

6   the pictures, he's processing this disconnect.  He's mulling

7   the possibilities.  He's looking back at the texts.  And he's

8   wondering:  Is she a fantasist really committed to the fantasy?

9   Is she a scammer, an online predator, or a real mother looking

10  for someone to molest her kids?  If she's a fantasist committed

11  to the fantasy, he's still game.  But if she's a child

12  molester, he came up with a plan:  He'd play along, he'd play

13  this out, and he'd gather information and turn her over to the

14  police.  And then it's confirmed.  Two days later she sends

15  photos of her children.  Four days and hundreds of messages

16  after Mr. Bright first asked for them.  One month after the

17  first communication on KinkD.

18          And he didn't ask for photos, like Mr. Li wants you to

19  believe.  He didn't say:  Send me pictures of your children or

20  kids.  He asks as an age-player.  Got any family photos?  I'd

21  love to see my students.  Why doesn't Agent Jensen -- it would

22  have been the perfect way to set the record straight from the

23  beginning, to clear up any ambiguity.  Send the pictures of the

24  kids and let's either cut this off or move forward.  What was

25  her reason?  She didn't have the approval of the supervisor

K3DLBRI4                         Summations

1    yet; and, in fact, she didn't ask for it.  If she really

2    believed he was a child molester and they were on the same

3    page, why wait four days?  Why wait a month from when he first

4    reached out to her on April 18th?  It seemed she knew they were

5    talking at cross purposes.  Meaning is often misconstrued.

6           You heard Mr. Bright's reaction to the photos.  He was

7    disgusted and horrified, but he was ready.  It wasn't an "ah

8    hah" moment, as Mr. Li describes it.  He had already considered

9    the possibility that she was a child molester and decided if

10   was true, he had to do something to stop her.  So he plays

11   along, switching mode but not vetting mode.  He comments about

12   the pictures like she would expect he would, without delay.  He

13   stays in role, a new role.  She asks him to send a picture of

14   his penis, and he does.  It was his way of staying in role and

15   playing along so she doesn't go silent.  I admit, it's an odd

16   thing to do under the circumstances, but we know it's not that

17   odd for Mr. Bright.

18          It's not an extremely personal photo, as Mr. Li said,

19   for Mr. Bright.  His phone is full of pictures and videos of

20   his penis, and he admittedly shares them freely.  And he sent

21   it to Liz.  And you will see in the text that they then -- the

22   two of them -- engage in banter about it.  He doesn't tell her

23   to show it to the kids.  And then he starts digging and

24   continues to formulate his plan.

25          The content, you will see changes.  Despite what

1   Mr. Li said, the content changed dramatically after the photos

2   are sent.  Remember when I'd asked Agent Jensen about this, and

3   she was leafing through the chats, pages and pages, looking for

4   sexual conversation involving the children after the photo was

5   sent, and she didn't find any?  The discussion of sexual

6   reference stopped.  Mr. Bright was playing along, but he

7   couldn't go that far.

8           He starts to ask questions.  He asks if he's being set

9   up to throw her off.  He asked personal questions about her

10  sexual history.  He asked if she's communicating with anyone

11  else on KinkD.  And when she says no, that's when it really

12  seals the deal that he has to do something.  He asks for her

13  address.  He asks for more pictures.  He takes screenshots of

14  her KinkD profile.  And then he decides to get her on tape,

15  telling her he'd like to talk with her first without the

16  children, so he could try to get her to say something

17  incriminating.  And he shows up an hour before the time he

18  believed the children would be arriving.  And he waits and he

19  waits because the FBI delayed the meeting.  The FBI pushed the

20  meeting closer and closer to the time when the kids would be

21  coming home, not Mr. Bright.

22          And why didn't he go to police?  Well, the proof is in

23  the pudding.  We're here.  You saw the behavior of the agents

24  who questioned Mr. Bright.  Agents Spivack and Adamczyk, who

25  questioned him with no real understanding of kink, age-play,

DDLG.  They were closed-minded and unwilling to hear what Mr.

Bright had to say.  They were aggressive at times.  They cut

him off when he tried to answer the questions.  Being in a kink

community, Mr. bright knew the stigma.  He knew the

misconceptions.  He didn't want to expose himself and his

sexual practices to police scrutiny.  He didn't want to turn

over his phone if he didn't have to.  He didn't want to violate

the privacy of the people who trusted him with personal

information and sexually explicit photos.

Yes, Mr. Bright told one lie to Agent Spivack about

not having considered the option of going to the police or the

FBI and saying, Here's my chats, here's my phone.  He lied

because he didn't want to have to give Agent Spivack the real

reason why he did it, and draw attention to the very thing on

his phone he was hoping the FBI wouldn't see.  And what if he

goes to the police at that moment without getting more

information and is wrong about Princessmom?  So he decides to

make a recording.  That's the best evidence, isn't it?  It's

exactly what the FBI tried and failed to do.  The recording

speaks volumes about his intentions and creates a reasonable

doubt.

The government argues that this recording is just a

coverup in case he gets caught.  This idea of a coverup is the

only thing the government can say about it and they have to say

about it.  Otherwise, the recording is proof that Mr. Bright is

1    innocent.  And why is he creating a coverup?  Would he record

2    himself committing a crime?  Why wouldn't he delete the chats

3    on his phone before he shows up, and all the other sexually

4    explicit things that he didn't want the FBI to see?  He wasn't,

5    as Mr. Li seems to suggest over and over again, just a

6    concerned journalist gathering evidence.  His job as a

7    journalist has nothing to do with this case.  Mr. Bright never

8    told anyone he's an investigative journalist working on a

9    story.

10           You've heard the recording Mr. Bright made as he

11   waited for Liz.  He expressed amazement that a woman would

12   really be offering her kids for sex, how it has to go against

13   everything the maternal spirit says it should.  He muses about

14   how funny it would be if she was trying to set up a sting,

15   sting the counter-sting.  And he asked:  What do you have to

16   say for yourself, Peter Bright?  He wasn't reading from a

17   script.  This is spontaneous and expressed genuine disbelief.

18   He's not creating a cover story.  What he doesn't do, most

19   importantly, is an overt act.

20           Remember that term that Agent Jensen used.  He doesn't

21   show up with STD tests that the government wants you to

22   believe.  You heard about the importance of this overt act.

23   It's a common FBI technique to ask the suspect to bring a piece

24   of physical evidence to the meeting, which would be strong

25   evidence of intent and, therefore, guilt.  Agent Jensen asked

1    for a printout of STD tests as a requirement to engage in

2    sexual activity with her kids.  Remember, the screenshots of

3    the STD tests were sent long earlier during the first chats

4    before the phone call.  And Mr. Bright told you about how it's

5    common in the KinkD community, more so than the vanilla

6    community, to share STD tests.  Agent Jensen, though, asked for

7    a printout because she wanted more of the STD tests as

8    requirement.  If that was Mr. Bright's intention, to engage in

9    sexual contact with kids, Mr. Bright would have printed those

10   STD tests out, had them in his pocket with the rest of his

11   pocket litter.  He didn't even have a screenshot at all on his

12   phone.  Instead, he had to pull up the website of the testing

13   facility and access his account toll find the results.  You

14   will have an opportunity to listen to that recording again.

15   You will see how long it took.  And you will hear how Agent

16   Jensen had to prompt him with the date of the results to help

17   him find it.  The fact that he doesn't have them at the ready

18   speaks volumes.  It's reason to doubt the government's case and

19   it tells you Mr. Bright is innocent.

20          So let's talk about the condoms for a minute, because

21   Mr. Li gives them a lot more importance than he should.  The

22   fact that Mr. Bright carries condoms is proof of nothing, more

23   than the fact that he's sexually active and responsible.  He

24   didn't bring them to the meeting, he had them in his pockets.

25   He told you, and he told Liz and Agent Spivack, about his date

1  on Friday night before the meeting.  He told you and Liz that

2  he had a date planned on the night before the actual meeting

3  that didn't materialize.  He told you that he uses condoms even

4  with his wife.  He told you that he's -- to use his words --

5  promiscuous and spontaneous sexually; that if his Scruff,

6  Tinder, KinkD, etc., dating apps alert him to a hookup

7  opportunity, he might just take it, and he needs to be ready.

