

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 30, 2020

**BY ECF**
The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Peter Bright*,
            **19 Cr. 521 (PKC)**

Dear Judge Castel:

    Peter Bright got out of a subway in Tribeca a year and a half ago thinking that his dream was going to come true: He was going to begin a sexual relationship with a seven-year-old girl and a nine-year-old boy. He had been cultivating them through their mother for just over a month. He had been explaining how he was going to ease them into sex with him. The mother sent Bright photographs of her children; Bright responded eagerly, and sent a photograph of his penis in return. This was the moment. This was what he had been working toward.

    Except it was not. In spite of the photographs and the extended dialogue between Bright and the children's mother, there were no children. The mother was not a mother at all, but rather an undercover FBI agent. And Bright would not see his fantasies come to life that day. He would be arrested instead.

    Bright exercised his right to go to trial. He even testified (as is his right), though he lied (as is not). With a straight face, Bright told the jury that he originally thought that he was engaging in a fantasy, and that the "children" would actually be adults, pretending to be children. That may have been plausible. But, he claimed, once he saw the photographs, he was repulsed by the idea of sex with children and became a vigilante — never, of course, contacting actual law enforcement authorities — determined to catch the mother in the act by … well … it was unclear. This was not plausible. In spite of overwhelming evidence, Bright told the jury and this Court that he was never actually attracted to children and showed up that sunny day in Tribeca not to have sex with children, but to stop others from committing that act. The jury did not buy it and convicted Bright of attempted child enticement, in violation of 18 U.S.C. § 2422(b).

The Government respectfully submits this letter in connection with Bright's sentencing on November 4, 2020. Bright faces a mandatory minimum term of ten years' imprisonment and a maximum of life imprisonment,[1] and the advisory United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") recommend a sentence between 30 years' and life imprisonment. Bright asks this Court to sentence him to the mandatory minimum of ten years' imprisonment. Such a sentence, however, would not fully account for the offense conduct and Bright's perjury at trial. A substantial term of imprisonment above the mandatory minimum, even if below the Guidelines range, is warranted in order to serve the goals of 18 U.S.C. § 3553(a).

## I. Bright's Offense Conduct

Between April and May 2019, Bright attempted to entice two young children — a seven-year-old girl and a nine-year-old boy — to engage in sexual activity through an undercover FBI agent purporting to be the children's mother.

On April 18, 2019, Bright messaged the mother on KinkD, an Internet application, to inquire about her profile, which sought a teacher to teach her children about "the birds and the bees." (PSR ¶ 7–8; GX 1; Tr. 32–33).[2] The mother told Bright that her "princess" was seven and her "Prince Charming" was nine. (PSR ¶ 8; GX 2A; Tr 39–40). Over the next few weeks, Bright exchanged hundreds of messages with the mother over KinkD and WhatsApp, an encrypted messaging application, to develop in detail the weekly in-person "lessons" that Bright planned for the children. (Tr. 42, 79). Bright asked about the children's prior sexual experience. (PSR ¶ 10; GX 3A at 70; Tr. 68). He suggested teaching them about the foreskin of his penis (GX 3A at 46; Tr. 56), and proposed penetrating the seven-year-old girl with a finger, toy, or his penis (PSR ¶ 10; GX 3A at 68; Tr. 67).

Not content with mere words, Bright repeatedly pressed the mother for pictures of Kayla (the seven-year-old girl) and Brayden (the nine-year-old boy). (GX 3A at 23, 28, 74; Tr. 68). When the mother sent pictures of what appeared to be actual children (GX 3A at 75–76; Tr. 69), Bright's reaction was as enthusiastic as it was swift.[3] Only

---

[1] Bright is also subject to a mandatory $100 special assessment and an additional special assessment of $5,000, pursuant to 18 U.S.C. § 3014(a).

[2] "PSR" refers to the Presentence Investigation Report revised September 22, 2020; "Tr." refers to the trial transcript; "GX" refers to the Government's exhibits at trial; "DX" refers to the defense exhibits at trial; and "Mem." refers to the defense sentencing submission dated October 23, 2020, ECF Doc. No. 96.