8          He told you about his dressing habits and his pocket

9  habits, how he fills his pockets with what the FBI describes as

10  pocket litter, and he leaves it there until the next time he

11  puts on the same pants.  He has a boarding pass in his pocket

12  from May the 9th, a movie theater receipt from May 19th, an

13  empty Viagra pocket from Friday night.  His pockets are his

14  purse.  If I emptied my purse right now, it would reveal lots

15  of things that I don't need or use, that I put in there days,

16  weeks, probably even months earlier.  And when I change purses,

17  it all gets transferred.  It's as simple as that.

18          In Mr. Li's opening he told you -- and I quote -- "In

19  April 19th, defendant reached out online to a person he

20  believed to be the mother of two children."  That's evidence

21  that you didn't see in this case.  It's not true, and it was

22  misleading.  Mr. Li told that you Mr. Bright told the mother he

23  wanted to teach her kids about sex.  That's not evidence in

24  this case.  It's not true and it's misleading.  Mr. Li told you

25  in his opening statement that in the chats, Mr. Bright

K3DLBRI4                    Summations

1   described in detail exactly what he meant, that he would insert

2   a finger and a small toy into the girl and have the children

3   play with his penis.  You didn't hear evidence of that in this

4   case.  It's misleading and not true.

5            THE COURT:  You have five minutes left.

6            MS. GALLICCHIO:  Thank you.

7            And Mr. Li told you that Mr. Bright asked for pictures

8   of the kids.  Misleading and not true.  And Mr. Li, finally

9   repeated over and over, and even today, something that Agent

10  Jensen never called herself, "mother."

11           The government's theory is, from day one, Mr. Bright

12  wanted to molest Princessmom's kids.  If you don't buy that

13  theory, then their case falls apart.  Because if you believe

14  that Mr. Bright reached out to Princessmom out of a genuine

15  age-play interest, then the only way that you could find him

16  guilty of this horrendous crime is by believing that somewhere

17  along the line, maybe after receiving a couple photos of

18  clothed children, Mr. Bright, all of a sudden, turned into a

19  child molester.  And that's just nonsense.

20           Mr. Bright is here at this table because of a careless

21  and reckless fishing expedition of the FBI.  Agent Jensen, with

22  little guidance and little training, ventured into a community

23  she knew little about and misunderstood and misconstrued.

24  Let's hope they learn something.  It's too late for Mr. Bright.

25  He got caught in the net not meant for him, an age-player

looking for a kinky threesome with consenting adults.  When he
discovered that this kinky encounter was not what he thought it
would be, something sinister, he did what he thought was best,
to catch her.  Maybe his plan wasn't perfect.  Maybe it wasn't
the best plan.  Maybe it's not the plan you'd come up with.
But Mr. Bright never found himself in this situation before and
he sorted it out the best way he could.

Mr. Bright never intended to engage a seven and
nine-year-old in sexual activity.  There is no evidence of
enticement here at all.  He had no idea that Kayla and Brayden
were actual children when he engaged Liz in sexual
conversation.  When he did realize it, the lesson plans and
sexual conversation related to who he then believed -- now
believed -- were children stopped.  When he showed up on May
22nd, his only intention was to get Liz on tape, get her
address, and later report her to the police.  He had no
intention of even seeing her children.

Mr. Bright is innocent, and the government's case is
riddled with reasonable doubt.  You will find reasonable doubt
in the KinkD communications and the WhatsApp chats themselves,
viewed with the eyes of an age-player.  You will find
reasonable doubt in the documented evidence that Mr. Bright was
a legitimate and practicing age-player before and during the
communications with Liz.  You will find reasonable doubt in Mr.
Bright's behavior in recording the conversation.  You will find

reasonable doubt in Mr. Bright's willingness to speak to the

police and consent to search his electronics.  You will find

reasonable doubt in the absence of child pornography.  You will

find reasonable doubt in the lack of an overt act.  And this is

just a few examples.

We ask you to untangle this net that Mr. Bright has

been caught in.  And when you do we are confident that you will

return the only verdict that serves justice and sets Mr. Bright

free, and that is not guilty.

THE COURT:  Thank you.

Mr. Li, whenever you're ready.

MR. LI:  Thank you, your Honor.

This case is not about the FBI.  Defense counsel spoke

for so long about Agent Jensen, not because she is a star

witness but because she isn't.  The star witness is Peter

Bright.  The evidence of guilt is in what the defendant said

and in what he did.  That's why the defense asked to look

somewhere else.

Now, the defense theory appears to be that this is all

just one big misunderstanding.  Yes, the defendant exchanged

hundreds of chat messages that appear to be about sex with

children.  Yes, he sent pictures of his STD tests and his

penis.  Yes, he showed up at a meeting with an undercover agent

with condoms in his pocket.  But no, he did not intend to have

sex with children.  He got tricked by an FBI agent who used

secret age-play code words, "mommy," "prince," "princess."  He

thought he was talking to an adult looking to offer two other

adults pretending to be children up until the moment he got

pictures of what appeared to be actual children.  And then he

became a vigilante working in secret to enforce the child

exploitation laws.

Now, this theory has a very convenient feature for the

defendant.  He can do no wrong.  No matter how sexually

explicit the chats are, no matter how graphic the photos, no

matter how far he goes to actually meet seven-year-old Kayla

and nine-year-old Brayden, his answer is always the same:  I

was just pretending.  At first, the defendant says he was

age-playing because the mother never told him explicitly that

the words "my kids" meant "my real kids" and not my adult

friend -- but when he received pictures of Kayla and Brayden,

which was undeniable proof the children were real, well, he

just seemingly shifted into vigilante mode.  He kept doing the

same things, talking about what he wanted to do with the kids,

sending graphic pictures, trying to arrange a meeting.  But now

he had just had a different reason.  The defendant is asking

you to just close your eyes and believe that no matter what he

said or what he did, he was always just pretending.  Except,

the overwhelming evidence proves he wasn't pretending.

I gave you the government's case.  I won't go through

it again.  Instead, let's just discuss a few of the arguments

1    the defense has made.  Let me start with age-play.

2            The defense has spent a lot of time talking to you

3    about the defendant's fetishes.  Now, let me be clear, the

4    defendant's sex life is not on trial.  There is nothing illegal

5    about role-play or other kink activity with consenting adults.

6    We're here today because, in May 2019, the defendant tried to

7    have sex with what he believed to be actual children.  Not

8    adults acting out a mutual fantasy, but children.  And trying

9    to have sex with a child is a crime.

10           Now, the defense wants to make this trial into

11   something it isn't about, to frame it as if, if he is into

12   kink, then he can't intend to have sex with minors.  But the

13   fact is, someone can want to have sex with adults pretending to

14   be children, and also want to have sex with children as well.

15   The defendant can be an age-player on Monday and a child

16   enticer on Wednesday.  These things are not incompatible.  The

17   defendant's membership in what he calls "the kink community" is

18   not a reason to find him guilty of anything, but it is also not

19   a free pass when he does commit a crime.  That's why we're here

20   today.

21           Now, the defense has spent a lot of time arguing that

22   the defendant thought the mother was an age-player because her

23   KinkD profile said "mommy" and she didn't use explicit words

24   like "mother" or "son" or "daughter" or "child."  But isn't it

25   convenient?  Every word she does use -- "kids," "my kids,"

1    "Kayla," "Brayden," "seven years old," "nine-year-olds," the

2    defendant says, well, that's age-play.  Do you really believe

3    that if she had said "child" instead of "kid," the defendant

4    would admit today that he knew it was actual children?