[3] Even Bright — who argued that he believed he was engaging in role-playing and fantasy up to this point — admitted both to the FBI and in his testimony before this Court that, the moment he saw the photos, he understood that this was not a kinky

*20 seconds* after receiving a photograph of seven-year-old Kayla, Bright responded: "She looks like a cutie." (GX 3A at 75–76; Tr. 189). The mother then sent a photo that appeared to be her preparing to perform cunnilingus on her own seven-year-old daughter, referring to it as "play time." (GX 3A at 76; Tr. at 190). Bright's reaction was not disgust but excitement: Within *27 seconds*, he responded "Oooh" and "Play time sounds fabulous." (GX 3A at 76; Tr. 69–70, 190).[4] After expressing, once again, how excited he was about the prospect of an adult mother performing sexual acts on her own seven-year-old daughter — opining "Kissing her flower, I'm sure it's beautiful" — Bright turned to the son, asking "How big a boy is Brayden?" (Ex. 3A at 77; Tr. 70). Bright immediately clarified that he was referring to Brayden's "manhood!" (GX 3A at 77; Tr. 70), and then, ten minutes later, sent a photograph of his own penis (GX 3A at 79; Tr. 71). In order to make sure that the mother did not hesitate at the possibility of exposing her children to infection, Bright also sent screenshots of his test results for sexually transmitted diseases. (GX 3O, 3I; Tr. 52–53). Bright remarked that he "greatly prefer[s] partners who are tested and clean," "[b]ecause condoms are much less fun." (GX 3A at 81). "That way," he added, "condoms can be restricted to lessons about condoms." (GX 3A at 82).

On May 17, 2019, Bright spoke with the mother by phone to plan the children's first in-person lesson. On the call, Bright confirmed that he would teach the children about his foreskin and that he hoped to return weekly. (GX 5B, 5C, 5T). Two days before the meeting, Bright, who had dispelled any possible doubt that the children were just adults engaged in sexual play-acting (GX 9-2, 9T at 6–7; *see also* Tr. 448), expressed a reasonable worry: "So my concern is, am I being set up here?" "I was struck by the fear yesterday that I'd be met by a cop or something." (GX 3A at 84; Tr. 71). The mother explained that she had had the same concern about Bright (GX 3A at 84–85; Tr. 71–72), and Bright, mollified, decided to meet on May 22, 2019. (GX 3A at 89; Tr. 72). As the meeting approached, Bright's excitement only grew: "At risk of sounding crude, I've been feeling unimaginably horny today and it has been phenomenally distracting." (GX 3A at 102). Along the way, Bright requested "more pictures of the three of you" (GX 3A at 90), and the mother obliged with two more photographs of her sleeping children (GX 3A at 115). Bright responded to each photograph in less than a minute with "What a cutie" and "Such delights." (GX 3A at 115–16).

---

game; rather, he realized that the mother was either a "scammer" or a "child molester." (Tr. 448; *see also* GX 9-2, 9T at 6–7).

[4] Bright later explained that he wanted even more explicit photos: "I must admit, I'd love to have more pictures of the three of you. The one with you kissing Kayla's thigh is thrilling, I only wish I could see what happens next!" (GX 3A at 90; Tr. 71).

Hon. P. Kevin Castel
October 30, 2020
Page 4 of 10

Shortly before the meeting, Bright messaged the mother to make sure they would be able to plan the children's "lessons," including what they would have the children do that day:

> Bright:   I was hoping we might talk a little before they got home
>
> Mother:   Ok - talk about what?
>
> Bright:   Mainly just practicalities, availability, that kind of thing.
>
> Mother:   Practicalities ?
>
> Bright:   Just, making sure we're on the same page about their lessons, that their lessons will be frequent enough, that kind of thing.
>
> Mother:   Hmmm , what do you mean frequent enough ?
>
> And same page regarding lessons ?
>
> Bright:   I think once or possibly twice a week would be my limit
>
> Mother:   Ok that works well. What are you interested in doing today with them?
>
> Bright:   Introductions, showing me what they know already. Getting familiar with each other.

(GX 3A at 129–31).

When Bright showed up to meet Kayla and Brayden and begin their lessons, he first showed the mother his online test results for sexually transmitted diseases and "talked about logistics and how often to meet." (Tr. 76). The mother, in turn, spoke with Bright about meeting her children and confirmed that he wanted to walk over to her home. (Tr. 76). As they walked to the apartment to meet the children and begin their lessons, Bright was arrested. (Tr. 76–77). Bright had four condoms at the time of his arrest, as well as an open packet of generic Viagra. (PSR ¶ 16; Tr. 221–26, 257, 316, 439; DX K, P).