5           And the defense already has it flipped.  If the

6    defendant really thought he was age-playing with the mother, he

7    would have used the language of age-play.  Dr. Cantor and the

8    defendant both told you how important knowing consent is to

9    age-play.  Dr. Cantor told you that some age-players even sign

10   written contracts to document their consent.  So where is the

11   explicit consent for age-play in this case?  Nowhere.  It

12   doesn't exist.  Not once does the defendant refer to "DDLG" or

13   "DDLB" or "fantasy" in all of his communications with the

14   mother.  But you know where those explicit words of age-play do

15   appear?  In his chats with Stevie and Denesy.  And most

16   importantly, even the defendant admits that by time he showed

17   up in the park, he believed the children were real.  So what he

18   initially thought really doesn't matter.

19          Now, the defense has put a lot of stock in the audio

20   recording that the defendant made of the meeting with the

21   mother.  Now, I want to take a minute to really think about how

22   this recording came about.  Picture this.  The defendant gets

23   on the subway.  It's an hour before the meeting.  He knows it's

24   one of two things:  Either he's finally going to get to meet

25   seven-year-old Kayla and nine-year-old Brayden, or it's a

1    sting.  He's worried it might be a sting, so he thinks:  Maybe

2    I better record this.  Maybe I better have something just in

3    case.  You know the old saying:  Hope for the best, prepare for

4    the worst.  He's sitting on the train.  He gets off, he starts

5    walking to the park.  Then he gets another idea:  "Approaching

6    the park where she said we'll meet.  Now we'll find out if a

7    woman really is offering her children for sex."

8           Ladies and gentlemen, nobody talks like that.  This is

9    not some narration of the defendant's innermost thoughts

10   perfectly recorded on tape.  This is none sense.  This is a

11   preplanned fabrication made by somebody who watches too much

12   tv, who thought he could just record a voiceover, hit play for

13   the FBI and walk away scot-free.  These are self-serving

14   statements made alone with no apparent purpose, except to play

15   for the cops in case he was ever arrested.

16          Now, the condoms.  The defendant has to explain away

17   the condoms, because why would he bring them if not for Kayla

18   and Brayden?  So he comes up with this story about the condoms

19   being left over from his Friday night date.  But if you look at

20   the details, his story falls apart.

21          Now, let's pause here for a second.  Remember how Ms.

22   Gallicchio said that the moment Liz sent the photos, the

23   defendant stopped discussing lessons?  I think that's probably

24   a mistake.  Right there, just an hour after he gets the

25   pictures, he writes:  "That way, condoms can be restricted to

1    lessons about condoms."  He texts about it up until the moment

2    before the meet.

3            When you get back to the jury room, look at page 130

4    of the chat, and you'll see.

5            Now, as we discussed, he said in his chats that the

6    condoms were not for him to wear, they were for lessons for the

7    kids.  And that is important.  And that's where the details

8    really matter.  And I do apologize for some of this.  The

9    condoms he normally uses, they're normal condoms.  You know

10   that because they're in his wallet.  This is Government Exhibit

11   10.  The regular blue Trojans are what he uses.  That's what he

12   carries around in his wallet.  After all, as he says in his

13   chats about his penis, "I think it's a reasonable size, though

14   far from huge."  Look, there's nothing wrong with that, but it

15   means he's using normal condoms.  But then he shows up with

16   fresh Trojan magnums.  Extra large condoms.  Not condoms that

17   would fit him, but condoms that would be perfect for teaching

18   children to about how to use condoms, to show them how to put

19   them on a vibrator or --

20           MS. GALLICCHIO:  Objection.

21           THE COURT:  Basis?

22           MS. GALLICCHIO:  Pure speculation.

23           THE COURT:  Overruled.

24           MR. LI:  -- to show them how to put those condoms on a

25   vibrator or banana or whatever else he wants to use.  So you

know his story about the condoms being left over from his

Friday night date is a lie.  Why?  Because they would not fit

him.  Not Friday night, not the date of his arrest, or any

other time.  He was carrying extra large demonstration condoms

in order to, in his own words, "provide lessons about condoms."

At the end of the day, the defendant's story is

absurd.  It just makes no sense.  To believe it, you have to

believe the defendant is the unluckiest man in the world.  He

had the bad luck of misinterpreting the mother as being an

age-player, even though the mother didn't select "age-player"

as an option, deciding just this one time not to discuss

age-play or DDLG explicitly.  The mother -- what appeared to be

actual children.

THE COURT:  Five minutes left.

MR. LI:  Being so committed to protecting children

that he responded to this new development in a way completely

indistinguishable from his earlier conversations about sex, and

then forgetting he had condoms on him when he went to meet the

mother and Kayla and Brayden, and having written about how he

thinks age-based rape laws are stupid, and having constantly

joked about jailbait and how he would like to have sex with 13

and 15-year-old girls.  And of course, he has the bad luck of a

14-year-old girl sending him suggestive pictures that he never

asked for in his flirty conversations with her.

Ladies and gentlemen, come on.  Nobody is that

K3DLBRI4                          Summations

1    unlucky.   The defendant meant what he said in his private chats

2    about wanting to have sex with kids.   He meant what he said on

3    *Twitter* about age-based rape laws being stupid.   He meant what

4    he said in his chats with the mother about wanting to have sex

5    with Kayla and Brayden.   And he meant what his actions showed

6    when he arrived at the meeting with condoms ready to go.

7         (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K3DKBRI5                         Rebuttal - Li

1           MR. LI:  (Continuing)  What the defendant is really

2    asking you to do is to not believe two things – his words and

3    his actions.  He wants you to disbelieve him when he speaks

4    openly about wanting to have sex with kids and when he chats

5    privately about actually doing it with seven-year-old Kyle and

6    nine-year-old Braydon.  He wants you to ignore the fact that he

7    showed up to a meeting with the mother and started to walk to

8    the apartment where the kids lived.  Instead, he wants you to

9    accept the self-serving lie that he made up on the day of the

10   meeting, after he became afraid of a sting, and ignore

11   everything he said and everything he did before, which amounts

12   to simply this:  That he intended to have sex with a

13   seven-year-old girl and a nine-year-old boy.

14          Ladies and gentlemen, the defendant has left with a

15   pile of lies, but you have everything you need to cut through

16   it.  You have the evidence, and you have your common sense.  So

17   when you go back to the jury room, look at the evidence in this

18   case, read the chats, which the defendant wrote before he had a

19   reason to lie.  Look at the condoms, which speak louder than

20   words.  Remember the testimony of the witnesses.  When you do,

21   you will conclude that the defendant is not an age player

22   turned vigilante; he is guilty.

23          THE COURT:  Thank you, Mr. Li.

24          Members of the jury, you have now heard all the

25   evidence in the case, as well as the final arguments of the

K3DKBRI5                        Charge

1   parties.  We have reached the point where you are about to

2   undertake your final function as jurors.  You have paid careful

3   attention to the evidence, and I am confident that you will act

4   together with fairness and impartiality in reaching a just

5   verdict in the case.

6           It has been my duty to preside over the trial and to

7   decide what testimony and evidence was relevant under the law

8   for you to consider.  My duty, at this point, is to instruct

9   you on the law, and it is your duty to accept these

10   instructions of law and to apply them to the facts as you

11   determine them.

12           If any attorney has stated a legal principle different

13   from any that I state to you now in my instructions, it is my

14   instructions that you must follow.  You must not substitute

15   your own ideas of what the law is or ought to be.

16           You are not to infer from any of my questions, or

17   rulings, or anything else I've said or done during this trial

18   that I have any view as to the credibility of the witnesses or

19   how you should decide the case.

20           I will give you the typed text of these instructions

21   for your use in the jury room.  It is possible that there is a

22   slight variation between the words I have spoken and the typed

23   text that I will give you.  The words I have spoken control

24   over the typed text.

25           One second at sidebar, please.

K3DKBRI5                          Charge

1            (At the sidebar)

2            THE COURT:  Do you have the verdict sheet and the

3    indictment?

4            MR. LI:  We can print those quickly, your Honor.  I

5    apologize, we did not bring them.

6            MR. MAIMIN:  I'm happy to run downstairs and take care

7    of that right now.