## II.   Bright's Trial

On July 16, 2019, a grand jury returned an indictment charging Bright with attempted enticement of a minor to engage in sexual activity, in violation of 18 U.S.C. § 2422(b). Bright was first tried before a jury in February 2020, and testified in his own defense. The jury was unable to reach a unanimous verdict and the Court declared a mistrial.

In March 2020, Bright was retried before a new jury, again testifying in his own defense. Among other things, Bright testified that he was not "sexually attracted to children" (Tr. 335) and never "intend[ed] to entice a seven and nine-year-old to engage in sexual activity" (Tr. 334). Instead, Bright claimed that he initially believed the mother and the children were all adults engaged in "age play" (Tr. 379-80); but when he received photographs of the children on May 19, 2019, Bright testified that everything "clicked" and he decided "to play along and get some evidence, get a recording, and give that recording to law enforcement." (Tr. 449). Bright testified that "I was worried about the kids, but I had no interest in them at all." (Tr. 457). Based upon Bright's trial testimony, the defense requested, and the Court issued, a jury charge expressly conveying the theory of the defense:

> The defense contends that Mr. Bright never intended to entice an actual seven-year-old and/or nine-year-old to engage in illegal sexual activity. The defense contends that Mr. Bright believed that he and the undercover agent were engaged in age-based role play, or age play, until the agent sent Mr. Bright photographs of what appeared to be children. The defense contends that Mr. Bright met with the undercover agent with the intent to gather evidence to report her to law enforcement, not with the intent to engage in illegal sexual activity with the purported children.

(Tr. 632–33). In short, Bright testified that he was actually innocent of the crime. If he was testifying truthfully, the jury would be obliged to acquit him.

The jury did not believe Bright: On March 16, 2020, the jury returned a unanimous guilty verdict.

### III. Applicable Guidelines Range

The Probation Office calculated a total offense level of 40 — taking no position on the Government's request for a two-point enhancement for obstruction of justice — and a criminal history category of I. (PSR ¶¶ 18, 42, 45). Because Bright testified falsely at trial, a two-level enhancement for obstruction of justice is warranted, pursuant to U.S.S.G. § 3C1.1. Accordingly, Bright's total offense level is 42, which, in Criminal History Category I, returns an advisory Guidelines range of 30 years' to life imprisonment, with a mandatory minimum sentence of ten years' imprisonment.

Other than arguing that the obstruction enhancement — on which the Probation Office took no position — does not apply, Bright does not contest the calculation of the Guidelines, instead focusing on the weight that this Court should give to those Guidelines. (Mem. 5–7). Accordingly, this letter only addresses the obstruction enhancement.

Hon. P. Kevin Castel
October 30, 2020
Page 6 of 10

### A. The Jury Necessarily Found That Bright Perjured Himself; Accordingly, The Obstruction Enhancement Applies

U.S.S.G. § 3C1.1 provides for a two-level enhancement if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." The application notes specifically list, as a type of conduct to which the obstruction of justice enhancement applies, "committing, suborning, or attempting to suborn perjury." U.S.S.G. § 3C1.1, app. n. 4(B). Perjury is thus a paradigmatic example of obstruction of justice. "[A] defendant's right to testify does not include a right to commit perjury," *United States v. Dunnigan*, 507 U.S. 87, 96 (1993), and "[u]pon a proper determination that the accused has committed perjury at trial, an enhancement of sentence is required by the Sentencing Guidelines," *id.* at 98.

In order to apply an obstruction enhancement based upon perjury, a sentencing court must find that the defendant "willfully and materially committed perjury, which is the intentional giving of false testimony as to material matter." *United States v. Zagari*, 111 F.3d 307, 329 (2d Cir. 1997); *accord Dunnigan*, 507 U.S. at 94. Where "the defendant's testimony relates to an essential element of his offense, such as his state of mind . . . , the judgment of conviction necessarily constitutes a finding that the contested testimony was false. Accordingly, assuming that the evidence also persuades the sentencing judge that the defendant knew, at the time of testifying, that the statements to which he testified were untrue, a section 3C1.1 enhancement would be appropriate." *United States v. Bonds*, 933 F.2d 152, 155 (2d Cir. 1991).

In this case, Bright willfully and materially committed perjury when he testified that he did not "intend to entice a seven and nine-year-old to engage in sexual activity" (Tr. 334), and that he instead intended to "play along and get some evidence, get a recording, and give that recording to law enforcement" (Tr. 449). The jury necessarily rejected this testimony, which was reflected in the theory of the defense charge, when it convicted Bright. In other words, by finding all of the elements of the offense beyond a reasonable doubt — including that Bright "intended to persuade, induce, entice, or coerce a minor to engage in a sexual act" (Tr. 628) — the jury necessarily found that Bright's testimony that he lacked such intent to be false. Given Bright's false testimony concerned his own state of mind, it is indisputable that Bright also "knew, at the time of testifying, that the statements to which he testified were untrue." *Bonds*, 933 F.2d at 155.