8            THE COURT:  Tend to that, please.

9            MR. MAIMIN:  Absolutely.

10           THE COURT:  So four copies of the indictment and

11   twelve copies of the verdict sheet.

12           MR. LI:  Yes, your Honor.

13           MR. MAIMIN:  Sure.

14           Did your Honor send us a verdict sheet?

15           MR. LI:  No.  We created one last night.

16           THE COURT:  Thank you.

17           And you can work with my law clerk if you need help.

18           (Continued on next page)

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.

K3DKBRI5                          Charge

1           (In open court)

2           THE COURT:  As members of the jury, you are the sole

3    and exclusive judges of the facts.  You pass upon the evidence.

4    You determine the credibility of the witnesses.  You resolve

5    such conflicts as there may be in the testimony.  You draw

6    whatever reasonable inferences you decide to draw from the

7    facts as you have determined them.  You determine the weight of

8    the evidence.  You have taken the oath as jurors, and it is

9    your sworn duty to determine the facts and to follow the law as

10   I give it to you.

11          It is the duty of attorneys to object when the other

12   side offers testimony or other evidence that the attorney

13   believes is not properly admissible.  Therefore, you should

14   draw no inference from the fact that an attorney objected to

15   any evidence.  Nor should you draw any inference from the fact

16   that I sustained or overruled an objection.

17          Your verdict must be based solely upon the evidence

18   developed at trial or the lack of evidence.  The parties in

19   this case are entitled to a trial free from prejudice about a

20   party's race, religion, national origin, sex, or age.  Our

21   judicial system cannot work unless you reach your verdict

22   through a fair and impartial consideration of the evidence.

23          Similarly, under your oath as jurors, you are not to

24   be swayed by sympathy.  Once you let fear, prejudice, bias,

25   feelings about the nature of the crime charged, or sympathy

1    interfere with your thinking, there is a risk that you will not

2    arrive at a just and true verdict.  Your verdict must be based

3    exclusively upon the evidence or the lack of evidence in the

4    case.

5          The fact that the prosecution is brought in the name

6    of the United States of America entitles the government to no

7    greater, and no lesser, consideration than accorded to any

8    other party to a litigation.  All parties, whether the

9    government or an individual, stand as equals under the law.

10          The defendant in this case, Peter Bright, has entered

11    a plea of not guilty to the indictment.  The law presumes a

12    defendant to be innocent of all the charges against him.  The

13    defendant is to be presumed by you to be innocent throughout

14    your deliberations until such time, if ever, that you, as a

15    jury, are satisfied that the government has proven the

16    defendant's guilt beyond a reasonable doubt.

17          The presumption of innocence alone is sufficient to

18    require an acquittal of a defendant unless and until, after

19    careful and impartial consideration of all the evidence, you,

20    as jurors, are convinced unanimously of the defendant's guilt

21    beyond a reasonable doubt.

22          The question that naturally comes up is:  What is a

23    reasonable doubt?  The words almost define themselves.  It is a

24    doubt founded in reason and arising out of the evidence, or the

25    lack of evidence.  It is a doubt that a reasonable person has

K3DKBRI5                    Charge

1   after carefully weighing all the evidence.  Proof beyond a

2   reasonable doubt, therefore, must be proof of such a convincing

3   nature, that a reasonable person would not hesitate to rely and

4   act upon it in the most important of his or her own affairs.

5   Proof beyond a reasonable doubt is not proof beyond all

6   possible doubt.

7           Reasonable doubt is a doubt that appeals to your

8   reason, your judgment, your experience, your common sense.  It

9   is not caprice, whim, or speculation.  It's not an excuse to

10   avoid the performance of an unpleasant duty.  It is not

11   sympathy for the defendant.

12           The government must prove each and every element of

13   the crime charged beyond a reasonable doubt.  The burden never

14   shifts to the defendant.  The law never imposes upon a

15   defendant in a criminal case the burden of calling any

16   witnesses or producing any evidence.  Even if Mr. Bright has

17   presented evidence in his defense, it is not his burden to

18   prove himself innocent.  The fact that one party called more

19   witnesses and introduced more evidence does not mean that you

20   should find in favor of that party.  It is the quality of the

21   evidence that matters.

22           If, after a fair, and impartial, and careful

23   consideration of all of the evidence, you cannot honestly say

24   that you are not satisfied of the guilt of a defendant -- that

25   is, if you have such a doubt as would cause you, as a prudent

person, to hesitate before acting in matters of importance to
yourself -- then you have a reasonable doubt.  In that
circumstance, it is your duty to return a not-guilty verdict
for the defendant.

On the other hand, if after a fair, impartial, and
careful consideration of all the evidence, you can honestly say
that you are satisfied of the guilt of a defendant, and that
you do not have a doubt that would prevent you from acting in
important matters in the personal affairs of your own life,
then you have no reasonable doubt.  Under the circumstances,
you should return a guilty verdict for the defendant.

The evidence in this case is the sworn testimony of
the witnesses, the exhibits received into evidence, and the
stipulations made by the parties.

By contrast, the questions of a lawyer are not
evidence.  It is the witnesses' answers that are evidence, not
the questions.

Testimony that has been stricken or excluded by me is
not evidence and may not be considered by you in rendering your
verdict.  If I have instructed you that, as I have in this
case, that evidence is received for only a limited purpose,
then it may be considered only for that limited purpose.

Arguments by lawyers are not evidence because the
lawyers are not witnesses.  What the lawyers have said to you
in their opening statements and in their summations are

K3DKBRI5                    Charge

1    intended to help you understand the evidence.  If, however,

2    your recollection of the facts differs from the lawyers'

3    statements, it's your recollection that controls.

4          To constitute evidence, exhibits must first be

5    admitted or received in evidence.  Exhibits marked for

6    identification, but not admitted, are not evidence, nor are

7    materials brought forth only to refresh a witness'

8    recollection.

9          It is for you alone to decide the weight, if any, to

10   be given to the testimony you have heard and the exhibits you

11   have seen.

12         Generally, there are two types of evidence that you

13   may consider in reaching your verdict.  One type is direct

14   evidence.  That's when a witness testifies about something he

15   or she knows by virtue of his or her own senses – something he

16   or she has seen, felt, touched, or heard.

17         Circumstantial evidence is evidence from which you may

18   infer the existence of certain facts.  Let me give you an

19   example to help you understand what is meant by circumstantial

20   evidence.

21         Now, I want you to imagine the following circumstance:

22   Imagine that the windows in this courtroom were completely

23   covered by heavy drapes, all of the windows, so that you could

24   not see outside, you couldn't even tell whether it was day, or

25   night, or what the conditions were outside.  I want you to

K3DKBRI5                    Charge

1    further imagine that it was a bright, sunny day when you

2    entered the courthouse.  And now, the doors at the back of the

3    courtroom open, and a person walks in with an umbrella, and it

4    appears to be wet or dripping.  And a few minutes later, a

5    second person comes into the courtroom wearing a raincoat and

6    perhaps brushing off drops from the shoulder.

7              From that combination of facts -- remember, you can't

8    look out the window in my hypothetical, it's all covered over.

9    On that combination of facts, it would be reasonable for you to

10   infer that it had been raining.  That's all there is to

11   circumstantial evidence.  You assume -- not assume, you infer,

12   on the basis of reason, and experience, and common sense from

13   one established fact, the existence or nonexistence of some

14   other fact.  So, it's an inference based on reason, experience

15   and common sense, and the evidence in the case, the existence

16   or nonexistence of some other fact.

17             Circumstantial evidence is of no less value than

18   direct evidence.  The law makes no distinction between direct

19   evidence and circumstantial evidence.  It simply requires that

20   your verdict must be based on all the evidence.

21             You have had the opportunity to observe all the

22   witnesses.  It's now your job to decide how believable each

23   witness was in his or her testimony.  You are the sole judges

24   of the credibility of each witness and of the importance of his

25   or her testimony.

K3DKBRI5                    Charge

1              You should carefully scrutinize all of the testimony

2      of each witness, the circumstances under which each witness

3      testified, the impression the witness made when testifying, and

4      any other matter in evidence that may help you decide the truth

5      and the importance of each witness' testimony.