This case is similar to *Bonds,* in which the Second Circuit agreed an obstruction enhancement was warranted where the defendant "denied knowing that the money

he had distributed was counterfeit." *Id.* at 155. "[B]y finding Bonds guilty of *knowingly* distributing counterfeit money, the jury necessarily determined that Bonds knew that the money he had distributed was counterfeit." *Id.* Similarly, in *United States v. Stewart,* the Second Circuit agreed that an obstruction enhancement was warranted where the defendant testified, among other things, that "she did not believe that she 'conspired with anyone to defraud the United States of America . . . .'" 686 F.3d 156, 176 (2d Cir. 2012). The Court reasoned that "the jury's findings of guilt on Count One, charging conspiracy to defraud the United States . . . required the jury to find that Stewart's actions were undertaken knowingly. The jury's findings contradicted Stewart's factual testimony to the effect that she did not engage in this conduct, or at least did not do so knowingly." *Id.* at 177. Here, as in *Bonds* and *Stewart*, Bright's testimony that he did not have the requisite state of mind is contradicted by the jury's finding that he did.

Bright resists this logical conclusion, arguing that "his testimony was consistent with the evidence the defense proffered, as well as with Mr. Bright's prior statement to law enforcement regarding his conduct." (Mem. 8). But the question is not whether Bright's defense was internally consistent. The question is whether Bright's testimony was materially false. It was, as demonstrated by the evidence this Court saw at trial, and, definitively, by the jury's verdict, which necessarily found that Bright's testimony was materially false, beyond a reasonable doubt — because, were it true, the jury would have acquitted Bright. Because Bright perjured himself, and the jury necessarily so found, this Court must apply the two-level enhancement for obstruction of justice.

## IV. Discussion

Bright's offense conduct — attempting to entice a seven-year-old girl and a nine-year-old-boy for sexual activity — is among the most serious in the United States Code. *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002) ("sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people"). Bright methodically took steps to bring his illicit fantasy to life, progressing from messages to a phone call to an in-person meeting, and he was arrested only as he was walking to the children's home. Bright argues that his behavior was less predatory than it might have been; he "never created internet profiles intending to lure children in." (Mem. 4). Yet, when he found the opportunity to engage in sexual activity with children in this case — when he saw pictures of the children and indisputably and by his own admission understood that he was not engaging in fantastic role-play, but rather was progressing toward sex with actual children — Bright embraced the opportunity with enthusiasm, showing the mother his STD tests and a photograph of his erect penis, and requesting and commenting eagerly upon photographs of the children.

Hon. P. Kevin Castel
October 30, 2020
Page 8 of 10

The particularly young age of the children in this case is also important to both Bright's culpability and the need for general and specific deterrence. As reflected in the enhancement under U.S.S.G. § 2G1.3(b)(5), children under the age of 12 are particularly vulnerable — especially where, as here, a parent is involved — and they have no meaningful ability to resist. Bright's efforts to provide sexual "lessons" to a seven-year-old girl and a nine-year-old boy therefore bear special condemnation. It is true that the children in this case were not real, and the defense posits that Bright's Guidelines range is "overly inflated due to an enhancement related to the ages of the purported children and a grouping analysis." (Mem. 15). But Bright *believed* that the children were real and that they were seven and nine years' old — and he attempted to entice them despite, or, more to the point, *because of* — their young age. That should be the measure of his culpability, and it is conduct that must be punished and deterred.[5]

Bright's perjury at trial also deserves punishment. While every defendant has the right to testify, no defendant has the right to lie. Bright's perjury "undermines the function and province of the law and threatens the integrity of judgments that are the basis of the legal system." *United States v. Alvarez*, 567 U.S. 709, 720–21 (2012) (plurality opinion). Bright's sentence should reflect the systemic danger imposed by his lying under oath to this Court and to the jury.