6              In other words, in assessing credibility, you may size

7      up a witness in light of his or her demeanor, the explanations

8      given, and all the other evidence in the case.  In making your

9      credibility determinations, use your common sense, your good

10     judgment, and your everyday experiences in life.

11             If you believe that a witness knowingly testified

12     falsely concerning any important matter, whether at trial or in

13     a prior proceeding, you may distrust the witness' testimony

14     concerning other matters.  You may reject all of the testimony

15     or you may accept such parts of the testimony that you believe

16     are true and give it such weight as you think it deserves.

17             In deciding whether to believe a witness, you may take

18     account of any evidence of hostility or affection that the

19     witness may have towards the defendant or the government.  You

20     may consider any evidence that a witness may benefit in some

21     way from the outcome of the case, and any loyalty, incentive,

22     or motive that might cause the witness to shade the truth.  You

23     should carefully scrutinize all of the testimony of each

24     witness, the circumstances under which each witness testified,

25     and any other matter in evidence that may help you decide the

truth and importance of each witness' testimony.

In deciding whether or not a witness was truthful, you may ask yourself:  How did the witness appear?  Was the witness candid, frank, and forthright, or did the witness seem evasive or suspect in some way?  How did the way the witness testified on direct examination compare with how the witness testified on cross-examination?  Was the witness consistent or contradictory?  Did the witness appear to know what he or she was talking about?  Did the witness have the opportunity to observe the facts he or she testified about?

It is your duty to consider whether the witness has permitted any bias or interest to color his or her testimony. In short, if you find that a witness is biased, you should view his or her testimony with caution, weigh it with care, and subject it to close and searching scrutiny.

Of course, the mere fact that a witness is interested in the outcome of the case does not mean that he or she has not told the truth.  It is for you to decide, from your observations and applying your common sense, and experience, and all the other considerations mentioned, whether the possible interest of any witness has intentionally or otherwise colored or distorted his or her testimony.  You are not required to disbelieve an interested witness.  You may accept as much of his or her testimony as you deem reliable and reject as much as you deem unworthy of acceptance.

K3DKBRI5                      Charge

1          You have heard testimony of law enforcement officers

2     and government employees.  The fact that a witness may be

3     employed by the federal, state, or local government as a law

4     enforcement officer or government employee does not mean that

5     his or her testimony is deserving of more or less consideration

6     or greater or lesser weight than that of an ordinary witness.

7     It is fair for you to consider whether the testimony of a law

8     enforcement witness has been colored by a personal or

9     professional bias or interest in the outcome of the case.

10         It is your decision, after reviewing all the evidence,

11    whether to accept the testimony of the law enforcement

12    witnesses and to give that testimony whatever weight, if any,

13    you find it deserves.

14         The testimony of a witness may be discredited by

15    showing that the witness testified inconsistently concerning a

16    material matter, or by evidence that at some other time the

17    witness said or did something, or failed to say or do

18    something, which is inconsistent with the testimony the witness

19    gave at trial.

20         Evidence of a prior inconsistent statement may not be

21    considered by you as affirmative evidence of the fact asserted

22    in the statement or the defendant's guilt.  Evidence of the

23    prior inconsistent statement was placed before you for the more

24    limited purpose of helping you decide whether to believe the

25    trial testimony of the witness who is said to have contradicted

himself or herself.  If you find that the witness made an

earlier statement that conflicts with his or her trial

testimony, you may consider that fact in deciding how much of

his or her trial testimony, if any, to believe.  If you believe

that a witness has been discredited in this manner, it is

exclusively your right to give the testimony of that witness

whatever weight you think it deserves.

In making this determination, you may consider whether

the witness purposely made a false statement or whether it was

an innocent mistake; whether the inconsistency concerns an

important fact or whether it had to do with a small detail;

whether the witness had an explanation for the inconsistency;

and whether the explanation appealed to your common sense.

You have heard evidence of certain statements made by

the defendant to the FBI.  Ultimately, you are to give the

statements such weight, if any, as you feel they deserve in

light of all the circumstances.

You have heard recordings of the defendant's

postarrest statement.  In these recordings, only Mr. Bright's

statements are evidence.  The statements and questions of the

FBI agents are not evidence.

Among the exhibits in evidence, some documents are

redacted.  "Redacted" means that part of the document was

covered.  You are to concern yourself only with the part of the

item that has been admitted into evidence.  You should not

1    consider any possible reason why the other part has been

2    covered.

3              In this case, you've heard evidence in the form of a

4    stipulation of fact, or one or more of these stipulations of

5    fact.  A stipulation of fact, as I told you, is an agreement

6    between the parties that a certain fact is true.  You must

7    regard such agreed-upon facts as true.  The weight or

8    importance of the fact is a matter for you, the jury, to

9    decide.

10             You have heard testimony about evidence seized or

11   obtained in connection with certain searches conducted by law

12   enforcement officers, or otherwise obtained by law enforcement.

13   Evidence obtained by law enforcement was properly admitted in

14   this case and may be properly considered by you.  Such searches

15   were appropriate law enforcement actions.

16             Whether you approve or disapprove of how this evidence

17   was obtained should not enter into your deliberations because I

18   now instruct you that the government's use of this evidence is

19   entirely lawful.  You must, therefore, regardless of your

20   personal opinions, give this evidence full consideration along

21   with all the other evidence in the case in determining whether

22   the government has proved the defendant's guilt beyond a

23   reasonable doubt.

24             There is no legal requirement that law enforcement

25   agents investigate crimes in a particular way or that the

K3DKBRI5                    Charge

1  government prove its case through any particular means.  While

2  you are to carefully consider the law enforcement evidence

3  introduced by the government, you are not to speculate as to

4  why they used the techniques they did or why they did not use

5  other techniques.  The government is not on trial.  Law

6  enforcement techniques are not your concern.

7        Your concern is to determine whether, on the evidence

8  or lack of evidence, the government has proven Defendant's

9  guilt by proof beyond a reasonable doubt.

10        You have heard evidence during the course of this

11  trial that this case arose from a so-called undercover

12  operation by law enforcement.  The government is permitted to

13  rely on such investigative techniques.  Any opinions you may

14  have about the use of an undercover agent should not enter into

15  your deliberations in any way.

16        You have heard testimony from what we call an expert

17  witness.  An expert is a witness who, by education or

18  experience, has acquired learning or experience in a

19  specialized area of knowledge.  Such witnesses are permitted to

20  give testimony as to relevant matters in which they profess to

21  be an expert and give their reasons for their opinions.  Expert

22  testimony is presented to you on the theory that someone who is

23  experienced in a specialized field can assist you in

24  understanding the evidence or in reaching an independent

25  decision on the facts.

1          Your role in judging credibility applies to experts as

2     well as to other witnesses.  You should consider the expert

3     testimony which was received in evidence in the case and give

4     it as much or as little weight as you think it deserves.

5          If you should decide the testimony of an expert was

6     not based on sufficient education or experience or on

7     sufficient data, or if you should conclude that the

8     trustworthiness or credibility of an expert is questionable for

9     any reason, or if the testimony of the expert was outweighed,

10    in your judgment, by other evidence in the case, then you might

11    disregard the testimony of the expert entirely or in part.

12         On the other hand, if you find the testimony of an

13    expert is based on sufficient data, education, and experience,

14    and the other evidence does not give you reason to doubt his or

15    her conclusions, you would be justified in placing reliance on

16    his or her testimony.

17         The government has offered evidence that on different

18    occasions, the defendant may have engaged in conduct similar to

19    certain of the matters charged in the indictment.  Let me

20    remind you that the defendant is not on trial for committing

21    acts that are not alleged in the indictment.  Accordingly, you

22    may not consider the evidence of the defendant's prior conduct

23    as a substitute for proof that the defendant committed the

24    crime charged.  Nor may you consider this evidence as proof

25    that the defendant has a criminal personality or bad character.