Bright argues for leniency on a number of grounds, at least some of which merit specific response. *First*, Bright argues that he is "not a pedophile," referring to doctors' evaluations of him based on what he told those doctors. (Mem. 3–4). But this completely ignores the fact that, in this very case, Bright enthusiastically pursued sexual relationships with two pre-pubescent children; it was pure luck that they were not real and he did not, in fact, do as he said he would do with them. To the extent that the question of whether Bright is a pedophile measures his dangerousness by asking "would he pursue a sexual relationship with a child?", the answer is simple: "He already did." *Second*, Bright argues that the fact of a mistrial is mitigating. (Mem. 4). But it is irrelevant: A jury of Bright's peers determined unanimously that he committed the crime, despite an excellent defense team. If the implication of the

---

[5] The legislative history of 18 U.S.C. § 2422 "clearly illustrates that Congress intended to impose lengthy mandatory-minimum sentences . . . specifically because the attempted sexual enticement of a minor is a very serious crime, regardless of whether there is an actual minor who is victimized." *United States v. Dobrowolski*, 406 F. App'x 11, 13 (6th Cir. 2010) ("'the offender's conduct in such a case reflects a real attempt to engage in sexual abuse of a child, and the fact that the target of the effort turned out to be an undercover officer has no bearing on the culpability of the offender, or on the danger he presents to children if not adequately restrained and deterred by criminal punishment'" (quoting H.R. Rep. No. 108–66, at 51 (2003)).

argument is that maybe Bright did not do it, the verdict says otherwise, conclusively. *Third*, Bright argues that this Court should all-but-ignore the Guidelines, in light of the Second Circuit's concerns about rote application of a different Guideline — U.S.S.G. § 2G2.2, which applies to child pornography offenses — in *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010). (Mem. 5–7).[6] But *Dorvee* concerned problems unique to Section 2G2.2. Indeed, Section 2G1.3 — to which Bright is subject — was held up by the *Dorvee* court as a *contrast* to Section 2G2.2: The court said that it was odd that a defendant sentenced under Section 2G2.2 would likely face a higher Guidelines range than a defendant who, like Bright, actually sought out sexual contact with a minor and was sentenced under Section 2G1.3. *Dorvee*, 616 F.3d at 187 & n.11; *see also, e.g., United States v. Tutty*, 612 F.3d 128, 132–33 (2d Cir. 2010) (explaining why it was troubling that a defendant subject to Section 2G2.2 would face a higher Guideline than one subject to Section 2G1.3); *cf. United States v. Vickers*, 708 F. App'x 732, 738 (2d Cir. 2017) (holding, where defendant argued that *Dorvee* rendered impermissible the "rote application" of Section 2G1.3, that *Dorvee* does no such thing and, where a Court considered all sentencing materials and relevant facts, a life sentence under Section 2G1.3 was reasonable). *Fourth*, Bright argues that he would face a sentence of 3½ to 25 years were he convicted in New York State, instead of federal court. (Mem. 17–18). The Second Circuit has counseled against such an analysis. *See United States v. Williams*, 524 F.3d 209, 215 (2d Cir. 2008).

In sum, a substantial term of imprisonment is necessary to punish and deter both Bright's criminal conduct *and* his perjury at trial. Happenstance and fortune kept children safe in this case, in spite of Bright's attempts to do otherwise. Bright had a choice of pursuing two prepubescent children or not, particularly when he saw photographs of children confirming that he was well past the boundaries of mere fantasy. A law-abiding person, a moral person, a person who did not pose a danger to society, would have made the right choice. He would have called the authorities. He would have chastised the mother. At the very least, he would have stopped. But not Bright. Bright doubled down, exclaiming how delighted he was, sending a photograph of his penis, and walking towards the children's home with four condoms in his pockets. At trial, Bright had the choice of not testifying, testifying and telling the truth, or testifying and lying. Again, he made the wrong choice. Bright demonstrated by his actions that he chooses to act in his own interest, without regard to the welfare of others or of the legal system. This Court should punish him for those actions and choices

---

[6] To be clear, while the Guidelines are advisory, they remain "not only the starting point for most federal sentencing proceedings but also the lodestar." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1346 (2016).

Hon. P. Kevin Castel
October 30, 2020
Page 10 of 10

and should send a message to others that such choices are not only wrong, but they are unacceptable.

        Respectfully submitted,

        AUDREY STRAUSS
        Acting United States Attorney for the
        Southern District of New York

By: _____
        Alexander Li
        Michael D. Maimin
        Timothy T. Howard
        Assistant United States Attorneys
        (212) 637-2265

cc: Amy Gallicchio, Esq. and Zawadi Baharanyi, Esq. (by email and CM/ECF)