1    The evidence of the other similar acts was admitted for a much

2    more limited purpose, as I instructed you at the time that

3    evidence was admitted, and you may consider it only for that

4    limited purpose.

5          If you determine that the defendant committed the acts

6    charged in the indictment and the prior conduct as well, then

7    you may, but need not draw an inference that in doing the acts

8    charged in the indictment, the defendant acted knowingly and

9    intentionally and not because of some mistake, accident, or

10   innocent reasons.  Evidence of the prior acts may not be

11   considered by you for any other purpose.  Specifically, you may

12   not use this prior act evidence to conclude that defendant

13   committed the -- that because the defendant committed the other

14   act or acts, he must also have committed the act charged in the

15   indictment.

16         Now, the prior acts weren't necessarily similar, nor

17   were they crimes, but they, according to the government's view

18   of the evidence, bear on the defendant's intent at the time of

19   the crime charged in the indictment.

20         The defendant, in a criminal case, never has any duty

21   to testify or to come forward with any evidence.  That is

22   because, as I have instructed you, the burden of proof beyond a

23   reasonable doubt remains with the government at all times, and

24   the defendant is presumed innocent, and he is never required to

25   prove that he is innocent.  He's presumed innocent.  In this

K3DKBRI5                        Charge

1    case, the defendant did testify, and he was subject to

2    cross-examination, like any other witness.  You should examine

3    and evaluate his testimony just as you would the testimony of

4    any witness.

5            I instruct you that anything you may have seen or

6    heard about this case outside the courtroom is not evidence and

7    must be disregarded.  Indeed, as I have instructed you

8    throughout this case, you may not read, view, or listen to any

9    media or press reports or internet or social media postings

10   about this case or about the people or issues referred to

11   during the trial.  Your verdict must be based solely on the

12   evidence or lack of evidence that came out in this courtroom

13   and the Court's instructions on the law.

14           Ladies and gentlemen, please join me in standing up

15   and stretching.

16           Are we okay?

17           JURY MEMBERS:  Yes.

18           THE COURT:  All right, good.

19           Let me turn to the substantive law to be applied in

20   this case.

21           The defendant, Peter Bright, has been formally charged

22   in what is called an indictment.  An indictment is simply an

23   accusation.  It is no more than the means by which a criminal

24   case is started.  It is not evidence.  It's not proof of the

25   defendant's guilt.  It creates no presumption, and it permits

K3DKBRI5                    Charge

1      no inference that a defendant is guilty.  You are to give no

2      weight to the fact that an indictment has been returned against

3      the defendant.

4              You will have in the jury room a copy of the

5      indictment.  I will first summarize the offense charged and

6      then explain in detail the elements of the offense.

7              The indictment charges that from on or about April 18,

8      2019, up to and including on or about May 22, 2019, in the

9      Southern District of New York and elsewhere, the defendant

10     willfully and knowingly used a facility and means of interstate

11     and foreign commerce to persuade, induce, entice, and coerce an

12     individual who had not attained the age of 18 to engage in

13     sexual activity for which a person can be charged with a

14     criminal offense, and attempted to do the same; namely, that

15     the defendant used computers and/or telephones to communicate

16     with an undercover FBI agent about arranging to engage in

17     sexual activity with a purported nine-year-old boy and

18     seven-year-old girl, and attempted to meet with the boy and

19     girl to engage in sexual activity, in violation of New York

20     Penal Law.  Before you begin your deliberations, I'll provide

21     you with a copy of the indictment.

22             Mr. Bright has entered a plea of not guilty and is

23     presumed innocent of the charge.  In order for you to convict,

24     it is necessary for you to find the government has proven each

25     and every element of the charge beyond a reasonable doubt.

K3DKBRI5                    Charge

1          I will now give you more detailed instructions.

2          To sustain its burden of proof with respect to the

3    charge of attempting to persuade, induce, entice, or coerce a

4    minor under 18 years of age to engage in illegal sexual

5    activity, the government must prove beyond a reasonable doubt

6    the following four elements:

7          First, that the defendant knowingly used a facility or

8    means of interstate commerce.  And this is the overview.  I'm

9    going to go into these elements in greater detail in a moment.

10   So that's the first element.

11         Second:  That the defendant knowingly persuaded,

12   induced, enticed, or coerced an individual to engage in sexual

13   activity, or attempted to do so;

14         Third, that the sexual activity would violate New York

15   State law;

16         And, fourth, that the individual was less than 18

17   years old at the time of the acts alleged in the indictment or

18   that the defendant believed the individual was less than 18

19   years old.

20         The first element that the government must prove

21   beyond a reasonable doubt is that the defendant used a facility

22   of interstate or foreign commerce, as alleged in the

23   indictment.  Transmission of communications by means of a

24   telephone or the internet constitutes the use of facility of

25   interstate commerce regardless of whether the communication

K3DKBRI5                          Charge

actually crossed state lines.  However, you must find beyond a
reasonable doubt that the specific communication in question
was actually transmitted by means of a telephone or the
internet.

The second element that the government must prove
beyond a reasonable doubt is that the defendant knowingly
persuaded, induced, enticed, or coerced someone to engage in
sexual activity, or that he attempted to do so.

The government does not have to prove that the
defendant communicated directly with the person.  Communication
with a third party whose role was to persuade, induce, entice,
or coerce the person is sufficient to establish this element.

To act knowingly is to act voluntarily and purposely
and not by mistake or accident.  The terms persuade, induce,
entice, or coerce are words of common usage, and you should
apply their common or everyday meaning to the evidence in this
case.

Now, science has not yet devised a means or manner of
looking into a person's mind and knowing what that person is
thinking.  Rarely is direct proof of state of mind available,
and direct proof is not required.  However, you do have before
you evidence of certain alleged acts that are alleged to have
taken place and certain physical evidence that can help you
infer what was going on in someone's mind.

Any one of these terms – persuade, induce, entice, or

1    coerce – suffices for the purposes of the statute provided that

2    all the other elements of the crime are also proven.  The law

3    does not require that any "sexual activity" actually occur if a

4    person knowingly persuaded, induces, entices, or coerces a

5    person to engage in any sexual activity.  For example, one

6    could knowingly entice a person to eat a piece of chocolate

7    candy even though the person never eats the candy.

8            Mere intention to commit a specific crime does not

9    amount to an attempt.  In order to establish this second

10   element, the government must prove beyond a reasonable doubt:

11           First, that the defendant intended to persuade,

12   induce, entice, or coerce a minor to engage in a sexual act;

13           And, second, that the defendant willfully took some

14   action that was a substantial step in an effort to bring about

15   or accomplish the crime.

16           In determining whether the defendant's actions

17   amounted to a substantial step towards the commission of the

18   crime, you must distinguish between mere preparation, on the

19   one hand, and the actual doing of the criminal deed on the

20   other.  Mere preparation may consist of planning the offense or

21   devising, obtaining, or arranging the means for its commission,

22   and, without more, that is not an attempt, although some

23   preparations may amount to an attempt.

24           A substantial step must be something more than mere

25   preparation, yet may be less than the last act necessary before

K3DKBRI5                    Charge

1    the actual commission of the crime.  The act or acts must

2    strongly show the firmness of the defendant's intent to commit

3    the actual crime.  Whether the specific conduct constitutes a

4    substantial step depends on the particular facts of the case

5    viewed in the light of the crime charged.  There is no

6    requirement that the attempt be successful or that the

7    defendant actually have carried out the crime he was trying to

8    commit.

9              The third element that the government must prove

10   beyond a reasonable doubt is that this sexual activity, if

11   completed, would violate New York law.  The indictment alleges

12   that the defendant attempted to persuade a person to engage in

13   sexual activity in violation of New York Penal Law, rape in the

14   third degree; rape in the second degree; rape in the first

15   degree; sexual abuse in the third degree; sexual abuse in the

16   second degree; and sexual abuse in the first degree.

17             A person commits rape in the third degree when he or

18   she engages in sexual intercourse with another person, the

19   other person is less than 17 years old, and the actor is 21

20   years old or older.

21             A person commits rape in the second degree when he or

22   she engages in sexual intercourse with another person, the

23   other person is less than 15 years old, and the actor is 18

24   years old or older.

25             A person commits rape in the first degree when he or

1    she engages in sexual intercourse with a person who is less

2    than 11 years old.

3           A person commits sexual abuse in the third degree when

4    he or she subjects another person to sexual contact without the

5    other person's consent.

6           A person commits sexual abuse in the second degree

7    when he or she subjects another person to sexual contact, and

8    the other person is less than 14 years old.

9           A person commits sexual abuse in the first degree when

10   he or she subjects another person to sexual contact, and the

11   other person is less than 11 years old.  A person also commits

12   sexual abuse in the first degree when he or she subjects

13   another person to sexual contact, the other person is less than

14   13 years old, and the actor is 21 years old or older.

15          Sexual contact, under New York law, means any touching

16   of the sexual or other intimate parts of a person for the

17   purpose of gratifying the sexual desire of either party.  It

18   includes the touching of the actor by the victim, as well as

19   the touching of the victim by the actor, whether directly or

20   through clothing, as well as the emission of ejaculate by the

21   actor upon any part of the victim, clothed or unclothed.

22          Under New York State law, sexual intercourse has its

23   ordinary meaning and occurs upon any penetration, however

24   slight.

25          Under New York State law, for a sexual act to be

1    criminal, it must be committed without the consent of the

2    victim.  Under New York law, lack of consent can result from an

3    incapacity to consent.  A person is deemed incapable of consent

4    under New York law when he or she is less than 17 years old.

5          Now, I've indicated to you a number of crimes in

6    violation of New York Penal Law, and I gave you the names of

7    those crimes.  You must all be in agreement as to one of those.

8    In other words, it can't be that half of you consider it one

9    crime and half of you consider it another crime; all jurors

10   must be in unanimous agreement that one of those crimes was the

11   object here.  All right?

12         The final element that the government must prove

13   beyond a reasonable doubt is that the person was actually under

14   the age of 18 or that the defendant believed the person was

15   under the age of 18.  It is not a defense to the charge that

16   the person was not in fact under 18 years old, as long as the

17   defendant believed him or her to be under 18 years old.

18         In addition to all the other elements I've described,

19   you must consider the issue of venue.  Venue is whether any act

20   in furtherance of the crime charged occurred within the

21   Southern District of New York.  The Southern District of New

22   York includes Manhattan, the Bronx, and Westchester, Rockland,

23   Putnam, Dutchess, Orange and Sullivan Counties and the bodies

24   of water and bridges over bodies of water within the boundaries

25   of Manhattan, the Bronx, Brooklyn, Queens, and Staten Island.

K3DKBRI5                         Charge

1          The government does not need to prove the crime was

2     committed in the Southern District of New York or that the

3     defendant was present here.  It is sufficient that any act in

4     furtherance of the crime charged occurred here.

5          Unlike the other elements of the crime charged, the

6     government need only prove venue by a preponderance of the

7     evidence, and not beyond a reasonable doubt.  A preponderance

8     of the evidence means that it is more likely than not that any

9     act in furtherance of the crime occurred in the Southern

10    District of New York.

11         If you find that the government failed to prove the

12    venue requirement by a preponderance of the evidence, then you

13    must find the defendant not guilty.

14         You will note that the indictment alleges that certain

15    acts occurred on or about various dates.  It is not essential

16    that the government prove that the defendant attempted to

17    entice a child on these particular dates.  The law requires

18    only a substantial similarity between the dates alleged in the

19    indictment and the dates established by the evidence.

20         The defense contends that Mr. Bright never intended to

21    entice an actual seven-year-old and/or nine-year-old to engage

22    in illegal sexual activity.  The defense contends that

23    Mr. Bright believed that he and the undercover agent were

24    engaged in age-based role play, or age play, until the agent

25    sent Mr. Bright photographs of what appeared to be children.

The defense contends that Mr. Bright met with the undercover
agent with the intent to gather evidence to report her to law
enforcement, not with the intent to engage in illegal sexual
activity with the purported children.

        The possible punishment of a defendant in the event of
conviction is not a proper consideration for the jury, and
should not, in any way, enter into or influence your
deliberations.  The duty of imposing sentence is on the Court
and the Court alone.  Your function is to weigh the evidence
and determine whether the defendant is or is not guilty on the
basis of evidence and the law.  Therefore, I instruct you not
to consider possible punishment in any way in your
deliberations in this case.

        I will allow the exhibits received into evidence to go
with you into the jury room.

        If you want to hear the recordings, send out a note,
tell me which recording you want to hear, be as specific as
possible, and we'll play that recording in the courtroom.

        If there's some testimony that you want to hear or
read back, you may ask for that testimony.  Please be as
specific as possible in the event you request to have testimony
read back.  Your request for testimony -- in fact, any
communication with the Court -- should be made in writing,
signed by your foreperson, and given to the deputy marshal
outside your jury room.

K3DKBRI5                         Charge

1          In any event, do not tell me or anyone else what the

2    vote is in the jury room until after a unanimous verdict is

3    reached.

4          Some of you have taken notes periodically throughout

5    the trial.  Notes that any of you have made may not be given

6    any greater weight or influence in determination of the case

7    than the recollections or impressions of other jurors, whether

8    from notes or memory, with respect to the evidence presented or

9    what conclusions, if any, should be drawn from such evidence.

10   Any difference between a juror's recollection and another

11   juror's notes should be settled by asking to have the court

12   reporter read back the transcript, for it is the court record

13   rather than any juror's note upon which the jury must base its

14   determination of the facts and verdict.

15         In a few moments, you will retire to decide the case.

16   It is your duty, as jurors, to consult with one another and to

17   deliberate with a view to reaching an agreement.  Each of you

18   must decide the case for himself or herself, but you should do

19   so only after a consideration of the case with your fellow

20   jurors, and you should not hesitate to change an opinion when

21   convinced that it is erroneous.  Your verdict must be

22   unanimous, but you're not bound to surrender your

23   conscientiously held beliefs concerning the effect or weight of

24   the evidence for the mere purpose of returning a verdict solely

25   because of the opinion of other jurors.  Discuss and weigh your

K3DKBRI5                          Charge

respective opinions dispassionately, without regard to

sympathy, without regard to prejudice or favor for either

party, and adopt the conclusion that in your good conscience

appears to be in accordance with the evidence and the Court's

instructions on the law.

          Please remember, you are not partisans; you are

judges – judges of the facts – not representatives of a

constituency or cause.

          If at any point you find yourselves divided, do not

inform the Court of what the vote is.  Once you have reached

the verdict, do not announce what the verdict is until I ask

you to do so in the courtroom.

          Once you get in the jury room, you must select a

foreperson who will be responsible for signing all

communications to the Court on behalf of the jury and for

handing them to the deputy marshal.  This should not be

understood to mean that an individual cannot send the Court a

note should the foreperson refuse to do so.

          There is a verdict form for you to use and to record

your decisions.  I'll have multiple copies sent in, but only

one copy gets signed to record your verdict.  And that's signed

by your foreperson and dated.

          And we'll give you an envelope --

          Flo?

          THE DEPUTY CLERK:  They have it.

K3DKBRI5                        Charge

1          THE COURT:   -- that you can put the verdict form or

2     any note in.  And in that note, or when you tell the deputy

3     marshal that you've reached a verdict and you've put it in the

4     envelope, do not say what the verdict is.  The Court will call

5     you back into the courtroom for the verdict to be read aloud in

6     open court.

7          I will stress that each of you must be in agreement

8     with the verdict that is announced.  Once your verdict is

9     announced by your foreperson in open court and officially

10    recorded, it cannot ordinarily be revoked.

11         Your function now is to weigh the evidence in this

12    case and determine whether the government has or has not proven

13    beyond a reasonable doubt the guilt of defendant Peter Bright

14    with respect to the count in the indictment.

15         You must base your verdict solely on the evidence or

16    lack of evidence in this case and these instructions as to the

17    law.  I am sure that if you listen to the views of your fellow

18    jurors and if you apply your own common sense, you will reach a

19    verdict in accordance with the evidence and the law.

20         Finally, let me state that your oath sums up your

21    duty, and that is:  Without fear or favor to anyone, you will

22    well and truly try the issues based solely upon the evidence or

23    lack of evidence and this Court's instructions as to the law.

24         Members of the jury, that concludes my instructions.

25    You may stand up and stretch while I confer with the lawyers at

K3DKBRI5                         Charge

 1  sidebar.

 2          (At the sidebar)

 3          THE COURT:  Anything from the government?

 4          MR. LI:  No, your Honor.

 5          THE COURT:  Anything from the defendant?

 6          MS. BAHARANYI:  No, your Honor.

 7          THE COURT:  All right.

 8          Thank you.  I'm going to instruct the alternates that

 9  they're still on jury duty.  They have to follow the

10  instructions that that I gave at the outset of the case, and

11  that they're subjected to recall.  Okay?

12          COUNSEL:  Thank you, Judge.

13          THE COURT:  And I've marked as Exhibit 3 the final

14  typed text of the instructions.

15          MR. LI:  Yes, your Honor.

16          (In open court)

17          THE COURT:  Ladies and gentlemen, can you please raise

18  your hand:  Juror No. 13, Juror No. 14, Juror No. 15,

19  Juror No. 16, Juror No. 17, and Juror No. 18.

20          You may put your hands down.

21          If you think I'm going to tell you that you're no

22  longer on jury duty, that's not the case.  Under the rules, you

23  are still on jury duty but you may leave now, and you may

24  resume your ordinary life.  You must continue to follow my

25  instructions, which I gave you at the outset, and all of those

K3DKBRI5                    Charge

1    instructions, including:  Do not discuss the case among

2    yourselves or with anybody.  All right?  That still applies to

3    you.  Do not do any research, because you are subject to being

4    recalled in this case, and you will be asked, under oath,

5    whether you complied with those instructions.

6              The one promise I have for you is that once a verdict

7    is reached or the jury is discharged in this case, we will call

8    you and let you know what happened.  That, I promise you, and,

9    that way, you will know that you're now released of your

10   obligation.

11             I stand in awe, I sit in awe.  I am so impressed with

12   this jury and how conscientious you all are.  I wish the rest

13   of our citizens could see how dedicated all of you have been to

14   your service.

15             At this point, we all will stand as these six jurors

16   exit the courtroom in honor of you.

17             You can leave your notebooks in the jury room, please.

18             (Alternates excused)

19             THE COURT:  Please be seated.

20             Mr. Deputy, if you'd please come forward for the

21   administration of the oath.

22             (Marshal sworn)

23             THE COURT:  Now, ladies and gentlemen, this is what

24   we're going to do:  You have more flexibility as a deliberating

25   juror in terms of your time schedule.  If I hear nothing from

K3DKBRI5                    Charge

1    you, I will bring you back into this courtroom shortly before

2    5:00 o'clock, and will say our goodbyes for the weekend.  If

3    you would like to stay beyond 5:00 o'clock, then please send a

4    note before 5:00 o'clock indicating that.  You can do it

5    shortly before 5:00 o'clock.

6            And if you would like -- when I say "if you would

7    like," I assume you would like -- a car service to your home,

8    we will endeavor to work a car service to your home.  There may

9    be some possibility that it might be to, for example, Grand

10   Central if you're taking a train, but I'm trying to get it so

11   that it would be to your home.  That's perfectly up to you,

12   whether you want to do that or not, but that would enable you

13   to stay a bit later, within reason.  All right?

14           Ladies and gentlemen, you may now discuss the case

15   among yourselves.

16           Mr. Deputy, see that the alternate jurors are out.

17           MARSHAL:  Yes, sir.

18           THE COURT:  If you'll stay there until they exit,

19   please.

20           (The jury retired to deliberate at 3:37 p.m.)

21           THE COURT:  Please be seated.

22           I say what I had said at the first trial:  The

23   lawyering in this case was exceptionally excellent,

24   professional.  The lawyers in this case acted the way members

25   of the Southern District bar should act – professional,

K3DKBRI5                          Charge

1   courteous to one another, compliant with the judge's
2   instructions.  In that sense, it was a dream trial to preside
3   over, and that's saying something when it's a retrial.  No
4   trial is a dream if it's a retrial because neither side wants
5   to do it twice, but I very much appreciate it.
6           As you know, it is my job to do what I do, and I make
7   no apology for that -- that's what I do -- but you certainly
8   all facilitated this case being presented to the jury in an
9   effective manner and in a timely manner.  So, you should be
10  very proud of that.
11          I follow the eight-minute rule, which is you have to
12  be in a position where we can get you back in the courtroom
13  within eight minutes of a note coming back.  So, that means you
14  can't go back to your offices; you have to be reachable, and I
15  think particularly for the balance of the afternoon, until we
16  know what the jury wants to do on timing, it's a good idea to
17  stay close.
18          Thank you very much.
19          MR. LI:  Thank you, your Honor.
20          (Recess pending verdict)
21
22
23
24
25

K3DKBRI5                         Charge

1          (Trial resumed at 5:06 p.m.; jury not present)

2          THE COURT:  All right. I have a note from the jury,

3    which we'll have marked as Court Exhibit 5.  I don't know if I

4    have the verdict sheet, which should be marked as Court Exhibit

5    4.

6          Do we have the verdict sheet?

7          DEPUTY CLERK:  I have it downstairs.  They were in the

8    jury room.

9          THE COURT:  Okay.  The note will be marked as Court

10   Exhibit 5, which says:  "We're done for the day.  We will

11   return on Monday."

12         And the name of the foreperson is illegible to me.

13         Bring our jurors in, please.

14         We'll mark the indictment as 6, I guess.  Here's the

15   indictment.

16         (Jury present)

17         THE COURT:  All right.  Please be seated.

18         Good afternoon, ladies and gentlemen.

19         Will the foreperson please identify themself?

20         All right.  Excellent, Juror No.  3.

21         So we have your note.  And I'm just calling you in to

22   wish you well for the weekend and to remind you of a few

23   things.  The case is now at a very sensitive stage.  When I say

24   do not discuss the case with anyone, you're going to be home

25   with your family this weekend.  You, as jurors, are the only

642

K3DKBRI5                    Charge

1    ones who have sat through this trial and heard the testimony

2    and know the evidence.  No matter how much you respect or care

3    for another loved one or a spouse or significant other, they

4    were not here.  Their opinions are not worth anything.  If you

5    had a family member or close friend who was involved in this

6    case, either at the front table or at the second table, you

7    would want jurors who followed the judge's instructions not to

8    do research, not to do your own investigation, not to talk to

9    anyone.  So please remember that and live up to your oaths.

10   You're wonderful jurors, and I know you will.

11           And we'll see you at 10:00 o'clock on Monday morning,

12   as usual.  And when you come in, flip the light on so that we

13   know that all 12 of you have arrived.  Do not begin discussing

14   the case until the last juror has arrived.  You can't begin

15   before that.  All right?

16           And my personal advice to you is when you walk out of

17   the building, take a deep breath and let it go for the weekend.

18   Put it out of your thinking.  Monday will be here soon enough,

19   all right?  So put it out of your mind.  You have enough other

20   things to think about, including laundry, and groceries, and

21   healthcare, and families, and plenty of things on your mind.

22   No baseball, no basketball, but you'll have other things, I

23   know.  And we'll see you for a prompt start on Monday morning.

24           Have a wonderful peaceful weekend.  See you then.

25           (Jury not present)

K3DKBRI5                          Charge

1            THE COURT:  And the advice I gave the jury goes for

2   all the trial participants as well.

3            Have a good weekend.

4            MR. LI:  Thank you, your Honor.

5            MR. MAIMIN:  Thank you, your Honor.

6            MS. BAHARANYI:  Have a good weekend.

7            (Adjourned to March 16, 2020, at 10:00 a.m.)

8                              * * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25